UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **LUV N' CARE** | **CIVIL ACTION NO. 3:16-00777** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LINDSEY LAURAIN, ET AL.** | **MAG. JUDGE PEREZ-MONTES** |

**RULING**

This is a patent infringement case in which Plaintiff Luv n' care, Ltd. and Nouri E. Hakim (collectively, "LNC") seeks a declaratory judgment that it does not violate any existing intellectual property right of Defendant Eazy-PZ, LLC ("EZPZ"). LNC offers the expert report of Ms. Ellie Rand in support of its claims that LNC has suffered damages under the Lanham Act, and an ascertainable loss under the Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, *et seq*., ("LUTPA"). Pending before the Court is EZPZ's Sealed "Combined Motion to Partially Strike Expert Opinions of Ellie Rand and Motion for Summary Judgment" [Doc. No. 338].[1] LNC responded to the motion. [Doc. No. 378]. EZPZ filed a reply. [Doc. No. 388]. For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

**I. BACKGROUND**

LNC claims that EZPZ initiated a "campaign of threats, intimidation, and unlawful boycott [of LNC's products] based on false claims of infringement and copying." [Doc. No. 338-1 at 6]. Specifically, LNC claims that EZPZ's campaign included "extensive advertising over the internet and on social media" accusing LNC of copying EZPZ's Happy Mat and infringing on EZPZ's patent and calling for a boycott of LNC Products (hereinafter referred to as the "Social Media

---

[1] Citations to the parties' filings are to the filing's number in the docket [Doc. No.] and pin cites are to the page numbers assigned through ECF.

Campaign"). *Id.* EZPZ moves the Court to exclude the following opinions of Ms. Rand:

> (a) Ms. Rand's opinion that the alleged conduct of EZPZ resulted in damage to the reputation of LNC and/or the Nuby brand;
>
> (b) Ms. Rand's opinions regarding the reach of the negative social media campaign allegedly started by EZPZ; and
>
> (c) Ms. Rand's opinions regarding a curative marketing plan for LNC to counter the alleged damage to LNC's reputation by EZPZ.

*Id.* at 6-7.  EZPZ does not move to strike Ms. Rand's opinions regarding the marketing efforts undertaken by EZPZ to promote the EZPZ's Happy Mat prior to February 2016. *Id.* at 7 n.2.

## II.     LAW AND ANALYSIS – MOTION TO STRIKE

Fed. R. Evid. 702 provides that a witness who is qualified "by knowledge, skill, experience, training, or education," may provide opinion testimony if that testimony will assist the trier of fact and "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." The witness must possess "specialized knowledge, skill, experience, training, or education in the relevant field," in order to be qualified to express his expert opinion on the topic in issue. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1110 (5th Cir. 1991).

The Supreme Court in *Daubert* charged trial courts with the task of determining whether expert testimony under Rule 702 is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993).

> The *Daubert* opinion lists a number of factors that a trial court may use in determining an expert's reliability. Trial courts are to consider the extent to which a given technique can be tested, whether the technique is subject to peer review and publication, any known potential rate of error, the existence and maintenance of standards governing operation of the technique, and, finally, whether the method has been generally accepted in the relevant scientific community . . . . These factors

>are not mandatory or exclusive; the district court must decide whether the factors discussed in *Daubert* are appropriate, use them as a starting point, and then ascertain if other factors should be considered . . . . But the existence of sufficient facts and a reliable methodology is in all instances mandatory. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.

*Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (internal citations omitted). In other words, "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury," is not relevant to the case, and should be excluded. *Guile v. United States,* 422 F.3d 221, 227 (5th Cir. 2005) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

### A. Ms. Rand's Opinion that the Social Media Campaign Resulted in Damage to the Reputation of LNC and the Nuby Brand

EZPZ argues that Ms. Rand's opinion that the Social Media Campaign resulted in damage to the reputation of LNC and the Nuby Brand is pure speculation and is not grounded in any facts or data. [Doc. No. 338-1 at 11]. EZPZ contends that Ms. Rand's deposition testimony reveals that she never established what kind of reputation LNC or the Nuby brand had before or after the Social Media Campaign, or their current reputation. *Id.* at 11-12. EZPZ further contends that Ms. Rand admits that she does not know the impact of the Social Media Campaign on LNC or if there even was an impact. *Id.* at 12 (citing Doc. No. 338-7 at 47:7-48:17). According to EZPZ, Ms. Rand's expert opinion concerning LNC or the Nuby brand's reputation, and her opinion regarding the purported damage to LNC/Nuby's reputation following the Social Media Campaign lacks the proper basis, and therefore, should be excluded. *Id.* at 13.

As discussed in more detail below, the Court finds that Ms. Rand's deposition testimony indicates that she lacks the proper basis to opine about whether the Social Media Campaign resulted in damage to LNC/Nuby's reputation. *See, e.g., Sykes v. Napolitano*, 634 F. Supp. 2d 1, 7 (D.D.C. 2009) ("[The expert] does not provide any basis for knowing Mr. Sykes' reputation before, or after, his involuntary transfer beyond what any layperson may infer from the presentation of

evidence. Thus, this part of his 'expert' opinion is lacking in foundation, lacking in expertise, and would not assist the jury but would supplant it."). Indeed, Ms. Rand offers only conclusory, general statements about reputation, which ultimately would not assist the jury, but instead would supplant it in finding whether LNC/Nuby suffered actual reputational harm in this case.

LNC argues that the protocol implemented by Ms. Rand is based on social media attacks that are necessarily harmful and uncertain in scope due to their nature. [Doc. No. 378 at 20]. LNC further argues that the damage to LNC's reputation was pervasive and apparent as evidenced by the social media posts themselves. *Id.* According to LNC, there was no need for her to interview anyone at LNC after reviewing the sufficient facts and data presented. *Id.*

The Court disagrees. Ms. Rand's "opinion does not arise from expertise as defined in Rule 702. It is merely part of having lived. Jurors have also lived. They would not be assisted by [Ms. Rand's] opinion as to the consequences that arise from life." *Sykes*, 634 F. Supp. 2d at 8. Accordingly, Ms. Rand is precluded from testifying on whether the Social Media Campaign resulted in actual damage to the reputation of LNC and the Nuby Brand.

### B. Ms. Rand's Opinions Regarding the Reach of the Social Media Campaign

EZPZ argues that Ms. Rand's opinions regarding the reach and the engagement level of the Social Media Campaign are irrelevant and do not assist the trier of fact. [Doc. No. 338-1 at 15-16]. According to EZPZ, Ms. Rand does not have any information as to how many people actually read the comments or posts let alone how many people read the comments and then decided not to buy products from LNC. *Id.* at 16. Finally, EZPZ argues that there is too great of an analytical gap between Ms. Rand's determinations regarding the engagement levels and her conclusion that the Social Media Campaign had a "substantial reach." *Id.*

LNC responds that Ms. Rand assessed the reach of the negative social media posts in question by applying the accepted formulae used to determine the impacts of postings on the

Internet. [Doc. No. 378 at 11-16]. LNC argues that based on her expertise, research, and the sufficient facts and data in front of her, Ms. Rand concluded that LNC's Nuby brand had been damaged. *Id.*

As discussed above, Ms. Rand is precluded from testifying on whether the Social Media Campaign resulted in actual damage to the reputation of LNC and the Nuby Brand. However, Ms. Rand is not precluded from testifying as to the reach of the social media posts. EZPZ does not challenge Ms. Rand's qualifications or expertise, but instead argues that this testimony is irrelevant. The Court disagrees. Ms. Rand's Report includes the methodology employed to determine the reach of the Social Media Campaign. Indeed, Ms. Rand provides a detailed discussion and the basis for quantifying the reach of the Social Media Campaign. [Doc. No. 338 at 9-29].

