## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | | |
|---|---|---|
| **LUV N' CARE, LTD.** | * | **CIVIL ACTION NO. 3:16-cv-00777** |
| **Plaintiff,** | * | |
| | * | **JUDGE TERRY A. DOUGHTY** |
| **v.** | * | |
| | * | **MAGISTRATE JUDGE JOSEPH H.** |
| **LINDSEY LAURAIN, EAZY-PZ, LLC** | * | **L. PEREZ-MONTES** |
| **Defendants** | * | |
| | * | **(JURY TRIAL DEMANDED)** |

### LNC'S POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RECORD CITATIONS

Carol Welborn Reisman (La. Bar No. 20410)
George Denegre, Jr. (La. Bar No. 08387)
Carey L. Menasco (La. Bar No. 28131)
Melanie Derefinko (La. Bar No. 37658)
**LISKOW & LEWIS, APLC**
701 Poydras Street, Suite 5000
New Orleans, LA  70139
Telephone:   (504) 581-7979
Facsimile:    (504) 556-4108

Hartwell P. Morse, III (Admitted *Pro Hac Vice)*
Robert M. Chiaviello, Jr. (La. Bar # No. 37370)
**Luv n' Care, Ltd.**
3030 Aurora Street, 2nd Floor
Monroe, LA  71201
Telephone: (318) 338-3603
Facsimile:  (318) 388-5892

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INEQUITABLE CONDUCT ............................................................................. 2

   A.    FINDINGS OF FACT .................................................................. 2

      1.    Background Facts Leading Up to the Filing and Prosecution of the '682 Application ............................ 2

      2.    Chronological Order of Prosecution of the '903 Patent ........................... 11

      3.    The Non-Disclosure of Material Information ........................................... 18

         a.    Applicable Law ............................................................ 18

         b.    Mrs. Laurain and Mr. Williams Had a Deliberate and Calculated Strategy to Not Disclose Prior Art to the USPTO. .................................................. 27

            (1)    Prior Art Known From the Inception of the Idea to the July 17, 2014 Filing of the '682 Application.    27

            (2)    Prior Art Known From the Filing of the of the '682 Application to the April 13, 2015 Response to First Office Action.    35

            (3)    Prior Art Known From the Filing of the April 13, 2015 Response to First Office Action to the August 26, 2015 Response to the Second Office Action.    37

            (4)    Prior Art Known From the Filing of the August 26, 2015 Response to the Second Office Action to the December 18, 2015 Applicant Initiated Interview.    41

            (5)    Prior Art Known From the December 14, 2015 Applicant Initiated Interview Summary to the March 9, 2016 Response to the Third Office Action.    47

            (6)    Prior Art Known From the March 9, 2016 Response to the Third Office Action to the Date the Patent Issued.    61

            (7)    Prior Art Known During the Prosecution of the Related Patent Applications.    64

      4.    Mr. Williams and/or Mrs. Laurain Withheld But-For Material References From the USPTO. .................................................... 73

         a.    The Webb Publication and the Webb Patent ................................. 73

| | b. | The Tommee Tippee Mat | 81 |
| | c. | The Platinum Pets Mat | 86 |
| | d. | The Lee Single Dog Bowl Mat | 91 |
| | e. | The Momo Baby Skid-Proof Silicone Placemat | 96 |
| | f. | The Brinware Silicone Placemat | 98 |
| | g. | The Bruno Patent | 101 |
| | h. | The Hot Iron Holster | 105 |
| | i. | The CIBO Stick Anywhere Placemat | 108 |
| 5. | | Affirmative, Egregious Misconduct (Fraud Practiced or Attempted) | 110 |
| | a. | Applicable Law | 110 |
| | b. | Mrs. Laurain and Mr. Williams Submitted False Declarations to the USPTO | 113 |
| | | (1) Declarations Attesting to a Lack of Marketing or Branding Are Unmistakably False | 113 |
| | | (2) The Failure to Disclose the Relationship Between Certain Declarants and EZPZ Rendered Those Declarations False | 135 |
| | | (3) Other false statements in the declarations | 139 |
| | c. | Affirmative Egregious Misconduct - False or Misleading Statements in Arguments to the USPTO | 143 |
| | | (1) Contrary to arguments made to the USPTO, the prior art *did* include references with a mat portion creating a partial vacuum | 143 |
| | | (2) Mr. Williams and Mrs. Laurain made materially false statements about the characteristics of the Platinum Pets Mat | 145 |
| | | (3) Mr. Williams and Mrs. Laurain falsely argued to the USPTO that the alleged invention demonstrated unexpected results, when they both "honestly knew" the results were not unexpected to a material scientist or a person of ordinary skill in the art | 145 |
| | d. | Affirmative Egregious Misconduct - False and Misleading Survey | 152 |

5328032_1

|  |  | (1) | Applicable Law | 152 |
|  |  | (2) | Mrs. Laurain and Ms. Falcone Manufactured False Evidence in the Flawed and Biased Survey | 152 |
|  | e. | | Affirmative Egregious Misconduct – Alleging Competitors Who Were Copying That Contested the Validity of the '682 Application. | 164 |

6. Individuals Associated with the Filing or Prosecution of the '682 Application. ...................................................................165

7. Intent to Deceive Is the Single Most Reasonable Inference to Be Drawn From the Evidence............................................................171

    a. Applicable Law.......................................................................171

    b. Motive to Deceive...................................................................174

    c. Direct Evidence of Intent to Deceive.........................................175

|  |  | (1) | The Withholding of the Video Showing the Platinum Pets Mat Self-Sealing and Making a Suction Sound | 176 |
|  |  | (2) | The Manufacture of False Evidence through the Survey | 179 |
|  |  | (3) | The Numerous False Statements in Declarations | 179 |
|  |  | (4) | Arguing "Unexpected Results" to the USPTO When Mr. Williams and Mrs. Laurain Knew They Could Not Get a Material Scientist to Testify There Were Unexpected Results | 180 |
|  |  | (5) | Failing to Include Products in the Video That Do Exhibit Self-Sealing | 181 |

    d. An Intent to Deceive May Also be Inferred from Facts and Circumstances Surrounding the Applicant's Overall Conduct ......................................................181

|  |  | (1) | Mr. Laurain and Mr. Williams' Strategy Not to Disclose Known Prior Art to the USPTO Evidences their Intent to Deceive | 181 |
|  |  | (2) | The Numerous False Statements in the Declarations Supports the Inference that the Declarations were the Chosen Instrument of an Intentional Scheme to Deceive the USPTO. | 184 |

5328032_1

(3)     Testimony that was False, Evasive, and/or Lacks Credibility ........ 184

    (a)     Applicable Law ........ 184

    (b)     Mrs. Laurain, Mr. Williams, and Mr. Bolton Lacked Credibility on Key Matters ........ 186

         (i)     Mrs. Laurain Provided False and Evasive Testimony Concerning Her Knowledge of Prior Art References ........ 186

         (ii)     Mrs. Laurain Gave False Testimony About Her Alteration of the Hip Mommies Invoices ........ 187

         (iii)     Mrs. Laurain Threatened to Terminate the Hip Mommies Distributorship if Joseph Chua Did Not Take Action That Would Allow Him to Testify His Declaration to the USPTO Was Truthful ........ 187

         (iv)     Other False or Inconsistent Testimony, and Misrepresentations ........ 189

         (v)     No One Claimed Responsibility for the Prosecution of the '903 Patent ........ 194

         (vi)     Witnesses Gave Evasive Testimony By Claiming an Inability to Understand Simple Questions and a Lack of Recollection Even With Documents Placed Before Them ........ 195

e.     Mrs. Laurain and Mr. Williams' Evidence of Inequitable Conduct Occurring During the Prosecution of Related Patents Establishes a Pattern of Deceit. ........ 199

|       |     | (1)  | Applicable Law | 199 |
|       |     | (2)  | Improper Conduct During Prosecution of Related Applications Evidences an Intent to Deceive the USPTO | 201 |
|       | f.  |      | Intent to Deceive May Also be Inferred from Litigation Misconduct Discussed Below .................................... | 203 |

B. CONCLUSIONS OF LAW ...................................................................... 203

II. EZPZ Acted with Unclean Hands Both Before and During this Litigation such that All Claims Against LNC Should Be Dismissed ................................ 206

A. FINDINGS OF FACT ............................................................................ 206

1. Applicable Law ........................................................................ 206

2. Mrs. Laurain Testified Evasively Regarding Whether She Had Seen Dog Bowls in her Prior Art Search .......................... 209

3. EZPZ Repeatedly Blocked LNC's Efforts to Obtain Mrs. Laurain's Prior Art Search ...................................................... 213

4. EZPZ Failed to Disclose Pertinent Related Patent Applications to LNC and the Court ........................................ 216

a. EZPZ's Failure to Disclose the '403 Application Deprived LNC and the Court of Pertinent Information Regarding Claim Construction .............................. 218

b. EZPZ's Failure to Disclose the '403 Application Deprived LNC of Pertinent Invalidity Arguments ...................... 222

5. Mrs. Laurain Altered Invoices Sent to Hip Mommies During this Litigation Although She Had a Duty to Preserve Such Evidence ........................................................ 226

6. EZPZ Submitted a Fraudulent Assignment to the USPTO .................... 229

7. EZPZ and Mrs. Laurain Repeatedly Made Misrepresentations to LNC and the Court. .............................. 230

8. EZPZ's 30(b)(6) Designee Provided Misleading and False Deposition Testimony ........................................................... 234

9. EZPZ Strung LNC Along During Settlement Negotiations to File a Separate Lawsuit in Michigan ................................ 235

10. EZPZ Engaged in Pre-Litigation Business Misconduct ........................ 237

5328032_1

B.      CONCLUSIONS OF LAW ................................................................243

5328032_1

**MAY IT PLEASE THE COURT:**

Luv n' care, Ltd. and Nouri E. Hakim (collectively, "LNC"), respectfully submit their Post-Trial Proposed Findings of Fact and Conclusions of Law with Record Citations relative to the bench trial held on LNC's claims of inequitable conduct and unclean hands conducted August 25, 2021 through September 3, 2021.

As used herein, the following terms have the following meanings:

- "EZPZ" refers to Defendant Eazy-PZ, LLC.

- "D327 Patent" refers to U.S. Design Patent No. D745,327 (Trial Exhibit 936).

- "'903 Patent" refers to U.S. Patent No. 9,462,903 (Trial Exhibit 220).

- "'682 Application" refers to U.S. Patent Application No. 14/333,682, filed on July 17, 2014 (Trial Exhibit 245).

- "'955 PCT Application" refers to PCT Patent Application No. PC/US2015/011955 filed on January 20, 2015 (Trial Exhibit 814).

- "'403 Application" refers to U.S. Patent Application No. 15/700,403 filed on September 11, 2017 (Trial Exhibit 281).

- "'823 Application" refers to U.S. Patent Application No. 15/507,823 filed on March 1, 2017 (Trial Exhibit 905).

- "'976 Application" refers to U.S. Patent Application No. 16/207,976 filed on December 3, 2018 (Trial Exhibit 583).

- "'824 Application" refers to U.S. Patent Application No. 16/717,824 filed on December 17, 2019 (Trial Exhibit 582).

I.        **INEQUITABLE CONDUCT**

      A.        **FINDINGS OF FACT**

            1.        **Background Facts Leading Up to the Filing and Prosecution of the '682 Application**

1.        Lindsey Laurain graduated with an undergraduate degree in marketing and communications and subsequently received a Master's in Business Administration while she was working at Pfizer.[1]

2.        Mrs. Laurain spent the majority of her corporate business career working at Pfizer, but subsequently worked for Humana, the health insurance company she was working for when she came up with the idea for the Happy Mat.[2]   While working at Humana, Mrs. Laurain was the director of operations for two years.[3]

3.        After Mrs. Laurain and her husband, Brad, decided to create something kids can't toss or throw, Mrs. Laurain obtained a copy of "The Mom Inventor's Handbook,"[4] searched online,[5] and "ran out and purchased" various mats, bowls, and other existing art.[6]  She then began combining what she had found.  She took a photograph to document her inventive thought process.[7]

---

[1]        Dkt. No. 826-2 (Laurain 2018 Depo.), at 177:14-178:21.  *See also* Dkt. No. 834 (Transcript Volume V), at 760:13-760:15.

[2]        Dkt. No. 834 (Transcript Volume V), at 588:19-589:3.

[3]        Dkt. No. 834 (Transcript Volume V), at 589:4-589:11.

[4]        Trial Exhibit 719.  *See also* Dkt. No. 826-2 (Laurain 2018 Depo.), at 203:2-203:14.

[5]        Trial Exhibit 7, at Brenda Speer 000033-40.

[6]        Trial Exhibit 41, at PDF p. 10.

[7]        Trial Exhibit 1, at EZPZ299247-248; Dkt. No. 826-26 (Laurain June 2019 Depo.), at 67:2-68:3.

5328032_1



4.      Mrs. Laurain also obtained a silicone sample she displayed during a Blab interview with Dawn Winkelmann.[8]  However, Mrs. Laurain never disclosed this silicone sample to LNC during this litigation or to the USPTO during the prosecution of the '682 Application.[9]

5.      In March 2014, Mrs. Laurain asked Mr. Sisbarro to create a placemat and bowl combination that would suction or stick to a surface.[10]  With no other instruction, Mr. Sisbarro produced a prototype that performed as Mrs. Laurain had dreamed of – it suctioned to surfaces.[11]

6.      In April 2014, Mrs. Laurain contacted Danette Lilja, an attorney with whom her husband had previous experience.[12]  Mrs. Laurain told Ms. Lilja, that she had "done a decent amount of research on [] the patent for the product."[13]  Mrs. Laurain sent Ms. Lija documents she prepared for the trademark and patent, noting she "tried to do as much searching etc."[14]

7.      In April 2014, Ms. Lilja referred Mrs. Laurain to her colleague, Brenda Speer, a patent lawyer[15] in Colorado and the head of BL Speer and Associates, from whom Mrs. Laurain sought

---

[8]      Dkt. No. 844 (L-14); Trial Exhibit 986.

[9]      Trial Exhibit 245.

[10]     Dkt. No. 833 (Transcript Volume IV), at 430:13-430:20.

[11]     Dkt. No. 833 (Transcript Volume IV), at 430:4-430:6; 430:13-431:13; Dkt. No. 844 (L-13 and L-12).

[12]     Trial Exhibit 6.

[13]     Trial Exhibit 6; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 30:7-30:9; 30:16-31:3.

[14]     Trial Exhibit 863; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 32:5-32:17.

[15]     Trial Exhibit 14 (Ms. Speer providing patent advice).

patent advice.[16]  On April 7, 2014, Mrs. Laurain told Ms. Lilja she would be meeting with Ms. Speer "in regard to the patent."[17]

8.     Mrs. Laurain provided Ms. Speer with a document entitled "Patent Search" (hereinafter referred to as "Patent Search I").[18]  Patent Search I stated it included the "most similar" patents she found, which included the Webb Patent (United States Patent No. 8,251,340 B2).[19]  Mrs. Laurain did a bunch of "googling" to put the document together.[20]  Included in her search, was a search for "kids suction bowls."[21]  Mrs. Laurain also gave Ms. Speer a PowerPoint presentation containing a slide that featured photographs of a single dog bowl and mat featured on yankodesign.com (the "Lee Single Dog Bowl Mat") with the comment, "[t]hrough all my research, this is the only similar item 'online.'"[22]  In addition the Patent Search I and the PowerPoint presentation, Mrs. Laurain provided Ms. Speer with several printed out utility patents, which included the Webb Patent and other dog bowl mats.[23]

9.     Mrs. Laurain testified that Ms. Speer did not provide her advice about a utility patent because she only sought her advice about a design patent[24] and further denied that Ms. Speer advised her that obtaining a utility patent would not be feasible.[25]  The Court does not find Mrs.

---

[16]     Trial Exhibit 598; Trial Exhibit 8; *see also* EZPZ Trial Exhibit 1019.

[17]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 39:23-40:19.

[18]     Trial Exhibit 3.

[19]     Trial Exhibit 3.

[20]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 34:8-34:11; 34:16-34:21; 34:23-35:11; 35:13-35:19; 78:16-78:21; Trial Exhibit 3.

[21]     Dkt. No. 826-2 (Laurain 2018 Depo.), at 201:13-201:25.

[22]     Trial Exhibit 8, at Brenda Speer 000040; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 58:24-59:2; 60:15-60:24;; 61:1-61:3.

[23]     Trial Exhibit 5; Trial Exhibit 4.

[24]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 39:25-41:22.

[25]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 63:15-63:16; 63:18-63:25; 64:2-64:10; 64:12-66:6.

Laurain's testimony to be credible because it is contradicted by Mrs. Laurain's provision of printed out utility patents,[26] including the Webb Patent,[27] to Ms. Speer along with Patent Search I,[28] as well as Mrs. Laurain's e-mail to Jordan Bolton dated May 24, 2014 stating that  after reviewing Patent Search I and conducting her own search, her unnamed female attorney did not "think a utility patent would be feasible and tough to write."[29]  Neither EZPZ nor Mrs. Laurain identified any other female attorney who could have rendered such advice within that same time period.

10.     After being advised by Ms. Speer that obtaining a utility patent on the suction function of her invention would not be feasible, Mrs. Laurain turned to an attorney from Michigan, Jordan Bolton, a close personal friend[30] of Mrs. Laurain and her husband.[31]

11.     Although Mrs. Laurain denied having retained the law firm of Clark Hill, APLC ("Clark Hill") to provide utility patent advice in May and June 2014 and tried to say she only had general conversations with Clark Hill during that time frame,[32] the documentary evidence, including Clark Hill's invoices,[33] contradict her testimony.  The Court finds that Mrs. Laurain retained Mr. Bolton and one of his colleagues, Timothy McCarthy, of Clark Hill, to provide her with utility patent advice in May and June 2014.[34]  Mr. McCarthy was a Member and Senior Counsel of the

---

[26]     Trial Exhibit 5.

[27]     Trial Exhibit 4.

[28]     Trial Exhibit 3.

[29]     Trial Exhibit 19.

[30]     Dkt. No. 833 (Transcript Volume IV), at 434:7-434:16; Dkt. No. 836 (Transcript Volume VII), at 1246:11-1246:18.

[31]     Trial Exhibit 19.

[32]     Dkt. No. 834 (Transcript Volume V), at 698:21-699:3.

[33]     Trial Exhibit 23.

[34]     Trial Exhibit 19; *see also* Trial Exhibit 23.

Intellectual Property practice group of the law firm of Clark Hill.[35]  Mr. McCarthy's areas of expertise include Intellectual Property Litigation and Patents, and he concentrates his practice in the area of patents, trademarks, copyrights and trade secrets.[36]  Mr. McCarthy is registered to practice before the USPTO.[37]  Mr. McCarthy was viewed as the "subject-matter expert" with respect to USPTO matters.[38]

12.     Mrs. Laurain also shared Patent Search I with Mr. Bolton.[39]  In May 2014, Mr. Bolton advised Mrs. Laurain she would have a difficult time obtaining a utility patent because "all of the prior art" threw "up some red flags."[40]

13.     On June 1, 2014, Mrs. Laurain communicated during an "extended" call with Mr. McCarthy[41] who advised her that her invention "was not patentable" because the Platinum Pets Mat was prior art.[42]  On June 10, 2014, Mr. Bolton cautioned Mrs. Laurain about not obtaining the legal "support needed" and warned Mrs. Laurain that "the benefit of any patent will be diminished by an obviousness and prior art argument."[43]

14.     Mrs. Laurain tried to discount the early advice she received from the Clark Hill attorneys (Messrs. Bolton and McCarthy) by testifying for the first time that she had not come up with the suction function idea until a friend (whose name she claimed she couldn't remember) suggested

---

[35]     Dkt. No. 826-4 (McCarthy Depo.), at 7:2-7:4; 8:10-8:15; Trial Exhibit 718.

[36]     Trial Exhibit 718.

[37]     Dkt. No. 826-4 (McCarthy Depo.), at 12:3-12:6.

[38]     Trial Exhibit 483; Trial Exhibit 24; Trial Exhibit 502, at EZPZ-CH-008650.  *See also* Dkt. No. 826-4 (McCarthy Depo.), at 218:11-218:17.

[39]     *See* Trial Exhibit 17.

[40]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 116:4-116:14; 116:24-117:9; Trial Exhibit 24; Trial Exhibit 610.

[41]     Trial Exhibit 23.

[42]     Trial Exhibit 86; Dkt. No. 826-4 (McCarthy Depo.), at 120:10-121:19.

[43]     Trial Exhibit 621.

it to her at a social function over the Memorial Day weekend.[44]   The Court does not find Mrs. Laurain's testimony in this regard to be credible given her prior inconsistent statements in the Inspired Insider interview that she knew from the very beginning she wanted her invention to suction, and that when Mr. Sisbarro took the prototype that suctioned out of the mold, everything she had dreamed of came true.[45]   Because Mrs. Laurain admitted the PowerPoint presentation she provided to Ms. Speer in April 2014 included a picture of the prototype created by Mr. Sisbarro, the suction function idea was clearly in Mrs. Laurain's mind when she sought advice from Ms. Speer.[46]   Nevertheless, even assuming that Mrs. Laurain did not decide to pursue a patent on the "suction function" until the Memorial Day weekend, Messrs. McCarthy and Bolton were fully apprised of that fact.   According to Mr. McCarthy's billing records, Mrs. Laurain's conference with Mr. McCarthy occurred on June 1, 2014—*after* Memorial Day (May 26, 2014).[47]   Indeed, the name for the Clark Hill billing matter was Patent Suction 1-Piece Placemat & Bowl.[48]   Prior to her June 1, 2014 conference call with Mr. McCarthy, Mrs. Laurain sent an e-mail to Messrs. Bolton and McCarthy specifically stating she had done some, but not much research on the "auto suction" and "suction function" she was hoping to patent,[49] that her invention focused on the "suction function" and "not necessarily the actual mat/bowl,"[50] and the "Example Patent" she sent to them highlighted the following: "Also and most importantly the

---

[44]   Dkt. No. 833 (Transcript Volume IV), at 430:7-430:20; 433:1-433:17.

[45]   Dkt. No. 844 (L-13 and L-12).

[46]   Dkt. No. 833 (Transcript Volume IV), at 437:2-437:16; *see also* Trial Exhibit 7, at Brenda Speer 000017.

[47]   Trial Exhibit 23; Dkt. No. 826-4 (McCarthy Depo.), at 69:1-69:3, 69:18-70:22.

[48]   Trial Exhibit 23.

[49]   Trial Exhibit 603; Trial Exhibit 22.

[50]   Trial Exhibit 24; Trial Exhibit 603.   Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 87:19-87:21; 87:23-88:7.

design of the mat creates an auto suction so the mat can't be lifted off the table… The suction the mat creates could have other uses outside of this invention, therefore it is the 'technology' we are patented, the way the mat/bowl auto suctions to the surface."[51]   In direct response to Mrs. Laurain's ideas on patenting the "suction function," Mr. Bolton told Mrs. Laurain that she would have a difficult time obtaining a utility patent because "all of the prior art threw "up some red flags."[52]

15.     In an e-mail dated February 2, 2017, Zac Garthe, EZPZ's then-General Counsel, stated that "literally 10+ lawyers said [Lindsey's patent] couldn't be done."[53]   Although Mrs. Laurain attempted to deny that she went to "numerous lawyers" to obtain a utility patent,[54] Mrs. Laurain stated in the 2017 Inspired Insider interview that "numerous lawyers" thought she would be unable to get the utility patent.[55]

16.     Having been advised by Mr. McCarthy (and possibly others) that her invention "was not patentable,"[56] Mrs. Laurain retained Mr. Williams on June 30, 2014 to file her utility patent application.[57]   Mr. Williams conducted a "client intake process" which "involve[d] getting disclosures" from Mrs. Laurain because he tells his clients it is very important that they disclose any preexisting device that they think is similar to their alleged invention.[58]   Despite Clark Hill

---

[51]     Trial Exhibit 668, at EZPZ-CH-000128.

[52]     Trial Exhibit 24; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 116:4-116:14; 116:24-117:9.

[53]     Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 71:16-72:5; Trial Exhibit 250.

[54]     Dkt. No. 833 (Transcript Volume IV), at 523:12-523:22.

[55]     Dkt. No. 844 (L-26).

[56]     Trial Exhibit 86; Dkt. No. 826-4 (McCarthy Depo.), at 117:15-118:3, 119:17-121:19.   *See also* Trial Exhibit 19.

[57]     Trial Exhibit 611.

[58]     Dkt. No. 834 (Transcript Volume V), at 794:13-795:6; Dkt. No. 835 (Transcript Volume VI), at 1124:16-1124:19.

-8-

warning Mrs. Laurain about the prior art,[59] Mr. Williams testified that the prior art "was not the focus of [their] conversation"[60] and that on June 30, 2014 Mrs. Laurain did not tell him about her conversations with the Clark Hill attorneys.[61]

17.     On June 30, 2014, Mrs. Laurain provided Mr. Williams an email wherein she referred to their "'plan'" and a similar document entitled "Patent Search," which contained a list of links to the prior art she had located and which she believed were similar to her claimed invention ("Patent Search III").[62]   Patent Search III included the Lee Single Dog Bowl Mat and the Platinum Pets mat at the top of the list.[63]   Prior to trial, Mr. Williams stated under penalty of perjury in a declaration that he "failed to notice all of the attachments that were embedded between photos and did not download those attached files including her amateur search."[64]   Mr. Williams again stated when deposed in 2020 that he did not review Mrs. Laurain's patent search,[65] and he went even further at trial by claiming he did not review her e-mail containing the links to the dog bowls either.[66]   On cross-examination, Mr. Williams claimed he received the email and attachments and put them in the drawings folder with the intent to go back to the drawings folder but "I just never – never did until this started actually."[67]   Nevertheless, the evidence shows that Mr. Williams was fully aware of both the Lee Single Dog Bowl Mat and the Platinum Pets Mat and that Mrs. Laurain had found other prior art because Mr. Williams' own

---

[59]     Trial Exhibit 24; Trial Exhibit 610, Trial Exhibit 23.

[60]     Dkt. No. 835 (Transcript Volume VI), at 1115:25-1116:3.

[61]     Dkt. No. 835 (Transcript Volume VI), at 1122:5-1122:14.

[62]     Trial Exhibit 611, at BWILLIAMS002003.

[63]     Trial Exhibit 611, at BWILLIAMS002003.

[64]     Trial Exhibit 921, at ¶ 5.

[65]     Dkt. No. 826-9 (Williams 2020 Depo.), at 417:18-418:5.

[66]     Dkt. No. 834 (Transcript Volume V), at 797:7-797:16.

[67]     Dkt. No. 835 (Transcript Volume VI), at 1119:15-1119:16.

-9-

notes of his meeting with Mrs. Laurain as well as an e-mail he sent to Mrs. Laurain on August 18, 2014 reference prior art and the dog bowl mats.[68]  Specifically, his contemporaneous notes of their meeting state:  "She will send prior art refs. found, and two dog bowls extant in the art."[69] In the highly relevant e-mail dated August 18, 2014 sent early in the prosecution, Mr. Williams told Mrs. Laurain that while "the other mats (those dog bowls, etc.) [do not] exhibit the *same* 'suction function,'" he was concerned, as he thought he had "said before," that the Examiners would claim the "suction function" was "inherent to structure disclosed in additional references which, taken in combination, sustain their rejection."[70]

18.     Despite the fact that a downloadable document from the Williams Intellectual Property website[71] and a YouTube video of Mr. Williams entitled, "Prior Art Search – Best First Step," that was posted in January 2015,[72] during the prosecution of the patent, stress the importance of a prior art search prior to drafting the application in order to come up with a strategy to overcome the prior art, Mr. Williams did not perform a prior art search of his own before filing the '682 Application.[73]  Indeed Mr. Williams recognized in the YouTube video[74] and the patent process document he authored,[75] that disclosure of prior art forces the Examiner to offer an opinion on the prior art and thereby avoids unnecessary litigation challenging the validity of the patent down the road.  In his YouTube video, Mr. Williams admitted:

---

[68]     Dkt. No. 835 (Transcript Volume VI), at 1119:7-1120:7.  *See also* Trial Exhibit 29; Trial Exhibit 678.

[69]     Trial Exhibit 678.

[70]     Trial Exhibit 29 (emphasis added).

[71]     Trial Exhibit 749, at p. 10.

[72]     Trial Exhibit 829.  *See also* Dkt. No. 835 (Transcript Volume VI), at 1112:13-1114:2.

[73]     Dkt. No. 826-9 (Williams 2020 Depo.), at 430:22-431:2.

[74]     Trial Exhibit 829.

[75]     Trial Exhibit 749, at p. 10.

-10-

An inventor should always approach a registered patent practitioner first. The first step an inventor should take is a competent patent search. You want to make sure you have a shot of making a patent and devise suitable patenting strategy before you spend thousands on marketing, web development, branding, and everything else profit hungry corporations will attempt to sell you. And while no patent search is guaranteed, we can determine art, discuss prior art, develop a good strategy and file a list of references at the time of filing the utility patent application that compels an examiner at the USPTO to issue an opinion on those references, a useful thing indeed to ward off potential infringement suits down the road.[76]

## 2. Chronological Order of Prosecution of the '903 Patent.

1.  On July 17, 2014, Mr. Williams on behalf of Mrs. Laurain filed the '682 Application with the USPTO without disclosing any prior art references on an Information Disclosure Sheet ("IDS") and without disclosing any Non-Patent Literature.[77]

2.  In the Summary of the Invention, Mr. Williams asserted that the "surface contact self-sealing integrated tablwear and dining mat [] is not anticipated ,rendered obvious, suggested, or even implied by the prior art, either alone or in combination thereof."[78]

3.  On April 13, 2015, Examiner Volz issued the First Office Action. She rejected all of the pending claims as being unpatentable as anticipated or for obviousness in light of two prior art references, US Patent No. 8,684,218 ("Stravitz") and U.S. Publ. No. 2005/0056642 ("Lion").[79]

4.  Mr. Williams replied on Mrs. Laurain's behalf to the First Office Action on April 13, 2015. Just as they had done when they failed to disclose prior art references on an IDS filed at

---

[76]     Trial Exhibit 829.

[77]     Trial Exhibit 245, at LN395194-228.

[78]     Trial Exhibit 245, at LNC395199.

[79]     Trial Exhibit 245, at LNC395229-238.

the time of the original application, the response did not disclose any of the prior art references of which they were already aware.[80]

5.     In responding to the first office action, Mr. Williams argued on behalf of Mrs. Laurain that Stravitz did not have a mat, and thus no planar portion with a suffuse undersurface as disclosed in the pending claims.   Mr. Williams and Mrs. Laurain further argued that Stravitz, unlike Mrs. Laurain's alleged invention, creates a suction when pressed to a suitable surface:

> Applicant clearly sets forth that her suffuse undersurface (structure entirely lacking in Stravitz) creates "a partial vacuum when attempts to *separate the undersurface* from the underlying surface are made *except at an outer edge*" [see claim 1].   Applicant's device does not create "suction" when pressed to a suitable horizontal surface "with which suction can develop", but on the contrary, creates a partial vacuum when attempts to remove the mat are made "except at an *outer edge* of the planar portion, whereby removal of the planar portion from the underlying surface is effective only by peeling the undersurface from the underlying surface starting first *at the outer edge*".[81]

6.     Mr. Williams, on behalf of Mrs. Laurain, argued that the disclosure of a "planar portion with a suffuse undersurface" was an "unanticipated structure":

> Applicant's invention, on the other hand, by having a planar portion with a suffuse undersurface, can effect stability over an uneven underlying surface by frictional contact because the entire undersurface contacts therewith, and resists removal because the partial vacuum is created only when attempts to lift the planar portion at a position *other than at an outer edge* are effected.[82]

7.     Mr. Williams, on behalf of Mrs. Laurain, asserted that, while her device may appear to be simple, "in actual fact it displays properties not seen in the prior art, properties entirely contrary

---

[80]     Trial Exhibit 245, at LNC395243-252.

[81]     Trial Exhibit 245, at LNC395247.

[82]     Trial Exhibit 245, at LNC395248 (emphasis in original).

[to] any enablement set forth by either Stravitz or Lion, or any proposed combination of the two."[83]

8.    On July 29, 2015, the USPTO issued a second, non-final Office Action in which all pending claims were again rejected as being obvious, this time in light of U.S. Pub. No. 2003/0152736 ("Bass"), U.S. Patent No. 5,053,262 ("Kerr"), and Lion.[84]

9.    Mr. Williams' contemporaneous notes of an August 16, 2015 phone interview with the Examiner interview state: "[s]end link to videos and email with relevant disclosure definitive of this self sealing from spec informative of the claims."[85]   There is no public record in the '682 Application of the email and link to videos Mr. Williams allegedly sent to the Examiner following the August 16, 2015 interview.[86]

10.    According to Mr. Williams' contemporaneous note of another phone interview, on August 26, 2015, the Supervising Examiner, Fenn Mathew, had concerns because "rubber sheets and silicone sheets exist that stick to walls."[87]   Mr. Williams notes are not part of the public record of the prosecution of the '903 Patent in the USPTO and, thus, undisclosed to the public.[88] Nevertheless, the entry reflects what Mr. Williams' understood from a communication with Supervisor Fenn Matthews.[89]

---

[83]    Trial Exhibit 245, at LNC395251.

[84]    Trial Exhibit 245, at LNC395255-263.

[85]    Trial Exhibit 678, at BILLIWIAMS001944.

[86]    *See* Trial Exhibit 245.

[87]    Trial Exhibit 678, at BWILLIAMS001944.   Dkt. No. 826-9 (Williams 2020 Depo.), at 555:4-556:4.

[88]    *See* Trial Exhibit 245.

[89]    *See* Trial Exhibit 678, at BILLIWIAMS001944.

11.     On August 26, 2015, Mr. Williams on behalf of Mrs. Laurain filed a response to the Second Office Action.  Again, Mr. Williams did not disclose any prior art references on an IDS or otherwise to the USPTO.[90]

12.     In the August 26, 2015 response, Mr. Williams, on behalf of Mrs. Laurain, argued against the Examiners' cited prior art references [Bass and Kerr] and amended the claims to require an "entirely suffuse undersurface" and an "undersurface entirely suffuse upon the portion."[91]  Mr. Williams testified that this amendment was made to "distinguish [the '682 Application] from suction cups."[92]

13.     Mr. Williams, on behalf of Mrs. Laurain, argued that Bass "teaches" the use of adhesives as opposed to what the claimed invention required, which was "sealable contact with an underlying surface" on which the mat is disposed and creation of a partial vacuum *only* when attempts to separate the undersurface of the mat from the surface on which it is placed except at the outer edge of the mat.[93]

14.     Mr. Williams did not contest that Bass disclosed all of the non-functional limitations of the then-pending claims as asserted by Examiner Volz, except for the disclosure of the use of silicone and making "'sealable contact with an undersurface' wherein "said sealable contact creates a partial vacuum when attempts to separate the undersurface from the underlying surface are made except at an outer edge of the planar portion."[94]

---

[90]     Trial Exhibit 245, at LNC395269-277.

[91]     Trial Exhibit 245, at LNC395269-73 (emphasis in original).

[92]     Dkt. No. 835 (Transcript Volume VI), at 1084:3-1084:11.

[93]     Trial Exhibit 245, at LNC395274.

[94]     Trial Exhibit 245, at LNC395269-75.

15.     On December 9, 2015, Examiner Volz issued the Third Office Action, in which she rejected all pending claims for obviousness based solely upon the combination of Bass and Lion.[95] The rejection was made final.[96]

16.     Examiner Volz explained that Bass disclosed all of the elements of the claims, including a planar portion with an entirely suffuse undersurface, but admitted that Bass did not disclose that the planar portion was "rubberlike" or that it was made of nontoxic polymer (claim 5) or silicone (claim 9).[97]

17.     Examiner Volz cited the food enclosure shown in Lion as teaching the use of nontoxic silicone to create a vacuum seal.[98]

18.     Examiner Volz concluded "it would have been obvious … to modify Bass to include a vacuum seal and nontoxic silicone, as taught by Lion, … and sealing without losing sealable contact with the underlying surface and a flexible, durable material."[99]  Mrs. Laurain and Mr. Williams did not disclose to the USPTO the "resiliently deformable" silicone mat described in the Webb Patent.

19.     Examiner Volz again found that Bass also disclosed all of the non-functional limitations for the then-pending claims, except for the disclosure of specific material, in pending claims 2-9.[100]

20.     In response to the argument that "Bass does not disclose the claimed invention since an adhesive is included," the Examiner stated the use of adhesive "does not prevent the invention

---

[95]     Trial Exhibit 245, at LNC395301-308.

[96]     *Id.* at LNC395302.

[97]     Trial Exhibit 245, at LNC395303-306.

[98]     Trial Exhibit 245, at LNC395304-305.

[99]     Trial Exhibit 245, at LNC395305.

[100]    Trial Exhibit 245, at LNC395303-306.

-15-

from reading on the claim.  Since the invention when combined with Lion has the same material, it can be assumed the tableware will function the same way and the adhesive will only increase the attachment to the surface."[101]

21.     On December 14, 2015, Mr. Williams participated on a video conference interview with Supervisory Examiner Mathew and Examiner Volz. During that interview, the Examiners agreed that the Lion reference did not teach "the self-sealing property,"[102] but they still had not identified a silicone mat that stuck to walls to replace the Lion reference.  According to Mr. Williams' contemporaneous notes, Supervisor Matthew inquired about the properties of silicone (*i.e*., the science of the material) and was told by Mr. Williams that it was "the arrangement of the material, not the substance, that effects [*sic*] its properties."[103]  Again, these comments are not part of the public record of the of the '682 Application.[104]

22.     The Applicant-Initiated Interview Summary of the December 14, 2015 video conference stated that the Examiners agreed to withdraw the previous final rejection based on Lion, but noted that there was no agreement as to the disqualification of the Bass reference.  The interview summary concluded: "The previous final rejection has been withdrawn and the affidavit will be entered when filed."[105]

23.     In response to the Third Office Action, Mr. Williams planned to argue against Bass and provide evidence of secondary considerations of non-obviousness: commercial success and unexpected results. [106]

---

[101]     Trial Exhibit 245, at LNC395306.

[102]     Trial Exhibit 245, at LNC395312.

[103]     Trial Exhibit 691, at CC-BW-003213.

[104]     *See* Trial Exhibit 245.

[105]     Trial Exhibit 245, at LNC395312.

[106]     Trial Exhibit 692, at OMH-BW-00002163-64.

-16-

24.     On March 9, 2016, Mr. Williams filed Mrs. Laurain's response to the Third Office Action.[107]

25.     The March 9, 2016 response admitted that Bass taught a "planar portion."[108]   Mr. Williams, on behalf of Mrs. Laurain argued, however, that the Examiner had improperly assumed or implied that the integrated mat and tableware device shown in Bass would have the "self-sealing" property claimed by Mrs. Laurain if made of silicone.[109]

26.     Mr. Williams, on behalf of Mrs. Laurain argued:

> "Examiner seems to be implying that simply rendering Bass's device in the same material of Lion (i.e. a "silicone mold") would be sufficient to render the same self-sealing property claimed by Applicant?  Examiner fails to offer any teaching provided by either reference in support of this assumption, nor does she explain how such a combination of elements is meant to be effected."[110]

27.     Mr. Williams argued:

> [M]erely making a device out of silicone alone does not necessarily create the surface contact self-sealing property Applicant claims…
>
> It's worth noting for the record, that there exist a whole panoply of silicone products in the state of the art that do not effect self-sealing in the manner explicitly set forth by Applicant.  From mouse pads, placemats, and other household items, the list is extensive. For an example of prior art that is rendered of silicone but fails to perform the same self-sealing property claimed by Applicant, please see Appendix D included with this communication and the video demonstration at:
>
> https://www.youtube.com/watch?v=o4kQlQJXM8A&feature=youtu.be[111]

28.     Mr. Williams argued the Examiner's assumption was improper because she had allegedly failed to "point[] out any teaching in the references themselves" that demonstrated a "suffuse

---

[107]     Trial Exhibit 245, at LNC395437.

[108]     Trial Exhibit 245, at LNC395441.

[109]     Trial Exhibit 245, at LNC395439-440.

[110]     Trial Exhibit 245, at LNC395439.

[111]     Trial Exhibit 245, at LNC395440 (emphasis in original).

undersurface effecting creation of a partial vacuum to resist separation except by peeling action effected at an outer edge."[112]

29.    Mr. Williams, on behalf of Mrs. Laurain, described the "suffuse undersurface effecting creation of a partial vacuum to resist separation except by peeling action effected at an outer edge" as being the "novel property" Mrs. Laurain claimed to have "discovered … in setting forth the metes and bounds of her claims."[113]

30.    Mr. Williams, on behalf of Mrs. Laurain, further argued the alleged invention was nonobvious in light of secondary considerations.[114]

31.    On October 11, 2016, the '903 Patent issued.[115]

### 3.    The Non-Disclosure of Material Information

### a.    Applicable Law

1.    There are two forms of inequitable conduct:  (1) failure to disclose material information and (2) affirmative egregious misconduct.  As regards the failure to disclose material information, "[t]he first step in an inequitable conduct inquiry is determining whether the patentee failed to disclose but-for material information to the PTO."[116]

2.    The public has "a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct…"[117]

3.    A patent by its very nature is affected with the public interest.  "The public interest is best served, and the most effective patent examination occurs when, at the time an application is

---

[112]    Trial Exhibit 245, at LNC395442-444.

[113]    Trial Exhibit 245, at LNC395441.

[114]    Trial Exhibit 245, at LNC395445-452.

[115]    Trial Exhibit 220.

[116]    *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017).

[117]    *Cap Export, LLC v. Zinus, Inc*., 996 F.3d 1332, 1334 (Fed Cir. 2021).

-18-

being examined, the Office is aware of and evaluates the teachings of all information material to patentability."[118]

4.      It is well settled that patent applicants are required to prosecute patent applications "with candor, good faith, and honesty."[119]

5.      Advocacy cannot be chosen over candor.  Patent agents and attorneys who "choose advocacy over candor" risk a finding of inequitable conduct, rendering the patent invalid and unenforceable.[120]

6.      "Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."[121]

7.      37 C.F.R. § 1.56 explains that there are different ways in which information can be considered material:

> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.

8.      The Manual of Patent Examining Procedure explains that the term "information" as used in 37 C.F.R. § 1.56 "means all kinds of information required to be disclosed and includes any

---

[118]      37 C.F.R. § 1.56(a); MPEP § 2001.

[119]      *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995).

[120]      *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1331 (Fed. Cir. 2020) (affirming district court's finding of intent to deceive based in part on a "patently false' statement" in a declaration where in the law firm and the inventors "chose advocacy over candor").

[121]      *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (emphasis in original) (finding article which was not prior art to be material to enablement issue).

-19-

information which is 'material to patentability.'"[122]  In addition to prior art such as patents and publications, 37 CFR § 1.56 includes, for example, "information on enablement, possible prior public uses, sales, offers to sell, derived knowledge, prior invention by another, inventorship conflicts, and the like."[123] Information can be material to patentability if it establishes "by itself or in combination with other information, a prima facie case of unpatentability."[124]

9.      The MPEP § 2001.05 provides the following:

> The duty to disclose material information extends to information such individuals are aware of prior to or at the time of filing the application or become aware of during the prosecution thereof.  Such individuals may be or become aware of material information from various sources such as, for example, co-workers trade shows, communications from or with competitors, potential infringers, or other third parties, related foreign applications…, related litigation…and preliminary examination searches.

10.     "The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) [Filing of Information Disclosure Statement] and 1.98. [Content of Information Disclosure Statement]."[125]

11.     According to the MPEP, when in doubt, "it is desirable and safest to submit information."[126]  The USPTO warns applicants against "making and relying on their own determinations of materiality" because more disclosure "will result in a strengthened patent and will avoid later questions of materiality and intent to deceive."[127]

---

[122]    MPEP § 2001.04.

[123]    MPEP § 2001.04.  *See also Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2004) (finding article which was not prior art to be material to enablement issue).

[124]    37 C.F.R. § 1.56(b)(1).

[125]    37 C.F.R. § 1.56

[126]    MPEP § 2004(10).

[127]    MPEP § 2001.04.

12.     "Failure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional."[128]

13.     "Partial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective."[129]

14.     The applicant should "carefully examine…[t]he closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the" USPTO.[130]

15.     Patentees "who are not 'up front' with the [US]PTO run the risk that, years later, a fact-finder might conclude they intended to deceive."[131]

16.     "It may be useful to evaluate the materiality of prior art or other information from the viewpoint of whether it is the closest prior art or other information.  This will tend to put the prior art or other information in better perspective."[132]

17.     "Determining but-for materiality requires that the court place itself in the shoes of a patent examiner and determine whether, had the reference(s) been before the examiner at the time, the claims of the patent would have still issued."[133]  "In determining the materiality of a reference, the court applies the **preponderance of the evidence** standard and gives claims their

---

[128]     *Molins PLC v. Textron, Inc*., 48 F.3d 1172, 1182 (Fed. Cir. 1995).

[129]     *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1190 (Fed. Cir. 2014) (collecting cases).

[130]     37 C.F.R. § 1.56(a)(2).

[131]     *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1329-1330 (Fed. Cir. 2020) (quoting *Molins PLC v. Textron, Inc*., 48 F.3d 1172, 1178 (Fed Cir. 1995)).

[132]     MPEP § 2004.

[133]     *Regeneron v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017) (citing *Therasense*, 649 F.3d at 1291-92).

-21-

**broadest reasonable construction**."[134] "[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO."[135]  Importantly, the consideration of whether a prima facie case of unpatentability exists is made "before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability."[136]

18.    "As with an invalidity analysis, the first step in determining but-for materiality of a reference is determining the scope of the claims at issue.  Thus, the court must first determine the broadest reasonable construction of the claims that the PTO would have applied during prosecution.  Next, based on the broadest reasonable construction, the court must determine whether a reasonable patent examiner would have allowed the claims had she known of the Withheld References."[137]  "The broadest reasonable construction of a claim term is one that is consistent with 'the specification and the record evidence' and is 'consistent with the one that those skilled in the art would reach.'"[138]  If a claim term has been broadly interpreted to read on an accused device, then the same broad construction will read on the prior art.[139]

---

[134]    *Regeneron*, 864 F.3d at 1351 (citing *Therasense*, 649 F.3d at 1291–92) (emphasis added).

[135]    *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).

[136]    37 C.F.R. § 1.56.

[137]    *Regeneron*, 864 F.3d at 1351 (citing *Am. Calcar v. Am. Honda Motor*, 768 F.3d 1185, 1189 (Fed. Cir. 2014)).

[138]    *Regeneron*, 864 F.3d at 1351-52 (citing *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015), overruled on other grounds by *Aqua Products, Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017)).

[139]    *01 Communique Laboratory, Inc. v. Citrix Systems, Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) (a patent holder must "beware of what [it] asks for" since a broad claim construction for infringement may ultimately result in a determination of patent invalidity).

19.     In making the but-for materiality determination, the Court may also consider whether obviousness and/or anticipation "was an issue of concern to the [US]PTO in its consideration of the [] Patent Application."[140]

20.     To prevail on an inequitable conduct affirmative defense, the accused infringer must prove by clear and convincing evidence that the patent applicant misrepresented or omitted material information with the specific intent to deceive the Patent and Trademark Office.[141]

21.     Well-established Federal Circuit precedent holds that reexamination does not cure inequitable conduct or egregious misconduct that took place during the original prosecution of the '903 Patent.[142]

22.     Prior art 'encompasses not only the field of the inventor's endeavor but also any analogous arts.'"[143]  A prior art reference is considered analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention (even if it addresses a different problem); or (2) the reference is reasonably pertinent to the problem faced by the inventor (even if it is not in the same field of endeavor as the claimed invention).[144]

---

[140]     *Deep Fix, LLC v. Marine Well Containment Co.*, No. 18-00948, 2020 WL 773164, at *9 (S.D. Tex. Feb. 18, 2020) (finding inequitable conduct when the patent attorney "was aware" that the USPTO "was conducting an obviousness analysis" but "decided not to disclose" the "Y" references in the ISA).

[141]     *See Therasense,* 649 F.3d at 1287.

[142]     *See Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276, 1288 (Fed. Cir. 2011) (en banc) ("[I]nequitable conduct cannot be cured by reissue….or reexamination." (internal citations omitted)); *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1182 (Fed. Cir. 1995) (Although withheld references were eventually cited in and passed a reexamination proceeding, "the references were not cited when they should have been.").  *See also Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1191 (Fed. Cir. 2014) (affirming district court's finding of inequitable conduct despite the fact that the prior art undisclosed during the prosecution of the patent was disclosed during reexamination and the USPTO issued a reexamination certificate).

[143]     *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1577-78 (Fed . Cir. 1995)).

[144]     *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004); MPEP § 2141.01(a).

23.     Where "certain arguments made by [the applicant] in the course of the prosecution could not have been made had [a prior art reference] been disclosed to the PTO, the prior art reference is not cumulative."[145]

24.     A withheld reference is not cumulative and may be "highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references."[146]

25.     The accused infringer must prove that the patent applicant knew of the undisclosed reference, "knew that it was material, and made a deliberate decision to withhold it."[147]

26.     "An applicant should know information is material when the examiner repeatedly raises an issue to which the information relates."[148]

27.     Patent applicants, agents, and attorneys "cannot shirk basic, § 102(b) factual inquiry requirements,' which arise at the time of filing and continue throughout the prosecution."[149]

28.     "[A]n applicant who knew of the art or information cannot intentionally avoid learning of its materiality…"[150] Thus, "it may be found that the applicant 'should have known' of that materiality."[151]

29.     "Once an attorney, or an applicant, has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her duty to disclose."[152]

---

[145]     *Synthon IP, Inc. v. Pfizer Inc*., 472 F. Supp. 2d 760, 777 (E.D. Va. 2007).

[146]     *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co*., 204 F.3d 1368, 1374 (Fed. Cir. 2000).

[147]     *Energy Heating,* 889 F.3d at 1299 (citing *Therasense,* 649 F.3d at 1290).

[148]     *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1366 (Fed. Cir. 2007).

[149]     *Brasseler, U.S.A. I, L.P. v. Styker Sales Corp*., 267 F.3d 1370 (Fed. Cir. 2001).

[150]     *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd*., 394 F.3d 1348 (Fed. Cir. 2005) (quoting *FMC Corp. v. Manitowoc Co*., 835 F.2d 1411, 1415 (Fed. Cir. 1987).

[151]     *Id.*  (emphasis added).

-24-

30.     An inventor "cannot obviate his own duty of candor by, in essence, 'passing the buck' to his patent counsel.  Both patentees and their attorneys have an ongoing duty of candor and good faith dealing in the prosecution of patent applications…"[153]

31.     An applicant who chooses to withhold known prior art should maintain "contemporaneous evidence" to establish that the prior art was actually analyzed.[154]

32.     "The duty to disclose information, however, does not end when an applicant becomes allowed but extends until a patent is granted on that application."[155]   "Potentially material information discovered late in the prosecution should be promptly submitted.  That the issue fee has been paid is no reason to excuse for failing to submit information."[156]

33.     "An electronic publication, like any publication, may be relied upon for all that it would have reasonably suggested to one having ordinary skill in the art."[157]

34.     "A reference contains an 'enabling disclosure' if one of ordinary skill in the art could have combined the publication's description of the invention with his [or her] own knowledge to make the claimed invention."[158]

35.     A prior art reference provides an enabling disclosure and thus anticipates a claimed invention if the reference describes the claimed invention in sufficient detail to enable a person

---

[152]   *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383 (Fed. Cir. 2001).

[153]   *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (finding inequitable conduct when inventor attempted to blame his attorneys for failing to disclose material prior art).

[154]   *See McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 910 (Fed. Cir. 2007) (finding the alleged explanation for failing to disclose prior art "incredible" partially because "no contemporaneous evidence (*e.g.*, notes, records, files, etc.) was adduced at trial to show that" the prior art was "actually analyzed").

[155]   MPEP § 2001.04 (citing 37 C.F.R. 1.97(d)).

[156]   MPEP § 2004(12).  *See also* Dkt. No. 826-4 (McCarthy Depo.), at 216:1-216:6.

[157]   MPEP § 2128 (c).

[158]   *In re Donohue,* 766 F.2d 531 (Fed. Cir. 1985).  *See also* MPEP § 2121.01.

of ordinary skill in the art to carry out the claimed invention; "proof of efficacy is not required for a prior art reference to be enabling for purposes of anticipation."[159]

36.     "Even if a reference discloses an inoperative device, it is prior art for all that it teaches."[160]  Therefore, "a non-enabling reference may qualify as prior art for the purpose of determining obviousness under 35 U.S.C. 103."[161]

37.     As long as there is evidence of record establishing inherency, failure of those skilled in the art to contemporaneously recognize an inherent property, function or ingredient of a prior art reference does not preclude a finding of anticipation.[162]

38.     "A reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference would 'at once envisage' the claimed arrangement or combination."[163]

39.     A reference is no less anticipatory if, after disclosing the invention, the reference then disparages it.   The question whether a reference "teaches away" from the invention is inapplicable to an anticipation analysis.[164]

---

[159]     *Impax Labs. Inc. v. Aventis Pharm.Inc.,* 468 F.3d 1366, 1383 (Fed. Cir. 2006).

[160]     *Beckman Instruments v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed. Cir. 1989).

[161]     *Symbol Techs. Inc. v. Opticon Inc.,* 935 F.2d 1569, 1578 (Fed. Cir. 1991).

[162]     *Atlas Powder Co. v. IRECO, Inc.,* 190 F.3d 1342, 1349 (Fed. Cir. 1999).

[163]     *Kennametal Inc. v. Ingersoll Cutting Tool Co*., 780 F.3d 1376 (Fed. Cir. 2015).  It is well-recognized that "[t]he law of anticipation does not require that the reference 'teach' what the subject patent teaches… [i]t is only necessary that the claims under attack, as construed by the court, 'read on' something disclosed in the reference."  *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983), *overruled in part on other grounds*, *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1125 (Fed. Cir. 1985) (en banc).  Here, the Court must apply the same standard applied by the USPTO.  "In making this patentability determination, the court should apply the preponderance of the evidence standard and give claims their broadest reasonable construction."  *Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc).  Indeed, "the question whether a reference 'teaches away' from the invention is inapplicable to an anticipation analysis."  *Celeritas Tech., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998).

### b.    Mrs. Laurain and Mr. Williams Had a Deliberate and Calculated Strategy to Not Disclose Prior Art to the USPTO.

1.    The Court finds that Mr. Williams and Mrs. Laurain adopted a calculated strategy to disclose as little prior art to the USPTO as possible in hopes that the Examiner would not be able to find prior art that would render the pending patent claims unpatentable.  The Court's finding in this regard is supported by the following evidence.

### (1)    Prior Art Known From the Inception of the Idea to the July 17, 2014 Filing of the '682 Application.

1.    At the time Mr. Williams and Mrs. Laurain filed the '682 Application, they were both fully aware of the duty of candor and good faith owed to the USPTO during the prosecution of a patent application.[165]  Mr. Williams acknowledged the duty of candor and good faith is broader than the duty to disclose material information.[166]  Additionally, Mr. Williams admitted the first step in the patent prosecution is a prior art search[167] and that it is "best practice" to file a list of prior art references that compels an Examiner to issue an opinion on those known prior art references.[168]

---

[164]    *Celeritas Tech. Ltd. v. Rockwell Int'l Corp.,* 150 F.3d 1354, 1361 (Fed. Cir. 1998) (The prior art was held to anticipate the claims even though it taught away from the claimed invention. "The fact that a modem with a single carrier data signal is shown to be less than optimal does not vitiate the fact that it is disclosed."). *See also Upsher-Smith Labs. v. Pamlab, LLC,* 412 F.3d 1319, 1323, 75 USPQ2d 1213, 1215 (Fed. Cir. 2005) (claimed composition that expressly excluded an ingredient held anticipated by reference composition that optionally included that same ingredient); *Atlas Powder Co. v. IRECO, Inc.,* 190 F.3d 1342, 1349 (Fed. Cir. 1999) (Claimed composition was anticipated by prior art reference that inherently met claim limitation of "sufficient aeration" even though reference taught away from air entrapment or purposeful aeration).

[165]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 28:18-28:24; Dkt. No. 826-9 (Williams 2020 Depo.), at 421:21-421:23; 421:25-422:9.

[166]    Dkt. No. 826-9 (Williams 2020 Depo.), at 421:21-421:23; 421:25-422:9.

[167]    Dkt. No. 835 (Transcript Volume VI), at 1110:20-1110:25.

[168]    Dkt. No. 835 (Transcript Volume VI), at 1111:6-1112:12.  *See also* Trial Exhibit 749, at p. 10.

2.      On March 21, 2014, while working for Humana, Mrs. Laurain sent herself a link to the Lee Single Dog Bowl Mat, which was featured on the Yanko Design website.[169]

3.      In 2014, Mrs. Laurain created a PowerPoint presentation that included a slide wherein Mrs. Laurain included photographs of the Lee Single Dog Bowl Mat as well as a link to the Yanko design website and noted that at that time it was the only "similar" item she had found online.[170]

4.      In addition to finding the 2007 publication of Mr. Lee's design on the Yanko Design website, in early 2014 Mrs. Laurain also found a number of products that were similar to her claimed invention, including the Momo Baby Skid-proof Silicone Placemat, the Brinware Silicone Placemat, and the Tommee Tippee Easi-Explora Mat (the "Tommee Tippee Mat").[171] Although Ms. Laurain has suggested she was simply looking at the competitive marketplace and not thinking of these products in terms of prior art,[172] the PowerPoint slide that immediately proceeds the slides containing these products reveals the contrary and states:  "As of today … no similar products available and no exact patent (need more patent research)."[173]

5.      In conjunction with Mrs. Laurain's retention of Ms. Speer, she provided Ms. Speer with a PowerPoint presentation containing a slide that featured the photographs of the Lee Single Dog

---

[169]     Trial Exhibit 507.

[170]     Trial Exhibit 7, at Brenda Speer 000040.

[171]     Trial Exhibit 7, Trial Exhibit 8, Trial Exhibit 9; Trial Exhibit 11; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 45:8-45:12; 45:22-46:13; 47:7-47:12; 53:6-53:15; 55:12-55:20; 56:20-57:6; 57:8-57:10; 57:17-57:23; 61:4-61:10.

[172]     Dkt. No. 834 (Transcript Volume V), at 666:12-666:23.

[173]     Trial Exhibit 7, at Brenda Speer 000034.

Bowl Mat, the Yanko design website link, and the comment, "[t]hrough all my research, this is the only similar item 'online.'"[174]



6.      To create a mock-up of her alleged invention, Laurain took the bowl that was sold with the Tommee Tippee Mat and taped it to a piece of paper, thereby creating her "all-in-one" bowl and placemat (bottom left).[175]



Mrs. Laurain also created her "all-in-one" bowl and placemat by placing the Oogaa bowl on top of the Tommee Tippee Mat, which she then placed on top of the Kidkusion Gummi Mat (top

---

174      Trial Exhibit 8, at Brenda Speer 000040; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 58:24-59:2; 60:15-61:3.

175      Trial Exhibit 1, at EZPZ299247-248; Dkt. No. 826-2 (Laurain 2018 Depo.), at 203:2-203:14; Dkt. No. 826-6 (Laurain 2019 Depo.), at 67:2-68:3.

left).  She documented her thought process by taking a photograph of the three products stacked one on top of the other and placed them alongside the Tommee Tippee bowl which she taped to a piece of construction paper.[176]

7.      In April 2014, Mrs. Laurain provided Mrs. Speer with a document entitled "Patent Search" ("Patent Search I") that included a reference to the Webb Patent.[177]

8.      Mrs. Laurain provided Mrs. Speer with a printout of Webb  that was printed on March 25, 2014.[178]  Mrs. Laurain knew of the importance and significance of Webb prior to filing her application in July 2014.[179]  However, Mrs. Laurain did not discuss the Webb Patent with Mr. Williams.[180]

9.      On May 24, 2014, Mrs. Laurain told Mr. Bolton she had done "a lot of patent research"[181] on her invention and provided him with a document entitled "patentsearch.docx," that included a reference to the Webb Patent.[182]

10.     On May 24, 2014, Mrs. Laurain provided Mr. Bolton with the web address for the Yanko Design website on which the Lee Single Dog Bowl Mat was featured, asked him to "check out" the link, and admitted that the Lee Single Dog Bowl Mat was the most similar product she had found.[183]  Mr. Bolton had knowledge of the Lee Single Dog Bowl Mat, and he testified that he "believe[s]" he communicated with Mr. McCarthy about the Lee Single Dog Bowl Mat, but does

---

[176]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 67:3-68:3.

[177]    Trial Exhibit 598, Trial Exhibit 3.

[178]    Trial Exhibit 4; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 35:20-35:22; 36:11-36:16; 36:18-38:5; 38:7-38:20.

[179]    Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 35:23-36:1.

[180]    Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 171:11-171:13.

[181]    Trial Exhibit 19.

[182]    Trial Exhibit 17.

[183]    Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 68:18-68:22; Trial Exhibit 19.

not recall the specifics of the communication, when it took place, or whether Mr. McCarthy said it should be disclosed to the USPTO.[184]

11.     On May 26, 2014 Mrs. Laurain provided both Mr. Bolton and Mr. McCarthy with a document entitled "Patent Search" containing a list of links to the prior art she had located and which she believed were similar to her claimed invention.  This Patent Search (hereinafter referred to as "Patent Search II") had the Lee Single Dog Bowl Mat added at the top of the list, a link to the Platinum Pets Mat under "other similar products (on amazon), the Webb Patent and the Webb Publication (US2008/0245947), which was also added.[185]

12.     On May 29, 2014, Mrs. Laurain emailed Mr. Bolton and Mr. McCarthy stating the following:  "So.....you aren't going to believe this, guess what I just found! http://www.promotionalgiftwholesale.com/custom-silicone-pet-dog-mat-with-feed-bowlcombo_1105294291/inquiry#tabs-content I seriously was going to do a similar product for dogs! Now I can just get it whole sale :)"[186]  This link contained an advertisement for the Platinum Pets Double Dog Bowl Mat.[187]

---

[184]     Dkt. No. 826-3 (Bolton Depo.), at 49:23-50:8.

[185]     Trial Exhibit 20; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 91:14-92:7.

[186]     Trial Exhibit 24; Dkt. No. 826-7 (Laurain 2020 Depo.), at 30(b)(6) 109:8-109:21.

[187]     Trial Exhibit 87.

-31-



13.     Mr. Bolton told Mrs. Laurain she would have a difficult time obtaining a utility patent because "all of the prior art" threw "up some red flags."[188]

14.     Mr. McCarthy told Mrs. Laurain that "her product was not patentable because the dog mat is prior art.  Even if it was sold only in China."[189]

15.     In the EZPZ June 2014 Business Plan, EZPZ recognized the Momo Baby Skid-proof Silicone Placemat as a competitor, just as Mrs. Laurain had done in the PowerPoint she provided to Ms. Speer wherein she pointed out the competitor information that was available "[a]s of today."[190]

16.     On June 30, 2014 Mrs. Laurain provided Mr. Williams a similar patent search  ("Patent Search III") (containing a list of links to the prior art she had located and which she believed were similar to her claimed invention, including the Lee Single Dog Bowl Mat, a link to the

---

188     Trial Exhibit 24; Trial Exhibit 610.

189     Trial Exhibit 86.

190     Trial Exhibit 7, at Brenda Speer 000034; Trial Exhibit 36, at EZPZ0291917.

Platinum Pets Mat, the Webb Patent, and the Webb Publication.[191]  The body of the email also included links to the Lee Single Dog Bowl Mat and the Platinum Pets Mat.[192]  In that same email, Mrs. Laurain outlined the "summary of [their] 'plan.'"[193]

17.  Unlike as she had done with Ms. Speer,[194] Mrs. Laurain did not disclose the Momo Baby Skid-proof Silicone Placemat, the Tommee Tippee Mat, or the Brinware Silicone Placemat, disclosing only the Skip Hop Plate, which she noted was made of "plastic."[195]

18.  Although Mr. Williams testified that he did not disclose the Lee Single Dog Bowl Mat to the USPTO because it was "non enabling,"[196] Mr. Williams failed to provide any contemporaneous notes[197] regarding his decision to withhold the Yanko design website describing the Lee Single Dog Bowl Mat from the USPTO.  Additionally, the images show an integrated placemat and bowl, and a planar portion surrounding the bowl that appears to be flat, without suction cups or any other feature that would secure the mat to the undersurface.[198]  The Yanko publication further states that the shape of the placemat "creates a suction."[199]

---

[191]    Trial Exhibit 611, at BWILLIAMS002003.

[192]    Trial Exhibit 611.

[193]    Trial Exhibit 611.

[194]    Trial Exhibit 7.

[195]    Dkt. No. 826-9 (Williams 2020 Depo.), at 453:22-454:1; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 171:8-171:10; Trial Exhibit 611, at BWILLIAMS001967 and BWILLIAMS001970.

[196]    Dkt. No. 835 (Transcript Volume VI), at 1162:9-1163:10.

[197]    *See McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 910 (Fed. Cir. 2007) (finding the alleged explanation for failing to disclose prior art "incredible" partially because there is "no contemporaneous evidence (*e.g.*, notes, records, files, etc.) was adduced at trial to show that" the prior art was "actually analyzed").

[198]    Trial Exhibit 698.

[199]    Trial Exhibit 698.

19.     Notwithstanding that Mrs. Laurain had received legal advice from Ms. Speer that a utility patent was not feasible,[200] from Mr. Bolton that there were "red flags" in the prior art,[201] and from Mr. McCarthy that her invention was not patentable because the Platinum Pets Mat was prior art,[202] and further notwithstanding that Mr. Williams had advised Mrs. Laurain to list any prior art she was aware of,[203] Mrs. Laurain reviewed the filing of the '682 Application[204] and accepted Mr. Williams' strategy to not disclose any prior art of which she was aware.

20.     Despite having knowledge of the Tommee Tippee Mat, the Momo Baby Skid-proof Silicone Placemat, the Brinware Silicone Placemat, the Webb Patent, the Webb Publication, the Platinum Pets Mat and the Lee Single Dog Bowl Mat, Mrs. Laurain failed to file an IDS and purposefully withheld all of this prior art from the USPTO at the time of filing the '682 Application.

21.     Despite having knowledge of the Platinum Pets Mat and the Lee Single Dog Bowl Mat (and his admitted acknowledgement as to the significance of these prior art references discussed below),[205] Mr. Williams failed to file an IDS and purposefully withheld this prior art from the USPTO at the time of filing the '682 Application.  Mr. Williams represented to the USPTO that the alleged invention is not "anticipated, rendered obvious, suggested or even implied by prior art, either alone or in combination thereof."[206]   In an effort to avoid this misrepresentation, Mr.

---

[200]     Trial Exhibit 19.

[201]     Trial Exhibit 24.

[202]     Trial Exhibit 86;  Dkt. No. 826-4 (McCarthy Depo.), at 117:15-118:3, 119:17-121:19.

[203]     Dkt. No. 826-9 (Williams 2020 Depo.), at 414:18-414:20; 414:22-415:8.

[204]     Dkt. No. 826-7 (Laurain 2020 Depo.), at 188:7-188:22; Dkt. No. 835 (Transcript Volume VI), at 1134:8-1134:15.

[205]     *See* Section I.A.3.b.2., at ¶ 1 *infra*; Trial Exhibit 29.

[206]     Trial Exhibit 245, at LNC395199; Dkt. No. 835 (Transcript Volume VI), at 1134:16-1135:11.

5328032_1

Williams' claimed this was simply "boilerplate language"[207] he adopted from prior filings even though the Williams Intellectual Property "Overview of the Patenting Process" states that each application is written "by hand" and not "cut and past[ed]."[208]

22.    The Court therefore finds that Mrs. Laurain and Mr. Williams adopted  an overall strategy of not disclosing any prior art references to the USPTO when they filed the '682 Application.  The Court further finds that Mr. Williams and Mrs. Laurain's conduct, from the outset,  fell far short of the disclosure obligations required by 37 C.F.R. 1.56.

> **(2)    Prior Art Known From the Filing of the of the '682 Application to the April 13, 2015 Response to First Office Action.**

1.    On August 18, 2014, Mr. Williams told Mrs. Laurain that although "the other mats (those dog bowls, etc.)" did not "exhibit the same 'suction function'" he was "concern[ed]" that the USPTO will "try to claim that feature as inherent to structure disclosed in additional refences which taken in combination, sustain their rejection."[209]   Notwithstanding Mr. Williams' concern and obvious recognition of the materiality of these references to patentability of the pending claims, Mr. Williams and Mrs. Laurain continued with their "strategy" and did not disclose the Lee Single Dog Bowl Mat or the Platinum Pets Mat to the USPTO at this time.

2.    The Court finds that Mr. Williams and Mrs. Laurain purposefully failed to disclose the Lee Single Dog Bowl Mat and the Platinum Pets Mat to the USPTO which, as recognized by Mr. Williams, could sustain a rejection to the patentability of the pending claims of the '682 Application.[210]

---

[207]    Dkt. No. 835 (Transcript Volume VI), at 1134:20-1135:11.

[208]    Trial Exhibit 749, at p. 11.

[209]    Trial Exhibit 29.

[210]    Trial Exhibit 29.

3.      On January 21, 2015, Dawn Winkelmann emailed Mrs. Laurain the Grommet article and video of the CIBO "stick anywhere" Placemat.[211] Mrs. Laurain admitted she had seen the CIBO Stick Anywhere Placemat at least as early as January 2015.[212] Mrs. Laurain further admitted that the CIBO placemat falls within the "tableware arts" because it is a placemat.[213] Although Mrs. Laurain denied ever thinking the CIBO Stick Anywhere Placemat was "so close" to her invention,[214] the contemporaneous evidence establishes that both Mrs. Laurain and Mrs. Winkelmann recognized this product as "similar" and "so close" to the Happy Mat.[215]

4.      As early as April 13, 2015, Mr. Williams was anticipating an obviousness rejection from the USPTO and notified Mrs. Laurain that "[c]ommercial success is a secondary consideration against obviousness rejections" such that they should start getting sales statistics together.[216] In this same email, Mr. Williams recognized that the "bureaucrats" at the USPTO are "overworked,"[217] and it is apparent that Mr. Williams and Mrs. Laurain tried to take advantage of the overworked and inexperienced Examiner[218] in connection with their strategy of nondisclosure.

5.      Despite Mrs. Laurain's knowledge of several prior art references, including the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Platinum Pets Mat (which Mr. McCarthy had advised her rendered her invention unpatentable),[219] the Tommee Tippee Mat, the

---

[211]    Trial Exhibit 932.

[212]    Dkt. No. 833 (Transcript Volume IV), at 403:2-403:4.

[213]    Dkt. No. 833 (Transcript Volume IV), at 403:5-403:7.

[214]    Dkt. No. 833 (Transcript Volume IV), at 406:8-406:11.

[215]    Trial Exhibit 934.

[216]    Trial Exhibit 920.  *See also* Dkt. No. 833 (Transcript Volume IV), at 411:1-411:10.

[217]    Trial Exhibit 920, at EZPZ301007.

[218]    Trial Exhibit 920.

[219]    Trial Exhibit 86; Dkt. No. 826-4 (McCarthy Depo.), at 117:15-118:3, 119:17-121:19.

Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, and the CIBO Stick Anywhere Placemat, Mrs. Laurain approved of Mr. Williams' strategy and response to the first office action that again failed to disclose any of the prior art references of which she was aware.

6.      Despite having knowledge of the Platinum Pets Mat and the Lee Single Dog Bowl Mat, and recognizing the USPTO could sustain a rejection in light of these prior art references, Mr. Williams failed to file an IDS and again failed to disclose any prior art references in response to the USPTO's first office action.

7.      Despite the additional knowledge described above, Mrs. Laurain and Mr. Williams continued to implement their strategy of not disclosing any prior art references to the USPTO when they filed the April 13, 2015 response to the first office action.

8.      On January 20, 2015, Mr. Williams, on behalf of Mrs. Laurain, filed the '955 PCT Application with the same drawings, written specifications and claims set forth in the originally filed '682 Application claiming priority to the July 17, 2014 filing of the '682 Application that issued as the '903 Patent.[220]  The USPTO was named as the receiving office.[221]

> **(3)      Prior Art Known From the Filing of the April 13, 2015 Response to First Office Action to the August 26, 2015 Response to the Second Office Action.**

1.      On May 4, 2015, in connection with EZPZ's '955 PCT Application the International Searching Authority ("ISA") issued its International Search Report ("Report") and a separate Written Opinion of the ISA ("Written Opinion") identifying the Webb Publication as a "Y" reference along with two other prior art references: U.S. Patent 5,180,132 (Pearson et al.) and U.S. Patent No. 2,545,733 (Hatfield) meaning "the claimed invention cannot be considered to

---

[220]     Trial Exhibit 814, at PDF pp. 67-101.  Dkt. No. 835 (Transcript Volume VI), at 1141:12-1141:22 (Williams agrees).

[221]     *See id.*

involve an inventive step when  the document is combined with one or more such documents, such combination being obvious to a person skilled in the art."[222]  Mr. Williams and Mrs. Laurain were both aware of the ISA Report and the Written Opinion.[223]

2.  Despite Mrs. Laurain's knowledge of several prior art references, including the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Platinum Pets Mat, the Tommee Tippee Mat, the Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, the CIBO Stick Anywhere Placemat, and now the ISA's findings relating to the Webb Patent and Webb Publication, Mrs. Laurain approved of Mr. Williams' strategy and response to the second office action that again, failed to disclose any prior art references of which she was aware and failed to disclose the ISA Report and Written Opinion.

3.  Despite having knowledge of the Platinum Pets Mat and the Lee Single Dog Bowl Mat, and now the ISA's findings relating to the Webb Patent and Webb Publication in the '955 PCT Application, Mr. Williams failed to file an IDS and again failed to disclose any of these prior art references in response to the USPTO's second office action.

4.  Mr. Williams, later on June 9, 2016, told Mrs. Laurain, Mr. Bolton, and Mrs. Falcone that he had a "fairly solid argument" to prevail over the prior art cited by the ISA in the Report, which included the Webb Patent and Webb Publication.[224]  Yet, Mr. Williams was well aware of his disclosure obligations at the USPTO[225] which contemplate that the USPTO must be given the opportunity to evaluate arguments related to prior art references in order to avoid a challenge to

---

[222]  Trial Exhibit 864; Trial Exhibit 527; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 237:15-237:23; 237:25-238:2; 238:3-238:23; 246:14-246:19.

[223]  Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 246:14-246:19; Dkt. No. 826-9 (Williams 2020 Depo.), at 528:14-528:20; Dkt. No. 835 (Transcript Volume VI), at 1140:24-1141:4.

[224]  Trial Exhibit 194.

[225]  Dkt. No. 826-9 (Williams 2020 Depo.), at 414:18-415:4; 416:14-416:24; 421:21-422:9.

the patent by accused infringers.[226]   Mr. Williams' own YouTube video notes that prior art should be disclosed to the USPTO because it "compels an examiner at the USPTO to issue an opinion on those references."[227]   The Court finds that having an "argument" does not satisfy Mr. Williams' duty of disclosure to the USPTO under Rule 1.56 and *Therasense*.  Rule 1.56 makes plain that prior art cited in search reports of a foreign patent office in a counterpart application should be disclosed to the USPTO.[228]  As testified by Marc Hubbard, LNC's expert, a member of the Patent Bar and a former Professor at Southern Methodist University Law School,[229] the results of an ISA Report must be disclosed to the USPTO.[230]  The Court therefore finds that Mr. Williams, who admitted to being familiar with the requirements of Rule 1.56, and who admitted that the Manual of Patent Examining Procedure ("MPEP") is black letter law,[231] breached the duty of candor and good faith in failing to disclose the ISA Report and Written Opinion to the USPTO during prosecution of the '682 Application.  At trial Mr. Williams offered a post hoc possible interpretation of Rule 1.56 for not disclosing the prior art cited in the ISA Report and Written Opinion claiming "[t]he international phase of a PCT Application is not ***necessarily*** a foreign filing"[232] and supposedly based upon "reading of the law at that time, [he] did not think

---

[226]   Dkt. No. 832 (Transcript Volume III), 330:3-330:19.  In fact, Mr. Williams agreed that you should try "to get as much on the record" as you can "to show the state of the art with relevant references."  Dkt. No. 834 (Transcript Volume V), at 856:3-856:4. *See also* Trial Exhibit 829 (Mr. Williams noting that prior art searches "compels an examiner at the USPTO to issue an opinion on those references, a useful thing indeed to ward of potential infringement suits down the road").

[227]   Trial Exhibit 829.

[228]   37 C.F.R. § 1.56(a)(1).

[229]   Trial Exhibit 994; Dkt No. 832 (Transcript Volume III), at 205:7-205:10.

[230]   Dkt. No. 832 (Transcript Volume III), at 213:3-216:4.

[231]   Dkt. No. 835 (Transcript Volume VI), at 1105:17-1105:22.

[232]   Dkt. No. 835 (Transcript Volume VI), at 1050:16-1050:22 (emphasis added).

that the USPTO constituted a foreign filing."[233]   EZPZ offered no contemporaneous notes to support his alleged rationale to identify the law he allegedly relied upon for this position. Additionally, Mr. Williams blamed his mis-reading of Rule 1.56's requirement because he claimed "[i]t's not a clear sentence without the benefit of a senior practitioner to turn to to ask anyway."[234]   The problem with Mr. Williams's testimony is that he *did* have a senior practitioner to turn to – the Clark Hill attorneys – and in fact, the documentary evidence reveals he did discuss the ISA Report and Written Opinion with Mr. Bolton.[235]   Mr. Williams later described the '955 PCT Application as "the international application," suggesting he knew full well that the PCT Application was a foreign proceeding.[236]   Moreover, Mr. Williams overlooks other language in Rule 1.56(a)(2) which provides that the applicant should also carefully examine the "closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentability defines, to make sure that material information contained therein is disclosed to the Office."   Given the ISA Report's characterization of Webb as a Y reference,[237] Mr. Williams and Mrs. Laurain should have disclosed Webb for this reason as well.  Mr. Williams excuses for not disclosing the Report and Written Opinion in the '682 Application are not credible.

5.      Despite obtaining knowledge of the ISA's Report and Written Opinion and the prior art references cited therein, Mrs. Laurain and Mr. Williams continued to implement a purposeful

---

[233]    Dkt. No. 835 (Transcript Volume VI), at 1045:3-1045:5.

[234]    Dkt. No. 835 (Transcript Volume VI), at 1051:6-1051:8.

[235]    Trial Exhibits 115, 116, and 194.  Of course, Mr. Bolton claimed not to recall that conversation. Dkt. No. 826-3 (Bolton Depo.), at 162:9-162:25.

[236]    Dkt. No. 835 (Transcript Volume VI), at 1055:6-1055:7.

[237]    Trial Exhibit 864.

strategy of not disclosing any prior art references to the USPTO when they filed the August 26, 2015 response to the second office action.

**(4)     Prior Art Known From the Filing of the August 26, 2015 Response to the Second Office Action to the December 18, 2015 Applicant Initiated Interview.**

1.      By August 26, 2015, Mr. Willliams and Mrs. Laurain knew that the supervising Examiner, Fenn Matthew, had concerns about "rubber sheets and silicone sheets…that stick[] to walls."[238]  Thus, even if Mrs. Laurain was unaware that the Brinware Silicone Placemat, the Tommee Tippee Mat, and the Momo Baby Skid-proof Silicone Placemat were material at the time of filing the '682 Application, their materiality was established when the Examiner was looking for a prior art reference for silicone sheets that stick to walls.  Yet, Mrs. Laurain still failed to disclose the Tommee Tippee Mat, the Momo Baby Skid-proof Silicone Placemat, or the Brinware Silicone Placemat to Mr. Williams[239] or to the USPTO[240] during the prosecution of the '682 Application.  Additionally, Mr. Williams knew that Claim 11 of the Webb Patent specifically and expressly claimed formation of a partial vacuum where the "support surface" was not only horizontal, but also "vertical."[241]

2.      On September 14, 2015, Mrs. Laurain sent Mr. McCarthy, Mr. Bolton, and Mr. Williams EZPZ's "IP Summary" prepared by Mr. Williams[242] that was going to be provided to a prospective purchaser.[243]   The IP Summary noted the ISA Report and Written Opinion was mailed to the International Bureau on May 4, 2015, to which informal comments were entered

---

[238]     Trial Exhibit 678, at BWILLIAMS001944.

[239]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 171:8-171:10; Dkt. No 826-9 (Williams 2020 Depo.), at 453:22-454:1.  *See also* Trial Exhibit 611.

[240]     Trial Exhibit 245.

[241]     Trial Exhibit 615.

[242]     Trial Exhibit 56; Trial Exhibit 720.

[243]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 264:20-265:21.

-41-

prior to the Chapter II filing and entry into the national stage.[244]   The IP Summary made sure to

state that the alleged invention is a "patentable distinction relative [to] *the prior art of record*":

> Importantly, no suction cups are required. We maintain this is a
> patentable distinction relative the prior art of record, which all use
> suction cups and/or adhesives to effect stability on a surface.[245]

As admitted by Mr. Williams, at this time, the only prior art "of record" were the references cited

by the Examiner.[246]  Mr. Williams and Mrs. Laurain were aware of prior art not "of record" that

had not been disclosed to the USPTO that exhibited the same self-sealing function of the Happy

Mat absent need of suction cups or adhesives.  However, none of this prior art was "of record"

because Mr. Williams and Mrs. Laurain deliberately failed to disclose it during the prosecution

of the '903 Patent.[247]  If, as Mr. Williams now maintains, he believed the prior art *not* of record

was not distinguishable, there would have been no reason to include the prepositional phrase "of

record" in the IP Portfolio and Mrs. Laurain and Mr. Williams would have disclosed the prior art

references to compel the Examiners to issue an opinion on those known prior art references.[248]

3.     The IP Summary also disclosed the existence of the ISA Report relative to the PCT

patent application.[249]  Mr. Bolton, however, claimed to have no knowledge of the simultaneous

prosecution of the '955 PCT Application[250] and claimed that he had no recollection of ever

---

[244]     Trial Exhibit 720, at EZPZ0158019; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 263:22-265:2; 265:5-266:15; 266:17-267:19; Trial Exhibit 56.

[245]     Trial Exhibit 720, at EZPZ0158018.

[246]     Trial Exhibit 245. *See also* Dkt. No. 835 (Transcript Volume VI), at 1103:4-1103:18.

[247]     Trial Exhibit 245.

[248]     Dkt. No. 835 (Transcript Volume VI), at 1111:6-1112:12.  *See also* Trial Exhibit 749; Trial Exhibit 829.

[249]     Trial Exhibit 720, at EZPZ0158019.

[250]     Dkt. No. 826-3 (Bolton Depo.), at 160:20-161:1.

having reviewed the ISA Report or the Written Opinion,[251] even though he was the original lead counsel for EZPZ in this litigation when utility patent infringement was alleged in the counterclaim.[252]

4.      The IP Summary further noted that the "[c]urrent strategy" with respect to the '955 PCT Application after receiving the ISA Report and Written Opinion was to "wait until prosecution is closed on the" '682 Application.[253]  Mr. Williams confirmed this strategy at trial.[254]

5.      Although Mr. Williams tried to deny it at trial,[255] Mr. Williams and Mrs. Laurain's stated and admitted IP strategy also included the decision to file design patent applications across multiple embodiments, including the D327 Patent, which was filed on December 15, 2015, in an effort to protect against infringement should the utility patent fail to issue.[256]

6.      On October 9, 2015, Laurain received an e-mail from Steven Dunn, the CEO of Munchkin (another baby products manufacturer), which she forward to Mr. Williams and Mr. Bolton, but not Mr. McCarthy.[257]  Mr. Dunn explained to Mrs. Laurain that after broaching the idea of "potentially being interested in purchasing" EZPZ, he had his "team complete some searches and came to the conclusion that there was little likelihood of EZPZ obtaining Utility Patent protection on its line based upon prior art way back to 1932."[258]  Mr. Dunn's email also

---

[251]    Dkt. No. 826-3 (Bolton Depo.), at 162:9-162:25.

[252]    Dkt. No. 27.

[253]    Trial Exhibit 720, at EZPZ0158019.

[254]    Dkt. No. 835 (Transcript Volume VI), at 1104:17-1104:21.

[255]    Dkt. No. 835 (Transcript Volume VI), at 1101:22-1101:25.

[256]    Exhibit 720, at EZPZ0158020.

[257]    Trial Exhibit 57.

[258]    Trial Exhibit 867, at BWILLIAMS001634.

included citations to three prior art patents U.S. Patent No. 3,939,976; U.S. Patent No. 2,813,509 (the "Bruno Patent"); and U.S. Patent No. 1,881,416.[259]

7.      Mr. Bolton advised Mrs. Laurain by email dated October 9, 2015 that the prior art provided by Mr. Dunn was something that should be discussed and was an "issue that deserve[d] [their] attention."[260]  Notwithstanding Mr. Bolton's advice that a discussion be held regarding the prior art Steven Dunn of Munchkin had provided to Mrs. Laurain, Mr. Williams sent Mrs. Laurain an e-mail on October 9, 2015 stating:

> I think we have to wait for the utility patent prosecution to wrap up.  So far, no response – which is not necessarily bad in and of itself.  After our interview with the Examiner and her supervisor at the USPTO, they said they would start a new search.  That they have not yet responded also means **they have not yet found prior art.  Fingers crossed.**[261]

8.      Even though the above quoted language is contained in an email string discussing the Dunn prior art, Mr. Williams claims it was not directed toward the Dunn prior art.[262]  The Court finds Mr. Williams and Mrs. Laurain made a deliberate decision to stick with their "strategy," not disclose this or any other prior art references, and to instead keep their "fingers crossed," while hoping that the Examiners would be unable to find those references themselves.

9.      Despite the prior art provided by Dunn being "an issue that deserves" attention,[263] EZPZ produced no evidence of contemporaneous notes of any conversation Mr. Bolton had with Mrs. Laurain and/or Mr. Williams regarding the Dunn prior art to document any reason why a

---

[259]    Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 269:12-270:2; 273:20-273:23; Trial Exhibit 867; Trial Exhibit 57; Trial Exhibit 58.

[260]    Trial Exhibit 57;  Trial Exhibit 58.

[261]    Trial Exhibit 867 (emphasis added).

[262]    Dkt. No. 835 (Transcript Volume VI), at 1190:3-1190:16.

[263]    Trial Exhibit 57;  Trial Exhibit 58.

decision was made not to disclose it to the USPTO.  Additionally, Mr. Bolton, Mrs. Laurain and Mr. Williams have no recollection of any such conversation.[264]

10.     Despite recognizing Mr. McCarthy as the "subject-matter expert,"[265] and admitting at his deposition on March 5, 2020, that Mr. McCarthy was the Clark Hill attorney "primarily" involved in the prosecution of the '903 Patent,[266] Mr. Bolton could not recall sending the prior art patents sent by Mr. Dunn of Munchkin to Mr. McCarthy[267] and there is no evidence of him having done so.

11.     When questioned at her June 28, 2019 deposition, Mrs. Laurain could not "recall" whether the prior art was disclosed to the USPTO.  Her "recollection was either some of this was already disclosed or we had talked about this" and her understanding was "it wasn't a concern" but could not recall "what was done" with the prior art.[268]  Mr. Bolton claimed he was unable to remember any details regarding the prior art sent by Mr. Dunn.[269]  He also claims he cannot remember whether he provided any advice to Mrs. Laurain about whether or not she should disclose the prior art forwarded to her by Mr. Dunn.[270]  Mr. Williams claims no recollection of Mr. Bolton saying the Dunn prior art was something that deserved their attention.[271]

12.     Despite Mrs. Laurain's knowledge of several prior art references, including the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Platinum Pets Mat, the

---

[264]     Dkt. No. 826-9 (Williams 2020 Depo.), at 668:2-668:12; Dkt. No. 826-3 (Bolton Depo.), at 158:10-158:17; Dkt. No. 826-6 (Laurain 2019 Depo.), at 96:14-97:22; 98:6-98:15.

[265]     Trial Exhibit 483; Trial Exhibit 24; Trial Exhibit 502, at EZPZ-CH-008650.

[266]     Dkt. No. 826-3 (Bolton Depo.), at 272:20-273:5

[267]     Dkt. No. 826-3 (Bolton Depo.), at 159:19-159:20.

[268]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 96:11-98:15.

[269]     Dkt. No. 826-3 (Bolton Depo.), at 158:7; 158:10-158:17.

[270]     Dkt. No. 826-3 (Bolton Depo.), at 165:13-165:16.

[271]     Dkt. No. 835 (Transcript Volume VI), at 1189:24-1190:12.

Tommee Tippee Mat, the Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, the CIBO Stick Anywhere Placemat, the ISA's findings relating to the Webb Patent and Webb Publication, and now the Bruno Patent sent by Mr. Dunn that Mr. Bolton advised Mrs. Laurain "deserved their attention," Mrs. Laurain once again approved of Mr. Williams' strategy in participating in an applicant initiated interview in response to the third office action without disclosing any prior art references of which she was aware.[272]

13.     Despite having knowledge of the Platinum Pets Mat and the Lee Single Dog Bowl Mat, the ISA's findings relating to the Webb Patent and Webb Publication, and now the Bruno Patent that Mr. Bolton recognized as an issue that "deserved their attention," Mr. Williams failed to file an IDS and again failed to disclose the Bruno Patent or any prior art references leading up to or during the Applicant Initiated Interview.[273]

14.     Mr. Williams admitted that one of the many embodiments described in the Bruno Patent is a flat undersurface.[274] While Mr. Williams attempted to explain his failure for citing Bruno at trial based on a reference to the mat being "anchored"[275] by the forepaws or feet of a feeding animal,[276] he did not address any other embodiments.  In any event, Mr. Williams made no contemporaneous notes regarding his alleged reasons for failing to disclose the Bruno Patent and originally claimed he first learned of it from Mr. Garthe after the prosecution of the '682 Application when an expert Mr. Garthe had hired described the Bruno Patent as "high risk prior art."[277]

---

[272]     Trial Exhibit 245.

[273]     Trial Exhibit 245.

[274]     Dkt. No. 835 (Transcript Volume VI), at 1188:21-1189:15.

[275]     Dkt. No. 835 (Transcript Volume VI), at 1189:1-1189:15.

[276]     *See* Trial Exhibit 991.

[277]     Dkt. No. 835 (Transcript Volume VI), at 1189:24-1190:18.

15.     Despite additional knowledge, Mrs. Laurain and Mr. Williams continued to implement a strategy of not disclosing any prior art references to the USPTO when they participated in the Applicant Initiated Interview.

### (5)     Prior Art Known From the December 14, 2015 Applicant Initiated Interview Summary to the March 9, 2016 Response to the Third Office Action.

1.     By December 14, 2015, Mr. Williams knew the Examiners were concerned about the "proprietary material" and the "arrangement of the material" of the alleged invention.[278]

2.     On December 15, 2015, Mr. Williams e-mailed Mrs. Laurain, Mr. Bolton, and Mr. McCarthy to report on his interview with the Examiners.  He recounted:

> This final rejection has ultimately been withdrawn verbally – the SPE agreed that the rejection was not proper. They are essentially looking for a reference to replace Lion. I maintain that Bass (which was introduced in the second non-final rejection) is not usable either, since he teaches the necessity of an adhesive. The SPE, though, did not agree - which is odd; he maintained the reference is valid because an adhesive is one way to prevent lateral displacement and therefore Bass could combine with another reference to read over our device. They have not yet presented that other reference (Lion has been invalidated) but they are **definitely searching for one**.[279]

By December 15, 2015, Mrs. Laurain knew the Examiners were looking for a prior art reference to replace Lion,[280] which taught the use of nontoxic silicone to create a vacuum seal,[281] and were looking for a reference that teaches the self-sealing property.[282]   Thus, even if Mrs. Laurain was unaware that the Brinware Silicone Placemat, the Tommee Tippee Mat, and the Momo Baby

---

[278]     Trial Exhibit 691, at CC-BW-003213; *see also* Dkt. No. 835 (Transcript Volume VI), at 1174:19-1175:20.

[279]     Trial Exhibit 692 (emphasis added), at OMH-BW-00002163.

[280]     *See id.*

[281]     Trial Exhibit 245, at LNC395304-305.

[282]     Trial Exhibit 245, at LNC395312.

Skid-proof Silicone Placemat were material at the time of filing the '682 Application, their materiality was established when Mrs. Laurain was placed on notice that the Examiners were looking for a prior art reference to replace Lion that teaches the self-sealing property.

3.      Mr. Williams acknowledged that the Examiners were looking to "combine a silicone substrate with Bass in lieu of Lion," and if they were able to find one, the Examiners "could sustain [their] obviousness rejection."[283]

4.      Again, on December 15, 2015, Mr. Williams emailed Mrs. Laurain, Mr. Bolton, and Mr. McCarthy stating the following: "…**I know the examiner is looking for a replacement reference.** Will she find one? **Arguably, she should have already found _it_.** So maybe not!"[284]

5.      In response to the Third Office Action, Mr. Williams planned to argue against Bass and provided evidence of secondary considerations of non-obviousness: commercial success and unexpected results.  In his e-mail dated December 15, 2015, Mr. Williams told Mrs. Laurain, Mr. Bolton, and Mr. McCarthy:

> Lastly, we can try for unexpected results or a greater than expected results. If we establish that the level of skill in this particular art is very low tech, then the self-sealability could be unexpected as signed by people familiar with baby products and tableware – however, that will likely come off as opinion unless we have some material scientist discuss the unexpected (or better than expected) result as it pertains to the shape and manufacture of the mat.  Still worth a try.[285]

6.      In response to the third office action and because he was aware of prior art that would sustain the rejection,[286] Mr. Williams had all but conceded that obviousness was an issue and that

---

[283]    Dkt. No. 835 (Transcript Volume VI), at 1039:7-1039:12; 1042:15-1042:17; 1109:1-1109:9; 1116:12-1117:15; 1152:5-1152:10.

[284]    Dkt. No. 826-9 (Williams 2020 Depo.), at 645:9-645:15; 647:11-648:3; Trial Exhibit 626 (emphasis added).

[285]    Trial Exhibit 692, at OMH-BW-00002163-64.

[286]    Trial Exhibit 29.

they would need to establish secondary considerations of nonobviousness.[287]   Yet, whether a prima facie case of unpatentability exists is made "before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability."[288] Thus, prior art was still very much an issue for the USPTO.  Mr. Williams is aware of this rule.[289]

7.     Mr. Williams and Mrs. Laurain knew the USPTO and the Examiners were searching for prior art, yet they deliberately failed to disclose the prior art of which they were already aware.

8.     When Mrs. Laurain contacted Mr. Bolton and Mr. McCarthy again in December 2015 to seek their assistance with the prosecution of the '903 Patent, Mr. McCarthy reviewed his previous emails between Mr. Bolton and Mrs. Laurain and was concerned that the Platinum Pets Mat had not been disclosed to the USPTO.[290]   On December 15, 2015, Mr. McCarthy emailed Mr. Bolton stating the following:

> P.S. You sent an email five days earlier than Lindsey's email to me in which she says "guess what I just found!"  In your earlier email, you say you seriously doubt that she could get a utility patent "i.e. good service device currently in-use for pets, and they invented the same thing for kids."
>
> So you seemed to know about the dog mat before Lindsey told me. Unless there is a different dog mat.[291]

---

[287]    Trial Exhibit 692, at OMH-BW-00002163-64; *see also* Dkt. No. 834 (Transcript Volume V), at 821:13-821:14; 833:18-833:20.

[288]    37 C.F.R. § 1.56.

[289]    Dkt. No. 835 (Transcript Volume VI), at 1134:1-1134:7.

[290]    Dkt. No. 826-4 (McCarthy Depo.), at 130:14-131:2.

[291]    Trial Exhibit 88; Dkt. No. 826-4 (McCarthy Depo.), at 126:11-126:19, 127:13-128:4, 129:2-129:9;.

-49-

The Court finds that the only dog mat about which Mrs. Laurain and/or Mr. Bolton informed Mr. McCarthy was the Platinum Pets Mat.  This is one of several instances where Mr. Bolton failed to disclose information about prior art to Mr. McCarthy.[292]

9.      Mr. McCarthy told Mr. Bolton that if he reviewed Mrs. Laurain's application for the purpose of giving her legal advice, he would become a person associated with the application and would then have a duty to submit the Platinum Pets Mat to the USPTO,[293] and he then purposefully did not ask Mrs. Laurain for a copy of the application.[294]

10.      On December 15, 2015, Mr. McCarthy sent an email to Mr. Bolton in which he stated that he "told Ms. Laurain that her product was not patentable because the dog mat is prior art" and went on to tell Mr. Bolton that "Ms. Laurain has a duty to submit this dog mat advertisement to the Patent Office, and if she does not do so, she is committing inequitable conduct which will make any patent she obtains on this application unenforceable. … Can you imagine being an adverse party in a patent infringement suit and seeing this email?"[295]   On this same day, Mr. Bolton sent an email to Brian Tobin and Matt Koziarz (an attorney who graduated in Materials Science & Engineering)[296] of Carlson Gaskey and Olds stating that he and Mr. McCarthy "may need to refer out an engagement to support the prosecution of a US utility patent application."[297]

---

[292]      Trial Exhibits 118, 867, and 194.

[293]      Trial Exhibit 86; Trial Exhibit 88; Dkt. No. 826-4 (McCarthy Depo.), at 122:15-122:25.

[294]      Dkt. No. 826-4 (McCarthy Depo.), at 123:18-123:22.

[295]      Trial Exhibit 86.

[296]      Trial Exhibit 649.

[297]      Trial Exhibit 89.

-50-

11.     Mr. Bolton asked Mrs. Laurain privately whether the Platinum Pets Mat suctioned.[298] Mrs. Laurain responded to Mr. Bolton, adding Mr. McCarthy to the discussion, and falsely told them that the Platinum Pets Mat did not suction.[299]

12.     Mrs. Laurain, who has repeatedly professed lack of involvement in the prosecution strategy and deference to the advice she received from her patent agent (and others),[300] emailed her team, and set forth the agenda for a conference call the following day to "ensure we have an agreeable plan in place."[301]  She specifically stated: "Attached are some of the documents from a previous rejection.  They withdrew Lions prior art but Bass (attached) is still in play."[302]  She then set forth the agenda for a conference call the following day during which Mr. Williams would summarize the USPTO's final rejection (which had nothing to do with secondary considerations, Clark Hill would provide their insight into the final rejection, and they would discuss the current strategy for responding to the rejection, including preparing affidavits and establishing commercial success.[303]  The contemporaneous documentary evidence indicates that Mrs. Laurain was actively and intimately involved with every step of the prosecution, having knowledge of the prior art that had been cited (and withdrawn) by the Examiner as well as an understanding of the basis for the final rejection.[304]

---

[298]    Trial Exhibit 692, at OMH-BW-00002160.

[299]    Trial Exhibit 692, at OMH-BW-00002160.

[300]    Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 321:16-321:23; 322:13-322:14; Dkt. No. 833 (Transcript Volume IV), at 428:22; 474:20-474:21; 617:17-617:18; 743:22-744:2; 747:22-474:23.

[301]    Trial Exhibit 680.

[302]    *Id*.

[303]    *Id*.

[304]    *See id*.

13.     On December 16, 2015, Mr. McCarthy, after participating in the conference call during which Mr. Williams described their strategy and telling Mr. Bolton "this is bullshit,"[305] told Mr. Bolton the following: "If they want functional claiming, they run into the suction cups, which perform the same function. If they want structural claiming, they run into the prior art which looks the same."[306]  Thus, Mr. McCarthy did not agree with the "patentable distinction" Mr. Williams maintained between Mrs. Laurain's invention, which functioned by forming a partial vacuum, and suction cups, which also function by forming a partial vacuum.[307]  He also wanted to hear from a material scientist who would say he would not expect the structure to have the suction function.[308]  In Mr. McCarthy's opinion "it should have been someone who had some training, education, or experience, such as a material scientist, to give that opinion and not someone who did not have training, education, or experience."[309]

14.     On January 21, 2016, Rebecca Baror of RSB Innovations/Silicandy emailed Mr. Williams regarding EZPZ's "unpublished patent," which had been provided by Mr. Williams, pointing out that the prior art Gerber Mealmat is "a one piece silicone mat, that sticks to the table, and [] was sold before [the] 'inventor' filed for her alleged 'patent.'"[310]  Additionally, Ms. Baror provided Mr. Williams with the Amazon link to the product with customers reviews and told Mr. Williams that the reviews of the Gerber Mealmat state that the mat is non-stick "the non-stick being an inherent trait of any 100% silicone mat."[311]

---

[305]     Trial Exhibit 92, at EZPZ-CH-001384.

[306]     Trial Exhibit 92.

[307]     *See id.*

[308]     Trial Exhibit 92.

[309]     Dkt. No. 826-4 (McCarthy Depo.), at 145:7-145:17.

[310]     Trial Exhibit 722, at EZPZ-CH-002169.

[311]     Trial Exhibit 722, at EZPZ-CH-002169.

15.     On January 21, 2016, Mr. Williams forwarded Ms. Baror's e-mail to Mrs. Laurain and Mr. Bolton, telling them, "**this is what I was afraid of**."[312]  The Court finds that Mr. Williams "was afraid" that alleged infringers would provide prior art references that would then need to be disclosed to the USPTO – further evidencing his strategy to disclose as little prior art to the USPTO as possible.  Although Mr. Williams denies that is what he was "afraid of," he offered no explanation for what he meant.[313]

16.     On January 21, 2016, Mr. Bolton, who tried to avoid any responsibility for the prosecution notwithstanding his willingness to opine on prior art,[314] the survey,[315] and the declarations,[316] responded to Mr. Williams, Mrs. Laurain, and Mr. McCarthy, stating the following:

> If it suctions, it is a more serious issue than if it does not.  **I am sure Ben is aware of his disclosure obligations**, and much of what she says is accurate (you may recall that we discussed this issue before engaging in communications with SC [Silicandy].  I think we should discuss tomorrow afternoon…[317]

Mr. Williams responded to Mr. Bolton and Mrs. Laurain on January 21, 2016 stating, "Yes – I am going to have to disclose this mat in our office action response.  **This is less than ideal**…"[318]

17.     On January 25, 2016, Mr. McCarthy, who had purposefully refused to review Mrs. Laurain's '682 Application in order to avoid becoming someone associated with the application

---

[312]     Dkt. No. 826-9 (Williams 2020 Depo.), at 661:16-661:25 (emphasis added).

[313]     Dkt. No. 826-9 (Williams 2020 Depo.), at 661:16-662:7.

[314]     *E.g.*, Trial Exhibit 24.

[315]     *E.g.*, Trial Exhibit 650.

[316]     *E.g.*, Trial Exhibit 977; Trial Exhibit 568, at EZPZ-CH-002614.

[317]     Trial Exhibit 722.

[318]     Trial Exhibit 871 (emphasis added); Dkt. No. 826-9 (Williams 2020 Depo.), at 660:2-660:18; 660:20-661:2; 661:16-662:4; 662:6-662:7; Trial Exhibit 100.

-53-

under Rule 1.56,[319] again told Mrs. Laurain, as a matter of general patent advice, that in his "humble opinion" the Platinum Pets Mat is prior art and should be included in a proposed video to the USPTO.[320]   Mr. McCarthy further advised: "If it does not suction, that is good, but I recommend including it in the proposed video."[321]   Thus, the Court finds Mrs. Laurain and Mr. Williams were on notice that the experienced patent attorney at Clark Hill, who was the subject matter expert,[322] had stated that even if a product does not "self seal" it can still be considered prior art that must be disclosed to the USPTO.

18.     Mr. McCarthy testified that he understood Mrs. Laurain's "invention" to be the same thing that was shown in Trial Exhibit 87 (the ad for the Platinum Pets Mat).[323]   It was Mr. McCarthy's understanding that the "invention…was substantially similar to" the Platinum Pets Mat and he thought the Platinum Pets Mat "should have been submitted as prior art."[324]

19.     On February 10, 2016, acting at the direction of Mrs. Laurain, Mr. Williams sent a cease and desist letter to Nuby-UK.[325]   Just as Rebecca Baror had responded to Mrs. Laurain's threats, so too, did Mr. Morse.[326]   On February 12, 2016, Mr. Morse responded to EZPZ's cease and desist letter, stating in pertinent part the following:

> [T]he PCT Application International Searching Authority has opined that the pending claims are invalid as being obvious in light of particularly relevant prior art cited in the International Search Report…[I]t is likely that we are already in possession of invalidating material prior art that significantly predates the claimed

---

[319]     Trial Exhibit 86.

[320]     Trial Exhibit 109.

[321]     *Id.*

[322]     Trial Exhibit 483; Trial Exhibit 24; Trial Exhibit 502, at EZPZ-CH-008650.

[323]     Dkt. No. 826-4 (McCarthy Depo.), at 96:4-96:10; Trial Exhibit 610 and Trial Exhibit 87.

[324]     Dkt. No. 826-4 (McCarthy Depo.), at 125:18-125:23.

[325]     Trial Exhibit 114.

[326]     Trial Exhibit 115.

-54-

July 17, 2014 priority date which we would have no hesitation asserting when and where applicable in response to your client's future actions.[327]

20.     On February 15, 2016, Mr. Williams forwarded Mr. Morse's letter mentioning the ISA Report and Written Opinion to Mr. Bolton and Mrs. Laurain, but not Mr. McCarthy.[328]  Even though he was initially going to respond to Mr. Morse's letter,[329] Mr. Bolton claims no recollection of the ISA which cited particularly relevant prior art as referenced in Mr. Morse's letter.[330]  No one ever responded on behalf of Mrs. Laurain or EZPZ to Mr. Morse.

21.     Notwithstanding multiple communications concerning Mr. Morse's letter and Mr. Bolton's stated intention of responding to Mr. Morse's letter,[331] Mr. Williams and Mrs. Laurain never followed up with Mr. Morse, and they never cited the ISA Report and Written Opinion to the USPTO during prosecution of the '682 Application.[332]

22.     On February 16, 2016, Mrs. Laurain told Mrs. Falcone, Mr. Bolton, and Mr. Williams she was unsure if they would be able to obtain a declaration from a material scientist because of "the recent silicony suction/sticky stuff…" in the market and provided Mr. Williams and Mr. Bolton, but not Mr. McCarthy, with a link to https://www.thegrommet.com/hot-iron-holster-lil-holster.[333] The link provided by Mrs. Laurain (https://www.thegrommet.com/hot-iron-holster-lil-holster) directs to the Grommet article on the Hot Iron Holster. The Grommet article describes the Hot Iron Holster as a "heat resistant pocket…Made 100% of silicone [consisting] of two parts: A pouch for holding styling tools and a flap specially formulated to cling to any smooth, non-

---

[327]     Trial Exhibit 115.

[328]     Trial Exhibit 115; Trial Exhibit 116.

[329]     Trial Exhibit 699.

[330]     Dkt. No. 826-3 (Bolton Depo.), at 162:9-162:25.

[331]     Trial Exhibit 699.

[332]     *See* Trial Exhibit 245.

[333]     Trial Exhibit 118.

-55-

porous household surface.  No screws or sticky adhesive is required.  It's easy to remove and reuse over and over again."[334]  It also notes that the product is "patented."[335] The Hot Iron Holster identified by Mrs. Laurain in February 2016, has been on the market since at least January 2014.[336]

23.     Despite Mr. Bolton informing Mrs. Laurain that Mr. McCarthy was the "expert" in patent issues[337] Mrs. Laurain and Mr. Williams never disclosed the Hot Iron Holster to Mr. McCarthy. Mr. Bolton was unable to provide any explanation for not forwarding this email to Mr. McCarthy and admitted that he did not know whether Mr. McCarthy would have said it needed to be disclosed.[338]

24.     Once on notice of the Hot Iron Holster, there is no contemporaneous evidence that Mr. Williams ever investigated the Hot Iron Holster or the underlying Balogh Patent.[339]  At trial, Mr. Williams originally testified that he did not know about the Hot Iron Holster during the prosecution of the patent.[340]  Once shown, Mrs. Laurain's email, however, he had to admit to having been made aware of it.[341]  Mr. Williams was unable to explain why the Hot Iron Holster was not listed in Appendix D filed in the '682 Application or included in the video submitted to

---

[334]     Trial Exhibit 119.

[335]     Trial Exhibit 119.

[336]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 124:2-125:18. Trial Exhibit 740.

[337]     Trial Exhibit 24, Trial Exhibit 483, Trial Exhibit 502.

[338]     Dkt. No. 826-3 (Bolton Depo.), at 179:7-179:14.

[339]     Dkt. No. 835 (Transcript Volume VI), at 1126:24-1127:2.

[340]     Dkt. No. 835 (Transcript Volume VI), at 1126:6-1126:11.

[341]     Dkt. No. 835 (Transcript Volume VI), at 1126:12-1126:3.

the USPTO.[342]  He originally tried to say it was not "self-sealing" but then had to admit that he had not even read the Balogh patent until after the prosecution had been completed.[343]

25.    On March 1, 2016, Mrs. Laurain sent Mr. Williams at least two videos (EZPZ has only produced two videos): (the Disclosed Video and the Undisclosed Video) that purported to demonstrate the "self-sealing function" of the EZPZ Happy Mat as compared to other prior art products.[344]  Mr. Williams responded to Mrs. Laurain's email providing him with the videos she had prepared:

> Hi Lindz – you know, I think I like the first one best.  **The dog mat kind makes a suctioning noise in this one – so it looks like it tries to self-seal but fails**.  I think we go with the first iteration – I like your discussion of the suction cups and the flat back better in that one **and the dog bowl comes away very easily without making a suctioning noise**.[345]

26.    Mrs. Laurain did not send the Undisclosed Video that made a "suctioning noise" to Mr. Bolton or Mr. McCarthy, despite knowing that Mr. McCarthy was the "expert."[346]

27.    Mrs. Laurain did not send the Undisclosed Video that made a "suctioning noise" to Mr. Bolton or Mr. McCarthy despite having previously represented to them that the Platinum Pets Mat did not suction.[347]

28.    In the Undisclosed Video, the Platinum Pets Mat makes suction sounds when Mrs. Laurain attempts to remove the mat from the counter.[348]

---

[342]    Dkt. No. 835 (Transcript Volume VI), at 1127:23-1128:16.

[343]    Dkt. No. 835 (Transcript Volume VI), at 1127:14-1127:22.

[344]    Trial Exhibit 614; Trial Exhibit 613 ("Undisclosed Video"); Trial Exhibit 612 ("Disclosed Video").

[345]    Trial Exhibit 614 (emphasis added).

[346]    Dkt. No. 826-6 (Laurain 2020 30(b)(6) Depo.), at 115:3-115:18; Trial Exhibit 24;  Trial Exhibit 483; Trial Exhibit 502.

[347]    Trial Exhibit 692.

[348]    Trial Exhibit 613.

-57-

29.     For the first time, and nearly 16 months after the filing of the '682 Application, Mr. Williams and Mrs. Laurain identified three prior art references in Appendix D: the Gerber Graduates Silicone MealMat (incorrectly labeled as the Gerber Silicone Platemat in the submission), a Silicone Mouse Pad, and the Platinum Pets Mat.[349]  Mr. Williams did not file a corresponding IDS listing the prior art identified in Appendix D[350] which would compel an Examiner to issue an opinion on these references.[351]

30.     Mrs. Laurain has no recollection of telling Mr. Williams, Mr. Bolton, or Mr. McCarthy about the CIBO Stick Anywhere Placemat,[352] but admits she did not include it in Appendix D or in the Disclosed Video she submitted to the USPTO.[353]

31.     With respect to the Gerber Graduates Silicone MealMat, in Appendix D Mr. Williams and Mrs. Laurain cite a single customer's negative review as evidence that it did not have "self-scalability [*sic*]".[354]  Despite Mr. Williams recognizing that the Gerber Graduates Mealmat was "relevant,"[355] Mrs. Laurain and Mr. Williams did not disclose the positive amazon reviews provided by Ms. Baror that she specifically asked Mr. Williams to "file…with the examiner."[356]  Thus, Mr. Williams and Ms. Laurain merely made a one-sided and incomplete representation that  the Gerber Graduate Mealmat did not "self-seal" on an underlying surface.

---

[349]     Trial Exhibit 245, at LNC395355-356.

[350]     *See* Trial Exhibit 245.

[351]     *See* Trial Exhibit 829 (Mr. Williams recognizing the importance of submitting prior art to the USPTO).

[352]     Dkt. No. 833 (Transcript Volume IV), at 403:8-403:14.

[353]     Dkt. No. 833 (Transcript Volume IV), at 403:15-403:22.

[354]     Trial Exhibit 245, at LNC395355-356.

[355]     Dkt. No. 834 (Transcript Volume V), at 855:22-855:24.

[356]     *Compare* Trial Exhibit 722, at EZPZ-CH-002169 *with* Trial Exhibit 245, at LNC395356.

32.     Additionally, Mr. Williams and Mrs. Laurain misrepresented the characteristics of the Platinum Pets Mat.  Despite listing the Platinum Pets Mat as a prior art device made of silicone that does not "Effect Surface Contact Self-Sealing" under Appendix D,[357] the evidence at trial, including the Undisclosed Video and Mr. Hubbard's demonstration, establishes that Platinum Pets Mat does in fact self-seal to an underlying surface.[358]

33.     Mr. Williams described the Disclosed Video including the Platinum Pets Mat as "demonstrat[ing] the lack of surface contact self-sealing of prior art" but purposefully and deliberately failed to disclose the Undisclosed Video wherein the Platinum Pets Mat makes suction sounds when Mrs. Laurain attempts to remove the mat from the counter.[359]  Mr. Williams made the deliberate decision not to disclose the Undisclosed Video and Mrs. Laurain agreed with his decision.[360]

34.     Despite Mrs. Laurain's knowledge of numerous prior art references, including the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Tommee Tippee Mat, the Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, the CIBO Stick Anywhere Placemat, the ISA's findings relating to the Webb Patent and Webb Publication, the Bruno Patent sent by Mr. Dunn, and the Hot Iron Holster, which Mrs. Laurain recognized as being a "silicony suction/sticky" product, Mrs. Laurain once again approved of Mr. Williams strategy in responding to the third office action without disclosing these prior art references of which she was aware.[361]  Additionally, despite knowing that there were positive Amazon reviews

---

[357]     Trial Exhibit 245, at LNC395355-356.

[358]     Trial Exhibit 613; *see also* Dkt. No. 832 (Transcript Volume III), at 229:22-230:6.

[359]     Trial Exhibit 245, at LNC395450.

[360]     Trial Exhibit 614; Dkt. No. 826-6 (Laurain 2019 Depo.), at 85:11-85:14; 85:21-86:6; 86:19-88:5; 88:16-88:20.

[361]     Trial Exhibit 245.

of the Gerber Graduates Meal Mat and that the Platinum Pets Mat made a "suction" sound when she attempted to lift the mat in the Undisclosed Video, Mrs. Laurain further approved of Mr. Williams' misrepresentations regarding both the Gerber Graduates Meal Mat and the Platinum Pets Mat in Appendix D of the March 9, 2016 response to the third office action.

35.     Despite having knowledge of the Lee Single Dog Bowl Mat, the ISA's findings relating to the Webb Patent and Webb Publication, the Bruno Patent, and the Hot Iron Holster Mrs. Laurain recognized as a "silicony suction/sticky" product, Mr. Williams again failed to disclose these prior art references of which he was aware.[362]  Mr. Williams further adopted a strategy of misrepresenting the prior art that he felt compelled to disclose to the USPTO as a result of Ms. Baror's email[363] and Mr. McCarthy's advice,[364] namely the Gerber Graduates Meal Mat and the Platinum Pets Mat.

36.     EZPZ's own expert, Mr. Kennedy, recognized that "when in doubt" about the materiality of a prior art reference you should "certainly" disclose prior art.[365]

37.     Despite additional knowledge, Mrs. Laurain and Mr. Williams continued to implement a strategy of not disclosing any prior art references to the USPTO and misrepresenting the prior art they did disclose in the March 9, 2016 response to the third office action.

38.     In failing to file a corresponding IDS listing the prior art identified in Appendix D, there is no presumption that Mrs. Laurain and Mr. Williams satisfied the duty to disclose under Rule 1.56(a).

---

[362]     Trial Exhibit 245.

[363]     Trial Exhibit 722, at EZPZ-CH-002169.

[364]     Trial Exhibit 109.

[365]     Dkt. No. 835 (Transcript Volume VI, at 983:2-983:3.

(6)      **Prior Art Known From the March 9, 2016 Response to the Third Office Action to the Date the Patent Issued.**

1.      On June 9, 2016, several days after LNC filed this declaratory judgment lawsuit, Mr. Williams again forwarded Mr. Morse's letter mentioning the ISA Report and Written Opinion to Mr. Bolton, Mrs. Laurain, and Mrs. Falcone.[366]   Mr. Bolton claimed not to remember or recognize the June 9, 2016 email from Mr. Williams to Mr. Bolton.[367]   Even though Mr. Bolton viewed Mr. McCarthy as the "subject matter expert,"[368] he could not recall whether he forwarded the June 9, 2016 email and attachments to Mr. McCarthy, and there is no evidence that he did so.[369]

2.      On August 4, 2016 Mrs. Laurain took a photograph of the Yummynator booth at a pet trade show in Las Vegas and sent it to Mr. Williams asking him to send it to the USPTO.[370]   He never did so.  She also had two heated confrontations with Marcus Koenig of Yummynator while at the trade show, which she later described in her Inspired Insider Interview.[371]

3.      On August 8, 2016, Mrs. Laurain received an email from Johan Deckx of Pet Concept wherein he asked her if her patent "is applied earlier than the AS one" because he did not "want to get in between this in case" they started importing.[372]

4.      On or about September 6, 2016, Mr. Williams found out that Mrs. Laurain would be receiving a notice of allowance for the '903 Patent.[373]

---

[366]      Trial Exhibit 194.

[367]      Dkt. No. 826-3 (Bolton Depo.), at 201:16-201:21; Trial Exhibit 194.

[368]      Trial Exhibit 483; Trial Exhibit 24; Trial Exhibit 502, at EZPZ-CH-008650.

[369]      Dkt. No. 826-3 (Bolton Depo.), at 204:4-204:7.

[370]      Trial Exhibit 705, at OMH-BW-00000501.

[371]      Dkt. No. 833 (Transcript Volume IV), at 460:231-461:2.  *See also* Trial Exhibit 360.

[372]      Trial Exhibit 706, at EZPZ0182067.

[373]      Dkt. No. 835 (Transcript Volume VI), at 1043:6-1044:1.

5.      On September 9, 2016, before her utility patent issued, Marcus Koenig of Yummynator sent Mrs. Laurain a letter notifying her that "several prior art documents have been cited against the claims" of her utility patent.[374]  Although Mr. Williams attempted to claim that he did not know "who Mr. Koenig is,"[375] Mrs. Laurain expressly asked Mr. Williams to prepare a cease and desist letter to provide to Mr. Koenig[376] and Mr. Williams was copied on email communications between Mrs. Laurain and Mr. Koenig.[377]

6.      On September 8, 2016 and only after receiving word from Mrs. Laurain that she would receive a notice of allowance on the utility patent, did Mr. Bolton then forward to Mr. McCarthy the June 9, 2016 email from Mr. Williams attaching the ISA Report and Written Opinion  along with Mr. Morse's letter.[378]

7.      EZPZ submitted no evidence that Mrs. Laurain or Mrs. Laurain or anyone on her prosecution team investigated any of the claims made by Mr. Deckx or Mr. Koenig regarding potentially applicable prior art.

8.      Once Mrs. Laurain knew that the USPTO had decided to issue a Notice of Allowance, she communicated with Mr. Bolton via text.[379]  Mr. Bolton subsequently sent her an email to which the ISA Report and Written Opinion, and the Webb Patent were attached which said, "Is this what you were talking about in your text?"[380]  Mr. Bolton produced text messages from September 10, 2016 and September 16, 2016 with no text that correlated with the email he sent

---

[374]    Trial Exhibit 707, at EZPZ0182073.

[375]    Dkt. No. 835 (Transcript Volume VI), at 1170:24-1171:4.

[376]    Trial Exhibit 705, at OMH-BW-00000501-502.

[377]    *E.g*., Trial Exhibit 239.

[378]    Trial Exhibit 206.

[379]    Trial Exhibit 205.

[380]    Trial Exhibit 195.

on September 14, 2016 referencing a text from Mrs. Laurain.[381]  Mr. Bolton claimed he could not

find a text that corresponded with his email to Mrs. Laurain dated September 14, 2016

referencing a text from her,[382] and he claimed he was unable to recall the context of Mrs.

Laurain's text from the email.[383]  Mrs. Laurain produced no text messages during discovery and

offered no text messages as evidence at trial.

9.      The Court finds that the missing text message would be harmful to Mrs. Laurain's

position herein.  The Court further finds that Mrs. Laurain's text message to Mr. Bolton (which

was not produced) related to Mr. Morse's letter discussing the invalidating prior art in the ISA

Report and Written Opinion and that they therefore were aware of and recognized the

significance of these undisclosed documents prior to the issuance of the '903 Patent.

10.     On September 19, 2016, Mr. Bolton emailed Mr. McCarthy, Mrs. Laurain, Mrs. Falcone,

and Mr. Williams stating that "Ben has said that he has already cited any prior art that [Nuby]

previously referenced…"[384]  Even though he had not cited the prior art that Mr. Morse had

referenced from the ISA Report, Mr. Williams did not correct Mr. Bolton's statement that Mr.

Williams had already cited to the USPTO any prior art previously referenced in Mr. Morse's

February 12, 2016 letter.

11.     On September 20, 2016, Mr. Williams emailed Mr. Bolton, Mr. McCarthy, Mrs. Falcone,

and Mrs. Laurain stating the following:

> [T]here appears to be no conflicting prior art of record.  The only option I think
> they could attempt is that the inherent property of silicone enabling the self-

---

[381]    Trial Exhibit 207; Trial Exhibit 208; Dkt. No. 826-3 (Bolton Depo.), at 227:24-229:11.

[382]    Trial Exhibit 195; Dkt. No. 826-3 (Bolton Depo.), at 220:3-220:22.

[383]    Dkt. No. 826-3 (Bolton Depo.), at 222:1-222:7.

[384]    Trial Exhibit 483.

sealing action is not an unexpected results, and that there is no novelty to the invention…[385]

The Court finds that the self-sealing characteristics of silicone were expected and known to Mr. Williams since the outset of the filing of the '682 Application.

12.     Despite Mrs. Laurain's knowledge of numerous prior art references, including the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Tommee Tippee Mat, the Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, the CIBO Stick Anywhere Placemat, the Hot Iron Holster, the ISA's findings relating to the Webb Patent and Webb Publication, the Bruno Patent sent by Mr. Dunn, Mr. Morse's February 12, 2016 letter, and their significance, Mrs. Laurain once again approved of Mr. Williams strategy to withhold prior art from the USPTO and kept her "fingers crossed" that the USPTO not find any prior art.

13.     Despite having knowledge of the Webb Patent, the Webb Publication, the Lee Single Dog Bowl Mat, the Hot Iron Holster, the ISA's findings relating to the Webb Patent and Webb Publication, the Bruno Patent sent by Mr. Dunn, Mr. Morse's February 12, 2016 letter, and their significance, Mr. Williams continued to withhold prior art from the USPTO and kept his "fingers crossed" that the USPTO not find any prior art.

14.     Despite additional knowledge, Mrs. Laurain and Mr. Williams continued to implement a strategy of withholding prior art references from the USPTO.

            **(7)      Prior Art Known During the Prosecution of the Related Patent Applications.**

1.      The Court's finding that Mr. Williams and Mrs. Laurain's "strategy" during prosecution of the '682 Application was to disclose as little prior art as possible is also informed  by their

---

[385]     Trial Exhibit 216.

-64-

subsequent conduct during prosecution of related patent applications claiming priority, whether successful or not, to the July 11, 2014 filing date of the '682 Application.

2.       Sometime before November 27, 2016, Mr. Koenig sent an e-mail to Mrs. Laurain notifying her that there was "already a product presented to market with similar functionalities in the pet product range in the year 2009.  The functionality obtained, state of the art' in 2007 and a patent is not possible on the functionality anymore."[386]  Mr. Koenig also told Mrs. Laurain that "if this information gets into wrong hands [] this could be a [] Show Stopper [] for both of" them.[387]  Mr. Koenig also attached a PDF entitled "patentoffice_research_EN.PDF."[388]  The precise date that Mr. Koenig sent these communications is unknown because EZPZ did not produce Mr. Koenig's e-mails to Mrs. Laurain in discovery.[389]  Rather, EZPZ produced only a communication Mrs. Laurain sent to Mr. Koenig on November 30, 2016 cutting and pasting portions of Mr. Koenig's prior communications to her.[390]  It is clear, however, that Mr. Koenig's e-mail to Mrs. Laurain was sent on or before November 27, 2016 because on November 27, 2016, Mrs. Laurain emailed the PDF entitled "patentoffice_research_EN.PDF" to Mr. Bolton, Mr. Garthe, and Mr. Williams.[391]  The PDF entitled "patentoffice_research_EN.PDF" sent by Mr. Koenig includes four different links to websites describing the Lee Single Dog Bowl Mat dating back to July 9, 2007.[392]  Mr. Williams originally tried to act as though he was not familiar

---

[386]       Trial Exhibit 239.

[387]       Trial Exhibit 239.

[388]       Trial Exhibits 239; Trial Exhibit 912.

[389]       Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 262:11-263:12.

[390]       Trial Exhibit 239; *see also* Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 262:11-263:12.

[391]       Trial Exhibit 602.

[392]       Trial Exhibit 912.

with the "patentoffice_research_EN.PDF."[393]  Despite Mr. Williams' testimony that he "d[id]n't know what it's made of,"[394] these additional links (sent to Mr. Williams) described the formation of a vacuum under the mat and explained that the mat was made of silicone.[395]  One website in particular, stated, "sucker action that forces the silicone rubber mat to cling to the floor."[396] Additionally, although Mr. Williams referred to the Lee Dog Bowl Mat as a computer generated design when testifying, Mr. Garthe, Mrs. Laurain and Mr. Williams knew from the information Mr. Koenig had provided that Mr. Lee had displayed his mat at an exposition.[397]  None of the websites other than the Yanko website were provided to the USPTO in connection with the prosecution of continuing patent applications[398] and it is unclear as to when, exactly, Mrs. Laurain learned of these additional websites and relevant and material information as EZPZ has failed to produce the original emails Mrs. Laurain received from Mr. Koenig and has only produced a lengthy email string in which Mrs. Laurain cut and pasted information she received from Mr. Koenig.[399]  The Court further infers that Mrs. Laurain, who had met and exchanged unpleasantries with Mr. Koenig at an exposition in August 2016,[400] received this information prior to the issuance of the '903 Patent and that she purposefully did not disclose it to the USPTO during the prosecution of the '903 Patent. Mrs. Laurain admitted that she had "no idea" when she received the "patentoffice_research_EN.PDF" from Mr. Koenig or whether he gave it

---

[393]     Dkt. No. 835 (Transcript Volume VI), at 1167:25-1168:2.

[394]     Dkt. No. 834 (Transcript Volume V), at 865:5-865:8.

[395]     Trial Exhibit 602.

[396]     Trial Exhibit 602, at PDF p. 6.

[397]     Trial Exhibit 602, at PDF p. 8.

[398]     *See* Trial Exhibit 281; Trial Exhibit 905; Trial Exhibit 582; Trial Exhibit 583.

[399]     Trial Exhibit 239.

[400]     Dkt. No. 833 (Transcript Volume IV), at 460:23-461:2.  *See also* Trial Exhibit 360.

to her during the Las Vegas Expo.[401]  Even if these additional websites and information were not provided by Mr. Koenig to Mrs. Laurain until after the '903 Patent had issued, they provided additional information and should have been disclosed in addition to the Yanko website in connection with the prosecution of the continuing patent applications.  Mr. Garthe's and Mr. Williams' failure to disclose the additional websites and Mr. Williams' excuse for not disclosing them (that they contained the same photographs and information),[402] lacks credibility, particularly when Mr. Williams recognized the Lee Single Dog Bowl Mat as "important and relevant."[403]

3.      On January 20, 2017, Mr. Garthe told Mr. Williams there was a "high-risk prior art" for the '903 Patent, and referred to the Bruno Patent.[404]  Mr. Williams responded falsely, stating that they had argued against the reference already.[405]  There is no evidence that Mr. Williams ever argued against the Bruno Patent during  prosecution of the '903 Patent.[406]

4.      On May 12, 2017, Mr. Tobin, one of EZPZ's counsel of record in this litigation, sent Mr. Garthe a link to the Yanko design website describing the Lee Single Dog Bowl Mat.[407]

5.      On June 14, 2017, Mr. Williams sent Mr. Garthe his informal comments to the ISA Report and Written Opinion that he had submitted on May 8, 2015 in the '955 PCT Application.[408]

---

[401]    Dkt. No. 826-7 (Laurain 2020 Depo.), at 330:11-331:2.

[402]    Dkt. No. 835 (Transcript Volume VI), at 1168:25-1169:10.

[403]    Trial Exhibit 602.

[404]    Trial Exhibits 900 and 901.

[405]    Trial Exhibits 900 and 901.

[406]    Trial Exhibit 245.

[407]    Trial Exhibit 880.

[408]    Trial Exhibit 903.

5328032_1

6.      Mrs. Laurain admitted that she filed continuing patent applications to "broaden" her "patent portfolio and to keep claiming to get patents" and "to put more arrows in the quiver" from a litigation perspective.[409]  Although Mr. Garthe tried to say EZPZ was seeking to broaden the claims in the related patent applications to cover the Bumkins product,[410] the evidence at trial establishes that Mrs. Laurain, Mr. Garthe, and Mr. Williams wanted to obtain continuing patents with claims that would cover not only the Bumkins product, but also the Nuby products for which they had already filed a counterclaim for infringement of the '903 Patent.[411]  Specifically, Mr. Garthe instructed Mr. Williams that "[w]e should make sure [the] continuation covers everything LNC says in this non-confidential disclosure, e.g., 3 degree curvature."[412]

7.      On June 29, 2017, Laura Ebert and Ted Olds, attorneys at Carlson, Gaskey, and Olds ("CGO") sent Mr. Williams and Mr. Garthe "a list of prior art that should be submitted to the USPTO in an IDS in the pending application (15/507,823), and in any new applications that may be filed."[413]  The prior art list was in the form of an excel spreadsheet and included non-patent literature ("NPL") references such as the Lee Single Dog Bowl Mat.[414] Neither Mr. Garthe nor Mr. Williams filed an IDS with the USPTO listing this identified prior art during the prosecution of the '823 Application or the '403 Application.[415]

---

[409]    Dkt. No. 834 (Transcript Volume V), at 704:8-704:22.

[410]    Dkt. No. 836 (Transcript Volume VII), at 1335:19-1336:20.

[411]    *E.g.*, Trial Exhibit 261 (Mr. Garthe notifying Mr. Bolton that he thinks he should "get claims on at least the following products: [] Something on the Nuby Mat[;] Something with a concavity that has a 90 angle at the base (rather than a sloped base").

[412]    Trial Exhibit 479.

[413]    Trial Exhibit 640.

[414]    Trial Exhibit 640, at EZPZ-EZ-0001909-1913.

[415]    Trial Exhibit 905; Trial Exhibit 281.

-68-

8.     During prosecution of the '823 Application, Ted Olds, an experienced patent attorney licensed to practice before the USPTO, had again advised Mr. Williams that the Yanko website that described the Lee Single Dog Bowl Mat should be cited to the USPTO as non-patent literature in both the '823 and the '403 Applications.[416] Even though Mr. Williams had admitted in writing to Mr. Garthe and Mrs. Laurain in November 2016 that the Lee Dog bowl was "relevant and important,"[417] Mr. Williams told Mr. Old that he was concerned that citing the Yanko link describing the Lee Dog Bowl Mat would "inadvertently open up a new avenue of prior art."[418]  Mr. Williams also reported to Mr. Olds that Zac Garthe, EZPZ's general counsel, was "of the opinion that we can cite it amidst a bunch of other stuff  if we can find it – [such as] dog bowls and other mats in general."[419]  This conduct demonstrates a continued willingness on the part of Mr. Mr. Williams to violate the duty of candor and good faith owed to the USPTO during the prosecution of patent applications.[420]  Mrs. Laurain is charged with the conduct of Mr.

---

[416]     Trial Exhibits 640 and 287.

[417]     Trial Exhibit 602.

[418]     Trial Exhibit 287; Dkt. No. 826-9 (Williams 2020 Depo.), at 605:14-605:17; 605:19-606:7; 741:23-742:22; 744:13-745:5.

[419]     Trial Exhibit 287.

[420]     *See Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.,* 837 F. Supp. 1444, 1477 (N.D. Ind. 1992), *aff'd,* 11 F.3d 1072 (Fed. Cir. 1993) ("The court further holds that it is likewise a violation of the duty of candor and fair dealing with the Patent Office for an applicant or its attorney to disclose a pertinent prior art patent reference to the examiner in such a way as to 'bury' it or its disclosures in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue."); *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1573 (Fed. Cir. 1983) ("The conclusion that [the examiner] was 'fully informed' rests solely on the presentation to him of a mountain of largely irrelevant data from which he is presumed to have been able ... to have found the critical data. It ignores the real world conditions under which examiners work."); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 965 (S.D. Fla. 1972) ("Obviously, the purpose of this misrepresentation was to bury the Wollard patent in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the Stuart claims, would ignore the list and permit the Stuart patent to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office."), *aff'd,* 479 F.2d 1328 (5th Cir. 1973).

-69-

Williams and Mr. Garthe as she was the applicant on all of the continuation applications.[421]  She repeatedly tried to claim lack of involvement in the continuation applications,[422] but she cannot hide behind her agent and attorneys.[423]

9.      On February 20, 2018, Mr. Williams asked Mr. Olds whether they should cite the Lee Single Dog Bowl Mat  "alongside a bunch of other stuff we can find online or just by itself."[424] Mr. Olds does not recall what Mr. Williams meant by this.  Mr. Olds responded that they should talk.[425]

10.     Mr. Olds testified it is likely that at this time he discussed the duty of disclosure with Mr. Williams, but he does not recall specifically what he said.  Mr. Olds likely said that they need to cite stuff to get it before the Examiner.[426]

11.     Mr. Olds further testified that what needs to be filed is a "Venn diagram" of what is known and "[e]verything was to be filed" because "[a]ll prior art must be filed.[427]  The Court finds Mr. Olds' testimony to be credible in this respect.

12.     Notwithstanding Mr. Olds' clear and unequivocal advice to Mr. Williams that the Yanko website describing the Lee Single Dog Bowl Mat should be disclosed to the USPTO, Mr.

---

[421]     37 C.F.R. § 1.56(c)(1).

[422]     Dkt. No. 833 (Transcript Volume IV), at 497:15-497:18; Dkt. No. 834 (Transcript Volume IV), at 704:16-704:17.

[423]     *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (finding inequitable conduct when inventor attempted to blame his attorneys for failing to disclose material prior art).

[424]     Trial Exhibit 704; Dkt. No. 826-10 (Olds Depo.), at 86:18-87:10; 87:13-87:23.

[425]     Trial Exhibit 704.

[426]     Dkt. No. 826-10 (Olds Depo.), at 88:17-89:6; 89:9-90:5.

[427]     Dkt. No. 826-10 (Olds. Depo.), at 71:25-72:24.

Williams did not disclose it to the USPTO during prosecution of the '823 Application or the '403 Application.[428]

13.     Mr. Williams testified at trial that he did not file the complete IDS from Mr. Olds due to a "merger" mistake and erroneously filed page 1 of the IDS five times.[429]   As a result, significant prior art was not disclosed to the USPTO in the '823 Application and the '403 Application.[430]

14.     Even if Mr. Williams is to be believed that this was an "honest error," his excuse that he accidentally filed the same IDS multiple times[431] is not a credible explanation for failing to disclose the non-patent Yanko design website describing the Lee Single Dog Bowl Mat that would be required to be disclosed as a separate NPL filing, not on an IDS.[432]   Thus, Mr. Williams' excuse that there was a "merge" error does not apply to the disclosure of the Yanko design website describing the Lee Single Dog Bowl Mat.   Additionally, despite being aware of the various other website articles describing the Lee Single Dog Bowl Mat in the "patentoffice_research_EN.PDF," Mrs. Laurain failed to disclose these additional website articles to the USPTO during the prosecution of related patent applications, electing only to disclose the Yanko website in the '824 Application.

15.     Almost 8 months after Mr. Olds indisputably told Mr. Willams and Mr. Garthe to cite the Lee Single Dog Bowl Mat in both the '403 and '823 Applications, on February 21, 2018, Mr. Garthe and Mr. Williams worked together to prepare an amended IDS, as well as an NPL

---

[428]     *See* Trial Exhibits 905 and 281,the prosecution histories of the '823 Application and '403 Application, respectively.

[429]     Dkt. No. 835 (Transcript Volume VI), at 1061:12-1063:6.

[430]     Trial Exhibit 905; Trial Exhibit 281.

[431]     Dkt. No. 835 (Transcript Volume VI), at 1062:16-1063:6; 1064:25-1065:1.

[432]     Dkt. No. 835 (Transcript Volume VI), at 1193:1-1193:15.

disclosure of the Lee Single Dog Bowl Mat.[433]   That same evening, Ashley of Williams Intellectual Property emailed Mr. Garthe to inform him of a January 9, 2016 comment by Thomas Turner on the publication of the Lee Single Dog Bowl Mat at https://www.yankodesign.com/2007/07/09/dog-bowl-and-placemat-all-in-one/ that stated the following:

> "Hey have you seen the American company EZPZ that is saying they have a patent on this exact product? But yours predates there's by 8 years. They were on Shark tank last night saying that they have the patent.  I would like to work with you to develop this further."[434]

Mr. Williams and Mr. Garthe did not file the amended IDS they had prepared or disclose the Lee Single Dog Bowl Mat to the USPTO after receiving the foregoing email.

16.     The Court finds that Mr. Williams, in failing to disclose the Yanko link describing the Lee Single Dog Bowl Mat during prosecution of the '823 and '403 Applications, allowed his concern about opening up new avenues of prior art[435] to override his duty of good faith and candor.  His post hoc excuses for not disclosing the Yanko website (*i.e.*, that it was non-enabling and that *it* was a suction cup)[436] lack merit.  This is further evidence of Mr. Williams approach of withholding material prior art from the USPTO during prosecution.

17.     The Court finds that Mr. Williams and Mrs. Laurain's conduct during the prosecution of the related applications further confirms their strategy was to disclose as little prior art as possible during the prosecution of the '682 Application and the related patent applications and to keep their "fingers crossed" that the Patent Examiner would not find the withheld prior art.

---

[433]     Trial Exhibit 643.

[434]     Trial Exhibit 645.

[435]     Trial Exhibit 287.

[436]     Dkt. No. 835 (Transcript Volume VI), at 1169:18-1169:24; 1171:11-1172:3.

### 4.    Mr. Williams and/or Mrs. Laurain Withheld But-For Material References From the USPTO.

#### a.    The Webb Publication and the Webb Patent

1.    On May 18, 2020, this Court confirmed the but-for materiality of the Webb Patent and the Webb Publication when it invalidated the '903 Patent due to its finding that the '903 Patent was obvious in light of the Webb Patent and the Webb Publication.[437]   The Court notes that its obviousness ruling was made under the clear and convincing standard whereas the standard for but-for materiality is a preponderance of the evidence.[438]   Thus,  the Court finds that the Webb Patent an the Webb Publication are but-for material prior art.

2.    "[T]reatment of prior art in connection with other related patent applications" is "of particular importance" to materiality.[439]   "The inference that prior art cited in a related foreign application is material is 'especially strong' when it was relied upon to reject 'the same or similar claims in the foreign application or where it has been identified in some manner as particularly relevant.'"[440]   The Court's findings concerning the but-for materiality of Webb and the Webb Publication is confirmed by the proceedings in the prosecution of the '823 Application and the '403 Application:

---

[437]    *Compare* Dkt. No. 522 and Dkt. No. 523.  As stated above, "if a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO."  *Therasense, Inc*., 649 F.3d at 1292.

[438]    *Compare* Dkt. No. 522, at p. 4 (applying clear and convincing evidence as the burden of proof), *with Regeneron*, 864 F.3d at 1351 (citing *Therasense*, 649 F.3d at 1291–92) (emphasis added) (applying a preponderance of the evidence standard for but-for materiality).

[439]    *Regeneron Pharm., Inc. v. Merus B.V*., 144 F. Supp. 3d 530 (S.D.N.Y. 2015) *aff'd sub nom. Regeneron Pharm., Inc. v. Merus N.V*., 864 F.3d 1343 (Fed. Cir. 2017).

[440]    *See Deep Fix, LLC v. Marine Well Containment Co*., No. 18-00948, 2020 WL 773164, at *7 (S. D. Tex. Feb. 18, 2020) (citing MPEP § 2001.06(a)).

a.  On March 1, 2017, the '955 PCT Application was filed in the USPTO as a Chapter II National Phase Application and became the '823 Application that was assigned to Examiner Volz, the same Examiner who was assigned to the '682 Application.[441]   Because the '823 Application is based on the '955 PCT Application, the ISA Report and Written Opinion were already part of the prosecution of the '823 Application having been carried over from the '955 PCT Application.[442]   The '823 Application was filed with the same drawings, written specification and claims as originally filed in the '682 Application.[443]   On June 27, 2017, Mr. Williams filed a preliminary amendment of the '823 Application to clarify that the application is a "national stage entry of international application PCT/US1511955 filed on January 20, 2015, which claims the benefit of" the priority date of the '903 Patent.[444]   On October 16, 2017, Mr. Williams filed a preliminary amendment canceling the original claims 1-9 and replacing them with method claims 10-13.  The method claims 10-13 were entirely analogous to the claims that issued as the '903 Patent.[445]   On June 28, 2018, Examiner Volz rejected claims 10 and 11 as being anticipated by Webb et al. (U.S. Pub. No. 2008/0245947).[446]   She rejected claims 12 and 13 for obviousness as being unpatentable over Webb et al. (U.S. Pub. No. 2008/025947 in view of Brown

---

[441]     Trial Exhibit 905, at p. 94.

[442]     Trial Exhibit 905, at pp. 134-143.

[443]     Trial Exhibit 905, at pp. 104-122.

[444]     Trial Exhibit 905, at pp. 78-79.

[445]     Trial Exhibit 905, at pp. 63-66.

[446]     Trial Exhibit 905, at p. 31.

(U.S. Patent No. 2,683,974)).[447]   Mr. Williams advised Mrs. Laurain of this rejection on June 29, 2018.[448]  Examiner Volz's rejection of the claims in the '823 Application thus further confirms the but-for materiality of Webb and the Webb Publication.

b.  The but-for materiality of Webb and the Webb Application was again confirmed for a second time during the prosecution of the '403 Application.  Like the '823 Application, the '403 Application shared the same drawings and written specifications of the originally filed '682 Application.[449]  On November 13, 2017, the Examiner rejected each and every one of Mrs. Laurain's claims under 35 U.S.C. § 102(a) as being anticipated by the Webb Application because it "discloses a surface contact self-sealing integrated tableware and dining mat," comprising of a silicone planar portion, a suffuse undersurface made of sticky material, that creates a partial vacuum when attempts to lift except at outer edge is made.[450]  The Examiner further noted "the curve of the suction cup [of the Webb Patent] can act as a receptacle."[451]  Finally, the Examiner noted that the Webb Application discloses a "cambered" planar portion "where the vacuum is created."[452]

---

[447]    Trial Exhibit 905, at 32-33.

[448]    Trial Exhibit 299; Dkt. No. 826-9 (Williams 2020 Depo.), at 755:7-755:10; 755:14-756:16.

[449]    Trial Exhibit 281, at EZPZ301222-243.

[450]    Trial Exhibit 281, at EZPZ301177-178.

[451]    Trial Exhibit 281, at EZPZ301178.

[452]    Trial Exhibit 281, at EZPZ301178.

3.     While Mr. Williams testified at trial that Webb and the Webb Publication were cumulative of prior art cited in the '682 Application,[453] the Court disagrees.  Mr. Williams and EZPZ failed to provide any patent or publication number such that the Court can readily identify what the "Rios" or "Vargos" patents are, or if they were in fact identified in the USPTO's search results, and in any event offered no analysis of how Webb and the Webb Publication are cumulative of the claims of Rios or Vargos.[454]  Additionally, United States Patent Publication No. US 2012/0128922 A1 ("Bowen") (the only patent publication Williams was able to identify by number),[455] Rios, and Vargos are references *not* cited to the USPTO by Mr. Williams or Mrs. Laurain, and do not appear in the lists of references actually cited by the Examiner in the '682 Application.[456]  Instead, these references appeared for the very first time as one of over two hundred hits in the Examiner's August 8, 2016 Automated Search Tool history.[457]  Mr. Williams, himself, admitted that the Examiner likely looked only at the first page of any patents in her search[458] and that Bowen was not expressly cited as the basis for a rejection.[459]  Additionally, Mr. Williams' allegation that the Balogh Patent was cited in the Examiner's August 8, 2016 Automated Search Tool history[460] is belied by the evidence.[461]  It does not appear anywhere in

---

[453]     Dkt. No. 835 (Transcript Volume VI), at 1054:17-1054:23.

[454]     Dkt. No. 834 (Transcript Volume V), at 837:10-837:21; Dkt. No. 835 (Transcript Volume VI), at 1041:3-1041:8.

[455]     Dkt. No. 834 (Transcript Volume V), at 859:3-859:11; Dkt. No. 835 (Transcript Volume VI), at 1039:22-1039:25.

[456]     *See* List of References Cited by Examiner dated April 13, 2015 (Trial Exhibit 245, at LNC395237) and July 29, 2015 (Trial Exhibit 245, at LNC395263).

[457]     Trial Exhibit 245, at LNC395466.

[458]     Dkt. No. 835 (Transcript Volume VI), at 1040:2-1040:8.

[459]     Dkt. No. 826-9 (Williams 2020 Depo.), at 433:10-436:16.

[460]     Dkt. No. 834 (Transcript Volume V), at 832:2-832:12.

[461]     Trial Exhibit 245, at LNC395466.

the prosecution history of the '903 Patent.[462]   Finally, Mr. Williams asserted that Webb and the Webb Publication were cumulative of the Platinum Pets Mat.[463]   Yet, as set forth in Section I.A.4.c., Mr. Williams and Mrs. Laurain undisputedly misrepresented the true characteristics of the Platinum Pets Mat such that pertinent information was not before the USPTO.   And, even assuming *arguendo* their description of Platinum Pets to be correct (*i.e.*, that it did not form a self-sealing partial vacuum), then Webb would clearly not be cumulative because it claims formation of a partial vacuum.[464]   The Court finds Mr. Williams' testimony to be nothing more than a belated and last minute attempt to justify his failure to disclose Webb and the Webb Publication during prosecution of the '682 Application based upon his hindsight review of the prosecution history well after issuance of the '903 Patent and the commencement of this litigation.   Importantly, Mr. Williams admitted he did not know Bowen had appeared in the Examiner's search history during prosecution.[465]   Indeed, the Examiner did not even post her search history until after Mr. Williams and Mrs. Laurain had learned a notice of allowance would be issued.[466]

4.     Mr. Williams further testified at trial that there was no need to disclose Webb because it "doesn't anticipate the invention"[467] and because it is a "suction cup."[468]

5.     In determining the materiality of prior art, the court must use the broadest possible claim construction, which in this litigation necessarily includes this Court's claims construction that the

---

[462]     Trial Exhibit 245, at LNC395466.

[463]     Dkt. No. 834 (Transcript Volume V), at 859:5-859:7.

[464]     Trial Exhibit 615 (Claim 18).

[465]     Dkt. No. 567-1, at 502:10-503:16.

[466]     Dkt. No. 835 (Transcript Volume VI), at 1043:6-1043:18; 1107:20-1107:25.

[467]     Dkt. No. 834 (Transcript Volume V), at 833:21-834:1.

[468]     Dkt. No. 835 (Transcript Volume VI), at 1046:6-1046:10.

mat need only be a part of a plane and could include a curvature. Given that EZPZ argued, and the Court accepted, a broad claim construction in an attempt to have the '903 Patent ultimately read on the LNC mats having a built in three degree curvature, the Court applies the same broad construction when analyzing prior art and therefor finds that the '903 Patent reads on the Webb Patent and the Webb Publication, which claim a resiliently deformable mat which, when attempts are made to pull it up from the surface, forms a concavity and a pocket of lower pressurized air (*i.e.*, a partial vacuum) results below the mat between the mat and underlying surface.[469]

6.     Material prior art is not limited to prior art that "anticipates" the invention, but also includes prior art references that can be combined with other prior art references for an obviousness rejection.[470]

7.     Additionally, even Mr. Williams admitted (in contrasting Webb and the Webb Publication with a prior art reference that is "clearly a suction cup") that Webb and the Webb Publication merely "operates in the same manner as a suction cup,"[471] and forms a partial vacuum "*like* a suction cup."[472]

8.     The Webb Patent specifically states the following:

> The effect of the **upwardly directed force** 36 is to provide a slight deformation of the mat 10 in the area 37 as shown. … As the suction cup 14 in this embodiment is also manufactured of TPE which is a resiliently deformable

---

[469]     Trial Exhibit 615. "If a claim term must be broadly interpreted to read on an accused device, then this same broad construction will read on the prior art." *O1 Communique Laboratory, Inc. v. Citrix Systems, Inc.,* 889 F.3d 735, 742 (Fed. Cir. 2018).  *See also Liebel-Flarsheim Co. v. Medrad, Inc*., 481 F.3d 1371, 1380 (Fed. Cir. 2007) (a patent holder must "beware of what [it] asks for" since a broad claim construction for infringement proposed may ultimately result in a determination of patent invalidity).

[470]     *See* 37 C.F.R. § 1.56.

[471]     Dkt. No. 835 (Transcript Volume VI), at 1052:10-1052:13.

[472]     Dkt. No. 835 (Transcript Volume VI), at 1088:21-1088:23

material, **the pulling action** is transferred to the point 19 on the upper peripheral edge of the suction cup 14 through the strap **to pull the small area 37 of mat 10 away from the surface 12 thereby increasing the concavity 31 to create a volume 38 35 defined by a lower surface 10 to the mat in the area 37 and by an opposing area of the feeding table 12.** As the mat may be made at least in part from TPE, which is an inherently "sticky" material, it will stick or adhere to a substantially smooth surface such as the feeding table 12 … In this area 45, volume 38 which is a vacuum or at least a partial vacuum, this serves further to hold the mat 10 against the surface 12, 45 thereby increasing the efficiency of the holding action of the mat 10 upon the surface 12 and in particular, enhancing the suction effect of the concavity 31. Indeed multiple concavities may be formed in the underside to provide multiple sucker effect in the same manner.[473]

9.      The Webb Patent is but-for material because Mr. Williams had previously distinguished suction cups because he argued: "Applicant's device does not create 'suction' when **pressed** to a suitable horizontal surface '"with which suction can develop', but on the contrary, creates a partial vacuum when attempts **to remove** the mat are made."[474]   He also admitted at trial that no vacuum is formed with Mrs. Laurain's invention until attempts to lift the mat are made.[475]   Thus, unlike with suction cups, where a **downward force** or "press[ing]" is applied to form the suction (*i.e.*, partial vacuum), the Webb Patent, just like Mrs. Laurain's invention, claimed formation of a partial vacuum caused by an "**upwardly directed force**" or "**pulling action**."[476]   There was not, therefore, a patentable distinction between the pending claims of the '682 Application and the Webb Patent, which was not a suction cup, did not create a partial vacuum in the same manner as a suction cup, and was but-for material.

10.      Even if the Court considers the Bowen Patent, Webb and the Webb Publication are not cumulative because nothing in the Bowen Patent contemplates a mat that self-seals to an underlying surface and EZPZ failed to identify any language in the Bowen Patent providing that

---

[473]      Trial Exhibit 615 (emphasis added).

[474]      Trial Exhibit 245, at LNC395247 (emphasis added).

[475]      Dkt. No. 835 (Transcript Volume VI), at 1174:2-1174:4.

[476]      Trial Exhibit 615 (emphasis added).

it is in fact self-sealing.[477]  In fact, Mr. Williams admitted the Bowen Patent does not claim a "partial vacuum forming under the mat."[478]

11.    Had the Examiners had the benefit of Webb or the Webb Publication during the prosecution of the '903 Patent, it is more probable than not that they would have rejected all claims of the '903 Patent for obviousness and/or anticipation.  Thus, Webb and the Webb Publication were but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had these references been disclosed to the USPTO during prosecution of the '903 Patent.  This is further confirmed by the prosecution of both the '823 Application and the '403 Application where Webb or the Webb Publication was disclosed and ruled upon by the respective Examiners to reject the pending claims as anticipated or rendered obvious by Webb or the Webb Publication.[479]

12.    Mrs. Laurain knew of the Webb Patent and Webb Publication at the outset of the filing of the '682 Application, knew of their significance to the patentability of the pending claims no later than May 4, 2015 when the ISA issued a Report and Written Opinion listing the Webb Patent and Webb Publication as a "Y" reference,[480] and deliberately failed to disclose it during the prosecution of the '682 Application notwithstanding Mr. Morse's letter advising her of the invalidating prior art, which included the Webb Publication.[481]

---

[477]    *See* Trial Exhibit 956; Trial Exhibit 957.

[478]    Dkt. No. 835 (Transcript Volume VI), at 1108:1-1108:5.

[479]    Trial Exhibit 905, at pp. 30-33; Trial Exhibit 281, at EZPZ301177-179.

[480]    Trial Exhibit 46; Trial Exhibit 47.

[481]    Trial Exhibit 115.

13.     Mr. Williams self-serving testimony that Examiner Volz was aware of the Webb Patent and Webb Publication during prosecution of the '682 Application[482] is refuted by the contemporaneous evidence and the public records of the '682 Application.[483]

14.     Mr. Williams knew of the Webb Patent and Webb Publication no later than May 4, 2015 when the ISA issued a Report and Written Opinion listing the Webb Patent and Webb Publication as a "Y" reference, knew of their significance, and deliberately failed to disclose it during the prosecution of the '682 Application.   Although Mr. Williams stated that he had a "fairly solid argument" to prevail over the Webb Patent and Webb Publication,[484] as noted, the Court finds that having an "argument" does not satisfy Mr. Williams' duty of disclosure to the USPTO under Rule 1.56 and *Therasense*.

### b.     The Tommee Tippee Mat

1.     The Tommee Tippee Mat[485] is the commercial embodiment of the Webb Patent.[486]

2.     The Tommee Tippee Mat has a planar portion with a suffuse undersurface that resists removal from the underlying surface when attempts are made to lift the mat from a location other than the outer edge.[487]

3.     During trial, Mr. Hubbard attempted to remove the Tommee Tippee Mat by pulling from the middle and it "wo[uld]n't lift at all" but he was able to peel it "from the side."[488]   Mr.

---

[482]     Dkt. No. 835 (Transcript Vol. VIII), at 1145:9-1145:13.

[483]     *See* Trial Exhibit 245.  *See also* Trial Exhibit 905, at pp. 30-33 (that same Examiner rejecting the entirely analogous method claims in the '823 Application).

[484]     Trial Exhibit 194.

[485]     Trial Exhibit 446.

[486]     Dkt. No. 832 (Transcript Volume III), at 283:23-284:1.

[487]     Trial Exhibit 446.

[488]     Dkt. No. 832 (Transcript Volume III), at 237:20-239:7.

Hubbard's demonstration at trial establishes that the Tommee Tippee Mat self-seals to an underlying surface.[489]

4.      A June 15, 2011 video review of the Tommee Tippee Mat notes that "there is no adhesive" and "it just plops right down" and "automatically sticks to anything, any surface."[490] Mr. Williams admitted there was no suction cup on the bottom of the Tommee Tippee Mat in the June 15, 2011 video review.[491]

5.      Mrs. Laurain originally denied that the Tommee Tippee Mat self-seals to an underlying surface,[492] but after it was demonstrated to her, she admitted that the Tommee Tippee Mat "sticks" and could lift up the tray to a highchair absent any external pressure put on the mat.[493] She also attempted to remove the Tommee Tippee Mat by grabbing the suction cup located at the center of the top of the mat and yanking forcibly upward, unsuccessfully.  Mrs. Laurain conceded that she could not lift the mat off the table that way, but had to "peel[] it" to remove it.[494]

6.      Mrs. Laurain acknowledged that the Tommee Tippee Mat, and other silicone mats, will not self-seal if they are dirty.[495] Additionally, Mrs. Laurain confirmed that if you put a Tommee Tippee Mat on the carpet, the fibers of the carpet will stick to the silicone and get dirty.[496]  The

---

[489]    *See id.*

[490]    Trial Exhibit 969.

[491]    Dkt. No. 835 (Transcript Volume VI), at 1161:2-1161:6.

[492]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 73:11-74:8.

[493]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 141:12-142:8.

[494]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 72:5-73:10.

[495]    Dkt. No. 833 (Transcript Volume IV), at 415:5-415:8; 418:22-419:1; Dkt. No. 826-6 (Laurain 2019 Depo.), at 142:2-142:16.

[496]    Dkt. No. 833 (Transcript Volume IV), at 415:5-415:7.

Court finds that Mrs. Laurain knew the Tommee Tippee Mat self-sealed when it was clean and not deformed by having been folded.

7.  Mrs. Laurain had a Tommee Tippee Mat in her possession in March 2014, but she claimed the one she obtained came folded up in a box and did not lie flat or self-seal.[497] Although Mrs. Laurain testified that she had not purchased her version of the Tommee Tippee Mat from the United Kingdom,[498] the evidence at trial, including the serial manufacturing number[499] and Mrs. Laurain's email from Amazon UK showing her interest in the Tommee Tippee Magic Mat from the United Kingdom,[500] establishes that Mrs. Laurain ordered the Tommee Tippee Mat folded in a box from the United Kingdom to give to her counsel, Brian Tobin, for purposes of this litigation.  In fact, in a social media post she made on February 17, 2015, she stated that she "ran out" and purchased competing products.[501]  "Running out" and purchasing is different from ordering on-line.  Mrs. Laurain admitted that if Mrs. Laurain "ran out" and purchased the Tommee Tippee Mat, she would have located one sold in the United States, not the United Kingdom.[502]  Additionally, pictures Mrs. Laurain took of the Tommee Tippee Mat in her early presentation show the Tommee Tippee Mat lying flat on a table, with no visible folds or bends.[503]

---

[497]     Dkt. No. 833 (Transcript Volume IV), at 414:16-414:19; 423:9-423:16.

[498]     Dkt. No. 833 (Transcript Volume IV), at 421:19-421:23.

[499]     Dkt. No. 835 (Transcript Volume VI), at 1011:10-1012:24.

[500]     Trial Exhibit 979.

[501]     Trial Exhibit 41, at PDF p. 10.

[502]     Dkt. No. 833 (Transcript Volume IV), at 416:21-417:15.

[503]     Trial Exhibit 7, at Brenda Speer 000017 and Brenda Speer 000039.

8.      While Mr. Williams testified that he did not believe Webb and the Webb Publication did not need to be cited because it operates like a "suction cup,"[504] that argument is inapplicable to the Tommee Tippee Mat because the Court's own examination of the Tommee Tippee Mat, and Mr. Williams testimony regarding the same,[505] confirms there is no suction cup on the undersurface of the mat.

9.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the Tommee Tippee Mat combined with Bass, because the Tommee Tippee Mat[506] filled in the following elements the Examiner found to be missing from Bass:

    a.  the use of silicone;

    b.  preventative of lateral displacement; and

    c.  the surface contact self-sealing characteristic.

10.     The Tommee Tippee Mat was not cumulative of prior art cited in the '682 Application for the same reasons Webb and the Webb Publication are not cumulative and because the prior art references cited by the Examiner in the '682 Application do not contemplate a placemat that self-seals to the underlying surface.

11.     The Tommee Tippee Mat is also an anticipatory reference because it meets all claim limitations, including but not limited to a surface contact self-sealing *integrated* tableware and dining mat, as the curve of the suction cup on the top of the mat can act as a receptacle.[507]  The

---

[504]    Dkt. No. 834 (Transcript Volume V), at 833:21-835:2.

[505]    Dkt. No. 835 (Transcript Volume VI), at 1161:2-1161:6.

[506]    Trial Exhibit 446.

[507]    Trial Exhibit 446.

Court's finding is consistent with the non-final rejection dated November 13, 2017 in the '403 Application, wherein Examiner Impink noted "the curve of the suction cup can act as a receptacle" and found Webb, the patent of which the Tommee Tippee Mat is the commercial embodiment,[508] to be an anticipatory reference.[509]

12.    Although Mrs. Laurain testified at trial that as of "*today*" she believes the Tommee Tippee Mat is "cumulative" of prior art references known to the USPTO during the prosecution of the '682 Application (*i.e*., Bowen),[510] neither Mrs. Laurain nor Mr. Williams knew Bowen appeared in the search results until *after* the '903 Patent issued.[511]   This post-hoc illegitimate explanation is irrelevant to why Mrs. Laurain failed to disclose the Tommee Tippee Mat to the USPTO during the prosecution of '682 Application.

13.    It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.   Had the Examiners had the benefit of the Tommee Tippee Mat during the prosecution of the '903 Patent, it is more probable than not that they would have rejected all claims of the '903 Patent for obviousness.   Thus, the Tommee Tippee Mat was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had these references been disclosed to the USPTO during prosecution of the '903 Patent.

14.    Mrs. Laurain knew of the Tommee Tippee Mat at the outset of the filing of the '682 Application, knew of its significance at the outset of the filing of the '682 Application when she

---

508      Dkt. No. 832 (Transcript Volume III), at 283:23-284:1.

509      Trial Exhibit 281, at EZPZ301178.

510      Dkt. No. 834 (Transcript Volume V), at 712:18-712:23 (emphasis added).

511      Dkt. No. 567-1, at 502:10-503:16.

included it in her PowerPoint to Ms. Speer,[512] which significance was confirmed on August 26, 2015 when the supervising Examiner, Fenn Matthew, had concerns about "rubber sheets and silicone sheets…that stick[] to walls"[513] and in December 2015 when Mrs. Laurain was placed on notice that the Examiners were looking for a prior art reference to replace Lion that teaches the self-sealing property,[514] and deliberately failed to disclose it during the prosecution of the '682 Application.

### c.      The Platinum Pets Mat

1.      Despite knowing she had an uncompromising duty of candor and good faith owed to the USPTO, Mrs. Laurain and Mr. Williams did not disclose the Undisclosed Video of the Platinum Pets Mat to the USPTO during the prosecution of the '903 Patent because it made a "suction" noise and "trie[d] to self-seal."[515]   Likewise, she did not disclose that the Platinum Pets Mat actually suctioned to an underlying surface.[516]

2.      The Disclosed Video is a misrepresentation of the actual functionality of the Platinum Pets Mat.[517]   A review of the Disclosed Video shows that it was placed on the countertop in a manner to permit air to get underneath the mat.[518]

3.      At trial, Mr. Hubbard demonstrated the self-sealing characteristic of a physical sample of the Platinum Pets Mat, which he lay flat atop the protective glass covering one of the wooden

---

[512]      Trial Exhibit 7, at Brenda Speer 000039.

[513]      Trial Exhibit 678, at BWILLIAMS001944.

[514]      *See* Trial Exhibit 692, at OMH-BW-00002163; Trial Exhibit 245, at LNC395312.

[515]      Trial Exhibit 614.

[516]      Trial Exhibit 245, at LNC395355.

[517]      Trial Exhibit 613 (Undisclosed Video).

[518]      Trial Exhibit 612.

-86-

tables in the back of the courtroom.[519]  While Mr. Williams testified that the Platinum Pets Mat

"doesn't effectively prevent displacement underneath,"[520] when Mr. Hubbard lifted the mat by

holding the rims of the two bowls, the mat sealed to the glass surface, lifting the glass several

inches above the underlying wood surface.[521]  The mat did not break its seal, and Mr. Hubbard

was able to lower both the mat and the glass safely to the wooden surface.[522]  Although EZPZ's

expert, Mr. Henley, was not able to recreate Mr. Hubbard's results,[523] Mr. Henley did admit on

cross-examination that the Platinum Pets Mat does self-seal to some extent.[524]  Mrs. Laurain

failed to provide Mr. Kennedy, EZPZ's patent law expert, with the Platinum Pets Mat or the

Undisclosed Video where in the Platinum Pets Mat makes a "suction" sound when Mrs. Laurain

attempts to remove the mat from the underlying surface.[525]

4.     Mrs. Laurain and Mr. Williams told the USPTO that the Platinum Pets Mat "fails to make

sealable contact" with an underlying surface.[526]  Given that both Mrs. Laurain and Mr. Williams

observed the Platinum Pets Mat self-sealing to the underlying surface to some extent before

separating from the surface with an audible "suction" sound, the Court finds that Mr. Williams

and Mrs. Laurain's representation was a knowingly false statement of material fact.  The Court

finds the statement to be material because the actual features of the Platinum Pets Mat contradict

the arguments Mrs. Laurain and Mr. Williams were advancing to the USPTO – namely, that the

---

[519]     Trial Exhibit 450.

[520]     Dkt. No. 834 (Transcript Volume V), at 799:10-799:15.

[521]     Dkt. No. 832 (Transcript Volume III), at 229:22-230:7.

[522]     Dkt. No. 832 (Transcript Volume III), at 229:22-230:7.

[523]     Dkt. No. 836 (Transcript Volume VII), at 1436:15-1437:14.

[524]     Dkt. No. 836 (Transcript Volume VII), at 1456:13-1456:15.

[525]     Dkt. No. 835 (Transcript Volume VI), at 950:4-951-17.

[526]     Trial Exhibit 245, at LNC395355.

Platinum Pets Mat is an example of a silicone product that does not self-seal to an underlying surface.

5.     Mr. Hubbard testified that the Platinum Pets Mat is an anticipatory reference to each and every element of Claim 1 of the '903 Patent.[527]  Mr. Hubbard testified that while the self-sealing characteristic of Mrs. Laurain's invention may be considered the "Rolls-Royce" of self-sealing mats and the Platinum Pets Mat might be considered the "Ford Pinto" of self-sealing mats, both shared all the same features.[528]  There is no dispute that the Happy Mat is a better engineered product, but as recognized by Mr. Williams, both mats create a partial vacuum and can ultimately be lifted up in the middle.[529]  In fact, Mr. Williams recognized that in order for any partial vacuum to exist, including in the Happy Mat, "air has to displace" just like it does for the Platinum Pets Mat.[530]  The Court agrees.  It is the presence of lower pressured air beneath the mat that forms vacuum.[531]

6.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), the Platinum Pets Mat anticipated claim 1 of the '903 Patent because it had at least the following elements:[532]

    a.  an integrated tableware and dining mat that exhibits surface contact self-sealing;

    b.  a planar portion having a raised perimeter delimiting two concavities surrounding a receptacle;

---

[527]     Dkt. No. 832 (Transcript Volume III), at 231:10-232:3.

[528]     Dkt. No. 832 (Transcript Volume III), at 231:10-232:3.

[529]     Dkt. No. 834 (Transcript Volume V), at 799:8-803:2.

[530]     Dkt. No. 834 (Transcript Volume V), at 799:8-801:17.

[531]     Dkt. No. 835 (Transcript Volume VI), at 1106:8-1106:11.

[532]     Trial Exhibit 450.

    c.  an entirely suffuse undersurface;

    d.  is preventative of lateral displacement of the planar portion across an underlying surface; and

    e.  the planar portion creates a partial vacuum when attempts to separate the undersurface the from the underlying surface are made.

7.    Although Mr. Williams and Mrs. Laurain disclosed a small black and white image of the Platinum Pets Mat in Appendix D stating it "fails to make sealable contact with an underlying surface"[533] and linked to a YouTube video containing the Disclosed Video,[534] the Court finds this disclosure was insufficient and improper, as it was tantamount to burying an important reference among non-pertinent references.[535]

8.    Moreover, the Court finds that Mr. Williams and Mrs. Laurain misrepresented the actual features of the Platinum Pets Mat, as set forth above.

9.    The Court finds that had Mr. Williams and Mrs. Laurain fully and properly disclosed the Platinum Pets Mat, it is more probable than not that the USPTO would have rejected at least claim 1 of the '903 Patent.  Thus, the Platinum Pets Mat is but-for material to the patentability of

---

[533]    Trial Exhibit 245, at LNC395355.

[534]    Trial Exhibit 245, at LNC395440-441.

[535]    *See Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.,* 837 F. Supp. 1444, 1477 (N.D. Ind. 1992), *aff'd,* 11 F.3d 1072 (Fed. Cir. 1993) ("The court further holds that it is likewise a violation of the duty of candor and fair dealing with the Patent Office for an applicant or its attorney to disclose a pertinent prior art patent reference to the examiner in such a way as to 'bury' it or its disclosures in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue."); *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1573 (Fed. Cir. 1983) ("The conclusion that [the examiner] was 'fully informed' rests solely on the presentation to him of a mountain of largely irrelevant data from which he is presumed to have been able ... to have found the critical data. It ignores the real world conditions under which examiners work."); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 965 (S.D. Fla. 1972) ("Obviously, the purpose of this misrepresentation was to bury the Wollard patent in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the Stuart claims, would ignore the list and permit the Stuart patent to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office."), *aff'd,* 479 F.2d 1328 (5th Cir. 1973).

the '903 Patent because at least claim 1 would not have issued had these references been disclosed to the USPTO during prosecution of the '903 Patent.

10.    Mrs. Laurain knew of the Platinum Pets Mat at the outset of the filing of the '682 Application, knew of its significance in May 2014 when Mr. McCarthy told her that her invention "was not patentable" because the Platinum Pets Mat was prior art,[536] was reminded of its significance in August 2014 when Mr. Williams told Mrs. Laurain the Examiners could "sustain" their rejection in light of the "dog bowls"[537] and in March 2016 when it made a "suction" sound when she attempted to remove the mat in the Undisclosed Video,[538] yet Mrs. Laurain deliberately waited until March 2016 to disclose the Platinum Pets Mat (and only when she was again reminded by Mr. McCarthy that it needed to be disclosed).[539]  Even then, Mrs. Laurain misrepresented the true characteristics of the Platinum Pets Mat.[540]

11.    Mr. Williams knew of the Platinum Pets Mat at the outset of the filing of the '682 Application, knew of its significance in August 2014 when Mr. Williams told Mrs. Laurain the Examiners could "sustain" their rejection in light of the "dog bowls,"[541] was reminded of its significance in March 2016 when it made a "suction" sound when she attempted to remove the mat in the Undisclosed Video,[542] yet Mr. Williams deliberately waited until March 2016 to disclose the Platinum Pets Mat (and only when he was told by Mr. McCarthy that it needed to be

---

[536]    Trial Exhibit 86; Dkt. No. 826-4 (McCarthy Depo.), at 117:15-118:3, 119:17-121:19.

[537]    Trial Exhibit 29.

[538]    Trial Exhibit 613.

[539]    Trial Exhibit 109.

[540]    *Compare* Trial Exhibit 613 and Dkt. No. 832 (Transcript Volume III), at 229:22-230:7, *with* Trial Exhibit 245, at LNC395355.

[541]    Trial Exhibit 29.

[542]    Trial Exhibit 613.

disclosed).[543]  Even then, Mr. Williams misrepresented the true characteristics of the Platinum Pets Mat.[544]

12.    The Platinum Pets Mat was not submitted with an IDS to the USPTO by Mr. Williams which would, under Rule 1.56(a), have been deemed to have satisfied the duty of disclosure.

### d.    The Lee Single Dog Bowl Mat

1.    Mr. Williams testified that he did not disclose the Lee Single Dog Bowl Mat to the USPTO because the images of the Lee Single Dog Bowl Mat do not depict the bottom of the integrated silicone mat and bowl,[545] such that the Lee Single Dog Bowl Mat was not enabled.[546] Again, Mr. Williams has no contemporaneous notes that would support this justification for nondisclosure and in fact in August 2014, Mr. Williams told Mrs. Laurain that although "the other mats (those dog bowls, etc.)" did not "exhibit the same 'suction function'" he was "concern[ed]" that the USPTO will "try to claim that feature as inherent to structure disclosed in additional refences which taken in combination, sustain their rejection."[547]   Similarly, Mr. Williams asserted at trial that he did not disclose the Lee Single Dog Bowl Mat because it was nonenabling.  But he conceded that it constituted Non-Patent Literature *i.e.*, it is not a patent.[548]

2.    Mr. Williams admitted that even if it is a "nonenabled reference," the Lee Single Dog Bowl Mat must be considered for what it would reasonably suggest to one having ordinary skill

---

[543]    Trial Exhibit 109.

[544]    *Compare* Trial Exhibit 613 and Dkt. No. 832 (Transcript Volume III), at 229:22-230:7, *with* Trial Exhibit 245, at LNC395355.

[545]    Dkt. No. 834 (Transcript Volume V), at 865:7-865:12.

[546]    Dkt. No. 834 (Transcript Volume V), at 863:3-863:20; Dkt. No. 835 (Transcript Volume VI), at 1162:9-1162:17.

[547]    Trial Exhibit 29.

[548]    Dkt. No. 835 (Transcript Volume VI), at 1162:15-1163:5.

-91-

in the art pursuant to Section 2128 of the MPEP.[549]   Given the well-known principles of atmospheric pressure that are readily demonstrated by the atmospheric mat,[550] a person of ordinary skill in the art would have been able to reduce the invention to practice with little to no experimentation after seeing the Yanko design website.  The images and comments clearly show an integrated placemat and bowl made out of a flexible material, and that the mat has a planar portion surrounding the bowl that appears to be flat, without suction cups or other feature that would create suction.[551]   The GOD-B1 publication, showing the same device, includes an "anti-sliding" image and references "sucker of vacuum adsorption."[552]   LNC's expert, Mr. Hubbard, testified that the referenced suction and vacuum feature appears to result from the sealing of the undersurface of the planar portion of the mat on contact with the undersurface.[553]

3.      Mr. Hubbard testified that the Lee Single Dog Bowl Mat anticipates claim 1 of the '903 Patent.[554]  The images and comments in the Yanko publication of the Lee Single Dog Bowl Mat depicting an integrated placemat and bowl and a mat that has a planar portion surrounding the bowl that appears to be flat, without suction cups or other feature that would create suction,[555] anticipate the '903 Patent because a person of ordinary skill in the art would envisage that such a structure made of silicone could be made to inherently self-seal to the undersurface without the need for the dog to "step on the mat."[556]

---

[549]      Dkt. No. 835 (Transcript Volume VI), at 1163:6-1163:12.

[550]      Trial Exhibit 372; Trial Exhibit 374.

[551]      Trial Exhibit 698.

[552]      Trial Exhibit 729.

[553]      Dkt. No. 832 (Transcript Volume III), at 248:7-250:10.

[554]      Dkt. No. 382 (Transcript Volume III), at 248:12-249:14.

[555]      Trial Exhibit 698.  *See also* Trial Exhibit 729.

[556]      Dkt. No. 835 (Transcript Volume VI), at 940:1-941:25.  *See also* Trial Exhibit 729.

5328032_1

4.     The fact that the Lee Single Dog Bowl Mat states it "does not slide because puppy steps on bowl with feet,"[557] makes the reference no less anticipatory because as explained above in the applicable law, whether a reference "teaches away" from the invention is inapplicable to the anticipation analysis.  Mr. Kennedy's testimony to the contrary[558] is irrelevant and unsupported by the case law.

5.     A person of ordinary skill in the art, looking at the publications of the Lee Single Dog Bowl Mat and using his own knowledge, could envisage the invention claimed by the '903 Patent.  In fact, the additional website descriptions provided by Mr. Koenig,[559] which Mrs. Laurain does not deny having received before the issuance of the '903 Patent,[560] provide more descriptive information that the mat was made of silicone and formed a vacuum.[561]

6.     Indeed, Mr. Williams, himself, repeatedly recognized that the suction function may well be "inherent to the structure" and expected by one skilled in the art.[562]

7.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), the Lee Single Dog Bowl Mat disclosed it had at least the following elements:

     a.   An integrated mat and bowl;

---

[557]     Trial Exhibit 729.

[558]     Dkt. No. 835 (Transcript Volume VI), at 940:1-941:25.

[559]     Trial Exhibits 239; Trial Exhibit 912.

[560]     Dkt. No. 826-7 (Laurain 2020 Depo.), at 330:11-331:2.

[561]     Trial Exhibit 912.

[562]     Trial Exhibit 29.

b.  the portion of the mat that surround the bowl and appears to be flat and in contact with the floor is entirely suffuse, and thus it has a planar portion that is entirely suffuse; and

c.  an integrated tableware and mat made of silicone.

8.  The Lee Single Dog Bowl and Mat was not cumulative of prior art cited in the '682 Application.  Although Mrs. Laurain testified that the Lee Single Dog Bowl Mat was cumulative of the Platinum Pets Mat disclosed in Appendix D to the March 9, 2016 submission,[563] the Court finds that the Platinum Pets Mat was not adequately disclosed and that its features were misrepresented by Mr. Williams and Mrs. Laurain, as discussed in Section I.A.4.c. herein. Moreover, even assuming *arguendo* that the disclosures made by Mr. Williams and Mrs. Laurain about the Platinum Pets Mat were true, such that it did not in fact effectively self-seal,[564] then the Lee Single Dog Bowl Mat as described was not cumulative.

9.  Alternatively, under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the Lee Single Dog Bowl Mat combined with Webb and/or the Tommee Tippee Mat and/or the Momo Baby Skid-proof Silicone Placemat and/or the Brinware Silicone Placemat, and/or Bass because the combined references include the following elements:

a.  an integrated mat and bowl;

b.  the use of silicone; and

c.  the surface contact self-sealing characteristic.

---

[563]    Dkt. No. 834 (Transcript Volume V), at 617:15-617:18.

[564]    Trial Exhibit 245, at LNC395355.

-94-

10.     It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

11.     Thus, the Lee Single Dog Bowl Mat was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

12.     Mrs. Laurain knew of the Lee Single Dog Bowl Mat at the outset of the filing of the '682 Application, knew of its significance at the outset of the filing of the '682 Application when she recognized it as the most "similar" item she had found online,[565] was reminded of its significance in August 2014 when Mr. Williams told Mrs. Laurain the Examiners could "sustain" their rejection in light of the "dog bowls,"[566] and deliberately failed to disclose it during the prosecution of the '682 Application.  Further, the Lee Single Dog Bowl Mat was raised again in at an undetermined date in 2016 in connection with Ms. Laurain's interaction with Mr. Koenig and Yummynator.[567]

13.     Mr. Williams knew of the Lee Single Dog Bowl Mat at the outset of the filing of the '682 Application, knew of its significance in August 2014 when Mr. Williams told Mrs. Laurain the Examiners could "sustain" their rejection in light of the "dog bowls,"[568] and deliberately failed to disclose it during the prosecution of the '682 Application.

---

[565]     Trial Exhibit 7, at Brenda Speer 000040.

[566]     Trial Exhibit 29.

[567]     *See* Section I.A.3.b.7., at ¶ 2.

[568]     Trial Exhibit 29.

5328032_1

14.      Mrs. Laurain and Mr. Williams' deliberate failure to disclose the Lee Single Dog Bowl Mat is confirmed by Mr. Williams' admitted reluctance to open up a new avenue of prior art[569] and their failure to disclose it to the USPTO in the '823 Application,[570] or the '403 Application,[571] despite being advised to do so by Mr. Olds.[572]

### e.      The Momo Baby Skid-Proof Silicone Placemat

1.      The Momo Baby Skid-Proof Silicone Placemat teaches an entirely suffuse planar undersurface of a silicone product that will not slip or slide, that possesses self-sealing properties, exhibits a high coefficient of friction, and can only be removed by peeling away the undersurface from the  outer edge as presented in the '903 Patent.[573]  At a minimum, it should have been disclosed by Mrs. Laurain when the Examiners were looking for a reference to replace Lion.[574]

2.      During trial, Mr. Hubbard attempted to remove the Momo Baby Skid-Proof Silicone Placemat by pulling from the middle and it "wo[uld]n't come up if you pull in the middle" but he was able to peel it "from the edge, it just comes up."[575]  Mr. Hubbard further testified that there were no "adhesives" under the Momo Baby Skid-Proof Silicone Placemat.[576]  Mr. Hubbard's demonstration at trial establishes that the Momo Baby Skid-Proof Silicone Placemat self-seals to an underlying surface without the need for suction cups or adhesives.[577]  When Mr. Hubbard's

---

[569]      Trial Exhibit 287.

[570]      Trial Exhibit 905.

[571]      Trial Exhibit 281.

[572]      Trial Exhibit 287; Trial Exhibit 904, at EZPZ-EZ-0001913.

[573]      Trial Exhibit 445.

[574]      Trial Exhibit 692, at OMH-BW-00002163.

[575]      Dkt. No. 832 (Transcript Volume III), at 232:4-233:3.

[576]      Dkt. No. 832 (Transcript Volume III), at 233:4-233:5.

[577]      Dkt. No. 832 (Transcript Volume III), at 232:4-233:3.

demonstration was described to Mr. Henley, EZPZ's technical expert, on cross-examination, Mr. Henley agreed that that would indicate "self-sealing."[578]

3.      Although EZPZ argued that the Momo Baby Skid-Proof Silicone Placemat has is "sticky" or contained an adhesive on one side, the Court inspected the mat and finds that it "feels the same on both sides."[579]   Moreover, nothing in the accompanying packaging states that the Momo-Baby Skid-Proof Silicone Placemat uses adhesive.[580]

4.      Mr. Williams admitted that that Momo Baby Skid-Proof Silicone Placemat is relevant for an "obviousness consideration."[581]

5.      During Mrs. Laurain's 2019 deposition, she admitted that to remove the Momo Baby Skid-Proof Silicone Placemat from an underlying surface you have to "peel" from the edge.[582]

6.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the Momo Baby Skid-proof Silicone Placemat combined with Bass, because the Momo Baby Mat filled in the following elements missing from Bass:[583]

> a.  the use of silicone;
>
> b.  preventative of lateral displacement; and
>
> c.  the surface contact self-sealing characteristic.

---

[578]      Dkt. No. 836 (Transcript Volume VII), at 1453:24-1454:10.

[579]      Dkt. No. 832 (Transcript Volume III), at 293:8-294:1.

[580]      Dkt. No. 835 (Transcript Volume VI), at 1003:17-1004:24.  *See also* Trial Exhibit 445.

[581]      Dkt. No. 834 (Transcript Volume V), at 823:1-823:7; 824:3-824:7.

[582]      Dkt. No. 826-6 (Laurain 2019 Depo.), at 71:10-71:18.

[583]      Trial Exhibit 445.

7.     It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat like the Momo Baby Mat with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

8.     The Momo Baby Mat was not cumulative of prior art cited in the '682 Application, for the same reasons that the Tommee Tippee Mat was not cumulative of prior art cited in the '682 Application provided above.

9.     Thus, the Momo Baby Mat was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

10.     Mrs. Laurain knew of the Momo Baby Skid-Proof Silicone Placemat at the outset of the filing of the '682 Application, knew of its significance at the outset of the filing of the '682 Application when she recognized it as a competitor she had found online,[584] was reminded of its significance in August 2015 when the supervising Examiner, Fenn Matthew, had concerns about "rubber sheets and silicone sheets…that stick[s] to walls"[585] and in December 2015 when Mrs. Laurain was placed on notice that the Examiners were looking for a prior art reference to replace Lion that teaches the self-sealing property,[586] and deliberately failed to disclose it during the prosecution of the '682 Application.

### f.     The Brinware Silicone Placemat

1.     The Brinware Silicone Placemat teaches an entirely suffuse planar undersurface of a silicone product that will not slip or slide, that possesses self-sealing properties, exhibits a high

---

[584]     Trial Exhibit 7, at Brenda Speer 000035.

[585]     Trial Exhibit 678, at BWILLIAMS001944.

[586]     *See* Trial Exhibit 692, at OMH-BW-00002163; Trial Exhibit 245, at LNC395312.

coefficient of friction, and can only be removed by peeling away the undersurface from the outer edge as presented in the '903 Patent.[587]

2.      Ms. Clark, a declarant who represented herself as an "expert in the baby industry,"[588] confirmed that the Brinware Silicone Placemat has a "self-sealing capability without the need of any suction cups or adhesives" and "prevent[s] displacement form an underlying surface except by peeling it at the outer edge."[589]

3.      During trial, Mr. Hubbard attempted to remove the Brinware Silicone Placemat by "sliding" it or pulling from the middle and "not only d[id] it resist," but he could not "even move it."[590]  However, Mr. Hubbard was "able to peel it from the outer edge."[591]  Mr. Hubbard further testified that there were no "adhesives" under the Brinware Silicone Placemat.[592]  Mr. Hubbard's demonstration at trial establishes that the Brinware Silicone Placemat self-seals to an underlying surface without the need for suction cups or adhesives.[593]

4.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the Brinware Silicone Placemat combined with Bass, because the Brinware Silicone Placemat filled in the following elements missing from Bass:[594]

      a.   the use of silicone;

---

[587]      Trial Exhibit 451.  *See also* Dkt. No. 832 (Transcript Volume III), at 233:19-235:2.

[588]      Trial Exhibit 245, at LNC395322.

[589]      Dkt. No. 826-11 (Clark Depo.), at 120:19-121:22.

[590]      Dkt. No. 832 (Transcript Volume III), at 233:19-234:24.

[591]      Dkt. No. 832 (Transcript Volume III), at 235:3-235:4.

[592]      Dkt. No. 832 (Transcript Volume III), at 234:1-234:2.

[593]      Dkt. No. 832 (Transcript Volume III), at 233:19-234:24.

[594]      Trial Exhibit 451.

    b.   preventative of lateral displacement; and

    c.   the surface contact self-sealing characteristic.

5.     It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat like the Brinware Silicone Placemat with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

6.     The Brinware Silicone Placemat was not cumulative of prior art cited in the '682 Application, for the same reasons that the Tommee Tippee Mat was not cumulative of prior art cited in the '682 Application provided above.

7.     Thus, the Brinware Silicone Placemat was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

8.     Mrs. Laurain knew of the Brinware Silicone Placemat at the outset of the filing of the '682 Application, knew of its significance at the outset of the filing of the '682 Application when she recognized it as a competitor she had found online,[595] was reminded of its significance in August 2015 when the supervising Examiner, Fenn Matthew, had concerns about "rubber sheets and silicone sheets…that stick[] to walls"[596] and in December 2015 when Mrs. Laurain was placed on notice that the Examiners were looking for a prior art reference to replace Lion that teaches the self-sealing property,[597] and deliberately failed to disclose it during the prosecution of the '682 Application.

---

[595]    Trial Exhibit 7, at Brenda Speer 000038.

[596]    Trial Exhibit 678, at BWILLIAMS001944.

[597]    *See* Trial Exhibit 692, at OMH-BW-00002163; Trial Exhibit 245, at LNC395312.

g.        The Bruno Patent

1.        Bruno discloses a food bowl integrated with a flexible mat that is intended for feeding pets. The invention of Bruno has three main portions, a cup or bowl [12] for holding food that sits within an upstanding skirt [11] that is "formed integrally with" a mat [10].  The mat is planar in shape and has a raised perimeter.  The upstanding  skirt is a receptacle that is above the surface of the mat and integrally formed therewith.  This receptacle is designed to engage and hold the bowl portion of the invention.  The embodiment depicted by figures 1-3 shows the under surface of the mat in Figure 2 is also entirely suffuse, as that term was defined by the applicant during the during the prosecution of the '903 Patent.  Although the bowl is detachable, the integrally formed upstanding skirt is a receptacle that could be used for holding food.  Further, the Bruno Patent specifically discloses a "substantially flat sheet-like mat 10 fabricated of relatively flexible material such as sheet rubber, plastic or the like, and having a flat undersurface adapted to rest upon a supporting surface of the floor."   In another embodiment depicted in Figure 4 there is also a continuous flat undersurface with an integrally formed upstanding skirt/receptacle.[598]

2.        Figures 1-3 and 6 of the Bruno Patent together with the descriptive language anticipate the '903 Patent because a person of ordinary skill in the art would envisage that such a structure made of silicone, which Mr. Williams admitted was a type of rubber,[599] could be made to inherently self-seal to the undersurface without the need for the mat to be anchored in place by an animal standing on it.

---

[598]        Dkt. No. 832 (Transcript Volume III), at 219:1-220:25.  *See also* Trial Exhibit 991.

[599]        Dkt. No. 835 (Transcript Volume VI), at 1189:5-1189:7.

3.      The fact that Bruno discusses anchoring of the mat by an animal stepping on it[600] makes the reference no less anticipatory because as explained above in the applicable law, whether a reference "teaches away" from the invention is inapplicable to the anticipation analysis.[601]

4.      A person of ordinary skill in the art, looking at the Bruno Patent and using his own knowledge, could envisage the invention claimed by the '903 Patent.

5.      Indeed, Mr. Williams, himself, repeatedly recognized that the suction function may well be "inherent to the structure"[602] and expected by one skilled in the art.

6.      Mr. Hubbard testified that the Bruno Patent meets the structural limitations of at least Claim 1 of the '903 Patent.[603]

7.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of Bruno combined with Webb and/or the Webb Publication and/or the Tommee Tippee Mat and/or the Momo Baby Skid-proof Silicone Placemat and/or the Brinware Silicone Placemat, and/or Bass because their combined elements meet all of the following elements: [604]

        a.   an integrated tableware and mat; and

        b.   a mat made of relatively flexible material such as sheet rubber, plastic, or the like.

---

[600]   Trial Exhibit 991.

[601]   This is similar to the argument advanced by EZPZ against the Lee Single Dog Bowl Mat and, for the same reason, the Lee Single Dog Bowl Mat can anticipate the pending claims of the '903 Patent.

[602]   Trial Exhibit 29.

[603]   Dkt. No. 832 (Transcript Volume III), at 220:21-220:25.

[604]   Trial Exhibit 991.

8.      It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

9.      Bruno was not cumulative of prior art cited in the '682 Application because it discloses more than any other prior art references before the USPTO by being "structurally [] identical"[605] and providing that it is made of "relatively flexible material."[606]

10.     Thus, Bruno was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

11.     The but-for materiality of the Bruno patent was pointed out to Mrs. Laurain by Steve Dunn of Munchkin in October 2015 when he noted that "there is prior art that dates back decades for [her] concept"[607] and confirmed on January 20, 2017, when Mr. Garthe hired a consultant to perform a prior art search and concluded that Bruno was "high-risk prior art."[608]  Rather than provide a legitimate reason not to disclose Bruno (because there was none), Mr. Williams responded stating that they had argued against the reference already.[609]  Mr. Williams' statement to Mr. Garthe was false, as he did not argue against Bruno during prosecution of the '903

---

[605]     Dkt. No. 832 (Transcript Volume III), at 219:1-220:25.

[606]     Trial Exhibit 991.

[607]     Trial Exhibit 57, at EZPZ-CH-000993.

[608]     Trial Exhibits 900.

[609]     Trial Exhibit 900.

Patent.[610]   Moreover, while Mr. Williams had argued against "suction cups,"[611] Bruno clearly and indisputably does not claim a suction cup (or an adhesive).[612]

12.     Mrs. Laurain knew of the Bruno Patent no later than October 9, 2015,[613] knew of its significance when Mr. Bolton told her that it should be discussed and "deserved" their attention,[614] and deliberately failed to disclose it during the prosecution of the '682 Application.

13.     Mr. Williams knew of the Bruno Patent no later than October 9, 2015,[615] knew of its significance when Mr. Bolton told him that it should be discussed and "deserved" their attention,[616] and deliberately failed to disclose it during the prosecution of the '682 Application.

14.     Mr. Williams' *post hoc* explanation at trial pointing to the wording "anchored in place"[617] by an animal standing on it[618] is insufficient to overcome a finding of inequitable conduct on his part.   The invention was nevertheless anticipated by the Bruno Patent which disclosed the invention to one of ordinary skill in the art and was identified by a patent expert hired by EZPZ as "high risk" prior art.[619]   Moreover, Mr. Williams has no contemporaneous records showing such reason for not disclosing the Bruno Patent.   The Court finds this alleged explanation does not satisfy Mr. Williams' duty of disclosure to the USPTO under Rule 1.56 and *Therasense*.

---

[610]     Trial Exhibit 245.

[611]     Trial Exhibit 245.

[612]     Trial Exhibit 991.

[613]     Trial Exhibit 867; Trial Exhibit 57; Trial Exhibit 58.

[614]     Trial Exhibit 57; Trial Exhibit 58.

[615]     Trial Exhibit 867; Trial Exhibit 57; Trial Exhibit 58.

[616]     Trial Exhibit 57; Trial Exhibit 58.

[617]     Dkt. No. 835 (Transcript Volume VI), at 1189:1-1189:13.

[618]     Trial Exhibit 991.

[619]     Trial Exhibits 900.

h.      The Hot Iron Holster

1.      The Hot Iron Holster teaches an entirely suffuse planar undersurface of a silicone product that "cling[s] to any smooth, non-porous household surface," without the need for suction cups or adhesives as presented in the '903 Patent.[620]  Mr. Williams admitted it was made of silicone and contained a planar portion.[621]

2.      The Hot Iron Holster, while outside Mrs. Laurain's field of endeavor, is analogous prior art.  It is reasonably pertinent to the problem faced by the inventor and uses "a [silicone] flap specially formulated to cling to any smooth, non-porous household surface" such that "[n]o screws or sticky adhesive is required."[622]

3.      The Hot Iron Holster – despite not falling within the so-called "tableware arts" – exhibits the exact same functional characteristics that Mrs. Laurain and Mr. Williams argued to the USPTO made her alleged invention "novel" and "non-obvious."

4.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the Hot Iron Holster combined with Bass, because the Hot Iron Holster filled in the following elements missing from Bass:[623]

        a.  the use of silicone;

        b.  preventative of lateral displacement; and

        c.  the surface contact self-sealing characteristic.

---

[620]    Trial Exhibit 119; Trial Exhibit 447; Trial Exhibit 740.

[621]    Dkt. No. 835 (Transcript Volume VI), at 1229:2-1229:7.

[622]    Trial Exhibit 119.

[623]    Trial Exhibit 447.

5.     It would have been obvious to a person of ordinary skill in the art to combine a silicone flap like the Hot Iron Holster with an integrated bowl as evidenced by the Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

6.     The Hot Iron Holster was not cumulative of prior art cited in the '682 Application, for the same reasons that the Tommee Tippee Mat was not cumulative of prior art cited in the '682 Application provided above.

7.     Although Mrs. Laurain testified at trial that as of "*now*" she believes the Hot Iron Holster is "cumulative" of prior art references known to the USPTO during the prosecution of the '682 Application (*i.e.*, Bowen),[624] neither Mrs. Laurain nor Mr. Williams knew Bowen appeared in the search results until *after* the '903 patent issued.[625]  This post-hoc  explanation is irrelevant to why Mrs. Laurain and Mr. Williams failed to disclose the Hot Iron Holster to the USPTO during the prosecution of 682 Application.

8.     Thus, the Hot Iron Holster was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

9.     The Hot Iron Holster is further "material to the patentability" of the '903 Patent because it "refutes" and is "inconsistent with," the position Mrs. Laurain took in "[o]pposing an argument of unpatentability" and in "[a]sserting an argument of patentability"[626] when she told

---

[624]     Dkt. No. 834 (Transcript Volume V), at 784:8-784:14 (emphasis added).

[625]     Dkt. No. 567-1, at 502:10-503:16.

[626]     37 C.F.R. § 1.56.

the USPTO these very features, properties, and characteristics were "not seen in the prior art."[627]

10.    Mrs. Laurain knew of the Hot Iron Holster no later than February 16, 2015,[628] knew of its significance because she sent it to her prosecution team and recognized "the recent silicony suction/sticky stuff…" in the market,[629] and deliberately failed to disclose it during the prosecution of the '682 Application.  Further, Mrs. Laurain posited that this explained why they could not find a material scientist to provide the answer they want.[630]

11.    Although Mr. Williams originally tried to claim he did not know of the Hot Iron Holster during the prosecution of the patent, he had to admit that he did.[631]  Mr. Williams knew of the Hot Iron Holster no later than February 16, 2015,[632] knew of its significance because Mrs. Laurain told him that it was one of the many "recent silicony suction/sticky stuff…" in the market,[633] and deliberately failed to disclose it during the prosecution of the '682 Application. Further, although Mr. Williams tried to rationalize that the Hot Iron Holster does not claim self-sealing,[634] he did not review the Balogh Patent until after the prosecution.[635]  Moreover, and as Mr. Williams acknowledged, the Balogh Patent claims friction,[636] which is also a functional aspect of Mrs. Laurain's claimed invention which operates "by means of the high coefficient of

---

[627]    Trial Exhibit 245, at LNC395251.

[628]    Trial Exhibit 118; Trial Exhibit 119.

[629]    Trial Exhibit 118; Trial Exhibit 119.

[630]    Trial Exhibit 118.

[631]    Dkt. No. 835 (Transcript Volume VI), at 1126:6-1126:23.

[632]    Trial Exhibit 118; Trial Exhibit 119.

[633]    Trial Exhibit 118; Trial Exhibit 119.

[634]    Dkt. No. 835 (Transcript Volume VI), at 1128:9-1128:13 .

[635]    Dkt. No. 835 (Transcript Volume VI), at 1127:20-1127:22.

[636]    Dkt. No. 835 (Transcript Volume VI), at 1127:23-1128:8.

friction."[637]   Mr. Williams ultimately admitted that the Hot Iron Holster could be used in combination to sustain an obviousness rejection,[638] but tried to avoid his disclosure obligation by arguing it was cumulative.[639]  For the reasons other prior art above is not cumulative, neither is the Hot Iron Holster.

### i.        The CIBO Stick Anywhere Placemat

1.     The CIBO Stick Anywhere Placemat is the commercial embodiment of U.S. Patent Application Publication No. US 2015/0135391 A1, filed November 19, 2013 that teaches a "planar" mounting portion made of "rubber material so as to increase the coefficient of friction between the support surface [] and the bottom surface."[640]

2.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application (and that apply to claims of inequitable conduct), at least claim 1 of the '903 Patent would be invalid for obviousness in light of the CIBO Stick Anywhere Placemat combined with Bass, because CIBO Stick Anywhere Placemat filled in the following elements missing from Bass:[641]

       a.  the use of silicone;

       b.  preventative of lateral displacement; and

       c.  the surface contact self-sealing characteristic.

3.     It would have been obvious to a person of ordinary skill in the art to combine a silicone placemat like the CIBO Stick Anywhere Placemat with an integrated bowl as evidenced by the

---

[637]    Trial Exhibit 220.

[638]    Dkt. No. 835 (Transcript Volume VI), at 1228:3-1228:17.

[639]    Dkt. No. 835 (Transcript Volume VI), at 1228:18-1228:23.

[640]    Trial Exhibit 952; Trial Exhibit 958.

[641]    Trial Exhibit 958.

Lee Single Dog Bowl Mat and the Platinum Pets Mat, both of which were prior art to Mrs. Laurain's claimed invention.

4.      The CIBO Stick Anywhere Placemat was not cumulative of prior art cited in the '682 Application, for the same reasons that the Tommee Tippee Mat was not cumulative of prior art cited in the '682 Application provided above.

5.      Thus, the CIBO Stick Anywhere Placemat was but-for material to the patentability of the '903 Patent because at least claim 1 would not have issued had this reference been disclosed to the USPTO during prosecution of the '903 Patent.

6.      The CIBO Stick Anywhere Placemat is further "material to the patentability" of the '903 Patent because it "refutes" and is "inconsistent with," the position Mrs. Laurain took in "[o]pposing an argument of unpatentability" and in "[a]sserting an argument of patentability" when she told the USPTO these very features, properties, and characteristics were "not seen in the prior art."[642]

7.      Mrs. Laurain knew of the CIBO Stick Anywhere Placemat no later than January 21, 2015,[643] knew of its significance,[644] and deliberately failed to disclose it during the prosecution of the '682 Application.  Mrs. Laurain's understanding of the significance CIBO Stick Anywhere Placemat was confirmed in her November 27, 2016 email to Mrs. Winkelmann wherein she stated the CIBO Stick Anywhere Placemat was "so close" to her product and did not think they should collaborate.[645]

---

[642]      Trial Exhibit 245, at LNC395351.

[643]      Trial Exhibit 932.

[644]      *See id.*

[645]      Trial Exhibit 934.

8.    The Court finds that Mrs. Laurain told Mrs. Winkelmann that she didn't think Mrs. Chandler had copied the Happy Mat,[646] because Mrs. Laurain knew the CIBO Stick Anywhere Placemat had been invented prior to the Happy Mat.  The court notes that Mrs. Chandler filed her patent application on November 10, 2013 and that it describes a "mounting portion" that is "generally planar" and a "bottom surface" of the mounting portion which is configured to "grip the support surface when positioned thereon."[647]  Further in one embodiment, the "bottom surface 110 may be fabricated from a rubber material so as to increase the coefficient of friction between the support surface 20 and the bottom surface 110 of the mounting portion 100."[648]  In another embodiment, the mounting portion may be weighted so as to "increase the normal force between the support surface and the bottom surface" so that the mounting portion may be "secure" and to "prevent the bib from sliding off the support surface."[649]

### 5.    Affirmative, Egregious Misconduct (Fraud Practiced or Attempted)

#### a.    Applicable Law

1.    "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality."[650]    However, "[w]hen the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material."[651]  "In this context, materiality is premised on the notion that 'a patentee is unlikely to

---

[646]    Trial Exhibit 934.

[647]    Trial Exhibit 952.

[648]    Trial Exhibit 952.

[649]    Trial Exhibit 952.

[650]    *Therasense*, 649 F.3d at 1291.

[651]    *Id*. at 1292 (citations omitted).

go to great lengths to deceive the PTO with a falsehood unless it believes that falsehood will affect issuance of the patent.'"[652]

2.      In an *ex parte* proceeding before the USPTO, the Examiner has no way to test the truth or falsity of a declaration and must accept the declaration as true – hence, the requirement for the absolute duty of candor and good faith.[653]

3.       "Cases involving affidavits or declarations are held to a higher standard."[654]  "[A] false affidavit or declaration is per se material."[655]  "There is no room to argue that submission of false affidavits is not material."[656]

4.      A failure to disclose a declarant's bias or financial or other relationship to the applicant constitutes a breach of the duty of candor and good faith.[657]

---

[652]   *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1345 (Fed. Cir. 2013) (citing *Therasense*, 649 F.3d at 1292).

[653]   *See Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1187 (Fed. Cir. 2006) ("Given the ex parte nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant," and affirming a summary judgment ruling of unenforceability for inequitable conduct based on the applicant's failure to disclose to the USPTO the financial relationships of multiple declarants to the assignee); *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed. Cir. 1985) ("There is no reprieve from the duty of square dealing and full disclosure that rests on [a patent applicant]…").

[654]   *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008).

[655]   *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012).

[656]   *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1330 (Fed. Cir. 2020) (quoting *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983)).

[657]   *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) (cited with approval in *Therasense,* 649 F.3d at 1292) ("there is no room to argue that submission of false affidavits [to the USPTO] is not material"); *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996) (cited with approval in *Therasense,* 649 F.3d at 1292) (finding the intentional omission of declarant's employment with inventor's company rendered the affidavit false and that "[a]ffidavits are inherently material"); *Caron v. QuickKutz, Inc.*, No. 09-02600, 2012 WL 5497869, at *14 (D. Ariz. Nov. 13, 2012) (granting summary judgment where financial relationships were not disclosed; had the USPTO known that the declarants were not experts, "it would have given little or no weight to their opinions, particularly regarding the novelty of" the product).

5.      The egregious misconduct exception to but-for materiality has flexibility and is not limited to the filing of a false affidavit.[658]

6.      In *Ferring,* the Federal Circuit noted:

> [B]y presenting five separate declarations to the examiners, the applicants appeared to have a broad consensus of scientific support to overcome the Vavra reference. In actuality, four of the five declarations were submitted by scientists with significant associations with the assignee itself. While we will never know how the examiners may have weighed the declarations differently, it seems clear to us that this stellar showing of support would have, at the very least, been tarnished.[659]

7.      "[T]he duty of candor cannot be avoided by willful ignorance or compartmentalization of knowledge…in an effort to insulate the patent applicants and their attorneys from information unfavorable to patentability."[660]

8.      Ignorance of the law is no defense to inequitable conduct.[661]

9.      Even when an Examiner does "not raise a question concerning any such relationship, it is material to an Examiner's evaluation of the credibility and content of affidavits to know of any significant relationship between an affiant and an applicant; failure to disclose that relationship violate[s]" the duty of disclosure.[662]

---

[658]    *Therasense*, 649 F.3d at 1293 ("the egregious misconduct exception [to the requirement of proving but-for materiality] gives the test sufficient flexibility to capture extraordinary circumstances").

[659]    *Ferring,* 437 F.3d at 1194; *see also Caron,* 2012 WL 5497869, at *10-14 (granting summary judgment when the patent applicant "failed to disclose the financial relationships").

[660]    *Synthon IP, Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 779 (E.D. Va. 2007).

[661]    *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1385 (Fed. Cir. 2001) (citing *Molins,* 48 F.3d at 1178) ("We reiterate that inventors represented by counsel are presumed to know the law.").

[662]    *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) (internal citations omitted) (applicant violated his duty of disclosure for known affidavits "in support of patentability, including points of distinction over prior art patents, without informing the examiner of the affiant's relationship to" the applicant).

10.      In the *ex parte* process of examining a patent application, the PTO lacks the means or resources to gather evidence which supports or refutes the applicant's assertion that the sales constitute commercial success.[663]

11.      "In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such success is not the result of **heavy promotion or advertising**, shift in advertising, consumption by purchasers normally tied to applicant or assigned, or other business events extraneous to the merits of the claimed invention, etc."[664]

12.      "In ex parte proceedings before the Patent and Trademark Office, an applicant must show that the claimed features were responsible for the commercial success of an article if the evidence of nonobviousness is to be accorded substantial weight."[665]

13.      "Merely showing that there was commercial success of an article which embodied the invention is not sufficient."[666]

> **b.      Mrs. Laurain and Mr. Williams Submitted False Declarations to the USPTO**
>
> **(1)      Declarations Attesting to a Lack of Marketing or Branding Are Unmistakably False**

1.      Mrs. Laurain and Mr. Williams submitted four declarations attesting to commercial success without marketing or branding: (a) the declaration of Joseph Chua, stating "sales of the

---

[663]      *In re Huang,* 100 F.3d 135, 139-40 (Fed. Cir. 1996).

[664]      MPEP § 716.03(b) (emphasis added).

[665]      MPEP § 716.03(b).

[666]      MPEP § 716.03(b);  *Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309 (Fed. Cir. 1985) (commercial success may have been attributable to extensive advertising and circumstances before the introduction of the patented product).

same surface contact self-sealing integrated tableware and dining mat appear to be derived chiefly from the remarkable self-sealing property the instant mat exhibits upon demonstration, whereby sales are consistent without a need for extensive advertising or branding whatsoever;"[667] (b) the declaration of Jeff Prager, stating "the present invention … demonstrates unequivocal commercial success derived of the product itself absent persuasion by branding or marketing strategies, strategies which, if subsequently employed, will only increase and strengthen market share;"[668] (c) the declaration of Julie Clark, stating "commercial success derived from the product itself, and not due to any advertising or branding,"[669] and (d) the declaration of Jamie Grayson, stating the "invention…demonstrates unequivocal commercial appeal derived from the product itself, and not from any particular advertising reach or previous customer base, evincible by rapid acquisition of the market share in the baby[]product arts absent appreciable advertising efforts on behalf of the inventor."[670]

2.    Mrs. Laurain and Mr. Williams also argued to the USPTO in their March 9, 2016 submission: "Applicant demonstrates commercial success derived from the product itself, and not due to efforts directed at advertising or branding or any previous client base, from consistent high sales revenues relative very low expenditures on advertising proper."[671]

3.    However, the Court finds overwhelming evidence to the contrary.

4.    Mrs. Laurain graduated with an undergraduate degree in marketing and communications and subsequently received a Master's in Business Administration.[672]

---

[667]    Trial Exhibit 245, at LNC395357.

[668]    Trial Exhibit 245, at LNC395321.

[669]    Trial Exhibit 245, at LNC395323.

[670]    Trial Exhibit 245, at LNC395318.

[671]    Trial Exhibit 245, at LNC395445.

[672]    Dkt. No. 826-2 (Laurain 2018 Depo.), at 177:14-178:21

5.      Mr. Williams admitted that in order to establish commercial success, an applicant's alleged commercial success must be based on the alleged invention, and not "other publicity"[673] or "ancillary stuff that may lead people to purchase the product."[674]

6.      At EZPZ, Mrs. Laurain is recognized as the "visionary leader" and "directs all of [EZPZ's] marketing and innovation efforts."[675]

7.      Mrs. Laurain and EZPZ consistently used the "story behind the brand" and labeled herself a "mom inventor" in order to market and advertise the product.[676]  In fact, Mrs. Laurain was using her "story" for branding as early as April 2014 when she reached out to Ms. Speer for patent advice.[677]

8.      Prior to launching the Happy Mat on Kickstarter, Mrs. Laurain created a PowerPoint stating that she had a "plan" for "Lots of 'Free' Advertising/Marketing," which included Kickstarter, the ABC Kids Expo and Shark Tank.[678]

9.      Mrs. Laurain raised funds for the first manufacturing run of her claimed invention, commercially known as the EZPZ Happy Mat, through a Kickstarter campaign,[679] which according to the testimony of Nancy Albers, is a form of paid advertising because Kickstarter retains a percentage of the funds raised through sales on its website.[680]  Ms. Albers' testimony in

---

[673]      Dkt. No. 834 (Transcript Volume V), at 850:5-850:11.

[674]      Dkt. No. 835 (Transcript Volume VI), at 1022:16-1022:19.

[675]      Trial Exhibit 339.

[676]      *See, e.g.*, Trial Exhibit 13, at HUMANA000079 ("the story behind the brand will help market to a unique audience, such as mogul mom, mom inventors, MOB because "[w]ho doesn't want to support a mom who went for it and invented some great products?") (emphasis added)

[677]      Trial Exhibit 7, at Brenda Speer 000031.

[678]      Trial Exhibit 624, at EZPZ0146654-655.

[679]      *E.g.*, Trial Exhibit 31; Trial Exhibit 59, at EZPZ0175068.

[680]      Dkt. No. 831 (Transcript Volume II), at 141:13-142:1.

this regard was unrefuted by EZPZ and Mrs. Laurain admitted Kickstarter took a fee to service the campaign.[681]

10.   EZPZ promoted the Kickstarter launch on Facebook on August 18, 2014, August 25, 2014, August 28, 2014, August 30, 2014, and September 3, 2014.[682]

11.   Mrs. Winkelman first learned about the Happy mat via the internet crowd funding marketing platform known as Kickstarter.[683]

12.   The Kickstarter website included a professional video prepared by EZPZ team members, Paul Joyner and Cara, that aired on August 28, 2014.[684]  The Kickstarter video promoted Mrs. Laurain's "story" as a "working mother to" three boys.[685]  Mrs. Laurain admitted that Kickstarter promoted the Happy mat.[686]

13.   Via Kickstarter Update No. 3 dated September 6, 2014, Mrs. Laurain posted that EZPZ would be attending the "ABC Kids Expo (largest kids trade show) via the Invention Connection" in order to promote the Happy Mat over a five day period to people from around the world.[687]  In that update, she also included links to five feature articles promoting the Happy mat.[688]   In Update No. 4, Mrs. Laurain referred to the first day of the ABC Kids Expo as the "Big Day."[689]

14.   On September 27, 2014, Mrs. Winkelmann, who was planning a move from California to Colorado, sent a direct message to Mrs. Laurain via Kickstarter saying she would like to

---

[681]   Dkt. No. 834 (Transcript Volume V), at 594:12-594:21.

[682]   Trial Exhibit 386, at pp. 57, 59, 67, 69, and 71.

[683]   Dkt. No. 836 (Transcript Volume VII), at 1466:12-1466:16.

[684]   EZPZ Trial Exhibit 1124; Dkt. No. 834 (Transcript Volume V), at 591:8-592:6; 716:4-716:22.

[685]   EZPZ Trial Exhibit 1124.

[686]   Dkt. No. 834 (Transcript Volume V), at 716:8-716:11.

[687]   Trial Exhibit 31, at pp. 44-45.

[688]   Trial Exhibit 31, at p. 45.

[689]   Trial Exhibit 31, at pp. 49-50.

"work/promote" together with Mrs. Laurain.[690]  The following day, Mrs. Laurain responded to Mrs. Winkelmann that she would like to "work/promote" together and thereafter it was a self-described "lovefest" between the two women.[691]

15.    When Mrs. Laurain learned about Mrs. Winkelmann's celebrity status and speech making at conferences around the world on a monthly basis Mrs. Laurain wanted to get Mrs. Winkelmann "on board"[692] and Mrs. Winkelmann started working not only as the EZPZ special needs coordinator,[693] but also as the "PR manager for EZPZ" and promoted the Happy mat and the EZPZ story on their behalf using a note penned by Mrs. Laurain and Mrs. Falcone and a promotional flyer.[694]  The co-promotional relationship between Mrs. Winkelmann and Mrs. Laurain began with Mrs. Winkelmann promoting the EZPZ products in the last quarter of 2014[695] and included, in addition to her PR manager activities and monthly speaking engagements, the following marketing and promotional activities: (1) Mrs. Winkelmann's endorsement of the Happy Mat in a November 25,  2014 newsletter she used to promote her services, which included a promotional discount on the Happy Mat,[696] (2) a verbal blog interview of Mrs. Laurain called a "blab" which was used to promote Mrs. Laurain's story and where she discussed her use of "bootstrapping," a marketing technique used by startup companies,[697] (3) posting of videos of Mrs. Winkelmann promoting the Happy Mat on the EZPZ YouTube channel

---

[690]    Trial Exhibit 987; *see also* Dkt. No. 836 (Transcript Volume VII), at 1493:12-1494:4.

[691]    Trial Exhibit 987; *see also* Dkt. No. 836 (Transcript Volume VII), at 1494:5-1494:18.

[692]    Dkt. No. 836 (Transcript Volume VII), at 1473:19-1475:1; 1478:22-1479:9; 1495:21-1495:25.

[693]    Dkt. No. 836 (Transcript Volume VII), at 1474:11-1474:15.

[694]    Trial Exhibit 53.

[695]    Dkt. No. 836 (Transcript Volume VII), at 1495:5-1495:7.

[696]    Dkt. No. 836 (Transcript Volume VII), at 1495:11-1495:20.

[697]    Dkt. No. 836 (Transcript Volume VII), at 1494:8-1494:18; 1503:1-1503:12; Trial Exhibit 986.

page,[698] and (4) researching and becoming involved with affiliates to partner with and promote the EZPZ products such as a company called ShareASale.com.[699]   As a result of her work promoting the EZPZ Happy Mat, Mrs. Winkelman received a number of bonus checks from EZPZ in 2014 and 2015.[700]   Mrs. Winkelmann is paid full time and continues working with EZPZ to this day.[701]

16.     One of the conventions at which Mrs. Winkelmann spoke about the Happy Mat was the MommyCon convention, which Mrs. Winkelmann told Mrs. Laurain was "an easy way to promote the EZPZ product."[702]   EZPZ became a sponsor of MommyCon and their co-promotional efforts were featured in a an EZPZ Instagram post.[703]

17.     EZPZ sponsored various conferences at which Mrs. Winkelmann spoke and then promoted the story of EZPZ doing good on Instagram.[704]

18.     During a Blab interview with Ms. Winkelmann, Mrs. Laurain admitted that "hiring a graphic designer and a photographer is life changing and worth the investment."[705]   Although EZPZ paid for a graphic designer and photographer, she did not include them under "advertising" in her profit and loss statement, but under subcontractors.[706]

---

[698]     Dkt. No. 836 (Transcript Volume VII), at 1494:19-1495:4.

[699]     Dkt. No. 836 (Transcript Volume VII), at 1501:19-1501:23; Trial Exhibit 53.

[700]     Dkt. No. 836 (Transcript Volume VII), at 1504:20-1504:24.

[701]     Dkt. No. 836 (Transcript Volume VII), at 1475:9-1475:10; 1476:9-1476:10.

[702]     Trial Exhibit 844, at EZPZ0249146; *see also* Dkt. No. 836 (Transcript Volume VII), at 1496:4-1496:15.

[703]     Trial Exhibit 41, at p. 20; Trial Exhibit 986; Dkt. No. 836 (Transcript Volume VII), at 1496:16-1497:4.

[704]     Trial Exhibit 383, at p. 158.

[705]     Dkt. No. 844 (W07).

[706]     Dkt. No. 834 (Transcript Volume V), at 718:5-718:23.

19.     No later than April 14, 2014, EZPZ had a "Go-To Market Plan."  This was something Mrs. Laurain prepared to send to Mayborn.[707]  Mrs. Laurain provided a similar "Go-To Market Plan" to Mr. Bolton on May 24, 2014.[708]  One of her "Next Steps" included "creat[ing] and execut[ing] a social media marketing plan."[709]

20.     In her initial May 24, 2014 e-mail to Mr. Bolton, Mrs. Laurain referred to "old branding" and attached the new brand logo she thought she was going to go with.[710]

21.     In 2014, Mrs. Laurain recognized that there are "Lots of 'Free' Advertising/Marketing Opportunities," which included mommy bloggers, online support through the Grommet, crowd funding through Kickstarter, the ABC Kids Expo, and Shark Tank.[711]  Although Mrs. Laurain claimed she only "really became aware of Shark Tank" when they approached her at the Invention Connection of the ABC Kids Expo,[712] Mrs. Laurain was forced to admit that appearing on Shark Tank was her plan before she ever appeared at the ABC Kids Expo.[713]

22.     EZPZ began promoting the brand logo and the Happy Mats on Facebook in July 2014, long before the Happy Mats had arrived in the United States.[714]

23.     Beginning in August 2014, before she ever launched the Happy Mat, Mrs. Laurain began marketing and promoting the EZPZ brand and her product on Instagram by using hashtags such as "#ezpzfun" and "#ezpz:"

---

[707]    Trial Exhibit 11, at Lilja 000057; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 42:1-42:3; 42:9-42:20; 43:21-43:24.

[708]    Trial Exhibit 18, at EZPZ-CH-0014865.

[709]    Trial Exhibit 18, at EZPZ-CH-0014868.

[710]    Trial Exhibit 16.

[711]    Trial Exhibit 624, at EZPZ0146654-655.

[712]    Dkt. No. 833 (Transcript Volume IV), at 412:3-412:8.

[713]    Trial Exhibit 624; Dkt. No. 833 (Transcript Volume IV), at 412:18-413:21.

[714]    Trial Exhibit 386, at pp. 1, 3, 5, and 7.



EZPZ has recognized the use of "#ezpzfun" as part of its marketing strategy.[715]   Thus, since before the launch of its product, EZPZ regularly utilized social media platforms to market and promote the alleged invention.   In fact, many of EZPZ's Instagram posts focus on the "story" behind the product, featuring Mrs. Laurain, her team, and her family, but do not include the Happy Mat or the alleged "suction function" of the Happy Mat.[716]

24.     Mrs. Laurain admitted that EZPZ posted on Instagram and Facebook an average of more than once per day prior to March 2016.[717]

25.     EZPZ repeatedly used social media platforms to post promotional discounts.[718]

26.     EZPZ used collaborative promotional activities.[719]

27.     EZPZ promoted its YouTube channel and promotional videos posted on it on Instagram.[720]

---

[715]     Trial Exhibit 51, at EZPZ0133658; Trial Exhibit 73, at EZPZ0293105.

[716]     *See e.g.*, Trial Exhibit 41. *See also* Trial Exhibit 383, at pp. 202, 292, 294, 308, 368, 372, 379, 404, 413, 416, 429, 435, 445, 463, 546, 551 and 584; Trial Exhibit 386, at pp. 23, 75, 157, 337, 438, 627, 739, 746.

[717]     Dkt. No. 41; Dkt. No. 833 (Transcript Volume IV), at 394:15-395:22.

[718]     *E.g.*, Trial Exhibit 383, at pp. 75, 322, 324, 467, and 486.

[719]     Trial Exhibit 383, at p. 233.

28.     Mrs. Laurain used members of the private Facebook group as EZPZ's "brand ambassadors."[721]

29.     During the ABC Kids Expo in September 2014, Mrs. Laurain tagged TheBabyGuy in at least three posts on Instagram asking him to "Come say hi."[722]   Only after EZPZ's repeated tagging and posting with TheBabyGuy did he come visit her booth at the ABC Kids Expo and perform a demonstration of the Happy Mat.[723]   Mrs. Laurain admitted that the video demonstration by TheBabyGuy is a promotion.[724]

30.     Mrs. Winkelmann admitted that in addition to her promotion of the Happy Mat, EZPZ used social media influencers such as TheBabyGuy to post about and promote the Happy Mat.[725]

31.     On October 27, 2014, EZPZ promoted the Happy Mat by showcasing mom entrepreneurship and the inventive process on a live chat with TheBabyGuy.[726]

32.     On October 29, 2014, EZPZ paid Jamie Grayson, known as TheBabyGuy, to launch the Happy Mat on his social media websites through a promotional giveaway.[727]   Mrs. Laurain knew that utilizing Mr. Grayson, as TheBabyGuy, was a marketing "tactic."[728]

33.     The EZPZ 2014 Profit & Loss statement included the following entries totaling $70,942.00, which most, if not all, constitute marketing, promoting, and branding:

---

[720]     Trial Exhibit 383, at p. 154.

[721]     Trial Exhibit 59, at EZPZ0175069; *see also* Dkt. No. 833 (Transcript Volume IV), at 488:24-489:8.

[722]     Trial Exhibit 383, at pp. 6, 10, 13..

[723]     *See* Trial Exhibit 383, at pp. 6, 10, 13; *see also* Dkt. No. 834 (Transcript Volume IV), at 593:2-593:8.

[724]     Dkt. No. 834 (Transcript Volume V), at 729:13-729:15.

[725]     Dkt. No. 836 (Transcript Volume VII), at 1499:6-1499:9.

[726]     Trial Exhibit 386, at pp. 157 and 159.

[727]     Trial Exhibit 32.

[728]     Trial Exhibit 45, at EZPZ0095032.

| Advertising | $6,398.13 |
| Meals & Entertainment | $2,562.54 |
| Promotional | $10,529.82 |
| Shipping & Delivery Expense | $22,152.10 |
| Travel | $6,021.26 |
| Travel Meals | $582.58 |
| Web/Graphic Design | $22,695.57 |

During that same time period, EZPZ's sales amounted to only $171,522.53.[729]  These expenditures represent 41% of EZPZ's 2014 sales.

34.    In 2015, EZPZ contracted with Akemi Williams to be in charge of "all of [EZPZ's] sales/marketing."[730]  EZPZ paid Ms. Williams paid $20,000.[731]  Mrs. Williams provided EZPZ with a list of bloggers and influencers for marketing purposes.[732]

35.    On November 16, 2014, Mr. Grayson provided Mrs. Laurain with a customer list that included over 12,000 contacts.[733]

36.    On January 25, 2015, Mrs. Laurain listed a list of 15,000 e-mail addresses as one of her company's intangible assets as well as a "utility patent" that, in fact, had not yet issued.[734]

37.    In order to promote the EZPZ brand, EZPZ placed its branded logo on wine bottles:[735]

---

[729]    Trial Exhibit 950.

[730]    Trial Exhibit 43, at EZPZ0242120; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 222:13-223:2; 228:20-228:22; 228:24-229:24; Trial Exhibit 628.

[731]    Laurain 2020 Depo., at 229:18-229:24.

[732]    Trial Exhibit 628.

[733]    Trial Exhibit 629.

[734]    Trial Exhibit 522.

[735]    Trail Exhibit 41, at PDF p. 8. *See also* Trial Exhibit 386, at p. 521.



38.     EZPZ sponsored the Pump and Dump Show in Tempe Arizona on March 12, 2015.[736]

39.     In April 2015, EZPZ was featured in the Parenting Magazine's Registry Guide.[737]

40.     EZPZ's August 2015 Marketing Summary noted that EZPZ has "a **strong branding** campaign and continue with as much grass roots support and 'free' press as possible."[738]

41.     In EZPZ's August 2015 Marketing Summary, Mrs. Laurain recognized the following "tactics" as a form of marketing: Kickstarter; launching at ABC Kids Expo; BabyGuyNYC Giveaway; Meredith Viera Show; social media engagement; tradeshows; consumer shows; co-promotions; affiliate marketing campaign; and email campaign.[739]

---

[736]     Trial Exhibit 854; Trial Exhibit 41, at PDF p. 8.

[737]     Trial Exhibit 383, at p. 223; Trial Exhibit 386, at p. 590.

[738]     Trial Exhibit 51, at EZPZ0133657; *see also* Dkt. No. 833 (Transcript Volume IV), at 502:10-502:16.

[739]     Trial Exhibit 51, at EZPZ0133657-659; *see also* Dkt. No. 833 (Transcript Volume IV), at 502:17-502:20.

5328032_1

42.     The August 2015 Marketing Summary included the number of followers that EZPZ had on social media and noted that EZPZ had a Facebook group of 200+ moms and brand ambassadors.[740]

43.     On September 5, 2015, Mrs. Laurain sent to the EZPZ team a "media outreach" plan that included local media email, speech/feeding affiliates, a long list of contacts and bloggers (including TheBabyGuy) that Mrs. Laurain wanted to use to promote the Happy Mat, and "sales sheet" or "promotional document" EZPZ could have sent to people.[741]   The email also included "PR advertising events"[742] and notes that Mrs. Laurain thought Ms. Winkelmann would be "perfect for this" and suggested she go to a few "studios" and make a "pitch."[743]   Mrs. Laurain also wanted Ms. Winkelmann to be involved in ShareASales, a third party affiliate platform.[744] In that same email, Mrs. Laurain drafted an email for Ms. Winkelmann to send out to potential affiliates that included the "backstory" of the Happy Mat.[745]

44.     On September 14, 2015, Mrs. Laurain sent Mr. Williams, Mr. Bolton, and Mr. McCarthy EZPZ's IP Summary that was sent to potential acquirers that stated EZPZ had "strong branding."[746] The IP Summary had been prepared by Mr. Williams who, therefore, knew that EZPZ had "strong branding."[747]

---

[740]     Trial Exhibit 51, at EZPZ0133658; Dkt. No. 826-5 (Falcone 2020 Depo.), at 50:2-50:7; 50:25-51:17; 52:15-52:25; 53:3-53:9; 54:4-54:11; 54:13-54:25; 55:5-10.

[741]     Trial Exhibit 53; *see also* Dkt. No. 834 (Transcript Volume V), at 725:23-727:1; 728:11-728:22.

[742]     Dkt. No. 836 (Transcript Volume VII), at 1502:8-1502:14; Trial Exhibit 53, at EZPZ0295496.

[743]     Trial Exhibit 53; *see also* Dkt. No. 834 (Transcript Volume V), at 721:23-722:10.

[744]     Trial Exhibit 53; Dkt. No. 834 (Transcript Volume V), at 723:10-723:16.

[745]     Trial Exhibit 53; Dkt. No. 834 (Transcript Volume V), at 724:2-725:19.

[746]     Trial Exhibit 720, at EZPZ0158016; Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 263:22-265:2; 265:5-265:15; 266:17-267:19.

[747]     Dkt. No. 826-9 (Williams 2020 Depo.), at 585:22-586:2; 591:1-591:5; 591:20-591:22; 591:24-592:3; 592:7-592:14; Trial Exhibit 720.

-124-

45.     In September 2015, EZPZ began using paid marketing through a "refer-a-friend + affiliate program and retargeting."[748]   Despite asserting that this was EZPZ's "first paid marketing,"[749] the documents establish that EZPZ used Kickstarter[750] and contracted with and compensated the BabyGuy (Jamie Grayson) to promote the Happy Mat as early as October 2014.[751]

46.     On October 9, 2015, Mrs. Laurain told Mr. Dunn of Munchkin that EZPZ was going to "have another promo that will reach 10 million +."[752]

47.     No later than November 2015, EZPZ began analyzing its social media impressions and reach via Twitter.[753]   In fact, EZPZ posted its "top 9 posts" on Facebook on December 31, 2015.[754]

48.     The EZPZ November 2015 Business Plan included an extensive Marketing Plan, which referred to, *inter alia*, the following:   a social calendar (*i.e.*, "Mom Crush Monday," "Tip Tuesday," "Weds Wisdom" "throwback Thursday," "Fun Friday"); attending trade shows (*i.e.*, ABC Kids Expo, Kind & Jugend); attending consumers shows (*i.e.*, Mommycon, Pump & Dump); co-promotion activities; affiliate programs (*i.e.*, blogger affiliates); newsletters; and relaunching of website and blog.[755]   All of these activities were recognized by Mrs. Laurain as

---

[748]     Dkt. #392-4, at ¶ 16.

[749]     *See id.*

[750]     Trial Exhibit 31.

[751]     *See* Trial Exhibit 32 (showing payments in October 2014 and December 2014).

[752]     Trial Exhibit 867, at BWILLIAMS001633.

[753]     Trial Exhibit 63.

[754]     Trial Exhibit 386, at p. 707.

[755]     Trial Exhibit 73, at EZPZ0293102-104.

"Marketing."[756]  The November 2015 Business Plan included similar marketing plans to those set forth in the June 2015 Business Plan.[757]

49.     The EZPZ November 2015 Business Plan included several Promotional activities including, *inter alia*, the following: the use of "#ezpzfun;" blogger giveaways; cross-brand promotion; continuous social media engagement; and referral programs.[758]  All of these activities were recognized by Mrs. Laurain as "Promotion."[759]  The November 2015 Business Plan included similar promotional efforts to those set forth in the June 2015 Business Plan.[760]

50.     Although Mrs. Falcone testified that Ms. Winkelmann, Mr. Joyner, and Ms. Williams were not involved in "marketing" with EZPZ,[761] the evidence at trial establishes otherwise.[762]

51.     One of the videos submitted to the USPTO to demonstrate the so-called commercial success of the EZPZ Happy Mat, featured Denise Emilia.[763]  After testifying that she did not know Ms. Emilia and that Ms. Emilia had no affiliation with EZPZ, Mrs. Laurain admitted that Ms. Emilia knows her brother[764] and actually received free Happy Mats from EZPZ.[765]  Mrs.

---

[756]     Trial Exhibit 73, at EZPZ0293102-104.

[757]     *Compare* Trial Exhibit 73, at EZPZ0293102-104, *with* Trial Exhibit 50, at EZPZ0175081-83.

[758]     Trial Exhibit 73, at EZPZ0293105.

[759]     Trial Exhibit 73, at EZPZ0293105.

[760]     *Compare* Trial Exhibit 73, at EZPZ0293105, *with* Trial Exhibit 50, at EZPZ0175083-84.

[761]     Dkt. No. 836 (Transcript Volume VII), at 1532:21-1532:22; 1536:3-1536:15.

[762]     *See, e.g.*, Trial Exhibit 53, Trial Exhibit 43; Dkt. No. 834 (Transcript Volume V), at 683:3-683:4; 716:8-716:17.

[763]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 88:21-89:13.

[764]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 88:21-89:13.

[765]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 88:16-90:23; *see also* Trial Exhibit 106, at EZPZ0298040.

Laurain did not disclose to the USPTO that Mrs. Emilia was someone who received free mats from EZPZ.[766]  EZPZ gave away numerous mats to product influencers.[767]

52.     In August 2015, Mrs. Laurain wrote to Mr. Chua that EZPZ was "sitting on a shit ton of inventory" and was looking forward to some huge announcements that would drive future sales.[768]  It appears Mrs. Laurain was referring to filming Shark Tank in September 2015.[769]

53.     EZPZ aired on Shark Tank on January 8, 2016.[770]  Mrs. Laurain recognized that "Shark Tank is a HUGE Show and over 10 million people watch new episodes.  So, regardless of the outcome with the Sharks, the show will generate tremendous exposure for ezpz …"[771]  In fact, Mrs. Laurain recognized as early as April 2015, in responding to Mr. Williams strategy for overcoming obviousness by establishing commercial success, that if her Shark Tank episode aired, "20 million consumers would see it."[772]  Mrs. Laurain also recognized in an interview that Shark Tank was "phenomenal for brand recognition."[773]

54.     In light of the foregoing, the Court finds that EZPZ's appearance on Shark Tank was a significant promotional activity.  Appearing on Shark Tank was part of Mrs. Laurain's "plan" from the very beginning.[774]

55.     At trial, Mrs. Laurain testified that Shark Tank did *not* cause any increase in sales.[775]  The Court does not find Mrs. Laurain's testimony in this regard to be credible, as it is contradicted by

---

[766]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 88:16-90:23.

[767]     Trial Exhibit 106.

[768]     Trial Exhibit 52.

[769]     Dkt. No. 834 (Transcript Volume V), at 603:16-603:20.

[770]     Dkt. No. 834 (Transcript Volume V), at 603:25-604:1.

[771]     Trial Exhibit 381.

[772]     Trial Exhibit 920; Dkt. No. 833 (Transcript Volume IV), at 411:11-411:21.

[773]     Dkt. No. 844 (L-21).

[774]     Trial Exhibit 624, at EZPZ0146654-655.

the testimony of Jeff Prager, EZPZ's CFO,[776] and Tamara Falcone, EZPZ's COO,[777] a prior interview Mrs. Laurain gave,[778] as well as EZPZ's own internal documents showing a spike in sales due to the Shark Tank appearance.[779]   The following EZPZ Sales Performance chart reflects that there was a sharp increase in sales once Mrs. Laurain began promoting her appearance on Shark Tank and continuing thereafter after she appeared on Shark Tank on January 8, 2016.[780]





---

[775]    Dkt. No. 833 (Transcript Volume IV), at 475:16-475:25.

[776]    Dkt. No. 836 (Transcript Volume VII), at 1374:20-1374:23; 1379:5-1379:7; 1381:19-1381:24.

[777]    Dkt. No. 836 (Transcript Volume VII), at 1542:3-1542:6.

[778]    Dkt. No. 844 (L-21).

[779]    Trial Exhibit 923, at EZPZ0143540.

[780]    Trial Exhibit 923, at EZPZ0143540; *see also* Dkt. No. 833 (Transcript Volume IV), at 476:12-476:15.

56.     Although Mrs. Laurain tried to claim that there was "no marketing activity that's driving [] sales and not even Shark Tank,"[781] the above chart showing EZPZ's sales performance identifies and places significance on Shark Tank, Amazon Prime day, and Kickstarter on the graph.[782]   The Court finds, as EZPZ itself concluded when it placed the three promotional activities in boxes on the graph it created, that the three red circled promotional activities contributed to EZPZ's commercial success.

57.     In July 2015, Mrs. Laurain recognized that Amazon Prime day and Judy's Life posting of the Happy mat drove sales.[783]

58.     On December 21, 2015 EZPZ announced on Facebook that it would be appearing on "Colorado's Own Channel 2: Daybreak."[784]

59.     Although Mrs. Laurain attempted to deny that QuickBooks wanted to have a commercial of EZPZ because of her story,[785] Mrs. Laurain's prior statements in an interview establish that QuickBooks approached EZPZ because it "love[d] [he]r story" and it wanted to "do a story about it."[786]   At least four of the six QuickBooks commercials launched on February 16, 2016, before the March 9, 2016 submission to the USPTO.[787]

60.     During 2014 and 2015 Hip Mommies ordered many Happy Mats and Happy Bowls from EZPZ.   A large percentage (roughly half) of the agreed upon price for these products was characterized by EZPZ and Hip Mommies as "Marketing and Brand Promotion" based on the

---

[781]     Dkt. No. 833 (Transcript Volume IV), at 475:16-475:25.

[782]     Trial Exhibit 923, at EZPZ0143540.

[783]     Trial Exhibit 49; *see also* Dkt. No. 833 (Transcript Volume IV), at 480:5-480:8.

[784]     Trial Exhibit 386, at p. 687.

[785]     Dkt. No. 833 (Transcript Volume IV), at 480:17-480:21.

[786]     Dkt. No. 844 (L-23).  *See also* Trial Exhibit 360.

[787]     Trial Exhibit 118.

-129-

"legit" extensive marketing and brand promotional efforts of EZPZ and so that Hip Mommies would only have to pay customs/duty tax on the actual manufacturing cost.[788]  Mrs. Laurain failed to tell Mr. Williams about these pertinent "Marketing and Brand Promotion" invoices.[789]

61.    In January 2016, Mrs. Laurain recognized that EZPZ's "Community/Brand" is what they were selling and that "Brand" was "VERY important."[790]

62.    Mr. Bolton also recognized that EZPZ was making "huge strides on the branding."[791]

63.    Prior to the March 9, 2016 submission to the USPTO, EZPZ paid Mr. Grayson to promote the Happy Mat.[792]

64.    During EZPZ's conversations with Frederick Lammens regarding Stokke acquiring EZPZ, Mrs. Falcone suggested, on July 25, 2016, they tell Mr. Lammens the following:  "We are confident that we (or whomever acquires us) will maintain the majority of our market share due to our 'first to market' position and strong brand / community."[793]

65.    Additionally, the notes EZPZ prepared for its meeting with July 2016 Stokke state that EZPZ has "developed a successful digital marketing strategy" and EZPZ has a "very strong brand."[794]

66.    In EZPZ's own Sealed Motion for Temporary Restraining and Preliminary Injunction filed in Michigan on October 18, 2016, it recognized that Amazon postings are a form of advertising.[795]

---

[788]    Trial Exhibit 773.

[789]    Dkt. No. 835 (Transcript Volume VI), at 1185:24-1186:6.

[790]    Trial Exhibit 105, at EZPZ0082774.

[791]    Trial Exhibit 108.

[792]    Trial Exhibit 32.

[793]    Trial Exhibit 654; Dkt. No. 826-5 (Falcone 2020 Depo.), at 173:7-173:18; 173:19-174:18; 174:21-175:1; 175:4-175:6; 175:9-175:14; 175:18-175:22; 175:25-176:2.

[794]    Trial Exhibit 878, at EZPZ0143581-582; Dkt. No. 833 (Transcript Volume IV), at 463:15-464:10.

67.     Mrs. Laurain's declaration filed in this Court in response to LNC's Motion for Summary Judgment on Trademark Infringement[796] "details significant marketing and advertising activities for the EZPZ Happy Mat occurring between July 2014 and January 2016.[797]

68.     EZPZ requested and received a customer list from Mr. Grayson.[798]

69.     Virtually all of EZPZ's team members have been involved in EZPZ's marketing efforts, including Mrs. Laurain, Mrs. Falcone, Ms. Holland, Ms. Brock, Mr. Joyner, and Mrs. Winkelmann.[799]   At some point, EZPZ worked with different marketing agencies, including Robin Hood Media, XYZ Advantage and Blue Plate Media.[800]

70.     Prior to the issuance of the patent, Ms. Brock managed EZPZ's marketing.[801]

71.     The Profit and Loss Statement from the June 2015 Business Plan Profit & Loss statement included the following entries totaling $194,978.48, which most, if not all, constitute marketing, promoting, and branding:

| | |
|---|---|
| **Advertising** | 829.57 |
| **Meals & Entertainment** | 3,363.51 |
| **Promotional** | 4,010.61 |
| **Shipping & Delivery Expense** | 78,503.74 |
| **Travel** | 7,130.47 |

---

[795]     Trial Exhibit 225, at p. 15 of pleading.

[796]     Dkt. No. 392-4.

[797]     Dkt. # 522 (Memorandum Ruling on LNC's Motion for Summary Judgment on Obviousness), at p. 25.

[798]     Trial Exhibit 629.

[799]     Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 100:16-101:2.

[800]     Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 101:6-101:17.

[801]     Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 102:14-102:22.

| | |
|---|---|
| **Travel Meals** | 205.73 |
| **Uncategorized Expense** | 77,077.68 |
| **Web Design/Graphic** | 23,857.17 |

During that same time period, EZPZ's sales amounted to only $423,055.44.[802]   These expenditures represent 46% of EZPZ's sales.

72.    In November 2014, EZPZ recognized that "[t]hanks to Meredith Vieira and the BabyGuyNYC [Jamie Grayson] demand" for products "skyrocketed."[803]   On October 22, 2014, EZPZ thanked the Meredith Viera Show for the opportunity to appear on the show.[804]

73.    Mrs. Laurain admitted that she paid Allison, a subcontractor with Pure Hearts, to design the EZPZ website.[805]   As testified by Dr. Albers, this is a form of marketing and promotion.[806]

74.    Jeff Prager, EZPZ's former CFO,[807] admitted that EZPZ engaged in significant marketing prior to March 2016, including social media, maintaining a website, blog posts, Amazon sales, trade shows, sales in boutiques, launching on Kickstarter, and appearing at the ABC Expo.[808]

75.    Julie Clark, the founder of Baby Einstein, likewise admitted that EZPZ engaged in significant marketing prior to March 2016, including sponsoring the Pump and Dump Show, appearing on the Meredith Vieira Show, appearing on Shark Tank, and participating in promotions with TheBabyGuy.[809]

---

[802]    Trial Exhibit 50, at EZPZ0175087.

[803]    Trial Exhibit 34, at EZPZ0139508; Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 126:5-127:4.

[804]    Trial Exhibit 383, at p. 43.

[805]    Dkt. No. 834 (Transcript Volume V); at 732:13-733:2.

[806]    Dkt. No. 831 (Transcript Volume II), at 191:16-191:20.

[807]    Dkt. No. 836 (Transcript Volume VII), at 1374:20-1374:23; 1379:5-1379:7.

[808]    Dkt. No. 836 (Transcript Volume VII), at 1395:13-1396:15.

[809]    Dkt. No. 826-11 (Clark Depo.), at 48:14-49:8; 96:13-98:1

76.     Dr. Albers testified that TheBabyGuy's Facebook video of the Happy Mat is promotional.[810]  She also testified that EZPZ participated in a number of other marketing and promotional activities, including posting on Instagram, Facebook and Twitter, participating in a live Blab interview, using electronic word of mouth, attending consumer events such as Mommycon and Club Mommy, and posting its products on a website and Amazon.[811]  Even if EZPZ did not pay for these activities, they are still promotional.[812]  Dr. Albers' testimony is unrefuted by EZPZ.

77.     Dr. Albers testified that Mrs. Laurain's creation of a "mom inventor" brand who left her job to care for her boys is an effort to develop a parasocial relationship with the intended audience.  Dr. Albers described this as an effective branding and marketing method used to encourage consumers to purchase the EZPZ Happy Mat.[813]  Dr. Albers' testimony is unrefuted by EZPZ.

78.     Although Mrs. Laurain tried to focus solely on advertising as defined by Dr. Albers (*i.e.*, paid advertising),[814] Mrs. Laurain referred early on to her plan to take advantage of free advertising.[815]  Thus, she viewed advertising as being broader in scope than traditional paid for advertising.[816]  Additionally, Mrs. Laurain knew that the test for commercial success was not

---

[810]     Dkt. No. 831 (Transcript Volume II), at 160:24-160:25.

[811]     Dkt. No. 831 (Transcript Volume II), at 188:1-188:21; 190:25-192:10.

[812]     *E.g.*, Dkt. No. 831 (Transcript Volume II), at 160:24-160:25.

[813]     Dkt. No. 831 (Transcript Volume II), at 129:11-131:9; 133:1-133:22.  *See also* Trial Exhibit 13, at HUMANA000079 and Trial Exhibit 7, at Brenda Speer 000031-32.

[814]     *E.g.,* Dkt. No. 833 (Transcript Volume IV), at 504:4-504:9.

[815]     Trial Exhibit 624, at EZPZ0146654-655.

[816]     *See id.*

simply based on "advertising" but also on "promotion" and "marketing."[817]   Dr. Albers explained that EZPZ actively participated in a wide range of nonpaid promotional, marketing, and branding activities.[818]

79.     Mrs. Laurain's attempt to rely solely on the advertising line item from her accounting records was misleading when she knew full well that other expenses, such as fees paid to EZPZ's marketing subcontractors were not listed as advertising.[819]   This is also true for other line items such as travel expenses and shipping costs to brand ambassadors.[820]

80.     Mr. Kennedy, EZPZ's own expert, found Mr. Williams' arguments regarding the Happy Mat's alleged commercial success to be unsupported and merely "ballyhoo."[821]

81.     Given all of the above, the Court finds that EZPZ was engaged in robust and intensive advertising, marketing, branding, and promotional activities between 2014 and March 9, 2016. Consequently, the Court also finds that the representations made in the declarations of Mr. Prager, Mr. Grayson, Mr. Chua and Ms. Clark submitted by Mrs. Laurain and Mr. Williams to the USPTO on March 9, 2016 were false.

82.     The Court also finds that the representation made by Mr. Williams and Mrs. Laurain that the invention's alleged "commercial success" was "derived from the product itself, and not due to efforts directed at advertising or branding or any previous client base…"[822] was false.

---

[817]     Trial Exhibit 695, at OMH-BW-00001633. *See also* Trial Exhibit 565, at BWILLIAMS001212 (Mrs. Laurain using "advertising," "marketing," and "promotion" interchangeably when referring to the need to establish the Happy Mat's commercial success).

[818]     Dkt. No. 831 (Transcript Volume II), at 188:1-188:21; 190:25-192:10.

[819]     Dkt. No. 834 (Transcript Volume V), at 718:5-718:23.

[820]     *See* Trial Exhibit 50, at EZPZ0175087; *see also* Trial Exhibit 106 (noting EZPZ paid $25,568.00 for donations, giveaways, and replacements).

[821]     Dkt. No. 835 (Transcript Volume VI), at 986:4-986:19.

[822]     Trial Exhibit 245 at LNC395445.

-134-

83.     Mrs. Laurain, in her role as the leader of EZPZ, was fully aware of all of the advertising, marketing, branding, and promotional activities described above.  At a minimum, Mr. Williams was aware EZPZ appeared on Shark Tank,[823] was aware of EZPZ's strong branding as evidenced by the IP Summary that he drafted,[824] and was aware of EZPZ's active presence on various social media platforms as evidenced by Mrs. Laurain's signature block in her emails.[825]  Mrs. Laurain and Mr. Williams thus knowingly submitted false declarations to the USPTO to overcome the Examiner's obviousness rejection.

### (2) The Failure to Disclose the Relationship Between Certain Declarants and EZPZ Rendered Those Declarations False

1.     Mr. Williams knew that biases of a declarant must be disclosed to the USPTO.[826]

2.     First, Mrs. Winkelmann's declaration dated February 16, 2016, identified her as having a "post-graduate degree as a speech and language pathologist and feeding specialist" and an "expert with extensive experience in reviewing technologies designed to assist parents raising children with special needs."[827]

3.     Given the huge impact that Mrs. Winkelman's promotional activities had on EZPZ's sales in 2014 and 2015, in early 2016 Mrs. Laurain "was trying desperately to come up with some ideas to keep" Mrs. Winkelmann on the EZPZ team.[828]  Mrs. Laurain and Mrs. Winkelmann negotiated a percentage interest in a future sale of EZPZ if it were to get "big."[829]

---

[823]     Trial Exhibit 920.

[824]     Trial Exhibit 720, at EZPZ0158016.

[825]     *See, e.g.*, Trial Exhibit 680, at EZPZ-CH-001193.

[826]     Dkt. No. 826-9 (Williams 2020 Depo.), at 624:9-624:11; 624:13-624:15.

[827]     Trial Exhibit 245 at LNC395314-15.

[828]     Dkt. No. 836 (Transcript Volume VII), at 1505:8-1505:20.

[829]     Dkt. No. 836 (Transcript Volume VII), at 1476:14-1477:1.

Although EZPZ tried to argue that the written agreement whereby Mrs. Laurain agreed to give Mrs. Winkelmann a 2% share of the future sale of the company was not actually signed until after Mrs. Winkelmann's declaration had been signed,[830] the discussions about the percentage interest in a future sale started before Mrs. Winkelmann ever signed the declaration that was submitted to the USPTO by Mrs. Laurain.[831]   In fact, on February 13, 2016, just a few days before Mrs. Winkelmann signed her declaration that was submitted to the USPTO,[832] the negotiations were memorialized in an email from Mrs. Laurain to Mrs. Winkelmann offering her $4,000 a month plus a 2% interest in the future sale of the company, which Mrs. Laurain valued at $500,000 (based on her valuation of the company at $25 million).[833]   Despite having arrived at this agreement, Mrs. Winkelmann claimed she "wasn't thinking of what if, what if, what if" EZPZ were to be sold for an increased value if the patent issued.[834]   Yet Mrs. Winkelmann popped champagne along with Mr. and Mrs. Laurain on September 7, 2016 when they learned a notice of allowance was going to be issued for the utility patent.[835]

4.     Mrs. Winkelmann's declaration did not disclose that she was an independent contractor for EZPZ making $4,000/month,[836] that she was part of the EZPZ "Team,"[837] or that Mrs. Laurain had promised her a 2% interest in any future sale of EZPZ days before Mrs. Winkelmann signed her declaration.[838]

---

[830]     Dkt. No. 836 (Transcript Volume VII), at 1477:2-1477:22.

[831]     Dkt. No. 836 (Transcript Volume VII), at 1477:23-1478:2.  *See also* Trial Exhibit 477.

[832]     Trial Exhibit 245, at LNC395315.

[833]     Trial Exhibit 477; *see also* Dkt. No. 836 (Transcript Volume VII), at 1504:25-1506:19.

[834]     Dkt. No. 836 (Transcript Volume VII), at 1482:3-1482:9.

[835]     Dkt. No. 836 (Transcript Volume VII), at 1506:3-1506:8.

[836]     Trial Exhibit 477.

[837]     Trial Exhibit 73, at EZPZ0293091.

[838]     Trial Exhibit 477.

5.      The Court finds these undisclosed facts would have been material to the Examiner's evaluation of witness bias, and to the weight to be given to Mrs. Winkelmann's statement and these facts should have been disclosed to the USPTO.

6.      Mr. Grayson's declaration dated February 18, 2016, identified him as "a leading expert and analyst in the baby-product industry" and "a recognized expert in the baby product field of endeavor."[839]  Mr. Grayson's declaration did not disclose that EZPZ paid Mr. Grayson to launch the EZPZ Happy Mat on his social media platforms in October 2014,[840] th that he received a minimum of $5,000 in compensation for promoting EZPZ products before he signed his declaration,[841] and that he earned a profit by selling "Baby Guy" boxes, which included the EZPZ Happy Mat that he purchased at a discounted price, to subscribers on a monthly basis.[842] The Court finds these undisclosed facts would have been material to the Examiner's evaluation of witness bias and the weight to be given to Mr. Grayson's statements, and thus should have been disclosed to the USPTO.

7.      Ms. Falcone's declarations disclosed that she was EZPZ's Chief Operating Officer,[843] but they did not disclose that Mrs. Laurain had agreed to give Mrs. Falcone a 10% interest in a future sale of EZPZ prior to Mrs. Falcone signing her declarations.[844]  Mr. Bolton, EZPZ's then-General Counsel, was aware of the change of control agreement between Ms. Falcone and EZPZ,[845] but even after having been shown an email dated November 27, 2015 discussing her

---

[839]      Trial Exhibit 245, at LNC395318-19.

[840]      Dkt. No. 826-13 (Grayson Depo.), at 43:10-43:21; Trial Exhibit 32; Trial Exhibit 245, at LNC395318-19.

[841]      *Id*.

[842]      Dkt. No. 826-13 (Grayson Depo.), at 24:15-26:04.

[843]      Trial Exhibit 245, at LNC395359 and LNC395377.

[844]      Trial Exhibit 476.  *See id*.

[845]      Dkt. No. 826-3 (Bolton Depo.), at 198:5-195:8.

-137-

10% change of control agreement, he refused to agree that he was aware of the agreement at the time of the March 2016 submission.[846]  Considering that Mrs. Laurain was in discussions to sell EZPZ and the evidence establishing EZPZ's belief that the sales price would be higher if the '903 Patent were to issue,[847] the Court finds that Mrs. Falcone had a direct financial interest and material bias with respect to whether the '903 Patent issued.  The Court finds these undisclosed facts would have been material to the Examiner's evaluation of witness bias and the weight to be given to Ms. Falcone's statements, and thus should have been disclosed to the USPTO.  The Court also finds Mr. Bolton's testimony that he did not recall Ms. Falcone's interest in EZPZ lacks credibility.

8.      Mr. Prager's declaration identified him as "an expert analyzing strategies for investors and corporate decision makers" and "a cofounder and owner of several multimillion dollar companies, with a combined market valuation of over $100 million."[848]  While his declaration did disclose that he "consult[s] with Eazy-PZ, LLC and [had] a thorough knowledge of their commercial operations including financial expenditures and revenues," his declaration did not disclose that he was EZPZ's CFO.[849]  Additionally, on June 26, 2015 (prior to the signing of Mr. Prager's declaration),[850] Mrs. Laurain had promised Mr. Prager a bonus upon the sale of EZPZ.[851]

---

[846]    Dkt. No. 826-3 (Bolton Depo.), at 198:9-199:7; Trial Exhibit 715; Trial Exhibit 75.

[847]    Trial Exhibit 960, at EZPZ0157312.

[848]    Trial Exhibit 245, at LNC395320-321.

[849]    Trial Exhibit 245, at LNC395320-321.  *See also* Dkt. No. 836 (Transcript Volume VII), at 1374:20-1374:23; 1379:5-1379:7.

[850]    Trial Exhibit 245, at LNC395321.

[851]    Trial Exhibit 812, at EZPZ0236106.

9.      Dr. Stathos's declaration identified him as "an expert in pediatric medicine with extensive experience in facilitating feeding strategies for infants and small children,"[852] but failed to disclose he was a former treating physician of Mrs. Laurain's children.[853]  The Court finds this undisclosed relationship would have been material to the Examiner's evaluation of witness bias, and thus should have been disclosed to the USPTO.

10.     The sheer number of declarants who had undisclosed relationships and financial connections to Mrs. Laurain and EZPZ – two of whom stood to directly gain financially from the issuance of the '903 Patent – prevents the Court from finding the omissions to be a mere oversight or mistake.  Instead, the Court finds that Mr. Williams and Mrs. Laurain intentionally failed to disclose this information to the USPTO because they were concerned that disclosing the information would cause the Examiner to outright reject or discount the opinions the declarants offered – which amounts to a specific intent to deceive.  The Court further finds this to be yet another example of Mr. Williams and Mrs. Laurain choosing advocacy over candor in breach of their obligations owed to the USPTO.

### (3)      Other false statements in the declarations

1.      In reviewing the draft declarations from alleged "excerpts," Mr. McCarthy noted that the declarations were "[l]ight on the facts, strong on conclusions."[854]  Mr. Bolton agreed, noting that the declarants did not "have the scientific chops to say much else."[855]

2.      Mrs. Laurain worked on Mrs. Clark's declaration[856] that states Mrs. Clark had "analyzed sales figures and marketing strategies of Eazy-PZ, LLC" and that the "advertising and

---

[852]    Trial Exhibit 245, at LNC395317.

[853]    Dkt. No. 345-13, at 28:7-28:19.  *See also* Dkt. No. 346, at pp. 17-18 (additional detail regarding problems with Dr. Stathos' declaration).

[854]    Trial Exhibit 977.

[855]    Trial Exhibit 977.

NavigationHeader

branding…expenditure ha[d] compromised less than 1% of gross sales revenues over a like period."[857]  Mrs. Clark testified, however, that she never reviewed any financial documents, sales reports, or sales figures of EZPZ.[858]  She merely had conversations with Mrs. Laurain about "how sales are going."[859]  She also testified that she was not familiar with EZPZ's advertising efforts from 2014 through the date of her declaration.[860]

3.      The Court finds that the statement in Mrs. Clark's declaration that she had "analyzed sales figures" was indisputably false.  Mrs. Clark had not "analyzed" anything.  She had simply taken the word of Mrs. Laurain about the sales figures and signed the declaration Mrs. Laurain presented to her without any input or revision from Mrs. Clark.[861]  The Court further finds that Mrs. Laurain knew the statement was false because Mrs. Laurain, or someone acting at the direction of Mrs. Laurain, would have had to provide Mrs. Clark with sales figures in order for her to verify the truthfulness of her statement and such information was never provided.

4.      The Court also finds the statement "advertising and branding…expenditure ha[d] compromised less than 1% of gross sales revenues" to be false.  Mrs. Laurain herself reported on January 7, 2016 – just one month before Mrs. Clark signed her declaration – that Advertising/Promotion was "3%" of EZPZ's spending in 2015.[862]  Mrs. Laurain thus knew the statement in Mrs. Clark's declaration was false at the time it was submitted to the USPTO.

---

[856]      Trial Exhibit 570, at BWILLIAMS001035

[857]      Trial Exhibit 245, at LNC395323.

[858]      Dkt. No. 826-11 (Clark Depo.), 90:2-91:24.

[859]      Dkt. No. 826-11 (Clark Depo.), 91:2-91:3.

[860]      Dkt. No. 826-11 (Clark Depo.), 31:18-31:22.

[861]      Dkt. No. 826-11 (Clark Depo.), 85:17-87:5.

[862]      Trial Exhibit 813.

5.      Mrs. Winkelmann's declaration stated, "WHEREAS I have never encountered any product in my over twenty (20) years as an expert in the special-needs community that effectively self-seals to an underlying surface absent suction cups of adhesive[.]"[863]   Although Mrs. Winkelmann testified that "it wasn't that [Mrs. Laurain] told me to state that" it "was me being an expert saying that,"[864] the declaration signed by Mrs. Winkelmann used terms that are not used in speech pathology and with which Mrs. Winkelmann admitted she was not familiar such as "tableware arts,"[865]  "surface contact, self-sealing or "feeding arts."[866]  This is further evidence that Mrs. Winkelmann's declaration was drafted by someone other than herself.

6.      Although Mrs. Winkelmann made representations in her declaration that she had "never encountered any product in [her] over 20 years as an expert in special needs community that effectively seals to an underlying surface absent suction cups or an adhesive" and admitted that she had previously testified during her deposition that she had never encountered "any silicone product" that adhered to a table,[867] on January 21, 2015, Mrs. Winkelmann actually forwarded to Mrs. Laurain via email a Grommet article discussing a CIBO "stick anywhere placemat."[868] Although Mrs. Winkelmann tried to say the CIBO Stick Anywhere Placemat did not fall within the category of tableware and testified it was not a placemat,[869] the Court finds that it does given Mrs. Winkelmann's admission that the CIBO Stick Anywhere Placemat is expressly referred to

---

[863]    Trial Exhibit 245 at LNC395314.

[864]    Dkt. No. 836 (Transcript Volume VII), at 1510:5-1510:6.

[865]    Dkt. No. 836 (Transcript Volume VII), at 1483:11-1483:16; 1509:18-1509:23.

[866]    Dkt. No. 836 (Transcript Volume VII), at 1509:24-1510:1.

[867]    Trial Exhibit 245, at LNC395314-315; *see also* Dkt. No. 836 (Transcript Volume VII), at 1510:9-1510:12.

[868]    Trial Exhibit 932; *see also* Dkt. No. 836 (Transcript Volume VII), at 1510:13-1510:21.

[869]    Dkt. No. 836 (Transcript Volume VII), at 1511:3-1511:10.

5328032_1

as "a stick anywhere placemat."[870]  Mrs. Winkelmann further admitted that the mounting portion

of the CIBO Stick Anywhere Placemat is planar and made of silicone.[871]

7.     Mrs. Winkelmann had to admit that she, herself, had told Mrs. Chandler that the

"products are so close" and that she had testified that they couldn't collaborate because the

products were "too similar."[872]  The Court has examined the CIBO Stick Anywhere Placemat,[873]

and finds that the planar silicone portion of the placemat does, in fact, "stick" or self-seal to a

table and acts to support the "trough" that hangs off the table.  The Court finds that in her desire

to help out her good friend and business colleague, Mrs. Laurain, that Mrs. Winkelmann signed a

declaration prepared by Mrs. Laurain that was false and that Mrs. Laurain, knew the declaration

was false given her familiarity with the CIBO Stick Anywhere Placemat that she, herself, had

characterized as "so close"[874] to the Happy Mat.

8.     Mrs. Winkelmann's statement in her declaration was false because she was fully aware of

the CIBO Stick Anywhere Placemat which adheres to the underlying surface without using

suction cups or adhesive[875] that directly contravenes her statement to the USPTO.[876]

9.     Mrs. Laurain herself acknowledged that the CIBO Stick Anywhere Placemat was "so

close"[877] to the Happy Mat.  The Court therefore finds that Mrs. Laurain knew that the statement

in Mrs. Winkelmann's declaration was false at the time that she submitted it to the USPTO.

---

[870]     Dkt. No. 836 (Transcript Volume VII), at 1511:11-1511:14.

[871]     Dkt. No. 836 (Transcript Volume VII), at 1511:25-1512:9.

[872]     Trial Exhibit 995; *see also* Dkt. No. 836 (Transcript Volume VII), at 1517:7-1518:4.

[873]     Trial Exhibit 958.

[874]     Trial Exhibit 934; Trial Exhibit 995.

[875]     Trial Exhibits 932, 934, and 995.

[876]     Trial Exhibit 245, at LNC395314-315.

[877]     Trial Exhibit 934.

10.     Mr. Grayson represented to the USPTO that the EZPZ Happy Mat had acquired a "rapid acquisition of market share," and had "commercial appeal derived from the product itself, and not from any particular advertising reach."[878]   However, during his testimony, he made the following admissions: (a) He did not know EZPZ's "volume of sales compared to competitors," nor did he know how much of the market EZPZ has;[879] and (b) he had "no knowledge of [EZPZ's] information whatsoever"[880] related to its advertising reach. Mrs. Laurain knew Mr. Grayson did not have access to such information, but she submitted his declaration to the USPTO anyway, rendering the declaration unmistakably false and per se material.

### c.     Affirmative Egregious Misconduct - False or Misleading Statements in Arguments to the USPTO

#### (1)     Contrary to arguments made to the USPTO, the prior art *did* include references with a mat portion creating a partial vacuum

1.     On April 13, 2015, Examiner Volz issued the First Office Action.  She rejected all of the pending claims as being unpatentable as anticipated or for obviousness in light of two prior art references, Stravitz and Lion.[881]

2.      Mr. Williams replied on Mrs. Laurain's behalf to the First Office Action on April 13, 2015.  Mr. Williams argued that Stravitz did not have a mat, and thus no planar portion with a suffuse undersurface as disclosed in the pending claims:

> Applicant clearly sets forth that her suffuse undersurface (structure entirely lacking in Stravitz) creates "a partial vacuum when attempts to *separate the undersurface* from the underlying surface are made *except at an outer edge*" [see claim 1].  Applicant's device does not create "suction" when pressed to a suitable

---

[878]     Trial Exhibit 245, at LNC395318-319.

[879]     Dkt. No. 345-16, at 34:9-34:13.

[880]     Dkt. No. 826-13 (Grayson Depo.), at 33:22-34:4.

[881]     Trial Exhibit 245, at LNC395229-237.

> horizontal surface "with which suction can develop", but on the contrary, creates a partial vacuum when attempts to remove the mat are made "except at an *outer edge* of the planar portion, whereby removal of the planar portion from the underlying surface is effective only by peeling the undersurface from the underlying surface starting first *at the outer edge*".[882]

3.      Mr. Williams, on behalf of Mrs. Laurain, also argued that the disclosure of a "planar portion with a suffuse undersurface" was an "unanticipated structure":

> Applicant's invention, on the other hand, by having a planar portion with a suffuse undersurface, can effect stability over an uneven underlying surface by frictional contact because the entire undersurface contacts therewith, and resists removal because the partial vacuum is created only when attempts to lift the planar portion at a position other than at an outer edge are effected.[883]

4.      Mr. Williams, on behalf of Mrs. Laurain, asserted that, while her device may appear to be simple, "in actual fact it displays properties not seen in the prior art, properties contrary [to] any enablement set forth by either Stravitz or Lion, or any proposed combination of the two."[884]

5.      While EZPZ's patent law expert, Mr. Kennedy, testified that the adhering properties of silicone were "so well known,"[885] he disregards the fact that the Examiners were concerned about "rubber sheets and silicone sheets exist that stick to walls"[886] and must have a prior art reference to cite in order to reject a patent application.[887]

6.      The Court finds that the foregoing arguments made to the USPTO were false because Mr. Williams and/or Mrs. Laurain were aware of numerous products that did self-seal, including Webb, the Webb Publication, the Tommee Tippee Mat, the Brinware Silicone Placemat, the

---

[882]    Trial Exhibit 245, at LNC395247.

[883]    Trial Exhibit 245, at LNC395248.

[884]    Trial Exhibit 245, at LNC395251.

[885]    Dkt. No. 835 (Transcript Volume VI), at 980:5-980:11.

[886]    Trial Exhibit 678, at BWILLIAMS001944.

[887]    Dkt. No. 832 (Transcript Volume III), at 302:18-303:4; 315:21-316:6.

Momo Baby Skid-proof Silicone Placemat, the CIBO Stick Anywhere Placemat, and the Hot Iron Holster.  In addition, Mr. Williams was aware, and informed Mrs. Laurain, of the inherent properties of silicone and believed the dog bowls (*i.e.*, the Platinum Pets Mat and the Lee Single Dog Bowl Mat), could be combined with additional prior art to reject the '682 Application.

**(2)    Mr. Williams and Mrs. Laurain made materially false statements about the characteristics of the Platinum Pets Mat**

1.    As set forth in Section I.A.4.c. above, Mrs. Laurain and Mr. Williams made materially false statements about the true characteristics of the Platinum Pets Mat.   Specifically, despite knowing that the Platinum Pets Mat self-seals to an underlying surface, Mrs. Laurain and Mr. Williams did not disclose the Undisclosed Video of the Platinum Pets Mat to the USPTO during the prosecution of the '903 Patent because it made a "suction" noise and represented to the USPTO that the Platinum Pets Mat "fails to make sealable contact" with an underlying surface.[888]  Given that both Mrs. Laurain and Mr. Williams observed the Platinum Pets Mat self-sealing to the underlying surface to some extent before separating from the surface with an audible "suction" sound, the Court finds that Mr. Williams and Mrs. Laurain's representation was a knowingly false statement of material fact.[889]

**(3)    Mr. Williams and Mrs. Laurain falsely argued to the USPTO that the alleged invention demonstrated unexpected results, when they both "honestly knew" the**

---

[888]    Trial Exhibit 245, at LNC395355.

[889]    *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1190 (Fed. Cir. 2014) ("Partial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective.") (citing *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335–36 (Fed. Cir. 2012); *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (finding intent where the patentee disclosed a complete reference in Japanese but did not provide translations of that part which was material to patentability); *Apotex Inc. v. UCB, Inc.*, No. 13–1674, 763 F.3d 1354, 1362, 2014 WL 3973498, at *8 (Fed. Cir. Aug. 15, 2014) (finding intent on the basis of an inventor misrepresenting material information about disclosed prior art)).

-145-

**results were not unexpected to a material scientist or a person of ordinary skill in the art**

1.      Mr. Williams and Mrs. Laurain argued "unexpected results" to the USPTO multiple times during prosecution of the '903 Patent: three times in the argument section of the March 9, 2016 submission,[890] once in the declaration of Jeff Prager,[891] and twice in the declaration of Jamie Grayson.[892]   For the reasons that follow, the Court finds that Mr. Williams and Mrs. Laurain knowingly and intentionally argued unexpected results to the USPTO even though they knew the results were not unexpected to a person of ordinary skill in the art.

2.      On June 10, 2014, Mr. Bolton told Mrs. Laurain to call Mr. McCarthy to discuss whether it was possible to get a utility patent on the "suction function."[893]   In response, Mrs. Laurain stated she was going to contact her engineer friend to find out the "why" of the suction function of her invention.[894]

---

[890]      Trial Exhibit 245, at LNC395445 ("Applicant has included in this communication nine (9) affidavits … supporting evidence of nonobviousness due to … **the unexpected (or greater than expected) result** in maintaining position upon an underlying surface without the use of suction cups or adhesives" and "The testimony of Jamie Grayson … readily supports the novelty of Applicant's device and **the unexpected result** it exhibits") and LNC395448 ("Each of these experts, therefore, testifies that the present surface contact self-sealing integrated tableware and dining mat presents an **unexpected result** …") and LNC 395452 ("The clear majority (over four-fifths) of sales appear to be derived from **the unexpected, or at least greater than expected, result** evinced by the surface contact self-sealing property Applicant distinctly claims.") (emphasis added).

[891]      Trial Exhibit 245, at LNC395321 ("demonstrations of the products' self-sealing capability … present novel and **unexpected results**…") (emphasis added).

[892]      Trial Exhibit 245, at LNC395319 ("… I was pleased to discover an **unexpected and remarkable self-sealing property** in an item offering useful improvements heretofore unknown in the baby-feeding arts" and "[the self-sealing] action was undeniably **unexpected by all persons skilled in the art** with whom I am familiar") (emphasis added).

[893]      Trial Exhibit 621.

[894]      Trial Exhibit 621.

3.      On August 18, 2014, Mr. Williams told Mrs. Laurain that he was concerned the USPTO would "try to claim that" the "suction function" "feature" is "**inherent to structure** disclosed in additional references which, taken in combination, sustain their rejection."[895]

4.      Following the December 14, 2015 interview with Examiners Matthew and Volz, Mr. Williams recognized in addressing "Unexpected Result/Greater than Expected Result" that the "[p]roblem we might run into, though, is what is considered an expected result re. silicone and self-sealing, frictive engagement."[896]

5.      On December 16, 2015, Mr. McCarthy told Mr. Bolton that he wanted "to hear from a material scientist that says he would not expect this structure to have this function."[897]

6.      On December 21, 2015, Mrs. Laurain emailed Mark Sires stating that she was "trying to find a credible material scientist /mechanical engineer who can speak to the properties of Silicone and that the suction is indeed an unexpected result."[898]  Thereafter she had Mr. Williams speak with Mr. Sires.[899]  While Mr. Williams denied ever speaking with Mr. Sires,[900] the documentary evidence contradicts his testimony.[901]  The Court does not find Mr. Williams's testimony to be credible, and finds that Mr. Williams did confer with Mr. Sires about whether the self-sealing characteristic of silicone was an expected or unexpected result.  In any event, EZPZ

---

[895]    Trial Exhibit 29 (emphasis added); Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 184:1-184:25; Trial Exhibit 29 (emphasis added).  *See also* Trial Exhibit 216 (noting that there were inherent qualities and characteristics about silicone that made it "self-seal" to an underlying surface and that it could be argued that this characteristic is not an unexpected result).   Dkt. No. 826-9 (Williams 2020 Depo.), at 492:20-492:25; 493:2-493:12.

[896]    Trial Exhibit 636, at EZPZ-CH-001232.

[897]    Trial Exhibit 92.

[898]    Trial Exhibit 684.

[899]    Trial Exhibit 529, at EZPZ-CH-014962.

[900]    Dkt. No. 826-9 (Williams 2020 Depo.), at 630:15-630:22.

[901]    Trial Exhibit 529, at EZPZ-CH-014962.

did not have any contemporaneous written evidence of what was said during Mr. Williams' conversation with Mr. Sires. Had Mr. Sires offered support for the unexpected result, it is not unreasonable to infer that Mrs. Laurain and Mr. Williams would have had him submit a declaration.

7.      Mr. Williams had prepared no later than January 31, 2016, a draft declaration for a material scientist to be filed with the USPTO.[902]  That draft declaration provides in part:

> In my expert opinion as an established and respected materials scientist who has worked in the design and production of a myriad variety of silicone products for market, the placemat created by Lindsey Laurain demonstrates an undeniable unexpected result – the state of the art of silicone products is well directed to hypoallergenics, but nothing has been disclosed regarding this remarkable self-sealing property.[903]

8.       On February 1, 2016, Mr. Williams told Mr. Bolton he thought they "need[ed] some sort of material scientist – manufacturer of silicone stuff.  A medical supply company perhaps.  What about the 3D printing store?"  Mr. Bolton responded: "A material scientist would be great."[904] Mr. Bolton testified he did not recall having said that and he was unable to recall whether he made any effort to find a material scientist.[905]

9.      In an EZPZ document dated January 18, 2016 identifying the status of the documents to be filed in the March 9, 2016 submission, one of the bullet points noted that they still needed a material scientist to establish unexpected results: "Un Expected Result NEED: Someone to

---

[902]     Dkt. No. 826-9 (Williams 2020 Depo.), at 672:14-674:15; Trial Exhibit 566.

[903]     Trial Exhibit 566.

[904]     Trial Exhibit 568.

[905]     Dkt. No. 826-3 (Bolton Depo.), at 113:11-113:13; 175:15-176:7.

confirm unexpected results via the Self-Sealing" and "TO DO: *Material Scientist is still needed."[906]

10.     On February 10, 2016, Mrs. Laurain told Mr. Williams and Mrs. Falcone that she had a "strong lead" on a material scientist and was "Sending [an] email."[907]

11.     On February 12, 2016, Mrs. Laurain emailed Barb at Maple and Mark about her "Material Scientist friend," stating she "never heard anything" and "would LOVE to ask her a few questions."[908]

12.     On February 16, 2016, Mrs. Laurain told Mrs. Falcone, Mr. Bolton, and Mr. Williams she was unsure if they would be able to obtain a declaration from a material scientist because of "the recent silicony suction/sticky stuff…" in the market and provided Mr. Williams and Mr. Bolton, but not Mr. McCarthy, with a link to https://www.thegrommet.com/hot-iron-holster-lil-holster, the Hot Iron Holster.[909]

13.     On February 21, 2016, Mrs. Laurain emailed Mrs. Falcone and Mr. Williams stating that she "never heard back from Material Scientists" and asked if that was okay.[910]

14.     On February 22, 2016 Mrs. Laurain told Mr. Bolton, Mrs. Falcone, and Mr. Williams, but not Mr. McCarthy the following: "Material Scientist- **I honestly don't think we would get what we want from them. SO I think it's OK not to have.**"[911]

15.     Following issuance of the Notice of Allowance by the USPTO in the '682 Application, on September 19, 2016, Mr. Williams told Mr. Bolton, Mrs. Laurain, Ms. Falcone, and Mr.

---

906     Trial Exhibit 565, at BWILLIAMS001213.

907     Trial Exhibit 570, at BWILLIAMS001035.

908     Trial Exhibit 571.

909     Trial Exhibit 118.

910     Trial Exhibit 572.

911     Trial Exhibit 121.

-149-

McCarthy that Nuby may argue "**inherent property of silicone enabling the self-sealing action is not an unexpected result and that there is no novelty.**"[912]   Thus, Mr. Williams and Mrs. Laurain knew throughout the prosecution of the '903 Patent that the inherent qualities of silicone create a partial vacuum that enables the placemat to "self-seal" to an underlying surface absent need for suction cups or adhesives.

16.     Notwithstanding their inability to find a material scientist to testify that the self-sealing characteristic was an unexpected result, and notwithstanding Mr. William's understanding that the self-sealing capability is an inherent property of silicone and Mrs. Laurain's own observation that other silicone products do, in fact, exhibit the same self-sealing (or "silicony suction/sticky stuff") characteristic as her alleged invention, Mr. Williams and Mrs. Laurain argued to the USPTO that the self-sealing characteristic was an unexpected result.[913]   They did not disclose the Hot Iron Holster, the "silicony suction/sticky stuff," or other self-sealing prior art about which they were fully aware, but instead cited examples of silicone products that they claimed *do not* self-seal[914] (although the Platinum Pets Mat does self-seal).[915]   The Court finds this to be yet another example of Mr. Williams and Mrs. Laurain exercising advocacy over candor.

17.     In addition, Mr. Williams and Mrs. Laurain selectively argued in the March 9, 2016 submission that "merely making a device out of silicone does <u>not</u> create the surface contact self-sealing property Applicant claims" and "that there exist a whole panoply of silicone products in the state of the art that do <u>not</u> effect self-sealing in the manner explicitly set forth by

---

[912]     Trial Exhibit 216 (emphasis added).

[913]     *See* ns. 890-892, *supra*.

[914]     Trial Exhibit 245, at LNC395355 (Appendix D).

[915]     *See* Section I.A.4.c, *supra*.

Applicant."[916] In addition to misrepresenting the self-sealing characteristics of the Platinum Pets prior art product, Mr. Williams and Mrs. Laurain failed to disclose the prior art silicone products of which they were aware that did exhibit the self-sealing characteristic including the Tommee Tippee Mat, Momo Baby Skid-proof Silicone Placemat, the Brinware Silicone Placemat, the Hot Iron Holster and the CIBO Stick Anywhere Placemat.

18.     Mr. Kennedy, EZPZ's own expert, found Mr. Williams' arguments regarding the Happy Mat's alleged "unexpected results" to be unsupported and merely "ballyhoo."[917]

19.     Germain to this subject, another Examiner in the subsequent '403 Application relied on "Air Pressure_The Atmospheric Mat," published by George Mehler "to teach inherent properties of a silicone mat or other rubber mat that is in surface contact with an underlying surface."[918] This very same Examiner also rejected the pending claims of the '403 Application as anticipated by the Webb Publication.[919]

20.     Likewise, EZPZ's technical expert, Michael Henley, opined that the "phenomenon" or "real magic" of the Happy Mat "is generally taught in high school physics classes" and refers to "Boyle's Law," or the "partial vacuum."[920]  The structure combined with the inherent properties of silicone "interfaces with the surface you put it on."[921]

---

[916]     Trial Exhibit 245, at LNC395440.

[917]     Dkt. No. 835 (Transcript Volume VI), at 986:4-986:19.

[918]     Trial Exhibit 281, at EZPZ301074.

[919]     Trial Exhibit 281, at EZPZ301177.

[920]     Dkt. No. 836 (Transcript Volume VII), at 1445:20-1446:14.

[921]     Dkt. No. 836 (Transcript Volume VII), at 1447:8-1449:18.

### d. Affirmative Egregious Misconduct - False and Misleading Survey

#### (1) Applicable Law

1.      "The trustworthiness of surveys depends upon foundation evidence that (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured. Failure to satisfy one or more of these criteria may lead to exclusion of the survey."[922]

2.      Surveys cannot be over inclusive or underinclusive.[923]

3.      Affirmative egregious misconduct also includes "the manufacture of false evidence[.]"[924]

#### (2) Mrs. Laurain and Ms. Falcone Manufactured False Evidence in the Flawed and Biased Survey

1.      In connection with their initial planning to make the case for secondary considerations at the USPTO, on December 15, 2015, Mr. Williams emailed Mr. McCarthy, Mr. Bolton, and Mrs. Laurain suggesting they "do a survey showing that most consumers purchased the product for

---

[922]   *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1205 (E.D.N.Y. 1983) (citations omitted).

[923]   *See Gen. Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F. Supp. 716, 737 (W.D. Mich. 1964) (survey of persons that "had no interest in boats at all" was an overinclusive sample set); *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1158 (S.D. Tex. 1982) (concluding that "serious and fatal errors exist[ed] in the survey universe" because the sample set was "too narrow")

[924]   *Therasense*, 649 F.3d at 1287.

it's [*sic*] utility."[925]  Mr. Williams suggested that they get the "surveyor to sign an affidavit as to the authenticity of the results."[926]

2.      On January 18, 2016, Mr. Williams expressly advised Mrs. Laurain that the results of the survey should be "sworn to by a third-party."[927]

3.      On February 15, 2016, Mrs. Falcone sent a first draft of the survey to Mr. Bolton, Mrs. Laurain, and Mr. Williams.[928]

4.      Mr. Bolton requested that Mrs. Falcone make changes to each of the four survey question responses, and she agreed.[929]

5.      Mr. Bolton requested that Facebook and/or Twitter be added to the social media category in the answer to question No. 1.[930]  Mrs. Falcone complied.

6.      Mr. Bolton requested that Mrs. Falcone add an option for "advertising" (as opposed to the actual language of the legal test for commercial success, i.e., "promotion or advertising") in the answer to question No. 2.[931]  She complied.

7.      At trial, Mrs. Falcone agreed that the three first options as answers to Question 2 relate to characteristics or product features of the Happy Mat, unlike the word "advertising" added by Mr. Bolton. She does not recall why she agreed with Mr. Bolton to add "advertising."[932]

---

[925]     Dkt. No. 826-9 (Williams 2020 Depo.), at 645:9-645:15; 645:22-646:9; 647:1-647:5; Trial Exhibit 626.

[926]     Dkt. No. 826-9 (Williams 2020 Depo.), at 645:9-645:15; 645:22-646:9; 647:1-647:5; Trial Exhibit 626.

[927]     Trial Exhibits 565 and 531.

[928]     Dkt. No. 826-5 (Falcone 2020 Depo.), at 105:17-106:19; Trial Exhibit 118.

[929]     Trial Exhibit 118, at BWILLIAMS000990; Trial Exhibit 650.

[930]     Dkt. No. 826-3 (Bolton Depo.), at 190:6-190:11; Trial Exhibit 650 Trial Exhibit 917.

[931]     Dkt. No. 826-3 (Bolton Depo.), at 193:18-194:4.

[932]     Dkt. No. 826-5 (Falcone 2020 Depo.), at 112:8-112:14; 112:16-112:19; 112:21-112:22; Trial Exhibit 118.

8.     Mr. Bolton requested that Mrs. Falcone change the word "solve" to "solution" in the third question of the survey.[933] She complied.

9.     Finally, Mr. Bolton requested that Mrs. Falcone flip the order of the responses for the final question to "very likely," "somewhat likely," and "not likely."[934] Again, she complied.

10.    Mrs. Falcone was a marketing major[935] who, prior to becoming the COO of EZPZ, conducted survey research in the private sector.[936]

11.    Mrs. Laurain sent out the survey on February 16, 2016, along with a biased transmittal message that tainted the survey results.[937]  Mr. Bolton drafted the initial version of the transmittal message.[938]

12.    On February 16, 2016, a few hours after the survey was sent out, and before receiving the survey results, Mrs. Falcone emailed EZPZ employee Christie Brock to let her know that the survey would "help [EZPZ's] 'case' to secure the Utility Patent."[939]

13.    Despite recognizing that biases could lead to an unfair sample set,[940] Mrs. Falcone asked Mrs. Brock to respond again to the survey using her yahoo account.[941]

14.    Mrs. Falcone sent an email to Mr. Bolton on February 16, 2016 saying "You go Bolton" when he said he took the survey and "love[d] how it default[ed]."[942]   She claimed she does not

---

[933]    Trial Exhibit 650.

[934]    Dkt. No. 826-5 (Falcone 2020 Depo.), at 112:23-114:1; Trial Exhibit 118.

[935]    Dkt. No. 826-5 (Falcone 2020 Depo.), at 27:19-27:12.

[936]    Trial Exhibit 245, at LNC395377; *see also* Dkt. No. 836 (Transcript Volume VII), at 1530:4-1530:15.

[937]    Trial Exhibit 485.

[938]    Dkt. No. 826-3 (Bolton Depo.), at 195:9-195:18; Trial Exhibit 650.

[939]    Trial Exhibit 486.

[940]    Trial Exhibit 946.

[941]    Trial Exhibit 486.

-154-

know what Mr. Bolton meant by how it "defaulted."[943]   She does not recall removing Mr. Bolton's response from the survey pool.[944]

15.      Mr. Bolton testified he was unable to recall what he meant by "Love how it defaults."[945] The Court finds Mr. Bolton's testimony lacks credibility because it is apparent, and the Court so finds, that the survey, as designed by Mrs. Falcone, defaulted to the preferred responses that supported the arguments relying on secondary considerations of non-obviousness to overcome the Examiner's obviousness rejection.

16.      On February 22, 2016, Mrs. Falcone sent an email to Mrs. Laurain, Mr. Williams and Mr. Bolton stating that the survey results looked great.[946] She does not recall the exact date of when she received the survey results.[947]

17.      The results included 62% of people found out about EZPZ on social media.[948]   In an effort to avoid the fact that posting on social media is marketing, Mrs. Falcone testified that "social media" is a place that you can market, but that "marketing" is a vague term.[949]

18.      On February 23, 206, Mr. Williams congratulated Mrs. Falcone on a "Nice job" for getting "that 82% suction function."[950]

---

[942]      Trial Exhibit 485.

[943]      Trial Exhibit 485; Falcone 2020 Depo., at 125:5-125:21; 125:24-126:10.

[944]      Trial Exhibit 485; Falcone 2020 Depo., at 131:9-131:11.

[945]      Dkt. No. 826-3 (Bolton Depo.), at 189:11-189:12.

[946]      Trial Exhibit 500

[947]      Dkt. No. 826-5 (Falcone 2020 Depo.), at 143:14-144:5.

[948]      Trial Exhibit 500.

[949]      Dkt. No. 826-5 (Falcone 2020 Depo.), at 144:12-144:23; 145:1-145:3; 146:21-146:22; 146:25-147:4; 147:7-147:8.

[950]      Trial Exhibit 500.

19.     On February 23, 2016, Mr. Williams again advised Mrs. Falcone, Mrs. Laurain, and Mr. Bolton that the results of the survey should be authenticated in an affidavit by an "objective expert."[951]

20.     On March 7, 2016, Mrs. Laurain sent an email to Mrs. Falcone, Mr. Bolton, Mr. McCarthy and Mr. Williams, asking Mr. Bolton or Mr. McCarthy if they had any advice or suggestions on the draft response to the USPTO.[952]   Mr. McCarthy advised that the survey results should be authenticated, and the credibility of the survey results can be attacked on numerous bases including wording, order, format, structure, visual layout, behaviors to be measures, and accuracy of the elicited information.[953]  Mrs. Falcone did nothing to remedy these flaws and claims that she does not recall having any conversations about how the survey could be attacked.[954]

21.     Mr. McCarthy admitted that he drafted a declaration for Mrs. Falcone to sign regarding the survey that he believed was more appropriate than the affidavit he was shown.[955]

22.     Mr. McCarthy was not told about the defaults that were built into the survey.[956]

23.     Mr. McCarthy was not informed that Mr. Bolton filled out the survey.[957]

24.     Mr. McCarthy was not informed that Mr. Bolton assisted in drafting the survey.[958]

---

[951]     Trial Exhibit 500.

[952]     Trial Exhibit 502, at EZPZ-CH-008650.

[953]     Trial Exhibit 502.

[954]     Dkt. No. 826-5 (Falcone 2020 Depo.), at 148:16-19; 149:2-149:11; 149:14-149:16; 151:14-152:4; 154:18-154:20; 154:22-154:23.

[955]     Dkt. No. 826-3 (McCarthy Depo.), at 182:25-183:9.

[956]     Dkt. No. 826-3 (McCarthy Depo.), at 187:13-187:20.

[957]     Dkt. No. 826-3 (McCarthy Depo.), at 187:13-187:15.

[958]     Dkt. No. 826-3 (McCarthy Depo.), at 177:4-177:10.

25.     The survey was attached to Mrs. Laurain's March 9, 2016 submission to the PTO along with the declaration of Mrs. Falcone.[959]

26.     Mrs. Laurain did not have an objective expert or independent third party authenticate the survey despite the advice to do so received independently from Mr. Williams and Mr. McCarthy.[960]   Mrs. Falcone signed the declaration to which the survey was attached. Mrs. Falcone admitted she was not an objective expert.[961]   Indeed, Mrs. Falcone was an employee of EZPZ who also stood to receive 10% of any future sale of the company.[962]

27.     Dr. Nancy Albers, the former dean of the college of business at LSU Shreveport, has an undergraduate degree in communication, a master's degree in business, and a Ph.D. in marketing.[963]   At LSU Shreveport, she has taught a number of courses, including introduction to research methods, statistics, marketing strategy, marketing research, international experience, and social media marketing.[964]   All of the courses she has taught include a section on survey design and implementation.[965]   In addition to teaching, Dr. Albers has served as a consultant for survey design, authored peer reviewed publications dealing with marketing and parasocial bonding, and made presentations on marketing at professional meetings.[966]

---

[959]     Trial Exhibit 245, at LNC395376-432.

[960]     Trial Exhibit 500; Trial Exhibit 502; Trial Exhibit 565.

[961]     Dkt. No. 826-5 (Falcone 2020 Depo.), at 147:10-147:20; 147:23-148:2; 148:5-148:8; 148:11-148:14; *see also* Trial Exhibit 245, at LNC395377.

[962]     Trial Exhibit 476; Dkt. No. 836 (Transcript at Volume VII), at 1563:10-1563:23.

[963]     Dkt. No. 831 (Transcript Volume II), at 110:13-110:25.

[964]     Dkt. No. 831 (Transcript Volume II), at 111:1-111:15.

[965]     Dkt. No. 831 (Transcript Volume II), at 111:23-112:1.

[966]     Dkt. No. 831 (Transcript Volume II), at 112:2-112:21; 113:8-114:2.

28.      In light of Dr. Albers' background and experience, the Court accepted and qualified Dr. Albers as an expert in survey design, survey ethics, marketing, social media marketing, marketing research, and marketing education at the collegiate level.[967]

29.      Dr. Albers testified that when creating a survey, individuals should strive to collect data in a manner that is unbiased and to avoid drawing only favorable or intended responses.[968] Further, it is unethical to develop a questionnaire that drives respondents to a desired result.[969] Dr. Albers testified that Mrs. Falcone created the survey, collected the survey results, and selected their respondent pool to ensure the survey resulted in responses that would support Mrs. Laurain's case before the USPTO.[970]   For example, as demonstrated by its wording, Mrs. Falcone created the survey with the intention of demonstrating that the suction function was the dominant selling feature in the EZPZ Happy Mat.[971]  Dr. Albers pointed out that Mrs. Falcone sent an email indicating that she knew in advance that the results of the survey would support Mrs. Laurain's position at the USPTO.[972]   As another example, while anyone who is biased should not be included in the respondent pool, Mrs. Falcone encouraged EZPZ employee Brock to respond twice.[973]  Dr. Albers' testimony is unrefuted by EZPZ.

30.      In Question 1 of the survey, Mrs. Laurain and Mrs. Falcone included "word of mouth" as a preselected response to the survey which Dr. Albers testified can ultimately skew the results

---

[967]      Dkt. No. 831 (Transcript Volume II), at 114:6-114:9; 119:12-119:14; 120:15-120:18; 121:7-121:9.

[968]      Dkt. No. 831 (Transcript Volume II), at 125:13-126:20.

[969]      Dkt. No. 831 (Transcript Volume II), at 126:18 – 126:20.

[970]      Dkt. No. 831 (Transcript Volume II), at 122:16-123:4; 127:13-128:5; 124:10-124:13; 126:3-126:7; 126:18-126:20; 161:16-161:24.

[971]      Dkt. No. 831 (Transcript Volume II), at 121:21-123:4; 183:3-183:6.

[972]      Trial Exhibit 486; Dkt. No. 831 (Transcript Volume II) at 127:17-127:19; 161:6-161:10.

[973]      Dkt. No. 831 (Transcript Volume II), at 128:12-129:5.

because the preselected response will be recorded for anyone who skips that question.[974] Additionally, the categories are not equally defined because they provide definitions and/or examples of each of the categories except "advertisement," which makes consumers less likely to pick that response.[975]

31.     Further, the categories in Question 1 were not mutually exclusive or collectively exhaustive because there was significant overlap in the available responses.[976]  For example, Mrs. Falcone listed TheBabyGuy as an example of social media in the responses, but EZPZ actually paid TheBabyGuy for promotional activities, making these posts an advertisement, so it is unclear to the respondent how they should respond to the question.[977]  Likewise, each of the other response options (social media, shopping on Amazon, consumer events) contains elements of advertising.[978]  Thus, consumers were left unclear as to what was being asked since the advertising option apparently excluded activities that can be forms of advertising.[979]  Dr. Albers' testimony regarding Question 1 is unrefuted by EZPZ.

32.     Question 2 of the survey assumes that the respondent had purchased the Happy Mat.[980] Although Mrs. Falcone told the USPTO that all of the respondents to the survey had purchased an EZPZ Happy Mat,[981] a number of respondents stated that they did not purchase the product.[982] Dr. Albers testified that in addition to preselecting the "Suction function" category, the response

---

[974]     Dkt. No. 831 (Transcript Volume II), at 134:11-134:23.

[975]     Dkt. No. 831 (Transcript Volume II), at 134:24-134:25; 135:19-136:11.

[976]     Dkt. No. 831 (Transcript Volume II), at 137:17-138:24.

[977]     Dkt. No. 831 (Transcript Volume II), at 139:7-139:25.  *See also* Trial Exhibit 32.

[978]     Dkt. No. 831 (Transcript Volume II), at 137:17-138:24.

[979]     Dkt. No. 831 (Transcript Volume II), at 139:22-139:25.

[980]     Dkt. No. 831 (Transcript Volume II), at 142:9-142:18.

[981]     Trial Exhibit 245, at LNC395377-378.

[982]     Dkt. No. 831 (Transcript Volume II), at 141:2-141:14; 148:2-148:23.

categories were not treated similarly.[983]   For example, Mrs. Falcone included an exclamation point with respect to the "Suction function" category, but not in any of the other response categories.[984]   Additionally, the incorporation of "advertising" as a response category is out of place because all other category responses are product-related features.[985]   And, moreover, it does not provide the respondents an opportunity to provide a response about "promotion or advertising," which is the express test to be used to establish commercial success. Finally, Mrs. Falcone and Mrs. Laurain failed to include a category related to EZPZ's "story" of the "mom inventor" and branding efforts that could have likely been a reason for purchasing the Happy Mat.[986]   Dr. Albers' testimony is unrefuted by EZPZ.

33.     In addition to the foregoing, the Court notes that the use of the word "advertising" in Question 1 (which necessarily excluded the activities in the prior response options) ensured that the "advertising" option in Question 2 would not be selected by any respondent who purchased the Happy Mat as a result of any of the other activities described in the responses to Question 1 (e.g., social media, shopping on Amazon).

34.     In Question 3 of the survey, Dr. Albers noted that Mrs. Falcone preselected five stars as the rating for the Happy Mat, which likely skewed the survey results.[987]   Dr. Albers' testimony is unrefuted by EZPZ.

35.     Dr. Albers testified that Question 4 of the survey suffers from one-sidedness because it assumes that the respondent is likely to recommend the Happy Mat, and gives two "likely"

---

[983]     Dkt. No. 831 (Transcript Volume II), at 143:2-143:11.

[984]     Dkt. No. 831 (Transcript Volume II), at 143:2-143:11; 183:3-183:6.

[985]     Dkt. No. 831 (Transcript Volume II), at 143:12-144:8.

[986]     Dkt. No. 831 (Transcript Volume II), at 144:11-145:23.

[987]     Dkt. No. 831 (Transcript Volume II), at 146:4-146:15.

responses and only one "not very likely" response as an option.[988]  Dr. Albers' testimony is unrefuted by EZPZ.

36.     Dr. Albers showed that, to some extent, Mrs. Laurain and Mrs. Falcone submitted truncated responses to the USPTO, precluding the USPTO from having a complete data set with comments.[989]

37.     Mrs. Falcone designed the survey such that it would default to EZPZ's preferred responses.[990] This was not disclosed to the USPTO.

38.     Although Mrs. Falcone's declaration stated that the survey was delivered to customers who had purchased the Eazy-PZ Happy Mat on www.ezpzfun.com, Dr. Albers showed that the results reflect that some people received it as a gift or worked for EZPZ.[991]

39.     Dr. Albers testified that when performing survey research, you should perform office edits to eliminate inappropriate or frivolous responses such as duplicates and biases.[992]  Mrs. Falcone testified that she does not recall whether she screened the people who received the survey to determine whether they were biased, but the evidence at trial indicates that she did not, as she included the survey responses of Ms. Brock and Mr. Bolton.[993]

---

[988]     Dkt. No. 831 (Transcript Volume II), at 146:16-147:7.

[989]     Dkt. No. 831 (Transcript Volume II), at 151:18-152:3.

[990]     Trial Exhibit 485; Dkt. No. 831 (Transcript Volume II) at 134:11-134:23.

[991]     Dkt. No. 831 (Transcript Volume II), at 141:2-141:14; 148:2-148:23; Falcone 2020 Depo., at 132:22-132:24; 133:2-133:5; 133:8-133:24; 134:2-134:6; 134:10-134:22; Trial Exhibit 930.

[992]     Dkt. No. 831 (Transcript Volume II), at 148:24-150:1; 151:4-151:7.

[993]     Dkt. No. 826-5 (Falcone 2020 Depo.), at 119:10-120:2; 120:4-120:24; 121:2-121:3; 124:9-124:12; 124:15-124:17; Trial Exhibit 485; Trial Exhibit 486.

40.     As noted, Mr. Bolton, who was not an objective third party, prepared a proposed cover communication for the survey.[994]   Dr. Albers testified that this introductory note biased the survey results by implying only supporters should be filling out the survey.[995]

41.     Dr. Albers testified that in unbiased research, one should never ask any person to complete a survey twice. [996]   Nor should a biased employee participate in the survey.[997] However, Mrs. Falcone encouraged Ms. Brock, an employee of EZPZ, to respond to the survey twice.[998]   The survey was also sent to and filled out by Mr. Bolton, whom Mrs. Falcone knew was clearly a biased respondent.

42.     The MPEP provides the following in connection with secondary considerations:

> In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such success is not the result of **heavy promotion or advertising**, shift in advertising, consumption by purchasers normally tied to applicant or assigned, or other business events extraneous to the merits of the claimed invention, etc."[999]

43.     Dr. Albers explained that promotion is a broader term than advertising.[1000]   Advertising implies payment to an identified sponsor, whereas EZPZ also engaged in a broad range of

---

[994]     Dkt. No. 826-3 (Bolton Depo.), at 195:9-195:18; Trial Exhibit 650.

[995]     Dkt. No. 831 (Transcript Volume II), at 131:10-131:23; 147:15-147:24. *See also* Trial Exhibit 485.

[996]     Dkt. No. 831 (Transcript Volume II), at 128:6-129:1.

[997]     *Id.*

[998]     Dkt. No. 831 (Transcript Volume II), at 128:16-128:20; 129:2-129:8.  *See also* Trial Exhibit 486.

[999]     MPEP § 716.03(b) (emphasis added).

[1000]    Dkt. No. 831 (Transcript Volume II), at 191:5-191:11; 193:3-193:5.

marketing and branding activities to promote the product and the story of the family behind the product that do not involve payment.[1001]

44.     Mrs. Laurain understood at the time that the commercial success component of secondary considerations is not limited to showing that sales were not due to advertising (which is paid) but also includes unpaid promotional activities, such as marketing.  In fact, she explained in an email to Mr. Prager and Mrs. Falcone that "we are working to show that our sales are from having a great product that suctions, not advertising/marketing."[1002]  Mr. Williams was well-aware of the requirement, having advised the prosecution team of the need to show that the product's success derived from the product itself, "and not from advertising or anything else."[1003]  Further, Mr. Williams testified to his familiarity with the contents of the MPEP.[1004]

45.     The survey twice offered advertising as a response (albeit with the problems discussed above) but did not offer an option for promotion, marketing or branding.[1005]

46.     In light of the amount of promotion done by EZPZ (discussed below), the Court finds that the absence of response options relating to promotion is further evidence of Mrs. Falcone's and Ms. Laurain's intent to achieve a desired result with the survey.

47.     Mrs. Falcone's willingness to adopt the suggestions of Mr. Bolton, EZPZ's attorney, especially the non-sensical addition of the word "advertising" in the response for Question 2, indicates a lack of intent to achieve an unbiased result and, rather, an intent to support Mrs.

---

[1001]    Dkt. No. 831 (Transcript Volume II), at 130:6-130:10; 144:17-144-19; 145:17-145:23; 173:2-173:13; 167:16-167:19; 168:15-168-18; 188:12-188:21; 189:8-189:17; 191:5-191:11.

[1002]    Trial Exhibit 695, at OMH-BW-00001633.

[1003]    Trial Exhibit 692 at OMH-TW-00002164.

[1004]    Dkt. No. 835 (Transcript Volume VI), at 1105:17-1105:22 (agreeing that MPEP is black letter law).

[1005]    Trial Exhibit 245, at LNC395381.

Laurain's efforts to prove secondary considerations and "help EZPZ's 'case' to secure the Utility Patent."[1006]

48.     The Court finds that Mrs. Laurain, a marketing major, concluded that no third party would authenticate the survey given the way in which it was designed.

49.     The Court finds that Mrs. Falcone, with the knowledge of Mrs. Laurain, designed the survey in a manner to cause respondents to provide answers that would support Mrs. Laurain's position with the USPTO, to-wit, that the Happy Mat was successful due to its "suction function" without the benefit of significant advertising or promotion/marketing.

50.     Given their marketing backgrounds and business experience, the Court finds Mrs. Laurain and Mrs. Falcone knowingly manufactured and submitted to the USPTO false survey evidence to support the commercial success component of secondary considerations of nonobviousness.

e.     <b>Affirmative Egregious Misconduct – Alleging Competitors Who Were Copying That Contested the Validity of the '682 Application.</b>

1.     Mr. Williams informed Mrs. Laurain that to establish "copying" as a secondary consideration for nonobviousness, they could show that "infringing devices cropped up after the Happy Mat" went on the market.[1007]   However, he also noted that "copying cannot be due to questions of patentability" and he had "mixed feelings about this, because clearly competitors do not think the happy mat is patentable for utility."[1008]

---

[1006]     Trial Exhibit 486.

[1007]     Trial Exhibit 528.

[1008]     Trial Exhibit 528.

-164-

2.      There is no dispute that Nuby-UK questioned the patentability of Mrs. Laurain's alleged invention when Mr. Morse responded, on February 12, 2016, to the cease and desist letter sent by Mr. Williams.[1009]

3.      There is also no dispute that Silicandy questioned the patentability of Mrs. Laurain's alleged invention when Ms. Baror emailed Mr. Williams in January 2016 informing him of the Gerber Graduates Mealmat and noting that its characteristics were "an inherent trait of any 100% silicone mat."[1010]

4.      Despite recognizing that Nuby-UK and Silicandy both questioned the patentability of the Happy Mat,[1011] Mrs. Laurain and Mr. Williams pointed to Nuby-UK[1012] and Silicandy[1013] to support their argument to the USPTO that:

> Extensive evidence exists in the national and international market of competitor's copying Applicant's "Happy Mat" (shown below with associated branding), as well as copying other embodiments of her invention set forth in the utility patent application here in question.
>
> Evidence of Applicant's market share is demonstrable by competitor attempts to dilute her brand with imitation trademarks, designs, and product descriptions.[1014]

### 6.      Individuals Associated with the Filing or Prosecution of the '682 Application.

1.      "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability."[1015]

---

[1009]    Trial Exhibit 115.

[1010]    Trial Exhibit 722, at EZPZ-CH-002169.

[1011]    Trial Exhibit 722, at EZPZ-CH-002168-171; Trial Exhibit 115.

[1012]    Trial Exhibit 245, at LNC395340.

[1013]    Trial Exhibit 245, at LNC395334-335.

[1014]    Trial Exhibit 245, at LNC395330.

-165-

2.      "Individuals associated with filing or prosecution of a patent application" include the named inventor, the attorney or agent who prepares or prosecutes the application and "[e]very other person who is substantively involved in the preparation of the application and is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application."[1016]

3.      To be "substantively involved" means "that the involvement relates to the content of the application or decisions related thereto, and the involvement is not wholly administrative or secretarial in nature.[1017]

4.      "If an individual who is substantively involved in the preparation or prosecution of an application fails to comply with his duty of candor, then that individual's misconduct is chargeable to the applicant for the patent, and the applicant's patent is held unenforceable."[1018]

5.      Mrs. Laurain is the named inventor and  Mr. Williams is the patent agent who filed and prosecuted the '682 Application.[1019]

6.      Pursuant to 37 CFR 1.56(c)(1) and (2), the Court concludes that Lindsey Laurain (as the named inventor) and Ben Williams (as the patent agent) owed a duty of candor and good faith in dealing with the USPTO and had a duty to disclose material information to the USPTO in connection with the prosecution.

7.      Tamara Falcone, EZPZ's Chief Operating Officer[1020] and a close friend of Mrs. Laurain,[1021] assisted with the preparation of the March 9, 2016 submission to the USPTO by

---

[1015]      37 C.F.R. 1.56(a).

[1016]      37 C.F.R. 1.56 (c)(3).

[1017]      *Avid Identification*, 603 F.3d at 974.

[1018]      *Avid Identification Systems v. Crystal Import Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010).

[1019]      *See* LNC Trial Exhibit 245.

[1020]      Dkt. No. 836 (Transcript Volume VII), at 1529:7-1529:10.

drafting some of the declarations[1022] and preparing and conducting the survey[1023] included in that submission. The Court finds that Ms. Falcone was substantively involved in the prosecution of the '682 Application related to the content of the March 9, 2016 submission and her involvement was not wholly administrative or secretarial in nature.

8.      Therefore, the Court concludes that Ms. Falcone was "substantively involved in the preparation or prosecution"[1024] of the '682 Application and was associated with the applicant, Mrs. Laurain, and assignee, EZPZ, such that Ms. Falcone owed a duty of candor and good faith in dealing with the USPTO and had a duty to disclose material information to the USPTO pursuant to 37 CFR 1.56(c)(3).

9.      Jordan Bolton, an attorney with the law firm of Clark Hill[1025] and a good friend of Mrs. Laurain,[1026] served as EZPZ's outside general counsel from early 2015 through the end of 2016.[1027]  Mr. Bolton provided advice to Mrs. Laurain and EZPZ concerning both his concern about "obviousness" as well as red flags in the prior art references she had found[1028] and materially contributed to the survey included in the March 9, 2016 submission.[1029]

---

[1021]   Dkt. No. 836 (Transcript Volume VII), at 1530:20-1530:25.

[1022]   Dkt. No. 836 (Transcript Volume VII), at 1537:4-1537:8.

[1023]   *See* Trial Exhibit 245, at LNC395377-395378.

[1024]   *Avid Identification Systems v. Crystal Import Corp.*, 603 F.3d 967, 974 (Fed. Cir. 2010) (citing Manual of Patent Examining Procedures § 2001.01).

[1025]   Dkt. No. 826-3 (Bolton Depo.), at 11:24-12:1.

[1026]   Dkt. No. 826-3 (Bolton Depo.), at 12:16-12:18; 12:25-13:2.

[1027]   Dkt. No. 826-3 (Bolton Depo.), at 29:15-29:17; 17:10-17:14; Trial Exhibit 73, at EZPZ0293091 (EZPZ's November 2015 Business Plan listing Mr. Bolton as "Legal Council"); Trial Exhibit 312 (attaching a website printout of the EZPZ website mentioning Mr. Bolton as the "General Counsel" for EZPZ).

[1028]   Trial Exhibit 24; Trial Exhibit 621.

[1029]   Trial Exhibit 650. *See also* Dkt. No. 836 (Transcript Volume VII), at 1554:13-1554:24.

-167-

10.     Mrs. Laurain testified that Clark Hill as brought in in December 2015 to provide its expertise with respect to secondary considerations.[1030]

11.     Mrs. Laurain testified that, in connection with responding to the final office rejection, she was paying Mr. Williams, Mr. Bolton and Mr. McCarthy to help prosecute the patent application.[1031]

12.     Mr. Bolton testified that he was "tangentially" working through secondary considerations with Mr. McCarthy and Mr. Williams.[1032]   While not denying that he was involved in the declarations filed with the March 9, 2016 submission to the USPTO, Mr. Bolton claimed "[m]y memory, as I sat there, was I don't recall being substantively involved in it."[1033]   Mr. Bolton did not dispute that he looked at the declarations before they were filed but did not know if he "green lighted" them.[1034]   Similarly, he did not dispute that he had a role in making suggestions to Ms. Falcone with respect to the survey but did not know "how tied it was to what I had – the work I had done."[1035]

13.     Generally, when confronted with contemporaneous documents during cross-examination, Mr. Bolton testified that he had no reason to dispute the documents but, otherwise, did not recall any specific details of the documents or the events identified therein.[1036]

---

[1030]     Dkt. No. 826-7 (Laurain 2020 30(b)(6) Depo.), at 283:25-285:02.

[1031]     Dkt. No. 834 (Transcript Volume VI), at 751:22-752:4.

[1032]     Dkt. No. 836 (Transcript Volume VII), at 1270:13-23.

[1033]     Dkt. No. 836 (Transcript Volume VII), at 1279:20-1280:18.

[1034]     Dkt. No. 836 (Transcript Volume VII), at 1284:20-1285:6.

[1035]     Dkt. No. 836 (Transcript Volume VII), at 1283:21-1284:4.

[1036]     *See* Dkt. No. 836 (Transcript Volume VII), at 1277:6-1278:16 (Trial Exhibit 568); 1279:7-1281:9 (Trial Exhibit 977); 1285:20-25 (Trial Exhibit 115); 1287:16-1288:4 (Trial Exhibit 794); 1288:5-1290:13 (Trial Exhibit 194); 1290:14-1292:9 (Trial Exhibit 206); 1292:10-1294:14 (Trial Exhibit 195); and 1295:9-1296:1 (Trial Exhibit 975).

14.     The Court finds that Mr. Bolton's testimony both by deposition and at trial was not credible, his lack of recall or memory of facts was suspiciously selective and, in the face of undisputed contemporaneous documentary evidence, sought to minimize his role and involvement in the March 9, 2016 submission in an effort to avoid being found subject to the duty of candor and good faith including the duty of disclosure.[1037]   Certainly, Mr. Bolton's deposition and trial testimony casts significant doubt on his assertion that he was not substantively involved in the March 9, 2016 submission.

15.     While Mr. Bolton excluded any involvement prior art from his description of his role in the prosecution of the '903 Patent,[1038] the contemporaneous documents  tell a different story. From the outset when Clark Hill was re-engaged in mid-December 2015, Mrs. Laurain's description of the project included prior art and was not limited to secondary considerations.[1039] Thereafter, Mr. Bolton was frequently involved in prior art issues.  For example, Mr. Bolton advised Mrs. Laurain by email dated October 9, 2015 that the prior art provided by Mr. Dunn was something that should be discussed and was an "issue that deserve[d] [their] attention."[1040] Additionally, on January 21, 2016, Mr. Bolton stated to Mr. Williams, Mrs. Laurain, and Mr. McCarthy that the prior art cited by Rebecca Barror is more serious if it suctions than if it does not.[1041]

16.     The contemporaneous documents plainly confirm that, notwithstanding Mr. Bolton's lack of memory, he was substantively involved in the preparation of the March 9, 2016 submission to

---

[1037]     *See, e.g.*, Section I.A.7.d.3.b.vi.

[1038]     Dkt. No. 836 (Transcript Volume VII), at 1248:25-1249:23.

[1039]     Trial Exhibit 680 (The USPTO "withdrew Lions prior art but Bass (attached) is still in play"); Trial Exhibit 692.

[1040]     Trial Exhibit 57 and Trial Exhibit 58.

[1041]     Trial Exhibit 722.

the USPTO.   Mr. Bolton was frequently consulted and provided advice regarding the declarations[1042] and survey,[1043] participated in devising the strategy for responding to the final office action,[1044] provided suggested revisions to the survey which were adopted by Ms. Falcone,[1045] and otherwise was involved in the review of the contents of the March 9, 2016 submission.   Such contemporaneous documentary evidence and the contents thereof are not disputed by Mr. Bolton, but he was otherwise unable to provide further context due to a lack of recollection or lack of memory which was not otherwise refreshed when confronted with the documents.

17.     The contemporaneous documents include communications during this period with Mrs. Laurain and Mr. Williams who were unquestionably involved in the March 9, 2016 submission. The contemporaneous documents contribute to a reasonable inference that Mr. Bolton was substantively involved in the prosecution of the '682 Application and, therefore, subject to the duty of candor and good faith including the duty of disclosure under Rule 1.56.[1046]

18.     Timothy McCarthy, an attorney with the law firm of Clark Hill,[1047] provided general advice to Mrs. Laurain and EZPZ concerning prior art references,[1048] and reviewed and provided

---

[1042]   *E.g.*, Trial Exhibit 977; Trial Exhibit 568, at EZPZ-CH-002614.

[1043]   *E.g.*, Trial Exhibit 650.

[1044]   *E.g.*, Trial Exhibit 680.

[1045]   *E.g.*, Trial Exhibit 650.

[1046]   *Avid Identification Sys., Inc. v. Crystal Import Co.*, 603 F.3d 967, 974 (Fed. Cir. 2010) (Contemporaneous communications supported the inference that individual was substantively involved in the prosecution of the patent at issue).  *See ZAGG Intellectual Property Holding Co., Inc. v. XO Skins, LLC*, 2:10-CV-1257-TC, 2012 WL 896352, at *3 (D. Utah. March 15, 2012) (Contemporaneous letters sufficient to infer that individual substantively involved in prosecution of patent-in-suit and subject to the duty to disclose).

[1047]   Dkt. No. 826-4 (McCarthy Depo.), at 5:17-5:25.

[1048]   *E.g.*, Trial Exhibit 109 (advising Mrs. Laurain that "the dog mat is still prior art if it was sold before [he]r critical date"); Trial Exhibit 23 (billing records indicating Mr. McCarthy participated

-170-

general advice concerning the March 9, 2016 submission as a whole.[1049]  The Court finds that Mr. McCarthy's testimony was credible.  Mr. McCarthy made it clear, however, that he would not become specifically involved with and expressly stated that he did not become involved with the prosecution of the '682 Application.[1050]

### 7. Intent to Deceive Is the Single Most Reasonable Inference to Be Drawn From the Evidence

#### a. Applicable Law

1.      The second step in an inequitable conduct inquiry, is a finding by clear and convincing evidence that there was a specific intent to deceive the Patent and Trademark Office.[1051]

2.      A finding of direct evidence of deceptive intent is rare.[1052]

3.      A district court may infer intent from indirect and circumstantial evidence even without direct proof.[1053]   To infer an intent to deceive, the explanation must be "the single most

---

[1049]   in an "extended telephone conference with client regarding possible patent application and prior art").

[1049]   Trial Exhibit 502.

[1050]   Trial Exhibit 212.

[1051]   *See Therasense,* 649 F.3d at 1287.

[1052]   *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009); *see also Abbott Labs. v. TorPharm, Inc.,* 300 F.3d 1367, 1380 (Fed. Cir. 2002) ("intent to deceive may be inferred from the surrounding circumstances rather than by direct evidence"); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1189–90 (Fed. Cir. 1993) (noting that "smoking gun" evidence of intent to deceive is rarely available and therefore this element "must **generally** be inferred from the facts and circumstances surrounding the applicant's overall conduct") (emphasis added).

[1053]   *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009)*; see also Belcher Pharms., LLC v. Hospira, Inc.,* 11 F.4th 1345, 1353-54 (Fed. Cir. 2021) (finding an intent to deceive "although there was no direct evidence of deceptive intent" when the person involved in the prosecution of the patent application "performed an about-face and emphatically and repeatedly advanced the position that the" alleged invention was a "'critical innovation'" contrary to the knowledge of a person of ordinary skill in the art that yielded 'unexpected results'" despite knowing "about the prior art's teachings"); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d at 1189-90 (concluding that the district court in granting summary judgment could infer an intent to deceive); *Therasense,* 649 F.3d at 1289 ("Because direct evidence of

---

-171-

reasonable inference able to be drawn from the evidence."[1054]  Intent to deceive may be inferred when an applicant fails to disclose material information to his or her patent agent or patent attorney during the prosecution of the patent.[1055]

4.      Failure to cite to the PTO a material reference cited elsewhere in the world justifies a strong inference that the withholding was intentional."[1056]

5.      A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice."[1057]   "In the absence of a credible explanation by the patentee, intent to deceive may be generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information."[1058]

---

[1054] deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence.").

[1054] *Star,* 537 F.3d at 1366; *see also, LaBounty Mfg., Inc., v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed. Cir. 1992) (ruling that inference of deceptive intent was supported by evidence of applicant making patentability arguments that could not have been made had the withheld prior art been disclosed).

[1055] *See Ashland Prods., Inc. v. Truth Hardware Corp.,* No. 99-5786, 2003 WL21524827, at *10-11 (N.D. Ill. July 3, 2003) (finding intent to deceive, in part, due to the fact that the inventors "understood what the PTO meant by the terms 'prior art' and 'duty to disclose,'" yet the inventors were "in possession of highly material prior art, which was not disclosed to patent counsel or the PTO")

[1056] *Molins v. Textron, Inc.,* 48 F.3d 1172, 1182 (Fed. Cir. 1995).

[1057] *GFI, Inc. v. Franklin Corp.,* 265 F. 3d 1268, 1275 (Fed. Cir. 2001); *see also Synthon IP, Inc. v. Pfizer Inc.,* 472 F. Supp. 2d 760, 782 (E.D. Va. 2007) ("Indeed, the lack of any credible explanation for the nondisclosure of this highly material information is highly probative of deceptive intent."); *Am. Standard Inc. v. Pfizer Inc.,* 722 F. Supp. 86, 146-47 (D. Del. 1989) (finding inequitable conduct when there was "clear evidence of materiality and knowledge of materiality," and there was "no evidence of subjective good faith, rather only a pattern of inconsistent conduct" and no "rationale or justification" to support the belief that a prior art reference did not need to be disclosed); *Argus Chem. Corp. v. Fibre Glass-Evercoat Co., Inc.,* 759 F.2d 10, 14 (Fed. Cir. 1985) ("Counsel's subjective 'good faith' does not, therefore, negate inequitable conduct'").

[1058] *Agrizap, Inc. v. Woodstream Corp.,* 431 F. Supp. 2d 518, 533 (E.D. Penn. 2006).

-172-

6.     An "inference of deceptive intent may fairly be drawn in the absence of" a "credible explanation for the nondisclosure."[1059]

7.     A patentee aware of material information but who fails to disclose it to the USPTO "can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead."[1060]

8.     Deceptive intent may be inferred when "a patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability arguments to the PTO."[1061]

---

[1059]   *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd*., 394 F.3d 1348 (Fed. Cir. 2005); *Synthon IP, Inc. v. Pfizer Inc*., 472 F. Supp. 2d 760, 782-84 (E.D. Va. 2007) (finding intent to deceive based on the "totality of the circumstances" including the fact that disclosure of prior art at issue "would have precluded the [] inventors from asserting certain arguments made by them in favor of patentability in the course of the prosecution…" and none of the inventors claimed "to have any recollection whatsoever of the" prior art at issue).

[1060]   *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239 (Fed. Cir. 2003).

[1061]   *Agfa Corp. v. Creo Products Inc*., 451 F.3d 1366, 1378 (Fed. Cir. 2006) (finding deceptive intent when the evidence regarding applicant's knowledge of the prior art reference as "overwhelming" and "because patentability arguments could not have been made had the withheld information been disclosed"); *see also Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 977 (S.D. Iowa 2010) (finding deceptive intent "not simply by the lack of a credible good faith explanation for the nondisclosure, but also by independent evidence of a far more substantial factual basis, namely that Plaintiff actually made an argument in favor of patentability that contained, as the primary distinguishing element, a feature that was not disclosed in any of the prior art before the examiner and that was readily apparent in the undisclosed [prior art]"); *GFI Inc. v. Franklin Corp*., 265 F.3d 1268 (Fed. Cir. 2001) (finding deceptive intent when the applicant "specifically distinguished the disclosed references [cited by the examiner] by arguing that none of them had console-mounted controls despite" having knowledge of prior art "with center-mounted recliner controls prior to the filing of" the patent application); *Synthon IP, Inc. v. Pfizer Inc*., 472 F. Supp. 2d 760, 783 (E.D. Va. 2007) (finding intent to deceive partially due to the fact that disclosure of prior art at issue "would have precluded the [] inventors from asserting certain arguments made by them in favor of patentability in the course of the prosecution…"); *LaBounty Mfg. v. U.S. Int'l Tarde Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992) (deceptive intent shown where a patentee withheld references and an argument for patentability that could not have been made had the prior art been disclosed).

9.      Deceptive intent should also be inferred where counsel "cultivate[s] ignorance, or disregard[s] numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art."[1062]

10.     An applicant "cannot overcome a finding of deceitful intent merely by showing that it did certain things properly."[1063]

11.     Advocacy cannot be chosen over candor.  Patent agents and attorneys who "choose advocacy over candor" risk a finding of inequitable conduct, rendering the patent invalid and unenforceable.[1064]

### b.      Motive to Deceive

1.      The testimony elicited at trial establishes that securing a utility patent would have been financially beneficial to Mrs. Laurain, and despite her repeated testimony that she was "not driven by money,"[1065] her number one goal was to sell EZPZ for a record amount[1066]  and doing so was entirely dependent upon Mrs. Laurain securing the utility patent.[1067]

2.      One of the companies interested in acquiring EZPZ, Stokke, told Mrs. Laurain the company's intellectual property, including pending patent applications, was "pretty important for

---

[1062]   *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1382 (Fed. Cir. 2001) (quoting *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 1275 n.6 (Fed. Cir. 1987)). *See also McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, No. 02-2669, 2006 WL 1652518, at *21 (E.D. Cal. June 13, 2006) ("'studied ignorance'…supports, rather than defeats, an inference of deceptive intent").

[1063]   *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (affirming district court's finding of inequitable conduct when the applicant "willfully misrepresented the [prior art] reference" by providing only a partial translation to the USPTO).

[1064]   *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1331 (Fed. Cir. 2020) (affirming district court's finding of intent to deceive based in part on a "patently false' statement" in a declaration where in the law firm and the inventors "chose advocacy over candor").

[1065]   Dkt. No. 826-6 (Laurain 2019 Depo.), at 79:23-80:17; 159:22-160:1.

[1066]   Trial Exhibit 630; *see also* Trial Exhibit 633, at EZPZ0236109; Trial Exhibit 960.

[1067]   Trial Exhibit 960 ("A lot depends on – Utility Patent.").

-174-

us to feel confident about a deal."[1068]   Mrs. Laurain admitted that she expected a substantial premium on the current valuation if the utility patent were allowed.[1069]

3.      The Court therefore finds that Mrs. Laurain had a motive to deceive the USPTO in order to secure issuance of the '903 Patent.

4.      On August 19, 2015, Mrs. Laurain told Mr. Williams that he would "get an incredible bonus" if they received the utility patent before she went on Shark Tank.[1070]   Mrs. Laurain testified that this was "personal incentive" for Mr. Williams.[1071]   Further, Mr. Williams was undoubtedly aware  that it would be beneficial to his fledgling patent prosecution practice to secure a difficult patent for Mrs. Laurain's  growing start-up company.

5.      The Court finds that Mr. Williams also had a motive to deceive the USPTO in order to secure issuance of the '903 Patent.

### c.      Direct Evidence of Intent to Deceive

1.      While direct evidence of an intent to deceive is not required to find inequitable conduct and is "rare" according to the Federal Circuit,[1072] the Court nevertheless finds direct evidence of an intent to deceive the USPTO on the part of Mr. Williams and Mrs. Laurain in this case.

---

[1068]      Trial Exhibit 654, at EZPZ-CH-010027.

[1069]      Dkt. No. 833 (Transcript Volume IV), at 447:24-448:23; Trial Exhibit 878.

[1070]      Trial Exhibit 631.

[1071]      Dkt. No. 826-6 (Laurain 2019 Depo.), at 92:2-92:13.

[1072]      *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009); *see also Abbott Labs. v. TorPharm, Inc.,* 300 F.3d 1367, 1380 (Fed. Cir. 2002) ("intent to deceive may be inferred from the surrounding circumstances rather than by direct evidence"); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1189–90 (Fed. Cir. 1993) (noting that "smoking gun" evidence of intent to deceive is rarely available and therefore this element "must **generally** be inferred from facts and circumstances surrounding the applicant's overall conduct") (emphasis added); *Therasense,* 644 F.3d at 1290 ("[D]irect evidence of deceptive intent is rare.")

-175-

### (1)   The Withholding of the Video Showing the Platinum Pets Mat Self-Sealing and Making a Suction Sound

1.   The e-mails between Mrs. Laurain and Mr. Williams dated March 1, 2016,[1073] concerning the demonstration of the Platinum Pets Mat reflect their conscious and deliberate choice to withhold a video demonstration of the Platinum Pets Mat that contradicted the very argument they were making to the USPTO – *i.e.*, that the Platinum Pets Mat does not "self-seal" and "doesn't suction," when, in fact, it very clearly suctions to an underlying surface and resists removal therefrom.

2.   Instead of disclosing both videos and accurately describing the features of the prior art Platinum Pets Mat, Mrs. Laurain and Mr. Williams presented a video demonstration that allowed them to avoid explaining to the USPTO why the product – which, according to Mr. Hubbard, had all of the elements of the pending independent claims, including an entirely suffuse undersurface[1074] – self-sealed to the underlying surface.  This is the equivalent of manufacturing false evidence, as they provided the USPTO with the video that tended to support their argument but withheld the video that would cause the USPTO to question their argument.

3.   Mrs. Laurain and Mr. Williams further misrepresented to the USPTO that the Platinum Pets Mat "fails to make sealable contact with an underlying surface."[1075]

4.   When confronted with whether the decision to withhold the Undisclosed Video from the USPTO satisfied her duty of candor and good faith, Mrs. Laurain tried to blame Mr. Williams for the decision about what to disclose.  She testified:

> Q.  And so you and Mr. Williams decided that you were not gonna give the US Patent Office a video where when you tried to remove the dog mat that it made a suctioning noise, correct?

---

[1073]   Trial Exhibit 614.

[1074]   Dkt. No. 832 (Transcript Volume III), at 229:3-232:3.

[1075]   Trial Exhibit 245, at LNC395355.

A. I – that's what this e-mail says so –

Q. That's certainly not full candor and good faith, is it, Ms. Laurain?

Ms. Fischer: Objection. Form.

A. Yeah, I would say he [*i.e*, Ben Williams] chose the video that he liked best and that was what was submitted.

Q. What does the word "candor" mean to you?

A  Honest.

Q. Is that honest, Ms. Laurain, to have a video that actually shows self-sealing function and that – that makes a suctioning noise and purposefully decide that you're not going to give that one to the US Patent Office?

Ms. Fischer: Objection. Form.

A. I mean, it's – who's to decide?  So Ben made the decision on what video to use and that was what was submitted.

…

Q. You also submitted with the – the video that you made, the one that you chose –

A. I didn't choose it.  Ben chose it.

Q. But you agreed with his selection?

A. Sounds good.[1076]

5.      An inventor "cannot obviate his own duty of candor by, in essence, 'passing the buck' to his patent counsel.  Both patentees and their attorneys have an ongoing duty of candor and good faith dealing in the prosecution of patent applications…"[1077]  In any event, Mrs. Laurain agreed with Mr. Williams' decision to submit only the Disclosed Video to the USPTO.[1078]

---

[1076]    Dkt. No. 826-6 (Laurain 2019 Depo)., at 87:9-88:5; 88:16-88:20.

[1077]    *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (finding inequitable conduct when inventor attempted to blame his attorneys for failing to disclose material prior art).

[1078]    Trial Exhibit 614; Dkt. No. 826-6 (Laurain 2019 Depo)., at 88:16-88:20.

6.     The Court finds Mrs. Laurain's responses to this line of questioning to be evasive. Ultimately, it is up to the Court to decide whether Mrs. Laurain and Mr. Williams' conduct satisfied their duty of candor, and the Court finds it did not.   Neither Mrs. Laurain nor Mr. Williams provided a credible excuse for favoring the submission of the Disclosed Video over the Undisclosed Video.   In addition to wanting to avoid the "suctioning noise" in the Undisclosed Video, Mr. Williams also "like[d] [Mrs. Laurain's] discussion of the suction cups and the flat back better" in the Disclosed Video.[1079]   Specifically, in the Undisclosed Video, Mrs. Laurain stated, "Here's a suction cup bowl, it's not flat, its concave."[1080]   Additionally, it is conceivable that Mr. Williams did not want to submit Mrs. Laurain's statement at the end of the Undisclosed Video that the Happy Mat was the "only thing on the market that self-seals"[1081] because he knew that was not the case.   In any event, he offered no plausible alternative reasons for rejecting the Undisclosed Video beyond what he wrote in the contemporaneous email.[1082]

7.     Even if Mrs. Laurain lacked culpability for this decision (which the Court finds she does not), her attempt to shift blame to Mr. Williams is unavailing because both she and Mr. Williams owe the duty of candor and good faith, and a breach by either one of them renders the '903 patent invalid.[1083]

8.     The deliberate decision to withhold information from the USPTO that directly contradicted the arguments they made to the USPTO in the March 9, 2016 submission establishes Mrs. Laurain and Mr. Williams' intent to deceive the USPTO.

---

[1079]     Trial Exhibit 614.

[1080]     Trial Exhibit 613, at 00:30-00:33.

[1081]     Trial Exhibit 613, at 1:03-1:06.

[1082]     *See* Trial Exhibit 614.

[1083]     *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.,* 292 F.3d 1363, 1377 (Fed. Cir. 2002) ("One bad apple spoils the entire barrel. Misdeeds of co-inventors, or even a patent attorney, can affect the property rights of an otherwise innocent individual.").

### (2)     The Manufacture of False Evidence through the Survey

1.     As described in Section I.A.5.d., the Court finds that Mrs. Laurain and Ms. Falcone, with the assistance of Mr. Bolton, manufactured false evidence by way of the flawed and biased survey with the intent to achieve a desired result to support evidence of secondary considerations to rebut the Examiner's obviousness rejection.

2.     The Court finds that Mrs. Laurain and Ms. Falcone specifically intended to deceive the USPTO by relying on the manufactured survey to overcome the Examiners' obviousness rejection.

### (3)     The Numerous False Statements in Declarations

1.     As discussed in Section I.A.5.b. above, the declarations Mrs. Laurain and Mr. Williams submitted to the USPTO with their March 9, 2016 submission include the following illustrative materially false statements and omissions:

- Multiple declarations falsely stating sales of the product were due solely to the self-sealing characteristic and not any advertising, marketing or branding efforts, given that EZPZ had engaged in very significant marketing, branding, and promotional activities for the product that were known to both Mrs. Laurain and the declarants themselves;

- Failing to disclose that declarant and survey designer Tamara Falcone stood to benefit financially from the issuance of the '903 Patent given her 10% interest in the proceeds from any future sale of EZPZ;

- Failing to disclose that declarant Dawn Winkelmann was a paid consultant for EZPZ and stood to benefit financially from the issuance of the '903 Patent given her 2% interest in the proceeds from any future sale of EZPZ, instead describing her as an independent "speech and language pathologist and feeding specialist" and an "expert with extensive experience in reviewing technologies designed to assist parents raising children with special needs;"

- Failing to disclose that Jamie Grayson, described as "a leading expert and analyst in the baby-product industry," had been paid by EZPZ to launch the EZPZ Happy Mat on his social media platforms and had other financial dealings with EZPZ; and

- Falsely stating that Julie Clark had analyzed had "analyzed sales figures and marketing strategies of Eazy-PZ, LLC" when, in fact, she had not reviewed any financial documents, sales reports, or sales figures of EZPZ.

-179-

2.      While the submission of one false statement alone, or the failure to disclose one declarant's bias, might be overlooked as a mistake or oversight, the overwhelming volume of evidence of false statements, misrepresentations, and material omissions contained in the declarations cannot be so described.  Instead, they establish Mrs. Laurain's specific intent to deceive the USPTO.[1084]

3.      Alternatively, as discussed below, the numerous false statements in the declarations supports the inference that Mrs. Laurain submitted these declarations to the USPTO with the specific intent to deceive.

### (4)     Arguing "Unexpected Results" to the USPTO When Mr. Williams and Mrs. Laurain Knew They Could Not Get a Material Scientist to Testify There Were Unexpected Results

1.      As discussed in Section I.A.5.c.3. above, Mrs. Laurain knew that a material scientist would not testify that the self-sealing characteristic of her alleged invention was an unexpected result because the self-sealing, sticky property is an inherent property of certain types of silicone.

2.      Nevertheless, she and Mr. Williams argued to the USPTO and presented multiple declarations that the self-sealing characteristic was an "unexpected result" sufficient to overcome the Examiners' obviousness rejection.[1085]  This conduct evidences a specific intent to deceive the USPTO.

---

[1084]   *See, e.g., Rohm & Haas*, 722 F.2d at 1571 (the submission of affidavits "usually will support the conclusion that the affidavit in which [the material false statements] were contained was the chosen instrument of an intentional scheme to deceive the PTO").

[1085]   Trial Exhibit 245, at LNC395319 (declaration of Mr. Grayson stating "I was truly surprised by the ability of the product to perform the same, that such action was undeniably unexpected by all persons skilled in the art…"); LNC395321 (declaration of Mr. Prager stating it "present[s] novel and unexpected results…"); LNC395445 ("The testimony of Jamie Grayson, 'The Baby Guy,'…readily supports the novelty of Applicant's device and the unexpected result it exhibits…").

### (5)   Failing to Include Products in the Video That Do Exhibit Self-Sealing

1.      In the video demonstration Mr. Williams and Mrs. Laurain included in the March 9, 2016 submission of products that do not exhibit the self-sealing characteristic as compared to the EZPZ Happy mat, Mrs. Laurain did not include the Tommee Tippee Mat that she had "run out and purchased" and admittedly had in her possession.[1086]

2.       Had the Tommee Tippee Mat that Mrs. Laurain purchased actually come folded in a box and did not exhibit a self-sealing characteristic, as she testified at trial,[1087] Mrs. Laurain would have included it in the video demonstration she submitted to the USPTO.  Mrs. Laurain's failure to include it, coupled with the fact that her own photograph of the product shows it lying flat on the carpet without any ridges, and her citation to a review of the product as a "great concept" but "not strong enough,"[1088] is evidence that Mrs. Laurain knew the Tommee Tippee Mat self-sealed to an underlying surface.

3.      Thus, the Court finds that Mrs. Laurain failed to include the Tommee Tippee Mat in the video demonstration with a specific intent to deceive the USPTO.

### d.   An Intent to Deceive May Also be Inferred from Facts and Circumstances Surrounding the Applicant's Overall Conduct

### (1)   Mr. Laurain and Mr. Williams' Strategy Not to Disclose Known Prior Art to the USPTO Evidences their Intent to Deceive

1.      As discussed in Section I.A.3.b. above, the Court finds that Mr. Williams and Mrs. Laurain formulated a calculated strategy to disclose as little prior art to the USPTO as possible in hopes that the Examiner would not be able to find invalidating prior art, and this strategy

---

[1086]      Trial Exhibit 612.

[1087]      Dkt. No. 833 (Transcrip Volume IV), at 423:13-423:21.

[1088]      Dkt. No. 833 (Transcript Volume IV), at 414:13-415:16; Trial Exhibit 624, at EZPZ0146651.

supports the Court's conclusion that Mr. Williams and Mrs. Laurain specifically intended to deceive the USPTO.

2.      Given that Mr. McCarthy had advised Mrs. Laurain her invention was not patentable because the Platinum Pets Mat was prior art, Mrs. Laurain and Mr. Williams should have disclosed the Platinum Pets Mat at the outset of the prosecution.[1089]  Mrs. Laurain and Mr. Williams disclosed the mat in March 2016, nearly two years after the prosecution began, only after Mr. McCarthy was re-retained by Mrs. Laurain to provide advice about secondary considerations of non-obviousness and was of the opinion they would be committing inequitable conduct if they failed to disclose it.[1090]  However, when Mrs. Laurain and Mr. Williams did disclose the Platinum Pets Mat, they buried it in an Appendix D to the submission rather than disclosing it in an Information Disclosure Statement or as Non-Patent Literature, and they misrepresented its actual features by stating it "fails to make sealable contact with an underlying surface"[1091] when they both knew that it suctioned to an underlying surface, at the very minimum to some extent.  As discussed above, the Court finds the Platinum Pets Mat is an anticipatory prior art reference.  At least one claim of the '903 Patent would not have issued had Mr. Williams and Mrs. Laurain properly disclosed it and its actual functionality.

3.      Given that Mrs. Laurain had identified Webb as the "most similar" to her own invention[1092] and had provided it to Ms. Speer, Messrs. Bolton and McCarthy, and Mr. Williams,[1093] the Court finds Mrs. Laurain should have disclosed Webb at the outset of the prosecution – or at minimum, at some point during prosecution of the '903 Patent.  While Mr.

---

[1089]    Trial Exhibit 86.

[1090]    *Id*.

[1091]    Trial Exhibit 245, at LNC395355.

[1092]    Trial Exhibit 20.

[1093]    Trial Exhibit 3; Trial Exhibit 4; Trial Exhibit 20; Trial Exhibit 611, at BWILLIAMS002003.

-182-

Williams claims he did not review Webb when Mrs. Laurain sent her June 30, 2014 e-mail, it is undisputed he was on notice of Webb and its significance when he received the May 4, 2015 ISA Report and Written Opinion identifying Webb to be a "Y" reference.[1094]  Yet Mr. Williams still did not disclose it to the USPTO.  Although Mr. Williams testified at trial that he did not have an obligation to disclose Webb to the USPTO,[1095] the documentary evidence shows that during prosecution of the '682 Application, Williams himself acknowledged he had merely a "fairly solid argument" against Webb's applicability.[1096]  Having a "fairly solid argument" against a prior art reference is not adequate justification for failing to disclose it to the USPTO, as that does not satisfy the obligation of good faith and complete candor required by Rule 1.56. Williams' expressed state of mind that he could withhold material references if he had a "fairly solid argument" evidences his knowing and deliberate decision to withhold material references and keep relevant information from the USPTO.  The Court expressly rejected the argument that Webb was not material because it was cumulative to other suction cup references when it previously found the '903 Patent to be invalid for obviousness.[1097]  Webb, therefore, is but-for material under *Therasense.*  "[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO."[1098]

---

[1094]     Trial Exhibit 864; Trial Exhibit 527; Dkt. No. 826-9 (Williams 2020 Depo.), at 528:14-528:20.

[1095]     Dkt. No. 834 (Transcript Volume V), at 833:21-834:1; Dkt. No. 826-9 (Williams 2020 Depo.), at 520:16-521:7; 711:3-711:15.

[1096]     Trial Exhibit 194 (referencing his Informal Comments at EZPZ-EZ-000400-402 as being "a fairly solid argument" against Webb).

[1097]     *See* Dkt. No. 522 at pp. 22-28.

[1098]     *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).

### (2) The Numerous False Statements in the Declarations Supports the Inference that the Declarations were the Chosen Instrument of an Intentional Scheme to Deceive the USPTO.[1099]

1.      As discussed above, the declarations contained an overwhelming number of false statements, misrepresentations, and material omissions described in Section I.A.5.b. above.

2.      Even if the submission of these declarations is not direct evidence of an intent to deceive, the Court finds that the single most reasonable inference from the sheer volume of false statements, misrepresentations, and material omissions in the declarations filed with the USPTO is that Mrs. Laurain submitted them with the specific intent to deceive the USPTO into a finding of non-obviousness.

### (3) Testimony that was False, Evasive, and/or Lacks Credibility

#### (a) Applicable Law

19.      Courts may consider lack of credibility in deciding whether there is an intent to deceive the USPTO.[1100]

20.      The credibility of a witness can be called into question when he is unclear when questioned by opposing counsel but in sharp contrast fortuitously remembers when events took

---

[1099]    *See, e.g., Rohm & Haas*, 722 F.2d at 1571 (the submission of affidavits "usually will support the conclusion that the affidavit in which [the material false statements] were contained was the chosen instrument of an intentional scheme to deceive the PTO").

[1100]    *See Belcher*, 11 F.4th at 1352 (affirming district court's finding of inequitable conduct when one of the individuals involved in the prosecution of the patent made "repeated efforts to evade questioning and inject attacks of the prior art into his answers" which "raised serious questions as to his credibility"); *see also GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1316 n.5 (Fed. Cir. 2020) (affirming the district court's decision to "discount" testimony provided by the inventor when the inventor "was argumentative and unclear about facts when questioned by" Defendant's counsel but was "fortuitously remembering" events when questioned by Plaintiff's lawyers" and "rely primarily on documents and testimony from other witnesses"); *Aventis Pharma S.A. v. Hospira*, 675 F.3d 1324, 1335-36 (Fed. Cir. 2012) (affirming district court's finding of inequitable conduct based, in part, on the finding that the inventor "lacked credibility").

place and recalls the meaning of documents when questioned by the lawyer with whom he is aligned.[1101]

21.     A failure to remember does not suffice as a credible explanation.[1102]

22.     "Selective" memory establishes a lack of credibility.[1103]

23.     The witnesses "across-the-board lack of recollection" is not credible, particularly given the significance of the documents at issue in this litigation.[1104]

24.     Even if it does not actually question the veracity of a witness, a district court can certainly conclude that a witness has a "propensity to evade the truth."[1105]

25.     When deponents discuss each other's testimony or subtly influence each other's testimony, the deposition testimony becomes inherently suspect and lacks credibility.[1106]

---

[1101]     *See GS Cleantech Corp., supra.*

[1102]     *Paragon,* 984 F.2d at 1192 ("The inventor merely stated he could not remember telling the attorney.  The attorney himself was silent on this point. Thus, viewing the evidence of record in the light most favorable to the non-movant, we find none which raises a genuine issue of fact respecting the deceptive intent inferred from the submission of deceptive, if not outright false, affidavits to the PTO.").

[1103]     *See Avid Identification Systems v. Crystal Import Corp.*, 603 F.3d 967, 975 (Fed. Cir. 2010) (finding inequitable conduct and a lack of credibility when the individual's "memory of facts was suspiciously selective, and he refused to acknowledge certain incontrovertible events").

[1104]     *Synthon IP Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 782 (E.D. Va. 2007) ("Viewed in the totality of the circumstances, this across-the-board lack of recollection on the part of the relevant Synthon employees is simply not credible, particularly given the significance and obvious materiality of the documents in issue.").

[1105]     *See GS Cleantech Corporation v. Adkins Energy LLC*, 951 F.3d 1310, 1319 n.9 (Fed. Cir. 2020).

[1106]     *See Athridge v. Aetna Cas. & Sur. Co.*, No. 96-2708, 1997 WL 732430, at *1 (D.D.C. Sept. 23, 1997) ("The common law has favored the sequestration of witnesses so that they cannot either directly or subtly influence each other's testimony.  This principle has been applied in the deposition context to exclude witnesses for this reason…"); *Donaghue v. Nurses Registry, Inc.*, 485 A.2d 945, 946 (Conn. 1984) ("To allow [witnesses] to be present at each other's deposition might provide them the opportunity to compare and alter statements to ensure their consistency thereby frustrating the [parties'] efforts to discover the facts."); *Lapenna v. Upjohn Co.*, 665 F. Supp. 412, 414 (E.D. Pa. 1987) ("Rule 615 [of the Federal Rules of Evidence] is a codification of the long established practice of sequestering witnesses to discourage or expose fabrication, inaccuracy, and collusion.").

26.     A finding of an intent to deceive is also appropriate when an applicant "threatens" or attempts to coerce an individual to provide supportive testimony.[1107]

**(b)     Mrs. Laurain, Mr. Williams, and Mr. Bolton Lacked Credibility on Key Matters**

1.     Mrs. Laurain, Mr. Williams, and Mr. Bolton all lacked credibility on matters of importance, as set forth below, supporting the Court's finding there was an intent to deceive the USPTO.

**(i)     Mrs. Laurain Provided False and Evasive Testimony Concerning Her Knowledge of Prior Art References**

1.     Under *Therasense,* a patent can be invalidated for inequitable conduct only if an applicant knew of a reference, knew it was material, and made a deliberate decision to withhold the reference from the USPTO, and if a claim of the patent would not have issued had the USPTO known of the reference.[1108]   Thus, which references were known to an applicant is highly relevant information in any dispute involving claims of inequitable conduct.

2.     As discussed in more detail in Section II.A.2. below addressing unclean hands, Mrs. Laurain testified she had not seen the Lee Single Dog Bowl Mat and she could not recall whether she had looked at dog bowls placed in silicone mats.

3.     Given the significant number of conversations Mrs. Laurain had with her counsel and with Mr. Williams concerning the Platinum Pets Mat and the Lee Single Dog Bowl Mat, the Court does not find Mrs. Laurain's testimony to be credible.

---

[1107]     *See GS Cleantech Corporation v. Adkins Energy LLC*, 951 F.3d 1310, 1316 n.5 (Fed. Cir. 2020) (affirming district court's finding of an intent to deceive when the applicant and the prosecuting attorney "threatened" an entity "to coerce its support regarding the critical date for the Patents-in-Suit" by offering the entity "a royalty-free license in exchange for [its] willingness to admit that the pending patents were valid.").

[1108]     *Energy Heating,* 889 F.3d at 1299 (citing *Therasense,* 649 F.3d at 1290).

-186-

**(ii)      Mrs. Laurain Gave False Testimony About Her Alteration of the Hip Mommies Invoices**

1.       As discussed in more detail in Section II.A.5. below, Mrs. Laurain falsely testified that "nothing was done" to the Hip Mommies invoices,[1109] only to admit later in her deposition that one of the invoices had been altered for unexplained "internal accounting reasons,"[1110] only to admit later -- after LNC filed a Motion for Spoliation of Evidence – that she had, in fact, altered all of the invoices LNC had identified by changing the words "Marketing and Brand Promotion" to "Canada Split."[1111]

**(iii)     Mrs. Laurain Threatened to Terminate the Hip Mommies Distributorship if Joseph Chua Did Not Take Action That Would Allow Him to Testify His Declaration to the USPTO Was Truthful**

1.       In September 2019, after LNC had filed a motion for an adverse inference due to Mrs. Laurain's deletion of the words "Marketing and Branding" from the Hip Mommies invoices (Dkt. No. 324), Mrs. Laurain ordered Mr. Chua to "immediately begin taking action with the Canadian Import Authorities … to correct inaccuracies in reporting cost of goods from past ezpz imports" and to pay any duties owed as a result of that underreporting.[1112]  Mrs. Laurain told Mr. Chua that if he failed to act within 14 days, EZPZ would need "to re-evaluate the distributor agreement and may terminate the agreement."[1113]

2.       Notwithstanding Mrs. Laurain's clear understanding about Hip Mommies' "inaccuracies in reporting cost of goods" to the Canadian Import Authorities, EZPZ represented to this Court

---

[1109]      Dkt. No. 324-16 at 47:2-47:23.

[1110]      Dkt. No. 826-6 (Laurain 2019 Depo.), at 58:15-60:5.

[1111]      Trial Exhibit 320 at ¶¶ 9-17.

[1112]      Trial Exhibit 321.

[1113]      *Id.*

just one month later that it "has no knowledge, however, of how those invoices were used for Hip Mommies' accounting or import tax purposes."[1114]

3.      Mr. Chua claimed not to recall the foregoing conversation with Ms. Laurain.[1115]  The Court does not find it credible that Mr. Chua would not recall a conversation with Mrs. Laurain in which she threatened to terminate the distributorship agreement for a product that represented 70% of Hip Mommies total sales, according to Mr Chua's declaration.[1116]

4.      It is readily apparent that Mrs. Laurain threatened Mr. Chua in this manner because she wanted him to be able to testify that his earlier statement to Mrs. Laurain that "We do have a legitimate argument that half the cost I pay you is marketing etc."[1117] – which statement justified the multiple invoices to Hip Mommies for "Marketing and Branding" expenses incurred by EZPZ – was not correct, as evidenced by the fact that he had corrected what he reported to the Canadian Import Authorities.  With that issue "fixed" with the Canadian Import Authorities, Mr. Chua would then be able to testify after the fact, that the statement in his declaration submitted to the USPTO that sales of the EZPZ Happy Mat "are consistent without a need for extensive advertising or branding whatsoever"[1118] was truthful.

5.      This clear threat by Mrs. Laurain establishes her willingness to coerce her exclusive Canadian distributor to testify that his declaration to the USPTO was not false and was not contradicted by the contemporaneous Brand and Marketing invoices.

6.      Mrs. Laurain's threats to Mr. Chua during this litigation support a finding that Mrs. Laurain intended to the deceive the USPTO.

---

[1114]      Dkt. No. 419-1, at p. 6.

[1115]      Dkt. No. 826-12 (Chua Depo.), at 170:9-170:23.

[1116]      Trial Exhibit 122.

[1117]      Trial Exhibit 734.

[1118]      Trial Exhibit 245, at LNC395357.

-188-

7.     Ultimately, Mr. Chua did not correct any reports he made to the Canadian Import Authorities about the cost of goods he purchased from EZPZ because he did not believe anything needed to be corrected.[1119]  Mr. Chua's inaction confirms that roughly half the cost he paid EZPZ for its product was for marketing and branding performed by EZPZ, rendering the statement in his declaration to the USPTO false.

**(iv)     Other False or Inconsistent Testimony, and Misrepresentations**

1.     During her depositions and at trial, Mrs. Laurain testified falsely or evasively in a number of other respects, including but not limited to the following:

b.     Despite testifying in June 2019 that she did not make the "Boycott Nuby" graphic,[1120] Mrs. Laurain expressly directed her Canadian distributor to make a second version of the graphic that included the words "meet ezpz."[1121]

c.     Mrs. Laurain testified that she had nothing to do with the social media #boycottnuby campaign,[1122] yet the documentary evidence reveals that she sent the boycott Nuby graphic to Jamie Grayson's sister asking him to share it,[1123] to Max Swedlow at Shark Tank asking him to share it,[1124] and published it to the members of the EZPZ Facebook group asking them to share it.[1125]  She also encouraged others to make negative postings on LNC's social media accounts.[1126]

---

[1119]     Dkt. No. 826-12 (Chua Depo.), at 171:10-172:1; Trial Exhibit 321.

[1120]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 149:7-149:19..

[1121]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 150:13-151:8; 152:24-153:6.

[1122]     Dkt. No. 833 (Transcript Volume IV), at 489:23.

[1123]     Trial Exhibit 155; Trial Exhibit 153.

[1124]     Trial Exhibit 173.

[1125]     Trial Exhibit 151.

[1126]     Trial Exhibit 151; Trial Exhibit 158; Trial Exhibit 126.

Mrs. Laurain was far from a passive bystander in the social media campaign against LNC, and her testimony that she was not involved is contradicted by the overwhelming documentary evidence to the contrary.

d.  Mrs. Laurain testified at trial that it wasn't part of her "plan" to go on Shark Tank and that the Shark Tank producers reached out to her,[1127] but the documentary evidence contradicts her testimony[1128] and she had no credible explanation at trial.[1129]

e.  In an effort to downplay the role that Shark Tank had on the product's "commercial success," which Mrs. Laurain and several declarants had told the USPTO was due to the product itself and not due to any advertising or branding, Mrs. Laurain testified that Shark Tank didn't cause a boost in sales.[1130]  Her testimony, however, is contradicted not only by her own documents showing a spike in sales,[1131] but by the testimony of both Jeff Prager, EZPZ's CEO,[1132] and Tamara Falcone, EZPZ's COO.[1133]  Mrs. Laurain also admitted at trial that she had previously told Mr. Williams she had applied to be on Shark Tank and that 20 million consumers would see it,[1134] and that getting the utility patent would be "amazing" for "marketshare."[1135]

---

[1127]   Dkt. No. 833 (Transcript Volume IV), at 412:3-412:8.

[1128]   Trial Exhibit 624, at EZPZ0146654-655.

[1129]   Dkt. No. 833 (Transcript Volume IV), at 412:3-414:9.

[1130]   Dkt. No. 833 (Transcript Volume IV), at 475:24-475:25.

[1131]   Trial Exhibit 923, at p. 6; Dkt. No. 833 (Transcript Volume IV), at 476:5-476:19.

[1132]   Dkt. No. 836 (Transcript Volume VII), at 1381:17-1381:21.

[1133]   Dkt. No. 836 (Transcript Volume VII), at 1541:23-1542:3.

[1134]   Dkt. No. 833 (Transcript Volume IV), at 411:11-411:21.

[1135]   Dkt. No. 833 (Transcript Volume IV), at 411:22- 412:2; Trial Exhibit 920.

f. Although Ms. Laurain tried to avoid answering whether Shark Tank was phenomenal for brand recognition, during a prior Inspired Insider interview with Dr. Jeremy Weisz,[1136] she admitted Shark Tank was "phenomenal for brand recognition."[1137]

g. Mrs. Laurain testified at trial that it wasn't her intention at the outset for the mat to suction and she did not start focusing on the self-sealing function until Memorial Day weekend 2014[1138] in an attempt to discount the advice she received from Clark Hill.  Her testimony is contradicted by her own statements in the Inspired Insider interview she gave, when she stated as follows: "I knew I wanted it to suction."[1139]  As set forth above, Mrs. Laurain had received the prototype created by Mr. Sisbarro by the time Mrs. Laurain met with Ms. Speer (the attorney she met with before Clark Hill),[1140] the "Example Patent" she sent Clark Hill focused on the "auto suction" of her alleged invention,[1141] and the name for the Clark Hill billing matter was Patent Suction 1-Piece Placemat & Bowl.[1142]

h. The Court finds that in an attempt to downplay the significance of EZPZ's social media marketing strategy Mrs. Laurain testified she was not sure whether EZPZ analyzed social media posts to see how many were made and how many people

---

[1136]   Trial Exhibit 360.

[1137]   Dkt. No. 833 (Transcript Volume IV), at 478:19-479:2; Dkt. No. 844 (L-21).

[1138]   Dkt. No. 833 (Transcript Volume IV), at 430:7-430:20; 433:1-433:17

[1139]   Dkt. No. 833 (Transcript Volume IV), at 431:24-431:25; Dkt. No. 844 (L-10).

[1140]   Dkt. No. 833 (Transcript Volume IV), at 437:2-437:16; *see also* Trial Exhibit 7, at Brenda Speer 000017.

[1141]   Trial Exhibit 668, at EZPZ-CH-000128.

[1142]   Trial Exhibit 23.

they had reached.[1143]  Indeed, after Mrs. Laurain had testified, Ms. Winkelmann identified a November 2015 email she had received from Mrs. Laurain in which Mrs. Laurain, herself, had stated, "I highlighted some statistics below.  Wowza. Tons of impressions and reach via Twitter."[1144]  In that email, Mrs. Laurain noted with excitement not only that @AngelHepp had liked one of EZPZ's tweets, but also that Tweet impressions had increased from 15.4K in September 2015 to 84.5K in November 2015.[1145]  The evidence also contains another email dated January 8, 2016 wherein Mrs. Brock reported on social media statistics to the EZPZ team, which included Mrs. Laurain as a recipient.[1146]

i.   In May 2018, Laurain testified she had no recollection of how she obtained the declarations or whether she was involved in drafting them.[1147]  In January 2019, she was able to give a declaration stating: "Williams IP provided ezpz with draft declarations and *other* members of ezpz communicated externally with the third parties about their declaration."[1148]  Documents produced following EZPZ's waiver of the attorney-client and patent agent privileges, however, reveal that Mrs. Laurain was significantly and heavily involved in the preparation of the declarations submitted to the USPTO in March 2016.[1149]  Mrs. Laurain worked on

---

[1143]   Dkt. No. 833 (Transcript Volume IV), at 395:4-395:14.

[1144]   Trial Exhibit 63; *see also* Dkt. No. 836 (Transcript Volume VII), at 1497:13-1497:20.

[1145]   Dkt. No. 836 (Transcript Volume VII), at 1497:21-1498:18; Trial Exhibit 63.

[1146]   Trial Exhibit 102.

[1147]   *See* Dkt. No. 826-2 (Laurain May 2018 Depo.), Dkt. #345-1, at 285:17-297:8.

[1148]   Trial Exhibit 312 (emphasis added).

[1149]   Trial Exhibit 120; Trial Exhibit 570; Trial Exhibit 121; Trial Exhibit 635; Trial Exhibit 695.

several of the declarations herself.[1150]  In light of her substantial involvement, the Court does not find credible Mrs. Laurain's claimed lack of recollection of her involvement in preparing the declarations as she testified in May 2018, nor does the Court find credible her declaration statement that "other members" of EZPZ, as opposed to Mrs. Laurain, communicated with the declarants.

    j.   Mrs. Laurain has repeatedly provided inconsistent testimony regarding the location of the original Tommee Tippee Mat she had in her possession in 2014:

        i.   At her June 2019 deposition, Mrs. Laurain claimed that she brought the original Tommee Tippee Mat with her to the deposition.[1151]

        ii.   At her June 2020 deposition, Mrs. Laurain claimed she "threw [] away" the Tommee Tippee Mat she originally had in her possession.[1152]

        iii.   At trial, Mrs. Laurain claimed that she gave her original Tommee Tippee Mat to Mr. Tobin, EZPZ's former counsel of record.[1153]

2.    Despite the numerous prior art references of which Mrs. Laurain was aware and the advice she received from the attorneys at Clark Hill about the prior art in connection with her "suction function" idea (*see* Section I.A.3.b.1.), Mrs. Laurain told Shark Tank that she was not aware of any prior art that would impact her intellectual property protection.[1154]

3.    Mrs. Laurain failed to disclose in discovery that she had acquired a pink silicone sample sheet early on in the development of her product.[1155]

---

[1150]    *See id.*

[1151]    Dkt. No. 826-6 (Laurain 2019 Depo.), at 65:18-66:6.

[1152]    Dkt. No. 826-7 (Laurain 2020 Depo.), at 84:4-85:5.

[1153]    Dkt. No. 833 (Transcript Volume IV), at 418:3-418:12.

[1154]    Trial Exhibit 516.

[1155]    Dkt. No. 833 (Transcript Volume IV), at 442:22-445:3.

4.      Mrs. Laurain continued to prosecute a baseless infringement action based on the '903 Patent despite recognizing that the "entire lawsuit is a complete waste of Time, Energy, Money ($1M+++ spent)."[1156]

5.      Mr. Williams made a number of false or misleading statements and omissions, including but not limited to the following:

      a.  Mr. Williams represented on his website that he had prosecuted more than 500 patents,[1157] but was forced to admit those figures were "a puffery," and he admitted those figures included patents that his former employer had prosecuted.[1158]  The Court finds this to be beyond mere "puffery."

      b.  Mr. Williams failed to correct Mr. Bolton's statement made on September 19, 2016, prior to the issuance of the '903 Patent, that "Ben has said that he has already cited any prior art that [LNC] previously referenced…"[1159]

      c.  Mr. Williams falsely represented to Mr. Garthe that they had argued against Bruno during prosecution of the '903 Patent.[1160]

### (v)      No One Claimed Responsibility for the Prosecution of the '903 Patent

1.      Mr. Williams claimed Mr. McCarthy was the attorney "in charge" of the prosecution of the '903 Patent.[1161]

---

[1156]      Trial Exhibit 302.

[1157]      Trial Exhibit 922.

[1158]      Dkt. No. 826-9 (Williams 2020 Depo.), at 472:20-473:18.

[1159]      Trial Exhibit 483.

[1160]      Trial Exhibit 901.

[1161]      Dkt. No. 826-9 (Williams 2020 Depo.), at 628:20-629:11; 629:13-629:18.

5328032_1

2.      Mr. Bolton testified that Mr. McCarthy, as opposed to himself, was the Clark Hill attorney "primarily" involved in the prosecution of the '903 Patent.[1162]

3.      Mr. McCarthy, however, had made very clear to Mr. Bolton that he had "not reviewed EZ PZ's PCT application as I am not supervising Ben nor have I participated in prosecution of that application (or of the US application)."[1163]  Mr. Bolton, however, claimed not to recall Mr. McCarthy's e-mail or statement to this effect.[1164]

4.      Although both Mr. Bolton and Mr. McCarthy of Clark Hill tried to distance themselves from the prosecution of the '903 Patent, Mr. Garthe, EZPZ's corporate representative, testified that Clark Hill was retained in connection with the patent prosecution and remained retained as of the date of his deposition in January 2019.[1165]

5.      Mr. Williams, Mr. Bolton, and Mr. McCarthy's unwillingness to claim responsibility for what was submitted to the USPTO evidences that no one wanted to take responsibility for the prosecution of the '682 Application.

> **(vi)  Witnesses Gave Evasive Testimony By Claiming an Inability to Understand Simple Questions and a Lack of Recollection Even With Documents Placed Before Them**

1.      At her June 10, 2020 deposition individually and as EZPZ's Rule 30(b)(6) representative, Ms. Laurain remembered very little that was not in a document placed before her.  She uttered the phrase "I do recall" or a variation thereof many dozens of times.  Mrs. Laurain could not recall:

---

[1162]      Dkt. No. 826-3 (Bolton Depo.), at 272:20-273:5.

[1163]      Dkt. No. 826-4 (McCarthy Depo.), at 222:16-222:25; 224:9-224: 24; Trial Exhibit 212.

[1164]      Dkt. No. 826-3 (Bolton Depo.), at 232:3-232:20.

[1165]      Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 69:9-69:16.

      a.   creating her patent search documents;[1166]

      b.   whether she printed out the documents listed on her patent search document, although Ms. Speer produced a copy of the Webb patent dated prior to her first meeting with Ms. Laurain;[1167]

      c.   whether she read the Webb patent at the time that she located it and printed out;[1168]

      d.   meeting with Brenda Speer;[1169]

      e.   what research she did on silicone;[1170]

      f.   whether she discussed any of the products on her competitive product charts with Brenda Speer.[1171]

2.   Mrs. Laurain's testimony was frequently contradicted by the contemporaneous documents. For example,

      a.   she claimed the Brenda Speer did not give her utility patent advice,[1172] although she wrote to Jordan Bolton that a prior lawyer had told her that a utility patent would not be feasible and tough to write;[1173]  and

      b.   she would not admit that Mr. McCarthy told her that the Platinum Pets Mat was prior art that needed to be disclosed,[1174] although Mr. McCarthy's December 15, 2015 email to Mr. Bolton reflects that he did.[1175]

---

[1166]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 35:3-35:7.

[1167]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 38:1-38:11.

[1168]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 39:11-39:13.

[1169]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 40:12-40:19.

[1170]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 44:18-44:22.

[1171]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 47:7-47:9.

[1172]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 65:15-65:24.

[1173]   Trial Exhibit 19.

3. As discussed below in Section II.A.7. addressing unclean hands, Mrs. Laurain gave sworn interrogatory responses concerning counsel she had hired to provide patent advice that proved to be false.

4. Mrs. Laurain also testified evasively at trial.  Numerous times, Mrs. Laurain refused to answer the question LNC's counsel had asked, requiring both the Court and even her own counsel to instruct her to answer the question that had been asked.[1176]  She also failed to concede even basic points, such as the fact that she had hired Akemi Williams to assist with marketing efforts.[1177]

5. Mr. Bolton, EZPZ's outside general counsel between 2015 and 2016, and an attorney who was substantively involved in the prosecution of the '903 Patent, could not recall virtually anything that occurred during the prosecution of the '903 Patent.  In the three hours played from his video deposition taken March 5, 2020, Mr. Bolton responded with "I don't recall," "I don't know," or some variation thereof, to nearly every question asked of him (nearly 300 times).   For example, Mr. Bolton could not recall:

   a. the initial email he received from Mrs. Laurain, requesting his advice and guidance in the filing of a utility patent application and attaching her patent search, draft patent, and PowerPoint presentation;[1178]

---

[1174]   Dkt. No. 826-7 (Laurain 2020 Depo.), at 110:11-110:20.

[1175]   Trial Exhibit 86.

[1176]   *See* Dkt. No. 833 (Transcript Volume IV), at 401:10-401:11 (by the Court), 408:3 (by the Court), 453:2 (by her own counsel),4 81:10-481:21 (by the Court), 482:13-482:20 (by the Court), 506:1-506:2 (by the Court); Dkt. No. 834 (Transcript Volume V), at 637:5-637:7 (her own counsel), 750:5-750:10 (by her own counsel).

[1177]   Dkt. No. 834 (Transcript Volume V), at 687:3-687:6.  *But see* Trial Exhibit 43, at EZPZ0242120 ("Akemi is amazing – she does all of our sales/marketing").

[1178]   Dkt. No. 826-3 (Bolton Depo.), at 31:11-34:16.

-197-

b.  what prior art threw up "red flags about the advisability of spending significant sums on the patent application process;"[1179]

c.  McCarthy telling him that the failure to disclose the Platinum Pets Mat would be inequitable conduct;[1180]

d.  wanting to discuss "the prior art" sent by Mr. Dunn of Munchkin because it deserved their "attention" or whether the prior art was ever discussed;[1181]

e.  whether he reviewed the International Search Report or asked to review it;[1182]

f.  whether he reviewed the link of the Hot Iron Holster on the Grommet sent by Mrs. Laurain on February 16, 2016;[1183]

g.  any communications about retaining a material scientist to testify as to unexpected results;[1184]

h.  whether Clark Hill provided Mrs. Laurain advice on prior art,[1185] notwithstanding Mr. Bolton's advice to Mrs. Laurain that the prior art sent by Mr. Dunn of Munchkin was something they needed to discuss[1186] and numerous email exchanges between Mrs. Laurain, Mr. Williams, Mr. Bolton, and Mr. McCarthy regarding the need to disclose the Platinum Pets Mat;[1187]

---

[1179]   Dkt. No. 826-3 (Bolton Depo.), at 80:13-80:25.

[1180]   Dkt. No. 826-3 (Bolton Depo.), at 89:10-90:9.

[1181]   Dkt. No. 826-3 (Bolton Depo.), at 158:10-158:17.

[1182]   Dkt. No. 826-3 (Bolton Depo.), at 162:9-162:25; 165:17-165:22; 226:12-226:14.

[1183]   Dkt. No. 826-3 (Bolton Depo.), at 177:23-179:3.

[1184]   Dkt. No. 826-3 (Bolton Depo.), at 113:6-113:13.

[1185]   Dkt. No. 826-3 (Bolton Depo.), at 80:13-80:25; 89:10-90:4; 223:13-223:18; 165:13-165:16; 290:20-290:25.

[1186]   Trial Exhibit 57.

[1187]   *See, e.g.,* Trial Exhibit 109.

  i. and why he waited to forward the June 2016 email from Mr. Williams forwarding the ISA Report and Written Opinion, and the cited "Y" references therein, to Mr. McCarthy until September 2016.[1188]

6. When shown emails to refresh his recollection, Mr. Bolton claimed his memory was not refreshed.[1189]  The Court finds Mr. Bolton's testimony was purposefully evasive, generally dismissive of the contemporaneous documentary evidence and lacked credibility.

7. The repeated evasive testimony from these witnesses establishes deceit.[1190]

### e. Mrs. Laurain and Mr. Williams' Evidence of Inequitable Conduct Occurring During the Prosecution of Related Patents Establishes a Pattern of Deceit.

#### (1) Applicable Law

1. The Federal Circuit, in a post-*Therasense* decision, has held that evidence of inequitable conduct occurring during the prosecution of "related patents" can establish intent based on "a pattern of deceit."[1191]  In *Intellect,* to determine whether the inventor intended to deceive the USPTO, the Court considered "the misrepresentations [made] during prosecution of the asserted patents," and the "false statements [made]…during prosecution of related patents in order to overcome prior art."[1192]  The Court noted the inventor made false statements "in several related

---

[1188] Trial Exhibit 206; Dkt. No. 826-3 (Bolton Depo.), at 218:3-219:12.

[1189] *See, e.g*., Dkt. No. 826-3 (Bolton Depo.), at 33:20-34:4; 162:9-162:25; 174:1-174:4; 177:23-179:3; 260:3-261:12.

[1190] *See Brasseler, USA I, LP v. Stryker Sales Corp.*, 267 F.3d 1370, 1384-85 (Fed. Cir. 2001) (affirming finding of intent to deceive where district court found that witness "tiptoes around the truth" and provided "evasive testimony" (internal quotation marks omitted).

[1191] *See Intellect Wireless, Inc. v. HTC Corp.,* 732 F.3d 1339, 1345 (Fed. Cir. 2013).

[1192] *Id.* at 1344.

patents," establishing a "pattern of deceit," and making "the inference [of intent] stronger."[1193] Despite the fact that the inventor submitted the false statements "after the asserted patents were allowed," the Federal Circuit found them nonetheless relevant because they "reinforce[d] the pattern of deceit."[1194]

2. The MPEP specifically explains to applicants that "[i]t is desirable to avoid the submission of long lists of documents if it can be avoided" and "[i]f a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance."[1195]

3. Although mistakes and omissions may be considered an oversight and are "not per se unreasonable when considered in isolation…inadvertence can carry an applicant only so far," and "repeated attempts to avoid playing fair and square with the patent system" will render a patent invalid and unenforceable due to inequitable conduct.[1196]

4. "Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom **must** be brought to the attention of the U.S. Patent and Trademark Office."[1197]

5. "At a minimum, the applicant should call the attention of the Office to the litigation, the existence and the nature of any allegations relating to validity and/or 'fraud,' or 'inequitable

---

[1193] *Id.* at 1345.

[1194] *Id.* (affirming district court's finding of intent to deceive). *See also Asghari-Kamrani v. United Servs. Auto. Ass'n*, 220 F. Supp. 3d 707, 727 (E.D. Va. 2016) (denying motion to dismiss inequitable claim based in part on the patent attorneys' "actions with respect to related patents" because it "strengthen[ed] the inference of intent to deceive the PTO").

[1195] MPEP § 2004.

[1196] *See Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, at 1235 (Fed. Cir. 2007) (noting that "some of the errors were attributable to [the applicant] representing himself during the prosecution of his patents," but the "collection of such problems" precluded the Court from finding that the district court's holding of unenforceability was an abuse of discretion).

[1197] MPEP § 2001.06(c) (emphasis added).

conduct,' relating to the original patent, and the nature of litigation materials relating to these issues."[1198]   The MPEP explains, that "[e]nough information should be submitted to clearly inform the Office of the nature of these issues so that the Office can intelligently evaluate the need for asking for further materials in the litigation."[1199]

6.      Related litigation is "per se" material information covered by the duty of disclosure.[1200]

7.      "It is clear from the language of § 2001.06(c) that the existence of [a] litigation itself is material information that an examiner **needs** to have."[1201]

8.      The existence of the litigation "is important because it signals to the examiner that other material information relevant to patentability may become available through the litigation proceedings."[1202]

### (2)      Improper Conduct During Prosecution of Related Applications Evidences an Intent to Deceive the USPTO

1.      Mr. Garthe's request that Mr. Williams cite the Lee Single Dog Bowl Mat "amidst a bunch of other stuff"[1203] in order to hide it and make it less noticeable to the Examiner,

---

[1198]      MPEP § 2001.06(c).

[1199]      MPEP § 2001.06(c).

[1200]      *Nisus Corp. v. Perma-Chink Systems, Inc.*, 421 F. Supp. 2d 1084 (E.D. Tenn. 2006); *DaimlerChrysler AG v. Feuling Advanced Tech., Inc.*, 276 F. Supp. 2d 1054, 1062–63 (S.D. Cal. 2003).

[1201]      *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, at 1234 (Fed. Cir. 2007) (emphasis added).

[1202]      *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, at 1234 (Fed. Cir. 2007) (affirming district court's holding that patents were unenforceable for inequitable conduct in failing to disclose litigation); *see also DaimlerChrysler AG v. Feuling Advanced Techs., Inc.*, 276 F. Supp. 2d 1054, 1062-63 (S.D. Cal. 2003) (defendants' argument that the "failure to disclose the litigation was not material…flies in the face of the text of MPEP § 2001); *Leviton Mfg. Co., Inc. v. Univ. Sec. Instru., Inc.*, 606 F.3d 1353, 1362 (Fed. Cir. 2010) (noting the existence of cases alleging invalidity were themselves material information that needed to be disclosed and not just invalidating prior art).  *Compare Outside the Box Innovations, L.L.C. v. Travel Caddy, Inc.*, 695 F.3d 1285 (Fed. Cir. 2012) (noting litigation that did not allege invalidity, unenforceability or unpatentability in the Complaint was not required to be disclosed).

[1203]      Trial Exhibit 287.

-201-

establishes EZPZ's specific intent to deceive the USPTO in the '823 Application.[1204]   Such conduct clearly violates the duty of candor and good faith owed to the USPTO during the prosecution of patent applications.[1205]

2.      Notwithstanding the advice of Ted Olds that the Lee Dog Bowl/Mat had to be cited in both the '823 and the '403 Application,[1206] Mr. Williams and Mr. Garthe made the deliberate decision not to disclose the Lee Dog Bowl/Mat during prosecution of these patent applications.[1207]   This is further evidence of an intent to deceive the USPTO in these related patent applications.

3.      Notwithstanding the MPEP § 2001.06(c) requirement that related litigation be disclosed to the USPTO, Mr. Williams' admission at trial that this litigation was an invalidity suit,[1208] and Mr. Olds's admission that this lawsuit should have been disclosed in the related applications,[1209]

---

[1204]   *See Nomadix, Inc. v. Hosp. Core Servs. LLC*, No. 14-08256, 2015 WL 3948804, at *9 (C.D. Cal. June 29, 2015).

[1205]   *See Golden Valley Microwave Foods, Inc. v. Weaver Popcorn Co., Inc.*, 837 F. Supp. 1444, 1477 (N.D. Ind. 1992), *aff'd,* 11 F.3d 1072 (Fed. Cir. 1993) ("The court further holds that it is likewise a violation of the duty of candor and fair dealing with the Patent Office for an applicant or its attorney to disclose a pertinent prior art patent reference to the examiner in such a way as to 'bury' it or its disclosures in a series of disclosures of less relevant prior art references, so that the examiner would be likely to ignore the entire list and permit the application to issue."); *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1573 (Fed. Cir. 1983) ("The conclusion that [the examiner] was 'fully informed' rests solely on the presentation to him of a mountain of largely irrelevant data from which he is presumed to have been able ... to have found the critical data. It ignores the real world conditions under which examiners work."); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 965 (S.D. Fla. 1972) ("Obviously, the purpose of this misrepresentation was to bury the Wollard patent in a long list of allegedly old prior art patents in the hope that the Patent Examiner, having already allowed the Stuart claims, would ignore the list and permit the Stuart patent to issue. Such conduct clearly violates the required standard of candor and fair dealing with the Patent Office."), *aff'd,* 479 F.2d 1328 (5th Cir. 1973).

[1206]   Trial Exhibits 640 and 287.

[1207]   Trial Exhibits 281 and 905.

[1208]   Dkt. No. 835 (Transcript Volume VI), at 1183:16-1184:17.

[1209]   Dkt. No. 826-10 (Olds. Depo.), at 77:4-77:25.

neither Mr. Williams nor Mrs. Laurain disclosed this pending lawsuit in those related applications.[1210]

### f.   Intent to Deceive May Also be Inferred from Litigation Misconduct Discussed Below

1.   As detailed in Section II.A.2.-II.A.10. below addressing unclean hands, EZPZ was not forthcoming with its adversary or with the Court in this lawsuit, just as Mrs. Laurain and Mr. Williams were not forthcoming with the USPTO during prosecution of the '903 Patent and related patent applications.

2.   The Court infers an intent to deceive the USPTO given EZPZ's litigation misconduct in this action.

### B.   CONCLUSIONS OF LAW

The Court, after conducting an 8-day Bench Trial, having received and considered the Findings of Fact and Conclusions of Law submitted by the respective parties, having taken judicial notice of pleadings filed in connection with the issue of inequitable conduct (Dkt. Nos. 346 and 347), having conducted a review of all of the facts in the case, having consulted with the Technical Advisor who was present throughout the entire Bench Trial, after having observed the demeanor and assessed the credibility of the witnesses, finds that the '903 Patent is unenforceable for inequitable conduct and for egregious misconduct perpetrated during the prosecution of the '903 Patent concludes as follows:

1.   LNC has proven by clear and convincing evidence that Mrs. Laurain and Mr. Williams knew about the following prior art during the prosecution of the '903 Patent, knew the following prior art was material, and deliberately withheld the following material prior art from disclosure to the USPTO during the prosecution of the '903 Patent: the Webb Publication, the Webb Patent,

---

[1210]   Trial Exhibit 281; Trial Exhibit 905; Trial Exhibit 582; Trial Exhibit 583.

the Tommee Tipee Mat, (the true features of) the Platinum Pets Mat, the Lee Single Dog Bowl Mat, the Momo Baby Skid-Proof Silicone Placement, the Brinware Silicone Placemat, the Bruno Patent, the Hot Iron Holster, and the CIBO Stick Anywhere Placemat.

2.      The prior art withheld by Mrs. Laurain and Mr. Williams is "but for" material prior art to the patentability of at least claim 1 of the '903 Patent and is not cumulative of the prior art of record cited during the prosecution of the '903 Patent.

3.      LNC has proven that at least claim 1 of the '903 Patent would not have issued had Mrs. Laurain and Mr. Williams disclosed this "but for" material prior art during the prosecution of the '903 Patent.  The withheld prior art is also "but for" material because it supported arguments advanced by the Examiner rejecting the patentability of the pending claims as well as refuting or properly placing into context arguments for patentability argued by Mrs. Laurain and Mr. Williams..

4.      In addition to withholding "but for" material prior art during the prosecution of the '903 Patent, LNC also has proven by clear and convincing evidence that Mrs. Laurain and Mr. Williams engaged in affirmative egregious misconduct by submitting false and misleading declarations, manufacturing false and misleading survey evidence, and making false and misleading representations of material fact to the USPTO in order to deceive the Examiners into issuing the '903 Patent.  Such conduct is per se material as a matter of law.

5.      LNC has further proven by clear and convincing evidence that Ms. Falcone and Mr. Bolton were substantively involved in the prosecution of the '682 Application and particularly in connection with the formation of the strategy for responding to the Final Office Action including decisions relating to, the content of, the preparation of and the review of documents to be filed with the March 9, 2016 submission to the USPTO.  As such, both Ms. Falcone and Mr. Bolton

were subject to the duty of candor and good faith owed to the USPTO under 37 C.F.R. § 1.56 at the very least with respect to the March 9, 2016 submission.

6.      LNC has further proven by clear and convincing evidence that Ms. Falcone and Mr. Bolton also engaged in affirmative egregious misconduct by submitting false and misleading declarations and manufacturing false and misleading survey evidence to the USPTO in order to deceive the Examiners into issuing the '903 Patent.  Such conduct is per se material as a matter of law.

7.      The Court further finds that the explanations offered by Ms. Laurain, Mr. Williams, Ms. Falcone and Mr. Bolton regarding their conduct before the USPTO during the prosecution of the '682 Application, when offered, were not credible or were inconsistent with the contemporaneous documentary evidence or evidenced a selective memory in favor of EZPZ.

8.      Based upon the totality of the evidence addressed above with respect to both the withholding of material prior art during the prosecution of the '903 Patent and the evidence of affirmative egregious misconduct, the single most reasonable inference to be drawn from the facts is that Mrs. Laurain, Mr. Williams, Ms. Falcone, and Mr. Bolton specifically intended to deceive the Examiners in order to secure issuance of the '903 Patent.  In light of all the circumstances, considering the various explanations and excuses offered by Mrs. Laurain, Mr. Williams, Ms. Falcone and Mr. Bolton and their plausibility in light of the evidence, and weighing the credibility of these witnesses, the evidence is more than sufficient to require a finding of deceitful intent on the part of Mrs. Laurain, Mr. Williams, Ms. Falcone, and Mr. Bolton.

9.      Having found that Mrs. Laurain and Mr. Williams engaged in inequitable conduct in failing to disclose "but for" material prior art to the USPTO during the prosecution of the '903

Patent in breach of their duty of candor and good faith, the Court holds that the '903 Patent is unenforceable.

10.     Having also found that Mrs. Laurain, Mr. Williams, Ms. Falcone and Mr. Bolton engaged in affirmative egregious misconduct during the prosecution of the '903 Patent in breach of their duty of candor and good faith, the Court further finds that such affirmative egregious misconduct also renders the '903 Patent unenforceable.

## II.     EZPZ Acted with Unclean Hands Both Before and During this Litigation such that All Claims Against LNC Should Be Dismissed

### A.     FINDINGS OF FACT

#### 1.     Applicable Law

1.     The equitable doctrine of unclean hands has long existed as a principal of patent law."[1211]

2.     "He who comes into equity must come with clean hands."[1212]  In *Keystone*, the Supreme Court described the doctrine of unclean hands as follows:

> [Plaintiff] must come into court with clean hands. He must be frank and fair with the court, nothing about the case under consideration should be guarded, but everything that tends to a full and fair determination of the matters in controversy should be placed before the court...It is a principle in chancery, that he who asks relief must have acted in good faith. The equitable powers of this court can never be exerted on behalf of [one] who has acted fraudulently, or who by deceit or any unfair means has gained an advantage. To aid a party in such a case would make this court the abetter of iniquity.[1213]

3.     The misconduct must "affect the equitable relations between the parties in respect of something brought before the court for adjudication."[1214]

4.     As Judge Learned Hand explained:

---

[1211]  *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13-04057, 2016 WL 3143943, at *23 (N.D. Cal. June 6, 2016), *aff'd sub nom. Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231 (Fed. Cir. 2018).

[1212]  *Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 241 (1933).

[1213]  *Id.* at 244-45.

[1214]  *Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 244-45 (1933).

> The [unclean hands doctrine] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant who invokes it need not be damaged, and the court may even raise it sua sponte.[1215]

5.      The party asserting the defense of unclean hands must prove it by clear and convincing evidence.[1216]

6.      The doctrine of unclean hands remains a viable defense in a patent infringement action and does not require a finding of materiality:

> This court recognizes that the early unclean hands cases do not present any standard for materiality. Needless to say, this court's development of a materiality requirement for inequitable conduct does not (and cannot) supplant Supreme Court precedent. Though inequitable conduct developed from these cases, the unclean hands doctrine remains available to supply a remedy for egregious misconduct like that in the Supreme Court cases.[1217]

7.      "[A] determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation,' *i.e.*, 'for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court.''[1218]

---

[1215]   *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 401 F. Supp. 2d 383, 392-93 (D.N.J. 2005) (quoting *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3rd Cir. 1959)).

[1216]   *See In re Omeprazole Patent Litig.*, 483 F.3d 1369, 1364 (Fed. Cir. 2007).

[1217]   *Therasense, Inc. v. Becton, Dickson & Co.*, 649 F.3d 1287 (Fed. Cir. 2011). *See also Aptix Corp. v. Quickturn Design Systems, Inc.*, 269 F.3d 1369, 1375 (Fed. Cir. 2001) (explaining that unclean hands in the form of litigation misconduct "while serving as a basis to dismiss the wrongful litigant, does not infect, or even affect, the original grant of the property right" as it does not render the patent unenforceable as to non-parties to the litigation as the inequitable conduct defense does); *France Telecom S.A. v. Novell, Inc.*, 2002 WL 31355255 at *3 (D. Del. 2002) (ruling that defense of unclean hands was not redundant with defense of inequitable conduct even when based on same transactions, because the defense of "[u]nclean hands … remains a broader defense less amenable to a particular checklist of elements" than inequitable conduct).

[1218]   *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (affirming district court's finding of unclean hands to vacate a $200 million infringement damage award

The misconduct to be considered can take place both before and during the litigation as long as it has an "immediate and necessary relation" to the relief sought in the litigation.[1219]

8.      "If an unconscionable act is committed during the prosecution of a patent before the PTO, then the unconscionable act has immediate and necessary relation to the equity sought before the PTO, namely the procurement of a patent."[1220]  "[B]ecause such an unconscionable act has an immediate and necessary relationship to any subsequent attempt to enforce the patent in a court of equity, the court has the discretion under the unclean hands doctrine to dismiss the litigation brought to enforce such a patent."[1221]

9.      "[I]f the unconscionable act in question took place during litigation, the court has authority to use only the unclean hands doctrine to dismiss specific causes of action *or the lawsuit in its entirety*."[1222]

10.     The unclean hands doctrine "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper

---

because inter alia, the employee who prosecuted the patent had committed litigation misconduct by persistently lying in depositions and at trial regarding his actions in the relevant events).

[1219]    *See Intamin, Ltd. v. Magnetar Tech. Corp.*, 623 F. Supp. 2d 1055, 1074-77 (C.D. Cal. 2009) (finding unclean hands because prior to the commencement of the litigation, the patentee asserted to members of the public that it owned the asserted patent years before it had properly obtained assignments of the invention, demanded and collected royalties from members of the public on the patent before it had secured rights in the patent, had twice submitted a forged back-dated assignment to the USPTO to show it owned the patent, and failed to disclose the forged assignment during discovery), *aff'd without opn.,* 2010 WL 5136113 (Fed. Cir. Dec. 10, 2010). *See also Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (affirming district court's finding of unclean hands due in part to pre-litigation misconduct).

[1220]    *Hoffman-LaRoche, Inc. v. Promega Corp.,* 319 F.Supp.2d 1011, 1017-18 (N.D. Cal. 2004).

[1221]    *Id.* at 1018.  *See Precision Instrument Mfg. Co. v. Auto, Maint. Co.,* 324 U.S. 806 (1945).

[1222]    *Hoffman-LA Roche, Inc. v. Promega Corp*., 319 F. Supp. 2d 1011, 1018 (N.D. Cal. 2004).

may have been the behavior of the defendant,' and requires that claimants 'have acted fairly and without fraud or deceit as to the controversy in issue.'"[1223]

11.     The doctrine of unclean hands has been applied "to situations involving lying under oath, unethical business conduct, or litigation misconduct."[1224]

### 2.     Mrs. Laurain Testified Evasively Regarding Whether She Had Seen Dog Bowls in her Prior Art Search

1.     When Mrs. Laurain was questioned during her May 2018 deposition whether she had "looked at dog bowls" or "looked at dog bowls placed in silicone mats," Mrs. Laurain testified that she did not recall.[1225]

2.     The Court does not find Mrs. Laurain's testimony to be credible because it is undisputed that "dog bowls" came up numerous times during Mrs. Laurain's prior art searches as well as during the course of the prosecution of the '903 Patent and other related applications:

> a.     On March 21, 2014, while working for Humana, Mrs. Laurain sent herself a link to the Lee Single Dog Bowl Mat featured on the Yanko Design website.[1226]

---

[1223]     *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach Co.*, 324 U.S. 806 (1945)).

[1224]     *Gilead Sciences, Inc. v. Merck & Co, Inc.*, No. 13-04057, 2016 WL 3143943, at *26 (N.D. Cal. June 6, 2016), *aff'd sub nom. Gilead Sciences, Inc. v. Merck & Co.*, 888 F.3d 1231 (Fed. Cir. 2018).  *See also Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970 (S.D.N.Y. 1992), *aff'd*, 983 F.2d 1048 (2d Cir. 1992) (finding unclean hands when the Defendant's president lied under oath and provided inconsistent testimony); *Mas v. Coca-Cola Co.*, 163 F.2d 505, 511 (4th Cir. 1947) (finding unclean hands and upholding dismissal of suit where plaintiff submitted false testimony and forged documents to the USPTO); *Clements Indus., Inc. v. A. Meyers & Sons Corp.*, 712 F. Supp. 317, 318 (S.D.N.Y. 1989) (finding unclean hands and dismissing plaintiff's claims when plaintiff attempted to extract confidential information from the defendant to obtain confidential trade secrets); *U.S. Ethernet Innovations, LLC v. Tex. Instruments Inc.*, 2014 WL 4683252, at *6 (E.D. Tex. 2014) (even though defendant's unprofessional litigation conduct and discovery abuses, including its failure to disclose key evidence during discovery threatened but did not affect the integrity of the litigation it constituted unclean hands and precluded its defense of laches); *Robocast, Inc. v. Microsoft Corp.*, 2014 WL 688644, *13 (D. Del. 2014) (explaining that litigation misconduct in the form of relying on forged documents to obtain an earlier date of conception could constitute unclean hands).

[1225]     Dkt. No. 826-2 (Laurain 2018 Depo.), at 204:4-204:6; 277:8-277:21.

-209-

b. The patents printed out by Mrs. Laurain on March 25, 2014, included a "Pet food bowl and mat," a "Stay put dog bowl," and a "Stabilized pet dish assembly and method." [1227]

c. In April 2014, Mrs. Laurain provided Ms. Speer with a PowerPoint presentation containing a slide that featured the photographs of the Lee Single Dog Bowl Mat, the Yanko design website link describing it, and the comment, "[t]hrough all my research, this is the only similar item 'online.'"[1228]

d. On May 24, 2014, Mrs. Laurain provided Mr. Bolton with the web address for the Yanko Design website on which the Lee Single Dog Bowl Mat was featured, asked him to "check out" the link, and admitted that the Lee Single Dog Bowl Mat was the most similar product she had found.[1229]

e. On May 26, 2014 Mrs. Laurain provided both Mr. Bolton and Mr. McCarthy with Patent Search II containing the Lee Single Dog Bowl Mat at the top of the list and listing the Platinum Pets Mat in "Other similar products."[1230]

f. On May 29, 2014, Mrs. Laurain emailed Mr. Bolton and Mr. McCarthy a link to the Platinum Pets Mat and hoped the product would not "suction."[1231]

g. On June 30, 2014 Mrs. Laurain provided Mr. Williams Patent Search III which included the Lee Single Dog Bowl Mat and the Platinum Pets Mat at the top of

---

[1226]   Trial Exhibit 507.

[1227]   Trial Exhibit 5, at Brenda Speer 000066, Brenda Speer 000081, Brenda Speer 000085,

[1228]   Trial Exhibits 7 and 8, at Brenda Speer 000040.

[1229]   Trial Exhibit 19.

[1230]   Trial Exhibit 20.

[1231]   Trial Exhibits 24 and 25.

the list.[1232]   Patent Search III was attached to an email Mrs. Laurain sent Mr. Williams, which itself included links to both the Lee Single Dog Bowl Mat and the Platinum Pets Mat.[1233]

h.   Prior to the filing of the application that issued as the '903 Patent in July 2014, Mr. McCarthy told Mrs. Laurain that "her product was not patentable because the dog mat is prior art..."[1234]

i.   When Mrs. Laurain contacted Mr. Bolton and Mr. McCarthy again in December 2015 to seek their assistance with the prosecution of the '903 Patent, Mr. Bolton asked Mrs. Laurain privately whether the Platinum Pets Mat suctioned.[1235]

j.   On January 25, 2016, Mr. McCarthy again told Mrs. Laurain that in his "humble opinion" the Platinum Pets Mat is prior art and should be included in a proposed video to the USPTO.[1236]

k.   Mrs. Laurain met and had two confrontational meetings with Mr. Koenig of Yummynator at a pet show expo in Las Vegas in the summer of 2016.[1237] Sometime thereafter in the summer or fall of 2016, Mr. Koenig emailed Mrs. Laurain notifying her that there was "already a product presented to market with similar functionalities in the pet product range in the year 2009.  The functionality obtained, state of the art' in 2007 and a patent is not possible on the functionality anymore."        Mr.    Koenig    also    attached    a    PDF    entitled

---

[1232]   Trial Exhibit 611 at BWILLIAMS2003.

[1233]   Trial Exhibit 611.

[1234]   Trial Exhibit 86.

[1235]   Trial Exhibit 692.

[1236]   Trial Exhibit 109.

[1237]   Dkt. No. 833 (Transcript Volume IV), at 461:1-461:2.

"patentoffice_research_EN.PDF."    The  PDF  includes  four  different  links describing in various details the Lee Single Dog Bowl Mat dating back to July 9, 2007.[1238]   Mr. Koenig also told Mrs. Laurain that he had been in communication with  Mr.  Lee  and  that  the  Lee  Single  Dog  Bowl  Mat  had  been  displayed  by  Mr. Lee at an expo.[1239]   On November 27, 2016, Mrs. Laurain sent Mr. Bolton, Mr. Garthe,  and  Mr.  Williams  the  PDF  received  from  Mr.  Koenig.[1240]   Mr.  Williams recognized the links as "important and relevant."[1241]

l.   The Lee Single Dog Bowl Mat and the need to disclose the Yanko website LNC had referenced in its Amended Complaint was also discussed at length during the prosecution of the '823 Application and the '403 Application.[1242]

3.   In addition to claiming not to recall whether she had "looked at dog bowls" or "looked at dog bowls placed in silicone mats," Mrs. Laurain also denied seeing the Lee Dog Lee Single Dog Bowl Mat (also described as the "Yanko GOD-B1") all-in-one silicone dog bowl and mat:

---

[1238]   Trial Exhibits 239 and 912.

[1239]   Trial Exhibit 239.

[1240]   Trial Exhibit 602.

[1241]   *See id*.

[1242]   Trial Exhibits 645, 287, 640, and 880.



Mrs. Laurain testified that she did not believe she had "seen this actual document" and did not "remember seeing this 'GOD – B1.'"[1243]  However, the Yanko Design link Mrs. Laurain had sent to Ms. Speer, Mr. Bolton, and Mr. Williams discloses this very product and two of the exact images depicted above.[1244]

### 3. EZPZ Repeatedly Blocked LNC's Efforts to Obtain Mrs. Laurain's Prior Art Search

1. Mrs. Laurain failed to disclose her prior art searches during the course of the litigation, despite LNC's Requests for Production unambiguously requesting all documents reflecting prior art searches.[1245]

---

[1243]    Dkt. No. 363-2, at 278:7-278:23.  *See also* Trial Exhibit 729 (Depo. Exhibit 57).

[1244]    Trial Exhibit 7, at Brenda Speer 000040, Trial Exhibit 20, and Trial Exhibit 611 at BWILLIAMS002003.

[1245]    Trial Exhibit 963, at Request for Production Nos. 200 and 201.

2.     Further, when LNC requested at Mrs. Laurain's May 14, 2018 deposition whether she had a printout of any prior art searches or whether she had maintained a file of her searches, Mrs. Laurain requested definitions of simple words with ordinary and commonly understood meanings (*i.e.,* the word "file,") thereby blocking LNC's efforts as to whether she had in fact performed a prior art search.[1246]  For example, Mrs. Laurain testified she did not "know what a file" was and repeatedly asked for LNC's counsel to "show" her what prior art searches he was referring to.[1247]  Yet, the evidence at trial establishes that Mrs. Laurain prepared no less than three versions of her Patent Search documents.[1248]  The various versions of Mrs. Laurain's Patent Searches are crucial evidence and reflect that Mrs. Laurain had located Webb and other key prior art during her initial prior art searches well before the July 17, 2014 filing of the '682 Application.[1249]  Only when LNC subpoenaed EZPZ's patent attorneys and patent agents did LNC finally obtain Mrs. Laurain's various prior art searches.[1250]  Mrs. Laurain's excuse for failing to produce her prior art searches is that she lost access to her email account during a period of time.[1251]  She has no explanation, however, for not producing the Word document of the patent search documents, which would have no doubt still been on her computer.  Moreover, as explained below, the Court does not find Mrs. Laurain's excuse to be adequate because it is undisputed she sent her patent search to various counsel (including counsel of record) and her

---

[1246]     Dkt. No. 826-2 (Laurain 2018 Depo.), at 203:2-207:5.

[1247]     *See id.*

[1248]     Trial Exhibits 3 (Brenda Speer 000168), 17 (EZPZ-CH-14856), 20 (EZPZ-CH-000131), and 611 (BWILLIAMS001967 at 203).

[1249]     *See id.*

[1250]     *See id.*

[1251]     Dkt. No. 833 (Transcript Volume IV), at 470:7-470:16.

-214-

patent agent at least four times[1252] and they could have easily retrieved and produced the patent search from the emails they received even if Mrs. Laurain no longer had the emails she sent.

3.      Mrs. Laurain stated in a Shark Tank questionnaire dated January 25, 2015[1253] that she had done a patentability search and had documentation of it.[1254]   However, when LNC's counsel specifically requested these prior art searches on May 29, 2019, EZPZ represented there was "no formal patent search" and all "responsive documents have been produced."[1255]   At that time, none of the prior art searches that were subsequently produced by Mr. Williams, Clark Hill, or Ms. Speer had been produced by EZPZ, even though they were all within EZPZ's "control" as described in Rule 26 of the Federal Rules of Civil Procedure.

4.      Mrs. Laurain sent her patent search to Mr. Bolton on two separate occasions and to Mr. McCarthy once in May 2014.[1256]   Importantly, Mr. Bolton and Mr. McCarthy, who were counsel of record for EZPZ from October 31, 2016 until August 22, 2019 were aware of and had the very patent search that LNC was searching for in their possession.[1257]   Yet, Clark Hill (counsel of record for EZPZ) failed to produce this non-privileged document (or at the very least list it on a privilege log) until LNC subpoenaed Clark Hill following EZPZ's waiver of the attorney-client and patent agent privilege.[1258]

---

[1252]      *See id.*

[1253]      Although the Shark Tank IP Questionnaire was dated January 25, 2014, Mrs. Laurain admitted this was done in error and should be January 25, 2015.  Dkt. No. 833 (Transcript Volume IV), at 394:7-394:14.

[1254]      Trial Exhibit 516, at Shark Tank 00043 ("Yes, I searched a tremendous amount (have documentation) and a registered patent agent also searched – July 2014.").

[1255]      Trial Exhibit 949.

[1256]      Trial Exhibit 17; Trial Exhibit 19; Trial Exhibit 20; Trial Exhibit 22.

[1257]      *See id.*

[1258]      *See id.*

5.     Mrs. Laurain was unable to explain why she did not produce any of her prior art searches to LNC during fact discovery other than to say she "lost" her email account.[1259]  Mrs. Laurain was undoubtedly aware that Mr. Williams, Mr. Bolton and Mr. McCarthy were in possession of her patent searches.[1260]

### 4.     EZPZ Failed to Disclose Pertinent Related Patent Applications to LNC and the Court

1.     Early on in fact discovery, LNC propounded requests for production of documents on EZPZ seeking documents referring or relating to "the '903 patent and/or the patent application(s) from which it issued and any related continuation, continuation-in-part, and divisional applications filed with the PTO," "any continuation, continuation-in-part and/or divisional patent application(s) filed in the PTO claiming the benefit of the filing date of the '903 patent…" and "communications between Eazy-PZ and Mr. Williams and/or Williams Intellectual Property referring or relating to the '903 patent…and/or any continuation, continuation-in-part and/or divisional application(s) of the '903 patent…filed with the PTO."[1261]  EZPZ responded on June 5, 2017, and subject to general objections, nevertheless agreed to produce in response to RFP 13, "any related applications filed with the PTO, to the extent they exist and can be located with a reasonable search …;" in response to RFP 48, "relevant, responsive, non-privileged documents, to the extent they exist and can be located with a reasonable search;" and in response to RFP 50, "relevant, responsive, non-privileged documents specifically referencing the '903 patent…and/or any continuation, continuation-in-part and/or divisional application(s) of the '903 patent…, to the extent they exist and can be located with a reasonable search[.]"[1262]  EZPZ did not state that

---

[1259]     Dkt. No. 833 (Transcript Volume IV), at 470:11-470:16.

[1260]     Dkt. No. 833 (Transcript Volume IV), at 470:11-470:22.

[1261]     Trial Exhibit 963 (requests for production Nos. 48 and 50).

[1262]     Trial Exhibit 963 (requests for production Nos. 48 and 50).

any documents were being withheld as a result of any objections.[1263]   EZPZ also did not subsequently supplement its discovery responses to LNC's RFP 13, 48, and 50 or produce responsive documents regarding these related patent applications during fact discovery.[1264]   Nor did EZPZ present any evidence that it otherwise informed LNC of additional or corrective information identifying the filing and prosecution of the related patent applications during fact discovery or in writing per Rule 26(3)(1)(A) of the Federal Rules of Civil Procedure.

2.      Despite having filed four separate patent applications related to the '903 Patent (the '823 Application, the '403 Application, the '976 Application, and the '824 Application), EZPZ never produced these applications to LNC until EZPZ waived the attorney-client and patent agent privilege well after the close of fact discovery and dispositive motion practice.[1265]   Each of these applications has the identical specification consisting of the background of the invention, the field of the invention, the summary of the invention, the drawings, and the detailed description of the drawings as found in the '903 Patent.[1266]

3.      Because the '403 Application was never published and, thus, never made available to the public from the USPTO, LNC could not have learned of its existence unless disclosed by EZPZ. [1267]   Likewise, because the '976 Application and the '824 Application were not published until April 23, 2020, LNC could not have learned of their existence or the contents of the file wrapper unless EZPZ identified and produced them at an earlier time.

---

[1263]   Trial Exhibit 963 (requests for production Nos. 48 and 50).  *See also* Dkt. No. 832 (Transcript Volume III), at 349:16-349:19; 350:6-350:9.

[1264]   Dkt. No. 832 (Transcript Volume III), at 361:24-362:6.

[1265]   Dkt. No. 832 (Transcript Volume III), at 352:10-353:3.

[1266]   *Compare* Trial Exhibit 220 (the '903 Patent), *with* Trial Exhibits 281, at EZPZ301225-236, 905, at 183-193, 583, at 71-82, and 582, at 149-159.

[1267]   Dkt. No. 832 (Transcript Volume III), at 352:10-353:6.

4.      EZPZ only produced the '403 Application, the '824 Application, and the '976 Application to LNC after LNC obtained an Order of this Court requiring their production.[1268]

5.      EZPZ never listed the related applications on any privilege log provided to LNC.[1269]

6.      At trial, EZPZ failed to establish any good faith justification for the failure to timely produce these related patent applications and even though Mr. Garthe was responsible for overseeing EZPZ's patent prosecution as EZPZ's in-house counsel, when he was questioned at the EZPZ 30(b)(6) deposition about the '823 Application in January 2019, he feigned ignorance as to what it was and claimed to be "a little bit confused by the document."[1270]

>           **a.      EZPZ's Failure to Disclose the '403 Application Deprived LNC and the Court of Pertinent Information Regarding Claim Construction**

1.      "A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent."[1271]   "[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application."[1272]   The Federal Circuit has held that "where multiple patents 'derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.'"[1273]

2.      The prosecution history of a patent is part of the "intrinsic evidence" and "consists of the complete record of proceedings before the PTO and includes the prior art cited during the

---

[1268]   Dkt. No. 512, 513.

[1269]   Dkt. No. 832 (Transcript Volume III), at 352:10-352:20.

[1270]   Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 93:9-93:16.

[1271]   *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).

[1272]   *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

[1273]   *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016)(quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

examination of the patent."[1274]     "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."[1275]

3.     One recognized maxim of claim construction is that "claims should be construed to preserve their validity."[1276]     "[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."[1277]     Moreover, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."[1278]

4.     EZPZ failed to disclose the '403 Application to LNC or the Court during the claims construction phase of this litigation, which spanned eleven months between the period July 28, 2017 to June 29, 2018, and during the dispositive motion phase of this litigation.

5.     In accordance with this Court's Scheduling Order, the parties proposed their constructions of certain claim terms and elements of the '903 Patent:[1279]

| Term | LNC Proposal | EZPZ Proposal |
|---|---|---|
| "planar portion" (claims 1, 2, 5 and 9) | "'planar portion' has its plain and ordinary meaning of a flat surface. A flat surface is one that is not curved." | "a part that includes an area that relates to a plane." |
| "an entirely suffuse undersurface" (claim 1) | "a continuous, flat surface, as spread out as with a liquid" | "a continuous undersurface without other separate adhering elements disposed thereon" |
| "an undersurface entirely suffuse upon the planar | "a continuous, flat surface, as spread out as with a liquid" | "an undersurface that is continuous on the planar portion without other |

---

[1274]     *Phillips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc).

[1275]     *Id.*

[1276]     *Id.* at 1327.

[1277]     *Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001).

[1278]     *Shire Dev., LLC v. Watson Pharms., Inc.*, 746 F.3d 1326, 1330 (Fed. Cir. 2014).

[1279]     Trial Exhibit 290, at pp. 11, 15, and 19.

| Term | LNC Proposal | EZPZ Proposal |
|------|--------------|---------------|
| portion" (claims 5 and 9) | | separate adhering elements disposed thereon" |

6.    The '403 Application sought to add claims to cover LNC's Sure Grip products by including the following language in pending claims 2, 6, 12, and 16: "wherein the *planar portion is cambered*."[1280] The term "planar portion" also appears in the claims of the '903 Patent.

7.    On November 13, 2017, a month after the completion of claim construction briefing before the Magistrate Judge, the Examiner in the '403 Application issued a First Office Action, rejecting on the merits all of the then-pending claims of the '403 Application on multiple grounds.[1281]   In pertinent part, in rejecting dependent claims 2, 6, and 12 under § 112, the Examiner stated the following:

> Regarding claims 2, 6, and 12, if the planar portion is planar, how is it cambered? By definition, Cambered [sic] means arched slightly or curved upward in the middle, and **planar means lying in a plane, or flat**.  For the purposes of examination the camber of the planar portion is not understood to be a molded in camber but a curved form the planar portion takes that creates a vacuum when the mat is in use.  With this in mind it seems that applicant has omitted functional language from the claims that are needed, to indicate how the planar portion is cambered.[1282]

8.    Likewise, in rejecting dependent claim 16 under § 112 as indefinite, the Examiner raised a series of fundamental unresolved questions:

> Regarding claim 16, regarding the limitation "wherein the planar portion is cambered wherein the planar portion splays upon the underlying surface when the mat is positioned upon said…." is the cambered portion related to the "when the mat is positioned" statement?  Is the camber somehow caused by the positioning upon the underlying surface?  Is the camber formed by the positioning or is it a

---

[1280]    Trial Exhibits 281, at EZPZ301237-242 (emphasis added).

[1281]    Trial Exhibits 281, at EZPZ301172-181.

[1282]    Trial Exhibit 281 at EZPZ301175 (emphasis added).

structurally molded in camber?   For purposes of examination the camber is understood to be part of the sealing of the mat.[1283]

9.      In addressing the § 112 rejection for dependent claims 3, 7 and 13 involving the recited limitation "wherein the planar portion intermittently contacts the underlying surface," the Examiner noted that this limitation is unclear "since the undersurface of the planar portion **appears to be completely flat in the figures**" and the term "'intermittent' does not appear in the written description.[1284]

10.     The Examiner's actions with respect to dependent claims 2, 6, 12, and 16 in the '403 Application support LNC's proposed construction of "planar portion" as flat and not curved argued during the claim construction process.[1285]   In contrast to LNC's  reliance on extrinsic evidence of the proper construction of "planar portion" based on dictionary definitions, the Examiner's comments in the '403 Application represent intrinsic evidence of the proper construction viewed by the Examiner based on the identical written specification and drawings found in the '903 Patent.

11.     In addition, the Examiner  objected to the specifications as failing to provide an antecedent basis for claiming "cambered."[1286]

12.     Although briefing before the Magistrate Judge had been completed and the matter of the proper construction of "planar portion" was still under advisement when the First Office Action issued on November 1, 2017 in the '403 Application (and remained under advisement for 162 days after EZPZ received the First Office Action), EZPZ deprived both LNC and the Court of

---

[1283]     Trial Exhibit 281 at EZPZ301176-177.

[1284]     Trial Exhibit 281 at EZPZ301175-176.

[1285]     *Compare* Trial Exhibit 290, at p. 15, *with* Trial Exhibit 281 at EZPZ301175-177.

[1286]     Trial Exhibits 281 at EZPZ301173.

the USPTO's interpretation of "planar" during Claim Construction in connection with the prosecution of the related '403 Application.[1287]

13.     On May 14, 2018 – still without the benefit of the Examiner's construction of "planar portion" rejections in the '403 Application – LNC appealed the Magistrate Judge's Claim Construction Memorandum Ruling objecting to the Magistrate Judge's refusal to consider the extrinsic evidence of the dictionary definition of "planar" as "flat and not curved" and presenting arguments based on both the intrinsic and extrinsic evidence of which LNC was aware at the time.[1288]  Had LNC been informed about the USPTO's rejection in the '403 Application that included the lack of specification support for "cambered" and the definition applied to "planar portion", it would have relied on this information in its briefing.[1289]  In opposing LNC's Appeal and despite having knowledge of what was transpiring in the prosecution of the '403 Application, EZPZ persisted in arguing against LNC's assertion that "planar" should be construed as "a flat surface, one that is not curved."[1290]  Additionally, EZPZ failed to bring the '403 Application to the Court's attention, much less disclose its existence to LNC in response to the outstanding and unsupplemented discovery responses.[1291]

> **b.     EZPZ's Failure to Disclose the '403 Application Deprived LNC of Pertinent Invalidity Arguments.**

1.     In addition to rejecting the claims under § 112 as indefinite, on November 13, 2017 the Examiner also rejected all claims (1-16) of the '403 Application under 35 U.S.C. 102(a)(1) as

---

[1287]     Dkt. No. 832 (Transcript Volume III), at 359:6-359:13.

[1288]     Dkt. No. 115, at p. 12.

[1289]     Dkt. No. 832 (Transcript Volume III), at 359:20-360:18.

[1290]     Dkt. No. 122, at pp. 11-13.

[1291]     Dkt. No. 832 (Transcript Volume III), at 359:6-359:13.

being anticipated by Webb.[1292]  Had LNC been aware of this rejection, LNC could have pointed to the '403 Application as additional support for its claim that the '903 Patent was invalid in light of Webb.

2.      On February 13, 2018, Mr. Williams, on behalf of Mrs. Laurain, filed a response to the non-final rejection in the '403 Application.  Mr. Williams argued Webb was not a pertinent reference because Webb allegedly "relies on a 'deformable mat portion' and a 'suction cup' to enable securement of his device to an underlying surface."   Additionally, Mr. Williams argued Webb "requires elastic rebound of his device to create a low pressure volume…" and because "Webb teaches a distinct and contrary operation, requiring distinct and mutually exclusive structure, to effect securement of his device to a surface, Applicant respectfully suggests Webb cannot anticipate Applicant's device."[1293] Nevertheless, Mr. Williams amended the pending claims to remove the term "cambered."  "However, Applicant has amended the claims to remove referenced to the word 'cambered.'"[1294]

3.      On May 15, 2018, the Examiner issued a final rejection.  The Examiner rejected claims 5-10 and 16 under 35 U.S.C. 112 as being indefinite. Additionally, the Examiner rejected claims 1-3, 5-7, 11-13, and 16 under 35 U.S.C. § 102 as being anticipated by U.S. No. 2007/0254134 ("Han") in view of "Air Pressure_The Atmospheric Mat," published by George Mehler on May 31, 2012 (www.youtube.com/watch?v+2x3Xm9jIaDM) ("Mehler").[1295] Finally, the Examiner

---

[1292]     Trial Exhibit 281 at EZPZ301177-179.

[1293]     Trial Exhibit 281 at EZPZ301139-141.

[1294]     Trial Exhibit 281 at EZPZ 301158.

[1295]     Trial Exhibit 281 at EZPZ301106-108; Trial Exhibit 372.

rejected claims 4, 8-10, 14, and 15 under 35 U.S.C. § 103 as being obvious and unpatentable over Han in view of U.S. No. D516,255 ("Maguire").[1296]

4.      The Examiner considered Mr. Williams and Mrs. Laurain's arguments and response, but found them to be "moot" because they did not apply to the references used in the current final rejection.[1297]

5.      On August 14, 2018, Mr. Williams, on behalf of Mrs. Laurain, filed a response to the final rejection arguing against the Examiner's rejection under 35 U.S.C. 102 because "the fact that a certain result or characteristic may occur or be present in the prior art is not sufficient to establish the inherency of that result or characteristic" and "[t]here must be teaching in the reference itself to support the inherency claimed."  Additionally, Mr. Williams argued "Mehler [] teaches away from any receptable integrated into a upper surface of his mat", "expresses no desirability of integrating a raised perimeter defining at least on receptacle into the upper surface of his mat", "is concerned with graspability to illustrate a physical concept", and "there is no motivation to support the combination with Han because Han offers no teaching of surface contact self-sealing and neither does Mehler prefer use of the mat as a feeding mat having receptacles integrated into an upper surface thereof."[1298]

6.      On September 13, 2018, the Examiner issued an advisory action, stating the following with respect to the rejection under 35 USC § 102:

> Han in view of Mehler is not a combination.  Mehler is introduced to teach the effect that atmospheric pressure has on the surface of a mat. Han alone teaches every element of the claimed invention (identical invention as contained in the claim).  The Mehler reference provides a basis in fact to reasonably support the determination that the allegedly inherent characteristic necessarily flows from the teachings of the applied prior art without any

---

[1296]    Trial Exhibit 281 at EZPZ301109.

[1297]    Trial Exhibit 281 at EZPZ301110.

[1298]    Trial Exhibit 281 at EZPZ301091-093.

optimization of conditions…If a person used the device of Han in the claimed manner, i.e., with surface contact between the bottom of the mat and an underlying surface and the lifting forced applied to the mat, the claimed self-seal inherently results.[1299]

7.      On September 13, 2018, a telephonic Applicant Initiated Interview was conducted wherein the Applicant requested a further discussion on the inherent properties of the applied prior art, setting an interview for September 17, 2018.[1300]

8.      On September 17, 2018, a telephonic Applicant Initiated Interview was conducted wherein Mr. Williams "argued that the secondary reference used to provide evidence of inherent characteristics of Han is improper" and that "Han does not teach a suffuse undersurface." However, the Examiner "held that because Han teaches the same structure as claimed that the silicone mat of Han inherently would function the same given the same situation as required by the instant invention (i.e., the mat must be spread such that there is no air underlying the mat)." Additionally, because "Han and Applicant's mat both have flat undersurfaces, applicant provides no particular structural characteristic to the undersurface other than showing that the undersurface is flat." Finally, no agreement was made, and "[b]ecause both Han and the instant application teach a silicone mat with a flat undersurface and molded receptacles, Examiner maintained that Han inherently would perform the same function."[1301]

9.      On November 5, 2018, Mr. Williams, on behalf of Mrs. Laurain, expressly abandoned the '403 Application before publication of the '403 Application.[1302]

10.     LNC had no knowledge of the existence of the '403 Application and the myriad rejections of the pending claims during the dispositive phase of this litigation. Had LNC been

---

[1299]      Trial Exhibit 281, at EZPZ301073-074.

[1300]      Trial Exhibit 281, at EZPZ301069.

[1301]      Trial Exhibit 281, at EZPZ301064-066.

[1302]      Trial Exhibit 281, at EZPZ301055-056.

aware of and provided copies of the prosecution history of the '403 Application, and therefore, knowledge of the rejections, including the rejections based on Han and Maguire, LNC could have and would have made additional invalidity arguments to the Court.[1303]

11.     As such, EZPZ deprived LNC, and, ultimately, the Court of access to the '403 Application during discovery including the claim construction and dispositive motion phases of this litigation.

### 5.     Mrs. Laurain Altered Invoices Sent to Hip Mommies During this Litigation Although She Had a Duty to Preserve Such Evidence

1.     Joseph Chua, the founder of Hip Mommies, Inc., submitted a declaration to the USPTO stating the following:

> WHEREAS sales of the same surface contact self-sealing integrated tableware and dining mat appear to be derived chiefly from the remarkable self-sealing property the instant mat exhibits upon demonstration, whereby sales are consistent without a need for extensive advertising or branding whatsoever;[1304]

2.     However, EZPZ invoiced Hip Mommies significant sums for "Brand & Marketing Promotions," including in Invoice Nos. 148, 149, 150, 157, 168, and 247.[1305]  In an email sent to Mrs. Laurain with the subject line "duty rates," Mr. Chua had asked for invoices for branding and marketing as early as January 2015, believing the marketing fees were "legitimate."[1306]

3.     The existence of invoices entitled "Brand/Marketing Promotions" or "Marketing & Brand Promotion," as well as Mr. Chua's acknowledged and stated belief to Mrs. Laurain that such

---

[1303]     Dkt. No. 832 (Transcript Volume III), at 360:14-361:23.

[1304]     Trial Exhibit 122.

[1305]     Trial Exhibit 320.

[1306]     Trial Exhibit 734; Trial Exhibit 893.

invoices were "legitimate," is directly contrary to Mr. Chua's declaration submitted by Mrs. Laurain to the USPTO.[1307]

4.      On January 24, 2017, long after the duty to preserve evidence in this case had been established, and after LNC had alleged declarations Mrs. Laurain had submitted to the USPTO were false, Mrs. Laurain altered six Hip Mommies' invoices to change the description of the invoiced services from "Brand & Marketing Promotions" to "International: Canada Split."[1308] Mrs. Laurain did not preserve Invoice Nos. 148, 149, 150, 157, 168, and 247 in their original form.

5.      During her deposition held June 28, 2019, Mrs. Laurain denied altering the invoices, testifying as follows:

> Q. Okay. Did you, Ms. Laurain, go in and change the reference to brand and marketing on [Invoice] 148[?]
>
> A. It's not my -- No, I have no recollection of doing that. And so I don't know why it's titled -- some of them are titled international Canada split and some brand and marketing. I've gone through and looked at, like, every invoice, every trail, every [edit and sent] you guys [stuff] so I don't know why they're labeled -- some are labeled that and some aren't.[1309]

6.      After Mrs. Laurain gave the foregoing testimony, she was forced to admit that she had, in fact, altered one of the invoices, Invoice No. 247, on January 24, 2017 to remove the words "Brand & Marketing Promotions" and replace them with the words "International: Canada split."[1310]  She pointed to her own e-mail stating the change was made for "internal accounting

---

[1307]    *Compare* Trial Exhibits 734 ("We do have a legitimate argument that half the cost I pay you is marketing etc.") and 893 (noting there was a lack of marketing with a previous supplier but in this case it "could be interpreted as legitimate") *with* Trial Exhibit 122 ("sales are consistent without a need for extensive advertising or branding whatsoever").

[1308]    Trial Exhibit 320.

[1309]    Dkt. No. 826-6 (Laurian 2019 Depo.), at 36:15-37:8.

[1310]    Dkt. No. 826-8 (Laurain 2019 Depo.), at 58:15-60:5; *see also* Dkt. No. 324-17.

reasons," but she could not recall what those alleged "internal accounting reasons" were.[1311]  Ms. Laurain did not correct her earlier testimony that (a) "nothing was done" to the invoices[1312] and (b) she did not know why some invoices said "Brand & Marketing Promotions" and others said "International: Canada split."[1313]

7.      After obtaining Mrs. Laurain's admission that one of the invoices had been altered, LNC asked EZPZ to stipulate that EZPZ Invoice Nos. 148, 149, 150, 157, 168, and 247 to Hip Mommies, Inc., when originally created and sent to Hip Mommies, Inc., charged an amount for "Brand/Marketing Promotions" or "Marketing & Brand Promotion," that Mrs. Laurain on behalf of EZPZ altered the invoices to replace those words with "International: Canada Split," and that EZPZ did not preserve original copies of the EZPZ Invoices in their original form.[1314]  EZPZ refused.[1315]

8.      After LNC filed a Motion for Sanctions Due to Spoliation of Evidence (Dkt. No. 324), however, and notwithstanding her prior testimony under oath that "nothing was done" to the invoices,[1316] Mrs. Laurain submitted a declaration admitting she had altered those very invoices. She explained how, but not why, the alterations occurred.[1317]

9.      The Court does not find Mrs. Laurain's testimony given during her June 28, 2019 deposition concerning her lack of knowledge about the alterations of the Hip Mommies invoices to be credible.  Neither EZPZ nor Mrs. Laurain offered any explanation as to why Mrs. Laurain

---

[1311]    Dkt. No. 324-16 at 59:17-60:5.

[1312]    Dkt. No. 324-16 at 47:2-47:23.

[1313]    Dkt. No. 826-6 (Laurian 2019 Depo.), at 36:15-37:8.

[1314]    Dkt. No. 324-1, at pp. 10-11.

[1315]    *See id.*

[1316]    Dkt. No. 324-16 at 47:2-47:23.

[1317]    *See* Dkt. #334-2.

was unable to admit on June 28, 2019 that she had altered the invoices in question given that she had "gone through and looked at, like every invoice, every trail, every [edit],"[1318] but then only two months later, after LNC filed its Motion for Sanctions, was able to admit to the alteration of the invoices in question and to explain exactly how (but not why) the alterations occurred.  The Court finds that EZPZ would have entered into the stipulation requested by LNC had it been forthcoming about the alteration of the invoices.

10.     Unable to obtain the invoices in their original form from EZPZ because Mrs. Laurain altered invoice Nos. 148, 149, 150, 157, 168, and 247, LNC was forced at great expense and only after having to seek a court order, to obtain the invoices from Hip Mommies, Inc., EZPZ's exclusive Canadian distributor.[1319]

### 6.     EZPZ Submitted a Fraudulent Assignment to the USPTO

1.     EZPZ represented to this Court that Mrs. Laurain orally assigned her intellectual property rights to EZPZ on April 10, 2014.[1320]  However, the evidence at trial establishes there was no such oral assignment of Mrs. Laurain's patent rights to EZPZ in 2014.[1321]

2.     On June 7, 2016, just days after this lawsuit was filed, Tim McCarthy, a patent attorney who provided his opinions relative to the prosecution of the '903 Patent, sent Mrs. Laurain a draft assignment purporting to assign the D327 Patent to EZPZ.  Although Mrs. Laurain testified it was always her intention to assign her intellectual property rights to EZPZ, she admitted that

---

[1318]     Dkt. No. 826-6 (Laurain 2019 Depo.), at 36:15-37:8.

[1319]     Trial Exhibit 666 and 896 (affidavit filed in Canadian proceedings).

[1320]     Dkt. No. 779 at p. 5.

[1321]     *See*, ns. 1322-1324, *infra*.

on June 7, 2016, she emailed Mr. Williams asking him whether he was okay with her assigning her patents over to EZPZ because LNC was suing her individually.[1322]

3.      On June 9, 2016, Mrs. Laurain emailed Mr. Williams again asking whether he had transferred her intellectual property rights over to EZPZ, noting she "seriously need[s] everything in" EZPZ.[1323]

4.      On September 27, 2016, while Mrs. Laurain was in negotiations with Stokke for the purchase of EZPZ, Jordan Bolton of Clark Hill APLC (EZPZ's outside general counsel at the time) represented in an email that Mrs. Laurain was copied on that Mrs. Laurain was "in the process of assigning the intellectual property to" EZPZ.[1324]

5.      On October 9, 2016, Mrs. Laurain filed with the USPTO, an assignment stating she had "orally assigned" her patent rights on April 10, 2014.[1325]  However, as evidenced by the earlier emails, no such oral assignment had, in fact, occurred.

#### 7.      EZPZ and Mrs. Laurain Repeatedly Made Misrepresentations to LNC and the Court.

1.      Following EZPZ's waiver of the attorney-client and patent agent privilege, LNC served its Third Set of Interrogatories upon EZPZ requesting the identification of all patent agents and/or attorneys with whom Mrs. Laurain communicated with regarding the prosecution of the '903 Patent and those who were involved directly in the prosecution of the '903 Patent.  On January 24, 2020, EZPZ provided responses verified by Mrs. Laurain that failed to identify Brenda Speer of Brenda L. Speer, LLC as one of the attorneys who provided patent advice to

---

[1322]      Trial Exhibit 801.  *See also* Dkt. No. 833 (Transcript Volume IV), at 484:23-485:25.

[1323]      Trial Exhibit 803.

[1324]      Trial Exhibit 211.

[1325]      Trial Exhibit 751.

Case 3:16-cv-00777-TAD-JPM   Document 847   Filed 11/22/21   Page 238 of 254 PageID #: 41646

Mrs. Laurain.[1326]   However, the evidence at trial establishes that Mrs. Laurain provided Ms. Speer with her first patent search,[1327] a printout of the Webb Patent and other utility patents Mrs. Laurain discovered,[1328] a PowerPoint presentation containing a slide that features the photographs of the Lee Dog Bowl Mat,[1329] and a second PowerPoint presentation identifying similar products on the market.[1330]   In addition, the evidence at trial establishes that Ms. Speer told Mrs. Laurain a utility patent was not "feasible."[1331]

2.      Additionally, in the verified responses, EZPZ materially downplayed Clark Hill's involvement in the prosecution of the '903 Patent, stating that "Laurain spoke with Clark Hill attorneys prior to retaining WIP but hired WIP to prosecute the patent."[1332]   The evidences at trial establishes that Mrs. Laurain entered into an attorney-client relationship with Clark Hill[1333] and Mrs. Laurain provided Mr. Bolton and Mr. McCarthy with her patent searches,[1334] called Mr. Bolton's attention to the Lee Dog Bowl Mat,[1335] called Mr. Bolton and Mr. McCarthy's attention to the Platinum Pets Mat,[1336] received advice that her product "was not patentable because the

---

[1326]    Trial Exhibit 609.

[1327]    Trial Exhibit 3.

[1328]    Trial Exhibits 4 and 5.

[1329]    Trial Exhibit 7.

[1330]    Trial Exhibit 9.

[1331]    Trial Exhibit 19.

[1332]    Trial Exhibit 609.

[1333]    Trial Exhibit 23.

[1334]    Trial Exhibits 17 and 20.

[1335]    Trial Exhibit 19.

[1336]    Trial Exhibits 24 and 25.

-231-

5328032_1

dog mat is prior art,"[1337] and the Clark Hill attorneys were heavily involved in the March 9, 2016 submission to the USPTO.[1338]

3.      EZPZ represented to this Court on October 28, 2019 that "EZPZ has no knowledge… of how the[] invoices were used for Hip Mommies' accounting or import tax purposes."[1339]  The Court finds the evidence at trial establishes EZPZ's representation that it had "no knowledge" of how these invoices were used is not credible in light of the exchange of emails between Mr. Chua and Mrs. Laurain in January 2016 entitled "duty rates" establishing the "dummy" invoice arrangement among which is one email where Mrs. Laurain expressly stated, "Let's do it!"[1340] Moreover, and even if Mrs. Laurain truly did not recall the "duty rates" emails from three years prior, just one month before making the above representation to this Court, in an email dated September 24, 2019 from Mrs. Laurain to Mr. Chua, Mrs. Laurain demanded he "immediately begin taking action with the Canadian Import Authorities…to correct inaccuracies in reporting cost of goods."[1341]  EZPZ's "no knowledge" representation to this Court was false.

4.      In an effort to get LNC's claims against Mrs. Laurain dismissed, she submitted an affidavit dated March 23, 2017 to the 4th Judicial District Court Parish of Ouachita stating the only contact she had with Louisiana was through EZPZ and the contact was "limited to sales of products by [EZPZ] to residents in Louisiana."[1342]  Yet, Mrs. Laurain had directed Mr. Williams

---

[1337]   Trial Exhibit 86.

[1338]   *E.g.*, Trial Exhibit 109; Trial Exhibit 498; Trial Exhibit 502; Trial Exhibit 650.

[1339]   *See* Dkt. No. 419-1, at p. 6.

[1340]   Trial Exhibits 734 and 893.

[1341]   Trial Exhibit 321.

[1342]   Trial Exhibit 259.

to send a cease and desist letter, based on the patent application owned by Mrs. Laurain and not EZPZ, to LNC in Monroe, Louisiana.[1343]  The statement in her declaration was, therefore, false.

5.      On October 17, 2019, in opposing LNC's Motion for Partial Summary Judgment of Invalidity of the '903 Patent for Failure to Disclose Material Prior Art and Dismissal of Infringement Counterclaims (Counts I and XII), EZPZ asserted (without any factual basis), that the Tommee Tippee Mat used at Mrs. Laurain's 2019 deposition was a "new iteration" and that the version Mrs. Laurain had in 2014 was "nothing like th[e] modern [Tommee Tippee] product."[1344]  These are clear misrepresentations to the Court because Mrs. Laurain, EZPZ's sole member, has no idea why this allegation was made.[1345]  In fact, Mrs. Laurain recognized that "all" of the Tommee Tippee Mats are the "same."[1346]  Moreover, as evidenced at trial, the Tommee Tippee Mat used at Mrs. Laurain's deposition was actually manufactured in 2010 as evidenced by the visible markings on both the mat itself and the packaging.[1347]

6.      In that same Opposition brief, EZPZ likewise misrepresented to the Court that the '682 Application was Mr. Williams "first patent filing."[1348]  However, Mr. Williams testified at trial "[i]t wasn't the first."[1349]

7.      During trial, Mrs. Laurain misrepresented to this Court that she did not purchase her version of the Tommee Tippee Mat from the United Kingdom.[1350]  However, the evidence,

---

[1343]    Trial Exhibit 144.  *See also* Trial Exhibit 141.

[1344]    Dkt. No. 383-1, at p. 6.

[1345]    Dkt. No. 833 (Transcript Volume III), at 420:2-420:17.

[1346]    Dkt. No. 833 (Transcript Volume III), at 419:8-420:1.

[1347]    Dkt. No. 832 (Transcript Volume III), at 337:16-338:10.

[1348]    Dkt. No. 383-1, at p. 11.

[1349]    Dkt. No. 834 (Transcript Volume V), at 791:22-792:24.

[1350]    Dkt. No. 833 (Transcript Volume IV), at 421:19-421:23.

-233-

including the serial manufacturing number[1351] and Mrs. Laurain's email from Amazon UK showing her interest in the Tommee Tippee Magic Mat from the United Kingdom,[1352] establishes that Mrs. Laurain ordered the Tommee Tippee Mat folded in a box from the United Kingdom to give to her counsel, Brian Tobin, for purposes of this litigation.[1353]

8.      Although EZPZ internally referred to the letters sent to Nuby as "cease and desist letters,"[1354] EZPZ represented to this Court on August 14, 2020 that these were simply "notice letters" to place LNC on notice of EZPZ's pending patent application.[1355]

### 8.      EZPZ's 30(b)(6) Designee Provided Misleading and False Deposition Testimony

1.      EZPZ's former general counsel,[1356] Mr. Garthe, testified as EZPZ's Rule 30(b)(6) representative on January 31, 2019.[1357]

2.      When asked about the purpose of the "dummy" invoices EZPZ provided to Hip Mommies, Mr. Garthe claimed that the invoices were referring to invoicing to update the recordkeeping that had not been done in 2015.[1358]  The evidence at trial offers no support for this explanation and instead establishes that Hip Mommies wanted to reduce the amount of import tax by claiming deductions for branding and marketing services provided to it by EZPZ.[1359]

---

[1351]   Dkt. No. 835 (Transcript Volume VI), at 1011:10-1012:24.

[1352]   Trial Exhibit 979.

[1353]   *See, supra*, Section I.A.4.b.

[1354]   Trial Exhibit 923, at EZPZ0143552.

[1355]   Dkt. No. 621, at p. 14.

[1356]   Dkt. No. 836 (Transcript Volume VII), at 1306:8-1306:19.

[1357]   Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 10:21-11:1.

[1358]   Dkt. No. 844 (G02 and G03).

[1359]   Trial Exhibits 734 and 893.

3.      Mr. Garthe claimed lack of knowledge as to whether Mrs. Laurain found the Tommee Tippee Mat during her initial prior art research.[1360]  Yet, the evidence at trial establishes Mrs. Laurain knew of the Tommee Tippee Mat before the filing of the '682 Application.[1361]

4.      Mr. Garthe testified that EZPZ did not retain BL Speer and Associates to provide patent advice.[1362]  The evidence at trial establishes that Mrs. Laurain did in fact seek patent advice from Ms. Speer[1363] and that, among other things, Ms. Speer advised Mrs. Laurain that it would not be feasible to obtain a utility patent.[1364]

5.      When asked to identify the published '823 Application, Mr. Garthe claimed to be "confused" by the publication and indicated a lack of familiarity.[1365]  Yet, the evidence at trial establishes that Mr. Garthe actually was heavily involved in the related patent prosecution matters including the '823 Application.[1366]

6.      In light of the foregoing and considering the duties imposed upon a Rule 30(b)(6) representative, the Court finds that EZPZ impeded LNC's efforts to obtain extremely crucial information to which it was entitled.

### 9.      EZPZ Strung LNC Along During Settlement Negotiations to File a Separate Lawsuit in Michigan

1.      On August 16, 2016, Mrs. Laurain told Mr. Bolton "SO I have decided I don't think I want to settle. I think a lot will depend on what happens with Stokke but if we end up selling we

---

[1360]      Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 147:3-147:17.

[1361]      Trial Exhibit 7, at Brenda Speer 000039.

[1362]      Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 60:23-62:16.

[1363]      Trial Exhibits 3, 4, 5, and 7.

[1364]      Trial Exhibit 19.

[1365]      Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 93:3-94:6; Trial Exhibit 490.

[1366]      *E.g.*, Trial Exhibits 261, 479, and 641.

will have the $ to fight this thing. I want to do a documentary and it will be much better if we can use Nuby's name and destroy them :)" [1367]

2.      In response, Mr. Bolton stated the following: "Let me do what I can to keep this on a morphine drip for a bit to see if the patent clears and see how Stokke progresses." [1368]

3.      Mrs. Laurain agreed, and responded with the following: "perfect about your asks, get a sample and let's just string them along. Can you say that we are rethinking settling and may pursue litigation as our client has never threatened anyone about suing and we believe your invention is a blatant copy of our clients. :)" [1369]

4.      Mr. Bolton recognized that if they "string them along, the best bet is for [him] to let them think settlement is possible, but keep asking for more information…"[1370]

5.      EZPZ hoped "to drag the lawsuit up to [Michigan] by filing a suit in [Michigan]."[1371]

6.      While LNC and EZPZ were engaging in settlement negotiations, EZPZ requested an extension of time to file an Answer to LNC's Complaint in this case that was unopposed by LNC.  EZPZ made the request for the extension so that it could file a secret sealed Complaint against LNC in the Eastern District of Michigan.[1372]  Mr. Bolton was the lead litigation attorney for the Complaint filed in Michigan.[1373]

---

[1367]    Trial Exhibit 202.

[1368]    *Id.*

[1369]    *Id.*

[1370]    Trial Exhibit 202.

[1371]    Trial Exhibit 971.

[1372]    Trial Exhibits 975, 223 and 225.

[1373]    Dkt. No. 833 (Transcript Volume IV), at 512:21-512:24.

7.      Despite LNC and EZPZ's ongoing settlement communications and the pending Complaint in this case, Mr. Bolton and EZPZ did not notify counsel for LNC of the sealed Michigan Complaint.[1374]

8.      The Court finds that Mrs. Laurain and EZPZ never had any desire to settle with LNC and engaged in improper litigation tactics to "string" LNC along such that EZPZ could file a sealed Complaint in Michigan without notifying LNC.

### 10.      EZPZ Engaged in Pre-Litigation Business Misconduct

1.      On March 26, 2016, EZPZ posted on a Nuby blogger's Instagram account that the Nuby Sure Grip product is "actually a copy" and "violates our utility patent!"[1375]   However, at that time not only did EZPZ not have a utility patent,[1376] but it had not yet been assigned to EZPZ.[1377]

2.      On April 25, 2016, Ms. Laurain suggested to the private EZPZ Facebook group that they start a "boycott Nuby Group."[1378]

3.      Although EZPZ attempted to argue that the "boycott" was directed towards Nuby-UK and not Nuby USA,[1379] Mrs. Laurain told her EZPZfun private Facebook group that she wanted to "go after" and "really fight" Nuby USA for "launching their 'sure grip plate'" months before her utility patent issued.[1380]

---

[1374]      Dkt. No. 836 (Transcript Volume VII), at 1295:14-1296:12.

[1375]      Trial Exhibit 127.

[1376]      *See* Trial Exhibit 220 (stating the '903 Patent issued on October 11, 2016))

[1377]      Trial Exhibit 584.

[1378]      Trial Exhibit 137.

[1379]      Dkt. No. 834 (Transcript Volume V), at 779:8-780:1.

[1380]      Trial Exhibit 126.

4.      On April 26, 2016, Ms. Laurain told Robin Cochran that she was "Thinking [they] should start a BOYCOTT NUBY campaign."[1381]

5.      On April 25, 2016, Mrs. Laurain posted in the private EZPZ Facebook group" "Should we start a boycott Nuby Group? ... Fingers crossed our Utility Patent goes through this summer."[1382]  On April 27, 2016, Mrs. Laurain again posted in the private EZPZ Facebook group that she was "Kinda getting serious about a Nuby Boycott?!!! Come on Patent"[1383]  Thus, Mrs. Laurain wanted to obtain a patent to bring an infringement claim against LNC.[1384]

6.      On April 27, 2016, Mrs. Laurain emailed Mr. Grayson (The Baby Guy) that she was "honestly thinking about starting a Boycott Nuby Campaign."[1385]

7.      On April 28, 2016, working with Jennifer Chua, Mrs. Laurain helped create the boycott Nuby graphic:[1386]

---

[1381]   Trial Exhibit 557.

[1382]   Trial Exhibit 137.

[1383]   Trial Exhibit 556.

[1384]   *See* Trial Exhibits 126, 137, and 179.

[1385]   Trial Exhibit 152.

[1386]   Trial Exhibit 730; Trial Exhibit 555; Trial Exhibit 554. *See also* Trial Exhibit 163 (Mrs. Laurain ask-ing Ms. Holland, an EZPZ employee, to add "heart ezpz" in "white cursive").



8.      On April 28, 2016, Ms. Laurain sent the boycott Nuby graphic to Jamie Grayson's (The Baby Guy's) sister in the hopes that he would post it on social media, where he had several thousand followers.[1387]

9.      On April 28, 2016, Mrs. Laurain sent the boycott Nuby graphic to Brian Dickman, who owns a workspace and has participated in inventor events.[1388]

10.     On April 29, 2016, Mr. Grayson posted the boycott Nuby graphic to his thousands of followers on Twitter:[1389]

---

[1387]      Trial Exhibit 155, at EZPZ0076599; Trial Exhibit 153 ("just sent to jamie").

[1388]      Trial Exhibit 162; *see also* Dkt. No. 833 (Transcript Volume IV), at 491:19-492:5.

[1389]      Trial Exhibit 559.



11.     After Jamie Grayson, the Baby Guy, tweeted the Boycott Nuby graphic, Mrs. Winkelmann informed others on the EZPZ team that she was going to respond to the postings on Twitter about the "knockoff from Nuby" by thanking, loving and retweeting, which she did with the Baby Guy's tweet which she retweeted on EZPZ's Twitter account and stated, "Thank you, Jamie, for the support and love.  So appreciate it."[1390]

12.     On April 29, 2016, Mrs. Laurain, using her EZPZ e-mail account, also requested that the producer of Shark Tank post the boycott Nuby Graphic.[1391]

13.     On April 29, 2016, Mrs. Laurain sent the boycott Nuby Graphic to the Florida PieLady stating she could "share this."[1392]

---

[1390]    Trial Exhibit 165; Trial Exhibit 983; *see also* Dkt. No. 836 (Transcript Volume VII), at 1514:18-1515:22.

[1391]    Trial Exhibit 173.

[1392]    Trial Exhibit 176; *see also* Dkt. No. 833 (Transcript Volume IV), at 489:13-490:2.

14.     At all relevant times, EZPZ did not have a utility patent.[1393] On April 27, 2016, when

Mrs. Laurain voiced concern about Nuby's Sure Grip Product, Mr. Bolton responded to Mrs.

Laurain and Mr. Williams as follows:

> I understand the frustration.  Unfortunately, at present, I haven't seen anything actionable
> from these guys.  On the plus side, they're apparently targeting a different market
> segment from a socioeconomic basis (*i.e.* BRU vs BBB).  If you extrapolate that out, they
> can have WalMart and you'll take Target.  Frankly, my suspicion is that folks shopping at
> BRU are not likely to spend $30 on the product.  I know that doesn't alleviate all of the
> issues, but it should offer you some limited comfort, while we wait for the utility to issue,
> so we can hit these guys aggressively.[1394]

15.     Despite Mr. Bolton's statement that there is nothing "actionable" at this time, Mr.

Williams and Mrs. Laurain still sent a cease and desist letter to the Nuby Louisiana address.[1395]

Mrs. Laurain admitted that on March 31, 2015, she asked Mr. Williams to remove the UK

information from the cease and desist letter sent to Nuby-UK to send to Nuby USA because it

was starting to launch its products.[1396]  Mrs. Laurain also requested Mr. Williams "drop a hard

copy in the mail."[1397] Although Mrs. Laurain tried to avoid referring to the letter as a "cease and

desist,"[1398] the letter undisputedly advises LNC to "cease and desist all sales activities."[1399]

16.     Notwithstanding the substantial documentary evidence showing Mrs. Laurain was in fact

involved in starting the boycott Nuby campaign, Mr. Garthe testified falsely that Mrs. Laurain

---

[1393]     *See* Trial Exhibit 220 (stating the '903 Patent issued on October 11, 2016).

[1394]     Trial Exhibit 144.

[1395]     Trial Exhibit 144; Trial Exhibit 145.

[1396]     Trial Exhibit 797; *see also* Dkt. No. 833 (Transcript Volume IV), at 486:1-486:25.

[1397]     Trial Exhibit 800.

[1398]     Dkt. No. 833 (Transcript Volume IV), at 486:21-487:4.

[1399]     Trial Exhibit 145.

was not involved,[1400] and Mrs. Laurain falsely testified that she was not involved.[1401] The contemporaneous documentary evidence identified herein discloses otherwise.

17.    Mrs. Laurain also told Dr. Jeremy Weisz during an Inspired Insider interview that "we had nothing to do with it" when referring to the social media attack campaign on Nuby.[1402]

18.    On several occasions, Mrs. Laurain has expressed animosity towards LNC, stating she wanted to "use Nuby's name and destroy them,"[1403] that she wanted to "fight Nuby,"[1404] and "Game F'ing on!"[1405]

19.    In addition to starting a boycott of all Nuby products and not  just Nuby's integrated feeding mats, EZPZ, through Mrs. Laurain sent a cease and desist letter to LNC[1406] and Nuby-UK[1407] despite knowing that it had engaged in inequitable conduct during the prosecution of the '903 Patent.

20.    Mr. Williams sent the cease and desist letters on behalf of EZPZ despite EZPZ having no rights to the pending application of the '903 Patent at that time.[1408]  Mrs. Laurain and Mr. Williams knew at the time they sent the cease and desist letters that only Mrs. Laurain had any valid rights to the pending application of the '903 Patent.[1409]

---

[1400]    Dkt. No. 826-8 (Garthe 30(b)(6) Depo.), at 134:14-134:17.

[1401]    Dkt. No. 833 (Transcript Volume IV), at 489:23.

[1402]    Trial Exhibit 360, at 46:39-47:00.

[1403]    Trial Exhibit 202.

[1404]    Trial Exhibit 675.

[1405]    Trial Exhibit 251.

[1406]    Trial Exhibit 141.

[1407]    Trial Exhibit 114.

[1408]    *See* Section II.A.6 (Fraudulent Assignment).

[1409]    *See* Section II.A.6 (Fraudulent Assignment).

### B.    CONCLUSIONS OF LAW

The Court, after conducting an 8-day Bench Trial, having received and considered the Findings of Fact and Conclusions of Law submitted by the respective parties, having taken judicial notice of pleadings filed in connection with the issue of unclean hands (Dkt. Nos. 363 and 578), having conducted a review of all of the facts in the case, having consulted with the Technical Advisor who was present throughout the entire Bench Trial, after having considered the demeanor and assessed the credibility of witnesses, finds that EZPZ is barred from continuing to assert any remaining counterclaims in this action against LNC and Mr. Hakim and, therefore, all remaining counterclaims and those previous EZPZ counterclaims dismissed without prejudice are hereby dismissed with prejudice.  This includes, but is not limited to, EZPZ's counterclaims for infringement of the '903 Patent, infringement of the D327 Patent and unregistered product design trade dress infringement.  EZPZ's unclean hands is evidenced by the following evidence which LNC has established by clear and convincing evidence:

1.    The numerous instances of Mrs. Laurain's evasive and false testimony throughout discovery regarding her prior art searches and her knowledge of the prior art dog bowls.

2.    EZPZ's numerous instances of efforts to successfully block LNC from obtaining crucial evidence related to Mrs. Laurain's knowledge of prior art during the prosecution of the '903 Patent and during fact discovery in this action.

3.    EZPZ's failure to comply with Rule 26 of the Federal Rules of Civil Procedure in connection with responding to LNC's Requests for Production Nos. 13, 48, and 50 regarding the '823 Application, the '403 Application, the '976 Application, and the '824 Application.  In connection with EZPZ's failure to offer any explanation or excuse for failing to fully and timely comply with Rule 26, the Court makes the subsidiary findings that:

a. EZPZ offered no excuse or explanation at trial for failing to timely supplement its responses to disclose the filing of related continuation patent applications claiming priority to the July 17, 2014 filing of the '682 Application throughout fact which disclosure was not made until well after the completion of fact discovery, expert discovery and the dispositive motion phase of this action.

b. EZPZ offered no evidence at trial that it otherwise, during the course of discovery in this action, made the existence of one or more of the related continuation patent applications known to LNC or in writing in compliance with Rule 26 of the Federal Rules of Civil Procedure.

c. The Court finds that '403 Application and, in particular, that portion of the '403 Application prosecution history relating to the period during the claim construction phase of this action, including the First Office Action dated November 13, 2017 and the February 13, 2018 Amendment and Response, provides relevant and probative evidence on the proper legal interpretation of "planar portion" that, due to EZPZ's discovery violation, was not known by LNC or the Court at the relevant time.

d. The Court further finds that the entirety of the '403 Application prosecution history which has never been available to the public from the USPTO also presents relevant and probative evidence relating to the validity of the '903 Patent which evidence was not disclosed to LNC until well after the close of fact and expert discovery and completion of dispositive motion practice due to EZPZ's violation of its discovery obligations under Rule 26 of the Federal Rules of Civil Procedure.

-244-

4.      Mrs. Laurain's alteration of Invoice Nos. 148, 149, 150, 168, and 247 from "Brand/Marketing Promotions" or "Marketing & Brand Promotion" to "International:  Canada Split," and Mrs. Laurain's false and evasive testimony under oath that she did not alter the invoices and requiring LNC to pursue motion practice that ultimately forced Mrs. Laurain to acknowledge that she had altered these invoices as alleged by LNC.

5.      EZPZ's bad faith settlement negotiations with no intent to seek a resolution of the dispute in a successful effort to string LNC along in order to allow EZPZ to prepare and file a sealed Complaint in the Michigan District Court seeking temporary and preliminary injunctive relief while this case was pending and without providing notice whatsoever to LNC's counsel of record.

6.      Mrs. Laurain's and EZPZ's fraudulent misrepresentation to LNC and to the Court regarding assignment of patent rights and Mrs. Laurain's contacts with the State of Louisiana when the contemporaneous documentary evidence establishes that there was never a verbal assignment of patent rights in April 2014 or any consideration of assignment until just before the issuance of the '903 Patent.

7.      EZPZ's multiple misrepresentations to LNC and the Court recounted elsewhere herein as further evidence litigation misconduct.

8.      Mr. Garthe's false and misleading testimony, as EZPZ's Rule 30(b)(6) designee recounted elsewhere herein.

9.      Mrs. Laurain's and EZPZ's pre-litigation conduct recounted herein including, but not limited to, asserting that LNC's products infringed the '903 Patent well before it had issued and orchestrating and conducting a boycott campaign against all of LNC's products whether or not they had any connection to the subject matter of the '903 Patent.

-245-

10.     In addition, the evidence of inequitable conduct and egregious affirmative misconduct perpetrated by Mrs. Laurain and Mr. Williams and the additional egregious affirmative misconduct perpetrated by Ms. Falcone and Mr. Bolton during the prosecution of the '903 Patent provide additional relevant evidence of unclean hands upon which this Court may rely in making its equitable determination.  While such evidence relates to conduct before the USPTO, it also, as outlined above in the section devoted to inequitable conduct and affirmative egregious misconduct, included numerous instances of unconscionable misconduct during this litigation in an effort to frustrate LNC's search for relevant facts, documents and testimony from EZPZ and its witnesses.

11.     Each and every one of the foregoing unconscionable acts of litigation misconduct have an immediate and necessary relation to the remaining counterclaims in this action asserted by EZPZ necessitating a dismissal, with prejudice, of all the remaining counterclaims asserted against LNC and Mr. Hakim.

     Respectfully submitted this 22nd day of November, 2021.

          Respectfully submitted,

          */s/  Carol Welborn Reisman*
          Carol Welborn Reisman (La. Bar No. 20410)
          George Denegre, Jr. (La. Bar No. 08387)
          Carey L. Menasco (La. Bar No. 28131)
          Melanie Derefinko (La. Bar No. 37658)
          **LISKOW & LEWIS, APLC**
          701 Poydras Street, Suite 5000
          New Orleans, LA  70139
          Telephone:        (504) 581-7979
          Facsimile:        (504) 556-4108
          Email: cwreisman@liskow.com
               gdenegre@liskow.com
               clmenasco@liskow.com
               mderefinko@liskow.com

          -and-

Hartwell P. Morse, III (Admitted *Pro Hac Vice)*
Robert M. Chiaviello, Jr. (La. Bar # No. 37370)
**Luv n' Care, Ltd.**
3030 Aurora Street, 2nd Floor
Monroe, LA  71201
Telephone: (318) 338-3603
Facsimile:         (318) 388-5892
Email:  hartm@nuby.com
             bobc@nuby.com

**Attorneys for Luv n' care, Ltd. and Nouri E. Hakim**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 22, 2021, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

 */s/  Carol Welborn Reisman*