To be sure, EZPZ's complaints all go to the weight the jury will give Ms. Rand's opinions and not to the admissibility of her testimony as an expert witness. *Borill v. Centennial Wireless, Inc.*, No. 6:11CV1492, 2013 U.S. Dist. LEXIS 82956, at *11 (W.D. La. June 12, 2013) ("[Q]uestions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration.") (emphasis in original) (citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996)). Accordingly, Ms. Rand is not precluded from testifying as to the reach of the social media posts.

That said, Ms. Rand is precluded from testifying about an "Invisible Audience," which she contends "refers to the people who actually saw your post versus the number of people you think saw your post." [Doc. No. 338-6 at 6]. Ms. Rand's Report does not include a methodology for determining the size and scope of the "invisible audience." Indeed, Ms. Rand's Report only

provides the conclusory statement that "[r]esearch indicates that social media posts reach more people than the poster anticipates," and refers to the following figure:



*Id.* Although Ms. Rand cites to an article in a footnote, she does not include a methodology or manner for quantifying an "Invisible Audience" as it applies to the facts in this case. Thus, any inclusion of an "Invisible Audience" is unreliable and would be unhelpful to the jury. Accordingly, Ms. Rand is precluded from testifying or referencing an "Invisible Audience." For example, Ms. Rand is precluded from testifying that one "can infer that [a] particular post reached a relatively large invisible audience," or that a metric "does not account for the invisible audience." *Id.* at 10, 16.

### C. Ms. Rand's Opinions Regarding a Curative Marketing Plan

EZPZ argues that Ms. Rand's opinions regarding what LNC needs to do to cure its reputation and the cost thereof are based on her unsupported assumption and speculation that LNC's reputation was in fact damaged and needs to be cured. [Doc. No. 338-1 at 17]. EZPZ also argues that the record is clear that Ms. Rand has no idea what LNC's current reputation is and whether or not it is still in need of repair three years after the Social Media Campaign took place.

*Id.* According to EZPZ, Ms. Rand has no information as to whether or not LNC's reputation ever needed any repair let alone whether or not it currently needs repair. *Id.*

LNC argues that the steps recommended in Ms. Rand's Report to cure the damages resulting from the Social Media Campaign are spelled out in the Report. [Doc. No. 378 at 17]. LNC contends that the heart of the program is the use of social media platforms such as Facebook and Instagram to disseminate messages to counteract the impacts of EZPZ's social media campaign. *Id.* at 17-18. LNC further contends that Ms. Rand provides a line item budget illustrating how she reached a total recommended budget for three-year curative campaign of $886,950.00. *Id.*

The Court finds that Ms. Rand should be precluded from testifying or presenting her recommended curative campaign to the jury. During her deposition, Ms. Rand explained the steps normally taken to determine if a company's reputation is in need of repair:

> Q.· · Okay.· So if a baby product company comes to you, says, "I want to hire you; I need to, you know, repair my reputation in the baby product world," what would you do to educate yourself about that world prior –
>
> A.· · Well, I would find out from the client why they think that their reputation needs repair.
>
> Q.· · How would you learn information such as, you know, who the target -- who their target audience is, what -- you know, what messaging they want to put out?· I mean, how would you gather that kind of information?
>
> A.· · Well, you start with research.· Going back to what we discussed earlier, you might do some interviews, maybe some focus groups, maybe some mystery shopping, some research, see what the conversation is about you, what are the words people are using. And then we'd also do some research or pull on some other research that's already been done about what matters to your target market.

[Doc. No. 338-7 at 31:3-23]. The record before the Court indicates that Ms. Rand was not asked to do any of these steps to determine if a curative campaign is even required. *Id.* at 13:12–17. For example, Ms. Rand testified that she did not do any of the research required, locate the data needed,

or obtain other information required to support the necessity of the recommended curative campaign. Specifically, she testified to the following:

- She indicated that she had not done any research into LNC or Nuby's reputation and did not know what LNC's reputation was with its consumers or vendors before or after the Social Media Campaign. *Id.* at 11:10-21; 20:18-21:4; 47:7-48:17.

- She indicated that she did not conduct any research into measuring LNC's reputation. *Id*. at 47:11-13.

- She indicated that she did not analyze whether or not the Social Media Campaign actually affected the reputation of LNC or Nuby. *Id*. at 47:7-48:17.

- She indicated that she did not know whether anything bad was said about LNC online or anywhere else prior to the Social Media Campaign because she did not conduct any online research to determine LNC or the Nuby brand's reputation or to determine what people's opinions were or are of LNC or the Nuby brand. *Id*. at 12:17-18:21.

- She indicated that she did not interview anyone at LNC or associated with Nuby or any of LNC or Nuby's stakeholders, partners, vendors, or consumers about LNC or Nuby's reputation. *Id*. at 12:17-18:21; 78:22-79:7.

- She indicated that she did not analyze any sales figures for LNC and that she did not know whether LNC suffered any lost sales as a result of the Social Media Campaign. *Id.* at 48:22-49:15.

Thus, Ms. Rand's recommended budget for a three-year curative campaign of $886,950.00 is purely speculative, unreliable, and would be unhelpful to the jury. Accordingly, Ms. Rand is precluded from testifying about the line items and related cost identified in her proposed budget for the three-year curative campaign.

However, because EZPZ does not challenge Ms. Rand's qualifications or expertise, the Court finds that there are two items related to the curative campaign budget that are allowable. Specifically, Ms. Rand is not precluded from testifying to the following:

- The hourly rate of $150.00 for "Reputation Management and Public Relations Fee." *Id.* at 338-3 at 49. However, Ms. Rand is precluded from testifying to the number of hours and/or total cost required or recommended for this fee because

    her testimony indicates that the estimated 80 hours per month is purely speculative.

- The cost of monitoring, which can range from $1,500 to $3,000 per month. *Id.* at 48, 49.[2] However, Ms. Rand is precluded from testifying to the number of months required or recommended for this service because her testimony indicates that the estimated 36 months is purely speculative.

To be clear, except for the two very specific items listed above, Ms. Rand is precluded from testifying about the line items and related cost identified in her budget for a three-year curative campaign of $886,950.00, which includes the section of the Report titled: "VI. Curative Campaign." *Id.* at 45-50.

### III. LAW AND ANALYSIS – MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* Fed. R. Civ. P. 56(c)(2). The Court views all evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury. . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). Likewise, the Court may not make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150.

---

[2] Ms. Rand states that "[s]ome full-service brand-monitoring solutions can run a midsize company anywhere between $1,500 - 5,000 per month." [Doc. No. 338-3 at 48] (footnote omitted). However, Ms. Rand limited the upper bound of this service to $3,000 in her recommended curative campaign budget. *Id.* at 49.

"Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1302 (Fed. Cir. 2010). "[A] dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Id.*

However, the existence of a factual dispute alone does not defeat a properly supported motion for summary judgment, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### A. Proof of Essential Elements Under the LUTPA, and Proof of Actual Damages Under the Lanham Act

EZPZ argues that LNC cannot prove an ascertainable loss under LUTPA. [Doc. No. 338-1 at 20]. EZPZ contends that LNC has failed to produce any evidence to establish lost profits, lost revenue, or a damage to LNC's reputation. *Id.* at 21. EZPZ argues that federal courts agree that the damage to a corporation's reputation or goodwill requires expert testimony. *Id.* at 22. Regarding the claim under the Lanham Act, EZPZ contends that a plaintiff seeking compensation for injury "must prove both actual damages and a causal link between defendant's violation and those damages." *Id.* at 24 (citing *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, 2017

U.S.Dist. LEXIS 54232, *5 (E.D. Tex. 2017)). According to EZPZ, LNC has failed to set forth any evidence of loss of sales, diversion of sales, loss of profits, or the loss of reputation or goodwill. *Id.*

LNC responds that even if the Court strikes Ms. Rand's opinions, LNC has other evidence of damages and an ascertainable loss sufficient to defeat EZPZ's motion for summary judgment. [Doc. No. 378 at 26]. LNC contends that its customers have stated that they will no longer purchase any LNC products as a result of the smear campaign and boycott. *Id.* LNC argues that the negative posts and the dissemination of the false Boycott Nuby graphic encouraged by Laurain and EZPZ were directed at LNC by name and were made with the sole intent of causing harm to LNC's reputation and to drive customers away from the Nuby brand. *Id.* at 27. According to LNC, a reasonable jury could find that EZPZ's smear campaign caused injury to LNC, and the amount and to what extent LNC has been injured is a question for the jury that should not be decided on summary judgment. *Id.* at 30.

In determining whether the movant is entitled to summary judgment, the court views the facts in the light most favorable to the non-movant and draws all reasonable inferences in the non-movant's favor. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F. 3d 528, 533 (5th Cir. 1997). Here, taking the facts in the light most favorable to LNC, the Court finds there are genuine issues of material fact related to the issue of an ascertainable loss under LUTPA, and actual damages under the Lanham Act. Accordingly, EZPZ's motion to dismiss LNC's claims brought under the Lanham Act and LUTPA is denied.

Regarding the cases cited by EZPZ related to LUTPA, the cases are not analogous because the plaintiffs in those cases failed to provide any evidence of harm caused by the alleged unfair

trade practices.³  Here, there are genuine issues of material fact related to the issue of an ascertainable loss under LUTPA.  Likewise, the case cited by EZPZ related to the Lanham Act do not support its assertion that it is entitled to summary judgment.⁴  Again, there are genuine issues of material fact related to the issue of actual damages under the Lanham Act.

## IV. CONCLUSION

For the foregoing reasons, EZPZ's Sealed "Combined Motion to Partially Strike Expert Opinions of Ellie Rand and Motion for Summary Judgment" [Doc. No. 338] is GRANTED IN PART and DENIED IN PART.

Monroe, Louisiana, this 31st day of August, 2020.

_____
**TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE**

---

³ *See K.P.'s Auto Sales, Inc. v. GMC*, No. 2:07 CV 031, 2007 U.S. Dist. LEXIS 62636, at *10 (W.D. La. Aug. 22, 2007) ("[T]here is no genuine issue of material fact. Because Navarre's offer was not accepted, there was no ascertainable loss and the cause of action pursuant to LUPTA has prescribed."); *Newsouth Communs. Corp. v. Universal Tel. Co.,* No. 02-2722, 2002 U.S. Dist. LEXIS 18969, at *73 (E.D. La. Oct. 4, 2002) ("[T]here is no evidence in the record that any misappropriation of NewSouth's trade secrets caused NewSouth to lose customers or employees, or to lose the Whitney Bank or Windsor Court accounts."); *Parasol Flavors, LLC v. SnoWizard, Inc.*, No. 09-3394, 2010 U.S. Dist. LEXIS 16873, at *10 (E.D. La. Feb. 25, 2010) ("Parasol and Southern Snow have not produced evidence of the existence of a genuine issue for trial on the essential element of cognizable injury or ascertainable loss."); *Chemtreat, Inc. v. Andel*, No. 03-1917, 2003 U.S. Dist. LEXIS 19333, at *9 (E.D. La. Oct. 29, 2003) ("[S]imply requesting damages is not enough to demonstrate such a loss."); *Vickers v. Interstate Dodge, Inc.*, 2004-109 (La. App. 3 Cir. 9/29/04); 882 So. 2d 1236, 1244 (Plaintiff "did not present any evidence of damages"); *Barbe v. A.A. Harmon & Co.*, 94-2423 (La. App. 4 Cir. 1/7/98); 705 So. 2d 1210, 1221 (same).

⁴ *Robroy Indus.-Texas, LLC v. Thomas & Betts Corp.*, No. 2:15-CV-512-WCB, 2017 U.S. Dist. LEXIS 54232, at *28 (E.D. Tex. Apr. 10, 2017) ("Under these circumstances, the Court concludes that a reasonable jury could find that T&B's misrepresentations caused the injuries suffered by Robroy."); *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 320 (1st Cir. 2002) (holding that there were "inconsistent positions on a crucial issue of fact" and reversed the district court's grant of summary judgment).