## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

| | |
|---|---|
| **LUV N' CARE, LTD.** | Civil Action No.: 3:16-cv-00777 |
| *Plaintiff,* | Honorable Judge Terry A. Doughty |
| *v.* | |
| **EAZY-PZ, LLC,** | Magistrate Judge Joseph H. L. Perez-Montes |
| *Defendant.* | |
| | **JURY TRIAL DEMANDED** |

## EZPZ'S SUPPLEMENTAL POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR THE BENCH TRIAL ON INEQUITABLE CONDUCT

Eazy-PZ, LLC ("EZPZ") hereby offers the following supplement to its proposed Findings of Fact and Conclusions of law, pointing to the trial evidence in exhibits and testimony, as required by the Court on September 3, 2021 at the conclusion of the bench trial on inequitable conduct.

LNC's shotgun approach at every attorney, patent agent and person involved in the patent prosecution and attack on every piece of prior art, even if it was cumulative, demonstrates a lack of evidence of any particular act that can be shown by clear and convincing evidence to be inequitable conduct in the prosecution of the '903 Patent. Further, LNC's multiple criticisms of prior art that was actually submitted to the PTO, like Platinum Pets, demonstrates that LNC's evidence wholly fails to establish wrongful conduct of any kind.

LNC failed to prove that intent to deceive was the single most likely inference that can be made to explain why Mr. Ben Williams, the patent agent, and Ms. Lindsey Laurain, the founder of EZPZ, made the decisions and choices they did. To the contrary, viewing the complete exhibits

and live testimony establishes that EZPZ acted in good faith in prosecuting its '903 patent and this case, as shown in detail below.

## METHODOLOGY OF PRESENTATION

The findings of fact below restate the proposed findings previously provided. If a fact is expanded by trial testimony it is listed as the same fact with a dash, for example paragraph 17-1. The trial testimony or exhibit supporting each fact is then provided below the stated fact in blue ink so it can be readily distinguished from what was already provided to the Court. EZPZ tried not to duplicate facts, although they may be supported in more than one category.

Pages of trial exhibits are referenced by their bates label pages, followed by the page of their digital pdf document. For example, the reference to "Exhibit 245,  the '903 Patent File Wrapper, pp. LNC385466-469 (.pdf 351-354)" means that within trial exhibit 245 the LNC numbers at the bottom of the page are the bates numbers of the '903 Patent file wrapper, and the page numbers of the digital pdf document are found at pages 351-354.

Trial testimony is described by the abbreviation "Tr.T" Followed by the person testifying, the trial date the witness appeared, the page of the transcript and the line on that page. For example,  Tr.T, J. Kennedy, 9/1/2021, 908:1 to 909:13, means that the reference is the trial testimony of John Kennedy on September 1 at page 908 of the transcript starting on line 1 and continuing through to line 13 of the next page. Then, the testimony itself is copy-pasted after the reference. (Sometimes the testimony is bolded to more precisely show the part that supports the stated fact.)

## FINDINGS OF FACT

### Procedural History of '903 Patent

1.      On July 17, 2014, Ms. Laurain filed United States Patent Application No. 14/333,682 for Surface Contact Self-Sealing Integrated Tableware and Dining Mat. The application was assigned to examiner Elizabeth Volz; however, because Examiner Volz was not a primary examiner, certain actions required review, participation and sign-off by special patent examiner ("SPE") Fenn C. Mathew. *See,* Exhibit 245, the '903 Patent file wrapper and prosecution history as detailed below.

2.      As informed by PatentBots. SPE Mathew is a GS-15 employee with seventeen years of experience. SPE Mathew's grant rate over the past three years is 7%. As rated by Patent Bots, it has been "extremely hard" for applicants to get applications for patents allowed as patents by SPE Mathew.

[Tr.T, J. Kennedy, 9/1/2021, 908:1 to 909:13]

Q:  Is there a mechanism to see what an examiner's rate is of allowance of patents?
A:  **There's a website out there called Patent Bots, which is kind of neat because it provides statistics on examiners.**  It's been around for a few years now, about probably less then [sic] five. But they've collected with machine loading and artificial intelligence statistics on the examiners in terms of allowance rates, appeal rates, all sorts of interesting things.
Q:  Okay.  Mr. Kennedy, did you review Patent Bots with respect to Examiner Volz and Examiner Mathews?
A:  I did.
Q:  What about with respect to Examiner Mathews?
A:  So E**xaminer Mathews, my understanding was that he had a very low pass rate of less than 10 percent, a very low allowance rate**.  When I say "pass rate," I mean allowance rate

3.      The USPTO's first Office Action dated April 13, 2015 (the "First Action"). *See,* Exhibit 245, File Wrapper, LNC395229-242 (PDF 56-74).

4.      A second Office Action (the "Second Action") was issued on July 29, 2015. *See,* Exhibit 245, LNC395255-268 (PDF 90-109). New grounds of rejection were raised, with the previous grounds of rejection having been withdrawn. Specifically, the Examiners' new basis for

3

rejection was that claims 1-3 were obvious over U.S. Patent Publication No. 2003/0152736 ("Bass") in view of U.S. Patent No. 5,053,262 ("Kerr") and that claims 4-9 were obvious over Bass in view of Kerr and in further view of Lion. *See,* Exhibit 245, LNC395257-261 (PDF 92- 96).

5.      On August 26, 2015, Mr. Williams filed a response to the 2nd Action (the "Second Response"). *See,* Exhibit 245, LNC395269-278 (PDF 110-121). The Second Response references an interview between Mr. Williams, Examiner Volz and SPE Mathew, although a summary of the interview is not in the file history. As part of this Second Response, Mr. Williams argued:

   a.   "Subsequent an interview with Examiner Volz and Supervisor Mathew on August 26th, 2015, the claims were amended to better disclose the entirety of the suffuse undersurface on the planar portion whereby no suction cups or other irregularities or roughness is enabled. Applicant further defined the "at least one concavity" set forth in claim 1 as "surrounding at least one receptacle". Thus the self-sealing quality of the present invention only when attempts to separate the undersurface from an underlying surface is better enabled, whereby use of adhesives, suction cups, or other "active" means of adherence to a surface is obviated." *Id.*

6.      A third and final Office Action (the "Final Action") was issued on December 9, 2015. New grounds of rejection were again raised by the Examiners. The Examiners withdrew their rejection based on suction cups, as taught by Kerr, while maintaining their rejection based on the use of adhesives, as per Bass. (*See,* Exhibit 245, LNC395306 (.pdf 161), wherein response to Applicant's prior argument regarding Bass' teaching of the use of adhesives that "the addition of the adhesive does not prevent the invention from reading on the claim.")

   **[Tr.T, B. Williams, 9/1/2021, 820:15, 820:24 to 822:12]:**

   Q:  What is that?

A: And because Kerr was in combination with Bass, that's when we get into the third action because, in my recollection of that conversation, we **also agreed that adhesives were traversed as well.  But Mathew Fenn, supervisor Mathew Fenn disagreed with me in that respect.**

Q: What do you mean by that?

A: Well, he said that actually Bass's adhesive is a type of surface contact, self-sealing. And, therefore, we're going to keep Bass on the record.  If you go to -- you can see – you can see his comments exact -- or her.  I guess Volz wrote it. But you can see it in my notes too.  I think I took notes down about that. But, you know, at the end of the day --

Q: Go ahead.

A: **At the end of the day, the obviousness rejection was traversed by showing secondary considerations anyway.  So Bass -- Bass was traversed on other grounds.  I still disagree with his opinion that adhesives are relevant to this because I think an adhesive leaves a residue. And I don't think you can separate Bass by peeling action at the outer edge.  It doesn't come up effortlessly like the Happy Mat does.  So it's a useful improvement over the use of an adhesive.  An adhesive has to be exposed.  It renders single use only and it leaves a residue and it's got resistance to being taken up.**

Q: Okay.  So, like, what you're saying is that Bass that was like the bathroom --

A: No, that was Kerr because that was suction cups.  **Bass is just an adhesive.  Bass is like a placemat with an adhesive on the bottom.** You withdraw -- you remove a film and stick it like sticky tape.  And then when you rip it up, it's a single-use mat because the adhesive is used up and you throw it in the trash; and then you clean your table evidently because you have a residue on there.  It's sticky.  Right?

Q: Yeah.

A: **So to me that's an absolute clear, useful improvement over adhesive.** Nonetheless, it was traversed on other grounds when we get to the third action, if you want to go there.  I don't know.

7.     Examiner Volz and SPE Mathew conducted a second interview with Mr. Williams on December 18, 2015 (the "Second Interview"). *See,* Exhibit 245, LNC395312 (.pdf 170). An Interview Summary was prepared by Examiner Volz and provides that "the previous rejection was improper based on the Lion reference which fails to teach the self-sealing property. There was no agreement reached with Mr. Williams as to the disqualification of the Bass reference. The previous final rejection has been withdrawn and the affidavit will be entered when filed." *See,* Exhibit 245, LNC395312 (.pdf 170).

**[Tr.T, B. Williams, 8/31/2021, 838:23 to 840:8]:**

5

Q: So this is the one where the examiner made it final but then withdrew it?

A: Correct. So here we go. Look, this is great. The previous final rejection. This is the interview summary. And this is entered by Examiners Fenn and Volz. I don't know why she has Mathew on there. But "**The previous final rejection has been withdrawn** and the affidavit will be entered when filed." And this affidavit refers to the secondary considerations. I don't know why they put it like that. But --

Q: Okay. So this note --

A: Oh, and **there was no agreement reached with Mr. Williams as to the disqualification of the Bass reference right there.**

Q: Okay. And that's what you were just talking about?

A: Right. **It was improper based on Lion which fails to teach the self-sealing property. "There was no agreement with Mr. Williams on Bass." So after this, you'll see they're going to run another search. And you can see where Bowen is listed in there, and you can see where the other mats are listed in there.** But she didn't cite them against us because of the -- this portion down here. This is it. You're right in the right place. So it was filed on my birthday, of all days, right there, March 8th, 2016. **So this is all the secondary considerations right here. This is the appendices we filed. Here are my remarks, my arguments and my conclusion. So you'll see I argue against Bass still.** I mean, I don't think Bass was -- because, just like any proceeding, you've got to make all your arguments at once. You know, you can't just sort of do it later. **So I still disagree that Bass actually does, you know, read over the claims, I really do. I don't see how you can use an adhesive as a motivation for surface contact, self-sealing. I think the one replaces the other.** And I think because of the mat you don't really see any -- you won't see, I don't think, any feeding mat with an adhesive on it because it's not really necessary. You know, you don't need it anymore.

**[Tr.T, B. Williams, 9/1/2021, 1146:7-23]:**

MS. REISMAN: Exhibit 245.

Q: And if we look at the next page, page 170, **this reports on a conference, a videoconference held with Examiner Volz and Examiner Mathew. Right?**

A: **Correct. This is one where the videos were shared as well and links were shared too.** So, yeah, I remember this very well. **This is the one we talked about the secondary considerations of nonobviousness.**

Q: Well, let me just ask my questions, please.

A: Sorry, yep. You're right. Yep.

Q: The issues discussed regarded 103, Section 103 obviousness. Correct?

A: Yes. That was all that was remaining, correct.

Q: And the substance of the interview is reported here in the patent wrapper. Right?

A: Yeah, that's a very brief characterization entered onto the record by Examiner Volz, correct.

8.     During prosecution of what became the '903 Patent, EZPZ decided to support its patent application with secondary considerations. Given that Ben Williams, EZPZ's patent agent, had not before submitted evidence of secondary considerations to the PTO, EZPZ engaged the law firm of Clark Hill to assist Mr. Williams in his submission in approximately December 2015. Two attorneys were assigned to the matter—Jordan Bolton, Esq., an attorney who had served EZPZ before as a general business attorney and who served at this time offering general thoughts on the patent application and acted as a liaison with Tim McCarthy, Esq., and Mr. McCarthy who was a patent prosecutor.

**[Tr.T, B. Williams, 9/1/2021, 1026:1-18]**

Q:  **And do you recall whether or not Tim McCarthy of Clark Hill was involved in part in helping you with this process?**
A. **With the declarations? Yeah, absolutely.**
Q:  **And in what way?**
A:  **Well, when we were putting this filing together, it was kind of -- I'm thinking it was March of 2016 is when we filed. So we're talking about February, January. And I had my talk with Examiner Volz and Fenn, you know, November, wintertime anyway of the preceding year. So we were trying to put this together. It was certainly the first time I'd ever argued secondary considerations of nonobviousness.** And so there was a lot of stuff to do. So I was basically working on getting the argument together and preparing the filing. And I -- you know, 1301.132 declarations, in the manual and patenting examining procedure, it's a single paragraph. So it exceeds my competency. So I -- you know, **they were assisting in, I think, coordinating the whole package.**

**[Tr.T, B. Williams, 8/30/2021, <u>By Deposition</u> (6/17/20), 628:20 to 629:11, 629:13-18]**

Q:  (BY MS. MENASCO) Mr. Williams, before we took a break -- I did want to revisit some of your testimony. You testified with respect to the affidavits that were being prepared to support the secondary considerations. You referred to, I think, Tim McCarthy as the -- I think the big-time patent lawyer; is that right? I think those were your words.
A.  That -- that sounds like I might have said that. I was a bit het [sic] up, and I apologize; so, yeah. I mean, he is. He's a partner at a big firm; so, yes.
Q.  All right. And he has a great deal of patent experience; is that right?
A.  I would -- I think so, yes. I mean, I don't know about the prosecution side, but certainly on the -- you know, the litigation side.
Q.  **And is it fair to say, because of his experience, you were following his advice?**

7

**A.  I mean, I think that is fair to say.  It wasn't just him.  I mean, we were kind of a team**.  But he was the guy -- you know, the feeling for me was he was in charge.  And if I remember my, you know, rules and ethics class from before here, as the attorney -- the senior attorney, he kind of is in charge; so, yeah.

**[Tr.T, Clark Hill attorney J. Bolton, 9/2/2021, 1248:25 to 1249:23]**

Q:  Okay. And did Clark Hill have any indirect role in connection with the prosecution of EZPZ's patents?

A:  A bit.  So we -- we talked through the process early on, both Ms. Laurain and I; and Ms. Laurain, Mr. McCarthy and I; and then Mr. McCarthy and Ms. Laurain. **Ultimately, Ms. Laurain, EZPZ, through Ms. Laurain, decided to engage Ben Williams to prosecute the patent.  And then there were, I believe, two other points where EZPZ came back to us for some -- some assistance.  One was when they were considering taking the patent overseas entering, I think it's called, the national phase.  And then, too, when they were going through the secondary considerations.**

Q:  And then what was Clark Hill's role with going through the secondary considerations?

A:  **So Mr. McCarthy had some communications with Ms. Laurain and I believe Mr. Williams with respect to the declarations or affidavits being submitted in support of that filing**, if you will.  And my -- **personally I was asked to offer thoughts with respect to a survey** that was -- had sort of a dual purpose; one, being used for that process; and two, just being used as a general survey to gain insight into their customers -- EZPZ's customers and whatnot.  It was really wordsmithing type, you know, just offering grammar incites, and what have you.

**[Tr.T, J. Bolton, 9/2/2021, 1262:6-20]**

Q.  Did you think it was -- what did you think when you knew Mr. Williams was prosecuting the patent and they came back to Clark Hill to ask for help in the secondary considerations process?  Were you willing to do that?

A:  Of course.  I mean, we were willing to help as much or as little as EZPZ desired.  I mean, do you want me to go further than that or is that the answer that –

Q.  No.  Was there any reason you didn't want to help them?

A:  No.  No.  **We were happy to do as much or as little as they wanted.  The main driver for Mr. Williams' involvement, from my vantage point, was the cost.  In an effort to keep the spend down, let's have somebody less expensive do it.  Got to a part of the process where he felt like he needed some guidance, asked us to help on a limited basis to get him through that part of the process.**

9.      On March 9, 2016 Mr. Williams submitted a response to the Final Action (the "Final Response").  *See*, Exhibit 245, LNC395314-453 (.pdf 173-330).  In the Final Response,

numerous appendices providing declarations and other evidence was provided. Mr. Williams also

submitted various arguments.

**[Tr.T, B. Williams, 8/31/2021, 839:10, 839:20-22, 841:6 to  842:25 ]:**

Q: Okay. And that's what you were just talking about.
. . .

A: . . . M**arch 8th, 2016.  So this is all the secondary considerations right here.  This is the appendices we filed.  Here are my remarks, my arguments and my conclusion**.
. . .

Q:  So what are you thinking in terms of your patent application at this point in time?
A:  **At this point in time, I'm thinking we have massive commercial success.  If it was obvious, we wouldn't have that.  We have secondary considerations of nonobviousness. And before I submitted this, in that interview that you saw the summary of on August, I spoke with her about it.  We looked at the videos of the prior art.  I shared links to emails of third-party reviews and testimony on line,** some of which are in the record, but some of them aren't unfortunately. And this is my fault.  I realize this that the record is almost as important as the patent.  And this is something this litigation has taught me more than anything.  It's one huge takeaway for Ben Williams.  **But, nonetheless, a lot of discussion had happened.  And we were basically trying to do something that I read about in the MPAP that I didn't know how to do.  And I actually asked them, you know, I think we have secondary considerations of nonobviousness.  We have all this copying. Ms. Laurain was worried about the amount of copying, like, because it was eating into her sales. And it wasn't just derivative products.  It was counterfeit products.  They were putting her EZPZ mark on it. I mean, they were all over the place. There wasn't much we could do. So I was incentivized to talk to them about what we can do? And so we brought all this up, and they actually told me what to file, you know. They said, "Well, if you're going to show this, you need to show a nexus between the commercial success and the product itself.**  You're going to need to show evidence of copying in the market, and you're going to need to show, you know," batta, batta, batta. And we walked through the part of the MPAP.  I **actually took notes on that too, which is somewhere in the record.  But I have my notes from trying to do that.  And that's how we began putting this gigantic filing together.  So, yes, it is obvious at this point in time.  We don't have a final rejection, even though it says final.  We have a non-final because the finality was withdrawn**, and you saw that in the thing. So basically what would happen now, the fight is not over. **We have either a final rejection would come next.  That would be the worst case scenario.  We'd have a notice of allowance, which would be the best case scenario, or we'd have another non-final action based on new prior art from her third search that she did.**

10.     A Notice of Allowability was issued on September 9, 2016, in which the Office

indicates the issuance of the '682 Application is in response to the "arguments filed 3/9/16." *See*,

Exhibit 245, LNC395459 (.pdf 340).

[Tr.T, **B. Williams**, 8/31/2021, 843:1 to 844:13]

A    . . . A**nd she did not cite that prior art against us because she found the secondary considerations of nonobviousness to be persuasive.** Did she write that in the reasons of allowance? She didn't record reasons for allowance.  And, in my experience, 80 percent of examiners don't.  They're supposed to, but 80 plus percent of them do not.  So she did not. But the allowance itself is, you know, the thing speaks for itself.  She wouldn't have done that if she thought that she could, you know, -- if she thought the secondary considerations weren't persuasive.

Q.   Is that because she had said here it was obvious?

A:   **Yeah.  I mean, she has found it obvious over Bass in view of Lion.  Lion is withdrawn. It's Bass in view of X.  X could be Bowen.  X could be Rios.  X could be Balogh.  X could be Vargos.  Those are four really close planar portions made out of silicone or rubber that teach surface clinging.** I think one of them might have had, you know, -- **Bowen was the best one of them.  I mean, just look at the title, self-clinging feeding assistance mat.  So that, in combination of the bowl of Bass, you don't need Bass' planar portion anymore.  I take the integrated bowl of Bass and I put it on Bowen.  It would be obvious to make Bowen, like Bass, get rid of the adhesive if it was obvious.  Boom, there's the Happy Mat.**

Q.   And why didn't anyone ever do that?

A.   **Because it's not obvious.  And that's what the secondary considerations show because of, you know, it is a simple device.  It's very profitable.  Why the heck wouldn't you do it?** I mean, you've seen the **emails, I'm sure, from competitors in the same channel of trade identifying that mat as a new product with excitement and ordering it and reducing it to practice, sending pictures of it, make this mat.** That is evidence Samsung versus Apple. **That is evidence of nonobviousness when a close competitor established in the channel of trade targets and uses photographs as blue prints, that is evidence of nonobviousness. It's highly persuasive evidence of nonobviousness because that giant would have done it five years ago if it was obvious.**

11.     October 11, 2016, the United States Patent and Trademark Office duly and legally

issued United States Patent No. 9,462,903 ("'903 Patent"), Surface Contact Self-Sealing Integrated

Tablewear and Dining Mat." *See*, Exhibit 220, a copy of the '903 Patent.

12.     The '903 patent rendered suction elements, adhesives, and mechanical fastening

means (such as clamps) obsolete in the feeding arts. Before the Happy Mat® arrived at market, no

10

integrated tableware and dining mat having a "suffuse undersurface" creating "surface contact selfsealing" was seen practiced in the dining arts. The trend established suctioning elements, adhesives, and/or clamps, none of which are necessary to practice surface contact self-sealing. In fact, by definition, suctioning elements and clamps (that require setting) and adhesives (that require addition to the product) must mutually exclude surface contact self-sealing *per se*.

**[Tr.T, B. Williams, 8/31/2021, 845:14 to 846:10]**

Q.  So at this point in time in the industry, **were there any examples that fulfilled all the claims of the '903 patent?**

A.  **No, not to my knowledge.   The trend in the art unequivocally relies upon adhesives, suction cups, or mechanical fastening means.   What is a mechanical fastening means?   A clamp, a screw, some other fastener to actively hold it in place**.  And you can look through, and I have, at lot of stuff that's out there.  And these are the motivations.  **These are the teachings that are established in the art. The people have had this problem.  They have been motivated to solve this problem. It may seem like a simple problem.  But people have been motivated.  Inventors have done this for decades.  And what they've come up with, as evidenced in the patent database, is those things:  Adhesives, different formulations of adhesives, different positions of adhesives, suction cups, different types of suction cups, different placements of suction cups, different types of instantiating, effectuating suction and mechanical clamps. In fact, Webb teaches a bunch of embodiments with mechanical clamps in lieu of that planar portion.**  There's a whole -- and he had a restriction requirement between those embodiments.  I mean, -- anyway, I'm sorry.

**[Tr.T, B. Williams, 9/1/2021, 1226:22 to 1227:23]**

Q.  Okay. So you were no longer thinking about suction cups after that?

A.  **Suction cups were no longer relevant to the line of inquiry ongoing at the patent office.**

Q:  Okay. And then –

A:  **And I don't think that they were relevant at all because that's what we've replaced. Right? The suction cups are obsolete because of the Happy Mat.**

Q.  Okay.  So Happy Mat is an improvement over suction cups?

   MS. REISMAN:  Object, leading.

   THE COURT:  Sustained.

Q.  Do you think -- what do you mean when you said in cross-examination that you think the Happy Mat is an improvement?

A.  **It is a useful improvement.  As I said earlier on yesterday as well, the fact that it can self-seal to a surface without a suction cup or an adhesive means you can remove it without breaking a vacuum or leaving a residue.  It's reusable.** It doesn't

rely on the elastic deformation of the material. **It's cheaper to produce because you don't have to mold suctioning elements. And as to the adhesive, it doesn't leave a residue and adhesive wears away.  And anything that uses an adhesive is therefore essentially disposable.  And the Happy Mat lasts a long time.  And it can be washed without affecting the adhesives or the elasticity of the suction cups.  It's a better product, and it's probably more profitable as a result.**

**[Tr.T, B. Williams, 8/31/2021, 816:14-20]**

Q.  And so what are Bass and Kerr?
A.  Bass is a feeding mat which has an integrated receptacle and some embodiments.  But **Bass teaches its adhesion by means of an adhesive in every single embodiment. So Bass basically is another thing, in my opinion, that the Happy Mat renders moot.  It renders it obsolete because you no longer need an adhesive to stop your kids from throwing it on the floor.**

**Patent Applications Related to the '903 Patent**

13.     On January 2, 2015, EZPZ filed its PCT Application No. PCT/US15/11955 (" '955 PCT"). *See,* **Exhibit 814.**

**[Tr.T, B. Williams, 9/1/2021, 1055:1-3]**

Q:  Okay.  And then so the PCT '955 Application was filed in order to get patents in other countries?
A.  Yes.

14.     EZPZ's filed its National Stage Entry on March 1, 2017, Application No. 15/507,823 ("'823 Application). This application post-dates issuance of the '903 Patent. The '823 Application is directed to method claims (as opposed to the apparatus claims of the '903 Patent). Method claims operate in a different statutory class than apparatus claims and define different inventive scope. *See e.g.* MPEP 806.05(e) (("[p]rocess and apparatus for its practice can be shown to be distinct inventions"). This application was abandoned on January 23, 2019. *See,* **Exhibit 905.**

[Tr.T, **B. Williams**, 9/1/2021, 1055:4-18, 1055:22 to 1056:16]

Q.  And then why was the '823 Application filed?
A.  **The '823 Application was a national phase application into the United States.**  So originally the PCT was filed. That's the international application to go into those countries I mentioned earlier, which I'm not allowed to talk about for some reason. And

then the U.S. -- we **reentered the U.S. after issuance** during litigation with the '682. The '682 was a continuing application, if you like, in the United States.

Q.  And then how about the '823?

A.  That's what I just meant was the '823.  Did I say the wrong word?

Q.  Yeah, you said '682.

A.  I'm sorry.  **The '682 is actually the '903 Patent.  The -- yes, the '823 Application.**

. . .

Q.  The '823 Application is the national phase application
stemming from the PCT Application?

A.  In the U.S.  Correct.

Q.  All right.  Why do you file a national phase application in the U.S. if you already have a patent in the U.S.?

A.  Well, this was explained to me as a common tactic to maintain priority within the scope of the specification. So the claims in a patent define the metes and bounds of the inventive step. Correct? They define the scope of the invention.  But they are sort of constrained by the four corners of the document. So you can elaborate your claims and expand or contract your claims, if you like, within the scope of the specification itself. So because the PCT was still alive -- and this is, as it was explained to me, is a very common tactic in all corporate patent filings.  It's this sort of more arrows in the quiver so you can issue more narrow claim sets and have three narrower patents versus one broad one.

Q.  Was this your idea to file it?

A.  It was not my idea to file it, no.

[Tr.T, **B. Williams**, 9/1/2021, 1058:13 to 1060:14]

Q.  Okay.  And what is a preliminary amendment?

A.  Well, During prosecution, you're allowed to amend your claims.  And you may do so in response to an examiner's action taken or rejection, or you can enter an amendment before anything happens. A**nd so in this case, we're re-entering the United States with substantially the same claims.  So to avoid a double patenting rejection, we entered a preliminary amendment in hopes of securing a method, which is one of the statutory**
**classes of invention.**

Q.  Did we talk yesterday about the difference between a method and a apparatus claim?

A.  I don't believe so.

Q.  What is the difference?

A.  Under 35 U.S.C. 101, there are four statutory classes of invention.  It comes from -- I'm going to paraphrase the law, but this is basically what it says.  **An inventor is entitled to a patent for any new or useful improvement in any process, machine, manufacture, or composition of matter.  And that law is constructed to have four patent eligibility – four statutory classes of invention. Apparatus claims apply to an object with particular structure.  Process claims apply to an act or a verb or a**

series of steps.  **Composition of matter is a chemical reaction or another add mixture of substances in any phase state.  And then the --**

Q.  **Method.**

A.  **No, I've already done the method.  That's the process. The process is the method**. The other one is basically the product by process.  So that that's the manufacturer.

Q.  Okay.  So the '903 Patent is a utility patent and apparatus?

A.  **Correct.**

Q.  **And the '823 was a method claim.  What's the difference?**

A.  **We amended the claims in the '823 to enter method claims.** So they're actually vastly different animals in the patent world.  The apparatus claim applies to a particular body. And a method claim applies to a means of use.  And I can demonstrate it by analogy, if you like. If I have a method for drinking water, right, I would be drinking the water. I could drink from a bottle.  I could drink from a cup.  I could drink from a mug. I could drink from various different apparatuses, but the method would be the same. Whereas the apparatus is the bottle itself or the cup or the whatever else, whatever receptacle could store water. Correct?  So you can have multiple different apparatuses upon which a method may operate.

Q.  Okay.

A.  Methods are generally broader.  That's the bottom line.

Q.  Could a reference be material to method claims but not to an apparatus claim?

A.  Yes.

**[Tr.T, L. Laurain, 8/30/2021, By Deposition (6/10/2020), 331:25 to 333:9]:**

Q:  Let me ask you something about the continuation patents, starting with the '403 that was filed on September 11, 2017.

A.  Yes.

Q.  What was -- what was the purpose of that filing?

A.  Well, I think just generally it's a more helpful conversation to back up and talk about all of the continuations together and, you know, having Zac. So at that time when -- I believe there is a continuation that's filed before that one, if I'm not mistaken, before the '403. And what was my understanding at the time?· Again -- which I'm sure you can see I'm not on a lot of the e-mail communications, because **at this time our patent had issued.· So just to get it on the record, October of '16, our patent issued.· I hired Zac Garthe, who I think you're deposing coming up here, shortly after as general counsel who really was leading a lot of these continuations and the strategy behind them. It was my understanding that patent continuations are filed to broaden patent portfolios and it's a common business strategy** that numerous companies do, and so I was advised by my legal counsel that it would be wise to file these continuations

15.   EZPZ filed a patent application on September 11, 2017, Application 15/700,403

("'403 Application"). This application does not appear in the family of the '903 Patent on Public

PAIR with the PTO. Because of a filing error, the '403 Patent did not claim priority to the '903

Patent; in other words, EZPZ's own PCT application (and product) functioned as a 102 rejection with respect to the new claims sought. This application was abandoned on November 15, 2018.

*See,* **Exhibit 281, the '403 Patent file wrapper.**

**[Tr.T, B. Williams, 9/1/2021, 1081:12 to 1082:14]**

Q. So, Mr. Williams, we were talking about the '403 Application. Why was it filed?
A. It was my understanding that it was another continuing application of the '823 Application, had the method claims. And t**he '403 was filed with different apparatus claims to try to cover alternative embodiments and workarounds in the prior art in the market**, **I should say, not the prior art.**
Q. So does that mean you were trying to broaden the claims?
A. Within the scope of the specification. That was the intent, yes.
Q. Okay. And were these claims the same as the '903 Patent?
A. They were not the same as the '903 Patent.
Q. Explain.
A. Well, there was -- there was a couple of new dependent claims that were added. So the first claim was – as originally submitted, was different in phraseology, was clearer perhaps to some particular elements of the apparatus. Claim 2, if I remember correctly, had the planar portion as cambered. And then claim 3, if I remember correctly, had wherein the undersurface intermittently contacts the underlying surface. So we were -- those were two new claims.
Q. Would a reference that was material to the '903 invention necessarily be material to the '403?
A. No, because they're different claims. And, in fact, in the prosecution of the '403, we can see that. It's an interesting prosecution history as a result of those particular Claims 2 and 3 that I mentioned.

**[Tr.T, B. Williams, 9/1/2021, 1096:13 to 1098:25]**

Q: Okay. And then do you believe you could have overcome or traversed Ms. Impink's subsequent rejection based on Han and Mehler?
   MS. REISMAN: Objection, Your Honor, calls for speculation. This application was withdrawn.
   THE COURT: Sustained.
Q. Did you have a -- did you file remarks about the rejection over Han and Mehler?
A. I don't think we got there. I think Ms. Reisman is correct it was withdrawn. It was abandoned. So I do believe it was traversable because of the way the rejection was made. And there was something else that importantly happened with this. The priority claim was not perfected, which I know has also been represented in I think --
Q. You don't have to clarify everything. Just say what it is.
A. **The priority claim was not perfected, so our own – our own PCT Application would have been a rejection against it.**

Q.  Okay.  And we talked about that with Mr. Hubbard.  So you could not claim -- the '403 Application could not claim the priority date that you needed to survive.  Right?

A.  **In order to claim priority, it must be made within four months of the filing date or 16 months of the document to which priority is claimed.  And by the time the error in the ADS was identified by Mollie -- by Ms. Impink, those dates had already expired.**  So the likelihood of maintaining this application was next to nothing.  Because as right here, you see it says right here in her interview comments -- I actually -- **I couldn't figure out what was wrong with the benefit claim in the application data sheet.  And she said basically at the end here, "All of this doesn't really matter because, as the examiner suggested, the arguments are mute if the benefit claim issue is not remedied since the PCT Application applies as a 102 rejection." That means our own disclosure preempts patentability. Our own international publication from January of the year prior prevents this thing from being really considered.**  All the arguments are moot in light of that.

Q.  **Because your own patent, the '955 Application reads on the claims as prior art, material prior art?**

A.  **Yes.**

Q.  Because you have to look -- because you didn't get to -- it's sort of like relating back on a complaint.  When you relate back to the date of the original filing of the complaint, you can no longer relate back to the priority date of the '955 which got the benefit of the '903 Patent, which was 7/17/2014?

A.  Yes.

Q.  S**o you could no longer just look at prior art before 7/17/2014, you now had to look at prior art from the '955 Application?**

A.  **Our own '955 Application was prior art.**

Q:  Okay.  So you had to use your own filing date as your beginning date?

A.  Yes.  In your analogy, it failed to relate back.  And the statute of limitations destroyed it, in a way.  I**n other words, our own disclosure because we broke priority and because we couldn't claim it by the time the error was made known, this previous disclosure reads over our claims.  So our own disclosure was now prior art.**  Our parent application was prior art.

Q.  Was there any point in keeping the '403 Application going?

A.  Probably not; probably not.

**[Tr.T, L. Laurain, 8/31/2021, 706:14-19]**

Q.  And what was your understanding of that in the '403 patent?

A.  Again, our -- our patent could have been prior art.  And the priority date going back to the beginning date if we didn't correct that, it would have got rejected over prior art just generally.  I think that's my understanding.

16.     EZPZ filed its first continuation application on January 3, 2018, Application 16/207,976 ("'976 Application). This application was abandoned on January 31, 2020. *See,* **Exhibit 583, file wrapper for this application.**

[Tr.T, B. Williams, 9/1/2021, 1073:13-19]

Q:  Okay.  **So when you filed the '976 IDS and you knew there was an error, why didn't you go back and correct it in the '403 and the '823 Application?**
A:  **They had already been abandoned**, I believe, at that time.
Q:  There was no point in doing that?
A:  They were abandoned, yeah.  In fact, in that sense, all of these application are dead.

17.     EZPZ filed a second continuation application on December 17, 2019, Application

16/717,824 ("'824 Application). This application was abandoned on April 20, 2020. *See,* **Exhibit**

**582, the file wrapper for the '824 Application.**

[Tr.T, **L. Laurain**, 8/31/2021, 705:14 to 706:13]

Q:  Why did you abandon the last one the last one specifically?
A:  Ben Williams -- Ben filed the first two and then he filed the beginning of the '976. And then I got a brand new lawyer that wasn't -- Ben, it was just discovery and going after Ben. And Ben also had a baby and he started law school. So he had a ton of stuff on his plate. **I hired a brand new lawyer named Scott Swanson.  He filed -- I think he managed the '896 and then filed the '824.** Then Hart Morse sent a letter with what things we didn't submit and inequitable conduct.  I was, like, I'm getting letters over here, and so **I abandoned that application the same day Hart sent his letter because I was fed up**.  I'm done.  I mean, and then we filed the reexam and they sent us three letters for that.  But that's why I was done.
Q:  **Were you concerned about any of the rejections in the continuing applications?**
A.  **No.**
Q.  And why not?
A.  Based on just the emails, if you read the emails about when we got a rejection and Ben's or Zac's response on how they were planning on overcoming them and what they were doing, **I never saw any issues. The one issue was priority date and that kind of nightmare about not having a priority date correct. But outside of that issue, I didn't see any issues.**

17-1.   EZPZ filed the patent applications related to the '903 Patent, in the United States,

primarily as a part of its litigation strategy.

[Tr.T, **Z. Garthe, 9/2/2021, 1309:3-11, 1315:3 to 316:4**]:

Q:  And then, shortly after that, you became general counsel?
A:  Yes.  And so I think that was right around the end of January, beginning of February 2017 is when I put in my notice with Chipman Glasser and transitioned over to EZPZ. So that was -- that was several months later after -- after Chipman Glasser had been retained.

Q: Okay. And then were you in-house counsel then for EZPZ?

A: Yes. Starting -- starting around I think that would have been February 2017 that's when I became in-house counsel.

. . .

Q: Did you -- were you involved in the decision to file the continuing applications?

A: Yes, ma'am.

Q: And how were you involved?

A: So this was -- **this was basically my legal strategy was to bring continuations into this application. So this is what we did when I was at the top firm working with all, you know, the most sophisticated legal counsel for the largest companies in the world. This is the type of activity that we would do. If you are representing a company and trying to secure and enhance the value of their patent portfolio and their assets as well as, you know, protect their market position, it is a strategic advantage to have an open patent application so that you can continue to file those continuations and those iterations.** So that was the strategy that I kind of have brought over to EZPZ.

Q: Are you the one -- so what did -- how did you think of it? Was that -- you're the one with the arrows and the quivers?

A: Yeah, that's an analogy I throw around all the time, yeah. **The idea is if you just have one patent, you've got all your eggs in that one basket, and so you're throwing that one spear is all you have. But, ideally, you would have several different arrows in your quiver instead. So instead of always having to fight with one spear, you have these different arrows you can use. So it's more targeted. It's more efficient.**

**[Tr.T, L. Laurain, 8/31/2021, 704:8 to 706:13]:**

Q: And then do you know why the continuing applications were filed?

A: So, my general understanding, and, again, t**his is my general understanding is patent continuations are filed to broaden your patent portfolio** and to keep claiming to get patents. And you broaden your portfolio to put more arrows in the quiver? Is that the right term? It was -- **from a litigation perspective, we were encouraged to do it really from litigation counsel.** I was not involved. I had Zac full time. Zac was working with Ben. And then you heard Ted Olds yesterday. And I never met Ted Olds or talked to him personally. It's my understanding they were filed to continue getting claims and then narrowing the **scope, broadening the counterclaim, narrowing the scope of the claims, but --**

**Q: You don't know what they were for?**

**A: Well, I know there's, like, a method patent is one. That was the '823. The '403 had the priority issues. But, generally speaking, patent continuations are to broaden your portfolio and have more arrows in the quiver. So I was following that general advice to say we can do these and then Zac led the process. That's why I had Zac full time.**

Q: Is there reason --

A:  Why are we doing this?  We've got a patent.  **I mean, it just seems silly to me.  If you guys want to do it and that's the right thing to do for business.  So, it's all these lawyers advising me, "This is what you do and this is what everyone does."  And this was the way it continued until the last one we abandoned, the '824.**  I continued getting advice we always have a continuation going.   And then we eventually abandoned the last one.

18.      The Court ruled that it agrees with LNC that the non-final office actions in continuing patent applications of the '903 Patent [filed after its issuance] or '955 PCT is relevant. Specifically, office actions in related patent applications are relevant for establishing the materiality of prior art references. *Regeneron Pharm., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 560 (S.D.N.Y. 2015) ("Rejections over withheld prior art in other patent applications with similar claims is evidence of materiality."). [Doc. No. 716].

19.      The Court rejected EZPZ's argument that the USPTO Notice of Intent to Issue Reexamination Certificate of the '903 Patent [Doc. No. 788] was relevant to the inquiry of materiality of prior art references. [Doc. No. 800].

## **Lindsey Laurain, Inventor**

20.      The story of EZPZ begins with Lindsey Laurain and her family: her husband Brad, and three boys, Brody, Chase, and Drew. The young children made such a mess at mealtimes that a better way was needed.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (5/4/2018), 44:14-46:13]**

Q.  Okay.  I would like you -- if you would kindly turn to what was marked previously as Plaintiff's Deposition Exhibit 6, Media Kit 2016.
Q:  (BY MR. MORSE)  I wanted to focus on the first full paragraph under "How it all began, "second line with the beginning of the sentence "One night." Do you see that?
A:  Uh-huh.
Q.  And it states there, One night (in the midst of his frustration) my husband said, 'Someone  needs to create something kids can't toss or throw at meals!, end quote. Did I read that accurately?
A.  Yeah, that's what it says.

Q:  Okay.  When you say "it all began," it all began after your husband's utterance that's reflected in what I read into the record?

A:  Yeah.  And I wouldn't say that's an accurate statement.  My husband identified the problem, as you can see here, and that's pretty much all he did, but I love him.

Q  Okay.  I think you mentioned, however, that that statement that we read "in the midst of his frustration" is when he identified a problem; is that correct?

A:  In the midst of his frustration, yes.

Q:  Then he said, Someone's got to --"Someone needs to create something kids can't toss or throw at meals," correct, or words like that?

A.  Something along those lines, yeah.

Q:  (BY MR. MORSE)  And that was an identification of a problem, in your mind?

A.  Uh-huh.

Q.  Okay.  So when you're in the midst of a -- and he mentioned yesterday it was perhaps in a situation where dinner or some meal was chaotic.  He made an utterance either similar like or in the general thing of what we have been looking at; he identified a problem and that's when it all began, so to speak.  When he made that utterance like that, what was your reaction to it?

A:  **We didn't talk much about it.  I mean, it was a messy dinner, he said that.  The next day I was at work.  I was like, Oh, my gosh, what Brad said last  night saying how messy; there has got to be a better way and started Googling stuff and realized nothing existed. came home from work and told Brad, I said, I'm going to create a company and create a product.  If anyone can do it, I can do it.**

Q:  After the sentence I already read, it  starts, "The next day."  "The next day I hopped online and, low and behold, nothing exists." Did I read that accurately?

A.  Uh-huh.

Q.  Is that what you recall?

A.  I recall getting online and looking for –  . . .

A:  I **just recall looking online and realizing that there wasn't a solution for messy mealtime, and so I came home and said, I want to create a product that solves this problem.**

21.    Ms. Laurain invented the Happy Mat® in 2014 and also left her job in Corporate

America to pursue EZPZ full time, which she still currently does. Between the night when she

decided there needed to be a better way and getting the Happy May to market in Nordstrom's was

just over a year—while also working full time, being a wife, and raising three children under the

age of four.

**[Tr.T, L. Laurain, 8/31/2021, 588:17 to 589:23]**

Q:   And when did you found EZPZ?

A:  **The company was formed in April of 2014.**

Q:  And what did you do before you founded EZPZ?

A: I spent the majority of my career working at Pfizer. And then I took some time off when we had Brody. And then I got pregnant with the twins, and so we had the twins. And then I took about 12 months off staying at home, realized I didn't like being a stay-at-home mom. I started working for Humana the health insurance company and was working there full time when he had -- **we had the idea for EZPZ up through the Kickstarter campaign. And then I resigned from Humana after the Kickstarter campaign.**

Q: What did you do at Humana?

A: I was the director of operations, so working on Medicare Advantage Plan, so quality health insurance, making sure people got mammograms and cholesterol screens, quality exams for health insurance.

Q: And how long did you do that?

A: I think it was about two years, but don't quote me on that.

Q: Okay. And so what was it about what happened at Kickstarter that made you resign from Humana?

A: Well, I was working full time and had a family to provide for, so I needed some sort of income coming in. So we had the idea. And then I was just working at night, you know, starting to start the company, doing the prototypes and all of that. And I didn't feel comfortable quitting my job and having no income from EZPZ because we didn't have income until the Kickstarter campaign was funded, and that gave me enough confidence to say, "Okay, I can resign." It's not just my idea. It's proven people like the product in the campaign. I guess it gave me the confidence to resign.

22.    EZPZ launched their first year in 2014 with the Happy Mat® as its flagship product

on the crowd funding site Kickstarter. EZPZ launched the travel version, the Mini Mat™, in 2016

and has launched numerous mat based products since (and non-mat based products).



**[Tr.T, L. Laurain, 8/31/2021, 590:6-16]**

**Q: Okay. And then when you did Kickstarter, that was in August of 2014?**

**A: Yes. I think it was at the end of August though -- it's a campaign. So Kickstarter is a crowd founding campaign. So you essentially create a video and a campaign, and then regular consumers contribute funds. I mean, there's levels of rewards. And it's actually -- we did it to raise money for our first production run.** With

Kickstarter, people are taking a gamble on the product.  You don't actually have the -- **we shipped the Kickstarter orders out in December of that year.**

**[Tr.T, L. Laurain, 8/31/2021, 629:11-24]**

Q   In your business, I think you already testified that you had 170,000, and then at 1.7 million and then $7 million the third year?
A   Yes, correct.
Q:  What are your sales now?
A:  We're going to do 15 million this year.
Q:  And what do you attribute that success to?
A:  Well, we continue to innovate since the Happy Mat.  Now, we have cups and other products, $7 million in revenue that was the commercial embodiment of the patent.  **We were only selling Happy Mats and mini mats to get to $7 million.  We did not have any other.**
Q:  All your sales were from the embodiment of the invention?
A:  Yes.

### Ben Williams, Patent Agent

23.     In July 2014, at the time of filing of the patent application that would become the '903 Patent, Mr. Williams had less than two years of being a practicing patent agent. He had been a practicing agent since only 2012.

**[Tr.T, B. Williams, 9/2/2021, 1105:14-16]**

Q:  Let's talk about, sir, your patent agent license.  You got that in 2012.  Right?
A:  **October of 2012, if I remember correctly, yes.**

**[Tr.T, B. Williams, 8/31/2021, 789:22 to 790:8]**

Q:  And with regard to your work at Williams Intellectual Property, what do you do?
A:  Well, I'm the principal there.  So basically today I represent inventors, both corporate and individual inventors, preparing their intellectual property for prosecution at that the patent office.
Q:  Back in 2014 when you first wrote the claims for EZPZ on the '903 Patent, what was your Williams Intellectual Property firm doing?
A:  Well, back in 2014 **I moved to Denver in I'm going to say September, I think it was, of 2013.  And I started Williams Intellectual Property about that time.**

**[Tr.T, B. Williams, 8/31/2021, 790:21-23]**

Q:  And you're also going to law school right now?
A:  Actually I just finished.  I finished law school about two weeks ago, I think.

**[Tr.T, B. Williams, 8/31/2021, 791:22 to 792:4]**

Q:  And then was the '903 Patent one of your first patents that you actually prosecuted?
A:  I mean, it was among the first absolutely.  It wasn't the first.  **But for Williams Intellectual Property, it was one of the ones that I had first undertook.  I had a lot of applications pending, you know, at that time, -- well, not a lot, but it was certainly one of the first that I was undertaking, yeah.**

24.     ~~The Court finds credible the testimony of Mr. Kennedy, EZPZ's patent expert,~~ ~~that new patent attorneys and agents (Mr. Williams being the latter) often need at least four (4)~~ ~~years of training (some even more) with an experienced patent attorney (or agent) before they are~~ ~~ready to proceed, substantially unsupervised before the Office.~~ [EZPZ did not end up putting on evidence related to this factual finding.]

**Allegations Of Prior Art References Not Disclosed as a Basis for Inequitable Conduct[1]**

POSITA

25.     The basis for any patent validity inquiry, which also informs inequitable conduct and other inquiries, begins with establishing an understanding of who is a person of ordinary skill in the art (a "POSITA,"). A POSITA is a "hypothetical person who is presumed to have known the relevant art at the time of the invention." MPEP § 2141. Such a POSITA, is one of "ordinary creativity" and necessarily has "the capability of the scientific and engineering principles applicable to the pertinent art." MPEP § 2143(internal cites omitted).

**[Tr.T, J. Kennedy, 9/1/2021, 924:7 to 925:8]**

Q:  I'm going to turn your attention to the concept of but-for material art in the context of inequitable conduct charges. What do you understand but-for material art to be?

---

[1] The Court is aware that the Notice of Intent for Reexamination of the '903 Patent was issued by the PTO, and that each of the below references was considered in such Reexamination, but declines to consider the impact of this on the materiality of the below prior art references, over objection by EZPZ. This information also provides evidence of whether a patent examiner would have made a different decision about allowance of the patent if the omitted disclosure was made.

A:  So that's the standard that the Court, the Federal Circuit, applied in Therasense and it's the standard today as I understand it. But-for material basically means that the examiner would not have issued the patent had they been aware of the prior art in question. So but for the prior art, the examiner would not have issued the patent. And that is an analysis under concepts of anticipation under 35 U.S.C. 102 and obviousness under 35 U.S.C. 103.

Q:  And when we talk about but-for material art, whose point of view are we analyzing that from?

A:  So the basic framework by which an application is examined and its validity determined or not determined, and this applies throughout the entirety of all proceedings, is governed by the Phillips standard, the Phillips decision of the U.S. Supreme Court. And the Phillips decision basically says that **you examine patents from the perspective of a person of ordinary skill in the art, a P-O-S-I-T-A, a POSITA, also referred to as a FOSITA [sic], often I use a person having ordinary skill in the art, but they're both -- mean the same thing.** And that's a person -- that's the basis for determining the patentability of an invention. And the POSITA is going to vary based upon the technology, based upon the invention. So it's different for different patents or different applications.

**[Tr.T, M. Hubbard, 8/27/2021, 318:5-8]**

Q:  So you know that a patent examiner evaluates prior art and the invention in view as a person of ordinary skill in the art?

A:  Right. Yes.

26.     For the '682 Application/'903 Patent, it is my understanding that the Parties substantially agree that a POSITA is a person who has either a bachelor's degree in mechanical engineering or product design (or equivalent degree or experience) with at least two years of practical experience in houseware products.

**[Tr.T, J. Kennedy, 9/1/2021, 925:9 to 925:14, 926:9 to 927:14]**

Q:  And who do you understand to be a POSITA in this case?

A:  Well, I deferred to the understanding that plaintiff's expert, Mr. Valderrama, set forth in his opinion. And I haven't seen any challenge to that. So that's the one I use. I thought, well, that's probably the most conservative approach.

. . .

So in paragraph 33 of my report, I basically refer to the Valderrama exit report which identify Exhibit B8. **And that person of ordinary skill in the art is a person who has either a bachelor's degree in mechanical engineering or product design or**

**equivalent degree or experience with at least two years of practical experience in housework products.** So that's the definition that I relied upon in my report. What's interesting about the prosecution history of patent applications is very rarely does an examiner identify what their basis for understanding of a POSITA is. So I shouldn't say never, because sometimes they do, but very rarely do they identify what they consider to be the POSITA. So we're kind of left at a guess as to what the examiners thought the POSITA was. But we do know what the parties believe the POSITA is, so that's what I deferred to.

Q: And what's important about viewing prior art references from the point of view of a POSITA, if anything?

A: So as you become more knowledgeable about a particular art, things become more obvious. So an analogy would be a person who is a home auto mechanic that can change their oil versus a skilled, trained auto mechanic that can pull your engine or replace your spark plugs or deal with your fuel injectors. So the problem to an engine -- to a skilled mechanic or a solution to a challenge for a skilled mechanic to an engine issue is more obvious than it is to a person who can change their oil. And **so you have to understand what the skill level is in determining whether something is obvious or not obvious because it is that basis of knowledge upon which something is determined whether it is patentable or not patentable.**

26-1.   Michael Henley, an expert presented by EZPZ, is a POSITA. LNC did not present the testimony of any POSITA.

**[Tr.T, M. Henley, 9/2/2021, 1413:16 to 1414:1]**

MS. SECOR:  **An expert in the area of the baby industry design and products and how they work.**

MR. DENEGRE:  I think she said it differently that time and didn't say the words how they're perceived in the market. And the way she said it that time we don't object to that.

THE COURT:  You said you do not object?

MR. DENEGRE:  We do not object to that, although, we continue to object to the relevancy of his testimony.

THE COURT:  Right. All right. I'll accept him in that field or fields. Go ahead and proceed.

**[Tr.T, M. Henley, 9/2/2021, 1415:14 to 1416:5]**

Q. All right. And then you defined what a person of ordinary skill in the art was in your report. Do you remember that?

A: I do.

Q:  And what would you say is one?

A:  **A degree in industrial design, mechanical engineering, four years of product development experience and/or, you know, inversely related so, in other words, if I have more experience than I do education, then potentially you could be**

considered as well and vice versa. If I have more schooling and less experience, it's possible.

Q: All right. And do you believe you are a person of ordinary skill in the art?

A:  Most definitely.

Q: And why?

A: Because specifically I am degreed in product development. I've been doing it for about 31 years. And I also worked in the juvenile products industry for seven.

26-2. Michael Henley undertook his analysis of prior art from the point of view of a POSITA.

[Tr.T, M. Henley, 9/2/2021, 1415:1-13]:

Q:  So with regard to the prior art, what were your conclusions?

A:  That -- and this has more to do with my second report which is on validity, but it has to do with the fact that **the concept is new and novel.**

Q: All right. And so when you look at the prior art, how did you get to that conclusion?

A: By eliminating -- basically comparing all of the claims in the patent against all of the prior art, and just eliminating point by point basically whether or not things were disclosed in any of the prior art, and what was and what wasn't; and -- and then also any physical product that was available, testing that for functionality too.

[Tr.T, M. Henley, 9/2/2021, 1420:4-19]:

Q: All right.  And then in light of that background, did you look at the prior art that -- some of the prior art that's been raised in this case?

A: Yes.

Q: And, in that process, did you consider the specific definition in the claims of the '903 Patent?

A: Yes.

Q: And did you also consider claim construction definitions?

A: Yes.

Q: And with those claim terms and claim construction definitions in mind, what were you looking for when you were looking at the prior art?

A: **I was looking for whether or not the prior art was disclosing anything in the claims and/or whether or not it was teaching away, meaning not disclosing or, you know, it didn't even connect.**

**Webb Prior Art (Materiality and Intent to Deceive)**

27.     On May 18, 2020, the Court entered Summary Judgment in favor of LNC finding the claims of the '903 obvious. The Court found that the claims of the '903 Patent were rendered

obvious in light of U.S. Publication No. 2003/0152736 ("Bass"), in combination with the Webb Prior Art (defined as (1) U.S. Publication No. 2008/0245947 (the "Webb Publication" or "Webb Publ."), published on October 9, 2008; and (2) U.S. Patent No. 8,251,340 ("Webb"), which issued on August 28, 2012. [Doc. No. 523]. The Court's findings established but-for materiality of the Webb Prior Art.[2]

27-1.   EZPZ maintains that Webb Prior Art reference is not but-for material reference to the '903 Patent and has demonstrated that the Webb Prior Art reference is not but-for material.

**[Tr.T, J. Kennedy, 9/1/2021, 954:15 to 962:2]**

MS. FISCHER:  May I turn your attention now to the Webb prior art reference if Ms. Kennedy [sic] could pull up **Exhibit 615**.
MS. KIM: Got it.
Q:  . Are you familiar with this reference, Mr. Kennedy?
A:  Yes.
Q:  I know you are aware of the Court's ruling regarding the Webb prior art reference.
A:  I am.
Q:  Did you analyze your belief with respect to the materiality of this reference both before and after the ruling of the Court?
A:  Yes, just about.
Q:  Okay.  I would like to go through some of your opinions -- Well, let me ask you:  Did you come to any opinions with respect to the but-for materiality of the Webb prior art?
A:  I did.
Q:   Okay.  I'd like to go through some of those opinions. Generally what is your opinion if this is a but-for material reference or not?
A:  **My opinion it is not the a but-for material reference under theories of anticipation or theories of obviousness.**  And my reports -- my reports set forth in extensive details the basis for that opinion -- those opinions.
Q:  I'd like to talk about some of them.  Let's talk about the anticipation piece first.  Why do you believe the Webb prior art reference doesn't anticipate the '903 Patent?
A:  Yeah.  I'd like to refer to my report real quick if I may just so I'm consistent here.
Q:  And then your supplemental report starts at PDF page 77.
A:  PDF 77.  Okay.  Yeah.  So in paragraph 192 under a section heading, 1, Webb does not teach a surface contact, self-sealing mat, I analyze why Webb does not teach that

---

[2] However, an order on a motion for partial summary judgment is interlocutory and the trial court has discretion to reconsider or reverse its decision. An interlocutory order is not final because the court at any time before final decree could modify or rescind it.' *Lightfoot v. Hartford Fire Ins. Co.,* No. 07-4833, 2012 U.S. Dist. LEXIS 28243, at *5 (E.D. La. Mar. 2, 2012)(internal citations and quotations omitted).

limitation surface contact, self-sealing, dot, dot, dot, mat, and, therefore, it is not anticipatory.  And then also going to why it's not obvious, doesn't lend to obviousness.

Q:  I want at talk about -- (indiscernible)

A:  Excuse me?

Q:  Let's talk about some of your opinions with respect to why the Webb prior art or why you believe the Webb prior art doesn't render the '903 Patent obvious.

A:  Yeah.  So beginning at 194 by looking at Webb's abstract, **Webb's abstract teaches a mat that is resiliently deformable. Resilient, again, referring this time to Merriam Webster Dictionary, means something will withstand a change without permanent deformation or rupture.  Deformed means the item becomes misshapen or changed in shape.  So that means you can basically change it in shape.**  It could be deformed resiliently and it will pop back at some point.      The cite say it can be misshaped, **example rolled up**, which is what Webb teaches in column 21 lines 41 to 52, and the mat will not be permanently deformed or damaged.  **So you can roll this thing up.  And that's the way I remember seeing an example of the Tommee Tippee Mat, which I understand is an embodiment of Webb.**      But you can roll this thing up.  And it comes rolled in a package and it won't be damaged by rolling it. **This resilient deformity, however, does not mean that it will undeform automatically.  So it's something that you can roll up does not mean it will automatically unroll.  And that is important because, on observation, when I took it out of the package, it did not unroll automatically.  It remained in its deformed, rolled up shape. And that also informs me as to whether it eventually operates as surface contact, self-sealing.**  And my observation upon th**e Tommee Tippee mat I had was that it did not – you actually had to spread it out in order to make it have contact. So if it came out of the tube deformed or was deformed, it remained deformed until you smoothed it. And so if the product per Claim 1 is surface contact, self-sealing, I interpret that to mean it's surface contact, self-sealing at all times and not just half the time or part of the time.  So Webb does not appear to be a surface contact, self-sealing mat.  That was one of the distinctions.**

Q:  And let me just, before we go on, just you said you – if I heard you correct, you said you looked at the Tommee Tippee Mat; and you understand that to be an embodiment of the Webb patent?

A:  That's my understanding, correct.

Q:  .And you had the opportunity to see a Tommee Tippee Mat?

A:  Yes, I did a video demonstration of the Tommee Tippee Mat in conjunction with my first expert report.  And I used it on the glass table as I did for those other mats we talked about earlier.

Q:  And if I heard your testimony right, how is that mat packaged?

A:  It comes in, like, a square, I call it a tube.  So it came in a square -- not a square, a oblong, square box.  Oh, no. I'm sorry.  It comes in a square box, yeah, this box here.      It's probably used just to show it.

Q:  And you've been handed **Exhibit 1017**?

A:  Correct.

Q:  Is that the Tommee Tippee Mat, or does that appear to be the Tommee Tippee Mat that you analyzed or you reviewed in connection with your expert report?

28

A:  Yeah.  And the video actually called out this -- I believe it called out the serial number on the back.  So that would be easy to confirm, but I assume it is.

Q:  Okay.  Sorry, I didn't to interrupt.  I just wanted to clarify the Tommee Tippee Mat packaging that you had available to you.

A:  Yeah, it --

Q:  And then you were --

A:  It was a little bit nicer packaging then.  It's been opened a few times since.

Q:  Okay.  I'm sorry.  You were going through the other reasons you believe that this wouldn't be a obviousness reference?

A:  Yes.  And so I talked about surface contact, self-sealing. In order to be surface contact self-seal, it's my opinion it must automatically deform.  I**f you have to flatten it out in order for it to make contact with the surface, then it isn't surface contact.  So surface contacts means when I set it down, it seals, not that I set it down and then I smooth it out and applied a bunch of pressure, and after doing all that action, it seals.**  So that's not surface contact. **So if we're going to give meaning to the limitations of the claim,** which the Court has instructed us we have to, **we can't vitiate the claim limitation surface -- surface contact from the claim.  Then it means that surface contact, self-sealing means that when you set it down, it has to seal. And you don't have to provide other pressure or forces in order for it to seal. And a classic example of something that's not surface contact, self-sealing is something that requires suction.  So if you require, suction, it requires the application of a force to create that suction.  And so that's an example of something that is nonsurface contact, self-sealing. But here when I took it out of the box, it did not surface contact.  I had to smooth it out.  And even then it's arguable whether it's surface contact, self-sealing.**

Q:  Thank you.  I'm sorry, I may have asked you this.  So is your -- do you have an opinion whether the Tommee Tippee Mat is but-for material to the application that became the '903 Patent?

A:  So it's not -- I think that there's one other point that I should -- I should mention, which I think is important for this concept of surface contact, self-sealing and deformability.  So Webb tells us exactly what type of material it's using. And it says this in -- where is it?  I don't have the precise column line cite.  **But, anyhow, Webb's matt is formed as a thin layer of flux material dot, dot, dot, such as a thermoplastic elastomer TP silicone or rubber or low to medium shore hardened, shore 820 to 30. Thus it's my understanding that that level of shore hardness, and I went and looked it up on the Webb, is something that's comparable to a rubber band.  So when somebody says it's shore hardness of a rubber band, which is a hardness between 20 to 30, it confirms this is something that when you lay it down is not going to exhibit the properties of surface contact, self-sealing.**  It's more flexible than that.  It's readily deformable.  **So it teaches away from that concept.**  So that's an important part, I think, that informs my opinions. There it is right there.  They're showing it on the screen.  Yeah.

. . .

Q: Okay.  Mr. Kennedy, did you come to an opinion with respect to the but-for materiality of the **Webb prior art?**
A: **Yes.  I concluded that it was not but-for material.**
Q: And, similarly, with Tommee Tippee, do you have an opinion about whether Tommee Tippee is but-for material to the '903 Patent?
A: **Yes.  I had the same conclusion that Tommee Tippee is not but-for material.**

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 483:22 to 484:14].**

Q: (BY MS. MENASCO)  Are you aware that the -- that the district court has granted a summary judgment motion finding the claims of the '903 patent invalid for obviousness? Are you aware of that?
A: I am and --
A: I am aware of that.  And just because the judge made an error in his judgment, in my opinion, saying that Elizabeth Volz had not considered any silicone planar portion -- when, in fact, she had -- just goes to show how clouded the issues have become.

**[Tr.T, B. Williams, 8/31/2021, 858:15 to 859:18]**

Q: So do you think if the patent examiner would have had Webb, it would have made a difference in how she evaluated the patent?
    MS. REISMAN:  Objection, Your Honor, calls for speculation.
    THE COURT:  Yeah, he can't testify as to what – what the patent examiner would have done; but he can testify why he didn't think -- he didn't think it would have.
    MS. SECOR:  Yes.
    THE COURT:  So as far as -- it is speculation as far as what the patent examiner would say.  But he can say why he thought it wasn't important or whatever.  Okay.
(By Ms. Secor)
Q: Yeah.  **Why do you think Webb wouldn't have made a difference in the patent granting?**
A: **Because Webb doesn't anticipate the Happy Mat.  It's cumulative to what was already disclosed.  The Platinum Pets is a much closer reference.  Bowen in view of Bass, or Bass in view of Bowen is a much better hypothetical combination because of the express teaching away in Webb of this deforming of the base sucker and creating the suction effect.**  And it wouldn't have stopped the secondary considerations of nonobviousness.
Q: And do you -- it would not have what?
A: It would not have stopped the secondary considerations of nonobviousness.
Q: What do you mean by that?
A: It would still be in combination with Bass or another reference.  And **the combination obviousness was traversed not by argument but by secondary considerations.**

**[Tr.T, M. Henley,9/2/2021, 1424:17 to 1425:25]**

30

Q:  And you also looked at the Webb patent?

A:  Yes.

Q:  And what did you determine?

A:  So the Webb -- there's two things.  **The Webb patent is one thing.  And then the Webb product, the commercialized version of it is different, you know, they're two different -- they're very similar, but they're slightly different. So I looked at both of them and, again, it's very close to having a Oogaa, or MoMo Mat.  But on top, they create a – a suction feature, a suction cup in the middle to attach a rigid bowl. So, again, it's a two-part system.  So it's not a integrated, you know, tableware, self-sealing tableware.**  You have also to, you know, smooth it out on a surface for it to function properly.

. . .

   I guess the point is – is – that it – **those elements of it also teach away from – you know, form the '903 Patent.**

Q:  Okay.  And you also evaluated the Stravitz patent in relation to t**he Tommee Tippee Easi Mat?**

A:  **Yeah.  And so that one, as I recall, that one is pretty different.  That is a -- basically a suction cup on the bottom of a stackable bowl.  So -- and that, you know, in a suction cup case, there's no planar portion.**  You're basically pressing something down onto a surface to create a mechanical action from a suction cup. So a suction cup is different than self-sealing under, you know, self-sealing tableware in that you need a rebound effect essentially with a mechanical property which is called a rebound effect with the way it's designed on the underside. But also it's designed to stack and it's a bowl only.  **So it all teaches away from the integrated tableware.**

Q:  **Those elements are not disclosed in the '903 Patent?**

A:  **Correct.**

   **[Tr.T, M. Henley, 9/2/2021, 1440:23 to 1441:25]**

Q: Okay.  Let me jump around a little bit.  In your rebuttal report, talking about Webb on page 30, you see where it says, "Moreover, the Webb patent is also analyzed in the prior arts" chart -- excuse me, "prior art claim charts of patent attorney Rick Martin at page 144 and 146.  And **I'm in agreement with his findings that Webb failed to disclose all the elements of the claims of the '903 Patent.**" So you didn't do your own claims chart for these your prior art products that you've been discussing.  Right?

A:  I -- I think I did.  I believe so.

Q:  For the prior arts products?

A:  As I analyze them in my report?

Q:  Right.  Yeah.

A:  Yeah, one -- I think one of them, yeah, I did.  I did.  I think it might have been a rebuttal report.

Q:  Well, I didn't see those claim charts.  It seemed instead that you relied on the claims charts done by Rick Martin?

31

A:  No, I agreed with them.
Q:  You agreed with them?
A:  That was the point, yeah, I agreed with him.
Q:  And he was an attorney for EZPZ?
A:  Correct.  He started -- he started the project before I came in.
**Q:  Okay.  And you agreed with his findings about Webb?**
**A:  I did.**

28.     The Court looks at facts that inform the Court's decision on whether the single most

reasonable inference is that there was an intent to deceive in not disclosing the Webb Prior Art.

[This is more of a conclusion of law in determining whether Webb was not disclosed because it

was cumulative or did not read on the claims or the patent examiner already found the prior art

references made the patent claims obvious, rather than the only reasonable inference was that

Webb was deliberately hidden to avoid an obviousness finding.]

29.     During the prosecution of the application that became the '903 Patent, as evidenced

by the Second Response, Mr. Williams' and the examiners discussed suction cups and disposed of

same as relevant.

**[Tr.T, B. Williams, 8/31/2021, 805:23 to 807:16]:**

Q:  Well, we'll find out. And, so, if we -- if we talk -- you talked about an obviousness. So, for example, in the first office  action with t**he '903 Patent, the examiner rejected the claims based on obviousness?**
**A:  I believe that's correct, yeah.**
Q:  And so the Examiner Volz said that in was it the Bass patent in light of Lion?
A:  It was actually Stravitz, if I'm not mistaken.  And I think it might have been a 102 and a 103.  So she originally -- I mean, you might want to bring that up if you want.  I don't know.  **But originally she rejected the Happy Mat, let's just call it for ease of discussion, over Stravitz.  And I think Lion was in there as well. And Stravitz is actually a suction cupping device that is pressed and splays and adheres by -- excuse me -- the elastic rebound of the material.**
Q:  It's a what device?
A:  It's like -- it's a suction cup device.  It's like -- if I remember correctly, **it's a bowl with two pieces that splay out and are set by the action of pressing it. And then Lion was a silicone mold that was used in baking and carrying things around.  So that was the beginning of the prosecution.  And that was traversed easily because suction cups were stipulated on the record as being not relevant prior art.**
**Q:  Why wouldn't suction cups be relevant prior art?**

32

A:  **Because suction cups operate in a different manner.**  They - this is one way I think that may illustrate this point. When you remove a suction cup, you break a partial vacuum, and it makes a popping sound.  You have to pull it off.  That's the sound of the air displacing underneath it.  It has a active vacuum, an active vacuum underneath it.  It is the elastic deformation of the material that is elastically rebounding trying to go up that's creating a negative pressure. **So it's actively adhered by the vacuum it is creating as a result of the elastic properties of the material.  And when you remove it, it makes a popping sound. So the Happy Mat does not do that.**  It doesn't create a partial vacuum until attempts to lift it are made.  There's no sound.  There's no resistance to picking it up.  **It is, therefore, a useful improvement because it allows surface contact adhesion, if you will, without the use of a suction cup, without the use of a clamp and without the use of adhesives.**

30.     Webb became known to Mr. Williams' at the time the International Search Report (ISR) (Exhibit 46) and the Written Opinion (Exhibit 47) of the International Search Authority issued for the PCT Application on May 4, 2015. This includes Webb Prior Art as a "Y" Reference. *Id*. At the time, prosecution of the application that became the '903 Patent was ongoing. The Court finds credible the testimony that Mr. Williams' did not earlier see the reference to a google patent reference that Ms. Laurain sent him, which was discovered during the litigation to be the Webb patent.

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 415:9 to 416:13]**

Q:  (BY MS. MENASCO) And I believe you did have that conversation with Ms. Laurain, because after your meeting, she sent you an email that listed all of the prior patents that she had found and similar products that she had found, right?

A:  **Yes, she did send me that email.  And I'm glad you brought that up.  That email was -- you're talking about a specific attachment that was on an email.  And the email had a lot of other stuff on it, including the drawings.  I took that email to be a disclosure email.  And, unfortunately, I did not even see that Word document tucked in between the giant JPGs.**  And when I dragged it into my folder, it's actually -- I think you -- you have it, because it was disclosed with all my hard drive.  It was in the old folder in my filing system. So yes, **she did send me a list of patent numbers from a search that she, herself, had conducted.  At that time, unfortunately, I wasn't aware of that. And I will also say that it arrived at like -- when I got to it, it was about 10:30 at night.  And I just grabbed all the attachments and dragged them into my folder** and went on with the -- the case I was working on at that time. But yes, she did -- she did disclose that to me.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 34:16-21, 34:23-25, 35:1-11, 35:23 to 36:1, 36:2-9]**

Q:  So this was produced to us by Ms. Speer as the patent search that you had sent to Ms. Lilja and Ms. Speer.· Do you recognize this patent search?

A:  I -- I recognize this patent search·document that's in front of me and that's what it ·says.

Q:  (BY MR. DENEGRE)· Okay.· And is this a document that you created?

A:  Um, I honestly don't recall specifically creating this document, because it was so long ago and it was done a week after I had the idea, but based on email exchanges and attachments, I have no reason to dispute this being a document that I created.

. . .

Q:  Let me call your attention to one of the patents, which is the sixth one down, US 8251340.· Do you see that one?

A:  Yes.

. . .

**Q:  Do you recognize that as the Webb patent?**

**A:  No, sir.**

**Q:  Do you know what I mean when I say "the Webb patent"?**

**A:  I do because of this litigation, but I have no way of telling that that would be the Webb patent.· To me, like I said, it looks like a Google search.**

31.     Although it may be common practice to disclose the ISR and the Written Opinion (they often are both issued at the same time) in an Information Disclosure Statement, the testimony of Mr. Williams' was credible that he did not disclose same because he believed that since the ISA Search office was the USPTO that the results were available during the prosecution of the application that became the '903 Patent, even if that belief was mistaken. Mr. Williams' was an inexperienced patent agent and this was the first PCT that he had filed.

**[Tr.T, B. Williams, 9/1/2021, 1044:12-1054:25]:**

Q: First, let's talk about the PCT, the Patent Cooperation Treaty Application.  And do you recall that an ISR was issued in that prosecution?

A:  In the PCT?  Yes, we're talking about the International Search Report.  Correct.  Yes.

Q:  And that is -- we talked about that before that it discusses the three "Y" references?

A:  Yes.  Yes.

Q:  And why did you not disclose the ISR in the '682 Application, which is the -- became the '903 Patent?

A:  Let me make sure I got my time line right.  I think that the first office action in the '903 happened in April of 2015. The ISR came out May of 2015.  And so there's really two

reasons that I didn't do that. One is that the duty of -- of disclosure requires you to pay attention to foreign filed applications.  Right?  And the USPTO is a receiving office.  In my reading of the law at that time, I did not think that the USPTO constituted a foreign filing. I know that they do have access to the continuity chain between the examiners.  So I presumed, and I think this was probably error on my part, that it would show up in the family. It's definitely visible there, but that doesn't necessarily mean that the examiner checked it.  But the more important reason --

Q:  Wait.

A:  Okay.

Q:  Well, go ahead.

A:  But the more important reason is because Webb is a suction cup.  Pearson was another one of the "Y" references, was a suction cup.  And Hatfield was kind of a reference that even though it was cited, it was not actually cited in the report. So Hatfield was kind a weird anomaly.  It was, like, a heating bowl for children's food.  And, I mean, the only thing I can think it was, it should have maybe been an X at the best or even completely not relevant, maybe for the divided receptacle.  But they didn't even cite it actually in the report The actual advisory comments, if you like, in the ISR were based solely on Pearson and Webb.  And when I looked at the search strings that the examiner had used, he clearly had placemat and suction cup, suction cup.     So, at the time, it was -- we had already traversed the suction cups with the '903 first office action.

Q:  And do you believe that the ISR was material then?

A:  I do not believe that Webb or Pearson or Hatfield are material references at all, no.

Q:  Because they're suction cups?

A:  Because they're suction cups.  And I actually wrote my comments to that effect on the file wrapper and submitted it as part of -- as part of the file record.  I did that in communication with the PCT help desk. You know, this is my first time doing a PCT Application. I just, you know, should say that probably.  You know, there's two phases to the PCT.  There's the international phase and there's the national phase. And so the international phase, as you guys probably know, occurs in the United States Patent and Trademark Office as receiving office.  That's where I would file it being domiciled in the U.S.  Right?  So I would file it into the United States Patent and Trademark Office as a receiving office.  And it sits here for a while.  The International Search Authority in this case is going to be the USPTO.  So it's the same body, same government agency.  And then basically 30 months after the priority date, it's going to enter the countries that we have designated we want patent protection in.  And that's when it becomes a foreign filing at that point when it goes into Europe, when it goes into Canada, when it goes into Singapore, when it goes into Australia, when it goes into wherever it goes, that's when it becomes a foreign filing.  That was my understanding of the process. So when I got the ISA report -- oh, those are my comments right there.  When I got the ISA report, --

     MS. SECOR:  Your Honor, this is Exhibit 492.

A:  I wrote down my reasonings for, wait a minute, you know, I rang up the patent help desk, PCT.  And I said, "Well, listen, it looks like they've done a search on suction cups, but we've already -- this is not a suction cup.  Is there anything I can do?"  And

the response was, "Well, you don't have to worry about this.  This is just a report.  It's put in there.  It goes with the application into the so-called designated states."  These are the -- the countries wherein foreign patenting will ultimately occur if we win, like we did in Europe and Singapore and Canada.

Q: So you thought you didn't have to file the ISR because it wasn't a foreign filing in your view?

A: Yes.  Number 1, that is absolutely true.  Number 1, when I did this, it wasn't a foreign filing.  There's different interpretations of that sentence.  It's not a clear sentence without the benefit of a senior practitioner to turn to ask anyway.  That is not the material reason, though, for not disclosing it. As my informal comments entered into the file wrapper show, pursuant to the PCT help desk's direction, which was to be published adjacent to the ISR in those foreign filings in those countries I mentioned before, -- which is why I mentioned them -- this would show up next to the ISR.  And that's why the PCT help desk encouraged me to submit them because there is no prosecution occurring at this phase.  I am merely putting on the record why I think Webb is not material at all.

Q: All right.  So at this time in May of 2015 in these comments in the 955 PCT Application after the ISR published, you provided these comments.  What do your comments show you believed about Webb at that time in 2015?

A: Well, they show everything that I have said all along from the very beginning and even yesterday.    They say that the ISA has issued an opinion that claims 1 through 6, 8 and 9, lack novelty in this case, an inventive step -- or obvious, excuse me.  An inventive step is how the International, the PCT Article 33 characterizes obviousness.  So it lacks an inventive step as being obvious over Webb in view of Pearson. But neither of these reference teach a suffuse undersurface capable of forming a partial vacuum only when attempts to separate the undersurface from an underlying surface are made.

Q: Right.  So --

A: And then we get into the suction cups because they both rely on suction cups.  Pearson is clearly a suction cup.  Webb, in my opinion, operates in exactly the same manner as a suction cup according to his own teaching.

Q: And we talked about that yesterday that Webb argued it was a suction cup to get granted over prior art.

A: Over Pearson.  Webb actually distinguishes over Pearson in his own prosecution, the use of the resilient ridge to deform the mat.  And he only is allowed in view of Pearson, which was I believe an anticipatory reference against him, clear suction cup, because the resilient ridge is under the receptacle and not outside it.  That's the only distinguishing feature that he has to get his patent. So the fact that the examiner grouped Webb and Pearson together in this manner is absolutely consistent with Webb's own prosecution. However, when you look at his search strings and he has suction cups in his search string, it was necessary, I felt, to write these informal comments to say, wait, this has got nothing to do with suction cups.  And that's basically what I did.

Q: And when you say "This has nothing to do with suction cups," you mean the invention --

A: Yes.

Q: of the 955?

A:  Yes.  I mean, the -- yes, the Happy Mat international phase application as submitted at that time.

Q:  Which claims were the same as the '903 Patent?

A:  .  I believe they were the same at that time, yes.  I mean, I didn't complete this filing in the end.  So I'm not sure how the claims ultimately ended up.  But, at that time, I think they were the same.

Q:  Okay.  And do you think the same argument applied for both?

A:  I'm sorry, the same argument?

Q:  That Webb is a suction cup and doesn't read on the claims?

A:  Oh, absolutely.  Yes, absolutely.  Absolutely.

Q:  And we talked about it yesterday that Stravitz was disregarded because it was suction cups?

A:  Correct.  We had traversed suction cups in April of 2015

Q:  Okay.  And so this is what you believed at the time.  Do you still believe this today?

A:  I do still believe this today.  I do believe that we traversed suction cups and that Webb and Pearson are clearly suction cups.  And I think the examiner's own search shows that.

Q:  Yes.

A:  It does.

Q:  And then in February of 2016, you were sent a letter by Mr. Morse of Nuby Law, and stating you should disclose the ISR in the 4 -- in the '903 patent prosecution.  Do you recall that?

A:  What was the date again?

MS. SECOR:  Thank you, Amy.

Q:  I believe it's February of 2016.

A:  Sure.  I guess that's probably true.  I don't remember exactly the date.  So --

Q:  When you received that letter in early 2016, did you think you had to disclose the ISR in the '903 Patent?

A:  I did not for the reasons I've already disclosed.

Q:  Because it's not but-for material?

A:  It's not but-for material.  Webb is cumulative of the art on record at that time, and it's not a foreign filing in my estimation of the -- of the law at that time.

Q:  Okay.

A:  But the first two reasons are more important for sure.

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 528:6-20, 532:2 to 533:8, 533:19 to 534:9, 534:12 to 535:2 ]**

Q:  (BY MS. MENASCO)  Now, after you submitted the response to the first office action and before you received the second office action on July 29, 2015, you received the International Search Authority search results and written opinion in the '955 PCT application, didn't you?

A:  I would have to take your word for the timeline; but yes, I believe that's correct.

Q:  That was on May 4th of 2015 that you received the search results and written opinion?

A:  That was the date it was mailed.  But bear in mind that we're dealing with the World Intellectual Property Office, even when the USPTO is receiving office.  So I probably received it a little bit later than that; but, yes.

. . .

Q:  All right.  And If we look on the second page, there are, in fact, two additional "Y" references, aren't there, sir?

A:  Pearson and Hatfield.

Q:  Why didn't you disclose Pearson and Hatfield to the patent office in the '682 application?

A:  I imagine because they dealt with suction cups or adhesives or they were not anticipatory references.  I would like to -- I'd like to see them. I don't recall off the top of my head, but I imagine that is why.

Q:  Do you have any notes about your analysis establishing -- explaining the basis -- I'm sorry.  Do you have any notes concerning your evaluation of these "Y" references?

A:  I mean, if you'd like to show them to me, I can talk you through it, if you want, right now, if  you want to show them to me.

Q:  I don't -- I don't have them.  I'm asking if -- if you took any?

A:  Well, if I did, you would have those notes; so I don't think so.  I don't remember.  I think Hatfield was a suction cup, and I think Pearson might have been a horse mat.  I don't remember off the top of my head, I'm afraid.  But, you know, there's no requirement to disclose these references, and I don't believe that they were material.

Q:  What are you basing your statement on that there's no requirement to disclose references cited in a co-pending patent application, sir?

A:  37 CFR 1.56.

. . .

Q:  (BY MS. MENASCO)  And what part of 37 CFR 1.56 are you relying on, sir?

A:  Relying on the part where it says that you are encouraged to notify the patent office of any foreign references cited in foreign filings.  And it says "encouraged" or "advised." It's not an actual requirement.  But obviously, had these been material references, Examiner Volz would already have access to them, correct, as the USPTO was the International Search Authority. This wasn't filed in another country, and it wasn't filed in WIPO directly, and it wasn't entering the United States from another country.  It was filed in the same office.

Q:  She might have access to it, but isn't it your obligation to bring her attention to it, sir?

A:  If it's material, yes; but I don't think these references were material, because they relied on suction cups and adhesives.  And Examiner Volz had already disposed of those in the first action.  So again, you know, there's a contrary side to the rule to disclose; and that is, you're not supposed to disclose irrelevant stuff, either, or immaterial stuff, either. And I realize there's some subjectivity there; but, you know, a material reference has got to be material to patentability and non-cumulative. And there's nothing here, that I recall -- granted, right, because it's been a while since I looked at these -- that I recall that in any way challenges the traversal of obviousness that we were able to

afford through the secondary considerations. There's nothing here that obviates our patent.

32.     Moreover, Mr. Williams believed that the Webb Prior Art was believed to be cumulative and not material based on the prosecution history that had already transpired regarding the immateriality of suction cups. The Court analyzes the veracity of Mr. Williams' testimony regarding his belief at the time about the prior art; axiomatically, different attorneys and different patent examiners each hold their own views, which may nor may not be consistent with Mr. Williams' or each other (indeed, we see different examiners treating Webb Prior Art differently in related applications).

As discussed in ¶¶27-31, and the following testimony.

**[Tr.T, B. Williams, 8/31/2021, 859:3-25]**

Q:  Yeah.  Why do you think Webb wouldn't have made a difference in the patent granting?
A:  Because Webb doesn't anticipate the Happy Mat.  It's cumulative to what was already disclosed.  The Platinum Pets is a much closer reference.  Bowen in view of Bass, or Bass in view of Bowen is a much better hypothetical combination because of the express teaching away in Webb of this deforming of the base sucker and creating the suction effect.   And it wouldn't have stopped the secondary considerations of nonobviousness.
Q:  And do you -- it would not have what?
A:  It would not have stopped the secondary considerations of nonobviousness.
Q:  What do you mean by that?
A:  It would still be in combination with Bass or another reference.  And the combination obviousness was traversed not by argument but by secondary considerations.
Q:  Okay.
A: So I don't know if she took my argument about Bass's adhesive.  She didn't put that in the notice of allowance either.  But from my discussions with her, up to this point in time, I think that's unlikely.  I think it was the secondary. I am 99 percent sure it was the secondary considerations of nonobviousness that won this patent.

**[Tr.T, B. Williams, 9/1/2021, 1225:15 to 1226:25]**

Q: Okay.  Okay.  And the -- you said it -- which was the ISA letter was basically the USPTO rehashing a similar rejection over nonpertinent prior art.  Do you see that?
A: I mean, yeah, right here.  I see.  I'm sorry.  I was looking in the wrong place.  Yeah, I mean, we were talking about Webb, so, yes.  Yeah.

39

Q: And so did you believe that you had an obligation to disclose Webb in the '903 Patent at this time?

A: So this is June of 2016.  So, no, this is already after the first two actions.  Right?  So we've already disposed of suction cups April of 2015.  And then in the second action, whenever that was, where it's actually stipulated on the record that suction cups are no longer in play.  So, no, I did not see Webb as relevant to the ongoing proceeding with the '903 patent.

Q: Did you believe you had already discussed cumulative prior art to Webb at this point in time with the examiners?

A: In June of 2016?  Certainly in August of 2016 we had discussed cumulative prior art.  At this time discussed with the examiners directly, I don't know if I can say that.  But by August, absolutely.

Q: But if suction cups had been traversed --

A: Well, you said all cumulative prior art, so, yeah, all suction cups, yes.  Yes.  I'm sorry.  Did I misunderstand the question?  Yes, suction cups absolutely.

Q: Okay.  In June of 2016, in your mind, suction cups were no longer an issue?

A: Yeah, as of April of 2015, suction cups were no longer an issue in this prosecution.

Q: Why April of 2015?

A: That was the date of the first office action where Stravitz was traversed.

Q: Okay.  So you were no longer thinking about suction cups after that?

A: Suction cups were no longer relevant to the line of inquiry ongoing at the patent office.


**[Tr.T, J. Kennedy, 9/1/2021, 970:5-7, 972:12 to 973:7]**

Q: Okay. Now, before we look at the exhibit, could you explain to the Court what an International Search Report and written opinion is in collection [sic] with the PCT?

A: . . . So the PCT process did a search for relevant prior art using a different examiner.  They came up with Webb. And they said is not anticipatory, but Webb may be useful for purposes for obviousness. And then the examiner explained they remarks their basis for their understanding.

Q: And, yet, in the '403 Application, they found that Webb anticipated in the -- in the non-final office rejection. Correct?

A: That's correct. The examiner initially found that, and then the examiner withdrew that rejection based upon argument and amendment.

Q: Does that indicate to you that even an examiner could look at references differently upon initial review?

A: Yeah. Two different examiners may review the same reference and draw different conclusions. And if it was but-for material, you would think that all the examiners would reach the same conclusion. So that kind of suggests it doesn't --  it doesn't establish, but it suggests or infers to me, that since you have this disparity of opinion between examiners, as set forth in written records, that it's not but-for material at least for purposes of anticipation.

33.     Mr. Williams' testimony is credible with respect to his reading of Webb teaching a suction cup and teaching away from the '903 Patent; that he had already discussed the inapplicability of suction cups to the '903 Patent with the examiners; and that suction cups had already been disposed of as relevant or analogous prior art.

As discussed in ¶¶27-32, and the following testimony.

34.     Notably this belief that Webb is a suction cup that is cumulative is evidenced in contemporaneous statements that corroborate Mr. Williams' trial testimony. To wit, Mr. Williams provided Informal Comments to the International Search Authority on May 8, 2015, four days after the ISA report identifying Webb Publication (US Pub. 2008/0245947-A1) as a "Y" reference. *See,* **Exhibit 865.** The information comments identify Mr. Williams' argument that the Webb Publication teaches no more than a suction cup and how the suction cup is different than the claims of the application that became the '903 Patent. *Id.* Additional consistent statements are evidenced by internal emails. *See,* **Exhibit 194.**

[Tr.T, B. Williams, 9/1/2021, 1141:23 to 1142:3]

Q:  In fact, sir, four days after you received the International Search Report and the written opinion of the International Search Authority, you filed informal comments in the PCT Application where you presented argument as to why Webb did not apply as invalidating prior art.  Correct?
A:  Absolutely correct, yes.

35.     Mr. Williams' consistently maintained his position in later prosecutions, namely the '823 Application and the '403 Application, albeit none of these applications reached a final determination by the patent office.  *See,* **Exhibit 905** ('823 Application); and **Exhibit 281** ('403 Application).

36.     In the National Phase Entry application, the '823 Application, EZPZ added claims 10-13 to the original claims 1-9 of the '903 Patent. It subsequently canceled claims 1-9 as to not

face a double patenting rejection. Claims 10-13 were *method* claims and not *apparatus* claims like claims 1-9.  *See,* **Exhibit 905** ('823 Application).

> **[Tr.T, B. Williams, 9/1/2021, 1058:13-22].**
>
> Q:  Okay. And what is a preliminary amendment?
> A:  Well, During prosecution, you're allowed to amend your claims. And you may do so in response to an examiner's action taken or rejection, or you can enter an amendment before anything happens. And so in this case, we're re-entering the United States with substantially the same claims. So to avoid a double patenting rejection, we entered a preliminary amendment in hopes of securing a method, which is one of the statutory classes of invention.

37.    Method claims and apparatus claims differ in scope and are not substantially similar claims. Claims 10-13 were rejected for being anticipated/obvious in the first non-final rejection on June 28, 2018. *See,* **Exhibit 905**. This rejection was traversed by EZPZ, arguing consistent with its position that Webb Prior Art taught a suction cup (*See,* Exhibit 905, pp. 29-41 (PDF 29-41)). The application was abandoned, however, before the next response by the PTO. *Id.*

38.    In a subsequent continuation application, the '403 Application—containing apparatus claims (*See,* Exhibit 281, LNC301156-159, PDF 104-105). Mr. Williams' arguments that the Webb Prior Art taught a suction cup and taught away from the claimed invention were sufficient to overcome the first non-final office action that rejected, in part, for the Webb Prior Art. (*See,* Exhibit 281, LNC301156-159, PDF 104-105). This application progressed further than the '823 Application in that we have information about the examiner's response to the argument that the teachings of the Webb taught only a suction cup which did not read on the claims.

> **[Tr.T, J. Kennedy, 9/1/2021, 969:4-16]**
>
> Q:  The fact that Webb was originally cited for anticipation [in the First Office Action of the '403 Application] and then wasn't cited in the subsequent office action, what does that indicate to you, if anything?
> A:  Well, it indicates to me that the Patent Examiner Impink agreed [with Williams' response] that Webb was not anticipatory. And the fact that the examiner no longer

relied upon Webb also teaches to me that the examiner would not have relied upon Webb for a but-for materiality obviousness consideration. Because if the examiner wanted to rely upon Webb for a but-for material obviousness rejection, the examiner presumably would have so rely. Examiner didn't. So that suggests to me that the examiner would not have relied upon Webb for a but-for materiality obviousness consideration.

39.     The examiner in the '403 Application withdrew Webb Prior Art after argument by Mr. Williams. Examiner Impink relied on portions of Webb's teachings to contend that claim 1 of the '403 Application, as originally filed, was *anticipated* by Webb. *See,* **Exhibit 281.** Such reliance did not survive scrutiny, and were not maintained in the next Office Action. *Id.* Instead, in the next Action, the Examiner relied on *obviousness* under 35 U.S.C. § 103 in view of entirely new art (and not Webb). *Id.* Further, in the next/Final Office Action, Examiner Impink *did not rely on* Webb for allegedly teaching *any element* of claim 1 of the '403 Application, as then pending. *Id.* This alone is telling of Examiner Impink's ultimate conclusions regarding Webb – it was not "but for" material – she had every opportunity to sustain rejections based on Webb alone or in combination with other references. Yet, when Webb's non-teaching of various limitations was asserted by Applicant, Examiner Impink moved on – and no longer asserted Webb anticipated or rendered the claims obvious over Webb in view of any other reference. Applicant's invention was patentably distinguishable over Webb, as recognized by the Patent Office.

*See also,* **Evidence, as presented in ¶35.**

40. Also, the Webb Prior Art was part of each continuing application by EZPZ. *See,* **Exhibit 905 ('823 Application); Exhibit 281 ('403 Application); Exhibit 583 ('976 Application); and Exhibit 582 ('824 Application).** It is not reasonable to infer that if EZPZ believed that it "got away with something" by not telling the PTO about the Webb Prior Art in the '903 Patent prosecution but yet would continue to go back to the PTO seeking continuing applications.

41. The single most reasonable inference is *not* that there was an intent to deceive in any failure to disclose Webb Prior Art.

*See,* **Evidence, as presented in ¶¶ 27-40. Mr. Williams believed it was cumulative of other suction cups prior art, such as Stravitz, which the patent examiner Volz expressly considered. Mr. Kennedy a patent attorney expert confirms and also agrees with his assessment. Mr. Hubbard, LNC's expert agreed that prior art that is merely cumulative is not required to be disclosed, and he did not evaluate the claims or the specification of the patent, only giving the definition the "broadest possible" interpretation. The only POSITA at trial, Mr. Henley testified that Webb does not read on the claims of the '903 Patent, and a person of ordinary skill in the art would not have thought to combine prior art to come up with the integrated mat made of silicone that would not require attachments of some sort (adhesives, suction cups, sticky adherents or other mechanisms of attachment like duck tape used by Ms. Winkelmann).**

<u>Tommee Tippee Prior Art Reference</u>
<u>(Materiality and Intent to Deceive)</u>



**42.**     The only Tommee Tippee mat of which Ms. Laurain was aware during prosecution of the '903 Patent was the Tommee Tippee Explora mat that came in package folded in three (as opposed, to Tommee Tippee Easi-Mat or Tommee Tippee Magic Mat). *See,* **Exhibit 1017.**

**[Tr.T, L. Laurain, 8/31/2021, 676:21 to ]**

Q:  At the time you filed your application, what Tommee Tippee mat did you have?
A:  That one -- yes, that; yes, that, mat.
Q:  This is Exhibit 1017, the Tommee Tippee Mat that you had?
A:  Yes.  And when I started out with the idea, I -- before we created the company, --
Q:  That's okay.  You already talked about that.
A:  Reaching out to Tommee Tippee.
Q:  Oh, no.  No, let me get to that question.
A:  Okay.
Q:  With regard to this mat, it came folded up in this little box?
A:  Yes, that's how it was packaged.
Q:  Okay.  And have you since looked on line?  Can you still buy that product?
A:  It's hard to find any of them.  They're all -- both mats are discontinued and not made anymore. It doesn't – you can get them on eBay, a few on Amazon, but they're not – they're not produced anymore. They're not making that product anymore. I could be wrong, but it's not on Tommee Tippee website anymore.
Q:  Okay.  So were you surprised to find the form of the LNC that's shown in the deposition?
A:  Yes, I hadn't seen it.
Q:  Is that like this mat?
A:  Again, that one comes folded up.  The other one doesn't. I think if you gave it to me, they feel a little different.  I don't know if it's accurate or it just feels differently. Visually once you get it out of the package they look the same so they all kind of look the same.

43.     The Tommee Tippee mat came "rolled-up" in its packaging. The mat had to be flattened by hand. Absent hand flattening, the Tommee Tippee mat maintained a crimpled, semi-rolled up configuration – it remained "deformed." Equally clear, such mat did not automatically un-deform and thus it was incapable of "surface contact self-sealing."

**[Tr.T, J. Kennedy, 9/1/2021, 956:3 to 957:13]**

Q:  Let's talk about some of your opinions with respect to why the Webb prior art or why you believe the Webb prior art doesn't render the '903 Patent obvious.
A:  Yeah.  So beginning at 194 by looking at Webb's abstract, Webb's abstract teaches a mat that is resiliently deformable. Resilient, again, referring this time to Merriam Webster Dictionary, means something will withstand a change without permanent deformation or rupture.  Deformed means the item becomes misshapen or changed in shape.  So that means you can basically change it in shape.  It could be deformed resiliently and it will pop back at some point.     The cite say it can be misshaped, example rolled up, which is what Webb teaches in column 21 lines 41 to 52, and the mat will not be permanently deformed or damaged.  So you can roll this thing up.  And that's the way I remember seeing an example of the Tommee Tippee Mat, which I understand is an embodiment of Webb.     But you can roll this thing up.  And it comes rolled in a package and it won't be damaged by rolling it.  This resilient deformity,

however, does not mean that it will undeform automatically.  So it's something that you can roll up does not mean it will automatically unroll.  And that is important because, on observation, when I took it out of the package, it did not unroll automatically.  It remained in its deformed, rolled up shape. And that also informs me as to whether it eventually operates as surface contact, self-sealing.  And my observation upon the Tommee Tippee mat I had was that it did not – you actually had to spread it out in order to make it have contact. So if it came out of the tube deformed or was deformed, it remained deformed until you smoothed it. And so if the product per Claim 1 is surface contact, self-sealing, I interpret that to mean it's surface contact, self-sealing at all times and not just half the time or part of the time.  So Webb does not appear to be a surface contact, self-sealing mat.  That was one of the distinctions.

43-1. The Tommee Tippee Mat is not integrated tableware as claimed by the '903 Patent.

**[Tr.T, M. Henley, 9/2/2021, 1426:1-18]**

Q: And then with regard to the Tommee Tippee Mats, do those -- is it the same thing?
A:  Yes.  So it's a two-part system intended for a rigid bowl and a flexible mat and taking the product on and off.  And again, the product and the concept, as well as the patent, teaches away.
Q:  So if it's a two-part system, why does that teach away from the '903 Patent idea?
A:  Not integrated tableware.
Q:  And what's important about that?
A:  It's -- it's the whole -- it's really kind of the key -- key feature of the EZPZ product.  t's one piece.  It's wrought of the same material.  It functions because of the way it's structured not just the material it's made out of.
Q:  Okay.  The Happy Mat?
A:  Correct.
Q:  And the Tommee Tippee Mat doesn't work in the same way?
A:  No.

44.     The Tommee Tippee mat in Ms. Laurain's possession was not "surface contact self-sealing" because it requires hand smoothing before any "sealing" action occurs. It was not "but-for" material. *See generally,* Laurain Deposition, June 28, 2019.



*See,* **Evidence, presented at ¶27.**

45.   Ms. Laurain contemporaneous belief was evidenced in **Exhibit 1025,** with a presentation that discussed competitor's products and stated with respect to Tommee Tippee Explora "Really???".



[Tr.T, L. Laurain, 8/31/2021, 670:6-17, 671:2-10]

Q:  So is this the Tommee Tippee Mat that you had in your deposition that you put on that high chair?
A:  Yes.
Q:  And then just pulled it up real easily?
A:  Yes.
      MS. SECOR:  Thank you.
Q:  And so this is that product?
A:  Yes, pictured on the right.
Q:  Okay.  And this is the one that you said it doesn't have surface contact, self-sealing?
A:  Yes.  I mean, I thought, Really?  This really?  I mean that's what's available?

. . .

Q:  And what did you mean when you wrote the words to Brenda Speer, Danette Lilja, "Really?"
A:  Really this is what's available?  Like, really?  I can't believe this is what's on the market.
Q:  Today do you believe that's material prior art?
A:  No.  Now, today, I don't -- what I know today, because -- and the Tiny Diner has suction cups on the bottom.
Q:  And then at the time, can you --
A:  Again, I didn't send this presentation to Ben.

46.   The single most reasonable inference is *not* that there was an intent to deceive in any failure to disclose Tommee Tippee.

See, Evidence, presented at ¶¶42-45. (The mat Ms. Laurain knew about came rolled up in a box, had to be smoothed out by hand and did not seal or self-seal.)

47

**[Tr.T, L. Laurain, 8/31/2021, 712:18 to 713:11, 714:18 to 715:20]**

Q:  All right.  Ms. Laurain, as you sit here today, and what you know about prior art
    today, do you believe that the Tommee Tippee Mat, the one LNC showed you at your
    deposition, the pink one, do you believe it's material prior art?

A:  As I sit here today, my understanding is no, it would be cumulative.

Q:  All right.  And why is that?

A:  Because there were other silicone mats that were considered before the examiner.

Q:  Okay.  And do you know of anything else that supports your belief that it is not
    material prior art?

A:  Well, my original -- you know, if I went in my headspace back in 2014 when I had
    the Idea, I had put really on the presentation, you know, that's may understanding of
    kind of how terrible the mat was.  And then subsequently before I created the EZPZ
    company, I wasn't sure if, you know, I could actually create a company and, you
    know, do what we've done.  So I actually reached out to a gentleman that worked at
    Mayborn which owns Tommee Tippee and this is probably in April of 2014.

           . . .

Q:  Yeah.  So let me ask you:  Did you ever talk to -- who is Mayborn Company, first of
    all?

A:  The owners of Tommee Tippee, Tommee Tippee the brand.

Q:  When did you first talk to Mayborn Company?

A:  I reached out to a gentleman --

Q:  No, I don't want the whole story.

A:  Shortly -- first I reached out in 2014, probably in April 2014, I reached out to
    someone from Mayborn saying, "I have this idea."

Q:  And what was your purpose in reaching out to them?

A:  My purpose was reaching out to see if a big company would maybe take on a big
    product so I wouldn't have to create a whole company myself.  "I've got this amazing
    idea.  Do you want to buy it from me?"

Q:  Did they buy it from you?

A:  So at that time, no, those conversations never went anywhere in April 2014.

Q:  And did you talk to them again subsequent to that?

A:  Yeah.  I would say within a year or two they reached out, and we were talking about
    acquisition.  They were interested in acquiring EZPZ within the last two years or 18
    months.

Q:  Okay.  And did they?

A:  No, the deal fell threw [sic].

Q:  Did Mayborn ever sue EZPZ for infringement?

A:  No.

Q:  Did Mayborn ever send EZPZ a letter that warned EZPZ that they might be infringing
    their Tommee Tippee product?

A:  Absolutely not, no.

**[Tr.T, L. Laurain, 8/31/2021, 667:13-19, 679:14-21]**

Q:  Okay.  And then let's look at that presentation you sent to Brenda Speer.  It's Exhibit 1025.  And let's go find -- let's just flip through the pages and show what you presented to her.  And I want to stop at the Tommee Tippee Mat. Wait.  Can we go back one page, two pages.  There. So you were listing competitors.  Right?

A:  Yes, so competitors.

. . .

Q:  So at any time, Ms. Laurain, did you deliberately decide not to disclose prior art to the patent office?

A:  Absolutely not.

Q:  If you thought that a prior art would have made your patent impossible, would you have still submitted it?

A:  Absolutely.  There's an email with the Gerber mat that I said submit it all in because I don't want to fight about this down the road.  Get it all on the record as best as we could.

Exhibit **

<u>Momo Baby Prior Art Reference</u>
<u>(Materiality and Intent to Deceive)</u>

47.      Momobaby is not a "but for" material reference. *See,* **Exhibit 1013**. The primary (if not sole) reason the Momobaby placemat does not slip is not because of the glue used – not because any property of the silicone mat itself. A product analysis confirms that the adhesive/glue used is unacceptable as use of the same risks damage to the underlying surface. The packaging reinforces this point, in stating, "[t]he placemat can be attached ... without any sticky residue" and "[a]ttach and remove multiple times without loss of tackiness."

**[Tr.T, J. Kennedy, 9/1/2021, 1016:16 to 1017:5]**

Q:  Okay.  And then you were also handed the MoMo Baby Mat to look at the packaging. Do you recall that?

A:  Yeah.  That we just looked at the orange -- the orange mat, the MoMo Baby with the sticky stuff on it.

Q:  Correct.  And the packaging says that the placemat can be attached without any sticky residue.  What do you understand that to mean about whether -- about the bottom of the mat, if anything?

A:  Well, I did some research on this one, and that's somewhere in my exhibit list.  And the comments on, I believe it was Amazon, I might be incorrect on the particular

49

website, was that it did leave a sticky residue. And, as I testified earlier today, when I actually had this one, I was concerned with putting it on my hardwood table in my kitchen because I didn't want to upset my wife because of that sticky residue possibility.     And when I took it out, had that initial polyurethane whatever, thin film on it, and he took it off and he said he noticed that it was sticky.  So a sticky residue is something certainly I would not want on my table from the mat.  So that kind of discouraged me from testing it on my wood table.

Q:  Would you expect it to display on the packaging about sticky residue in the absence of some type of adhesive?

A:  No, I would not.

Q:  And then similarly it also said it could be attached, I think you said, attach, not past tense, attach and removed multiple times without loss of tackiness.  What do you elicit from that statement with respect to the type of material that's used in MoMo Baby?

A:  So it says it's self adhesive.  And so the lack of tackiness means to me that it's kind of like a Post-It Note where you have that sticky stuff on the back and it still sticks because of that adhesive.  So the adhesive doesn't go away with use at least multiple times. So it also infers that it is relying upon an adhesive because, if it wasn't, then you would expect it to work forever without loss of tackiness.  So the fact that there's some concern with potential loss of tackiness from -- after multiple uses, whenever that occurs, suggests that there is an adhesive to it.  Does that make sense?  Make that clear?  Okay.

     48.     Teaching the use of an adhesive to stick to the table, Momobaby both teaches away from the claimed invention and is cumulative to Bass (a reference discussed in the application leading to the '903 Patent), which also teaches use of an adhesive. Further, if combined with Bass, Lion or any other known prior art reference, not only do such references internally conflict, but when combined they do not teach each and every limitation of claim 1 of the '903 Patent.

**[Tr.T, J. Kennedy, 9/1/2021, 936:16-21]**

Q:  I'd like you to focus on MoMo Baby in particular.  And that, I believe, was 1013.  It's that orange mat before you.

A:  Okay.

Q:  Did you have an opportunity to review the website for MoMo Baby or the MoMo Baby Mat?

A:  I did.

**[Tr.T, J. Kennedy, 9/1/2021, 937:1 to 938:15]**

Q: And was there additional, I guess I said it was a website for MoMo Baby.  I should be clearer.  It's an Amazon.Com sales page for MoMo Baby.  Did this give you any additional information about the product?

A: Yeah.  So one of the things that stood out and was confirmed by further information on this website is this self-adhesive.  It's a description of the product by MoMo Baby itself that it's self-adhesive.  And that informs me that there's a glue.  An adhesive is a glue of some sort.

Q: And did you have the opportunity to inspect the MoMo Baby product prior to today?
   A: I did.  And I did a demo video.  And when I pulled it out of the container, there was a -- if I recall correctly, there was a plastic-like filament paper on the bottom side of the placemat.  And that was to keep the sticky stuff from sticking to the mat. So when you remove that, it was very sticky.  And I was so concerned that I didn't want to test it originally on my wood kitchen table because I thought it might mess up my table and my wife would be very mad at me if I did it.  So we tested it on a glass coffee table knowing I could scrape the glue off if I had to.  But, yes, it was very sticky.

Q: And did that help inform your opinion of whether the MoMo Baby Mat would be but-for material to the application that became the '903 Patent?

A: It does because during the prosecution history, it was discussed that surface contact, self-sealing and the rest of the claim limitations basically excluded use of an adhesion. So an adhesive is a teaching away art.  It's another way of seeking to solve the problem that Ms. Laurain was trying to solve, which was kids pulling their bowls and placemats and flinging the food across the kitchen. So if you're using a glue, that's a different way of solving a problem and teaches away from the solution that Mrs. Laurain came up with, invented.

Q: So in your view, are any of the -- the MoMo Baby, Ooga or Brinware mat but-for material to that '903 patent?

A: No, they are not but-for material

**[Tr.T, M. Henley, 9/2/2021, 1458:25 to 1459:3]**

Q: Let me ask you this question, Mr. Henley:  If a piece of prior art had adhesive or sticky stuff that was added to it, would it read on the claims?

A: No.

**[Tr.T, B. Williams, 8/31/2021, 821:24 to 824:6]**

Q: Okay.  So, like, what you're saying is that Bass that was like the bathroom --

A: No, that was Kerr because that was suction cups.  Bass is just an adhesive.  Bass is like a placemat with an adhesive on the bottom.  You withdraw -- you remove a film and stick it like sticky tape.  And then when you rip it up, it's a single-use mat because the adhesive is used up and you throw it in the trash; and then you clean your table evidently because you have a residue on there.  It's sticky.  Right?

Q: Yeah.

A: So to me that's an absolute clear, useful improvement over adhesive.  Nonetheless, it was traversed on other grounds when we get to the third action, if you want to go there. I don't know.

Q: Okay.  We'll go there in just one moment.

A: Okay.

Q: So when you're talking about you said Bass is the adhesive?

A: Yeah, Bass had an adhesive on the back.

Q: Is that like this?

A: No, because -- I mean, that -- that has something else.  Yeah, it's got some oily residue. Bass had a -- well, does that film come on it?  Do you separate -- do you tear off a film and stick it on there?

Q: Yes.  Would you like to see it?

A: Sure, I'd like to see it.  I guess.  I don't know.  It looks kind of weird.

(Ms. Secor approaching the witness and handing him an exhibit)

Q: That's okay.

A: I mean, yeah, it's a little sticky.  You know, my thing with this is that it's a planar portion that is moot on other grounds.  It doesn't have integrated tableware.  So, you know, absent an obviousness consideration, it's not relevant.  It certainly doesn't anticipate the claims.  Right?  So --

Q: What do you mean?

A: It doesn't have integrated tableware involved in it.  So this by itself cannot deny the novelty of the Happy Mat.  It would have to be in combination with another reference. And since we traversed Bass, which this is pretty close -- this is actually close to another reference called Bowen that was cited by the examiner in the third search.

COURT REPORTER:  Bowen?

THE WITNESS:  Bowen, B-O-W-E-N.

A: Actually she had at least four silicone planar portions in her third search result that I think are better than this for self-cling because this is a bit sticky.  It's a viscid.  It's got thermoplastic elastomer in it, which is known to be a sticky substrate.  In fact, you know, a lot of folks started moving to silicone to get away from this stickiness.  So I don't know why -- I don't know what the formation of this is, but you can see it's stretchy.  Right?  That's the -- that's thermoplastic elastomer.  That's a different polymer.  And, as a result, it's going to get, and it does have, things stuck to it.

Q: Okay.  That is MoMo Baby?

A: Is that what that is?

Q: Yeah.

A: Okay.

49.     The single most reasonable inference is not of an intent to deceive, but, that EZPZ rightly concluded that the Momobaby placemat suffered from numerous, obvious defects and such product was simply not relevant to the patentability of any claim for EZPZ's invention.

*See,* **Evidence, as presented in ¶¶47-48.**

**[Tr.T, L. Laurain, 8/30/2021, By Deposition (6/10/2020), 55:12 to 56:19]**

Q:  Okay.· So I'm going to ask you to turn to production page No. 34 in this Exhibit 682.
A:  Yep.
Q:  And am I correct that over the next several pages, you've listed a few competitors, right?
A;  Yes.
Q:  And turning to page 35, you've got the Momobaby mat, correct?
A:  Correct.
Q:  At the time, did you have a copy of the -- excuse me. Did you have an example of the Momobaby mat?
A;  No, I did not.
Q:  But you've seen it now in deposition, correct?
A:  Yes.
Q:  And you would agree with me that it self-seals to surfaces?
     MS. FISCHER:· Objection.· Form.
A:  I would completely disagree with you.· It literally is like a sticky residue when you actually feel it.· In my deposition, I remember -- and you can watch the video -- I was shocked to see how it felt, so no, that's not a fair statement.
Q:  ·(BY MR. DENEGRE)· Well, regardless of what mechanism it may have, would you at least agree that it does self-seal to flat surfaces?
               MS. FISCHER:· Objection.· Form.
A:  No, and I don't have the mat here.· And quite frankly, I've answered all of these questions now numerous times.· I think this is my third deposition, so -- on this.

50.     Given the readily observable and highly undesirable properties of the Momobaby placemat, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

*See,* **Evidence, as presented in ¶¶47-49.**

<u>OOGA, Brinware, and Momo Prior Art Reference</u>
<u>(Materiality and Intent to Deceive)</u>



51.     LNC contends that Momobaby, Oogaa and Brinware placemats each teach a mat that does not "slip or slide" and "can possess the self-sealing properties." Yet, the claims in the

53

'903 Patent do not recite mats that simply do not "slip or slide." Instead, the "integrated tableware and dining mat" (the "integrated ... mat") in addition to, (a) preventing "lateral displacement," must also (b) "create a partial vacuum when attempts to separate the undersurface from the underlying surface are made except at an outer edge of the planar portion" and (c) "whereby removal of the planar portion from the underlying surface is effective only by peeling the undersurface from the underlying surface starting first at the outer edge." *See,* **Exhibit 935** ("'903 Patent).** Momobaby, Oogaa and Brinware, alone or in combination with other references, do not teach these limitations. *See,* **Exhibits 959, 1013, and 1016.**

**[Tr.T, J. Kennedy, 9/1/2021, 931:22 to 934:22, 935:25 to 936:15]**

Mr. Kennedy, I was getting ready to turn your attention to some of the prior art references that have been raised in this matter. I'd like to talk about the MoMo Baby, the Oogaa and the Brinware Mat as a group. The physical exhibits are there in the courtroom. They've been identified as Exhibits 1013, 1015 and 1016. If you need some at any point, let me know.

(Ms. Kim is approaching the witness and handing him exhibits)

    THE WITNESS: Okay. Jennifer, I've been informed that the Oogaa is **LNC** Exhibit 959.
    MS. FISCHER: Okay.
    THE WITNESS: And the Brinware is 1016 and the MoMo Baby is 1013, just so the record is clear.
    MS. FISCHER: Okay. Thank you.
    THE WITNESS: Yeah.

(By Ms. Fischer)
Q: I'll let you leave them up there if you need them for reference. But have you reviewed these references with respect to whether they are but-for material in your opinion?
A: Yes, I did.
Q: And what were your conclusions, if any, with respect to these placemats?
A: My conclusion was that they were not anticipatory, and I didn't see any argument as to what they provide for an obviousness analysis that would make them but-for material.
Q: Let's back up and talk about those separately. You say that none of them were anticipatory. Why is that?
A: Well, at a minimum, and I'm looking at the patent claim. So focusing first upon Claim 1 is it recites in the preamble surface contact, self-sealing integrated tableware and

dining mat.  And none of those provide an integrated tableware and dining mat.  At best, they provide placemats.

Q: So the next inquiry is whether there was any – whether there could be a obviousness reference?

A: Yeah.  Let me make one comment.  So that's just -- that's just one observation as to why they're not anticipatory.  And I don't have an obligation today to show any other basis for non being anticipatory because anticipation requires all the elements.  And so if one element is missing, then by matter of law, they're not anticipatory references.  And so, I'm sorry, your question about obviousness.

Q: Yes.  I was asking whether you had any conclusions with respect to whether they're but-for material and part of an obviousness reference.

A: My conclusion was that they were not but-for material.  At a minimum, they're cumulative to other art that was before the examiner teaching silicone placemats.

Q: And have you come to the conclusion that they're cumulative?

A: Say it again.

Q: Have you come to the conclusion that they're cumulative?

A: So I compare what was before the examiner, as based upon the search history and also based upon the prosecution history, which includes some materials provided by EZPZ to the examiner in the final office action response.  And, looking at those, I don't see these teaching anything that's not taught before, that would be known to the person of ordinary skill in the art and to the examiner.

Q: Did you examine -- did you examine these references to see whether there was any motivation for a -- for a POSITA to combine with any other references?

A: Well, I view that as the obligation of the plaintiff to establish that motivation.  And I have not seen anything to date where that motivation to combine has been established.  I don't see any motivation to combine these with any of the other references for various reasons.  One of them is that these, generally speaking, do not provide a surface contact, self-sealing mat, let alone a surface contact, self-sealing integrated tableware mat.  So I don't know how you can combine these to teach all the limitations of the Claim 1 because the art that was supposedly missing was the surface contact, self-sealing mat.  And these, when I demonstrated them at my house, generally speaking, are not surface contact, self-sealing mats.  They wouldn't have that property when you put a bowl or something on them.  It would easily pull from the table.

. . .

Q: Yes.  Mr. Kennedy, I asked you whether the number of silicone placemats on the market impact your determination with respect to but-for materiality?

A: It does.

Q: And how so?

A: Well, there's numerous placemats on the market that one could use for feeding children, which is what the '903 Patent is primarily directed to.  And those numerous placemats that I'm aware of, based on the prosecution history and the evidence I've reviewed, didn't teach the properties of surface contact, self-sealing.  And these here don't teach the property of surface contact, self-sealing for an integrated mat. So it seems to me these are just cumulative to mats that are already known and mats that were already of

record in the prosecution history based upon search results and other evidence presented to the patent examiner.

**[Tr.T, J. Kennedy, 9/1/2021, 937:25 to 938:15]**

Q:  And did that help inform your opinion of whether the MoMo Baby Mat would be but-for material to the application that became the '903 Patent?

A:  It does because during the prosecution history, it was discussed that surface contact, self-sealing and the rest of the claim limitations basically excluded use of an adhesion. So an adhesive is a teaching away art. It's another way of seeking to solve the problem that Ms. Laurain was trying to solve, which was kids pulling their bowls and placemats and flinging the food across the kitchen.     So if you're using a glue, that's a different way of solving a problem and teaches away from the solution that Mrs. Laurain came up with, invented.

Q:  So in your view, are any of the -- the MoMo Baby, Ooga or Brinware mat but-for material to that '903 patent?

A:  No, they are not but-for material

**[Tr.T, B. Williams, 9/1/2021, 1207:10 to 1208:7]**

Q;  Okay.  We'll talk about why it's not material again in a minute.  But -- so would MoMo Baby be cumulative to Platinum Pets?

A:  Absolutely because it's the planar portion but without the receptacles.

Q:  Right.  Would Oogaa Baby be cumulative to Platinum Pets?

A:  If Oogaa Baby is a mat, then, yes, it would be.  Does it have an integrated receptacle? Probably not.  So, yeah, it would be cumulative of Platinum Pets.

Q:  So would Brinware, the mat, be cumulative to Platinum Pets?

A:  Absolutely.

Q:  And why is that?

A:  It's another silicone planar portion that doesn't have the necessary features to anticipate the invention.  And it has a planar portion which is made out of silicone, which is also in the Platinum Pets and which the Platinum Pets reads over.

Q:  Okay.  So all of the prior art that's been put in front of you today is cumulative to this one that's closest to the invention?

A:  Yeah.  Yes, I would say that.  That right there renders much of this discussion moot because that is a relevant reference.

**[Tr.T, M. Henley, 9/2/2021, 1421:25 to 1422:2, 1422:22 to 1423:23, 1424:6-16]**

Q:  All right.  And then did you consider Brinware, MoMo, Oogaa and Gerber silicone placemats?

A:  Yes.

 . . .

Q:  And what did you find on those silicone placemats?

A:  That they were -- basically just as described.  So they're very thin, flexible, presumably silicone rubber placemats that -- they usually come packaged prerolled

and you lay them out. And they make mealtime a little less messy. But in terms of the -- in terms of how they compare to the '903, you know, there's no -- there's no partial vacuum created because you can't -- you can't lift it from anything because there's nothing on the upper surface.  It is a very thin membrane basically so it doesn't have structure.  So it's not contact self-sealing.  You have to lay it out and smooth it down.  So, you know, those types of things.

Q:  And what about those things tells you they're not like the product?  Do they teach away?

A:  That's correct, they teach away.

Q:  And what do you mean by that when you say that?

A:  Well, so teach away is basically not disclose.  So as a person of ordinary skill in the art, I'm looking at -- I'm analyzing things of whether they give me -- and give me information, you know, and enough information, basically, to develop an idea that would be -- in this case would be identical to what EZPZ and Lindsey Laurain has produced.

Q:  So, for example, if there's nothing on the upper surface, no integrated tableware and dining, -- integrated tableware, then that teaches away because that's not like what's in the claims of the patent?

A.  Correct.

52.     The claims as a whole recite that the entire combination of the "raised perimeter delimiting at least one cavity" AND the "entirely suffuse undersurface" exhibits properties (a), (b) and (c) (as identified immediately above). *See,* **Exhibit 935** ("'903 Patent). That is, the "integrated ... mat" must both not slip and must be non-removable from a table or other surface except when peeled from such surface starting at an edge. *Id.* Clearly, an "integrated ... mat" as per the '903 Patent is grabbable, by the raised perimeter, by a person using their hands. *Id.* Yet, per the '903 Patent it is not removable absent "peeling." *Id.* None of these prior art articles teach the "raised perimeter ..." limitation. Further, one or more of these prior art articles are removable by simply pulling on the top surface thereof. That is, one or more of these prior art articles do not have the "absent peeling" property.

**[Tr.T, M. Henley, 9/2/2021, 1429:23 to 1430:23]**

Q:  All right.  And so with respect to -- let's start with the first one on the list was, yeah, Brinware.

A:  Okay.

Q: That's our trial Exhibit 451.  And what is it about Brinware that you think teaches away from the invention of the '903?

A: It is an unstructured, flexible mat.  So, basically, if I want to put this down, number one, I'm just going to put it down and lay it out and smooth it out in order to get it to kind of be stationary.  I've got no upper features on it whatsoever. So if I want to pull this off, I'm basically going to have to grab it from an edge and peel it off the surface that it's on.  It's not always -- a lot of these products also don't -- they stick on different surfaces differently.  So glass is probably ideal, if it's clean glass in particular, and the underside of the product is clean as well.  That helps adhesion too. So it teaches away because it's not -- it's unstructured. Right?  It's just a floppy -- a floppy mat.  There's no integrated tableware to it.  It's just -- it's just basically a door mat, if you will.

Q: Okay.

A: Let's try this.  Again, this is very similar to the Oogaa mat.  It's probably a little bit thicker, but, again, it's super flexible.  It doesn't have -- Thank you.

53.    The Examiners knew that placemats existed in 2014, that such placemats were "sticky," and that some placements resisted slipping/sliding. (*See*, Exhibit 295, LNC395303-04, PDF 158-159) Given these facts, Ms. Laurain had no duty to disclose cumulative references – such as the Momobaby, Oogaa and Brinware placemats.

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 555:9 to 556:4]**

A: 797?

Q: Yes, sir.

A: Okay.

Q: And on the second page there's an entry for August 26, 2015.

A: Oh, yes.

Q: And can you -- and you wrote there, "Supervisor Fenn Matthew [sic] - concerns: says rubber sheets and silicone sheets exist that stick to walls. Concavity change to receptacle?  Suffuse undersurface - define."

A: Yes.

Q: "Suffuse means continuous and spread out."

A: Yes.

Q: Can you -- so was supervisor -- Supervisory Examiner Mathew (sic) telling you that he was aware of rubber sheets and silicone sheets that stick to walls?

A: Yeah.  His argument -- his concerns were that there exist other sheets that -- that can stick to walls, yeah.

**[Tr.T, L. Laurain, 8/31/2021, 666:9-23, 667:24-15]:**

Q: So through the years that you've been in this litigation, do you have a different understanding what prior art is?

A: Yes, absolutely.

58

Q:  Well, can you describe what you understood it to mean when you filed the patent compared to what you understand it today?

A:  Well, all of my search -- so the beginning in my – the presentation that's been shown, the EZPZ presentation I sent to Brenda Speers, I was Googling and searching competitors of products made out of silicone.  So I never even thought about sending that to Ben Williams.  I mean, that was the Brinware and MoMo and Oogaa.  Those were other companies selling silicone products.  I thought they were products nonrelevant. I was making a presentation to say here's the landscape.  Those were competitors that had nothing to do with from a prior art standpoint.

. . .

Q:  Okay.  So move forward.  MoMo Baby is listed.  You didn't disclose MoMo Baby in your initial -- in your disclosure in the '903 Patent?

A:  I don't believe so.

Q:  And why not?

A:  Again, I thought this was -- I was just looking for other silicone products and baby manufacturers.  So --

**[Tr.T, L. Laurain, 8/31/2021, 668:23-25]:**

Q:  In 2016, when you filed your Appendix D adding prior art, why wouldn't MoMo Baby and Oogaa Baby be included?

A:  I mean, yes, I would say it would have been cumulative. But Ben was putting together Appendix D. Outside of the Gerber Mat saying let's put this in. He put a mousepad, like, a silicone mousepad.

**[Tr.T, M. Henley, 9/2/2021, 1460:6 to 1461:25]:**

Q:  So then the -- if there was a silicone mat -- that's a different question.  We've already covered it.      Would you say at the time -- you were asked questions about silicone and rubber mats.  Would you say at the time this invention was invented in 2014, were silicone or rubber material generally available in the marketplace?

A:  Yes.  Yeah.  It was -- it was just -- it was in limited use, you know, you basically had nipples and you had pacifiers and you had small features on other rigid plastic products, you know, trying to get -- trying to get -- using it as even over molding on grips and stuff, but grips on the bottom of – if we're talking about baby products, in particular, undersides of bowls and plates and so forth. But other than when the mats came out, you know, it's -- it was an expensive material.  So -- and I think I covered that in my report as well.  So it was expensive relatively at the time and then became more and more prevalent for larger components and larger products when it became really less expensive and the inherent properties were noticed.

Q:  Okay.  And so a person of ordinary skill in the art would be familiar with the principles of atmospheric pressure. Right?

A:  They should.

Q:  So if you invented an invention, a mat that operated by the principles of atmospheric pressure, that wouldn't be a novel invention, would it?

A:  No.

Q:  And the inherent characteristics of silicone would also be well-known to a person of ordinary skill in the art.  Right?

A:  Yeah.  Not only silicone, though, any other viscoelastic material.

Q:  And does the Happy Mat, the embodiment of the '903 invention, does the Happy Mat operate just by principles of atmospheric pressure or properties of silicone?

A:  No. It's got to be a combination.

Q:  Okay. And does it -- does it operate just by those two properties together that everyone knew about?

A:  No.

Q:  And are -- I don't want to be leading. Have you already talked about the additional properties that make this products work?

A:  Yeah. And I think I mentioned earlier in the courtroom, too, so a lot of that has to do with the structure of how you design your product and how it structurally is made or fabricated.

**[Tr.T, B. Williams, 9/1/2021, 1207:10 to 1208:1]:**

Q:  Okay. We'll talk about why it's not material again in a minute. But -- so would MoMo Baby be cumulative to Platinum Pets?

A:  Absolutely because it's the planar portion but without the receptacles.

Q:  Right. Would Oogaa Baby be cumulative to Platinum Pets? A. If Oogaa Baby is a mat, then, yes, it would be. Does it have an integrated receptacle? Probably not. So, yeah, it would be cumulative of Platinum Pets.

Q:  So   would   Brinware,   the   mat,   be   cumulative   to   Platinum   Pets?

A:  Absolutely.

Q. And why is that?

A. It's another silicone planar portion that doesn't have the necessary features to anticipate the invention. And it has a planar portion which is made out of silicone, which is also in the Platinum Pets and which the Platinum Pets reads over.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 45:8 to 47:3]:**

Q:  Okay.· So in the same document, look at production page 56.· Do you see that?

A:  Yeah, and this is actually another good example.· Yep.· Go ahead.

Q:  Is it fair to say that this is a list of competitors that you have identified?
     MS. FISCHER:· Objection.· Form.

A:  Um, that -- it says products and it names other competitors, not specifically -- it has only one other product, but just names competitors.· I don't -- yeah, I don't -- and, again, there is no mention of self-sealing or suctioning, once again, on this document.

Q:  (BY MR. DENEGRE)· Okay.· So on this document, you mention the Gummi placemat, correct?

A:  Yep.

Q:   And am I correct that you actually had a physical sample of the Gunni placemat?
A:   I believe so.
Q:   And this document mentions the Oogaa placemat, correct
A:   Yes, that's what it says.
Q:   What research did you do on the Oogaa placemat?
A:   I included it in a competitor presentation as a competitor, and that's all I did is ·looked up Oogaa and what products they sold out of silicone.· They had bowls and utensils as well.
Q:   And they had a silicone mat?
A:   I believe so.
Q:   Did you get a sample of that mat?
A:   No, I don't believe so.
Q:   And then you list the Skip Hop mat.
A:   I don't –
    MS. FISCHER:· Objection.· Form.
A:   It just says "Skip Hop," not "mat."· But it says "Skip Hop XXX."
Q:   (BY MR. DENEGRE)· Okay.· Did you get – what did you mean by "Skip Hop XXX"?
A:   Those were competitors in the space.· So Boon, Skip Hop.· In theory, Nuby could have been there, but I guess at that time I did not think of  them as well-known – you know – I just – they weren't – it could have been Nuby XXX, but those were the competitors that I knew in the space.

**[Tr.T, M. Hubbard, 8/27/2021, 295:8-17, 304:14-18, 305:4-24]**

Q.   So you don't dispute that MoMo Baby and Brinware don't have the integrated tableware within the mat itself?  It's just a mat, Brinware and MoMo Baby?
A.   Correct, it's not integrated.
Q.   And we looked at Bowen before, and it's a silicone mat. A. I don't know. I did not look at Bowen.

54-1   Brinware is cumulative, and by definition under Rule 56, cannot be but-for material.

**[Tr.T, M. Hubbard, 8/27/2021, 295:8-17, 304:14-18, 305:5-24]**

Q.   So you don't dispute that MoMo Baby and Brinware don't have the integrated tableware within the mat itself?  It's just a mat, Brinware and MoMo Baby?
A.   Correct, it's not integrated.
Q.   And we looked at Bowen before, and it's a silicone mat. A. I don't know. I did not look at Bowen.
Q.   Okay.  And you know that the definition of prior art that must be disclosed that's material to patentability automatically does not include cumulative prior art?
A.   I think it says "merely cumulative," yes.
. . .
(By  Ms.  Secor)

Q. So on 8/26/15, Mr. Hubbard, it says: {"Supervisor Fenn Mathew concerns: Says rubber sheets and silicone sheets exist that stick to walls." Does that create a fair, reasonable inference that they were discussing that issue?

Q. So Mr. Hubbard, if Mr. Williams testifies or has testified that he spoke to the examiner on August 26th, 2015, and discussed and showed him silicone mats that stick to walls, would you agree -- well, that's the first part of the hypothetical. Okay?

A. So you're saying he's disclosed the mat?

Q. They've discussed silicone mats that are of record in the prosecution history.

MS. MENASCO: I'm sorry. Just to be clear, is this a hypothetical?

MS. SECOR: Yes.

THE COURT: Okay. Go ahead.

(By Ms. Secor)

Q. Adding Brinware to the discussion doesn't add anything to the table, does it?

A. If Mr. Williams admitted that silicone mats existed that stuck to walls and that did so using the same functionality as set forth in the claims, then I don't think he would need to decide at that point the additional items. But there's no record that he ever did that.

**Hot Iron Holster Prior Art Reference (Materiality and Intent to Deceive)**



54. The "Holster" is made of 100% silicone, has "[a] roomy pocket for holding styling tools and a flap that grips household surfaces," it "clings to any smooth non-porous surface", is best on surfaces that are "clean and dry," "press the flap onto your sink or countertop and it will firmly grip the surface. Lift up to easily remove." *See,* **Exhibit 119**. As shown by variously colored

and highlighted portions, the Holster does not anticipate or render claim 1 obvious; accordingly, it

is not but-for material.

**[Tr.T, B. Williams, 9/1/2021, 1126:6-11, 1127:10-25]**

Q:  This product you were made aware of during the prosecution of the patent, were you not?  This is the Hot Iron Holster.
A.  Yes.
. . .
Q:  Did you go out and purchase this product to see whether or not it had suction cups under the part that lays flat there on the table?
A:  I did not purchase that product, no.
Q:  Did you look up to see whether or not Ms. Balogh had obtained a patent for that product?
A:  I've seen the patent for that product.  And it has weights and snappers and it has a hook and loop fasteners.  And it teaches friction.  It doesn't teach surface contact, self-sealing, so it's a different action.
Q:  Well, did you disclose -- when did you see that, sir? When did you learn of the Balogh patent?
A:  During -- after the issuance of the '903.
Q:  Because you didn't do what you should have done which was thoroughly investigate this reference and disclose it if it had material information, if this was a replacement reference to Lion.  You should have disclosed, shouldn't you?
A:  I think that is cumulative of Platinum Pets, which is a much more reference than that thing.  That thing doesn't even have tableware, and it doesn't teach surface contact, self-sealing.  It's hanging off the side.  It's friction of the -- of the silicone apron.

**[Tr.T, B. Williams, 9/1/2021, 1227:24 to 1229:7]**

Q:  You were asked in cross-examination about the Hot Iron Holster.  That's the -- how do you say that?  Balogh patent?
A:  Yeah, Balogh, Balogh, something like that, B-A-L-O-G-H, I think is what it is, something like that.
Q:  Yes.  And why isn't that patent or the product material?
A:  Well, again, it doesn't have the teaching.  So when you read that patent, it goes into a counterweight.  It talks about friction, friction between two surfaces.  It talks about sticking.   It talks about thermoplastic elastomer, if I'm not mistaken.  It has hook and loop fasteners.  It has snaps.  It has a lot of other stuff involved in it.  It doesn't teach the surface contact, self-sealing action impliedly or expressly.  And it doesn't have a integrated tableware component.  So, at best, it can only be used in combination with something that does have that to read over the claim.  Even if it did teach surface contact, self-sealing, it doesn't have -- it doesn't anticipate the Happy Mat.  So it could only be used in combination to sustain an obviousness rejection. And so it is also cumulative in its best embodiment.  If you want to scroll down, you can see some of the pictures, in its best embodiment.  See number 115 is a counterweight, keep going

63

on down, if you want.  Counterweight is down there.  Keep going on.  Here's the snap, the Velcro.  Keep going on.  Keep going on.  There's the Velcro.  Right?    There's -- so it is teaching all sorts of different means of adhering to itself and to surfaces that don't imply or expressly state surface contact, self-sealability.  So even in an obviousness type rejection, its own teaching is usable against it.  It does not sustain obviousness.  And even if it could by hindsight reconstruction because it's made out of silicone, it has a planar portion, the secondary considerations of nonobviousness are an objective indication of the nonobviousness of the Happy Mat.

**[Tr.T, J. Kennedy, 9/1/2021, 943:15-17, 943:24 to 945:25 ]**

> Ms. Fischer: The next reference which is the Hot Iron Holster.  Ms. Kim, if you could pull up Exhibit 119.

Q:  Okay.  Did you have the opportunity to review this prior
art reference?

A:  I did.

Q:  Okay.  And did you review this reference with respect to whether determining it was but-for material to the '903 Patent?

A:  I did.

Q:  And what conclusions did you reach, if any?

A:  I concluded it's neither anticipatory nor a but-for material reference under a theory of obviousness.

Q:  And how did you come to that conclusion?

A:  Well, for anticipation, again, we just need to read the preamble here and it's clearly that it's teaching away.  It's not a surface contact, self-sealing integrated tableware and dining mat that has a rubberlike planar portion, skipping ahead, that has a receptacle above an upper surface and an entirely undersurface.  So if we count this to be the receptacle, and I'm circling the portion where the remote is in, and we count this area here, which is below the glasses.  If you say that that's the suffuse surface, well, the primer of a cavity is not above, it's to the side.  And words in claims have meanings.  And the claims here clearly say a receptacle above an upper surface. So it does not meet the limitations of Claim 1 or it does not teach the limitations of Claim 1 under principles of anticipation, Section 102, or novelty.  Both are used interchangeably. And then for 103, it doesn't teach that the undersurface, which is the entirety of this thing, is suffuse.  So I don't know what the backside of this teaches.  It also doesn't teach that the principles of -- characteristics of operation of this, that it doesn't teach that sealable contact preventive of lateral displacement of the planar portion across the lateral surface.  So I don't see any teaching that this thing wouldn't slide. And it certainly doesn't teach whereby removal of the planar portion from underlying surface is effective by peeling the undersurface.  So here you have to look at the product on the whole.  If you pull up on this portion that has the perimeter in which the concavity exists, which has to be, again, above, if you pull up on this and you somehow equate this to be flat, if you peel up on this portion, it clearly comes off the table.  That's how you release it.  And I believe there's something in this document that actually explains that. So when you look at this in the entirety, you say this does not teach Claim 1 by anticipation.  A person skilled in the arts is not going to rely upon this to fill in any

missing elements of other references because it clearly just teaches away in so many different ways.  So I don't think it's but-for material for obviousness purposes either.

55.     First, the "roomy pocket" and the "flap that grips household surface" are separate elements of the Holster device. The Holster does not have a "raised perimeter ... above an upper surface and an entirely suffuse undersurface disposed for sealable contact." Instead, only the flap portion "clings" to the "surface." There is simply no teaching that the "roomy pocket" clings to anything. *See,* **Exhibit 740.**

*See,* **Evidence, presented at ¶54.**

56.     Second, in order for the Holster to cling to a surface, one must "press the flap onto [the surface]." *See,* **Exhibit 119.** This is a clear teaching away from Applicant's "surface contact self-sealing ... mat." The Holster is not taught as being "surface contact self-sealing."

*See,* **Evidence, presented at ¶54.**

57.     Third, the Holster "will firmly grip the surface." *See,* **Exhibit 119.** This teaches to a PHOSITA that a "partial vacuum" is not the mechanism by which the Holster adheres to a surface when pulled on. Instead, the Holster uses principles of surface adhesion and friction (i.e., stickiness) to "grip the surface." The Holster does not teach that principles of atmospheric pressure clamp the Holster to a surface. The Holster teaches away from claim 1's "entirely suffuse undersurface disposed for sealable contact ... [that] creates a partial vacuum ..."

*See,* **Evidence, presented at ¶54.**

58.     Last, to remove the Holster, one need to merely "Lift [it] up. *"See,* **Exhibit 119.** A POSITA would immediately recognize that the Holster will not function as a feeding tray that adheres to a table surface and one which a child cannot pick up and toss about. The Holster teaches exactly the opposite; again teaching, "Lift up to easily remove." Given this teaching, combining Bass or any other reference teaching feeding trays/mats with Holster would result in the primary

intended purpose for Bass et. al. being catastrophically defeated. No POSITA would look to combine Holster with Bass et. al. if the child needs to merely "lift it up" to remove its adhesion to a surface. The "Lift up to easily remote" teaching of Holster is a clear and unmistakable teaching away.

*See,* **Evidence, presented at ¶54.**

59.    The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Hot Iron Holster reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

59-1.   LNC offers only speculation to support its contention that the Hot Iron Holster is but-for material.

**[Tr.T, M. Hubbard, 8/27/2021, 244:11-15, 245:9-22](emphasis added)**

Q: Mr. Hubbard, did you form any opinions about a product called the Hot Iron Holster?
A:  Yes. I thought it was -- or, in my opinion, it is a material reference that Rule 56 required disclosure of.
Q:  And why did you reach that opinion, sir?
. . .
THE WITNESS:      I can't even say it. So it extends perpendicularly, you know, from the holster. So in other words, kind of out to the side, and it's intended to rest on the surface of the countertop while the holster is hanging off of the countertop. So it's almost like it's a way to hang this -- this container off to the side of the countertop. And it -- based on its description and based on this picture, it -- so it -- it just simply lays on the countertop. And that's -- so there's enough -- it resists movement laterally across the countertop, otherwise the holster wouldn't stay in place. And it's obviously sticky, as she says. And, you know, it -- *and it probably also functions to -- in a suction-like manner as described in connection with those placemats.*

**<u>Yanko Prior Art Reference (Materiality and Intent to Deceive)</u>**



60.     As further captured from the website, https://www.coroflot.com/nforee/2001-2003-portfolio, the designer of the Yanko dog bowl was Mr. Seungchan Lee. *See,* **Exhibit 708.** As shown in the image therein, Mr. Lee describes his product as follows: "When puppy eat feeds, the bowl does not slide. because puppy steps on bowl with feet and made a bowl with silicone rubber. *Id***.** As shape in the bottom is designed like sucker of vacuum absorption, the bolw [sic] cling to floor." (Errors in original, emphasis added.). *Id*. That is, per Mr. Lee his design did not slide because of two reasons, first the puppy stood on the mat and, secondly, the bottom of the mat was "designed like [a] sucker of vacuum absorption." By this, I understand him to mean that the raised portion of his design was not suffuse. Instead, it created a space that created suction when the puppy stood on the mat.

**[Tr.T, J. Kennedy,  9/1/2021, 1126:6-11, 938:23 to 939:8, 940:1 to 943:14]**

So Exhibit 1018 is before me.
Q:  Thank you.  Are you familiar with this Yanko prior art, what we've been referring as the Yanko prior art reference?
A:  Yes.
Q:  Was there ever a physical product for you to examine?
A:  Not to date.
Q:  Did you review this reference, this paper reference with respect to whether the Yanko prior art reference is but-for material?

A:  Yes.  I reviewed this, and there was other exhibits that were with -- regarding Yanko.

Q:  Okay.  And let's talk about some of those teaching aways that you see in this reference.

A:  Yes, okay.  Yes, I think we need to blow this up a little bit.  Can we enlarge this on this screen?  Is that something I can do or --

    MS. SECOR:  We can do it.

A:  You can do it.  Okay.  So the first part -- let's look over.  Here's part of the -- one of the most telling things.  So the puppy steps on the front part of the product.  So the dog stands on the map.  Keep sliding back up, please.

    MS. SECOR:  Oh, back up sorry.  Right there.

A:  And then over here, when puppy eat -- feeds -- so this is written by I believe it might have been Chinese or Japanese, I forget the -- it doesn't really matter but the English is kind of -- kind of poor. So when the puppy eats, the bowl does not slide.  So the first thing we note is that the puppy eats by standing on the mat.  So the bowl is not going to slide because the dog is on the mat.  I mean, so that's -- has nothing to do.  It's not relevant to whether it's soft -- surface contact, self-sealing. Because puppy steps on bowl with feet and made a bowl with silicone rubber.  So the bowl is silicone rubber. It doesn't say that the silicone rubber.  It says "plastic."  It says "silicone rubber."  So it's really quite unclear as to where is the silicone and where is the plastic. As shape in the bottom is designed like sucker of vacuum absorption, the bowl cling to floor. So this here is the sucker.  So this is basically an inverted suction cup, is the way I understand it. And so when you stand on it, it creates the suction effect, the pressure you have to apply to create a suction effect. And then it is that combination of the pressure from the dog standing that creates the pressure -- the suction effect that keeps it from sliding due to vacuum absorption. And so it seems to me that this is a product that clearly teaches away from a surface contact, self-sealing integrated tableware and dining mat, which is the preamble of Claim 1. Because this one it says you've got to step on it to create suction, and then it won't slide. It doesn't say you put it on the floor and it doesn't slide or it doesn't move. So if we go ahead and scroll down the rest of the page just to make sure we didn't miss anything here. Yeah. So design like sucker of vacuum absorption, bowl cling to floor. So it doesn't say the mat clings to the floor. It says the bowl clings to the floor. And the bowl portion -- if we scroll back up -- is the portion I circled. So the bowl clinged to floor. It doesn't say the mat clings to the floor. It says the bowl clings to the floor. And the bowl clings to the floor because of sucker. So sucker requires a suction. So that's how I understand it to be teaching.

Q:  And then that last line on the bottom where it says material:  Silicone, rubber and plastic, is that the plastic you were referring to earlier in the testimony?

A:  Yes.  And it's -- it's kind of -- like I mentioned, it's kind of unclear because it says the bowl is silicone.  And then it says silicone rubber, and then it says bowl.  So it's not -- scroll back up, please. Bowl with silicone -- made a bowl with silicone rubber. So that seems to say that the bowl is silicone rubber, but here it says plastic.  And I don't show if it's plastic it's the bowl, but it says the bowl is silicone.  So it's really unclear as to exactly how thing operates other than you stand on it. That creates a suction effect and then the bowl will cling to the floor.  So -- so I don't know.  Go ahead.

Q:  Do you understand this to be a but-for material reference to the '903 Patent?

A:  No, I don't see how you would combine this with any other references to teach a surface contact, self-sealing integrated tableware and dining mat when the rest of the

limitations of Claim 1, it just seems to me that it's teaching away because it's teaching the suction effect, which under the broadest reasonable interpretation standard applied by the patent office during examination suggests that that suction effect is not what's happening or what is claimed in the '903 Patent. The '903 Patent is claiming use of essentially atmospheric pressure, and that's different than suction.   They're just fundamentally different concepts.

Q:   And do you have any information with respect to what the underside of the Yanko product looks like?

A:   I do not.  I don't see any pictures of what it looks like. But since it's saying it suctions, I, based upon experience and based upon the picture I would see here, would suggest that this is hollow through here.  Because to make that rigid would certainly require a lot of excess material, and it wouldn't suction if you had material there.  So I would suggest that it's -- that it's a hollow recess.  So it's not suffuse.  It's not a rubber-like planar portion having a suffuse – an entirely suffuse undersurface.  So it doesn't meet that limitation or teach that limitation of the claims either.

61.     An alternative interpretation is that the suction mentioned by Mr. Lee occurs by a human pushing down on the food bowl (made of plastic) into the raised area of the mat. That is, under either interpretation, the suction occurs based upon the application of force (by a human) or by a dog (from standing and gravity) and not from a "partial vacuum" created upon "sealable contact" by an "entirely suffuse undersurface" – as recited by claim 1 of the '903 Patent.

**[Tr.T, J. Kennedy, 9/1/2021, 943:3-14]**

Q:   And do you have any information with respect to what the underside of the Yanko product looks like?

A:   I do not.  I don't see any pictures of what it looks like. But since it's saying it suctions, I, based upon experience and based upon the picture I would see here, would suggest that this is hollow through here.  Because to make that rigid would certainly require a lot of excess material, and it wouldn't suction if you had material there.  So I would suggest that it's -- that it's a hollow recess.  So it's not suffuse.  It's not a rubber-like planar portion having a suffuse – an entirely suffuse undersurface.  So it doesn't meet that limitation or teach that limitation of the claims either

**[Tr.T, M. Henley, 9/2/2021, 1427:14-25]**

Q:   Okay.  And then is Yanko similar to Platinum Pets?

A:   Yes.  I mean, it looks -- although it's only one bowl holder, it looks to have the identical sort of concept.

Q:   Okay.  And then does Yanko read on the claims?

A:   No.  There's not enough disclosed there.  We don't know what's happening on the underside of the illustration and how it's formed.  Again, it's a two-part system, not

integrated tableware.  It's intended for a rigid bowl and to be a bowl holder.  It instructs for a puppy to stand on the front of the mat.  So all these things basically teach away from surface contact, self-sealing integrated tableware and dining mat of the '903.

62.      Also, per Mr. Lee's design, the Yanko design does not teach many of the limitations of claim 1 of the '903 Patent. For example, it does not teach a "rubberlike planar portion having ... an entirely suffuse undersurface." The raised portion that creates the suction and holds the dog bowl is clearly not "suffuse."  *See,* **Exhibit 708.**

62-1. Mr. Williams' testimony was credible that he believed the Yanko reference to be not enabled and not a material reference that needed to be disclosed to the USPTO. The belief that the Yanko reference is not enabled was reasonable.

[Tr.T, B. Williams, 8/31/2021, 863:3-20, 865:5 to 867:2]

Q:  Okay. Do you think that if Yanko had been produced to the examiners, that would have had any effect in the analysis based on your view of it?

A:  Yanko? The computer rendering, the -- no. And there's a lot of problems with that reference. The most -- in my opinion, the biggest problem with that reference is a lack of enablement. So I'm going to have to explain what this means probably. But in patent stuff, you have to have enough information about the invention, about the product to be able to, in quotes, "reduce it to practice." If it is not enabled, it cannot, in any sense, be material. And there's no duty of disclosure that attaches. Otherwise, we would be filing everything. A drawing of an airplane by my kid would read over an air foil. Right? A rectangle with a circle in the middle of it would read over the Happy Mat. I mean, it doesn't -- it doesn't have enough information. It's a blog post of a computer rendering. There it is.

. . .

Q:  This is 1018. So you were -- Mr. Williams, do you think that -- you say it's nonenabling?

A:  Yeah, it's not an enabled reference. We just don't know what it's made out of. We don't know what the undersurface of the mat looks like. The dog stands on it to keep it in place. We don't know how floppy it is. Is it stiff? It's just – I couldn't write -- I couldn't write a patent on this. There's just too many questions. So it's not an enabling reference.

Q:  If there was a later publication that said, "Well, it's made out of silicone," would that give you enough information?

A:  No, because silicone has so many different formulations. And, as we've said, there's tons of silicone things out there that don't do this. I have had a mouse pad that I've used for years that is made out of silicone, has a planar portion. It doesn't self-seal at all. I

can pick it up no problem. It doesn't move around. Right? It frictively engages. But it - - I mean, something like that -- mine has actually got a rest on it. This is actually the one I use. I took a picture of it. Or I used the skew for it to find it. But the fact that it's made out of silicone alone doesn't even read over 866 Claim 1 because silicone doesn't come into that mat until Claim 4. So this is functional claiming language. We are claiming the ability of that rubberlike planar portion. That's a technical term, rubberlike. It's one word. It means having a consistency or action like rubber. Right? So it's a rubberlike planar portion. But that planar portion can only be separated from a underlying surface by peeling action at an outer edge. I don't think there's anything in this reference that teaches that. When puppy eats, feeds, puppy eat, feeds, the bowl does not slide because puppy steps on the bowl. Right? He puts his feet on the front. I mean, you can zoom in. Sure. So, in that sense, if the puppy is anchoring it in place, it's more like -- gosh, I'm trying to remember the name of the reference. It's more like Bruno. There's a reference by Bruno which is for pets. And the dog or the pet with its four legs anchors it in place. That has a detachable bowl. So there's just no way to know enough about this. It's a concept. It's not an idea. Like, if you're going to build a house, you need enough information to build the house. I can't draw a house -- you know, like a little square and put a triangle on top and say, "Here are your plans, Mr. Architect. This is my house." I mean, it needs more reduction to practice to be a viable 867 reference. And technically it doesn't meet the requirements of 112. That's what I would say.

**[Tr.T, B. Williams, 8/31/2021, 1162:9 to 1163:24]:**

Q: Sir, you remember your testimony that the biggest problem with the Yanko dog bowl design is that it is not enabling?

A: Yeah, I do remember that.

Q: In fact, you testified that it does not meet the requirements of Section 112. Right?

A: Yes, that is correct. That is the enablement requirement.

Q: Because the Yanko dog bowl design is not enabling, you believe it cannot be material. Correct?

A: Yes, I think that is correct.

Q: Yanko is nonpatent literature. Right?

A: Correct.

Q: Yanko is a printed publication. Right?

A: Under a very broad -- yes. I mean, it's on line. Right? So as case law has continued, it is probably a printed publication, yes.

Q: And Yanko -- the Yanko Design website showing Mr. Lee's dog bowl invention is not required to be enabled to be considered in connection with an obviousness rejection. Correct?

A: It is to be material though. So consideration and materiality are two different things, and there's just -- yeah. So, no.

Q: And the Yanko Design website must be considered for what it would reasonably suggest to one having ordinary skill in the art. Correct?

A: If it were to be submitted as a nonenabled reference, it would be considered that way, yes.

Q:  Okay. And that's actually in MPEP 2128?
A:  Correct, yeah.
Q:  Is your testimony that Yanko had to be enabling before it could be considered prior art?
A:  No, because what is prior art is just prior. To be material, it would have to be enabled. It's a big difference, Ms. Reisman. It's prior art but it's not prior art that is material to the prosecution of the '903 Patent as five examiners have found. Right?
Q:  But you didn't disclose the Yanko Design website in the '682 Application that became the '903. Right?
A:  No, I did not disclose the nonenabled reference just like I wouldn't disclose a picture that my kid had on the -- on the fridge with a mat because it's not enabled.

**[Tr.T, B. Williams, 8/31/2021, 1166:6-22]:**

Q:  Okay.  "This is important and relevant."  Did you state that, sir, with respect to the patent office research that Ms. Laurain forwarded to you and Mr. Garthe and some others in November 2016?
A:  No.  This is -- like, this is important and relevant. Ultimately I think this reference fails the enablement requirement.  That's what's important and relevant, Ms. Reisman. Okay.  This is important and relevant, but I think it fails reference [sic] requirement. That's what's important and relevant.
Q:  Well, let me ask you --
A:  You're misconstruing everything I write.  It's amazing.
Q:  Well, Mr. Olds thought that the Yanko Design dog bowl was relevant and needed to be cited in the continuing applications. Right?
A:  Because of this litigation, yes, not because it was material to prosecution but because of this.

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 430:3 to 431:24]:**

Q:  That's not true, though, Mr. Williams. If we're looking at the Exhibit 456 in front of you, in the body of the email Ms. Laurain provides you, "Here is the link to the Dog Yanko Design bowl.  As you can  see, it is not actually a product but merely a design in another country?"  And she provides you a link that we're going to see many times today, right?
A:  Okay.
A.  Yes, I see that.  But you're talking about the Yanko Design article, the non-enabled reference that is not applicable?  Is that -- is that what we're talking about here?  Are we talking about the dog bowl that is not enabled in any way, shape, or form? There's no requirement to disclose a non-enabled reference, Ms. Menasco.  That is also equally irritating to the patent office.  There's two sides to this equation.  You're not supposed to inundate irrelevant -- inundate the patent office with irrelevant information.  So that's -- yeah, I was aware of the Yanko Design article.  And it's not enabled, so . . .

63.   Further, Yanko does not teach how his mat is removable. For all we know, it could have been easily removable simply by pulling upwards on the raised portion.

*See,* **Evidence, presented at ¶60.**

64.   Even if somehow Yanko could anticipate claim 1 of the 903 Patent, claim 3 requires a divided receptacle, and nothing in Yanko discloses a divided receptacle. Indeed, you would not with a dog bowl, not for the purposes of keeping food stuffs separate. *See,* **Exhibit 935** ('903 Patent).

65.   Any comment by Ms. Laurain that the Yanko dog bowl was "similar" does establish intent as the "the single most reasonable inference able to be drawn from the evidence'" "similarity" is not a standard upon which an invention is patentable or non-patentable. Instead, given how Yanko worked and the clear distinctions between it and the claimed invention, the single most reasonable inference is that Ms. Laurain recognized that Yanko was similar, yet still significantly different and patentably distinguishable.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 35:1-19]**

Q:  (BY MR. DENEGRE)· Okay.· And is this a document that you created?
A:  Um, I honestly don't recall specifically creating this document, because it was so long ago and it was done a week after I had the idea, but based on e-mail exchanges and attachments, I have no reason to dispute this being a document that I created.
Q.: And is it fair to say that it reflects the most similar patents that you had found to the one that you were seeking to obtain a patent for, a utility patent for?
          MS. FISCHER:· Objection.· Form.
A:  I don't agree with that predicate.· No.·It says -- it's completely taken out of context.· It says, "Patent search.· Most similar I have found," and it's a list of what looks to me like a bunch of Google links, because at that time, you know, it was a week after the idea.· I did a bunch of Googling of different patents and that's what I put together.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 58:24 to 59:16]**

Q:  (BY MR. DENEGRE)· So on the next page, we have the Yanko Design dog bowl designed by Mr. Lee. Do you see that on the next page?
A:  Yes, I do.
Q:  And this Yanko Design dog bowl is something you're quite familiar with, correct?

73

A:  Um, I don't know if -- once again, I don't agree with the predicate, and I would like to take this opportunity to now for the third time clarify on the record that this is the image I had seen and included in my presentation. In previous depositions, there were exhibits put in front of me asking out of context questions about the Yanko dog bowl that had, once again, been turned around and used inappropriately in 15·different motions.· So this is the image that you can see that I had in my possession.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 86:25 to 87:18]:**

Q:  Go ahead.

A:  It says, "Some other similar patents I have found that may need to be cited.· I have not searched on the Suction Function which will most likely need to be searched and confirmed doesn't exist."  So I just want to put that in perspective.· On May 26, which is after the documents -- the patent search that I sent to Ms. Speer, apparently, and I guess I had sent it to Mr. Bolton and Mr. McCarthy, that patent search document that I can pull out again was prior to me even ever searching about a suction function, which I was trying to say earlier is my recollection. So I would like to get that on the record that the patent search document that exists, there was no searching involved in regard to the suction function in regard to that document.· So I'm glad that this e-mail has surfaced.

**[Tr.T, J. Kennedy, 9/1/2021, 939:16 to 939:25]:**

Q:  Before I ask you more about this, I want to ask you, hypothetically, if an inventor you were working with called a reference to this "similar," quote/unquote "similar," would that indicate to you that the product was but-for material?

A:  No, similarity is not the standard that's used. Similarity is the language that a person not skilled in patent process, such as Ms. Laurain at the time, would use.  And that just means it's something that you might want to look at.  And when you look at it [the Yanko reference], it teaches away pretty quickly, at least to me, from the claimed invention.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 319:3-22]:**

Q:  .(BY MR. DENEGRE)· But he [Marcus Koenig] told you that it [the Yanko reference] would be a show stopper in November of 2016, right?

A:  After the patent was already issued.· So you even saying that, I have to laugh a little bit. It's literally a gentleman who stole my entire product and told me it would be a show stopper.· I mean, I can't believe you're even trying to bring that in, like I said, when you've precluded us from using the Yanko dog ball [sic] that you guys sent in, I believe numerous times to the USPTO.· You also sent it in to Canada to block the Canadian patent, and you hired your Canadian firm -- I think it's the same firm that's going after Joey for contempt and jail time. You sent in Yanko to the USPTO.  So if you want to start talking about Yanko being presented and patents still being allowed and we can discuss that, great.· If not, we need to move on from a discussion that

happened after the ·patent was issued.· It's completely irrelevant and, one, it's painting a picture that is not the reality.

65-1.   The reference is not "but-for" material, given the readily observable and highly distinguishable properties of the Yanko reference.

*See,* **Evidence, presented at ¶¶**60-64.

65-2. EZPZ included Yanko in the continuing applications. However, this is not a concession or admission that Yanko should have been included in the application that became the '903 Patent.

**[Tr.T, L. Laurain, 8/31/2021, 746:23 to 747:25]**

Q:  On November 27th, 2016, Mr. Williams said to you, "This is important and relevant," did he not, Ms. Laurain?
A:  This is the email I actually explained.  And it goes on to explain why it's not --
Q:  It's just a simple question.  Did he say that?
A:  I would ask that everyone reads this entire email because he's explaining why it's not material.
Q:  He chose advocacy over candor.  Right?
A:  Absolutely not.
Q:  Well, candor would be to disclose all the information, all these websites that we saw in the PDF in the continuing applications, wouldn't it, Ms. Laurain?
A:  We disclosed Yanko because we were advised from litigation counsel because you guys kept bringing it up.  This is an email that shows Ben's thought of why he doesn't think Yanko is prior art.  It's not enabling. So, again, this is a perfect summary of stuff that you guys take out of context.  Ben doesn't think it's material. It's nonenabling.  We submitted Platinum Pets in our patent. You guys try to find anything.  And you pound, pound, pound. So our litigation counsels put it on in the continuations to get rid of you doing this, just like we did in the reexamine. And, again, we submitted Yanko on the IDS.  We didn't submit this.  Ben does not believe it's a material prior art reference.  I defer to Ben.  I'm not -- I don't understand prior art.  I would never make a determination about this.  And it was disclosed on an IDS in a continuation.  And, so, if we didn't disclose everything that you wanted us to, I apologize.

**[Tr.T, Z. Garthe, 9/2/2021, 1319:9 to 1321:14]**

Q: That's all right. So my new question to you is: When you had a discussion where we started, when you were having the discussion with Ben about what to disclose, do you remember which application it was?

A: Oh, I see. Well, it would have either been the '823 or the '403 Patent Application is when those happened because those were -- yeah, they were 2017. And so I'm not sure to which application it was being discussed, but presumably both, I guess.

Q: Okay. And so why were you discussing Yanko?

A: Kind of like I said earlier, it was just because of the litigation.

Q: What do you mean by that?

A: Well, LNC had alleged that it was material prior art. And so, based on that, it was, you know, the recommendation from Ben and ultimately from Mr. Olds at CGO, to say, "Well, we should go ahead and disclose it to the patent office."

Q: And why did EZPZ do that?

A: Why -- I mean, that's -- that was our advice of counsel. Right? I'm not -- like I said, I'm not a patent prosecutor, and I haven't -- I don't practice before the U.S. Patent and Trademark Office in that capacity. So when we -- you know, Mr. Williams and I had had our arguments, and then we had external counsel to settle that exact dispute. And so we took the advice of counsel to disclose it.

Q: All right. We're going to find out about that in a minute, but I just want to go back then now that we have the context.

A: Sure.

Q: Why did you not want to disclose it?

A: So, in my personal opinion, I don't view the Yanko article as providing any information that was not already before the patent office. So the Yanko Design article being of a dog bowl that doesn't disclose -- you know, the most important part of the utility patent is going to be the undersurface of the mat. Right? That's where the functional claiming exists. So this publication, the Yanko Design, doesn't provide any information as to the undersurface of it, and provides no additional information than what was before the patent -- I mean, the patent office already had much more pertinent, relevant art before it when it considered the application.

Q:  Okay. Did you believe it was cumulative?

A: Yes. I mean, it would have been -- it's my understanding that you don't want to give irrelevant material to the patent examiner. If it's not going to help the examiner make the decision, if it's cumulative of what's in before it, like, you don't repeatedly put the same stuff before the same examiner over and over again if it's all the same. Right? You're trying to help the examiner make a determination of whether or not there's an invention. And so since it doesn't provide any new information; and then it seems to suggest that, you know, an entirely separate field of art of, like, pet feeding would come into play or be relevant, it didn't seem necessary to me. But, you know, our outside counsel advised otherwise.

65-3.   LNC does not meet the applicable clear and convincing standard to show that the

Yanko reference was withheld with an intent to deceive.

**[Tr.T, L. Laurain, 8/30/2021, 617:15-23]:**

Q: Okay. And so why didn't you list the Yanko mat when you did your secondary considerations to the patent office?

A:  I mean, I would defer more to Ben. I would assume Yanko mats are cumulative of our Platinum Pets.

Q:  You mean cumulative of Yanko?

A:   No. Yanko is cumulative of Platinum Pets, I'm assuming, but I was not making all the decisions on what to include. This is my assumption is because of it's cumulative of Platinum Pets.

## **Uhalt Prior Art Reference (Materiality and Intent to Deceive)**

66.    LNC contends that U.S. Patent No. 1,881,416 ("Uhalt")(*see,* **Exhibit 990**) is material to the application without supporting such contention. Notably, the allegation itself applies the wrong standard for determining whether inequitable conduct occurred. Per *Therasense*, the standard is not whether a reference is "but for" material to the "application" but rather to the issued claims. This determination is not made in isolation, but, rather in view of the entirety of the prosecution of the application, including a consideration of references that were disclosed and known by the Examiners.

67.    Looking at the object of the Uhalt invention shows that it is not "but-for" material. "The primary object of the invention is to provide table **c**hinaware for serving meals which are fixably mounted on rigid sectional mats adapted for use on dining tables..." (*See,* **Exhibit 990**) Uhalt, 1:4-10 (emphasis added).) The highlighted words above alone teach away from Ms. Laurain's claimed invention. Uhalt also teaches that the plates "are mounted [to the mats] when the mat is in use." (Uhalt, 1:48-2:1) That is, per this embodiment, the plates are not integrated with the mat. Claim 1 of the '903 Patent recites differently. Further, while Uhalt teaches the dishes can be permanently attached to the mats, the dishes are indisputably not made of the same material as

the mat. That is, the raised perimeter that delimits a cavity as per claim 1 is not taught by Uhalt.

Also, a rigid mat is the opposite of a suffuse mat. *See,* **Exhibit 990.**



**[Tr.T, J. Kennedy, 9/1/2021, 945:23-25, 946:4 to 947:13]:**

MS. FISCHER:  I'm going to turn your attention now to the Uhalt prior reference. Can you pull up Exhibit 990.
 . . .

Q:  Mr. Kennedy, did you have opportunity to review this patent in connection with your expert testimony today?
A:  I did.
Q:  And I'll refer to this as the Uhalt patent.  The name is there on the top on the first page. What were your conclusions, if any, with respect to the but-for materiality of this reference to the '903 Patent?
A:  Well, I concluded it was not but-for material under anticipation, and would not be relied upon in rendering a claim obvious.
Q:  And how did you come to this conclusion?
A:  Again, I compared the teachings of Uhalt to the claim limitations themselves.  So if we look at anticipation, there's no teaching here that this meal serving mat, which is what Uhalt calls it, is surface contact, self-sealing.  It does appear to teach some integration of a bowl with the mat.  And that's shown in figure 4.  But it doesn't teach that it's surface contact, self-sealing.  And it doesn't teach the other aspects of it being disposed for sealable contact with an underlying surface. If we scroll down, we'll see that it actually described it as being rigid somewhere, if we search for the word rigid.  You See.  So here's on rigid sectional mats.  So provide table -- so it says here the primary object of the invention is to provide table chinaware for serving meals which are fixably mounted on rigid sectional mats adapted for use on dining table.  So rigid teaches away from suffuse undersurface, just like a board isn't a suffuse undersurface for sealable contact. So would a rigid mat not be a suffuse surface for sealable contact. So there's other aspects in this that also suggest to me that an examiner would not rely upon this in rejecting the claims had the -- had the examiner been aware of this, it would have been relied upon in rejecting the claims under obviousness.

68.     The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Uhalt reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

### **Bruno Prior Art Reference (Materiality and Intent to Deceive)**



69.     LNC contends that U.S. Patent No. 2,813,509 "("Bruno") (*see,* **Exhibit 991**) is material to the application without supporting such contention.

70.     Bruno is entitled "Animal Feeding Device." *See,* **Exhibit 991.** Specifically, Bruno teaches that his invention "relates to ... a combination bowl and mat which is designed to be anchored by the feeding animal in a stationary position so as to prevent movement of the feeder and the overturning thereof." (Bruno, 1:15-19.) Further, Bruno teaches that an object of his invention is to provide a feeding device that "may be rolled up when not in use for storage ..." (Bruno, 1:27.) In explaining his invention, Bruno provided eleven (11) figures. The figures show the invention.

**[Tr.T, J. Kennedy, 9/1/2021, 947:20 to 949:23]**

Q:  Mr. Kennedy, did you get a chance to review the Bruno patent in connection with your expert testimony?
A:  I did.

Q:  And did you make any determinations with respect to whether this patent is but-for material prior art that should have been disclosed in the application of the '903 Patent?

A:  I did.

Q:  And what conclusions did you come to, if any?

A:  Can I refresh my recollection real quick on this one?

Q:  Of course.

A:  Where was that in my opinion?

Q:  In your original report at PDF 101.

A:  101.  Okay.  Yeah.  So one of the first things I -- I note is in line -- or column 1 lines 15, 19, so if he could slide down the page, please.  Column 1 lines 15 to 19.  If we could enlarge that.  So here it says it's primarily directed to an animal feeding device with a combination bowl and mat which is designed to be anchored by the feeding animal in a stationary position.  So that immediately teaches to me that it's not surface contact self sealing.  Because if it was, you wouldn't have to have it anchored by the feeding animal.  All right.  Will you now go to 127, so scrolling down a little bit.  And line -- oops too far.  Up a little bit, please, column 1 line 27.

     MS. KIM:  I'm sorry.  Column 1 line 27.

A:  And it says it's one -- oh, get rid of that.  Which may be rolled up when not in use for storage in a convenient place.  So that says to me that if you're going to roll this thing up and you have a bunch of bowls on it, it's going to create a very big rolled object.  And that's not going to be stored conveniently.  I mean, just common sense says that.  If I've got bowls on it and my goal is to roll this thing up, it's not going to be stored conveniently.  So that suggests to me that the bowls are removable, and therefore, they're not integrated.  So it's another indication.  So it's not an integrated mat that is surface contact self sealing.  Instead it's a mat that a dog stands or an animal stands on that has bowls that you can remove so you can scroll -- roll this thing up.  Now, there's different embodiments.  And if we go back to the first page, we can see the drawing figures.  This page here, so minimize that.  And one of the observations – the next page, please.  Page up, please.  I'm sorry.  I went the wrong way.  Yeah, page up.

     MS. KIM:  Page down.  The other way.  I'm sorry. Like that?

A:  So figure 5, there's five different embodiments showing one of the observations I had that coming across all these embodiments the receptacle, which is 12 or 24.  So you see receptacle 12, receptacle 12 and 24, wherever that is, is independent of the mats 10 and 22.  And Bruno teaches that. That's the bowl is not integrated.  And there's other aspects of it that I found that would compel a examiner not to rely on this for but-for materiality.

**[Tr.T, Z. Garthe, 9/2/2021, 1367:1-16]**

Q:  The email by Ben Williams saying we already argued Bruno. A. Oh, right. Right. So there were a lot of different -- Sorry. There were several different prosecutions going on because of the international phase. And so it could have been at a different time when he argued it or before a different, you know, patent office or something and overcome it. Like, the -- I think the salient point of his email was agreeing, in a sense, that it's not a concerning piece of prior art.

Q:  And why is it not concerning?

A:  Because it doesn't have any of the, you know, functional claiming issues that are, you know, fundamental invention aspects of the utility patent. It hasn't -- you know, teaches away.

Q:  Okay. And so if a piece of prior art teaches away from the claimed invention, is it material?

A:  No, I would not consider that to be material.

70-1.   LNC uses the wrong standard to try to establish "but-for" materiality by focusing on how the product "basically looks the same" irrespective of the "suffuse undersurface" that is limited by functional language requiring it self-seal and create a partial vacuum under the mat only when attempts to lift the mat are made, except at an outer edge of the planar portion. The fact that Bruno is rubber does not satisfy this element, the section references several materials showing that the teaching is not self-sealing. *See,* **Exhibit 991.** Bruno, col. 1 lns. 62-65 ("a substantially flat sheet-like mat 10 fabricated of relatively flexible material such as sheet rubber, plastic, or the like, and having a flat under surface adapted to rest upon a supporting surface such as a floor"). Platinum Pets and the Gerber mat have the same elements (and are made of silicone or a rubberlike substrate) and were disclosed in the prosecution of the '903 patent.

**[Tr.T, M. Hubbard, 8/27/2021, 219:13 to 220:1]:**

Q:  And how did you reach that conclusion?

A:  Well, it -- structurally, it's identical to the claim -- to the structure required by Claim 1 of the '824 -- or '903 Patent.

Q:  And what do you mean by that? Can you explain that being structurally the same?

A:  Well, if you look at it, it has a -- well, it has a planar mat that -- and a receptacle or -- on top of the mat that's integrated with the mat. So it meets all the basic structural limitations of the claim. If you want to put up the claim, I can walk through the actual limitations. I don't have it memorized.

Q:  Sure.

A:  But basically it looks the same. And it also is made of -- I think it says it's made of rubber.

71.     Common across all of the embodiments of Bruno, the receptacle is independent of the mats. *See,* **Exhibit 991.** To have a combined receptacle and mat, the former must be assembled with the latter. These components are not integrated. Thus, upon even a cursory glance, it is clear

that Bruno does not anticipate the claimed "integrated tableware and dining mat" as claimed in the '682 Application or as issued in the '903 Patent.

*See,* **Evidence, presented at ¶¶**69-70.

72.     Further, Bruno's expressly teaches away from integrating a receptacle with a mat. *See,* **Exhibit 991.** Such a combination would defeat one of Bruno's objects of his invention – to provide a "rollable" mat. (1:27, also see 2:68-70 (teaching use of rigid receptacles made of "metal, plastic, or the like").) An integrated tableware and dining mat that includes a "... raised perimeter delimiting at least one cavity ..." as per claim 1 of the '682 Application is not "rollable." Teaching away from an intended use, Bruno in view of a self-sealing silicon member renders Bruno incapable of accomplishing one of its intended uses and is thus improper as a matter of law. (See *In re Ratti*, 270 F.2d 810, 813 (CCPA 1959).) Thus, for at least this reason, Bruno is not a "but for" material reference.

*See,* **Evidence, presented at ¶¶**69-71.

73.     Likewise, Bruno repeatedly teaches that the mat is anchored by the animal standing on it. (1:15-19 and 2: 62-67.) Simply stated, Bruno teaches away from use of a self- sealing mat, as per claim 1 of the '682 Application.

**[Tr.T, B. Williams, 9/1/2021, 1188:21 to 1189:15]**

Q:  Let's look at Exhibit 991, which is the Bruno patent.
A:  Okay.
Q:  And, in particular, I want to call your attention to figures 2 and 4 there.
A:  I see them.
Q:  And you're aware, sir, that the Bruno patent describes an invention made of sheet rubber, plastic or the like.  Right?
A:  Yeah, but the number 15 and 10, but the 12 is actually metal and other materials depending on -- yes.
Q:  And silicone is a type of rubber.  Right?
A:  Not necessarily.  It is known as silicone rubber, but I don't think it's the same, but point taken.

Q:  And you would agree with me, sir, that we see in figures 2 and 4 that that is a flat undersurface there for that mat. Right?

A:  Yeah.  And if you scroll down, you can see where he says that it's anchored in place by the animal standing upon it to stop it moving around.  So there's no surface contact, self-sealing taught within the scope of the patent.  I reviewed this one quite thoroughly actually.

74.    The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Bruno reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

**[Tr.T, Z. Garthe, 9/2/2021, 1329:13 to ]**

Q:  And then let's look at LNC Exhibit 900. Do you recall this email, Mr. Garthe?

A:  Yes, I do.

Q:  And what – what does it mean?

A:  So when – this actually, in context, this is when I was still at Chipman Glasser. Ms. Laurain had set me up with an EZPZ email address at that time, but was still at the firm and was still using the firm's email. But this was when I had internal communications with EZPZ, then I would use the EZPZ email address. So at this time, as outside counsel still leading the case, I had retained another attorney to do our due diligence on the case because, you know, as we were analyzing the case, one, we felt like there was a plausible claim for infringement but then, two, because the patent had issued we felt there was a plausible claim for validity --

Q:  You've got to talk slower for Ms. Court Reporter.

A:  I apologize. A plausible grounds of validity. The patent, once issued, is presumed valid. But to start the litigation, we wanted to do our due diligence and have an independent investigation done into the prior art into the patentability. And so I hired Mr. Roberts, Mr. Dan Roberts, to conduct a patent search. This was me as an attorney at a firm. And he found some number of references. And he sent me the patent application that's attached to this email, which is to Bruno. He sent that to me. And it was his opinion that that was the high risk prior art.

Q:  And what did you think?

A:  I thought that was great because the Bruno application is absolutely not high risk prior art. So my response was -- to my partners was, "Hey, this is what Dan found. This is the worst Dan thinks is out there. This is a gold mine for us because if this is the worst prior art, there's no way this invalidates the patent. It's got nothing to do with the patent functionality. We're good to go."

Q:  So let's go to the second page of this exhibit. So what do you mean this had nothing to do with your invention -- EZPZ's invention

A:  Yeah. So I would say this is one of the problems with looking at pictures of things. Again, if you were to look at the Happy Bowl or something and then look at this picture,

you're like, "Oh, look it's a bowl and a mat." But once you analyze what this -- what this patent application discloses, is this is a rigid material, patent. Right? The disclosure describes it as being made out of metal or firm plastic. And it instructs that the animal, the dog stands on the mat in order to hold it in place. So if you were to look at this patent and then try to get from here to the Happy Mat, right, it makes no sense because you're thinking, "Okay, I'm going to have my toddler stand on the mat while they eat, or something, or hold the mat in place?" It completely teaches the wrong structure. So when I saw this -- when Mr. Roberts sent this to me as high risk, for me, that was like golden. If this is the worst that's out there, we're ready to rock and roll. But I mentioned this to Ben. He asked me what it was. He wanted to see what the high risk was. So I emailed it to him and said, 'Hey, here's the high-risk prior art." Not my opinion; Dan Roberts' opinion that I passed on to him.

Q: Okay. So was your takeaway that it was what?

A: Bruno reference? My takeaway was that if this reference was the highest risk prior art, then we've got a slam dunk of a patent infringement case.

### VanIseghem Prior Art Reference (Materiality and Intent to Deceive)



     LNC has the burden of proof to show materiality and intent to deceive. Yet, LNC did not present any testimony at trial about this reference, accordingly it does not need to be considered by the Court; and, it is not discussed here.

     84. ~~LNC contends that U.S. Patent No. 3,939,976 ("VanIseghem") (*see,* Exhibit 58) is material to the application without supporting such contention.~~

     85. ~~Failure to show "but-for" materiality means that the question of whether it was not disclosed with an intent to deceive does not need to be reached.~~

**Hatfield Prior Art Reference (Materiality and Intent to Deceive)**



77.　　LNC contends that U.S. Patent No. 2,545,733 ("Hatfield") (*see,* **Exhibit 459**) is material to the application without supporting such contention.

78.　　Hatfield teaches a "Child's Hot Food Dish." (Title). Hatfield solves the pre-microwave problem of keeping a child's food warm. Apparently, this is accomplished by using an inner vessel into which hot water can be poured. The hot water then keeps an inner vessel warm and the contents therein warm. There is no basis for asserting that Hatfield anticipates claim 1 or that Hatfield in view of any other prior art reference of record renders claim 1 unpatentable as being obvious.

*See,* **Testimony** at ¶31.

79.　　The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Hatfield reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

*See,* **Testimony** at ¶31.

85

Pearson Prior Art Reference
(Materiality and Intent to Deceive)



80.     LNC contends that U.S. Patent No. 5,180,132 ("Pearson") (*see,* Exhibit 618) is material to the application without supporting such contention.

81. Pearson teaches a "Self-setting Suction Holder Device." (Title). Pearson's "holder" effectively works by providing a "suction chamber" on the underside of his holder that secures the holder to a surface. (*see,* Exhibit 618, 2:23-35). Pearson teaches his "holder" "may be constructed of a silicone rubber material." (*see,* Exhibit 618, 2:54-55). A beverage cup {14} is attached to the "holder" base {12} using an adhesive. (*see,* Exhibit 618, 2:67-68). Due to the formation of the suction cup (*i.e.*, the bottom is not "suffuse"), Pearson teaches that a "setting" force need not be applied when the holder is placed on a "relatively horizontal surface." (*see,* Exhibit 618, 3:16-39). To release the holder, one merely lifts upward on a rim {28}. This release operation is importantly different than claim 1. Accordingly, Pearson does not anticipate claim 1.

*See,* **Testimony** at ¶31.

81.     Also, Pearson in view of other prior art of record does not render claim 1 unpatentable because Person relies on the formation of suction, by not having a suffuse undersurface, and Pearson relies on the simply pulling upon on the rim to release such suction.

*See,* **Testimony** at ¶31.

83. The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Pearson reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.

### *Walls* Prior Art Reference
### (Materiality and Intent to Deceive)



LNC has the burden of proof to show materiality and intent to deceive. Yet, LNC did not present any testimony at trial about this reference, accordingly it does not need to be considered by the Court; and, it is not discussed here.

84.      LNC contends that U.S. Design Patent No. D344, 436 ("Walls") (*see,* **Exhibit 416**) is material to the application without supporting such contention.

85.      Wall's design is for a "Tray." (See Title.) A tray is a well-known dining implement. Anyone who has attended a U.S. public school in the last 50 years likely used a "tray" at one time or another. A "Tray" is typically used to carry something, such as food, and may contain various compartments (though not always, see *e.g.*, a tray for a buffet line often comes with or without compartments depending on whether the food is plated or server from a common bowl or the like). Wall's patent is not for the "tray," in terms of its functional aspects. It is for his "Tray" aesthetic aspects. Such aesthetic aspects do not differ, in terms of any consideration of the patentability of

~~the utility of the '682 Application, from any other 'tray.' Both have a flat bottom, and contain~~

~~compartments (as used in school cafeterias) for holding food.~~

~~86.     The reference is not "but-for" material. Given the readily observable and highly~~

~~distinguishable properties of the Walls reference, the "single most reasonable inference" standard~~

~~is an impossible threshold to meet and LNC does not meet the applicable clear and convincing~~

~~standard.~~

<u>Bridges Prior Art Reference</u>
<u>(Materiality and Intent to Deceive)</u>



LNC has the burden of proof to show materiality and intent to deceive. Yet, LNC did not present any testimony at trial about this reference, accordingly it does not need to be considered by the Court; and, it is not discussed here.

~~87.     LNC contends that U.S. Design Patent No. D226,830 ("Bridges") (*see,* Exhibit~~

~~414) is material to the application without supporting such contention.~~

~~88.     Bridges design does not include a flat surface let alone a suffuse undersurface.~~

~~The cross-section shown in Fig. 5 is from Fig. 4 and indisputably includes a bottom having~~

~~concave elements, ridges, and only at the distal end, a flat portion. Bridge's bottom is not~~

~~"suffuse"—if it were, the bowl elements would clearly bend and likely lead to a spillage of~~

~~contents thereof.~~

89.    ~~The reference is not "but-for" material. Given the readily observable and highly distinguishable properties of the Bridges reference, the "single most reasonable inference" standard is an impossible threshold to meet and LNC does not meet the applicable clear and convincing standard.~~

### General Considerations Related to Materiality of Prior Art

90.    To the extent that LNC identifies alleged material references discussed above, in addition to the arguments made, LNC does not attempt to determine whether they are cumulative to the *over 95 references* that the Examiner Volz herself identified and reviewed during the 25 prosecution of the patent application that became the '903 Patent. *See,* **Exhibit 245**, LNC385466 -469 (.pdf 351-354). Whether a reference is or is not cumulative is determined in view of all of the prior art of record, not just one other reference or by itself in a vacuum.

90-1. In addition to the prior art LNC provides as being cumulative to what was covered during the prosecution, the prior art is also cumulative in and of itself (numerous silicone mats, suction cups, and references listed twice).

90-2.   LNC impliedly concedes that a reasonable reading of its references, i.e. Bruno, Uhalt, Webb, and Momo Baby Mat, are less material than Platinum Pet, by its testimony on the materiality of Platinum Pets. It is established in the case law that references are cumulative when there are less material than other references already before the examiner, such as Platinum Pets.

**[Tr.T, M. Hubbard, 8/27/2021, 231:10-12, 232:2-3 ]**

Q. Does it matter that the Platinum Pets Mat doesn't self-seal as effectively as the commercial embodiment of the '903 Patent?
A:  . . . I just thought this was very, very clearly an anticipating reference.

90-3. LNC's also impliedly concedes that Yanko, Platinum Pets, Tommee Tippee, Oogaa, Brinware are not but-for material by its omission of these references on their own feeding mat

patent application; the patent application was similar enough to the '903 Patent to warrant citing

the '903 Patent as prior art.

[Tr.T, L. Laurain, 8/31/2021, 231:10-12, 232:2-3 ]

Q:  I wanted to ask you about Exhibit 201 you brought up Luv N' Care's patent application.
A:  Abandoned.  It's since been abandoned, but, yes, this is the original patent.
Q:  Okay.  And you indicated -- well, let's look at the patent application.  If we look at page 3, the last line, this is the application.  All right.  And do we not see there, Ms. Laurain, that when Luv N' Care filed -- prepared its application, it disclosed to the U.S. Patent Office the EZPZ all-in-one Happy Mat, did it not?
A:  Yeah.  I said earlier you didn't disclose Yanko, Platinum Pets, Tommee Tippee, Oogaa, Brinware on on and on and on and on and on.  You -- This is a bogus patent that you filed to force me into settlement demanding that I pay you $50,000. It's a bogus patent, and you have since abandoned it.  And you have not submitted any of the prior art you've sat and  accused me of being a fraud over for the last five years when he submitted this patent as a bogus patent to keep us out of the market and scare us into settlement. So, yes, this has killed my soul that this was done.  And I'm sitting here getting accused of fraud.
Q:  How do you know what patents or information Mr. Hakim was aware of that he supposedly didn't disclose in this application?
A:  Because Oogaa sent you the Yanko -- the reason you know about Yanko is Oogaa sent it to you.  And you were so excited because you found Yanko, and you were going to destroy us.  And he had Yanko when he submitted this patent.  He didn't disclose any of it. And you've used it as a way to harass and then you abandoned the application. And you're sitting here accusing me of fraud when you guys have either -- you're either lying to this Court or you're lying to the USPTO.  I'm sorry.  I'm sorry for that tone, but it's frustrating. And you've left off your patent agent prosecuting it.  And he was kicked out of the case because of the protective order. Yeah, Bob Chiaviello's name is off of this.  Yes, you remember Bob got excluded from the -- well, that's why you're hired because Bob got kicked off the case because he didn't include his name on this.  I'm sorry.

91.    The patent examiner reviewed prior art cited like Bowen, titled Self-Clinging Mat

For Eating Assistance, for example, which discloses "a substantially planar sheet of pliable

grippy material" having a "lower surface 26" that is "substantially smooth, advantageously with

a mirror-like finish" that is made of, *inter alia*, "thermoplastic rubber (TPR), silicone, vinyl, and

the like." This was listed in the search report entered into the File Wrapper immediately before

the notice of allowance (as well as elsewhere during prosecution). *See,* **Exhibit 245**, LNC385466

-469 (.pdf 351-354). A visual from the Bowen Patent is:



**[Tr.T, B. Williams, 9/1/2021, 1039:22 to 1042:20]**

Q: This is, I believe, page 108

A: I'm trying to get it. There it is. I ringed it. That, for the record, I believe this is correct, 2012/0128922 is the reference to Bowen. And there's other ones in there that are of interest. Now some of these are obviously repeated from the prior search, but that reference particularly is of note.

Q: Are you saying Bower or Bowen?

A: I believe it is B-O-W-E-N, I believe, is the --

Q: That's the one with the baby in the high chair and the mat, silicone mat on the high chair?

A: That is exactly right. It is the self-clinging feeding assistance mat. I believe that's the name. And she would have seen the first page with that title for sure.

Q: All right. And then what's important about that?

A: Well, I think I just said that. It has to do with the planar portion in combination with Bass. Right? So we successfully traversed Lion. There are two references left at this point. One is Bass, whichever in every embodiment requires an adhesive. You reveal the adhesive, you stick the mat down. But what Bass teaches is an integrated receptacle in the mat. So we have an express teaching away of surface contact, self-sealing because of the use of the adhesive. It's not self-sealing. It's governed adhesive. It's set. It's disposable. It is separable without the adhesive. The adhesive is not self-sealing. She wanted to use Lion to say that, well, even if there is an adhesive, if we just made Bass out of silicone, it would inherently perform this way. And so we traversed Lion on the grounds that it was nonstick silicone. It was a mold, and it had handles. And, therefore, it taught away from surface contact, self-sealing as well. So both Lion and Bass do not self-seal in contact with a tabletop.

Q: Right.

A: So she was looking for something to combine with that. And Bowen, Rios, Vargos and other prior art of record in her search easily fulfilled that function.

Q: Okay. So from what you've just said, just to confirm so I'm clear, you're saying that the patent examiner had taken the integrated tableware of Bass and combined it with the silicone mat of Bowen and -- but -- No?

A: No, I'm saying that she would have done that if she wanted to sustain the obviousness rejection.

Q: Okay.

A: So she was -- Lion is being -- like the original rejection was based on a hypothetical combination between Lion and Bass.

Q: Right.

A: Lion is removed.  We all agreed.  We stipulated that Lion is not appropriate prior art.  It does not read over any scope of the claim.  And in combination with Bass, it doesn't provide the necessary features, right, to replace the adhesive?

Q: Right.

A: She's trying to make an inherency argument about it would be inherent for Bass to function this way.  But inherency requires express teaching.  Right?  And it's really not appropriate for an obviousness rejection.  But that doesn't necessarily matter.  It's usually used in anticipation rejections. But, nonetheless, we don't even need to get into that because when I spoke with her about this and the secondary considerations of nonobviousness, excuse me, she said that she would withdraw the final -- the finality of the rejection because the rejection over Lion was improper. And the next action would either be a new rejection or a notice of allowance, depending on the affidavit being filed, the secondary considerations of nonobviousness in her interview summary.  I don't know if you remember seeing that.

Q: Yes.

A: So when she went to look for her final search, she's looking for things that are made out of silicone and that are planar and that would combine with Bass.  And of this search, there are numerous examples of those already that she did find. And she didn't need to cite them against the patent because she issued a notice of allowance instead.

**[Tr.T, B. Williams, 9/1/2021, 1108:10 to 1109:9]:**

Q: Let's look at -- so, as I understand it, based on the testimony that we've heard in this case, Examiner Volz on August 18th ran a search.  And she came up with 233 hits.  And then she would go through them, and she would look at them and decide, as we've been told to believe, that she then saw the Bowen application and that provided her with the missing reference that she was looking for to replace Lion.  Is that my understanding of what -- what you've testified, sir?

A: Partially but not entirely.

Q: Well, let me ask you this --

A: Because she wasn't looking for a single reference.  Right? She wasn't out there hunting for one reference.  They were doing another search looking for if there was something that would combine in such a way that would ultimately -- I think anticipation is what would be required at that point with the secondary considerations.  But --

Q: Well, let me ask you this, sir, --

A: Yeah.

Q: -- you had written an email, had you not, that the examiners were looking for something to replace the withdrawn reference of --

A:  Yes, they were going to conduct another search, which they always would do, correct, after every action and every amendment and every response, whether an amendment was made, they would always run another search.  So that's not uncommon

92.     The prior art references must also take into consideration that Mr. Williams discussed with the examiner silicone sheets that exist that "stick[] to walls." Specifically, Mr. Williams' notes reflect that on "8/26/15 – Supervisor Fenn Mathew – concerns: says rubber sheets and silicone sheets exist that sticks to walls." *See,* **Exhibit 678**.

**[Tr.T, B. Williams, 8/30/2021, By Deposition (6/17/2020), 555:04 to 556:04]:**

Q:  (BY MS. MENASCO)  All right.  I want to go back to your notes.  And we can -- we can see that there was a call on August 26 of 2015.  If you can flip back to tab 12 (sic) in your binder, that is the document that we marked as Exhibit 797.
A:  797?
Q:  Yes, sir.
A:  Okay.
Q:  And on the second page there's an entry for August 26, 2015.
A:  Oh, yes.
Q:  And can you -- and you wrote there, "Supervisor Fenn Matthew [sic] - concerns: says rubber sheets and silicone sheets exist that stick to walls. Concavity change to receptacle? Suffuse undersurface - define."
A:  Yes.
Q:  "Suffuse means continuous and spread out."
A:  Yes.
Q:  Can you -- so was supervisor -- Supervisory Examiner Mathew (sic) telling you that he was aware of rubber sheets and silicone sheets that stick to walls?
A:  Yeah.  His argument -- his concerns were that there exist other sheets that -- that can stick to walls, yeah.

92-1. The record is devoid of any evidence that there was a motivation to combine Bass with Webb, or any other combination of prior art references.

**[Tr.T, M. Henley,9/2/2021, 1445:8-19]:**

Q: Okay.  So I think you drew a conclusion here I'd like to look at. "However, although there were some clever solutions to secure mealtime food containment at the time, in my opinion none of the prior art provided or suggested the unique improvements of the '903 invention delivered by combining an integrated or homogenous tableware and placemat design together with advantages of effortless surface contact and self-sealing."  Is that your opinion?
A:  That's the real magic, yeah.

Q:  Combining two things?
A: Yeah, like a Band-Aid, right.  Gauze and medical tape.

**[Tr.T, J. Kennedy, 9/1/2021, 934:5-12]:**

Q. Did you examine -- did you examine these references to see whether there was any
   motivation for a -- for a POSITA to combine with any other references?
A. Well, I view that as the obligation of the plaintiff to establish that motivation. And I
   have not seen anything to date where that motivation to combine has been established.
   I don't see any motivation to combine these with any of the other references for various
   reasons.

**[Tr.T, B. Williams, 9/1/2021, 804:17 to 805:20]:**

Q:  And what do you mean by "obviousness"?
A:  Oh, wow, I mean, I don't know if we have time to go into crazy patent law.  But
    essentially, you know, obviousness is a legal determination.  It's not the colloquial it's
    obvious. It's a legal definition that is made by case law, essentially, since, you know,
    patenting is in the Constitution, the rights to inventors and authors for a limited time,
    the rights to their invention. So over 300 years obviousness is basically a hypothetical
    combination of teachings that is evidenced in the prior art. In other words, you must
    look at a jigsaw puzzle of one or more inventions. And to show a teaching or a
    motivation, these are the terms of art that are used, a teaching being a suggestion, a
    teaching or motivation to combine the references in the same manner to read over the
    claimed effects.  All those words in that claim I uttered have to be found in one or more
    other references in combination to show obviousness. Otherwise hindsight obviates
    novel inventions that are actually nonobvious because the appearance of the invention
    itself may lead to assumptions about what it is.    And that's especially true,
    unfortunately, with simple inventions like this one.  It's not the only problem with --
    with that, but that definitely is a common result of simplicity. And so these legal tests
    have been enshrined in the Federal Circuit for decades. And they are tests that need to
    be met. They're not simply -- it's not my opinion. Right? It's an objective opinion based
    on this hypothetical combination.

**[Tr.T, B. Williams, 9/1/2021, 1044:10-21]**

Q:  All right.  And so if you read Webb, which is the patent that relates to Tommee Tippee,
    if you read Webb, do you believe that there's any indication in Webb that teaches a
    motivation to combine a suction cup, an adhesive, and a integrated tableware to result
    in the Happy Mat?
A:  Well, no, because the Happy Mat doesn't have the suction cup.  So I think -- I think
    Webb might have a motivation for a suction cup and an adhesive, right, because I think
    Webb had an adhesive in it and it uses a base sucker and it has clamps. But it doesn't
    have motivation to replace a suction cup or to replace an adhesive and render them
    obsolete, if that makes sense.

### General Considerations Related to Intent to Deceive

<u>EZPZ's Belief in the Strength of Its Secondary Considerations Negates any Inference of Intent to Deceive</u>

93.    Each reference is discussed above, individually, but as a general matter, EZPZ's belief in the strength of its secondary considerations also weighs against a finding of intent to deceive in withholding any specific reference that could potentially be used as a basis for an obviousness reference.

**[Tr.T, B. Williams, 9/1/2021, 1020:23 to 1023:2]:**

Q: I was just going into your comments on secondary considerations we had covered. You talked about commercial success.
A: Okay.
Q: Copying was the third thing. The second thing was –
A: Unmet needs.
Q: Yes.
A: Yes.
Q: And so we had talked about those generally. Can we talk about what you did to show commercial success and what you were looking for?
A: Certainly. To my recollection, we were trying to demonstrate sales of the product, high revenue streams from the products that derived from the product itself, the so-called nexus requirement. And so we presented a lot of data to establish that
Q: And do you know where that data was derived from?
A: Yes. It came from EZPZ corporate and -- yeah.
Q: Did you see anything or did you have any concern that the numbers weren't correct?
A: I had no reason to suspect the numbers were not correct.
Q: Okay. And did you believe that the financial data did show that there was a commercial success that warranted secondary considerations that supported nonobviousness?
A: Absolutely.
      MS. MENASCO: Objection, leading. A. I mean, not just from the sales.
      MS. REISMAN: Wait. There's an objection.
      THE WITNESS: Oh, I'm sorry. I didn't hear the objection.
      THE COURT: Okay. What's the objection?
      MS. REISMAN: Leading, Your Honor.
      THE COURT: I'm going to overrule that one. Go ahead.
Q: Do you recall the question?
A: Oh, yes. I'm sorry. So, yes, no. Commercial success, there was a number of reasons for the commercial success. I had no reason to doubt any of the financial information provided to me, nor the publicity that was generated or the awards, the industry praise that the product had received. I mean, it's third party a lot of that stuff. So –

Q:  Okay. So let's go back. You said you were trying to show a nexus. What did you mean by that and why is that important?

A:  Well, because the nexus requirement requires that commercial success be derived from the product itself. So, for example, it can't be from puffery. It can't be from ancillary stuff that may lead people to purchase the product. the product's success must be derived from it and, in this case, the patentable feature. What is it about the product that made it so desirable for consumers and netted that success? Is that derivable to the patent itself, to the patented feature, what is disclosed?

Q:  All right. And did you feel like you had shown that with the -- with the declarations and the information submitted to the patent office?

A:  I did. And I think the patent office felt that too, yes.

   **[Tr.T, B. Williams, 9/1/2021, 1215:13-25]:**

Q:  Was there anything that you withheld from the examiners because you knew they were looking for other prior art?

A:  Nope.  There was nothing that I deliberately withheld from the examiners to confound their search of prior art.  They were very knowledgeable of the field of art, believe me.

Q:  And you had already submitted your secondary consideration evidence in March of 2016, right, the copying, the commercial success, the declarations?

A:  I think it was March 8th, March 9th that was filed, yes.

Q:  Okay.  Of 2016.  What did you believe was going to carry the day at that point in time?  Did you still think you could overcome obviousness?

A:  Yes, because we had commercial success. We had --

   **[Tr.T, B. Williams, 9/1/2021, 12103-13]:**

Q:  At that point in time, was there any prior art that you thought was going to hurt you that would make it any worse than what you were facing right then with an obviousness ruling?

A:  To answer your question, no.  I mean, at the point of having an obviousness rejection, we already were rejected. So the way to show that it was nonobvious, even if there was something that had surface contact sealing that was somehow out there, without that being expressed or intended or implied by the party who had made it, it doesn't meet the threshold for obviousness especially under the secondary considerations because of that objective standard that applies.

   **[Tr.T, B. Williams, 9/1/2021, 846:11 to 848:16]:**

Q:  You're fine.  So this is where I want to go to now.  So tell us why you think secondary considerations are so important?

A:  Well, I think Leonard Hand said it really well, you know, because market selection is better at determining objectivity objectively whether or not something is obvious relative to the subjective opinions we as humans have. The problem with an invention is that once it arrives, it is apparent.  And it -- it is now subject to hindsight

96

reconstruction.  Of course it's obvious.  It's just a mat.  How could it not be obvious?  Look at it.  Market selection tells us, "Well, if it is obvious, where has it been for the last 20 years?"  There is probably little more inspiring or motivating in human culture than profit seeking.  Honestly speaking, right?  And something that is cheap to produce, easy to ship, effective, useful, high profit margin speaks for itself.  And that's Leonard Hand, 1947.  He said that.  There's a lot of great case law on secondary considerations of nonobviousness for that very reason.  And it really does apply and is most importantly applied to simplistic inventions because of that hindsight bias.  "Simple inventions are more subjective to hindsight reconstruction" -- these are the Federal Circuit's words -- "than other type of art."

Q:  In fact, is that what you encountered in this case of how people first saw this invention?

A:  Yeah, it absolutely is, I mean, in every single case.  And that really goes to my claim drafting.  But, yeah, no, in every single case.  But what is interesting is --

Q:  Wait a minute.

A:  Yeah.

Q:  What do you mean that happened in every single case?

A:  In every filing that we've done, it has been initially rejected; and then, upon closer examination, has been allowed including in Europe, just wanted to say that.

Q:  And what do you account for this change from the initial rejection to them being allowed?

A:  Not close enough inspection.  I think it's simple.  You look at it.  There is a tendency -- I'm guilty of the same thing, you saw with that email of an overemphasis on the drawings.  And so a lot of people look at the drawings and they make -- I mean, there's one rejection, actually it's in the PCT.  There's a "Y" reference, which is a highly relevant reference, which has got nothing to do with this.  It's a self-heating kind of bowl.  It's a way of keeping food warm.  But it looks similar.  It's got a divided receptacle.  But if you actually read the patent, it's not even remotely relevant, I mean, maybe slightly.  It has a suction cup in one element.  But it's not relevant under an analysis of it.   So I think that's the problem.  I think people look at it and they're, like, you know, you read fast.  You don't dig into the peculiarity of the claim language.  I used functional claiming, right, which is allowable, but it's obviously problematic.  So it takes closer analysis to determine what -- how it actually operates, what is the structure that we're claiming . .

**[Tr.T, B. Williams, 9/1/2021, 1231:5 to 1232:5]:**

Q:  Okay.  So what is it about secondary considerations that you believe supports that system?

A:  Well, I mean clearly secondary considerations show -- and, again, to quote Learned Hand our friend, they are the most -- often the most probative evidence of nonobviousness due to market selection because we as human beings impute subjective ideas into things. It's hard to remember the novelty or nonobviousness of an idea when it now exists in front of you.  Right when you see it, "Well, look, it's a mat that self-seals, it's atmospheric pressure.  It makes complete sense."  But before that mat was in front of you to demonstrate that fact, you didn't think to make it and it did not exist.  And because that thing is so valuable, as everybody knows, as everybody knows, it is

nonobvious by definition.  And because it was specifically targeted for reproduction among competitors in close channels of trade, it makes it nonobvious. If it was obvious, you wouldn't need to copy it.  You wouldn't need to produce it.  You wouldn't need to talk about it.  You wouldn't need to track it down.  You wouldn't need to examine it and produce it yourself.  You would simply have already done it.  That's what Learned Hand's analysis of secondary considerations is all about.  It's very -- you know, again, it's often the most probative evidence of nonobviousness in the record.  It's not my language; that's the Federal Circuit

**[Tr.T, B. Williams, 9/1/2021, 1233:22 to 1234:21]:**

Q:  Do patent agents evaluate whether or not there's commercial success that fits the bill for nonobviousness?

A:  In a secondary -- I mean, that is a -- As a patent agent, my job is to gauge patentability.  And part of that involves a nonobviousness inquiry.  In that aspect, yes.

Q:  Okay.  And so why?  Why is that important?

A:  Again, because if there is a demand for a product that is unfulfilled, it represents an unmet need.  Right?  There is a demand that has not been filled. If I produce the product to fulfill that demand and it sells tons of units and I make a lot of cash on it or it becomes very commercially viable, the theory is – and again it's not my theory -- the theory is that somebody who is established already and has expertise in that particular market would already have made it, especially where it's simple and easy to create as that is. I mean that is the perfect example of why we have secondary considerations of nonobviousness in patent law, that invention.  And, in fact, maybe this case will be important to that sort of case law.  I don't know.  But that is the absolute epitome of why we have secondary considerations of nonobviousness.

Q:  So if there's a big demand, that means that people didn't realize they wanted it, that they needed it?

A:  Yeah, there was an unmet need.

**[Tr.T, B. Williams, 1033:17 to 1034:18]:**

Q:  Okay.  And based on your experience with the examiners and your view of the file at the time when the patent was granted in September -- when you were first notified that the patent was going to be allowed in September of 2016, --

A:  Okay.

Q:  -- why do you believe the patent was granted at that time?

A:  Well, I think it's the same reason I think it was granted, you know, today.  It was because of nonobviousness.  We had secondary considerations of nonobviousness.  So any hindsight reconstruction to read obviousness into the invention was obviated, prevented by market selection and the secondary considerations of nonobviousness. And I think the commercial success is really the big one. But the copying in the marketplace is also a very, very, very compelling argument for secondary consideration.  There's a lot of case law that I've since become aware of that speaks to that point.

Q:  And why is copying so important?

A: Well, it's copying within -- by a competitor in the same channel of trade.  Because, again, if it was obvious and commercially successful, then a competitor would have already done it to reap the benefits of the invention.  But if when the invention appears and it is reduced to practice quickly and appropriated by others and entered into that market, then it goes against obviousness.  It belies obviousness because -- especially, as I said I think yesterday, the more simple the invention, the more prone it is to that.

94.   The Happy Mat® had undeniably enjoyed commercial success (more than 750,000 mats were sold in the two years before the '903 patent issued, more than 2.1 million mats sold from 2016 through 2018). Consumer interest in the invention was evident. One video shared on the "Droold" Facebook page had over 22,000,000 views and more than 471,000 shares by December 8, 2016. *See,* **Exhibit** 1176.

**[Tr.T, L. Lindsey, 8/31/2021, 629:11-14, 629:23-24]**

Q:  In your business, I think you already testified that you had 170,000, and then at 1.7 million and then $7 million the third year?
A:  Yes, correct.

 . . .

Q:  All your sales were from the embodiment of the invention?
A:  Yes.

**[Tr.T, L. Lindsey, 8/31/2021, 641:7]**

Q:  And then it went down and came back up. What does that say?
A:  Those are the viral videos.  **That was after the patent issued.**
Q:  What do you mean viral videos?
A:  So we -- I think it was the Kickstarter video or video similar to the Kickstarter video. And, at that time, more people were on FaceBook.  But we had just numerous sites like Drooled and Food.  It was shared hundreds of millions of times, I think literally hundreds of millions.  And we sold -- we sold out.  I think we sold 15,000 units when those videos went viral.
      MS. SECOR: Okay. Let's look. I'm going to do this one, Jennifer. If you look at Exhibit 1176.
      MS. REISMAN:  And what is it?
      THE WITNESS:  Oh, that's the video.
Q:  Okay.  This is the Drooled video.
A:  Can you scroll down a little just so you can see how many people shared or viewed it. This was 22 million views.  61,000 people commented on it.  And then this was one of -- I mean, in the comment the first time, I feel like in nursing homes, which I think

99

there's another huge opportunity, you know, with people with special needs and disabilities.

95.    Applicant believed it could show Awards, Acclaim, and Industry Praise. The Happy Mat® received awards, acclaim, and praise from trade associations and professionals in the child feeding industry immediately. Among the many awards, recognition, and press the Happy Mat® received are awards and recognition from industry giants including:

    a.  the Juvenile Products Manufacturers Association (awarding the Happy Mat its Innovation Award in 2015. The JPMA (an industry standard in the baby space) described the Happy Mat® as "a revolutionary game changer for mealtime with kids." *See,* **Exhibit 1037**;

**[Tr.T, L. Laurain, 8/31/2021, 601:1 to 602:1 ]**

Q:  And then will you look – well, let me ask you: After the Quickbooks awards, how did things go for EZPZ?
A:  Great.  So we also won the JPMA Juvenile Products Manufacture Association's Award, which I think is one of the most special ones to award because it's the association that oversees all the juvenile products.
Q:  Will you look at Exhibit 1037.  And what is that?
A:  Yeah, it's JPMA announces 2015 most innovative products of the year.  So this was a big one personally because we were at the ABC Kids Expo.  So you remember we launched in October 2014 in the Invention Connection.  So a year later we went back to the ABC Kids Expo.  This time we actually had a booth at the trade show, not in the hall in a little invention area.  And we won an award in 2015.  The winners -- and we got announced at the trade show Saturday, like, and they had a party, which was cool.  It was exciting because our team was there and to come
--
Q:  Okay.  And so for -- excuse me.  Did you pay to get that award?
A:  No, I don't -- no.
Q:  And did JPMA, did they pick one person to get it at the --
A:  Different categories.  So I think it says feeding and bathing and changing.  There was a category of feeding products, changing and --
Q:  Because of the feeding mat?
A:  Yeah, and it says, "Most innovative products of the year."

    b.  Huggies® (**Huggies**® awarded eazy-PZ, LLC, a $15,000 MomInspiredTM grant in 2015 for the Happy Mat®. Grant recipients are "parents [who] have created must- have products and ideas inspired by parenthood and *an unmet need*" (emphasis added)). *See,* **Exhibit 1036.**

100

    c.  the Cribsie Awards (The Happy Mat® was awarded the "Must-Have for Mealtime" Cribsie Award in 2016. The Cribsie Awards were founded in 2010 to "recognize the best products, services, and websites for babies and tots." Drawing from consumer votes (votes are cast "in the millions"), the Cribsies are "the definitive awards for parents." The Happy Mat received 379,514 votes). *See,* **Exhibit 1040**; and

**[Tr.T, L. Laurain, 8/31/2021, 608:20 to 609:9 ]:**

Q:  And did you also receive the Cribsie Awards?  I'm going to call them crispy.
A:  Yeah.  That was another award 379,000 parents on people voted.  And so that was -- we got awarded Must Have For Meal Award in 2016.  And they recognized the best products and services and websites for babies and tots.  So Happy Mat received that with 379,000 votes.
Q:  Will you please look at Exhibit 1040.  Is this is the Cribsie website and the award winners for 2016?
A:  That's what it appears to be, yes.  I think you'd have to click on mealtime above, I'm assuming.  No, go down a little bit.  Yeah, right there, mealtime.  Their Must-Have For Mealtime.  And then, yes, just go to our website.
Q:  And the Mini Mat won that award?
A:  That was actually the Happy Mat.

    d.  Shark Tank® (Ms. Laurain was accepted as a contestant for Shark Tank® in 2015. Two Sharks (Kevin O'Leary and Barbara Cocoran) offered Ms. Laurain $1 million each for respective stakes in eazy-PZ, LLC, after Ms. Laurain demonstrated the Happy Mat®. Both Sharks are experienced investors in the baby space). *See,* **Exhibit 101** (Shark Tank video)

**[Tr.T, L. Laurain, 8/31/2021, 602:10 to 603:4 ]**
Q:  And then in January of 2016 is when you went on Shark Tank?
A:  Yes, it was. Well, we aired on Shark Tank in January of 2016.
Q:  All right. Now, you were cross-examined yesterday about Shark Tank being one of EZPZ's goals to get on there to get the 10 million people exposure. Do you remember that?
A:  I remember it being brought up.
Q:  It was listed in your business plan –
A:  Yes.
Q:  -- of 2015. When -- did you apply for it or did they ask you to?
A:  So I met the Shark Tank producers in The Invention Connection in September 2014. They followed up and asked us if we would be -- consider being a contestant. And, to be honest, one of my initial responses was I didn't necessarily want to go on Shark Tank. I didn't want to be known as a Shark Tank brand having our success contributed to a show. I didn't want people to think we were successful because of Shark Tank. That was a silly reason.
General Testimony, on awards:

**[Tr.T, B. Williams, 8/31/2021, 849:8-25 to 852:23]:**

Q: All right.  So let's go to your secondary considerations that you filed with the patent office real quickly, here.  So you -- in light of the examiner's belief that the -- the patent invention was obvious, you submitted these secondary considerations of nonobviousness.  Right?

    MS. REISMAN: Objection, leading.

    THE COURT: Okay. Overruled. I'm going to let her -- she was just pointing that out. I don't think that was a yes-or-no answer. So go ahead.

    MS. SECOR: Thank you.

Q: And what did you tell the examiner?

A: In this action? We -- well, we set forth what I believe is the most persuasive first, so commercial success. We relied on copying in the marketplace. We tried to demonstrate an unmet need in the feeding arts, which is tied up with commercial success. There's the unmet need, and rife copying in the marketplace. Those were the three big ones. And we had industry praise. I don't know if we used that in this particular filing. I also filed  additional prior art, as you can see.  And I know that's a bone of contention, so I apologize for doing it that way.

Q: We'll talk about that.  So let's go back up and let's talk about commercial success.  So what did you mean by that and what did you submit to the patent office?

A:  Commercial success is basically, you know, derive – you have to show that it's derived from the product itself, so the nexus requirement they call that.  It can't be based on other publicity and, you know, advertising expenditures.  It's from the feature that is claimed, in this case, the surface contact, self-sealing, we might call it, the suction function as it's sometimes colloquially referred to. And you demonstrate that by high sales, like how you would demonstrate commercial success in any undertaking, just pure demand.  There's other ways to show it, industries praise is another one.  I don't think we relied on that as much in this particular filing. However, the Happy Mat did win a lot of awards from actual people of skill in the art.  You know, the Junior Products Manufacturing Association gave it the Innovation Award.  There was another one by the Cribsie guys.  There was the Toys, Tots and Pets people that have a national competition that is basically a panel of people voted that it was an innovative, and met an unmet need, that's their own language. And there was other examples of industry praise to show the success and, in this case, the commercial success of the product based on sales.

Q: And so what did you do to determine that was true?

A: Well, we looked at Lindsey's sales figures, right, 2 million in less than 12 months has been -- We filed affidavits by various people associated with EZPZ familiar with the process.  This guy right down here, Jamie Grayson the Baby Guy, is a baby personality who deals with reviewing baby products. And I believe in September at the trade show he saw the Happy Mat and was enamored by it and gave it really positive reviews and testified to, in his experience, that it was, you know, a successful product.

Q: Okay.  And then where did you get the figures to – for EZPZ sales?

A: I got them from Ms. Laurain.

Q: Okay.  And then?

A:  Here's the -- there's the stores that it was in, by the way.  So also we listed the retail establishments that were -- were selling it and the countries wherein it was also being distributed.

Q:  Why is it important the countries where it's being distributed?

A:  It shows global demand, you know.

Q:  And then --

A:  It's just not sustained in international distribution network unless it's paying for itself.

Q:  And Ms. Laurain testified that at the time this was filed, the only product she had was the Happy Mats?

A:  At the time this was filed in 2016, yeah, I believe that's true.  I mean, I'm not in -- you know, up to speed on the ins and outs of EZPZ.  But, to my knowledge, that's absolutely correct, yeah.

Q:  And what's important about that?

A:  What's important about that is that that mat was the first product that launched the company.

Q:  And so all of the profits are attributable to the embodiment of the invention?

A:  Absolutely, yes.

Q:  And then let's talk --

A:  The success of that product is the success of EZPZ.  The beginning of EZPZ's success because I know they've enjoyed more success since then.

Q:  Okay.  And then you indicated that also you referenced a survey on here.  What was the purpose of the survey?

A:  To my recollection, the purpose of the survey was to show that nexus requirement, why were people buying this mat?

96.     Applicant believed it could show an unmet need from medical professionals with expertise of feeding disorders to show a need existed which the Happy Mat® met. Previous attempts to prevent overturning of tableware by problem eaters resolved around adhesives, suction cups, and mechanical fastening means (including affidavits by two Certified Speech Language Pathologists and two medical doctors with specialties in feeding and public health as well as other industry experts). *See,* **Exhibit 245.**

**[Tr.T, D. Winkelmann, 9/2/2021, 1484:4 to 1485:5]:**

Q:  .And what did you think that meant, from your point of view?

A:  That I've never seen anything like the Happy Mat before, any type of this technology; and that the self-sealing technology was going to be able to -- if this patent was granted, going to be able to be utilized to help families.

Q:  You felt like the Happy Mat was innovative?

A:  Absolutely.

Q:  And then you said, so it says, "By preventing displacement from an underlying surface except by peeling action at the outer edge absent need for any suction cups, adhesive, or other active suction means."  Did you know what that meant?

A:  Yes, ma'am.

Q:  And what does that mean?

A:  Everything that I was doing, Duck Tape, Crazy Glue, any way to be able to -- to provide a means to be able to help the patients that I served.

Q:  And then it says that, in your expert opinion, the present invention to which this affidavit is directed clearly realizes an unmet need by providing a novel feeding solution for special needs children.  Do you still believe that?

A:  Yes, ma'am. I think that, in retrospect, I would actually broaden that instead of just special needs I think I would have wrote six months of age to 99 and a half because of the fact that, you, know – by this way my expertise part was to bring in that special needs component, but it really should say much broader six months to 99.

**[Tr.T, L. Laurain, 8/31/2021, 608:2-13]:**

Q:   And is this the article that was published in the Colorado Parent Magazine?

A:  Yes. So that is, I think, if you go down, Making Mealtime Easy-Peasy. And then if you scroll up to the picture, that is Dawn Winkelmann we talked about the speech pathologist, and two moms. They have kids with Down Syndrome. It was a huge focus when we launched EZPZ, special needs kids with Down Syndrome. Kiddos with autism, blind kiddos could eat and have stability with the mat. Really when we launched, that was a huge priority. We were changing the face of beauty. We were using kids with disabilities to advertise. So we were in that magazine for that.

**[Tr.T, B. Williams, 8/31/2021, 853:5-22]:**

Q:  And then you also talked about the unmet need and what do you mean there?

A:  Well, this is a bit complicated. There's a couple of things about the unmet need. So unmet need is sort of wrapped up and can be inferred. So Apple versus Samsung is a great case on this. By direct copying, you can show that there is an unmet need if it's nonobvious in the marketplace because otherwise that need would have been fulfilled. But in this specific example, we're referring to speech language pathologists who have dealt with feeding disorders, who have found the mat, the Happy Mat to be consequential in treating problem eaters.  I hope that's the right terminology.  I don't want to be saying something that's wrong, problem eaters. So, you know, I have a 4 year old.  She doesn't really throw her food around, thankfully.  But apparently it's been very useful in therapy in helping folks, you know, eat without doing what problem eaters do.

**[Tr.T, T. Falcone, 9/2/2021, 1548:12 to 1549:10]:**

Q.  And with regard to the information, what was your goal to put in the affidavits?

104

A: So I think essentially we wanted to prove that the self-seal, you know, the functionality, that attribute of the product itself was disruptive in the marketplace and was special and was a primary reason that the product sold so well.

Q: And did you believe that was true at the time?

A: Absolutely.

Q: And why did you believe that?

A: Well, I mean for sales to jump like that coming from somebody that, you know, has worked with a lot of different products, products don't just take off like that unless they're truly special, different, and that they're solving a problem that, you know, wasn't solvable or wasn't particularly easy to manage prior to that product. So, I mean, and, like I said, Lindsey served so many ideas up to me before she told me about the Happy Mat and showed me some prototypes. And I'll never forget, I said to her, "This thing has legs." And she said it was one of the best compliments I've ever served her. I don't server her a lot of compliments. But I just -- I knew it was special and different. I have kids myself, and I certainly had never seen anything like it, and I thought that it was a real game changer for parents.

97. Applicant was also aware of extensive copying in the market.

97-1. Applicant was also aware of extensive coping in the market, including by LNC.

**[Tr.T, L. Laurain, 8/31/2021, 710:19 to 712:15]:**

Q: Yes. Do you recognize what 1058 is, Ms. Laurain?

A: It looks like an order from Abe Hakim, Amazon, 3030 Aurora. It was a order of a blue Happy Mat from Abe Hakim -- Joseph Hakim.

Q: Dated?

A: March 21st, 2015.

Q: Will you please -- I move to admit Exhibit 1058.

    THE COURT: Any objection to that?

    MS. REISMAN: No objection, Your Honor.

    THE COURT: Let 1058 be filed.

    MS. SECOR: And we look at 1059.

Q: And what is that?

A: That is an order from Eddie Hakim. He ordered the Happy Mat in coral, which is over there, the Happy Bowl in lime and another product. And Eddie had it shipped to 3030 Aurora Avenue. Again, this appears to be later -- or, no, I guess it was in March of 2015? The last one, yeah. So this is in October of 2015. It's an order from Eddie to LNC.

    MS. SECOR: I move to admit it, Your Honor.

    THE COURT: Any objection?

    MS. REISMAN: No objection, Your Honor.

    THE COURT: Let it be admitted, 1059.

Q: Then Exhibit 1186. And you recognize this document, Ms. Laurain?

A: Yes, this is an order -- another order from Steve Ariel, who's an employee of Nuby. He's a sales director. And it looks like another order of a blue Happy Mat shipped to

3030 Aurora Avenue, again Luv N' Care address, so another Happy Mat order to Luv N' Care.

Q: What date?

A: March 26th, 2016.

Q: 25th?

A: Oh, the email is March 25th. Oh, it's guaranteed delivery. I guess they were guaranteed delivery. I guess this was the one that got screwed up the delivery.

Q: We don't need to talk about any depositions.

A: Well, this is what happened, appears.

Q: That's okay.

A: Okay.

Q: So the date is?

A: March 25th, 2015.

    MS. SECOR:  And, thank you.  And then we can go off. Yeah turn it off.

    Your Honor, did I move to admit 1186?

    THE COURT:  Any objection?

    MS. REISMAN:  No, Your Honor.

    THE COURT:  All right.  Let 1186 be admitted.

**[Tr.T, L. Laurain, 8/31/2021, 775:11 to 17, 776:4-16]:**

A: Yeah, it was more of you guys sent the mat to China. So you sent my Happy Mat to the Chinese manufacturer and said, "Can you make something, a similar product?" So I did not send -- I sent our white prototype to our Chinese manufacturer. You guys sent our Happy Mat to your Chinese manufacturer and said, "Can you make us something similar?" That's what I sent to our manufacturer. You sent my product to your manufacturer.

    . . .

A. Well, you guys rush delivered -- we looked at the orders from Lisa. Eddie ordered a mat. Steve Ariel ordered a mat. I don't think it was Jack. It was his brother or someone close. And then Steve Ariel had the audacity to send me a message asking why his Amazon Mat didn't show up. And I replied, like, "I'm so sorry. It's not overnight. We'll send you a new one." And so then Abraham Joseph overnight -- So clearly they were having an email in Monroe and everyone wanted to see the EZPZ mat. You turned around and you sent the EZPZ mat to your Chinese manufacturer and you said, "Can you make us something similar?" So, no, I did not do that, and I have not done that for a competitive product.

**[Tr.T, L. Laurain, 8/31/2021, 778:15-19]:**

Q: Ms. Laurain, will you please look at Exhibit 1345 -- I'm sorry 1117. Yeah, you can highlight that. Do you recognize this email?

A: Yes, that's what I referenced. "We picked the colors based on the EZPZ colors."

Q: Who sent that email, or who was this email between?

A:  It looks like it was between Susan and sent to Nathan Shamosh and a few others.
Q:  At Nuby.
A:  Yes.

**[Tr.T, L. Laurain, 8/31/2021, 779:11 to 781:13]:**

Q:  All right.  And will you please look at Exhibit 1345.  You can say yes.  Do you recognize this email?
A:  Yes.  That is the EZPZ Happy Mat to the right.  And it looks like that is a kidney shape mat, and they've taken the smile part of the EZPZ mat and put it on the --
    MS. SECOR:  This is to show that Nuby has copied EZPZ and why EZPZ put in their Appendix D in the patent prosecution that Nuby is copying them.
    THE COURT: Is that relevant to today's proceeding?  I understand that could be relevant for the jury trial, but is that relevant today?
    MS. SECOR:  Yes, because copying is evidence of secondary considerations, and it shows why -- and it support --
    THE COURT: All right.  That's a good point.  I'm going to change my mind.  I will allow it for that purpose only.  Okay.  All right.  So the objection is overruled.
Q:  So do you believe this shows Nuby copied you?
A:  Yeah, if we could pull --
Q:  Copied EZPZ, sorry?
A:  If we could pull up Appendix D, this looks like the exact mat we list in Appendix D, Nuby's mat.
    MS. SECOR:  Okay.  We'll do that, Exhibit 245.  Go to page 197.  It's past that.  There you go.  That's C.  Now, we just go a few more pages to D.  So if you'd -- yeah, scroll
THE WITNESS:      There you go.  So that mat on the left, if you put it side by side, looks like what I mentioned earlier, the smile.  It's that picture.  They cropped – they photo shopped.  I mean, cropped literally our Happy Mat smile and then superimposed it on that mat.

**[Tr.T, L. Laurain, 8/31/2021, 656:16, 657:4-14, 658:4 to 663:17, 664:9 to 665:16]:**

Q:  Ms. Laurain, will you look at Exhibit 245.

. . .

Q:  Do you have it?  Okay.  So, Ms. Laurain, in your patent application that you submitted to the patent office, --
A:  Yep.
Q:  -- did you submit a section on secondary considerations?
A:  Yes.
Q:  And as part of that section, did you submit a section on copying?
A:  Yes, Appendix C.

Q: Okay.  And does that start at page 50 of the file wrapper, the PDF page of the file wrapper?

A: I believe so.

. . .

Q: So if you can go to page 197 of that PDF.

A: Yes.  Yeah, that's it.

Q: Is this what you're talking about?

A: Yes.

Q: And so if we go partial listing of copying devices, we can see that, for example, the baby -- turn off, turn up. I lived in Georgia when I was forming my Ps and Ds, and it don't show.  So and also Ben Williams noted that – indicated "Helps eliminate tipped bowls, plates and mealtime mess."  I mean, did you think they were copying the Happy Mat?

A: Yes.

Q: And it looks like the Happy Mat right in the middle there, doesn't it?

A: Yes, well deliberately confusable.

Q: If you go, you can go to the other page other reference in the Baby Turnip that you felt like was copying you?

A: This appears to be comments on Amazon.  So this is not an original EZPZ product. "Please check out the real EZPZ mat. This was stolen from EZPZ."

Q: In fact, consumers warned that this is not the EZPZ Happy Mat.  Correct?

A: Yes.

Q: And then there was also the Swish Smiling Bird?

A: Yes.  And then -- and then they did, like, a logo, yes, and they had our logo, essentially our trademark.

Q: You can see that right here.  It looks just like EZPZ trademark?

A: Yes, it's a little blurry on this but that's what it is.

Q: And then the RSB Solution?

A: Yep.  So that was the Silicandy mat.

Q: Silicandy is the one that Ms. Bar is associated with. Right?

A: I believe so.

Q: And Ms. Bar sent you the Gerber mat, right, and said, "This shows your product shouldn't have a patent"?

A: Yes.  That was part of the email that she sent us.

Q: And did you submit the Gerber mat with Appendix D?

A: Yes.  The Gerber mat is listed in Appendix D.

Q: And we'll get to that in a minute.  So you actually listed Silicandy as an example of someone who was copying you?

A: Yes.

Q: Did Ms. Bar and Silicandy quit copying you after you had a confrontation with them?

A: I believe so.

Q: And Mr. Williams pointed out to the U.S. Patent Office some of the things that show these people were copying and that customers believed that it was the EZPZ patent Happy Mat. Right?

108

A:  Yes, that's what this says.

Q:  Galaxy Technology was another copier where it looks just like the Happy Mat?

A:  Yes.

Q:  And you can see they even copied the way you put the food in?

A:  Yeah.  Usually they just use our pictures, but they did it with their own food.

Q:  And then also there were other examples of copying throughout.  But these are actually EZPZ Happy Mats right here?

A:  Yes.  And this was the worst part for me was when everyone was using our boys all over.

Q:  These are actually your children right there --

A:  Yes.

Q:  -- being advertised by this company?

A:  Yes, there's numerous of this.

Q:  And then Kids Smile did the same thing?

A:  Yes.

Q:  And Nuby, Nuby you feel copied you?

A:  Yes, I do.

Q:  Is this -- is this mat right here the mat that was the subject of the hash tag that said Nuby was copying EZPZ?

A:  Yeah.  And this actually, remember when the Amazon UK came up yesterday and there was, like, a Tommee Tippee link if you were on Amazon UK, it would be looking for Amazon mat.  And this would be an example NUBY-UK I mentioned I looked on Amazon UK for that Nuby Happy Mat.

Q:  If we -- is that smile exactly half of the EZPZ Happy Mat?

A:  It looks like the exact part of the EZPZ smile Happy Mat smile, yes.

Q:  The Maria Mat was NUBY-UK.  Do you know when -- if that was sold in the U.S.?

A:  Yes.  So they originally launched it under NUBY-UK, and then they launched that same mat in the U.S. as well.  Then they switched over to their smile mats late in the year.  That was in, I think, September they launched their --

Q:  SureGrip Happy Mat?

A:  They called it the Happy Silicone Feeding Mat in the same colors, the lime and the coral and the blue.

Q:  So they copied your colors?

A:  Yes.  But that wasn't until September 2016 right before, I think, honestly I saw those mats.  And then within a few days, we got notice of allowance on the utility patent inclusion was when we saw them in Germany and served them in Germany.  That was for a design patent.

Q:  Then Kaiao also copied your own children?

A:  Yeah, that's Chase who's now 9.

Q:  And your Happy Mat?

A:  Yes.

Q:  And Kangning did the same thing?

A:  Yes.

Q:  Not your children?

A:  No, the children are there too.

Q: Oh, okay.  And then other companies were using EZPZ product description for searches?

A: And our photos, again, our kids are photographed, copy from on the left.

Q: No adhesive, and it's a less mess happy eating in the product description?

A: Yes.

Q: Okay.  And --

A: That's the Happy Bowl.  That's our photo.

Q: Okay.  And kdsilicone?

A: Yep, that's another happy mat with the fake logo.  See if you can see ours has EZPZ in the eyes but they purposely made it just eyes, not EZPZ and –

Q: They use the same logo without EZPZ letters?

A: Yes.

Q: And then?

A: This was actually the worst for me.  It was hard enough for me to have our kids copied.  When I started, we had our friends photograph my -- so originally it was our kids.

Q: Just repeating what you said photographed?

A: Photographed.

Q: And is this -- who's -- which child is this?

A: I can't remember her name.

Q: Okay.

A: But Christie's kids usually we photographed Chloe and Christie Brock who works for EZPZ.  Chloe was everywhere.

Q: And then LeadOne also copied the Happy Mat?

A: Yes.  And, again, our kids are pictured there.

Q: Yeah.  And then Royal Mould copied it?

A: Yes.  And it looks like, again, our kids are pictured there.

Q: On the bottom?

A: Yeah, in that second picture.  That's from the video we watched earlier.

Q: And the Kickstarter video?

A: Yeah.

Q: And then Royal Silicone did as well?

A: Yes.

Q: And the video on line shows suction function, the remark says on this Royal page?

A: Yep, it appears there.

. . .

Q: Okay.  And then it's there's your kids on this Alibaba website?

A: Yes.

Q: Advertised for new products.  Shengdar Rubber also used the Happy Mat description and the mats?

A: Yes.

Q: And Silly mat also used it?

A: Yeah, this was actually the first copy that ever came out. And that was probably the hardest, I mean, because it was the first copy.  That's Brody.  He's 11 now.  But if you look at that video, they dubbed over our Kickstarter video.  It was me in the video, someone else talking.  Like, are you sick of spilled milk?  And it was me.  So this was

110

actually the first copy that was ever brought to my attention.  I think this was the first, yes. And then that was a Chinese manufacturer shortly thereafter.

Q:  Okay.  And so why were you showing the evidence of copying to the patent office?

A:  I'm assuming that when Ben talked to the examiners, they said, "If there's evidence of copying for secondary considerations, you should submit that."   And so it's my understanding that evidence of copying supports secondary consideration.  So even, like, Nuby, for example, sending our mat to China as a blueprint, that is strong evidence of secondary considerations of copying.  Using your exact mat as a blueprint to send to a manufacturer is strong evidence to support secondary consideration of nonobviousness. So if it was so obvious, why would a big manufacturer like Nuby be sending our mat to China as a blueprint?  That supports nonobviousness.

Q:  Before your idea was published, were there any examples of the Happy Mat on line and being copied?

A:  No.

**[Tr.T, L. Laurain, 8/31/2021, 680:22 to 681:1]:**

Q:  Back in the beginning when it was more important, what was important about it?

A:  There were so many copycats.  I mean, we saw 20 on that list.  We've taken down thousands and thousands of listings, I mean, thousands.

**[Tr.T, B. Williams, 854:3 to 855:9 ]:**

Q:  All right.  Now, let's talk about copying devices.

A:  Okay.

Q:  Is that what we've already talked about where you said people are copying it?

A:  Yeah.  I mean, copying in the marketplace is a great example of nonobviousness.  Right?  Because if somebody is directly deriving sales from your idea, and they didn't do it beforehand, it shows that an industry competitor likes the product, likes the invention, and is appropriating it for their own purposes. So, in this case, there were literally thousands of them. I mean, it was all over the place.  When that thing arrived on the scene -- it's hard to realize in 2021, right.  But, in 2014, there was nothing really like that out there.  Right? There was just these other things that were separable elements: Ways to clamp it, attach it, make sure it stays in right, all this other stuff. When that thing arrived, everybody freaked out.  I mean, it won all these awards.  As I said, close channel of trade competitors reduced it to practice from itself and counterfeiters -- I think the mold walked right out of the back of the factory wherever it was produced.  And they were all over Alibaba.  I mean, even ones with Ms. Laurain's children. And they were counterfeits.  They weren't even just derivative infringements, if you look.  They were counterfeit products. It became the benchmark of this suction function, this surface contact, self-sealing integrated tableware.   It became the benchmark reference product to which all these other products were compared.  "It doesn't do it as well as the EZPZ mat.  Have you seen the EZPZ?  But this is like the EZPZ mat." I mean, it was everywhere for about two, two and a half years. It was absolutely everywhere.

98-1.     EZPZ also had a belief in its patent application based on its success obtaining

other patents, such as in Germany.

[Trial, Tr., L. Laurain, 8/31/21, 693:3-25]

A:  I think specifically in regard to the Michigan lawsuit, that was in October of 2016. But prior to that, in September of 2016, we got our notice of allowance, which was really exciting. We went to Germany for the Kind + Jugend Trade Show. And we walked to the trade show. There was a blue mat on Nuby's booth replicating our Happy Mat. Jordan Bolton was our German lawyer in the court system there. And we were able to serve Nuby an injunction at the trade show. Eddie didn't come out to meet me. I got to meet Joe Hakim at that trade show. We went in and served the injunctions. They had to remove mats from their booth at the trade show, and they had to remove their placemats because we had a design patent in Germany. We were extremely confident in our IP because we had just come off an injunction served against Nuby . . . .

99-1. EZPZ was not advised that the invention of the '903 patent was not patentable.

**[Tr.T, L. Laurain, By Deposition (6/10/20), 70:3-15, 77: 19-25 to 78: 1-15, 87:19-21, 87:23-88:07, 88:08-88:24]**

A:  You know, it's, I think, interesting enough, though, when you look at my mind-set on the e-mail I sent to Jordan --
Q:  (BY MR. DENEGRE)· Ms. Laurain, I –
A:  Well, I want to say it says, Can we file -- "Could we file a provisional patent and then spend the year 'researching' to see if a utility patent is possible.· If it isn't, then no worries.· We don't end up getting the utility. "I mean, that's -- that was my mind-set there versus this egregious businesswoman that I am doing anything that I can.· So I just want to -- again, on May 24, that was my mind-set.

. . .

Q:  (BY MR. DENEGRE)· Okay.· So we looked earlier at the language in the letter where you say that "after my lawyer reviewed it and did some searching, she said that she doesn't think a utility patent would be feasible and tough to write."Do you see that?
A:  Yes, I see that right there.
Q:  Do you deny that you got the advice from a lawyer that your utility patent would not be feasible?
A:  No, I do not deny that.· I don't recall having a conversation in regard to that, but I would like to just point out that during that time, based on documents that we've received today, there is no mention of any sort of self-sealing, suction function, that ability around a utility patent, so my assumption would be if there was a conversation had, it was not in regard to that.· It would have been around the all in one, and my recollection is in regard to a design patent.· So I'm not denying that, but this is what the e-mail says.

. . .

Q: Let me ask you a question.· Was the only thing you were seeking to obtain a utility patent over a suction function?

A: I don't recall the specifics in regard to -- I mean, that -- the self-sealing ability and suction function is a big part of the patent, so that's what ended up patenting. I think this is just documentation of what my Google search limitations were at the time and what I was doing in my head space.· And I am glad this e-mail exists.· Because, like I said, my recollection -- it's hard to recall this, but the documents speak for themselves.

Q: (BY MR. DENEGRE)  What did you mean by "suction function"?

A: I think that's the easiest way to describe that literally at that time you couldn't get the plate off -- a plain bowl off the table.  I mean, I  was lifting 200-pound tables with the mat.  Or I couldn't lift -- I couldn't break a seal.  I was able to lift hundreds of pounds table. So to even -- when you look at the Tommee Tippee mat that I had on the tray, they are so different to have now this white prototype all in one that people stop in their tracks.  I mean, they can't even believe it, that you can't get it off the table. It was literally and it literally is a phenomenon.  I mean, it was -- it's exciting and it goes back to an exciting time, that the suction function is something that you would not expect.

**[Tr.T, L. Laurain, By Deposition (6/10/20), 104:01-21, 121:22-24, 122:01-04, 122:05-08, 122:10-123:04,** 132:09-133:05, 150:20-22, 150:24-151:05]

Q: Do you know if Mr. Bolton or Mr. McCarthy ever reviewed your patent search?

A: Based on their deposition transcripts and what they said, they both stated that they did not review it or see it, so I would assume that's what they said. I don't have a recollection. I mean, that's what they stated on the record.

Q: So after you sent it, you didn't take the initiative to discuss it with them? I don't agree with the predicate. I think I took a lot of initiative in this and was trying to do as much as I could to save money, I'm assuming, and Googling and figuring out what I could, so I don't think that's a fair statement that -- I sent them that and then ended up hiring Ben. So I'm assuming if they would have read it, it would be on a bill and they would be -- it would have been billed.· So that would be another way you guys could look at it outside of their deposition testimony.

**. . .**

Q: (BY MR. DENEGRE)· Did you receive any advice from Clark Hill during this time period through the end of May 2014?

A:  And what do you mean by "advice," if you want to be more specific?  I mean, Jordan Bolton wrote me an e-mail, so is this considered -- I don't know. You need to be very specific about "advice."

Q: (BY MR. DENEGRE)  Well, did you consider it to be advice that -- Mr. Bolton's statement that there would be a lot of red flags, did you consider that to be his advice?

A: No.· I think that's an opinion.· I mean, if Bolton -- Tim and Bolton were eventually brought back in on the prosecution for secondary considerations.· And even after we submitted the secondary considerations, I think I sent a note to Bolton and Tim and

said, Hey, guys, how are you feeling? And Bolton's response is, It's still going to be, you know, a tough road, and that had nothing to do with prior art at all.· It's just getting a utility patent -- if it was easy, I'm sure there would be a lot more utility patents.· It's not just an easy thing to get a utility patent.· They take prosecution. And so I think any really thing you're taking from one e-mail is going to be taken out of context because -- I mean, it's not even fair to compare continuing applications to our application, because they're -- I mean, it's just -- it's very easy to take stuff out of context in hindsight.

. . .

Q: Well, both McCarthy and Bolton were very negative on your chances to obtain a utility patent, correct?

A: That's a strong statement to make.  One, Bolton isn't a patent expert, so any one of Bolton's statements, I think, has to be used in that context, that he's giving his high level of friend opinion. And I don't remember my specific conversations with Tim McCarthy. I would say if they were both that concerned, why would they have gotten involved helping us prosecute the patent in March of 2016? Yes, there were -- getting a utility patent isn't easy.  And like I said, Jordan Bolton has statements similar in March of '16 that it's still going to be a tough road.  So I think any of that is taken out of context.  If they had concerns, I'm assuming they would have said, We're not going to help you do the secondary considerations and so on and so forth, and, quite frankly, wouldn't have probably got involved in a litigation, so I think your statement is taken out of context.

. . .

Q: Did you tell Mr. Williams what your other lawyers had told you about the problems with getting a utility patent?

A: I don't recall my specific conversation, but I don't think that they were problems that people told me, so I think that was out of context, your statement. So I don't know if I would have said, These are the problems people would have said, because I didn't see them as problems, but I don't recall my specific conversation and -- yeah.

**[Tr.T, J. Bolton, 9/2/21, 1252:1 to 1253:18, 1254:1-21, 1255:8-17, 1257:10-25, 1258:1-5, 1275:1-7, 1276:4-1277:1**

Q: Yes. So at the  -- May 26th, 2014, is the date of your prospective engagement. It was [Deposition] Exhibit 529 that we already saw, [Exhibit] 21, I believe, is admitted. At that time in May of 2041, did you doubt the invention was patentable?

A: I recall -- I mean, recalling specifically that moment in time is a little difficult. But generally, just from a story perspective, I recall when Lindsey -- when Lindsey -- Ms. Laurain, I'm sorry -- when Ms. Laurain had first contacted me about what the invention was, it sounded as if it was just an integrated dish or bowl and placemat. And then ultimately as the invention itself evolved, it became much more than that. So -- so certainly my view of it evolved over -- over time, no doubt.

Q: And then did you have concerns that the benefit of the patent -- did you have any concerns about EZPZ getting a patent?

A. Not so much concerns about EZPZ getting a patent. My concern really was, was the juice worth the squeeze? And what I mean by that is was the investment in -- in our firm to prosecute a patent worth the spend because knowing that that spend would -- if it resulted in the issuance of a patent, was just an opportunity to have further spend on top of that. So that was really -- it wasn't so much a concern about getting the patent or not getting the patent. It was more a concern about the risk benefit analysis, if you will. And when I say risk, I'm talking about the spend.

Q: Okay. And so why would you have a spend after you get the patent?

A:  To protect the patent, to enforce your intellectual property rights.

Q: Okay. And is that typically what you see in your practice with clients who have patents?

A: I mean, so, yes, certainly have, in my experience, limited as it may be with respect to patent litigations, incredibly expensive, more expensive than even straight up the middle commercial litigation, which is already expensive. So that was the thrust of my concerns.

Q: All right. And then what did you recommend EZPZ do with regard to the risk analysis?

A:  I suggested that –

Q: Wait a minute. I don't mean to ask attorney-client advice.

A:  Yeah.

Q:  So did EZPZ pursue its patent?

A: Ultimately EZPZ decided to prosecute the patent with Mr. Williams who was far less expensive than we would have been for that process.

Q: Okay. And when you first saw the mat, you said you thought of it as just an integrated tableware. Right?

A: When it was first described to me, that's the impression that I was left with when I first saw the actual Happy Mat, or whatever it was called as of that time, like I said, it was far-- it went far beyond just simply being an integrated placemat with dish or bowl.

Q:  And did that surprise you?

A: I was surprised by -- I recall, you know, at some point Lindsey had a Facetime or sending me a video or something along those lines showing me, you know, picking up a table with the mat and having it stick vertically on a wall and that type of thing, and, yes, that surprised me. And in May -- late May of 2014, you sent an email to Ms. Laurain that the prior art throws up some red flags about the advisability of spending significant sums on the patent application process. Do you remember sending that to her?

A:  I don't remember specifically sending that email and typing that email out. I remember generally that type of conversation; and that's exactly what I was talking about earlier with respect to the spend, and what have you.

Q: And so here you said, "throws up some red flags." What all -- what all did you refer -- were you referring to there?

A: The red flags about the advisability of spending significant sums on the patent application process. So to me it goes to the spend issue. So in my mind, the -- the existence of -- of the prior art would make the patent prosecution process more expensive, and it would make the patent defense process expensive litigation of it more expensive. And so it was really a question of the spend and whether, again, the juice is worth the squeeze, so to speak.

115

Q: And so when we go back to 2014, your advice about the patentability was only about this spend issue?

A: That was certainly my focus. I mean, as I said before, I'm not a patent prosecuting attorney, you know, so I'm not terribly -- I mean, I've seen it from the outside looking in a bit, but it's not a process that I certainly engage in with any frequency. But I just -- I knew from my conversations, not only with my partner, but my experience prior that it was going to be an expensive process. It was certainly going to be an expensive process if we handled it. And I knew that it was going to be expensive to -- I shouldn't say I knew. I suspected that there was at least a possibility that it would be expensive to -- to defend the patent if EZPZ was successful in obtaining a patent.

Q: And then you said you didn't stay working with EZPZ at this point in time, that Mr. Williams was hired to prosecute the patent. Right?

A: A little more nuance in that. We didn't stay working with EZPZ with respect to patent prosecution. I continued from 2014 through until late 2016 working with EZPZ on a variety of other engagements.

. . .

Q: I also heard you say that at the time Ms. Laurain first came to you in May of 2014 you thought that her invention was limited to an integrated bowl and mat?

A: That's my recollection, yes, that when she -- when she came to me at the very outset, the first conversation that she was describing to me was that that was kind of the thrust of the invention.

Q: Right. Right. Well, you see here in the letter below, "I'm a bit relieved that we are focusing on the suction function, not necessarily the actual mat and bowl." You see that?

A. That's right.

. . .

    MR. DENEGRE: Will you pull up Exhibit 21.

Q: This was an email that you discussed with Ms. Reisman. Do you recall that?

A: Give me a moment to look at it, please. Yes, I recall that or at least recall it from having reviewed it recently.

Q: Right. Right. Right. I want to look at the lower email now that you have a better recollection and see -- and ask you a couple of questions. "Under circumstances such that I seriously doubt that they could get a utility patent, i.e. food service device currently in use for pets and they invented the same thing for kids." What did you mean when you said "they invented the same thing for kids"?

A: I think it's along the lines of what we were discussing just a moment ago. My memory is that there's this integrated bowl and mat and that was that dog dish, or whatever it was I was talking about a moment ago. And they were doing the same thing for kids. That's my -- that's my memory as of that time or my memory as of this moment

116

**Allegations Of Prior Art References Not Sufficiently Disclosed as a Basis for Inequitable Conduct**

References in the '903 Patent

98. Among the prior art devices that were considered by the PTO, made of silicone (or other rubberlike substrate) that fail to make the same sealable contact to prevent displacement of atmosphere under the mat unless peeled at an outer edge were: "Gerber Silicone Placemat"; a "Silicone Mouse Pad"; and the "Platinum Pets Silicone Pets Bowls." *See,* **Exhibit 245, LNC395355-356 .pdf 224-225.**

**Platinum Pets**



98. The disclosed Platinum Pets dog mat is the same product as the Promotional Gift dog mat. Applicant was under no obligation to disclose the same product twice to the USPTO. It is not disputed that the Platinum Pets dog mat was disclosed to the PTO. In short, since the Platinum Pets product was disclosed to the Patent Office it cannot be a "but for" material reference.

**[Tr.T, B. Williams, 8/31/2021, 855:16 to 857:15]:**

Q: And then what about the additional prior art?

A: Okay. So this was -- you know, I know this is a bone of contention in this case, believe me I do know. So I cited this art in this action to get this stuff on the record in response to things that had occurred. And the -- probably the most important one here, I think, is this one, is the Platinum Pets one. You know, the Gerber silicone mat doesn't have suction cups. Right? It's a silicone mat. It has molded receptacles. It's relevant. I now know that -- I think this was given to me before. I did not know until when I filed this that I had this. This all has come up, for me, before this filing. And I'm just trying to get as much on the record as I can really to show the state of the art with relevant references that have the closest structure of which I was aware to show that they don't perform in the same manner. So we actually wanted to send physical products of these in to the -- I spoke to Volz and Mathew Fenn about sending them all of these products,

but they don't want physical samples anymore.  They used to take physical samples. But I guess they just don't want tons of stuff around.  So we sent them tons of links -- I mean, not tons, but links, and videos.  And I know you've seen some of the videos that were submitted.

Q: All right.  And then you --

A: There's two of them right there, yeah.

Q: Appendix D provided the additional --

A: Can I say something without --

Q: You said there's another prior art that you know --

A: Well, these weren't the only links that were sent in.  I just want to say that.  And I think you've seen the email.  There's an email that was sent to Volz with other links in, but anyway, I just wanted to point that out.

Q: So where did the links that you sent in to Volz, where did they go to?

A: Do you mean these ones or the ones that I sent before?

Q: All of them.

A: Well, the ones I sent via email, I sent to her via email. Remember I showed you her email address in my notes.  These were just in the file wrapper.  So I know that she looked at these because we actually spoke about them.  I mean, we spoke about them before I even filed this.  We actually talked about them on the call and the prior art that was exhibit -- I know that it's the file wrapper.  I know it's got to be writing. But I'm just saying that did happen.  So --

Q: What was the prior art that these links went to?

A: This one, I think, is the Platinum Pets.  And I think the other one is -- maybe is it the reviews or is it Lindsey doing the whole bunch of them on the tabletop?  There was a whole selection of different products.  I think one of these is one of those.

**[Tr.T, J. Kennedy, 9/1/2021, 951:13 to 952:6]:**

Q: Okay.  Let me just -- I'm just go back a little, Mr. Kennedy, to clarify.  The video that you reviewed was the one that Ms. Laurain submitted or that EZPZ submitted in connection with the '682 Application.  Correct?

A: That is correct.

Q: And you -- to your knowledge, the Platinum Pets reference was disclosed in the '682 Application?

A: Correct.  It was disclosed with Exhibit D in the prosecution history, I believe.

Q: And how does this disclosure to the PTO of the Platinum Pets reference affect your opinion with respect to but-for materiality?

A: Well, case law seems to be pretty clear that when you disclose a reference to the patent office and it's considered on the record by the examiner, that it cannot be but-for material because you disclosed it.  So but-for materiality appears when you did not disclose something. In this case, I understand they disclosed it, therefore, it's not but-for material.

99.     Review of the product shows that the Platinum Pets does not exhibit the same self-

sealing properties as the '903 Patent teaches. The testimony is credible that when Platinum Pets

makes a "suction sound" it is evidence that there is displacement of atmosphere underneath the product so that it could be separated—the opposite of the self-sealing functionality claimed by the '903 Patent.

**[Tr.T, B. Williams, 8/31/2021, 860:17 to 861:10, 861:23 to 863:2]:**

Q:  Okay.  So why do you say that Platinum Pets is the closest prior art?

A:  Because it has molded receptacles that are part of an integral unit.  It is an integrated mat.  It's tableware mat integrated.  It has a planar portion that is rubberlike.  It meets the claim description with the exception that it is removable at places other than the outer edge.  It doesn't perform the same surface contact, self-sealing.  Air displaces underneath the mat, and sometimes it makes a noise where you can hear the air displacing under the mat.

Q:  So you know that there's an issue about the two videos, one was of Platinum Pets? One was submitted to the patent office, one was not.

A:  I do.  And I watched those videos.  And, like, the suction sound is very very -- I mean, there's not that much difference between them.  And the sound that it makes is actually evidence of the opposite alleged.  It's the sound of atmosphere displacing under the mat.  So the sound itself is evidence that it doesn't surface contact, self-seal.

. . .

A:  Can I say also that the two videos are not that different. I don't know if you guys have watched them in here.  But if you actually watched them and listened to it, I mean, I don't see - I don't see why -- anyway I just think that's ridiculous.

Q:  Okay.  So you've said that the sound means that it shows that the air is getting underneath the mat?

A:  Yeah, the sound is atmosphere displacing under the mat. That's exactly what is happening.

Q:  So if air is displacing under the mat, it makes it less likely to stay --

A:  Well, when you try to lift the Happy Mat, do you hear a noise?

Q.: When I try or when I do?

A:  No.  When you try to lift it.  Try to lift it in the middle.  I don't hear any fart sounds, forgive my language, to use your vernacular.  Now lift it up at the edge.  Do you hear any displacement of atmosphere?  No, because the atmosphere isn't -- you know, one, there is no seal for the atmosphere to displace under when you're picking it up at the edge.  And the other time it is sealing and no atmosphere can displace under the edge.  So there's no noise involved.

Q:  So if air can get underneath the mat, then it does not -- does not read on the Happy Mat?

A:  Correct.  That is surface contact, self-sealing.  It's not just that air can't get under it, it's in contact.  It self-seals so there's no setting and the air does not get under the mat.  Those, I think are three -- and there's other language in the claim, but those are three things that need to be met for sure

119

**[Tr.T, M. Henley, 9/2/2021, 1426:19 to 1427:13]:**

Q:  And then Platinum Pets, did you evaluate that?

A:  I did.

Q:  And what's your opinion about that?

A:  It's very similar also to another concept that was – I looked at too.  And you may have heard of it, too, it's Yanko.  And it's a Korean student's, I think, portfolio.  But it's basically a two-part system again, much like Tommee Tippee, too, in that you're basically having a mat – a bowl holder and a mat and you're taking in and out a physical rigid bowl.

Q:  And we've been looking at a version of the Platinum Pets Mat here.  And this isn't the whole product, though, is it?

A:  No.  It's two stainless steel bowls that are meant to go in those holders.

Q:  So, like, Tommee Tippee that has a bowl that you add on, you add a bowl inside?

A:  Correct.  The only difference between those two would be that you're not getting a mechanical suction effect in the holders like you do with the one suction cup in the center of the Tommee Tippee

**[Tr.T, M. Henley, 9/2/2021, 1435:19 to 1438:13]:**

Q:  And then how about the Platinum Pets?

A:  So similar -- similar story.  This product is folded, you know, in packaging.  Again, this is -- this is kind of like -- it's a two-part system.  It's really a door mat and it's got bowl holders built into it.    So if -- if I can't get it to lay down and self-seal, that's Number 1, right, and a lot of that is going to happen because, again, it took a compression set in the way it was formed either in the post production, the way it was cured or and/or added because of it happened when it was folded and packaged and shipped. But. Regardless, this teaches away, Number 1, because it's -- again, it's not just a two-part system, it's a three-part system.  But the idea is it's really a holder for a stainless steel dog bowl.  And the mat itself, as you can see, will laterally displace as well as relatively easily peel off. So it's not -- it's not a good example of something that self-seals and, you know, putting -- I'm only using hindsight basically to evolve this into a integrated tableware for a child.  This is, you know, it's a pet product and, again, a multi-part system.

Q:  So, when Mr.      , LNC's expert, demonstrated Platinum Pets, he was able to lift this glass tabletop off the table with it?

A:  Uh, huh.

Q:  Can you do that?

A:  Probably.  I'll use that one because it looks a little bit --

Q:  No.  Can you do it with that one?

A:  I'll try.

Q:  What is it about this one that looks better to you for --

A:  It's just not as deformed.  So, in other words, it's not taking as much of a compression set.  There's a little bit of undulation there.  But --

Q:  Okay.  We'll use the better one then.

A:  All right.  Let's try it.

Q: Do you know how this package -- this product comes packaged?

A: In a box just folded on itself. Actually let's do it without these, first.  Thank you. Will this lift?  Hang on.

Q: You can try it without the bowls if you want.

A: Okay.  It really needs to be a thicker mat in order to work properly.  No.  All right.  So I'm basically just breaking the seal.  I can't replicate whatever -- whoever you said lifted the table.

Q: If you have to smooth it down to get it to work, does that read away from the claims?

A: Correct.  So that's manual manipulation, right.  It's not surface, contact self-sealing.

Q: So if you have manual manipulation, it's not self-sealing?

A: Correct.

Q: So show us what you mean by that with the Happy Mat.

A: I'll trade you.  Boy, this thing is heavy.

Q: You don't need to lift the table.  I just want to show --

A: Isn't that what you said happened?

Q: Yeah.  Well, they used the Platinum Pets.

A: Okay.

Q: So explain to us why the Happy Mat is different.

A: It's structurally different.  It is -- it is truly surface contact, self-sealing.  In other words, I don't need to do any additional manual manipulation.  I can drop it from a lot of different angles.  It will sit down.  And as soon as I try to move it laterally, vertically, you know, obliquely, it's just not -- it sticks.  So I'm trying to create a partial vacuum underneath it and that's a very difficult thing to do.

Q: So Mr. Hubbard mentioned in his report that your report said something about being able to lift the Happy Mat, and I think he said 20 pounds of pressure or something like that?

A: Even more.  20 to 30 pounds.

**[Tr.T, J. Kennedy, 9/1/2021, 952:7-9, 953:5 to 954:14]:**

Q: And you -- you're aware of a contention by Mr. Hubbard that Mr. Williams, quote, "admitted that this product has suction"?

Q: Okay.  Mr. Hubbard, you're aware of an allegation that quote "Mr. Williams" admitted or "admits that the product suctioned"?  Did you opine?

A: You said Mr. Hubbard but I assume you meant Mr. Kennedy. That's okay.

Q: I'm sorry.

A: Yeah.  You referenced a part of my report.  Where is that?

Q: It's supplemental report paragraph 156.

A: Okay.  I'm going to look at that real quick if I may.

Q: Okay.

A: Okay.  So what was the question again, please?

Q: The question was would this change your opinion with respect to the but-for materiality of Platinum Pets?

A: The representation that it suctions does not change my opinion because the claims of the '903 Patent work under the principle of atmospheric pressure which is different than the principles of a suction.  In a suction -- and I have an exhibit here where I refer to

121

the online Cambridge dictionary C-15, and I'll pull that up real quick because that's the best way to refresh my recollection. According to Cambridge, "Suction is the act of removing air from a space resulting in a lower pressure in that space either causing liquid gases or other substances that are causing two surfaces to stick together." So suction requires removal of air, according to Cambridge. And the '903 Patent does not operate under the concept of suction. It operates under the concept of creating a void which creates a partial vacuum. And that's due to the presence of the atmospheric pressure. So the concepts are physically different. And a person in the ordinary skill of the art would understand that difference in concepts. So one suctions, such as Platinum Pets apparently. And I understand the '903 Patent to be directed towards the use of atmospheric pressure. They're just different concepts.

**[Tr.T, B. Williams, 8/31/2021, 799:8 to 800:19]:**

Q:  So when we put down the Platinum Pets Mat, that atmospheric pressure is holding it?

A:  It has the same -- actually the Platinum Pets is a larger substrate, right? It's a larger plane, so it actually has more pressure -- I mean, it's the same pressure per square inch, but it's a higher mass of atmosphere on top of it. But it doesn't effectively prevent displacement underneath, so it just comes away.

Q:  So when we take Platinum Pets and put it down and then pull it up from the middle -- let me get -- may I use your mat? When I use -- when I put the Platinum Pets down and –

A:  Yeah, it's deforming. You see the atmosphere is displacing underneath it. It doesn't -- it doesn't effectively self-seal in the same manner at all.

Q:  Hold on. Let me get the other one.

A:  Okay. How many mats you have of this?

Q:  He was using one the other day that didn't -- so -- so if you pull up on the middle, like this, and it's not coming up, why isn't that coming up?

A:  Well, in the middle there, it could be a number of different reasons. But the scope of the claims that I drafted was except by peeling action of the outer edge. And that is separable in many places other than the outer edge. It may be the flimsiness of the material. It may be the particular formation of silicone. It does not perform the same surface contact, self-sealing sealability.

Q:  You have partial vacuum going on when you pull up. Right?

A:  Probably, yeah. I mean, I can't really see what you're doing. But, yeah, I would --

Q:  Because you can see the mat come up a little, but the air is getting underneath there? How does a partial vacuum work?

A:  A partial vacuum is just a change in pressure across a boundary, right, so where there was a lower pressure underneath. Because when you're bringing that up, it has a large cover, it is basically creating a negative pressure underneath it as you're lifting it up.

**[Tr.T, B. Williams, 8/31/2021, 1212:5 to 1213:5]:**

Q:  Okay. So, in your own words, we can't just look at it now and say, "Hey, yeah, it kind of sticks. And when we pull it up in the middle, it sticks and has a suctioney sound when you pull it"?

A: It's still deforming and atmosphere is still displacing under the mat even when you hold it in the middle like that.
Q: Air still gets under it.  Right?
A: Correct.
Q: And you have to examine the claims because the claims of the Happy Mat are that it's self-sealing.  You can't get it up. This isn't even all the way down on the bottom, and it is stuck to the table.
A: It's very stuck.  I mean, it's not even just a matter of degree.  It is absolutely immovable.  And on many different substrates, which is also what we try to intend by suffuse.  I mean, even on wood, you know, and other substrates.

**[Tr.T, M. Henley, 9/2/2021, 1462:9 to 1463:12]:**

Q: Okay.  And then you were asked about something that you said in the claim construction about the vertical test.  What is that?
A: Yeah.  So vertical test is basically taking a --
Q: I'm not going to put it on this because I don't want to destroy it.  Let's put it on  --
A: So taking a clean vertical surface and applying a mat to, and then basically doing a test on the -- on just the overall cling effect and there's atmospheric pressure going against it as well and how well it bonds to this -- you know, this self-sealing characteristic of it on a vertical surface.  So I did that with a number of different -- a number of different products. So would the Platinum Pets product survive the vertical test?
A: No.
Q: Why not?
A: Well, first of all, it's -- it is not a clean undersurface in terms of you have a lot of undulation.  But the biggest thing that's working against it is it's a thin mat and the bowl holder sections that are on top of it make it extremely heavy too.  Again, it's really meant for the floor just to kind of sit on the floor.  So it won't -- you know, hold itself in place for very long at all.  It will just fall.

    99-1.     LNC conceded that Platinum Pets can be lifted by means other than picking it up from the edge.

**[Tr.T, M. Hubbard, 8/27/2021, 329:11-13]:**

Q: It resists lifting.  But you can still lift it without picking it up from the edge, right?
A: Yes.

    99-1.     EZPZ's intent that was to fully disclose Platinum Pets to the PTO.

**[Tr.T, B. Williams, 9/1/2021, 1204:10-23]:**

Q: No. No. I need you to go with me. So when you were focused on the – and we're going to March 2016. There's no IDS issue in March of 2016. Right?

A:  I'm talking about the filing of the Platinum Pets in the action itself as opposed to on an IDS.

Q:  Okay.  So we'll get that out of the way.  You said something on your answer in cross-examination that it would have been untimely.  And Ms. Reisman jumped to the next question.

A:  Correct.

Q:  What you did mean by that?

A.  An IDS is supposed to be filed in certain time periods and we were late on those. And I wanted to make sure at this point that it was of record, it was in the record, so we did it the best way that I knew how.  And that might not have been the best way to do it, but it was not deliberate.  You know, it wasn't done to deceive or mislead the patent office.

**[Tr.T, L. Laurain, 8/26/2021, By Deposition (6/10/2020), 169:6-20]:**

Q:  Did Mr. Williams ever give you an opinion that the Platinum Pets dog bowl did not need to be ·produced to the patent office?

· · · · · · · MS. FISCHER:· Objection.· Form.

A:  No.· I mean, I think the opposite was --  when it came back up in March 2016, he, I think, called the examiner to find out if we could actually send in the physical mats, so I would say, if anything, it was the opposite. He was figuring out how to get the best version of the mat to the examiner, whether an in-person interview, sending in the mats, video.· We also sent a link and we sent a picture of the mat, so I think that was five different ways we discussed getting Platinum Pets to the examiner.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 108:11 to 109:21, including omitted lines]:**

Q:  So what was your reaction to finding that Platinum Pets mat?

A:  Yeah, I can't remember my exact reaction at the time, but based on my e-mails, I mean, You're not going to believe this.· Guess what I just found? And, you know, I'm a bit relieved that we're focusing on the suction function, not necessarily the actual mat/bowl. So I believe that after this – after this e-mail, I ordered this product, and I think – I don't know if they're on this e-mail -- there is follow-up e-mails of me being very excited that it doesn't suction function.· And I think there is even an e-mail of me -- well, when this gets back brought up in 2016, quote, unquote, saying, you know, This isn't prior art, but people can think it's prior art. I mean, that's -- I was surprised when I saw this.· We ordered -- or I ordered that, and that I was very excited that it didn't work the same way, so I'm assuming my fears, you know, went away and I continued on.

Q:  (BY MR. DENEGRE)· All right.· So when you found it, you thought that it was prior art, correct? You say that in your letter to Mr. McCarthy, or your e-mail.

A:  Yeah, and I think, you know, my understanding of even what prior art is, I -- at this time the way I describe prior art and then seeing that e-mail that I sent to Mr. McCarthy and Mr. Bolton that says, This mat isn't prior art, but people can think it's prior art, I think I had -- my view of prior art, I don't even know -- you know what I mean?· I've learned a lot since this litigation and what constitutes prior art, to be honest.

124

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 109:22 to 110:10, including omitted lines]:**

Q: (BY MR. DENEGRE)· Did you discuss the Platinum Pets dog bowl mat with Mr. McCarthy?

A: I do not remember discussing it.· I'm not denying that it was discussed.· I clearly sent e-mails about it and then followed up with excitement that it doesn't work the same. And then really shortly after, I moved on to hire Ben, because, really, it was an expense as well.· I mean, these guys were going to charge – I think it was $15,000, if memory serves, something along that just to get started, when, as you guys know, Ben prosecuted the entire patent for $1,750, so.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 308:16 to 310:2]:**

Q: (BY MR. DENEGRE)· All right. So this is a document that's previously been marked as Exhibit 549.· So I take it from your statement that you recognize this document as an e-mail that was sent to you?

A: Yeah.· And, George, earlier -- so yes. But you had stated Mr. McCarthy did not want to get involved in the prosecution and refused to do so.· And so I think this is the e-mail I was referencing to say that's not an accurate statement.· Here you can see my understanding not only of the prior art, it could be viewed as prior art, but it isn't, and his reply in regard to that.· So I would assume if he didn't want to be involved, he would say, Please stop involving me in these communications.

Q: All right.· Well, Ms. Laurain, my words were not exactly as you've quoted them, but that doesn't really matter.· I just want to -- I just want to confirm that you received this e-mail from Mr. McCarthy where he said, "In my humble opinion, the dog mat is still prior art if it was sold before your critical date.· It might not be invalidating prior art, but it is still prior art.· If it does not suction, that is good, but I recommend including it in the proposed video." Did I read that right?

A: Yes, and that's another example of when we were told to do something, we -- I did it.

Q: Now, the dog mat that Mr. McCarthy is talking about, would you -- would that be the Platinum 21· ·Pets mat?

A: Yep.· It's on all -- there's a very long chain about it, and this is where I said -- we talked about visiting the examiner in person, sending the mats in, which we found out we were not able to do.

[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 178:5 to 179:3]

Q: (BY MR. DENEGRE)· You sent it -- you sent in -- you sent in a videotape that did not reflect that the Platinum Pets suctioned when you had one that did reflect that, so that's my view of what you did, but let's keep going –

A: No, no, no, no, no, no, no, no, no, no –

Q: -- we have a lot of material.

A: -- I'm answering -- that's not -- I'm not letting the record stand on that. We chose -- we literally were trying to meet with the examiner, physically send him Platinum Pets, physically we tried to send it in so the examiner could examine it herself, and we were

told we couldn't do that.· So if you think the video we chose out of two videos is cause for anything, then you can continue to make those arguments, but they had plenty of different ways they could look at Platinum Pets. When I was told -- when I brought it up to say we should send it in and someone said, Yes, I think you should, what did we do?· We sent it in. What did I do with the Gerber mat when it was brought to my attention that you have a need -- you have a duty to disclose?· I sent it in.· We sent everything in.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 177:08 to 178:4]**

Q:  (BY MR. DENEGRE)  You've seen the e-mail where Mr. McCarthy said that he told you that you wouldn't be able to get a patent due to the dog bowl?

A:  And that's taken out of context and I would like to -- I would like this opportunity to clarify what Nuby has put on the record about inequitable conduct. That e-mail that Tim McCarthy sent internally to Jordan Bolton is completely taken out of context. He had no -- we had no discussions.  I don't even recall discussing the prior art with him. And once I sent Tim McCarthy -- I literally bring it back up in March of 2016 and I say, Hey, this is the dog mat that isn't prior art, but people can think it's prior art.  Should we submit and send in the mat? And he replies -- and I can pull out this e-mail -- In my humble opinion, it's prior art, so send it in.  And what did we do on the record when I was advised to send in something?  What did we do? What did I do, George?  I sent it in in five different –

100.     Even more, notwithstanding LNC's argument that it "suctions," suction is not recited in the claims and Ms. Laurain's invention does not operate by use of "suction." Suction requires the removal of air from an enclosed space. No such removal of air occurs by the '903 Patent. While a partial vacuum is formed during use of Ms. Laurain's invention, such vacuum is not formed by the use of suction.

*See,* **Testimony** at ¶27.

<u>Gerber Meal Mat</u>

101.     LNC has taken the position that Gerber Meal Mat is an anticipatory reference. It is undisputed that the PTO specifically reviewed the Gerber MealMat—in the context of a prior art reference that did *not* effect surface contact self-sealing. *See,* **Exhibit 245**, LNC395440 (PDF 317). There is no evidence to support that the PTO was incorrect in its analysis of this prior art.



102.     In addition, the Court finds that LNC cannot take contradictory positions in this litigation. LNC concedes that the Gerber MealMat is *not* an anticipatory reference. The position asserted by LNC that the Gerber MealMat is an anticipatory reference directly contrary to a position that it argues regarding damages. LNC cannot take differing positions based on what is advantageous to it—either LNC believes that the Gerber MealMat is an anticipatory reference or it is not. LNC's stated position is that The Gerber MealMat "do[es] not infringe the asserted claims of the '903 Patent." *See,* Joshua Lynn Rebuttal Expert Report [Doc. No. 360-2]. LNC contends that the Gerber MealMat is a non-infringing alternative to the '903 Patent. *Id.* at 52-55.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 301:1 to 302:14]:**

Q:  Okay.· I'm not going to -- I won't go over all of that.· And then Ms. Baror as part of that calls attention to the Gerber Meal Mat, correct?
A:  Yes, sir.
Q:  Okay.
A:  Well, and I think -- yeah.
Q:  And I'm now on page -- go ahead.
A:  Go ahead.
Q:  I'm on page 2209 where you say, "Everything about this makes me nervous.· In regard to Gerber...I know about this product.· I actually talked about the product designer about this," et cetera. Do you see that?
A:  Yes, yes.

**The 37 CFR §1.132 Declarations as an Alleged Basis for Inequitable Conduct**

Jeff Prager's Declaration
(Materiality and Intent to Deceive)

103.     Mr. Prager's Declaration is part of the '903 Patent Prosecution history. *See,* Exhibit 1073.

**[Tr.T, J. Prager, 9/2/2021, 1376:17-25 ]:**

Q:  Does this look like the declaration that you signed, Mr. Prager?
A:  Yes.
Q:  Okay.  Before we go into the details of the declaration, what did you do to gather the information to be able to say these things?
A:  Well, obviously I looked at their financials, but I also looked at other supporting data to -- to make this kind of a declaration.

**[Tr.T, L. Laurain, 8/30/2021, 500:17-23 ]:**

Q:  You submitted a declaration to the U.S. Patent Office, Ms. Laurain, from Jeff Prager, "the Happy Mat sales derive directly from the product itself absent any motivated marketing campaign."  He stated "unequivocal commercial success absent persuasion by branding or marketing strategies."  Do you agree with that, Ms. Laurain?
A.  Yes, I absolutely agree.

104.    LNC contends that Mr. Williams' reliance on Mr. Prager's statement regarding

1% percentage of revenue spent on advertising is misleading.

**[Tr.T, J. Prager, 9/2/2021, 1380:22 to 1381:16]:**

Q:  Right.  And then the next paragraph, the fourth paragraph on your declaration says, "Whereas, over a same period of sales, EZPZ, LLC, has demonstrated below minimal advertising expenditures of less than 1 percent of gross sales while maintaining consistent high sales figures and acquisition of market share."  What does that mean?
A:  What you're looking for is the relationship of sales to dollars spent.  And, with most companies, you would expect that the advertising expense would be about 10 percent of sales.  In this company, it was very different.  She was having meteoric growth with very little money being spent on advertising.  And that's usually the indicator. I mean, for all practical purposes, we would classify her as an E-commerce business. That's unheard of to get that kind of sales for that little money. And if you look at the statistics, and I may not have them exactly right, but 75 percent of their sales came from word of mouth and social media.
Q.  And –
A.  Most companies would kill for that kind of penetration.

**[Tr.T, J. Prager, 9/2/2021, 1382:20 to 1384:12]:**

Q:  All right. So if -- how can it be that you have this mom entrepreneur story that resonates with people, you have this free promotion on Shark Tank, and the like, how do you know it's true what you say in your fourth paragraph that it's only less than one percent of gross sales?
A:  Because I believe at the time she had spent about $8,900 -on direct advertising.  And I forgot the sales figure back then.  But -- I'm actually looking at my notes.  She had sales

of approximately -- the one I'm looking at 1.6 million.  And she had spent 88 -- 88, $8,899. Can you imagine a company getting sales of 1.6 million on just $8,900?  That's -- that doesn't happen normally.  That's why I'm saying the majority of the sales were socially motivated and were free.  In accounting, we only measure direct expenditures. There are exceptions to that rule, but for the most part, in this particular case, accounting only counts for direct expenditures. The other thing is what we call proactive, and I say this in the next sentence, the motivated marketing campaign. Motivated means was she proactive?  Did she spend money?  Was it a deliberate campaign? And advertising is a  very deliberate type of thing, whereas how would you know you're going to get on Shark Tank or get carried by media? How would you know that you're going to win awards? You don't know that. Nor is it measured in dollars. I mean, the effect of sales is, but in accounting, we don't account for noncash expenditures, for the most part. Again, there are exceptions, but those exceptions don't apply in this case.

Q:  So if EZPZ paid the Baby Guy $5,000 for promoting -- for doing a product giveaway on his FaceBook page, is that advertising expense?

A:  That one is questionable, yes. It could be marketing expense versus advertising. I'm splitting hairs. But when your marketing, there's advertising, there's merchandising, there's the sales effort and promotion, PR. I would put that more in the PR category but, yes, I think you can make that a gray area.

Q:  And if you added in that $5,000 to the $8,900, does that affect your bottom line conclusion?

A:  Absolutely not. You're still talking about less than – well less than 10 percent of money going towards advertising.

**[Tr.T, J. Prager, 9/2/2021, 1397:4 to 1398:25]:**

Q:  And you did know that Mrs. Laurain had appeared on Shark Tank in January 2016. Right?

A:  That is correct.

Q:  And you agree that you can be doing lots of things that are marketing without spending money. Right?

A:  Yeah. But in my -- in my declaration, I said she spent less than 1 percent of her money on advertising. Advertising and marketing are two different things. Advertising is the component of marketing. I was very specific saying 1 percent for advertisement. I was very specific. So I don't see what you're telling me.

. . .

Q:  Mr. Prager, with regard to that last question about marketing and advertising, so what difference does it make in your evaluation that marketing and advertising are very different?

A:  Because what we're -- what we're trying to do in my declaration is talk about what makes this product so unusual. And for a company of this size to spend that little money on direct advertising and have the sales that they had, is remarkable.  And I have more superlatives if I had enough time. So when you look at it, look at how the sales were derived, and look at other companies that have a product and see how their sales are

derived.  You could see the amount of money that EZPZ spent on -- and I'll include marketing right now, marketing, advertising, promotion -- is remarkably low because the market penetration she did in as little time as she did and I will hang my hat on that.

**[Tr.T, J. Prager, 9/2/2021, 1399:1-23]:**

Q:  And so --
A:  All right.
Q:  So why don't we count promotion and being on Shark Tank and those other shows in figuring out -- isn't that a form of advertising? Well, look, you're on the show, so of course people see the product?
A:  Yeah, but it's other people promoting her. In other words, Shark Tank gets a benefit because they get the promoter, and it makes more viewers watch the show. And were they really promoting her and/or was that a side effect of her being on the show? Here's the bottom line.  In accounting, we account for dollars expended.  Did she -- obviously she got a marketing benefit out of it, but other than to travel there, did she get -- did she advertise?  Did she go directly to the consumer on her own?  That makes a huge difference.  If she had to go after each one of her customers individually, there's no way in the world she could have done it for $8,900.  None.
Q:  What is --
A:  I stand by what I'm saying.
Q:  What is reactive promotion or reactive?
A:  Reactive is somebody invites you to be a guest on their podcast, on their show

**[Tr.T, J. Prager, 9/2/2021, 1402:12-21, 1403:5-19]:**

Q:  So what I'm asking is, is that still true in light of what we've been talking about with promotion and people being attracted to the product?
A:  Oh, yeah.  Absolutely.  Absolutely.
Q:  So why is that?
A:  Well, branding and marketing to you get people to come to look at a product.  The product itself still has to sell themselves.  So, yeah, I believe that.  It's the product.  If she had the right answer but the wrong product, it wouldn't make a difference, nobody would buy it.
. . .

Q:  So I'm just trying to figure out where branding -- if you have great branding and marketing, why doesn't that sell the product instead of the product itself?
A:  It could sell the product.  But the fact of the matter is she went viral, and that tells me the product is the main driver. You can only fool some of the people some of the time.  So if you don't have a good product -- you could have the best story, the best branding in the world -- but if you don't have a good product, it won't sell.  And people can see through it. And based on the testimonials I saw and what I did see and observed with my own two eyes, I would say it was the product that was selling everything.  The story was great.  It may have attracted attention, but it was the product.  People bought the product.

105.    LNC, however, does not establish that Mr. Prager's statement that EZPZ has "demonstrated below minimal advertising expenditures of less than 1% of gross sales" is wrong or misleading. As shown by EZPZ's 2015 P & L statement (Exhibit 1053). EZPZ's gross sales profit was ~$1.6M, while its advertising expenses were ~$9K or less than 0.56%. If anything, Mr. Prager's comment was extremely conservative.

**[Tr.T, J. Prager, 9/2/2021, 1386:7-24]:**

Q: Okay. I'm just making sure.
A: Again, the direct advertising dollars was less than 1 percent of the total sales at that point in time that I made these representations.  It wasn't --
Q: By the --
A: Yeah.
Q: Sorry.  By the way, did you write this affidavit yourself? Did you type in those words?
A: I got a draft from somebody, I can't remember who.  And I did not write what they were asking me to attest to, the wording of it.  So did I edit it?  Yes.
Q: That's good.  You put it in your own words?
A: Yes.
        MS. MENASCO:  Objection.  Leading.
A: I borrowed some words.  But --
        THE COURT:  What was the objection?
A: I definitely believe in everything I've put down on this affidavit.  I will stand by what I put down.

**[Tr.T, L. Lindsey, 8/31/2021, 629:25 to 630:9, 630:17 to 631:3, 631:17-25]:**

Q: You -- you've seen the figures that were used in the facts and conclusions by LNC.  Will you identify where their figures came from.
A: Yes.  So those were pulled out of the business plan.
Q: Will you take a look at exhibit -- will you please pull up Exhibit 50.
A: Yes.  And they included numerous categories that LNC classified as marketing and branding such as, well, one I can't even find this information in our financial system.  Like, yes -- that's not -- noncategorized.

. . .

Q: So these are profit and loss January to June of 2014.  Are these the actual figures?
A: I don't believe so in the sense of when I tried to check these and got into QuickBooks like we don't have uncategorized expense in QuickBooks anymore.  But if you look at – they essentially said we had $194,000 in marketing and promoting in findings of fact included marketing and -- and uncategorized expense for $5,000; shipping and delivery

$78,000. They also included our travel, our travel meals, meals and entertainment.  And then promotional and our website design. And then there was, like at that time $800 of actual paid advertising.

. . .

Q:  Okay.  Now, when Jeff Prager did this -- did this declaration, did he look at EZPZ's actual financials?

A:  Yes.  He would have looked at it actually out of QuickBooks.

Q:  And do you recall -- do you believe those numbers are correct that Jeff Prager used?

A:  Yes, absolutely.

Q:  He used the actual figures in QuickBooks, not a business plan?

A.  Yes, that's correct.

**[Tr.T, J. Prager, 9/2/2021, 1390:24 to 1391:4]:**

Q:  And so where did you get the $1.6 million gross sales number?

A:  I'm looking – just a second. I'm looking at the January through December sales on their profit and loss for the year 2015, the year ) – the year – the numbers I based the affidavit on.

106.    LNC further contends that Mr. Prager's relationship with EZPZ was mischaracterized and that there was some form of compensation promised in exchange for Mr. Prager's declaration. This is expressly refuted.

**[Tr.T, J. Prager, 9/2/2021, 1388:22 to 1388:8, 13-20]:**

Q:  All right. And then the next paragraph says, "All statements made in this declaration are made by my own personal knowledge, and I'm not being paid for executing this declaration." Right?

A:  I did not get anything extra for doing this.

Q:  Do you think it's misleading that you didn't say there, "Oh, by the way, I do get paid for being a consultant"?

A.  I think anybody with any kind of common sense would know if I'm consulting, I'm getting paid.

Q:  Right.

A:  That just stands to reason, I would think.  I didn't think I had to really spell it out to the detail you're talking.

. . .

Q:  Mr. Prager, the next paragraph is, you are being warned that willful false statements are punishable by imprisonment and willful false statements, and the like, jeopardize the validity of the submission.  And you declare all statements made in the declaration as being of your own knowledge and are true. Do you still believe that's true?

A.  Absolutely.

**[Tr.T, J. Prager, 9/2/2021, 1390:19-23]:**

Q:  Okay.  Were you still consulting with them when you signed this declaration in 2016?
A:  Yeah, that was about -- Yes, I was -- I was definitely consulting.  I even say it in the affidavit.  Yes, I was consulting with them

107.    Moreover, Mr. Prager's financial relationship with EZPZ was disclosed in his declaration. His declaration states "... *I consult with Eazy-PZ, LLC*..." (Prager Declaration, emphasis added, Exhibit 245, LNC395321, (PDF 183)). SPE Mathew and Examiner Volz would not infer from this statement that Mr. Prager consulted with EZPZ for free. To assume the Examiners thought otherwise infers a naivete by the Examiners that is unsupportable. Further, Prager declared "[I] have a thorough knowledge of their [EZPZ's] commercial operations including financial expenditures and revenues; ..." Again, the Examiners would not have concluded that Mr. Prager gained such knowledge for free, or that such knowledge could be gained without having a close working relationship with Ms. Laurain, the founder and CEO of EZPZ. While the particular details of how Mr. Prager is/was to be compensated were not disclosed in his Declaration, the Prager Declaration discloses that he had a professional and close relationship with EZPZ. Mr. Prager did not represent himself as being a disinterested party.

**[Tr.T, J. Prager, 9/2/2021, 1379:25 to 1380:4]:**

Q:  Were you -- were you a CFO in the sense that you came to work every day at EZPZ?
A:  No.  No.  I was on a retainer, and I would come in and -- on a routine basis and look at things and develop strategies.  I did not work as an in-house CFO.

**[Tr.T, J. Prager, 9/2/2021, 1388:5-25 ]:**

Q:  And then the next whereas product, "Whereas, I consult with EZPZ, LLC, and have a thorough knowledge of their commercial operations, including financial expenditures and revenues."  What did you mean by that?
A:  Well, number one, it's no surprise, and I don't know why it came up in deposition, but I was a consultant.  I got paid to work with her.  I got a monthly retainer.  And then when we added the accounting services, that was billed a different way. But, number one, I'm not totally independent because I do work with them.  So I wanted that to come out.  But I do have a thorough knowledge or feel like I had at the time, a full

knowledge of their operations. I worked with Tammy to really understand the nuts and bolts of what made it tick, the marketing channels, the advertising channels, their gross profit.  I channeled – I helped them develop ways of following it.  So I do feel like I had an intimate understanding of their operations

**[Tr.T, B. Williams, 9/1/2021, 1030:20 to 1031:19 ]:**

Q:  Okay. And then with regard to Mr. Prager, what was your understanding of his role with respect to his declaration and the secondary considerations?

A:  My understanding of his role is that he basically is a CPA or an accountant who has basically reviewed EZPZ's financial data for, you know, a while and was aware of their expenditures probably more than anybody.

Q:  And in his declaration, he identified himself as a financial consultant for EZPZ who had examined their financial records?

A:  Yeah, that sounds right, yes.

Q:  And at one time on EZPZ's website, he had been identified as a CFO. If he did not identify himself as a CFO of the company, do you think it should have been on his declaration that EZPZ thought of him that way?

A:  I don't know if he was the CFO. So I don't believe he was. So -- I mean, no, I don't -- I mean, he -- at best, he's -- to my understanding, at best, he's a subcontractor. So I don't believe he was an employee.

Q:  So it would have actually made it inaccurate if he would have put in his declaration that he was the CFO?

A:  Yeah. I would argue that that is a mischaracterization of his role and his job. If he's a subcontractor, there are legal consequences to being an employee, which did not fit to his description at all.

108.     There are no false statements or material omissions that satisfy the materiality prong of inequitable conduct. LNC cannot identify any specific statements in the declaration that were false or that it contends that EZPZ knew to be false. The Court does not need to move on to an analysis of intent to deceive.

<u>Jaime Grayson's Declaration</u>
<u>(Materiality and Intent to Deceive)</u>



109.   Jaime Grayson, a baby-product expert, learned of EZPZ at the ABC Kids Tradeshow in September 2014. Upon discovery of the "Happy Mat" he was so impressed that he posted to his followers on Facebook about his discovery. This was not done at the direction of EZPZ nor did EZPZ compensate Mr. Grayson for this post.

**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 41:23-42:11]:**

Q: (BY MS. MENASCO)  And that video, you posted it on your social media; is that right?
A:  Yes.
Q:  That video went viral; is that right?
      MR. GARTHE:  Objection to form.
A:  Yes.
Q:  (BY MS. MENASCO)  Did EZPZ compensate you to post -- to make that post from the ABC Kids Show? Is that the name of it?
A:  Absolutely not.
Q:  (BY MS. MENASCO)  Okay.  So would that fall into the category of one of your editorial posts where you're not compensated? Correct.

**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 128:16-128:22]**

Q:  (BY MS. MENASCO)  If you turn to the second page, the first "Whereas" paragraph says, "I first saw the product in person without any previous exposure to the product, its manufacturer, or its brand, at one such tradeshow, the ABC Kids Expo, on October 21, 2014," right?  That's what it says?
A.   Yes.

110.    LNC contends that Mr. Grayson misrepresented himself as an "expert in the baby-product industry." Yet, it is indisputable that Mr. Grayson declared that he "is recognized as a leading expert and analyst in the baby-product industry." *See,* **Exhibit 245.** He immediately, thereafter, explained why he so contends, namely, he has "worked at Buy Baby Inc. and Real Birth, and alongside some of the top doulas and lactation consultants in New York City as a baby-product analysis, reviewer, and rater" and has "been featured in the Wall Street Journal, New York Times, LA Times, and on national television such as Martha Stewart's annual Baby Shower." *Id.* Based on the foregoing, Mr. Grayson qualifies as an expert on the subject matter he identified in his declaration. There is no evidence to the contrary.

**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 114:16-17, 114:19 to 115:02]**

Q:  Did Lindsey Laurain or anyone at EZPZ tell you why they wanted you to sign a declaration?
A:  To my understanding, because I am a recognized expert in this field and it is my opinion that they were the first company to have a suction mat like the Happy Mat, so they wanted me to just back that up.

111.    LNC further contends that Mr. Grayson failed to disclose bias and financial interest, including that he sold EZPZ products and profited from those sales. Grayson did not sell product for EZPZ at any time prior to signing a declaration for the PTO. He performed only two giveaways of EZPZ products for minimal compensation of $2,500 each. There was no on-going business relationship between EZPZ and Jaime Grayson. The relationship is not a significant one and is not a material omission.

**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 42:13 to 43:03]**

Q:  Did EZPZ compensate The Baby Guy -- you, The Baby Guy, to link to their Kick Starter page?

A:  No.
. . .

Q.  (BY MS. MENASCO)  Has Lindsey Laurain or EZPZ ever promised you anything of value upon the sale of EZPZ as a company?

A:  100 percent no.

112.    In the preamble to his Declaration, Mr. Grayson clearly sets the context upon which his declared statement is based, namely, his initial impressions of EZPZ's product as demonstrated at a tradeshow in October 2014. These initial impressions occurred before Mr. Grayson ever sold any EZPZ products, assisted in its marketing efforts, or otherwise. Such actions occurred later and bear no relation to his initial impressions of the EZPZ products to which he was exposed in October 2014. *See,* **Exhibit 245, the '903 Patent file wrapper.**

**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 126:22 to 127:02, 127:04 to 127:12, 127:14, 127:18 to 128:03]:**

Q: (BY MS. MENASCO)  If we look at the first  page of the declaration, the fourth "Whereas" paragraph, the declaration states, "Whereas the application for patent to which this affidavit is directed."  What application for patent to which this affidavit is directed are we referring to here?
A:  I do believe it's the self-sealing.
Q:  (BY MS. MENASCO)  The self-sealing feature of the Happy Mat?
A:  Correct.
Q:  And you say it's "an invention that in my considered and expert opinion demonstrates unequivocal commercial appeal derived from the product itself, and not from any particular advertising reach of previous customer base."
A:  Yes.
A:  I did not review any documents, but I know the space and they're -- that's the reason I first put it up on my Facebook page is because I was, like, This is a very, very, very good product and it's going to help a lot of people. Like I stated in my initial Facebook post, it is basically my policy I rarely, rarely put up a kick starter link.  But because of this product being brand-new and being so innovative, I made an exception to my, you know, self-imposed rule, whatever.
. . .
Q:  (BY MS. MENASCO)  Okay.  And when you went to the booth, you saw the product. You ended up making a video of the product sealed to a table; is that right?
A:  Yes.

**[Tr.T, T. Falcone, 9/2/2021, 1541:7-20]:**

A:  . . . From there, it was -- within the Kickstarter campaign itself, we -- we had somebody who I know you guys have spoken about, the Baby Guy NYC.  He is kind of a celebrity

within the baby gear space.  And he -- we presented our product at the -- it's called the Invention Connection as part of one of the trade shows in the juvenile industry, and he could not believe the suction feature. And so he got really excited about it.  I remember in his video he said, "I've never shown anything from an Invention Connection.  I don't like to show product this early, but this is blowing my mind."

Q:  Go ahead.

A:  Okay.  And he kind of lifted the table.  So that was a wonderful thing where we did not have to pay, and he was excited and share it with his other large community. And that's really when our Kickstarter campaign took off.

113.    Moreover, it is not shown that any relationship between Mr. Grayson and EZPZ

was withheld with the intent to deceive.

*See,* **Evidence, presented at ¶¶110-113.**

Dawn Winkelmann's Declaration
(Materiality and Intent to Deceive)

114.    Dawn Winklemann reached out to EZPZ after discovering their product on

Kickstarter. On September 24, 2014, Ms. Winkelmann sent a message to Ms. Laurain about her

excitement about the product and indicated that she was moving to Colorado in the near future

from California. *See,* **Exhibit 1067.**

 **[Tr.T, L. Laurain, 8/31/2021, 724:11-18]:**

Q:  And, in fact, Dawn first reached out to you because she was working in California as a speech and language therapist. And she wanted for you and she to work/promote together. Right?

A:  My recollection is Dawn reached out to us and said, "This is a novel idea.  I've been doing this for 20 years and I've never seen anything like it.  And I'll be moving to Colorado. I'd love to connect."

 **[Tr.T, D. Winkelmann, 9/2/2021, 1493:9-18]:**

Q:  And you talked about how you reached out to Ms. Laurain after you saw the Happy Mat on Kickstarter.  Right?

A:  Yes, ma'am.

Q:  And I wanted to show you Exhibit 987.

A:  Okay.

Q:  At this point, when you first reached out to Ms. Laurain, you were living in California. Right?

A:  Yes, ma'am.

138

Q: And you were planning to move to Colorado. Right?
A: Yes.
Q: You sent her, I guess, a direct message through the Kickstarter platform?
A: Yes.

[Tr.T, D. Winkelmann, 9/2/2021, 1469:1-25]:

Q: So what did you think when you saw the Happy Mat or what did you do after you saw that?
A: I contacted them -- her. I was, like, "You are going to change the world. My name is Dawn. Hi, how can I help?"
Q: Okay. So then what did you do?
A: So then I asked Lindsey, one, I wanted to sponsor the Kickstarter because my husband and I do that a lot, but I also wanted to be involved. I wanted to be able to get this to the kids that I was working with. At the time, I was running multiple feeding groups for the Down Syndrome Association of Orange County. And so I had a couple hundred children ages six months to two and a half years of age that were really struggling feeding and self feeding is one of those issues. So some of these babies who are six months, eight months, nine months of age were not doing any self-feeding whatsoever because they have low tone. Low tone happens in children with special needs specifically because they don't really have the core support to be able to keep them upright. So the Happy Mat was able to help them be able to help facilitate that and be able to eat independently. So I wanted my kiddos to be able to experience that.

115.    Dawn Winklemann's declaration identifies her expertise, gained over 20 years, of working with special needs children and those with eating disorders. Next, she states that she "encountered numerous products devices to adhere to tabletops..." Then, she states that over her twenty (20) years of experience she has never seen a product that adheres to a tabletop without suction cups or adhesives. In view of this learned knowledge and experience, she declares that the "instant product" (*i.e.*, the EZPZ Happy Mat, which is covered by the claims of the '903 Patent) "realizes an unmet need." *See,* **Exhibit 245**, LNC395314-315 (PDF 173-174). Ms. Winkelmann further testified that her knowledge regarding the unmet need came from her having to physically attach duct tape to the bottom of a plate or bowl to keep her special needs children from throwing food everywhere.

[Tr.T, D. Winkelmann, 9/2/2021, 1479:21-25]:

Q:  Okay.  And then so you are -- let's go ahead and pull up your declaration.
     THE COURT: Okay.
Q:  All right.  Do you recognize this, Ms. Winkelmann?
A:  Unfortunately, yes.

**[Tr.T, D. Winkelmann, 9/2/2021, 1480:1 to 1481:12]:**

Q:  And you said in the first whereas clause, "I have a post graduate degree as a speech and language pathologist and feeding specialist."  I think we covered that.  "And assisting families with special needs children." And you said you had 20 years.  You were training special needs children at hospitals, rehabilitation facilities, --
A:  Yes.
Q:  -- at home for families with special needs children?
A:  Yes.
Q:  And then that's what we've already talked about so far. Right?
A:  Yes, ma'am.  Yes, ma'am.
Q:  And then you said you encountered numerous products devised to adhere to tabletops to prevent displacement and overturning during mealtime.
A:  Yes, ma'am.
Q:  What did you mean by that?
A:  So in a lot of the jobs that I had before, as a clinical director, we have to buy products for the whole entire facility.  So I would buy products, feeding products, spoons, cups, plates, cushions, a whole bunch of different medical devices.  And I would purchase those items for the entire pediatric unit. So a lot of the things at the time was just these suction cup bowls or plates that once you put them in the dishwasher they lost that suction function.  So then, again, we were stuck not being able to utilize that. And then also different types of adhesives.  So I would use Gorilla Glue, you know, any type of adhesive to suction and seal to a wheelchair or to a countertop.  So that's what that meant.
Q:  Did any of them work very well?
A:  No, they didn't, but it's all we had.
Q:  Right.  And then the next paragraph is, "I've never encountered any product in my over 20 years as an expert in special needs community that effectively seals to an underlying surface absent suction cups or an adhesive." That's correct.

**[Tr.T, D. Winkelmann, 9/2/2021, 1466:12 to 1467:25 ]:**

Q:  Okay.  And so how did you come to learn about the Happy Mat?
A:  So I'm kind of a Kickstarter junky.  And so there's this site called Kickstarter.  And I saw the Happy Mat on Kickstarter and thought, oh my God, this is literally going to change the feeding industry and I had hundreds of kids that I was working with at the time that I knew that would benefit from this new technology because it did something that we've struggled with in the feeding industrial is being able to provide a child with a way to be able to independently feed themselves.
Q:  And what did you recognize in the Happy Mat that led you to that conclusion?

A: So many things.  The first was that it suctioned to the surface.  I was literally Duck taping bowls and plates to wheelchairs and tables and highchairs and velcroing to be able to help because children are supposed to feed themselves at six months of age. But we never had anything to be able to actually implement that developmental milestone. So when I saw the Happy Mat, I was, like, this is going to help neurotypical kids, but also kids with Down Syndrome, cerebral palsy, pediatric stroke, which is more common than you think, and being able to help them independently feed themselves.

**[Tr.T, D. Winkelmann, 9/2/2021, 1484:1-20]:**

Q: So did you feel like -- so did you understand what it meant?
A: Yes.  Absolutely.  Absolutely I did.
Q: And what did you think that meant, from your point of view?
A: That I've never seen anything like the Happy Mat before, any type of this technology; and that the self-sealing technology was going to be able to -- if this patent was granted, going to be able to be utilized to help families.
Q: You felt like the Happy Mat was innovative?
A: Absolutely.
Q: And then you said, so it says, "By preventing displacement from an underlying surface except by peeling action at the outer edge absent need for any suction cups, adhesive, or other active suction means."  Did you know what that meant?
A: Yes, ma'am.
Q: And what does that mean?
A: Everything that I was doing, Duck Tape, Crazy Glue, any way to be able to -- to provide a means to be able to help the patients that I served.

116.    No statements in [Ms. Winkelmann's] declaration have been shown to be false.

LNC's contention of failure to disclose is not supported.

117.    The speculative 2% ownership stake in EZPZ that Ms. Laurain gave Ms. Winklemann came at a time *after* signing of the declarations, albeit it was discussed beforehand. The payments that Ms. Winkelmann received, although before signing of the declaration, were after the timeframe she referenced in her declaration. Any payment or speculative interest in the company is [not] shown to be material to the opinion that she offers.

**[Tr.T, D. Winkelmann, 9/2/2021, 1476:14 to 1479:20]:**

Q: Okay.  And when -- do you recall filling out a declaration for this case?
A: Yes, I do remember.
Q: And you filled it out in February of 2016.  Do you recall that?

A:  That sounds right, yes.

Q:  And we'll talk about it in a minute.  But that – that declaration was dated in February of 2016?

A:  That sounds right, yes, ma'am.

Q:  Had you had discussions with Lindsey Laurain and EZPZ about getting the percentage ownership in the company before you signed the declaration?

A:  We did.  We talked a little bit about any other way that I could be compensated.

Q:  Okay.  Was it your understanding that EZPZ couldn't afford to pay you what you were making?

A:  Yes, ma'am.

Q:  In California?

A:  Yes, ma'am.

Q:  And then, in your declaration, you don't indicate that you're making a salary from EZPZ or that you have a right to get payment if the company sold.

A:  No, I did not.

Q:  And why not?

A:  I didn't see a place on there on the form for me to do something like that.  And, to be frank, I didn't really find it to be relevant.  I mean, we're sitting here now and now I know it is.  But, at the time, I was there to be an expert.  I was -- I was not there like putting on my EZPZ hat.  I'm an expert in the field, and I'm writing a declaration that this has never been on the market, that this is helping so many families.  I was there to be an expert.  That's what I was asked to do and not give my salary history.

Q:  And you've kind of already answered this, but just to be sure, what makes you think you are an expert separate from EZPZ to be able to say that?

A:  Although I love my job with EZPZ, I was an expert prior to working with EZPZ.  EZPZ did not make me an expert.  I was an expert prior and had been speaking across the United States and actually internationally on the subject of feeding and swallowing in pediatric disorders.  And so that was one of the reasons why Lindsey wanted me on board was because I had such of an expertise, not only within my field, but worldwide in regards to other allied medical professionals, pediatricians, ENTs, these recommend me to do their speaking engagements across the country prior to my working with EZPZ.

Q:  And you've worked in a number of different environments in the medical field, haven't you?

A:  Yes, ma'am.

Q:  Like?

A:  Nursing homes.  So adults, as well as pediatrics.  So nursing homes, acute rehab centers specifically with children, children hospitals, rehab centers.  My favorite work, which is the hardest work, but pediatric hospice as well.  So I even did trachs and vents for a pediatric unit.  I was a clinical director at most of these hospitals servicing feeding disorders on the unit.

**[Tr.T, B. Williams, 9/1/2021, 1029:24 to 1030:19]:**

Q:  All right. And then with regard to the declaration of Ms. Dawn Winkelmann, she's a feeding specialist. Right?

142

A.  She is, yes.
Q:  Do you believe that her compensation as a consultant with EZPZ affected her opinion?
A:  No, I don't.
Q:  And why not?
A:  I can tell you why because I think Dawn is, one, a very honest person, number 1. And I don't think she's a mercenary. I don't think there's many people out there do things for money as is alleged. But I will say that Dawn, as to my understanding, approached EZPZ. And from my personal communications with Dawn after the fact, she was already aware of the Happy Mat and its ability in her space to have an impact before she ever came on with EZPZ.
Q:  So she expressed those opinions before she joined EZPZ?
A:  Absolutely. I mean, when she signed the affidavit, I don't know where she was in the time line. But she absolutely had her opinions that were expressed in the affidavit previous to her -- whatever compensation she may or may not have had at EZPZ.

**[Tr.T, D. Winkelmann, 9/2/2021, 1481:14 to 1483:1]:**

Q:  And then you say, "All statements made in the declaration are made of my own personal knowledge, and I'm not being paid for executing this declaration."
A:  Yes, ma'am.
Q:  And did you feel like -- do you feel like that's a true statement?  I mean, you said you're not being paid, actually you were making a salary at EZPZ?
A:  Yes, but it was for this piece of paper.  Me being an expert in signing that piece of paper I was not being paid.  If you -- if you sign this piece of paper, you're going to get some money for that.  I was not getting money for writing that piece of paper.  I wanted to be able to bring some validity to the patent saying that I am an expert in this field, and, yes, I did not get paid to sign that piece of paper.
Q:  So if the utility patent were granted, that increases the value of EZPZ.  And then if EZPZ gets sold with that greater value, doesn't that benefit you if you're getting a percent of the company?
A:  That's what ifs.  But, technically, yes, I guess it would. But then, again, as an expert, I wasn't thinking of what if, what if, what if.  It was my intention was to be able to help this product, make sure that it stays in the market so that the kids that I work with could actually have that opportunity, so that the therapists that were needing a product like this just like me that they have the opportunity to be able to do that.
Q:  And is your desire to help the feeding needs community, would you lie or misrepresent something on an affidavit to accomplish that?
A:  No, ma'am, I would not.
Q:  And then -- then you agree that you were being warned that "willful false statements are punishable by a fine or imprisonment and that such statements may jeopardize the validity of the submission."  And, despite that, you're declaring that all statements made in the declaration are made of your own knowledge and are true?
A:  Yes.
Q:  And do you believe today that you did that?
A:  Yes, ma'am.

118.    Ms. Winklemann was not the only speech pathologist to submit a declaration. Ms. Winklemann's opinion was corroborated by Melanie Potock's declaration, which is found at Exhibit 245, LNC395326 (PDF 191). Ms. Potock declared *inter alia* that she was "a certified speech pathologist who specializes in the assessment and treatment of feeding disorders" that "despite familiarity with hundreds of alternatives, I have never before encountered a placement capable of effectuating the same self-sealing properties to an underlying surface absent suction cups or adhesives" and "in [her] expert opinion the present surface contact self-sealing integrated tablewear and dining mat to which this declaration is directed clearly demonstrates novelty in the placemat and feeding arts and meets an unmet need . . ." *Id.*

**[Tr.T, D. Winklemann, 9/2/2021, 1487:22 to 1488:11]:**

Q:  And then there was another declarant who was a children's eating specialist, Melanie Potock?
A:  Yes, ma'am.
Q:  Do you know her?
A:  Yes, I do.
Q:  How do you know her?
A:  We are friendly competitors in the field.
Q:  And so she does the same thing you do?
A:  Yes, ma'am, she does.
Q:  Workwise?
A:  Yes.
Q:  And she provided a declaration as well?
A:  Yes, she did.
Q:  Does she work for EZPZ?
A:  No, she does not.

**[Tr.T, L. Laurain, 8/31//2021, 628:23 to 629:8 ]:**

A:  The commercial success, again, I was just kind of following along of giving our financials for the advertising expenditures.  Another prong of commercial success is if there's an unmet need.  And so that's where the medical professionals come in. So Dawn -- and you had mentioned Dawn's competitor, Melanie Potock, another speech pathologist, who actually competes with Dawn.  And she also signed a declaration saying you'd -- "I've been doing this for 20 years and I've never seen anything like this. I mean, I've been taping bowls to paper." I don't know if that's commercial success or unmet need.

119.    The evidence of Ms. Potock's declaration shows that there was no intent to deceive with respect to Ms. Winklemann's declaration. The same information was before the PTO. Ms. Winklemann's declaration and Mr. Potock's declaration were offered and served the same purpose.

**[Tr.T, B. Williams, 9/1//2021, 1023:4-19]:**

Q:  Okay. And then with regard to unmet need, do you recall what you argued to the patent office?
A;  I do, yes. I mean there's a number of different ways to construct that term. But in Appendix D, it -- is everything okay?
Q:  Yes.
A   I don't have anything on the screen. Okay. I'm sorry. In terms of appendix -- okay. Well, there we go. Okay. Well,  there's Appendix D. In terms of Appendix D, the unmet need. We filed a number of declarations by speech language  pathologists. I think there was at least two of them, if I remember correctly, and an M.D. who were engaged in treating feeding disorders. And it has come to light through sale of the mat and its use in treatment of feeding disorders that problem eaters can be helped

120.    No intent to deceive is shown.

<div align="center">

Julie Clark's Declaration
(Materiality and Intent to Deceive)

</div>

122. The subject of Ms. Clark's Declaration in support of the application that became the '903 Patent was the commercial success of the EZPZ Happy Mat. *See,* **Exhibit 245.**

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/27/18.), 77:16 to 77:17, 77:19 to 78:08, and 78:11]:**

Q:  And what was your understanding about why you were submitting that declaration?
A:  My understanding was that -- I mean, essentially that I was just testifying that all of these things were true, that this is who I am and that I believed that this was a unique and -- a unique idea that worked and -- I mean, I guess now that I'm, you know, four and a half years later thinking about it, yeah, I mean, it's a Patent and Trademark Office, which would suggest that she was applying for a patent, but I don't know the difference, as I said earlier, between a utility patent and other types of patents.
Q:  (BY MS. MENASCO)  At the time that you signed your declaration were you aware that that document was going to be submitted to the Patent and Trademark Office?
A:  Yes.

123. As Ms. Clark stated, she was the founder of the "Baby Einstein" brand, one of the most recognized baby brands in the United States; has authored over fifty (50) children books; is a nationally recognized personality, entrepreneur, and expert in the baby industry who has been featured on The Oprah Winfrey Show, The Today Show, Good Morning America, and many other broadcast news programs; and due to her expertise and experience has provided addresses at Fortune 500 companies such as Microsoft and business schools such as Harvard Business School, as a recognized expert within the billion dollar baby industry. *See,* **Exhibit 245**, LNC 395322 (PDF 185). Ms. Clark's expertise in the baby industry is, undisputable, as is her experience in reviewing new baby oriented products and technologies, advising companies, and otherwise – as stated in her Declaration.

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/29/18.), 22:10 to 22:23, 23:3-9, 23:22 to 24:01, 24:3-23, 25:3-25:24, 26:1-26:10, 26:12-20, 26:25 to 27:04, 27:6-14, 27:19-22, and 27:24 to 28:06 ]:**

Q: (BY MS. MENASCO)  All right.  Let's get to something a little bit more pleasant, hopefully.  I understand that you are the founder of Baby Einstein?
A: Yes, I am.
Q: And you founded that company back in 1996?
A: Yes.
Q: And I've done some reading.  I know that you sold the company to Disney a few years later for -- is it 25 million?
A: I don't think we're allowed to say what we sold for.
Q: Okay.
A: But we did sell the company to Disney.
Q: So in the four years -- or four to five years that you had the company before you sold to Disney, what was the product line generally?
      MR. GARTHE:  Objection to form.
A: Videos and music and books for children to expose them to classical music, poetry and art, children under 5.

. . .

Q: (BY MS. MENASCO)  Okay.  We may get to that. After you sold Baby Einstein to Disney in 1996, did you maintain any affiliation with the company?
A: A consultant.
Q: Okay.  And what were your job responsibilities as a consultant?

A:  I sold Baby Einstein to Disney in 2001.
   (BY MS. MENASCO)  Okay.
   And I did continue to work for Disney as
   MR. GARTHE:  Objection to form.

A:  I continued to write books, I continued to make videos and I continued to advise on products that Disney was intending to -- new products that Disney was intending to create under the Baby Einstein licensed name.

Q:  (BY MS. MENASCO)  Okay.  And how long did you serve in that role?

A:  Well, I was contracted to – initially contracted to serve in that role for eight years, but was diagnosed in 2004 with breast cancer and was sort of, you know, allowed to cut back a lot of my roles and responsibilities.  And as of that point in 2004, pretty much was more of an advisor than a full-time consultant.

Q:  (BY MS. MENASCO)  Okay.  So if we can kind of go through -- I'm just trying to get a timeline.

A:  That's fine.

Q:  So from 1996 to 2001, you owned Baby Einstein.  In 2001, you sold Baby Einstein to Disney.

A:  Uh-huh.

Q:  And from 2001 to 2004, you were serving as a full-time consultant?

A:  Not full time.  I was a consultant as  needed, but it was quite close to full time, I would say.

Q:  And then after 2004, you were in an advisory role?

A:  Yes.

Q:  Until what time?

A:  I don't remember.  I would say 2008. It's a little fuzzy, that whole time.

Q:  I'm sure you had a lot going on at that time. And in the advisory role, what did you do?

A:  I continued to -- I did continue to write children's books.  I continued to do public speaking engagements.  I continued to be the face of the brand, and that's about it.

Q:  (BY MS. MENASCO)  Okay.  And backtracking just a little bit, in your consultant role when you said you advised on new products that were – that Disney was developing, that would be licensed with the Baby Einstein name; is that right?

A:  Yes, yes.

Q:  (BY MS. MENASCO)  What type of products were you advising on?
   MR. GARTHE:  Objection to form.

A:  Well, toys and products that are considered in the juvenile -- oh, gosh, what's the word they use?  It's people who go to JPMA.  It's the Juvenile Product Manufacturers Association.  People who make things like, you know, mats that babies lay on and exersaucers and those kinds of things.

Q:  (BY MS. MENASCO)  And after you sold Baby Einstein to Disney, did you -- I understand that you were advising on products, but did you individually develop any products other than the books that you were continuing to write?

Q:  (BY MS. MENASCO)  Okay.  And what was the other company?

A:  Not for Baby Einstein.

Q:  (BY MS. MENASCO)  For anybody else?

A:  I had another company that I started and It was called "The Safe Side," and we produced videos and music that exposed children to lessons that would help them stay safe with strangers.

Q:  (BY MS. MENASCO)  Have you -- other than the books and videos that we talked about with Baby Einstein and now with The Safe Side, have you ever developed any other products?

A:  Yes.

Q:  (BY MS. MENASCO)  Okay.  What other products have you developed?

A:  So currently I have a company called WeeSchool.  It's W-e-e.  And we have created a parenting app that helps parents understand how to engage with and encourage their child's development the first three years of life.

121.    LNC contends that Ms. Clark makes material misstatements in stating that she analyzed EZPZ sales figures and marketing strategies of Eazy-PZ, LLC for investor and retailers.

125. Ms. Clark did declare that "she has analyzed the sales figures and marketing strategies of Eazy-PZ LLC for investors and retailers ..." Ms. Clark testified that she both conversed with Ms. Laurain about EZPZ's sales and that she had "seen the success [EZPZ has] had internationally." Regarding the "1% of gross sales revenues," Ms. Clark testified that her statement was based on actual discussions with Ms. Laurain. There is no material misstatement by Ms. Clark.

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/27/18.), 90:16-24, 91:1-7, 91:9-10, and 91:12-19]:**

Q:  (BY MS. MENASCO)  Okay.  And we talked earlier, you've not reviewed any sales figures for EZPZ, have you?

A:  I have not reviewed them on paper.  I've had conversations where we have discussed how sales are going, but I've never reviewed them on paper.

Q:  (BY MS. MENASCO)  You understand that this declaration says that you have analyzed sales figures?

A:  Yes.

Q:  (BY MS. MENASCO)  Is the statement there inaccurate, then?

A:  I guess it depends on how you use the word "analyzed."  I mean, honestly, I feel that I've analyzed them in terms of conversations that I've had. I have seen how sales are going.  I've had an understanding of the success of EZPZ when they have attended trade shows and seen the success that they have had internationally, and so I feel that it is true in my understanding.

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/29/18.), 93:17-23, 93:25 to 94:04, 94:06-94:11, 94:23-25, 95:02-6, 95:20-21, and 95:23]:**

Q:  (BY MS. MENASCO)  And if we go towards the end of the paragraph in Exhibit 218, it says, "the present invention demonstrates unequivocal commercial success evinced by sales figures I have analyzed for investors in the baby industry." So what sales figures have you analyzed for investors in the baby industry?

A:  The sales figures that Lindsey shared with me verbally.

Q:  (BY MS. MENASCO)  Okay.  And what investors were you talking with Lindsey Laurain about the sales figures?

Q:  (BY MS. MENASCO)  Or for what investors were you --

A:  Yeah, sure.  Well, myself.  I mean, we invest -- my husband and I invest in a number of companies, and so we would be certainly potential investors, although we have not invested.

Q:  (BY MS. MENASCO)  Let me rephrase that. Have you ever specifically reviewed EZPZ's sales figures for any specific investor?

A:  I have reviewed them verbally, as I said, with Lindsey and with myself as a potential investor.

Q:  (BY MS. MENASCO)  How many conversations did you have with Lindsey Laurain about sales figures?

A:  I don't remember.

122.    Although LNC classifies EZPZ and Ms. Clark as engaging in "joint ventures" none are shown. There was no on-going business relationship between EZPZ and Jaime Grayson Julie Clark The relationship is not a significant one and is not a material omission.

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/29/18.), 58:06-9, 58:11-13, and 58:15]:**

Q:  (BY MS. MENASCO)  Has Lindsey Laurain  promised you anything of value in the event EZPZ is ever sold as a company?

**A:**  No.

Q:  (BY MS. MENASCO)  Has anyone at EZPZ made you such a promise

A:  No.

Q:  Was there any sort of joint venture between EZPZ and JoyBox?

**[Tr.T J. Clark, 8/30/21, By Deposition, 11/29/18.), 64:09-12, 64:17, 64:24, 65:3-8]:**

Q:  (BY MS. MENASCO)  Did you ever compensate Lindsey Laurain or EZPZ for any of these collaborations or cross-promotions that we have been  talking about?

A:  No.

Q:  (BY MS. MENASCO)  Have you ever paid Lindsey Laurain anything for any help that she's provided to you or your companies?

A:  No.

Q:  My question was -- my question was  whether or not you have ever paid Lindsey Laurain for any of the help that she's provided to you or your companies.  And your counsel said -- instructed you not to answer for post 2016 matters.

A:  We have not ever pre or post 2016.

Joseph Chua's Declaration
(Materiality and Intent to Deceive)

127.       Mr. Chua and Ms. Laurain became acquainted at the ABC Kid Show in 2014.

**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 76:24 to 77:13, 79:24 to 80:5],**

Q:  (BY MS. REISMAN)  But you made plans to go and meet with Ms. Laurain at the ABC Expo based on the images that you had seen, correct?
A:  I always go to the ABC show.  We try to go to that show every year.  I was going to go to that show regardless.
Q:  Turn, if you would, to page 1 of Exhibit 721, and there's am e-mail from you dated August 29, 2014.  By this time you had decided you were going to the ABC show, right?
            MS. SECOR:  Object to form.
A:  I think I answered this question already, but I'll say it again.  I always go to the ABC show at least at that time.  I probably had gone three consecutive years at that point, maybe four.
Q:  (BY MS. REISMAN)  And while you were at the ABC Expo, were you looking for other potential products that you might want to distribute in Canada?
A:  I'm always looking for new products, or at least someone within Hip Mommies is looking for new products in that show, on the Internet, people reach out in e-mails, so it's all encompassing.

128.       Mr. Chua executed a declaration in support of the application that became the 903 Patent. Mr. Chua truthfully stated that "The present surface contact self-sealing integrated tableware and dining mat demonstrates commercial success derived of its ability to self-seal to any underlying surface without the need of suction cups, adhesives, or other active means of effecting adhesion, to resist displacement from said underlying surface, wherein children are prevented from overturning the mat or removing it from a tabletop during feeding time, and that removal from an underlying surface is readily effected only by peeling action at the outer edge, such that reuse of the present mat is enabled, whereby the present mat is attractive to consumers." *See,* **Exhibit 245,** LNC395358 (PDF 228).

**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 83:16-19, 83:21 to 84:15, and 84:16]:**

Q:  Let's look, sir, at your declaration, which is tab 5.  We've labeled it as Exhibit 723.  You took an oath that the statements in the declaration were true, correct?

A:  What is the oath?  Is it the signature?

Q:  (BY MS. REISMAN)  Sir, if you look at page 2 of 2, there is a paragraph towards the top, "Whereas I."  Do you see that paragraph?

A:  Yes.

Q:  Okay.  And do you see where it says that you "declare that all statements made in this Declaration are made of my own knowledge and are true." Do you see that?

A.  I do.

Q:  And did you read that before you signed the declaration?

A:  Of course I did.

Q:  At the top of page 2, there is also a statement, "I am not being paid for executing this Declaration." Do you see that?

A:  I do.

Q:  Why did you include that statement?

A:  Because it's true.

**[Tr.T, B. Williams, 9/1//2021, 1032:21 to 1033:16]:**

Q:  Okay.  And did you have any reason to believe that Joey Chua's declaration wasn't completely accurate and true?

A:  No, I had no reason to believe that the declaration he attested to was not 100 percent true.

Q:  So did you believe that the information you were submitting to the patent office was correct?

A:  Of course, yes.

Q:  You believed it was true?

A:  Yes.

Q:  With no misrepresentations?

A:  Absolutely.

Q:  And is there any circumstance where you would deliberately misrepresent a fact in a declaration?

A:  Absolutely not.

Q:  And why not?

A:  Because that would be lying and it's not -- that's a terrible thing to do.  Absolutely not.  That would be dishonest.  It would be entirely dishonest.

Q:  And would it have consequences for you personally?

A:  Yeah, it would.  It would be -- put my license on the line.  That would be ridiculous.

129.    Mr. Chua also stated for his background that he was a significant distributor for

EZPZ, with the product constituting more than 70% of Hip Mommies' total sales, and sales are

consistent without a need for extensive advertising or branding whatsoever. *See,* **Exhibit 245,**

LNC395357 (PDF 227).

**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 92:9-23, 93:7 to 94:02, 105:16 to 106:1].**

Q: Flip back, if you would, to Exhibit 723, which is tab 5.  And if you look at the first page there, the last full "Whereas" paragraph, and you are talking about the sales of the self-sealing integrated tableware and dining mat and you state that "sales are consistent without a need for extensive advertising or branding whatsoever." Did you write that language, sir?

A: Do you mean did I physically write this declaration?

Q: Did you come up with those words or were they written by someone else?

A: I agreed with these words because they are true.

. . .

Q: (BY MS. REISMAN)  And so when you read those words and you believed them to be true, what did the word "extensive" mean to you?

A: "Without a need for extensive" would mean to me not a lot of.

Q: And the word "advertising," what did that mean to you?

A: In the context of extensive, "without a need for extensive advertising"?

Q: Uh-huh.

A: It would mean not a lot of.

Q: And there is no word there modifying advertising, is there?  In other words, it doesn't say "without a need for extensive paid advertising," right?

A: What it says is "without a need for extensive advertising or branding."

Q: And what did you take the word "branding" to mean?

A: I mean that the product speaks for itself.

. . .

Q: (BY MS. REISMAN)   What did you mean – or what did you take the word "whatsoever" to mean?

A: I meant it to mean that it required very little advertising and/or branding.

. . .

Q: (BY MS. REISMAN)  That's what I'm referring you to, sir.  Do you agree with me that the January 21, 2015, e-mail in which you said that EZPZ was already becoming a household name would refute the statement that you made in your declaration that sales -- let me make sure I get the wording right -- Sales are consistent without a need for extensive advertising or branding whatsoever"?

A: If you're asking me if I agree with what I said in the declaration, that last part, I 100 percent do.

**[Tr.T, B. Williams, 9/1//2021, 1024:18 to 1025:7]:**

Q: The EZPZ's Canadian distributor Hip Mommies, the principal of Hip Mommies is Joey Chua. His declaration was used. Do you recall that?

A: I do. I do. I do recall that. As a distributor in Canada. Correct?

Q: Yes.

A: I do recall that.

Q: And what was important about that? I believe, if I remember correctly, that his testimony was that the Happy Mat had rapidly become the highest proportion of his sales in Canada.

Q: Okay. And then did you ever have any reason to doubt that that was true?

A: No, I had no reason to doubt. I don't think anyone would sign a statement that would be untrue.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/28/2019), 54:12-19]:**

Q: (By Ms. Reisman) And do you agree with Mr. Chua's statement in his declaration that "the sales of your self-sealing integrated tableware and dining mat appear to be derived cheaply from the remarkable self-sealant property that instant mat exhibits upon demonstration, whereby, sales are consistent without a need for extensive advertising or branding whatsoever."

A: Yeah, we didn't do a lot of paid advertising.

**[Tr.T, L. Laurain, 8/30/2021, 501:16-23]:**

Q: And Mr. Chua stated that, "Sales are consistent without a need for extensive advertising or branding whatsoever," did he not?

A: That's what it says.

Q: And you submitted that to the U.S. Patent Office?

A: We wanted a brand in Canada. Nobody knew who we were in Canada when we hit the ground. We did not spend anything on advertising. It absolutely is an accurate statement.

**[Tr.T, L. Laurain, 8/30/2021, 688:6-11]:**

Q: Are you referring to the same thing when you talk to the patent office about marketing and branding?

A: No. And specifically branding, you know, we weren't an established brand; and no one knew -- when you say if I made that and we were Nike, but we were not Nike. We were no one. No one knew who we were.

130.    There is also no bias shown. The dates LNC complains of related to Chua's statements about bias occur after he signed his declaration. LNC and Hakim argue that the fact that Chua allegedly asked to treat part of his sales costs as marketing and brand promotion for customs tax purposes means he lied about the Happy Mat selling itself, and not requiring

153

"extensive advertising or branding whatsoever." However, the tax treatment does not change the veracity of the declaration statement.

**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 162:20 to 163:15, 164:13 to 165:22],**

Q: (BY MS. REISMAN)   And the agreed-upon price was higher than the manufacturing costs that were showing to the Canadian customs authorities, right?

A: That's true in a tax context, but like we discussed in these other e-mails, my job is to reduce our taxes, and because I had that allotment for branding or marketing expenses, that's where I chose to use it.  That's how I chose to run my business. What business of that is yours?

Q: (BY MS. REISMAN)  Because, sir, you also signed a declaration that was submitted to the U.S. Patent Office stating that sales of the EZPZ mats were derived without advertising and branding whatsoever.

A: It is true.  The declaration is true as is.  From a reporting standpoint of my taxes that is also true.  I have the ability to allocate expenses into advertising and promotion, and that's what I chose to use it for.

. . .

Q: So then you go on to say, "It's hard to make the change in later shipments as the pricing will be established and a big change will be a red flag." What did you mean by "red flag," sir?

A: What it looks like I meant at that time was I was trying to make sure when we import products we are doing it properly, and if we are going to make any mistakes, we should try to avoid them and do it right the first time.

Q: (BY MS. REISMAN)  And that's the reason, is it not, sir, that Ms. Laurain told you on January 29, 2016, "Feel free to do the invoices how you want them to backdate them," because she was authorizing you at that point to backdate the invoices to avoid Traffic Tech and the customs authorities seeing any red flags, right?

A: No, of course not.  That's not true. Also, those products had already come into Canada. That's not true.

Q: (BY MS. REISMAN)  Who did you think that the red flag was going to be waved by?

A: I did already answer this question.  I was trying to make sure that we would not have any issues and we were doing things properly the first time around.

Q: (BY MS. REISMAN)  And to avoid red flags, Ms. Laurain told you it was okay to backdate the invoices, right?

A: No, not true.  I already said that's not true and I've already answered that question.

**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 194:13 to 195:4]:**

Q: What was -- what was the financial record or records that you relied upon, sir, in providing the information that was in the declaration that you signed that was submitted to the United States Patent Office?

A: Can you be more specific with that Question?

Q:  Did you review any financial records --

A:  Of course I did.

Q:  -- before signing the declaration that you signed that Ms. Laurain then submitted to the U.S. Patent Office?

A:  Yes.

Q:  And where are those records?

A:  They are in our sales system that collects all of our sales data.

**[Tr.T, L. Laurain, 8/30/2021, 520:23 to 521:15]:**

Q:  I'd like to sow the timeline if we could put up Exhibit 324. And I'd like to scan to page PDF 9 second to last paragraph at the bottom. If you see there after the docket entry 324-3, it says, "EZPZ has  no knowledge, however, of how those invoices were used for Hip Mommies' accounting or import tax purposes."

A:  Yes.

Q:  That is one month after you had conversations with Joey Chua about the import tax follow up.  Correct?

A:  I don't know.  I mean, if you put that email up.  And I don't have any knowledge.  I mean, that's an accurate statement.  We rely on our distributors to do all their import tax.  When you started saying you have a scheme, I literally sent an email, if there's anything going on, we can pull up the previous email.  Please fix this.  I have no idea how you do taxes.  I don't know. As our distributor says, I still don't know and I think in Joey's deposition I think he said he got everything cleared.

131. In either event, no intent to deceive is shown.

*See,* **Evidence, presented at ¶¶___.**

131-1. For ease of reference, the above information is presented in response to the specific allegations of LNC, identified in the Bench Verdict Form [Doc. No. __]

<u>LNC Does Not Meet Its Burden to Show Statements in the Declarations Are False; Testimony Supports the Statements Made in the Declarations Are True</u>

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| (a)  "[T]he present invention to which this affidavit is directed demonstrates unequivocal commercial success derived of the product itself absent | **[Trial Tr., J. Prager, 9/2/21, 1389:13 to 1390:13, 1400:9 to 1401:23, 1402:9-24, 1403:5-19]**<br><br>Q:   Mr. Prager, the next paragraph is, you are being warned that willful false statements are punishable by imprisonment and willful false statements, and the like, jeopardize the validity of the submission.  And |

155

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| persuasion by branding or marketing strategies…" (Jeff Prager Declaration) | you declare all statements made in the declaration as being of your own knowledge and are true.  Do you still believe that's true? |
| | A.   Absolutely. |
| | Q.   And so then in the last paragraph, you say, "I hereby testify under oath and willingly declare that, as an expert analyzing strategies for investors and corporate decision-makers for innumerable products across multiple markets, the present invention to which this affidavit is directed demonstrates unequivocal commercial success derived at the product itself absent persuasion by branding or marketing strategies, strategies which, if subsequently employed, will only increase and strengthen market share." What did you mean by that? |
| | A.   Well, number one, I looked at it.  Hold on.  I've looked at many, many products over the course of my career.  And I thought, in my opinion, that this was going to be a huge success, which, in hindsight, we could say it was.  And once she did start marketing actively, our sales went up dramatically.  So, I mean, I don't know what they are now, but we were in the tens -- we were over 10 million when I stopped consulting with Lindsey, I believe.  I can't remember exactly, |
| | **[Trial Tr., J. Prager, 9/2/21, 1400:9 to 1401:23, 1402:9-24, 1403:5-19]** |
| | Q.   What are you saying in your statement that leads you to the conclusion that it was the product itself that drove the sales and not the promotion and the other marketing? |
| | A.   Because of the way the sales came in through the Internet, the fact that she was dealing with so many people through direct contact on her website.  Okay?  Not outgoing, but incoming.  So it wasn't outgoing marketing, it was incoming marketing. |
| | Q.   Is incoming marketing like people were attracted to the product? |
| | A.   They're attracted to the product, the messaging.  Her messaging is phenomenal.  They're attracted to the whole story. That's incoming. |
| | Q.   So how do -- |
| | A.   You don't see that very often.  You don't see that very often. |
| | Q.   So how do we know that the phenomenal sales aren't due to her -- are not due to marketing by itself and not the nature of the product? |
| | MS. MENASCO:  Objection, leading. |
| | THE COURT:  No, overruled.  Go ahead.  You can answer that. |
| | MS. SECOR:  Thank you. |
| | A.   Can you ask the question again, please. |
| | Q.   Yeah.  How do you know that it's not her story that she's promoting that's contributing to the sales as opposed to the product itself?  How do you put it in your declaration? |
| | A.   I'm not sure I could actually answer that question.  Let me give it a try.  Hold on a second.  The message, the product, it's all intertwined.  I'm not saying it wasn't the story.  I'm not saying it -- the story is -- is |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
|  | manifested through the product. She had a tough time feeding her kids, and she's relating to her audience but she's showing a solution. The audience is not only identifying with her plight, if you will, her problem that she's solving, but they're saying, "We like your solution to the problem.  We want to buy your solution."  They don't want to buy her problem.  They want to buy her solution to the problem.  And that's why I think I can make the statement I did.<br><br>**[Trial Tr., J. Prager, 9/2/21, 1402:9-24, 1403:5-19]**<br><br>Q:      Well, maybe my question isn't clear.  Will you look at your declaration, the very last paragraph.<br>A.      I have it.<br>Q.      So what I'm asking is, is that still true in light of what we've been talking about with promotion and people being attracted to the product?<br>A.      Oh, yeah.  Absolutely.  Absolutely.<br>Q.      So why is that?<br>A.       Well, branding and marketing to you get people to come to look at a product.  The product itself still has to sell themselves.  So, yeah, I believe that.  It's the product.  If she had the right answer but the wrong product, it wouldn't make a difference, nobody would buy it.<br><br>. . .<br><br>Q.      So she could have the best story in the world, but if the product didn't solve the problem she was identifying, people aren't going to buy it.  Is that what you're saying? I'm just trying to figure out where branding -- if you have great branding and marketing, why doesn't that sell the product instead of the product itself?<br>A.      It could sell the product.  But the fact of the matter is she went viral, and that tells me the product is the main driver. You can only fool some of the people some of the time.  So if you don't have a good product -- you could have the best story, the best branding in the world -- but if you don't have a good product, it won't sell.  And people can see through it. And based on the testimonials I saw and what I did see and observed with my own two eyes, I would say it was the product that was selling everything.  The story was great.  It may have attracted attention, but it was the product.  People bought the product. |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| (b) The Happy Mat demonstrated "sales derived from the product itself absent any motivated marketing campaign." (Jeff Prager Declaration) | **[Trial Tr., J. Prager, 9/2/2021, 1382:20 to 1384:12]:**<br><br>Q:  All right. So if -- how can it be that you have this mom entrepreneur story that resonates with people, you have this free promotion on Shark Tank, and the like, how do you know it's true what you say in your fourth paragraph that it's only less than one percent of gross sales?<br>A:  Because I believe at the time she had spent about $8,900 -on direct advertising.  And I forgot the sales figure back then.  But -- I'm actually looking at my notes.  She had sales of approximately -- the one I'm looking at 1.6 million.  And she had spent 88 -- 88, $8,899. Can you imagine a company getting sales of 1.6 million on just $8,900?  That's -- that doesn't happen normally.  That's why I'm saying the majority of the sales were socially motivated and were free.  In accounting, we only measure direct expenditures.  There are exceptions to that rule, but for the most part, in this particular case, accounting only counts for direct expenditures. The other thing is what we call proactive, and I say this in the next sentence, the motivated marketing campaign. Motivated means was she proactive?  Did she spend money?  Was it a deliberate campaign? And advertising is a  very deliberate type of thing, whereas how would you know you're going to get on Shark Tank or get carried by media? How would you know that you're going to win awards? You don't know that. Nor is it measured in dollars. I mean, the effect of sales is, but in accounting, we don't account for noncash expenditures, for the most part. Again, there are exceptions, but those exceptions don't apply in this case.<br>Q:  So if EZPZ paid the Baby Guy $5,000 for promoting -- for doing a product giveaway on his FaceBook page, is that advertising expense?<br>A:  That one is questionable, yes. It could be marketing expense versus advertising. I'm splitting hairs. But when your marketing, there's advertising, there's merchandising, there's the sales effort and promotion, PR. I would put that more in the PR category but, yes, I think you can make that a gray area.<br>Q:  And if you added in that $5,000 to the $8,900, does that affect your bottom line conclusion?<br>A:  Absolutely not. You're still talking about less than – well less than 10 percent of money going towards advertising.<br><br>**[Trial Tr., J. Prager, 9/2/2021, 1397:4 to 1398:25]:**<br><br>Q:  And you did know that Mrs. Laurain had appeared on Shark Tank in January 2016. Right?<br>A:  That is correct.<br>Q:  And you agree that you can be doing lots of things that are marketing without spending money. Right? |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| | A:  Yeah. But in my -- in my declaration, I said she spent less than 1 percent of her money on advertising. Advertising and marketing are two different things. Advertising is the component of marketing. I was very specific saying 1 percent for advertisement. I was very specific. So I don't see what you're telling me.<br><br>. . .<br><br>Q:  Mr. Prager, with regard to that last question about marketing and advertising, so what difference does it make in your evaluation that marketing and advertising are very different?<br>A:  Because what we're -- what we're trying to do in my declaration is talk about what makes this product so unusual. And for a company of this size to spend that little money on direct advertising and have the sales that they had, is remarkable.  And I have more superlatives if I had enough time. So when you look at it, look at how the sales were derived, and look at other companies that have a product and see how their sales are derived.  You could see the amount of money that EZPZ spent on -- and I'll include marketing right now, marketing, advertising, promotion -- is remarkably low because the market penetration she did in as little time as she did and I will hang my hat on that. |
| (c) The "invention...demonstrates unequivocal commercial appeal derived from the product itself, and not from any particular advertising reach or previous customer base, evincible by rapid acquisition of the market share in the baby[]product arts absent appreciable advertising efforts on behalf of the inventor"  (Jamie Grayson Declaration) | **[Trial Tr., J. Grayson, By Deposition (11/27/18), 124:07-09, 124:11-15]**<br><br>Q.  When you received the draft of the declaration, did you have any questions about the declaration?<br>A.  Obviously yes, just because this -- I'm not a legal expert person, so it was just conversation.  You know, I did a lot, like, research online and Googling about some stuff and read everything.<br><br>**[Depo. Tr., J. Grayson, (11/27/18 Depo.), 126:22 to 127:02, 127:04 to 127:12, 127:14, 127:18 to 128:03]:**<br><br>Q:  (BY MS. MENASCO)  If we look at the first  page of the declaration, the fourth "Whereas" paragraph, the declaration states, "Whereas the application for patent to which this affidavit is directed."  What application for patent to which this affidavit is directed are we referring to here?<br>A:  I do believe it's the self-sealing.<br>Q:  (BY MS. MENASCO)  The self-sealing feature of the Happy Mat?<br>A:  Correct.<br>Q:  And you say it's "an invention that in my considered and expert opinion demonstrates unequivocal commercial appeal derived from the product itself, and not from any particular advertising reach of previous customer base."<br>A:  Yes.<br>A:  I did not review any documents, but I know the space and they're -- that's the reason I first put it up on my Facebook page is because I |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| | was, like, This is a very, very, very good product and it's going to help a lot of people. Like I stated in my initial Facebook post, it is basically my policy I rarely, rarely put up a kick starter link.  But because of this product being brand-new and being so innovative, I made an exception to my, you know, self-imposed rule, whatever. |
| (d) "WHEREAS sales of the same surface contact self-sealing integrated tableware and dining mat appear to be derived chiefly from the remarkable self-sealing property the instant mat exhibits upon demonstration, whereby sales are consistent without a need for extensive advertising or branding whatsoever" (Joseph Chua Declaration) | **[Depo. Tr., J. Chua, (6/11/2020 Depo.), 92:9-23, 93:7 to 94:02, 105:16 to 106:1].**<br><br>Q:    Flip back, if you would, to Exhibit 723, which is tab 5.  And if you look at the first page  there, the last full "Whereas" paragraph, and you are talking about the sales of the self-sealing integrated tableware and dining mat and you state that "sales are consistent without a need for extensive advertising or branding whatsoever." Did you write that language, sir?<br>A:    Do you mean did I physically write this declaration?<br>Q:    Did you come up with those words or were they written by someone else?<br>A:    I agreed with these words because they are true.<br><br>. . .<br><br>Q:    (BY MS. REISMAN)  And so when you read those words and you believed them to be true, what did the word "extensive" mean to you?<br>A:    "Without a need for extensive" would mean to me not a lot.<br>Q:    And the word "advertising," what did that mean to you?<br>A:    In the context of extensive, "without a need for extensive advertising"?<br>Q:    Uh-huh.<br>A:    It would mean not a lot of.<br>Q:    And there is no word there modifying advertising, is there?  In other words, it doesn't say "without a need for extensive paid advertising," right?<br>A:    What it says is "without a need for extensive advertising or branding."<br>Q:    And what did you take the word "branding" to mean?<br>A:    I mean that the product speaks for itself.<br>. . .<br><br>Q:    (BY MS. REISMAN)  What did you mean – or what did you take the word "whatsoever" to mean?<br>A:    I meant it to mean that it required very little advertising and/or branding.<br><br>. . .<br><br>Q:    (BY MS. REISMAN)  That's what I'm referring you to, sir.  Do you agree with me that the January 21, 2015, e-mail in which you said that EZPZ was already becoming a household name would refute the statement |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| | that you made in your declaration that sales -- let me make sure I get the wording right -- Sales are consistent without a need for extensive advertising or branding whatsoever"?<br>A:    If you're asking me if I agree with what I said in the declaration, that last part, I 100 percent do.<br><br>**[Depo. Tr., J. Chua, (6/11/2020 Depo.), 194:13 to 195:4]:**<br><br>Q:    What was -- what was the financial record or records that you relied upon, sir, in providing the information that was in the declaration that you signed that was submitted to the United States Patent Office?<br>A:    Can you be more specific with that Question?<br>Q:    Did you review any financial records --<br>A:    Of course I did.<br>Q:    -- before signing the declaration that you signed that Ms. Laurain then submitted to the U.S. Patent Office?<br>A:    Yes.<br>Q:    And where are those records?<br>A:    They are in our sales system that collects all of our sales data.<br><br>**[Trial Tr., L. Laurain, 8/30/2021, 501:16-23]:**<br><br>Q:    And Mr. Chua stated that, "Sales are consistent without a need for extensive advertising or branding whatsoever," did he not?<br>A:    That's what it says.<br>Q:    And you submitted that to the U.S. Patent Office?<br>A:    We wanted a brand in Canada. Nobody knew who we were in Canada when we hit the ground. We did not spend anything on advertising. It absolutely is an accurate statement.<br><br>**[Trial Tr., L. Laurain, 8/30/21, 688: 6-11]**<br><br>Q.    Are you referring to the same thing when you talk to the patent office about marketing and branding?<br>A.    No. And specifically branding, you know, we weren't an established brand; and no one knew -- when you say if I made that and we were Nike, but we were not Nike. We were no one. No one knew who we were. |
| (e) "WHEREAS I never encountered any product in my over twenty (20) years as an expert in the special-needs community that effectively self-seals to an underlying surface | **[Trial Tr., D. Winkelmann, 9/2/21, 1466:12 to 1467:25]**<br><br>Q:    Okay.  And so how did you come to learn about the Happy Mat?<br>A:    So I'm kind of a Kickstarter junky.  And so there's this site called Kickstarter.  And I saw the Happy Mat on Kickstarter and thought, oh my God, this is literally going to change the feeding industry and I had hundreds of kids that I was working with at the time that I knew that |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| absent suction cups or an adhesive." (Dawn Winkelmann Declaration) | would benefit from this new technology because it did something that we've struggled with in the feeding industrial is being able to provide a child with a way to be able to independently feed themselves. |
| | Q:   And what did you recognize in the Happy Mat that led you to that conclusion? |
| | A:   So many things.  The first was that it suctioned to the surface.  I was literally Duck taping bowls and plates to wheelchairs and tables and highchairs and velcroing to be able to help because children are supposed to feed themselves at six months of age.  But we never had anything to be able to actually implement that developmental milestone. So when I saw the Happy Mat, I was, like, this is going to help neurotypical kids, but also kids with Down Syndrome, cerebral palsy, pediatric stroke, which is more common than you think, and being able to help them independently feed themselves. |
| | **[Trial Tr., D. Winkelmann, 9/2/21, 1507:6-11, 1508:20-25]** |
| | Q.   Okay.  Let me ask you about the fourth whereas paragraph on the first page.  "Whereas, I've never encountered any product in my over 20 years as an expert in the special needs community that effectively self-seals to an underlying surface absent suction cups or adhesive." |
| | A.   Yes. |
| | Q.   Okay.  And the surface contact, self-sealing, that's some of the language in the -- in the utility patent application that you read. Right? |
| | A.   Yes.  And that suction technology is what actually makes that so different being able to have that adhere so that kids can actually utilize that as another surface area. |
| (f) Julie Clark "analyzed sales figures and marketing strategies of Eazy-PZ, LLC." (Julie Clark Declaration) | **[Trial Tr. J. Clark, 8/30/21, By Deposition, 11/27/18.), 91:1-7, 91:9-10, and 91:12-19]:** |
| | Q:   (BY MS. MENASCO)  Okay.  And we talked earlier, you've not reviewed any sales figures for EZPZ, have you? |
| | A:   I have not reviewed them on paper.  I've had conversations where we have discussed how sales are going, but I've never reviewed them on paper. |
| | Q:   (BY MS. MENASCO)  You understand that this declaration says that you have analyzed sales figures? |
| | A:   Yes. |
| | Q:   (BY MS. MENASCO)  Is the statement there inaccurate, then? |
| | A:   I guess it depends on how you use the word "analyzed." I mean, honestly, I feel that I've analyzed them in terms of conversations that I've had. I have seen how sales are going.  I've had an understanding of |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| | the success of EZPZ when they have attended trade shows and seen the success that they have had internationally, and so I feel that it is true in my understanding. |
| (g) That the "advertising and branding…expenditure ha[d] compromised less than 1% of gross sales revenues over a like period." (Julie Clark Declaration) | **[Trial Tr. J. Clark, 8/30/21, By Deposition, 11/27/18.), 91:1-7, 91:9-10, and 91:12-19]:**<br><br>Q:   (BY MS. MENASCO)  Okay.  And we talked earlier, you've not reviewed any sales figures for EZPZ, have you?<br>A:   I have not reviewed them on paper.  I've had conversations where we have discussed how sales are going, but I've never reviewed them on paper.<br>Q:   (BY MS. MENASCO)  You understand that this declaration says that you have analyzed sales figures?<br>A:   Yes.<br>Q:   (BY MS. MENASCO)  Is the statement there inaccurate, then?<br>A:   I guess it depends on how you use the word "analyzed." I mean, honestly, I feel that I've analyzed them in terms of conversations that I've had. I have seen how sales are going.  I've had an understanding of the success of EZPZ when they have attended trade shows and seen the success that they have had internationally, and so I feel that it is true in my understanding. |
| (h) That Julie Clark had "personal knowledge" of the facts set forth in her declaration (Julie Clark Declaration) | **[Trial Tr. J. Clark, 8/30/21, By Deposition, 11/27/18.), 77:16 to 77:17, 77:19 to 78:08, and 78:11]:**<br><br>Q:   And what was your understanding about why you were submitting that declaration?<br>A:   My understanding was that -- I mean, essentially that I was just testifying that all of these things were true, that this is who I am and that I believed that this was a unique and -- a unique idea that worked and -- I mean, I guess now that I'm, you know, four and a half years later thinking about it, yeah, I mean, it's a Patent and Trademark Office, which would suggest that she was applying for a patent, but I don't know the difference, as I said earlier, between a utility patent and other types of patents.<br>Q:   (BY MS. MENASCO)  At the time that you signed your declaration were you aware that that document was going to be submitted to the Patent and Trademark Office?<br>A:   Yes.<br><br>**[Trial Tr. J. Clark, 8/30/21, By Deposition, 11/29/18.), 93:17-23, 93:25 to 94:04, 94:06-94:11, 94:23-25, 95:02-6, 95:20-21, and 95:23]:**<br><br>Q:   (BY MS. MENASCO)  And if we go towards the end of the paragraph in Exhibit 218, it says, "the present invention demonstrates unequivocal |

| Declaration Statement | Testimony Proving Declaration TRUE (not false) |
|---|---|
| | commercial success evinced by sales figures I have analyzed for investors in the baby industry." So what sales figures have you analyzed for investors in the baby industry?<br>A:   The sales figures that Lindsey shared with me verbally.<br>Q:   (BY MS. MENASCO)  Okay.  And what investors were you talking with Lindsey Laurain about the sales figures?<br>Q:   (BY MS. MENASCO)  Or for what investors were you --<br>A:   Yeah, sure.  Well, myself.  I mean, we invest -- my husband and I invest in a number of companies, and so we would be certainly potential investors, although we have not invested.<br>Q:   (BY MS. MENASCO)  Let me rephrase that. Have you ever specifically reviewed EZPZ's sales figures for any specific investor?<br>A:   I have reviewed them verbally, as I said, with Lindsey and with myself as a potential investor.<br>Q:   (BY MS. MENASCO)  How many conversations did you have with Lindsey Laurain about sales figures?<br>A:   I don't remember. |
| (i)    Other    statement identified  by  the  Court based upon the evidence presented at trial | Not applicable. |

## LNC Does Not Meet Its Burden to Show There Were Material Omissions in the Declarations With Intent to Deceive

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| (a)    That    Dawn Winkelmann had (or had been promised) a 2%  interest  in  any future  sale  of  EZPZ prior    to    Mrs. Winkelmann  signing | **[Trial Tr., D. Winkelmann, 9/2/2021, 1476:14 to 1479:20]:**<br><br>Q:   And did EZPZ offer you an incentive so that you would stay and keep working for them?<br>A:   Yeah, we had a lot of discussions because I took such a severe pay cut that we were trying to negotiate some other ways to be able to help encourage |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| her declaration (relative to the Declaration of Dawn Winkelmann) | me to come on board.  And one of those ways was giving some of the children that I work with some Happy Mats.<br>Q:  And what was another way?<br>A:  Another way was to be able to discuss futuristic possibilities, so what could we do if -- you know, if EZPZ ever got big, like, what could happen?  And so being able to have a percentage in the company and being able to expand my knowledge base within the company.<br>Q:  And so eventually you were given a percentage of the company if it should sell?<br>A:  Uh-huh.  Yes, ma'am.<br>Q:  And when did that occur?<br>A:  I think that occurred soon after, maybe a year later.<br>Q:  Was that, like, in -- when was the -- there was a formal agreement --<br>A:  Yes.<br>Q:  -- for that.  Right?<br>A:  Yes, there is.<br>Q:  And is that in May of 2016?<br>A:  I believe that is correct.<br>Q:  Okay.  And when -- do you recall filling out a declaration for this case?<br>A:  Yes, I do remember.<br>Q:  And you filled it out in February of 2016.  Do you recall that?<br>A:  That sounds right, yes.<br>Q:  And we'll talk about it in a minute.  But that – that declaration was dated in February of 2016?<br>A:  That sounds right, yes, ma'am.<br>Q:  Had you had discussions with Lindsey Laurain and EZPZ about getting the percentage ownership in the company before you signed the declaration?<br>A:  We did.  We talked a little bit about any other way that I could be compensated.<br>Q:  Okay.  Was it your understanding that EZPZ couldn't afford to pay you what you were making?<br>A:  Yes, ma'am.<br>Q:  In California?<br>A:  Yes, ma'am.<br>Q:  And then, in your declaration, you don't indicate that you're making a salary from EZPZ or that you have a right to get payment if the company sold.<br>A:  No, I did not.<br>Q:  And why not?<br>A:  I didn't see a place on there on the form for me to do something like that.  And, to be frank, I didn't really find it to be relevant.  I mean, we're sitting here now and now I know it is.  But, at the time, I was there to be an expert. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | I was -- I was not there like putting on my EZPZ hat.  I'm an expert in the field, and I'm writing a declaration that this has never been on the market, that this is helping so many families.  I was there to be an expert.  That's what I was asked to do and not give my salary history. |
| | Q:  And you've kind of already answered this, but just to be sure, what makes you think you are an expert separate from EZPZ to be able to say that? |
| | A:  Although I love my job with EZPZ, I was an expert prior to working with EZPZ.  EZPZ did not make me an expert.  I was an expert prior and had been speaking across the United States and actually internationally on the subject of feeding and swallowing in pediatric disorders.  And so that was one of the reasons why Lindsey wanted me on board was because I had such of an expertise, not only within my field, but worldwide in regards to other allied medical professionals, pediatricians, ENTs, these recommend me to do their speaking engagements across the country prior to my working with EZPZ. |
| | Q:  And you've worked in a number of different environments in the medical field, haven't you? |
| | A:  Yes, ma'am. |
| | Q:  Like? |
| | A:  Nursing homes.  So adults, as well as pediatrics.  So nursing homes, acute rehab centers specifically with children, children hospitals, rehab centers.  My favorite work, which is the hardest work, but pediatric hospice as well.  So I even did trachs and vents for a pediatric unit.  I was a clinical director at most of these hospitals servicing feeding disorders on the unit. |
| (b)  That Mrs. Winkelmann was an independent contractor for EZPZ who was paid approximately $4,000/month before Mrs. Winkelmann signed her declaration (relative to the Declaration of Dawn Winkelmann) | **[Trial Tr., D. Winkelmann, 9/2/2021, 1469:1-25]:**

Q:  So what did you think when you saw the Happy Mat or what did you do after you saw that?

A:  I contacted them -- her.  I was, like, "You are going to change the world.  My name is Dawn.  Hi, how can I help?"

Q:  Okay.  So then what did you do?

A:  So then I asked Lindsey, one, I wanted to sponsor the Kickstarter because my husband and I do that a lot, but I also wanted to be involved.  I wanted to be able to get this to the kids that I was working with. At the time, I was running multiple feeding groups for the Down Syndrome Association of Orange County.  And so I had a couple hundred children ages six months to two and a half years of age that were really struggling feeding and self feeding is one of those issues. So some of these babies who are six months, eight months, nine months of age were not doing any self-feeding whatsoever because they have low tone. Low tone happens in children with special needs specifically because they don't really have the core |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
| --- | --- |
| | support to be able to keep them upright. So the Happy Mat was able to help them be able to help facilitate that and be able to eat independently. So I wanted my kiddos to be able to experience that. |

**[Trial Tr., D. Winkelmann, 9/2/2021, 1472:8 to 1475:19]:**

Q.   And then I'll have you look at Exhibit 932. Wait. I've got to ask you a little bit before we do that. So you said you called Lindsey Laurain and said, "How do I be a part of this?" And so what happened then?

A.   Lindsey and I started talking. And I was explaining to her my experience. And, at the time, I was teaching also at Santa Ana college and said, you know, "I would love to have some of these Happy Mats to be able to not only help some of the children that I was working with but also to facilitate the next generation of speech language pathologists who will want to learn more about this because this will literally change the way that my profession sees feeding and sees that children can actually make those milestones." So I was very excited from a personal standpoint for the clients that I serve, but also for the standpoint of teaching other medical professionals about the product.

Q.   And so then what happened with you and EZPZ?

A.   So the more that Lindsey and I talked, the more she wanted to really -- and she learned about my expertise and really what I was doing on, not only a state level, but on a national level with teaching, feeding. I did some speaking circuits for the Autism Society of America, the Down Syndrome Association and then all also for my professional organization the American Speech Language and Hearing Association. And so I wanted to take a Happy Mat on the road and be able to, you know, let families know that this was something that could actually help them, and then also let my colleagues know that there's a product out there now that can actually do the things that we've been wanting to help children facilitate.

Q.   And are you still doing national speaking engagements?

A.   Yes, ma'am.

Q.   How often do you do them?

A.   Pretty much every month.

Q.   And so did you come and work with EZPZ?

A.   Yes, I did.

Q.   And in what capacity did you start working with them?

A.   So I started working as a special needs coordinator, basically taking -- Lindsey knew everything with her twins about from a neurotypical standpoint, so what typical children do and how they could be able to successfully use a Happy Mat. My expertise came from, hey, this not only works for neurotypical children, but these also work for children with special needs;

167

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | so, you know, like I said before, cerebral palsy, pediatric stroke and wanting to be able to say that, you know, through this product is something that can really help facilitate children with special needs; and be able to tap into a skill set that they're going to be able to do for a lifetime and wanting to have the opportunity and to be able to do that and to showcase that. |

Q.   And did you actually become an employee or an independent contractor with EZPZ?

A.   Yes, I did.

Q.   And when did that start?

A.   That started in 2014.  So soon after the Kickstarter, I really wanted to be a part of the organization and really help facilitate feeding for the kids.

Q.   And are you working with EZPZ today?

A.   Yes, I am.

Q.   And what do you do with them today?

A.   I still do a lot of special needs outreach.  But I also do a lot of education.  And so I educate parents as well as medical professionals.  And I do that by still doing what I have always done is teaching about developmental milestones and feeding skills and how to really make a joyful mealtime.  But now I'm also highlighting products that are going to be able to help them make those milestones because our products are really new and inventive especially the technology of the Happy Mat.

**[Trial Tr., D. Winkelmann, 9/2/2021, 1475:22 to 1476:8]:**

Q.   Do you also have your own practice?

A.   Yes, ma'am, I do.

Q.   And what is your practice?

A.   It's called Ms. Dawn, SLP.  And I teach and also see clients hands-on for feeding and swallowing disorders, so helping parents who are struggling starting solids with their baby to be able to help make that process a little bit more relaxing, and really giving them the knowledge that they need in order to -- to really accept the mess and really understand when they're supposed to be chewing, when they're supposed to be grabbing, how they should be picking up foods, what the grasp is like from a developmental standpoint and so I teach.

**[Trial Tr., D. Winkelmann, 9/2/2021, 1480:1 to 1481:12]:**

Q:   And you said in the first whereas clause, "I have a post graduate degree as a speech and language pathologist and feeding specialist."  I think we covered that.  "And assisting families with special needs children." And

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
|  | you said you had 20 years.  You were training special needs children at hospitals, rehabilitation facilities, --<br>A:  Yes.<br>Q:  -- at home for families with special needs children?<br>A:  Yes.<br>Q:  And then that's what we've already talked about so far. Right?<br>A:  Yes, ma'am.  Yes, ma'am.<br>Q:  And then you said you encountered numerous products devised to adhere to tabletops to prevent displacement and overturning during mealtime.<br>A:  Yes, ma'am.<br>Q:  What did you mean by that?<br>A:  So in a lot of the jobs that I had before, as a clinical director, we have to buy products for the whole entire facility.  So I would buy products, feeding products, spoons, cups, plates, cushions, a whole bunch of different medical devices.  And I would purchase those items for the entire pediatric unit. So a lot of the things at the time was just these suction cup bowls or plates that once you put them in the dishwasher they lost that suction function.  So then, again, we were stuck not being able to utilize that. And then also different types of adhesives.  So I would use Gorilla Glue, you know, any type of adhesive to suction and seal to a wheelchair or to a countertop.  So that's what that meant.<br>Q:  Did any of them work very well?<br>A:  No, they didn't, but it's all we had.<br>Q:  Right.  And then the next paragraph is, "I've never encountered any product in my over 20 years as an expert in special needs community that effectively seals to an underlying surface absent suction cups or an adhesive."<br>A:  That's correct.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1481:14 to 1483:1]:**<br><br>Q:  And then you say, "All statements made in the declaration are made of my own personal knowledge, and I'm not being paid for executing this declaration."<br>A:  Yes, ma'am.<br>Q:  And did you feel like -- do you feel like that's a true statement?  I mean, you said you're not being paid, actually you were making a salary at EZPZ?<br>A:  Yes, but it was for this piece of paper.  Me being an expert in signing that piece of paper I was not being paid.  If you -- if you sign this piece of paper, you're going to get some money for that.  I was not getting money for writing that piece of paper.  I wanted to be able to bring some validity |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | to the patent saying that I am an expert in this field, and, yes, I did not get paid to sign that piece of paper.<br><br>Q: So if the utility patent were granted, that increases the value of EZPZ. And then if EZPZ gets sold with that greater value, doesn't that benefit you if you're getting a percent of the company?<br><br>A: That's what ifs.  But, technically, yes, I guess it would. But then, again, as an expert, I wasn't thinking of what if, what if, what if.  It was my intention was to be able to help this product, make sure that it stays in the market so that the kids that I work with could actually have that opportunity, so that the therapists that were needing a product like this just like me that they have the opportunity to be able to do that.<br><br>Q: And is your desire to help the feeding needs community, would you lie or misrepresent something on an affidavit to accomplish that?<br><br>A: No, ma'am, I would not.<br><br>Q: And then -- then you agree that you were being warned that "willful false statements are punishable by a fine or imprisonment and that such statements may jeopardize the validity of the submission."  And, despite that, you're declaring that all statements made in the declaration are made of your own knowledge and are true?<br><br>A: Yes.<br><br>Q: And do you believe today that you did that?<br><br>A: Yes, ma'am.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1484:4 to 1485:5]:**<br><br>Q: And what did you think that meant, from your point of view?<br><br>A: That I've never seen anything like the Happy Mat before, any type of this technology; and that the self-sealing technology was going to be able to -- if this patent was granted, going to be able to be utilized to help families.<br><br>Q: You felt like the Happy Mat was innovative?<br><br>A: Absolutely.<br><br>Q: And then you said, so it says, "By preventing displacement from an underlying surface except by peeling action at the outer edge absent need for any suction cups, adhesive, or other active suction means."  Did you know what that meant?<br><br>A: Yes, ma'am.<br><br>Q: And what does that mean?<br><br>A: Everything that I was doing, Duck Tape, Crazy Glue, any way to be able to -- to provide a means to be able to help the patients that I served.<br><br>Q: And then it says that, in your expert opinion, the present invention to which this affidavit is directed clearly realizes an unmet need by providing |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | a novel feeding solution for special needs children.  Do you still believe that? |

|  |  |
|---|---|
| | A:   Yes, ma'am. I think that, in retrospect, I would actually broaden that instead of just special needs I think I would have wrote six months of age to 99 and a half because of the fact that, you, know – by this way my expertise part was to bring in that special needs component, but it really should say much broader six months to 99.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1487:22 to 1488:11]:**<br><br>Q:   And then there was another declarant who was a children's eating specialist, Melanie Potock?<br>A:   Yes, ma'am.<br>Q:   Do you know her?<br>A:   Yes, I do.<br>Q:   How do you know her?<br>A:   We are friendly competitors in the field.<br>Q:   And so she does the same thing you do?<br>A:   Yes, ma'am, she does.<br>Q:   Workwise?<br>A:   Yes.<br>Q:   And she provided a declaration as well?<br>A:   Yes, she did.<br>Q:   Does she work for EZPZ?<br>A:   No, she does not.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1493:9-18]:**<br><br>Q:   And you talked about how you reached out to Ms. Laurain after you saw the Happy Mat on Kickstarter.  Right?<br>A:   Yes, ma'am.<br>Q:   And I wanted to show you Exhibit 987.<br>A:   Okay.<br>Q:   At this point, when you first reached out to Ms. Laurain, you were living in California.  Right?<br>A:   Yes, ma'am.<br>Q:   And you were planning to move to Colorado.  Right?<br>A:   Yes.<br>Q:   You sent her, I guess, a direct message through the Kickstarter platform?<br>A:   Yes. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| (c) That Tamara Falcone had (or had been promised) a 10% interest in any future sale of EZPZ prior to Ms. Falcone signing her declaration (relative to the Declarations of Tamara Falcone) | **[Trial Tr., T. Falcone, 9/2/2021, 1558:10-25]:**<br><br>Q.  So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?<br>A.  Yes.<br>Q:  Did you have a compensation package with EZPZ at the time you signed this declaration?<br>A:  I believe we did have, yeah, a phantom stock agreement in place, correct.<br>Q:  Did you get paid anything, a salary of any kind?<br>A:  Not until January of 2016.<br>Q:  Okay. So this declaration was signed March 9th, 2016. Would you have had a salary at this time?<br>A. Yes.<br>Q:  And did you think you needed to reveal you had a salary since you were identifying you were a chief operating officer?<br>A:  No. I would assume that that is obvious. I don't think a lot of people work for free<br><br>**[Trial Tr., T. Falcone, 9/2/2021, 1559:1-18]:**<br><br>Q.  Okay. Let's go back to the beginning. And the phantom equity agreement, what did you understand that to be?<br>A.  It essentially says that if I am still part of the organization in the case of a sale, I will be given a certain percentage of that sale.<br>Q.  And did you reflect that in your declaration?<br>A.   I did not.<br>Q.  Why not?<br>A.  I think divulging that I was the COO shows that I had a vested interest in this being accepted by the USPTO. And, yeah, and I also just -- a lot of small companies like this, not that it is -- it is assumed, but in many, many instances like this where you're a young company, somebody like the COO, the second in command, would have some sort of a compensation package.<br>Q.  And then so you didn't feel like you needed to spell that out?<br>A.  No, that never occurred to me. |
| (d) That Jeff Prager received a retainer of $1,500.00 per month from EZPZ and additional money on an hourly basis for | **[Trial Tr., J. Prager, 9/2/21, 1388:5-21, 1389:2-8, 13-20]:**<br><br>Q.  And then the next whereas product, "Whereas, I consult with EZPZ, LLC, and have a thorough knowledge of their commercial operations, including financial expenditures and revenues."  What did you mean by that? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| accounting and bookkeeping services, was paid $3,500.00 for converting EZPZ's bookkeeping system (relative to the Declaration of Jeff Prager) | A.   Well, number one, it's no surprise, and I don't know why it came up in deposition, but I was a consultant.  I got paid to work with her.  I got a monthly retainer.  And then when we added the accounting services, that was billed a different way.  But, number one, I'm not totally independent because I do work with them.  So I wanted that to come out.  But I do have a thorough knowledge or feel like I had at the time, a full knowledge of their operations. I worked with Tammy to really understand the nuts and bolts of what made it tick, the marketing channels, the advertising channels, their gross profit.  I channeled – I helped them develop ways of following it.  So I do feel like I had an intimate understanding of their operations<br><br>Q.   Do you think it's misleading that you didn't say there, "Oh, by the way, I do get paid for being a consultant"?<br><br>A.   I think anybody with any kind of common sense would know if I'm consulting, I'm getting paid.<br><br>Q.   Right.<br><br>A.   That just stands to reason, I would think.  I didn't think I had to really spell it out to the detail you're talking.<br><br>Q.   Mr. Prager, the next paragraph is, you are being warned that willful false statements are punishable by imprisonment and willful false statements, and the like, jeopardize the validity of the submission. And you declare all statements made in the declaration as being of your own knowledge and are true. Do you still believe that's true?<br><br>A.   Absolutely. |
| (e) That Jeff Prager was EZPZ's Chief Financial Officer at the time Mr. Prager signed his declaration (relative to the Declaration of Jeff Prager) | **[Trial Tr., J. Prager, 9/2/21, 1369:15-25]**<br><br>Q.   And what is your occupation, Mr. Prager?<br>A.   Right now I am the cofounder of The CFO Project.<br>Q.   And what's The CFO Project?<br>A.   We teach professional -- financial professionals how to help their clients develop one clear path to a growing and more profitable business.<br>Q.   And what do you do in that project?<br>A.   Literally what we do is we have a course outlining how to -- for CPAs, bookkeepers, people with a financial background on how to provide the CFO service at an affordable price to the small to medium-sized business community.<br><br>**[Trial Tr., J. Prager, 9/2/21, 1379:5 to 1380:4, 1390:19-23]**<br><br>Q:   All right.  And speaking of at this time -- at the time you signed your declaration, were you CFO of EZPZ? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A.  Yes, by my definition of CFO.<br>Q.  Yes, by definition?<br>A.  By definition which is a strategist helping them make sense of their numbers and developing a strategy to get bigger.<br>Q.  All right.  And then the second paragraph of your declaration says you have over 40 years of experience valuing specific products on the international and domestic markets for investors and corporate decision-makers.  Can you tell us how you came to that conclusion?<br>A.  Now it's about 45 years.  But in the course of my work, that's what I have to do is look at the products, the processes, the people, the numbers, trying to figure out what makes them valuable and how do we increase the value of those companies.  So, yeah.<br>Q.  And did you do that for EZPZ in working for them?<br>A.  Yes.<br>Q.  Were you --<br>A.  Yes.  Under -- okay.<br>Q.  Were you -- were you a CFO in the sense that you came to work every day at EZPZ?<br>A.  No.  No.  I was on a retainer, and I would come in and -- on a routine basis and look at things and develop strategies.  I did not work as an in-house CFO.<br><br>. . .<br><br>Q:  Okay.  Were you still consulting with them when you signed this declaration in 2016?<br>A.  Yeah, that was about -- Yes, I was -- I was definitely consulting.  I even say it in the affidavit.  Yes, I was consulting with them. |
| (f) That Mrs. Laurain promised Mr. Prager a bonus if she sold EZPZ, and Mrs. Laurain also discussed Mr. Prager possibly having an interest in the sale of EZPZ similar to Mrs. Winkelmann and Mrs. Falcone (relative to the | **[Trial Tr., J. Prager, 9/2/2021, 1388:22 to 1389:8]:**<br><br>Q:  All right. And then the next paragraph says, "All statements made in this declaration are made by my own personal knowledge, and I'm not being paid for executing this declaration." Right?<br>A:  I did not get anything extra for doing this.<br>Q:  Do you think it's misleading that you didn't say there, "Oh, by the way, I do get paid for being a consultant"?<br>A.  I think anybody with any kind of common sense would know if I'm consulting, I'm getting paid.<br>Q:  Right. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| Declaration of Jeff Prager) | A:   That just stands to reason, I would think.  I didn't think I had to really spell it out to the detail you're talking. |
| (g)      That      EZPZ contracted   with   and compensated     Jamie Grayson       for conducting giveaways and   promotions   of EZPZ   products   on social media beginning in 2014, before Mr. Grayson   signed   his declaration (relative to the   Declaration   of Jamie Grayson) | **[Trial Tr., J. Grayson, By Deposition (11/27/18), 41:16-20, 41:23 to 42:06, 42:08-11, 42:13]:**<br><br>Q.  (BY MS. MENASCO)  Okay.  And when you went to the booth, you saw the product.  You ended up making a video of the product sealed to a table; is that right?<br>A.  Yes.<br>Q.  (BY MS. MENASCO)  And that video, you posted it on your social media; is that right?<br>A.  Yes.<br>Q.  That video went viral; is that right?<br>    MR. GARTHE:  Objection to form.<br>A.  Yes.<br>Q.  (BY MS. MENASCO)  Did EZPZ compensate you to post -- to make that post from the ABC Kids Show?Is that the name of it?<br>A.  Absolutely not.<br>Q.  (BY MS. MENASCO)  Okay.  So would that fall into the category of one of your editorial posts where you're not compensated?<br>A.  Correct.<br><br>**[Trial Tr., J. Grayson, By Deposition (11/27/18), 108:23-25, 109:2]:**<br><br>Q.   (BY MS. MENASCO)  Has Lindsey Laurain or EZPZ ever promised you anything of value upon the sale of EZPZ as a company?<br>A:   100 percent no.<br><br>**[Trial Tr., J. Grayson, By Deposition (11/27/18), 114:16-17, 114:19 to 115:02, 115:04-7]:**<br><br>Q.  Did Lindsey Laurain or anyone at EZPZ tell you why they wanted you to sign a declaration?<br>A.  To my understanding, because I am a recognized expert in this field and it is my opinion that they were the first company to have a suction mat like the Happy Mat, so they wanted me to just back that up.<br>Q.  (BY MS. MENASCO)  Okay.  And when you say they were the first one to have a suction mat like the   Happy Mat, are you saying they were the first to have a product that self-sealed? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A.   In terms of self-sealing to the surface area, yes, because every other plate that I am aware of -- or plate or bowl or feeding device -- used a suction cup up until that point.<br><br>**[Trial Tr., L. Laurain, 8/31/21, 729:8 to 730:15]**<br><br>Q.   And actually we see, for example, Ms. Laurain, that one of the people is the second one there Baby Guy NYC contributor to FIT Pregnancy and Stroller-traffic.  And you describe him a lot. Obviously that one paid off, didn't it, Ms. Laurain?<br>A.   Well, luckily, Jamie found us in The Invention Connection and promoted a video without being paid.  So I guess I got -- we got lucky with Jamie Grayson.  So --<br>Q.   Well, let me ask you about Jamie Grayson and not being paid.  I mean, he's not just someone who posts on social media for the good of humanity, does he?  He's someone that he goes to the ABC Expo, and he's basically looking for clients because he's a marketer and he promotes things. And so he went and he was going to scratch your back, and he was going to take a video and post it.  And then a month or two later, you were paying him to do more promotion.  Right?<br>    MS. SECOR:  Objection, Your Honor, assumes facts not in evidence and involves speculation.<br>    THE COURT:  Okay.  Well, I'm going to allow her to ask it on cross I think if she knows the answer to that.<br>A.   No, I don't think --<br>    THE COURT:  She asked enough facts --<br>    THE WITNESS:  I'll answer that.<br>    THE COURT:  Go ahead.<br>A.   I don't think it was I'm going to scratch your back.  I'd like to pull up the Jamie Grayson quote again.  And everyone I've ever done business with, you make it sound like we're all criminals, and that's just not true. So Jamie Grayson posted because he believed in the product.  We were so lucky that he didn't charge us because Jamie literally only posts about the products he believes in and loves and stands by.  So, unfortunately, I wish Jamie was coming and you could ask him<br><br>**[Trial Tr., T. Falcone, 9/2/2021, 1541:7-22]:**<br><br>A:   . . . From there, it was -- within the Kickstarter campaign itself, we -- we had somebody who I know you guys have spoken about, the Baby Guy NYC.  He is kind of a celebrity within the baby gear space.  And he -- we |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | presented our product at the -- it's called the Invention Connection as part of one of the trade shows in the juvenile industry, and he could not believe the suction feature. And so he got really excited about it. I remember in his video he said, "I've never shown anything from an Invention Connection. I don't like to show product this early, but this is blowing my mind."<br>Q:   Go ahead.<br>A:   Okay. And he kind of lifted the table. So that was a wonderful thing where we did not have to pay, and he was excited and shared it with his other large community. And that's really when our Kickstarter campaign took off. |
| (h) Dr. Stathos was a former treating physician of Mrs. Laurain's children (relative to the Declaration of Dr. Stathos) | No evidence presented at trial |
| (i) Other information identified by the Court based upon the evidence presented at trial | Not applicable |

**General Considerations Related to Declarations, Including Lack of Marketing**

132. The EZPZ Happy Mat was the first product launched by EZPZ, accordingly no previous customer base existed. EZPZ, by its Happy Mat, was practicing the claimed invention of the '903 Patent.

**[Tr.T, L. Laurain, 8/31/2021, 629:11-14, 23-24]:**

Q:   In your business, I think you already testified that you had 170,000, and then at 1.7 million and then $7 million the third year?
A.   Yes, correct.

. . .

Q: All your sales were from the embodiment of the invention?
A: Yes.

**[Tr.T, L. Laurain, 8/31/2021, 758:20 to 759:6]:**

Q: There were questions asked of you about commercial success.  And I wanted to ask you about one of the things in addition to the argument made to the patent office about advertising and branding, you also stated that there was commercial success absent any previous client base.  Do you remember that argument that you and Mr. Williams made to the patent office?
A: I'm assuming because, like, when we started Kickstarter, again, we had no customer base, so going from zero up to I think 1,500 people supported Kickstarter 1,568.  So, yes, I think that's a fair statement from when we launched EZPZ we had no base.

**[Tr.T, L. Laurain, 8/31/2021, 760:24 to 761:24]:**

Q: Would you agree with me if it says, "Commercial Success Must Be Derived From the Claimed Invention"?  That's the title of that provision.
A: Yes.  And I would say our success is from the claimed invention.  So just from that statement, I would agree with, yes.
Q: "In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed in a marketplace where the consumer is free to chose on the basis of objective principles.  And that such success is not the result of heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee or other business events extraneous to the merits of the claimed invention."  And then it goes on. Do you recall reading that language before, Ms. Laurain?
A: I'm assuming that's why we would have done the survey is to create a nexus to show that people purchased the product for the product itself and not from advertising, and then in addition to submitting the advertising expenses.  So, yes, I'm sure I read that and I agree with what we stated.
Q: Okay.  And the language there doesn't just focus on paid advertising, does it?
A: Well, again, I'm not meaning to be -- I'm not meaning to be, like, argumentative but your expert said advertising is paid.

**[Tr.T, B. Williams, 8/31/2021, 852:4-19]:**

Q: And Ms. Laurain testified that at the time this was filed, the only product she had was the Happy Mats?
A: At the time this was filed in 2016, yeah, I believe that's true.  I mean, I'm not in -- you know, up to speed on the ins and outs of EZPZ.  But, to my knowledge, that's absolutely correct, yeah.
Q: And what's important about that?

A:  What's important about that is that that mat was the first product that launched the company.

Q:  And so all of the profits are attributable to the embodiment of the invention?

A:  Absolutely, yes.

Q:  And then let's talk --

A:  The success of that product is the success of EZPZ.  The beginning of EZPZ's success because I know they've enjoyed more success since then.

133. Less than 1% of gross revenue (which was close to $2 million in less than 12 months) was spent on advertising since the device was placed on the market. Typical expenditures on advertising can reach 30% of gross revenue as an industry standard. This is unrebutted by LNC.

**[Tr.T, J. Prager, 9/2/2021, 1382:20 to 1383:23]:**

Q:  All right. So if -- how can it be that you have this mom entrepreneur story that resonates with people, you have this free promotion on Shark Tank, and the like, how do you know it's true what you say in your fourth paragraph that it's only less than one percent of gross sales?

A:  Because I believe at the time she had spent about $8,900 -on direct advertising.  And I forgot the sales figure back then.  But -- I'm actually looking at my notes.  She had sales of approximately -- the one I'm looking at 1.6 million.  And she had spent 88 -- 88, $8,899. Can you imagine a company getting sales of 1.6 million on just $8,900?  That's -- that doesn't happen normally.  That's why I'm saying the majority of the sales were socially motivated and were free.  In accounting, we only measure direct expenditures. There are exceptions to that rule, but for the most part, in this particular case, accounting only counts for direct expenditures.  The other thing is what we call proactive, and I say this in the next sentence, the motivated marketing campaign. Motivated means was she proactive?  Did she spend money?  Was it a deliberate campaign? And advertising is a very deliberate type of thing, whereas how would you know you're going to get on Shark Tank or get carried by media? How would you know that you're going to win awards? You don't know that. Nor is it measured in dollars. I mean, the effect of sales is, but in accounting, we don't account for noncash expenditures, for the most part. Again, there are exceptions, but those exceptions don't apply in this case.

**[Tr.T, L. Laurain, 8/31/2021, 629:23 to 630:9, 630:17 to 631:25]:**

Q:  All your sales were from the embodiment of the invention?

A:  Yes.

Q:  You -- you've seen the figures that were used in the facts and conclusions by LNC. Will you identify where their figures came from.

A:  Yes.  So those were pulled out of the business plan.

Q:  Will you take a look at exhibit -- will you please pull up Exhibit 50.

A: Yes.  And they included numerous categories that LNC classified as marketing and branding such as, well, one I can't even find this information in our financial system. Like, yes -- that's not -- noncategorized.

Q: So these are profit and loss January to June of 2014.  Are these the actual figures?

A: I don't believe so in the sense of when I tried to check these and got into QuickBooks like we don't have uncategorized expense in QuickBooks anymore.  But if you look at – they essentially said we had $194,000 in marketing and promoting in findings of fact included marketing and -- and uncategorized expense for $5,000; shipping and delivery $78,000. They also included our travel, our travel meals, meals and entertainment.  And then promotional and our website design. And then there was, like at that time $800 of actual paid advertising.

Q: Okay.  So EZPZ had $800 of paid advertising in 2015?

A: And I would need to confirm these numbers because this is from our business plan. Even I don't know if these are accurate numbers based on what they've included.

Q: They include 5,000 shipping and different expenses for sales of product, not advertising.  Right?

A: Yeah, absolutely not.  That would be shipping and delivery, like shipping cost.

Q: Okay.  And if you ship five or more mats to Baby Guy, you didn't move that shipping expense up to advertising expense, did you?

A: I don't believe so.

Q: Okay.  Now, when Jeff Prager did this -- did this declaration, did he look at EZPZ's actual financials?

A: Yes.  He would have looked at it actually out of QuickBooks.

Q: And do you recall -- do you believe those numbers are correct that Jeff Prager used?

A: Yes, absolutely.

Q: He used the actual figures in QuickBooks, not a business plan?

A: Yes, that's correct.

**[Tr.T, L. Laurain, 8/30/2021,644:24 to 645:11]:**

Q: You reported that as part of your sales when you gave the declarations to the U.S. Patent Office about the 1 percent advertising?

A: Yes.

Q: And the 5 percent figure is still pretty low.  Right?

A: Yes, I think so.  I think in the patent actually secondary considerations they can say advertising.  I don't know if it's advertising and promotional can be up to 25 to 30 percent.

Q:  Okay.  And so you were at 1 percent in 2016?

A: Yes.  And I'm sure if you added in all those promotional activities, you'd still be under 5 percent.  If we added in probably anything uncategorized expenses, we might still be around 5 percent.

**[Tr.T, L. Laurain, 8/30/2021,643:9-25]:**

Q:  Okay.  And there's a lot of question about whether or not the sales are attributable to your story or they're attributable to the phenomenal result of the Happy Mat.  What do you attribute the sales to?

A:  Well, just based on that video, I think it's all about the mat.  I mean, I'm flattered that people say it's me.  But, I mean, the product -- again, people are amazed by it and they can't believe it when you lift the table off.  And I think there's something to the surprisement of people and excitement. As a mom and anyone that has kids in this room, most of us have dealt with mess.  Feeding kids is annoying in general.

Q:  You can pick up the table, you know, that's a phenomenon?

A:  Yes.

Q:  And so did you honestly believe when you said in the – to the patent office that you believe the sales are generated by the product itself and not for advertising dollars you spent?

A:  Absolutely.

**[Tr.T, L. Laurain, 8/30/2021, 709:15-24]:**

Q:  And then will you please look at Exhibit 1053.  What is that, Ms. Laurain?

A:  That looks like our profit and loss statement for 2015. So this is what the secondary considerations would have been based on.

Q:  Okay.  And does that show your advertising costs?

A:  Yes.

Q:  And what are they?

A:  $8,898.

Q:  Okay.  Thank you.  That's right here

133-1. LNC has not shown that EZPZ's commercial success was due to advertising or heavy promotion. It is LNC's burden to present evidence to rebut the presumed nexus between commercial success and the patented invention itself. The evidence shows the contrary that EZPZ's commercial success was not due to advertising or heavy promotion.

**[Tr.T, L. Laurain, 8/30/2021, 474:22 to 476:23]:**

Q:  Let me show you something you didn't show to the United States Patent and Trademark Office.  Let's look at LNC Trial Exhibit 923.  And if we could turn to the top of page 6.  And let's focus in on that chart there.  This is your sales performance data, right, Ms. Laurain?

A:  Yeah, this is great.

MS. REISMAN:  And if we look, you-all show what's driving sales.  And you actually have put boxes. Let's do this, Stephanie, can you cut off the last part of it.

MS. SECOR: Objection to the statement and question it shows what's driving sales. It just identifies an event.

THE COURT:  I mean, I'm going to let her ask questions about it.  I'm not taking that as evidence of anything.  I'm going to have to have some evidence.

MS. REISMAN: I don't think I finished my question.

Q:  Anyway, we could see three events, basically that you-all have marked on this chart that you came up with showing what had caused sales to increase. Right, Ms. Laurain?

A:  I wouldn't classify it the way you just stated. For example, Shark Tank is listed. I mean, you can see there's not a huge spike with Shark Tank, that hockey stick is going up with no promotional activities, Amazon Prime Day for giving a sale of 15 percent off, or Kickstarter. When we started, we are at zero. Kickstarter raised $72,000, went to $170,000 or 100 -- yeah, 170,000 our first year, 1.7 million our second year, 7 million our third year. This shows actually that there's no marketing activity that's driving these sales and not even Shark Tank.

Q:  Shark Tank. Right at the top highest peak during that time period is Shark Tank?

A:  Look at all before. Shark Tank is literally the peak. It's not because of Shark Tank. Do you see the hockey stick?

Q:  When did you appear on Shark Tank?

A:  In January.

Q:  So you could go back -- so actually where you put the little box for Shark Tank, it's actually not correct? If you drew a line down from it, it would actually go to looks like March 2016?

A:  So prior.

Q:  When you really appeared on Shark Tank, that would have been January the 8th, 2016. And we see a sharp increase in sales after that, do we not?

A:  Yeah. And Shark Tank was -- we were working on the declaration before we even found out we were going to air on Shark Tank. They tell you they'll call you two weeks before they say you're going to get an air date. When we started the declarations, Shark Tank wasn't part of the process.

Q:  You didn't submit those declarations until March 2, 2016. Right?

A:  Our sales spike wasn't because of Shark Tank. We were doing 635,000 before Shark Tank.

**[Tr.T, L. Laurain, 8/30/2021,479: 3-25]:**

Q:  And, Ms. Laurain, I want to ask you about Amazon Prime Day.  I want to show you LNC Trial Exhibit 49.  You said that Amazon Prime Day is a day when you-all offer sale – your products are less than the regularly -- regular market price. Right?

A:  Yes.  They're generally 20 percent off.

Q:  And a sale is a form of marketing?  That's a way of promoting a product, offer a discount, a sale so that people will buy it.  Right?

A:  Can you ask that question again.

Q:  Offering a discount is a form of marketing a product, correct, Ms. Laurain?

A:  Offering a discount is a form of marketing?  I don't know if I'd necessarily agree with that.  We're having a sale and Amazon.com requires a sale day.  And Amazon is the one who markets it.  We gave our products for 20 percent off sales discount.  You say marketing?  Not really.  Now I want to actually --

**[Tr.T, L. Laurain, 8/30/2021,483: 21 to 484:10]:**

Q: And do you remember on the graph that we looked at, do you think that those four commercials that were playing on major broadcast stations led to that additional spike after the Shark Tank appearance, Ms. Laurain?

A: No, because those commercials on national TV weren't until the election against Trump and Clinton.  And these were Hulu. So, no, there was no spike at all until the election when we went on Prime Time.

Q: Well, February 16th, 2016, four commercials launched?

A: Yeah, that was on Hulu, soft launch on Hulu.  Nothing. Pull up a sales chart.  And, actually, when they aired in November 2016 during the election, there was never a sales spike.  Great for branding.  People were calling me, "I saw you on TV," but not a sales spike.  There was never any sales driven from that QuickBooks commercial.

**[Tr.T, L. Laurain, 8/30/2021,502:21 to 504:14]:**

Q: 2015 there are a number of things beginning with trade shows -- blow it out -- co-promote and social and other marketing.  All those things are listed as planned marketing activities for 2015.  Correct, Ms. Laurain?

A: Yes, that -- this is a plan.  And this is what the document states.

Q: And, in fact, your plan was one of the things in the other marketing was Facebook group with 200 plus moms brand ambassadors.  Part of that plan was to post things on social media, was it not?

A: Can you repeat that, please,

Q: Part of your plan was to have the Facebook group of brand ambassadors posting on social media on your behalf.  Right?

A: I don't know if that's -- if that was our intent.  We had a great community with moms.  I don't know if our intent was to have them be posting.  So I wouldn't necessarily say that.

Q: You attended 2015 trade shows.  We have them listed there. You attended a second time the ABC Kids Expo, mommy pump and dump.  You did co-promotional activities.  All these things listed here as your plan for 2015 you actually did, did you not, Ms. Laurain?

A: I actually would have to go through it.  It's a plan.  For example the pump and dump, none of this drove sales.  That would be the real question, is there a nexus between any of these marketing activities?  Some of these retailer shows so we're marketing to retailers. Pump and dump definitely we did not -- we created the 10 percent off for pump and dump, that was never used or maybe used once.  In this, exact sales have been achieved via organic reach.  We have not done any paid marketing or advertising.  So this is organic grass roots.  We had no budget, literally startup.  And then we submitted the financials that showed this.

Q: But you knew it wasn't just paid marketing, paid promotional, paid or unpaid, that's the test with the U.S. Patent Office?

A: I think it's more specific.  We had done a survey.  Your expert said -- you don't have to say paid advertising.  Your expert sat here and said advertising is paid.  She said that.

Q: And the test is more than just paid advertising, it's promotional activities, is it not?

A:  That's why the survey was created.  In the survey, we gave people options.  And we gave every single action in the survey, how they were asked, the raw data, that had all this listed

**[Tr.T, L. Laurain, 8/30/2021, 632:25 to 633:2-22]:**

Q:  When you saw a "branding campaign," do you mean that what EZPZ – EZPZ has that it will present?

A:  Yes.  And, again, this is a plan.  I don't know if I necessarily wrote this, but we're aspiring to have a strong brand.  So having a logo that people recognize, you know, our colors, the smile the trademark and trade dress, grass roots support, people tell people that's what grass roots is.  And we say it all over the place.  We had social media.  I mean, the viral videos haven't come up, but –

Q:  So people saw the Happy Mat and they were spreading the word?

A:  Yes.  And, again, we didn't have funding.  I mean, we were still a startup, in my mind.  But we are -- I think there's a business plan.  We had to end up spending obviously way more on legal than any sort of advertising or marketing campaign, probably 30 or 40 percent of our cost.

Q:  Okay.  And then let's look at Exhibit 923.

A:  And then just one thing as you're pulling this up, Lisa, and I said this yesterday but in this financial plan or business plan or whatever this is, it does say sales have been reached, or sales have been achieved via organic appeals.  We have not done any marketing or paid advertising.

**[Tr.T, L. Laurain, 8/31/2021, 636:9 to 637:4, 637:10 to 639:10]:**

A:  . . . So Stokke reached out to us after the trade show in Germany late 2015, made an offer to purchase us.  We declined the offer because it was just -- we were early on in the journey.  They came back about a possible acquisition probably a year or two later, and it didn't end up working out.  And so then we actually decided -- they decided to license our mats.  We created a custom mat for Stokke.  It has EZPZ on one side and Stokke on the other side.

Q:  And part of your discussions -- now we can go to that page.  And part of the discussion with Stokke, you produced a sales performance graph.  Right?

A:  Yes.

Q:  And this is --

A:  Yep.

Q:  This is within Exhibit 923.  It's the -- just for the record, it's the page ending in Bates labeled EZPZ0143540.  And so, Ms. Laurain, what does that graph represent?

A:  Yeah.  So this, it actually went all the way through June 2017.  So it doesn't go beyond when we submitted -- when we got the patent.  But it shows, you know, we went from zero sales to what we've talked about 72,000 and then up to –

. . .

184

A: It just shows.  I mean, we're trying to, you know, show them that we have very high sales.  And then you can see our expenses.

Q: Okay.  So now let's talk about what are in the little boxes.  So, for example, we have a Kickstarter box on the left right here.  Why is that box there?

A: Just to show that's when we started and you can see that spike.

Q: And so that's listed above December 2014?

A: Yes.  And it should be over actually a little bit to the left.

Q: So Kickstarter was in --

A: Yeah.

Q:  -- late August?  So you had a little bump in sales because of Kickstarter?

A: Yeah, that's what funded our original --

Q: And then sales looked like they leveled off through the beginning of 2015?

A: Yep.

Q: And then there's a Amazon Prime Day.  Now, Amazon Prime Day looks like it was about in June of 2015.  Did Amazon Prime Day actually spike your sales?

A: Yeah.  I mean, so we sold --

Q: See how you say, yeah, before you answer the question?

A: Yeah.

Q: I want to know did it spike the sales?

A: Yes, we had -- we sold I think 5,000 units on Amazon Prime Day.

Q: Is that a spike?

A: I would say, yes.

Q: Okay.  And so go ahead with what that shows in your graph here.

A: So, then, yes, it's the spike in July of 2015, I think it was.  Then, you know, we came back down after selling the 5,000 mats.  Don't quote me on that, but a lot of mats.  And then we just kept growing and growing you can see consistently.

Q: The sales going upward motion?

A: Yes.

Q: Now, yesterday when you were questioned about this by Ms. Reisman, you said something about a hockey stick, look at the hockey stick.  What did you mean by that?

A: That's the curve from, you know, August 2015 till up in the peek.

Q: What you're talking about is this shape right here?

A: Yes.

Q: So it looks like a hockey stick?

A: Yes. And so that is great to show. And that's what that says. And then, actually, another something that spiked this was after the patent viral videos. This was after the U.S. Patent Office already issued but that is something that drove sales. So I think I had mentioned yesterday --

**[Tr.T, L. Laurain, 8/31/2021, 639:15 to 640:5]:**

Q: Did Shark Tank increase your sales like you thought it was going to?

A: No, no. It didn't actually. I thought we would be on Shark Tank and that was the golden ticket and you don't have to do anything. You're still packing boxes and not much changes. And so I could look at the exact sales figures, but we didn't -- as a consumer, I perceived people who go on Shark Tank, it changes your life. Again, it's literally a

golden ticket. It's not that way. Don't get me wrong. It was an okay experience, but we didn't have massive sales from Shark Tank.

Q:  And you had two who actually wanted to invest in EZPZ, didn't they?

A:  Yes, we got two offers on Shark Tank.

Q:  And you turned both those offers down?

A:  Yes.

**[Tr.T, L. Laurain, 8/31/2021, 643:4 to 644:25 ]:**

Q:  You had a seasonal decline, but your sales actually still went up?

A:  Yeah, at this time, our sales go down.  Nuby launched sales and ours go down 7 million and 6 million in our mat sales.

Q:  Okay.  And there's a lot of question about whether or not the sales are attributable to your story or they're attributable to the phenomenal result of the Happy Mat.  What do you attribute the sales to?

A:  Well, just based on that video, I think it's all about the mat.  I mean, I'm flattered that people say it's me.  But, I mean, the product -- again, people are amazed by it and they can't believe it when you lift the table off.  And I think there's something to the surprisement of people and excitement.  As a mom and anyone that has kids in this room, most of us have dealt with mess.  Feeding kids is annoying in general.

Q:  You can pick up the table, you know, that's a phenomenon?

A:  Yes.

Q:  And so did you honestly believe when you said in the – to the patent office that you believe the sales are generated by the product itself and not for advertising dollars you spent?

A:  Absolutely.  And this was an example, Lisa mentioned this is through 2017.  So these aren't the same numbers in our affidavits because it's a year later.  But what I was saying, we spend legal -- our litigation enforcement we were up to 28 percent of our expenses for our legal and this litigation.

Q:  And so advertising spent in these years was 178,000, 5 percent?

A:  Yes.  So 5 percent for advertising.  We were using Ad Roll for getting started doing -- and actually right at the end of 2015 we started with Ad Roll.

Q:  Started with --

A:  It's a company called Ad Roll.  So it's -- when someone comes to your website, then you can retarget them and literally put an ad in front of them.  So we started that at the end of 2015.

        MS. SECOR:  You can go off.

Q:  So you spent $8,000 on Ad Roll in 2015?

A:  I think that's what the P and L states.

Q:  So if somebody buys an EZPZ mat, they're -- they're email address is targeted and they get an ad?

A:  Yes.  Yes.  So, like, yes, and you're paying to get that customer.  So you're paying.  And it's a post per acquisition.  So it would be up to $5, $10 you can pay to get that person to come to your website and get your product.

Q:  You reported that as part of your sales when you gave the declarations to the U.S. Patent Office about the 1 percent

**[Tr.T, L. Laurain, 8/31/2021, 644:24 to 645:20, 646:2-11]:**

Q:  You reported that as part of your sales when you gave the declarations to the U.S. Patent Office about the 1 percent advertising.

A:  Yes.

Q:  And the 5 percent figure is still pretty low.  Right?

A:  Yes, I think so.  I think in the patent actually secondary considerations they can say advertising.  I don't know if it's advertising and promotional can be up to 25 to 30 percent.

Q:  Okay.  And so you were at 1 percent in 2016?

A:  Yes.  And I'm sure if you added in all those promotional activities, you'd still be under 5 percent.  If we added in probably anything uncategorized expenses, we might still be around 5 percent.

Q:  Okay.  And so then, for example, LNC asked you about the pump and dump show and that you hadn't listed that.  That's promotion that you didn't count.  Did you spend any dollars in promotion for pump and dump?

A:  I don't know what the dollar -- I don't know if we spent a dollar amount. There's a comedy show. And so we had put, like, labels on wine bottles, EZPZ logos, so moms would get - it's like a very raunchy pumping. Do you know what pump it up means?

. . .

Q:  So the pump and dump promotion did not generate sales?

A:  No.

Q:  That's correct?  No, it didn't or --

A:  No, it didn't.  No, it did not generate sales.

**[Tr.T, L. Laurain, 8/31/2021, 755:16 to 756:24]:**

Q:  All right.  Now, Amazon Prime Day, you told – you indicated that that wasn't the result of any advertising. Right?

A:  No, I said we did a discount for Amazon Prime Day.

Q:  Okay.  Let's look down here because on the expenses under advertising you have Amazon?

A:  Yeah, because we were doing -- this is in 2017.  But we were doing advertising on Amazon, so it's not -- they're two different things.

Q:  Weren't you doing -- every time you post your product on Amazon, post a photograph of it, wasn't that advertising on Amazon of your product?

A:  No.  And I think that's the main issue is there's a different understanding.  So we have an Amazon link like every store that has a product of Amazon.  That's our Amazon listing. We also, in addition, and we started doing this in 2017, you can do ads on Amazon where you serve an ad to a customer, and they would click and buy.  So that's an advertisement on Amazon, which is this. Having a listing on Amazon is not advertising per the expert.  We're not paying to have our product on Amazon.  It's an Amazon listing.  It's like a wholesale listing.  And so I think that, again, this is -- in

2017, we were doing ads on Amazon where you serve an ad to someone and you pay to get that customer to come buy. So that is advertising, absolutely, and that's why it's listed on advertising. So, if you remember for the submission to the USPTO, we had Ad Roll listed, and we had just started. We spent $8,000 for Ad Roll. Following that, we started advertising on Amazon, clearly our budget has gone up. At the end -- or middle of 2017, we had spend $170,000, so 5 percent in 2017. Those are Amazon ads. Completely different than Amazon Prime Day. Amazon Prime Day is our Amazon store and we offer 20 percent off or whatever.

**[Tr.T, L. Laurain, 8/31/2021, 681:11-25, 686:17 to 687:6 ]:**

Q: Yes. And then we're going to go back to that question in a minute, but I left off something that we were talking about before on marketing and branding. So on marketing, you were cross-examined about whether or not you have this big marketing team that put the push out to get the Happy Mat to be popular. So you've seen the graphic that LNC did about who is your marketing team?
A: My jaw dropped when I saw this.
Q: And why is that?
A: Because, one, that's not our marketing team. Most of those people -- most of those people aren't even there. That's pretty much our entire team, the EZPZ team is now classified as the EZPZ marketing team. We could go through it right there.
Q: It's right there.
A: Akemi Fisher.

. . .

Q: This is exhibit -- will you look at Exhibit 628.
A: Yes. Yes. So this was introduced to say it's EZPZ's business model to block out contacts. That's not a correct thing. It's definitely not our business model. This is what one of the ambassadors wrote in connection with Akemi. "Great product, but I simply have no time to deal with a sloppily-orchestrated ambassador program, which I had a feeling was going to have issues after I had to pay my own shipping for your EZPZ mat via Amazon. You should really consider hiring an experienced agency to help launch a properly compensated true ambassador program." So, in my opinion, Akemi damaged our brand. She's not on our marketing team. That is not correct.
Q: So you don't believe this is true?
A: No, that's not true. Thank you.

**[Tr.T, L. Laurain, 8/31/2021,785:17-23 ]:**

Q: And then after all the questions from Ms. Reisman about promotion, do you believe that the product was sold because EZPZ promoted it?
A: No, it was third-party promotion and praise.
Q: And do you think that the product sold because the third parties promoted it?
A: I think the product sold because the product is awesome.

**[Tr.T, T. Falcone, 9/2/2021,1550:24 to 1551:15]:**

Q:  In 2016, were you spending money on promotion and advertising?
A:  Very little, if at all.
Q:  And so when you did get promotion, like you were saying with Shark Tank, didn't you think that was what was driving sales?
A:  . It certainly helped. Yeah. No, Shark Tank was great exposure. We found that -- and, you know, word of mouth seemed to be really big. And that's something I love about our community is that, you know, moms love talking to moms and caretakers and aunts and uncles and grandparents. And I think it really speaks to the fact that it was such a game changer that it was worthy of talking about. It was, you know, something different that parents hadn't had at their disposal, you know, previously and now they did. And so I think a lot of that really organic growth was what propelled that big spike that you showed me earlier on the graph.

134. Last, LNC's argument that EZPZ considered obtaining a material scientist is not relevant to intent to deceive regarding declarations. A "material scientist" is not a PHOSITA – as agreed upon by the parties.

134-1.  In other words, a material scientist would not be relevant to any inquiry before the PTO in connection with the patent application that became the '903 Patent or any inquiry before the Court.

**[Tr.T, J. Kennedy, 9/1/2021, 927:15 -25]:**

Q:  Do you understand what a material scientist is?
A:  Yeah.  I looked this up yesterday.  And the Department of Commerce has a classification for material scientist. I did a Google search.  And essentially it's basically somebody who researches materials, whether it be silicone or semiconductors or glass. So essentially it's a researcher in the properties of materials, substances, chemicals, etcetera. So a material scientist is somebody who probably has that ASE certified mechanical engineering -- or engine engineering level experience and not that oil changing level experience. And so in the context of the '903 Patent, the material scientist is probably somebody who has beyond the ordinary skill.  They have more than the ordinary skill.  And so I would posit that that's not the proper standard for evaluating whether something is patentable or not because the Federal Circuit -- excuse me -- or even the Supreme Court in Phillips commands otherwise.  So --
Q:  So you anticipated my question.
A:  Oh, sorry.
Q:  Would a material scientist be a POSITA for this case under how the parties have defined it?

A: No.  I think they're beyond a POSITA, I think they're a person above the ordinary skill, and that's not the standard.

Q: When you say, "that's not the standard," what are you referring to that's not the standard for?

A: That's the Supreme Court's decision in Phillips.

**[Tr.T, B. Williams, 9/1/2021, 1177:14 to 1178:7]:**

Q: And can you tell me if the -- my understanding of the benefits to the public with a patent application are that someone that isn't of ordinary skill in the art would be able to pick up the application once it has -- pick up the patent once the patent has expired and make the EZPZ Happy Mat. Right?

A: Just like you guys did, yes.

Q: What language in the patent, sir, tells someone like me if we went into the future how to formulate the silicone to make it seal?

A: Well, number 1, it's a person of ordinary skill, not a person not of ordinary skill.  And, number 2, ask you guys. You did it.  You reduced it to practice.  You bought one and made one.  So clearly it was an undue experimentation.

Q: And, sir, wasn't it that Supervisor Mathew here was asking -- he was -- he was basically asking, just as he had been asking about the silicone sheets that stick to walls, now he's asking about material properties.

A: That's incorrect.

Q: He's asking about what a material scientist would know about the properties of silicone. Right?

A: No, there's two things I've got to respond to that.  One, he wasn't asking about things that stick to walls.  He said he knows of things that stick to walls.  And, Number 2, we were discussing the arrangement of the mat, why, for example, a mouse pad in particular doesn't do this even though it's a very similar silicone substrate, and why the Happy Mat does and how the seal forms.  But, anyway, yeah.

Q: Sir, isn't it true that you told Mr. Bolton and Ms. Laurain and Mr. Fountain and Ms. Falcone and Mr. McCarthy that the -- that  LNC's likely argument after they filed suit in June 2016 was that the inherent property of silicone enabling the self-sealing action is not an expected result and that there is no novelty to the invention?

A: Did I say that was probably going to be your argument?

Q: Uh-huh.

A: And is that not the argument you made?

Q: Well, doesn't that mean, sir, that you -- that you knew -- that you knew there were inherent properties of silicone –

A: Inherency doesn't matter, though, when it comes to patentability and our presumption of validity because we have the secondary considerations that we didn't need inherency.  Inherency is not relevant to the obviousness inquiry.  But I appreciate the opportunity for sharing that.

**[Tr.T, L. Laurain, 8/31/2021, 626:8 to 628:199]:**

Q: So then there's been a lot of talk about the material scientist.

190

A:  Yes.

Q:  So I think it was Mr. McCarthy that said we -- "To show the structure and to do this and show this, the silicone doesn't do what's expected, I want a material scientist."  Do you remember that email?

A:  Yes.

Q:  What did you think about that at the time?

A:  At the time, it was part of the secondary consideration. I was trying to find a material scientist, and I don't know the degrees, but having a Ph.D. and that could attest to that silicone, the inherent property of silicone or you wouldn't expect this with silicone.

Q:  What did you look for?

A:  I was never able to connect with one.  I was trying to get through my network to literally find the person, and I never had a conversation with a material scientist.

Q:  What did you do about silicone and what you thought you were trying to prove at the time?  A.  So, at the time, and prior to this, I didn't realize silicone could be even, like, tacky and sticky.  And so we had known of sticky silicone bakeware.  That was when I saw the Hot Iron Holster.  I was, like, silicone can be tacky, so we were not going to get a material scientist.  I hope it's okay not to include that.

Q:  The reason you couldn't get the answer was it was different than you believed?

A:  Yes, yes, I didn't believe silicone could be sticky or tacky.  I saw the Hot Iron Holster that was sticky and tacky. That's what I was saying, hey, there's other sticky stuff.  I don't think a material scientist wouldn't say silicone can do that, yes.

Q:  Because it can?

A:  Yes.  And I want to clarify, though, we still claimed unexpected results even though a material scientist wasn't there to give us an answer.  Unexpected results -- for instance as a person passes us by in the trade show, they're walking and they see a placemat and a plate, you lift the table, it's an unexpected result.  You wouldn't expect the table to lift. That's important.  There's nothing about the properties of silicone in the patent.

Q:  And so there was not -- there was nothing -- that's okay. Did you think you had to have the material scientist to be able to overcome the secondary -- or -- I'll start from the beginning.  Did you think you had to have a material scientist to succeed on the secondary consideration?

A:  No, it was just the original strategy outlaying all different kind of areas.  And then that was when I said, "I hope it's okay because I didn't literally find one."  And then I'm assuming, yeah, that's fine.

Q:  Did you believe you had unexpected results as to commercial success?

A:  Yes.

Q:  And why did you think you had commercial success?  Why did you think those were unexpected results?

A:  Again, as a mom or dad back walking by, you would think placemat and plate and you wouldn't expect the table to lift. So it's literally an unexpected result.  Yeah, everyone knows what a placemat and plate is.  You see it, you say, "Oh, that's cool.  When you lift the table, that's an unexpected result.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 325:12-25]:**

Q: Let me ask you to look at 580- -- Exhibit 582, which you should have in front of you now.

A: Yep.

Q: So you say in the second sentence, "Material Scientist - I honestly don't think we would get what we want from them.· So I think this is OK not to have."

A: Yep, that's what it says.

Q: Why didn't you honestly think that you would not get what you wanted from them?

A: I don't recall my specifics, but I do believe there is another e-mail that has been produced that I've either discussed -- that says with all the, like, sticky -- there is a sticky silicone and I give a link to a product and I say -- that would be my justification if I was speculating. And again, I just want the record to stand that I never was able to connect with a material scientist, so this is only my assumption.· This was never told to me.· And so, yeah, there is another e-mail that states something more specifically, but that's what I would have to speculate.

**[Tr.T, L. Laurain, 8/31/2021, 753:3 to 754:3]:**

Q: Well, because you knew that you didn't want to hear what a material scientist had to say. And so instead you talked about, and I think that you said this earlier, a mom and dad passing by would be amazed at your product sticking to the table. Right?

A: Well, and I want to clarify because you said -- if you go back.  I didn't -- I didn't -- can you repeat the question before that.  I didn't want to hear what a material scientist had to say?

Q: Right.  Didn't Mr. Williams tell you that in an email, Ms. Laurain?  "I don't think that Mr. Sires is really going to give the testimony that we want."

A: I don't believe that.  If you want to pull it up and show me.

Q: We'll let the Court look at it later.

A: There's an email where I say, "I can't find a material scientist." I say -- I'm the one who says it.  I say, "I don't think we can get an answer we want because of the silicone sticky stuff." So, again, I thought silicone was nonstick bakeware.  When I saw that silicone can even be sticky, I realized, oh, silicone can be sticky.  It's not an inherent property of the material.  End of story.  It was never claimed in the patent. There was no discussion about the properties of silicone being sticky, so we didn't use it.  And it's not because of any other reason.

### The Survey Evidence as an Alleged Basis for Inequitable Conduct

#### Tamara Falcone's Declaration In Connection with Survey Evidence
#### (Materiality and Intent to Deceive)

135. LNC contends that Ms. Falcone's relationship to EZPZ was not disclosed.

136. This is wholly unsupported by the Declaration. As Ms. Falcone states, she is the

Chief Operating Officer for EZPZ. *See,* Exhibit 245, LNC395359-360 (PDF 230-231). No

authority is provided to support the bald allegation that an officer's compensation package must be revealed to the patent office. The officer's involvement reveals that she received compensation, *ipso facto,* because one may assume a COO gets paid, and may even get a promotion if the product does well.

**[Tr.T, T. Falcone, 9/2/2021, 1558:10-25]:**

Q:  So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?

A:  Yes.

Q:  Did you have a compensation package with EZPZ at the time you signed this declaration?

A:  I believe we did have, yeah, a phantom stock agreement in place, correct.

Q:  Did you get paid anything, a salary of any kind?

A:  Not until January of 2016.

Q:  Okay. So this declaration was signed March 9th, 2016. Would you have had a salary at this time?

A.  Yes.

Q:  And did you think you needed to reveal you had a salary since you were identifying you were a chief operating officer?

A:  No. I would assume that that is obvious. I don't think a lot of people work for free

**[Tr.T, T. Falcone, 9/2/2021, 1562:1-16]:**

Q:  Okay. And then you declared under the penalty of perjury that all those statements made in the declaration were true and correct?

A:  I do.

Q:  And you still believe that?

A:  Absolutely. I stand behind it.

Q:  Okay. And then in the very end, you said, "I testify to the authenticity of the survey results, included Overleaf and displayed as raw data imported into the Excel spreadsheet included herein; and that the associated percentages and metrics are all correct, accurate, and true to the best of your knowledge and ability"?

A:  Yes.

Q:  Okay. So is there any misrepresentation or falsity anywhere in this declaration?

A:  No.

137. There are no false statements or material omissions that satisfy the materiality prong of inequitable conduct. LNC cannot identify any specific statements in the declaration that were

false or that it contends that EZPZ knew to be false. The Court does not need to move on to an

analysis of intent to deceive.

*See,* **Testimony** at ¶¶135-136.

137-1.  The Court finds that the testimony established the intent of the declarants and the

patent agent in giving the patent office legitimate opinions of experts in their respective fields

regarding their personal experience with the success and usefulness of the Happy Mat and why

any information was omitted. This testimony undermines LNC's claim that the single most

reasonable inference was an intent to deceive. For example, Ms. Potock's testimony as a feeding

specialist was not challenged by LNC, and they fail to show how any bias Ms. Winkelmann had a

result of her financial interest in EZPZ affected the otherwise truthful statements about the utility

of the Happy Mat in the feeding industry, as corroborated by Ms. Potock's unchallenged testimony.

The following chart demonstrates trial testimony that supports EZPZ's good faith in presenting

the facts and information presented to the patent office in support of secondary considerations

offered to overcome the patent examiners' findings of obviousness::

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
| --- | --- |
| (a) That Dawn Winkelmann had (or had been promised) a 2% interest in any future sale of EZPZ prior to Mrs. Winkelmann signing her declaration (relative to the Declaration of Dawn Winkelmann) | **[Trial Tr., D. Winkelmann, 9/2/2021, 1476:14 to 1479:20]:**<br><br>Q:   And did EZPZ offer you an incentive so that you would stay and keep working for them?<br>A:   Yeah, we had a lot of discussions because I took such a severe pay cut that we were trying to negotiate some other ways to be able to help encourage me to come on board.  And one of those ways was giving some of the children that I work with some Happy Mats.<br>Q:   And what was another way?<br>A:   Another way was to be able to discuss futuristic possibilities, so what could we do if -- you know, if EZPZ ever got big, like, what could happen?  And so being able to have a percentage in the company and being able to expand my knowledge base within the company. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
|  | Q:   And so eventually you were given a percentage of the company if it should sell?<br>A:   Uh-huh.  Yes, ma'am.<br>Q:   And when did that occur?<br>A:   I think that occurred soon after, maybe a year later.<br>Q:   Was that, like, in -- when was the -- there was a formal agreement --<br>A:   Yes.<br>Q:   -- for that.  Right?<br>A:   Yes, there is.<br>Q:   And is that in May of 2016?<br>A:   I believe that is correct.<br>Q:   Okay.  And when -- do you recall filling out a declaration for this case?<br>A:   Yes, I do remember.<br>Q:   And you filled it out in February of 2016.  Do you recall that?<br>A:   That sounds right, yes.<br>Q:   And we'll talk about it in a minute.  But that – that declaration was dated in February of 2016?<br>A:   That sounds right, yes, ma'am.<br>Q:   Had you had discussions with Lindsey Laurain and EZPZ about getting the percentage ownership in the company before you signed the declaration?<br>A:   We did.   We talked a little bit about any other way that I could be compensated.<br>Q:   Okay.  Was it your understanding that EZPZ couldn't afford to pay you what you were making?<br>A:   Yes, ma'am.<br>Q:   In California?<br>A:   Yes, ma'am.<br>Q:   And then, in your declaration, you don't indicate that you're making a salary from EZPZ or that you have a right to get payment if the company sold.<br>A:   No, I did not.<br>Q:   And why not?<br>A:   I didn't see a place on there on the form for me to do something like that.  And, to be frank, I didn't really find it to be relevant.  I mean, we're sitting here now and now I know it is.  But, at the time, I was there to be an expert.  I was -- I was not there like putting on my EZPZ hat.  I'm an expert in the field, and I'm writing a declaration that this has never been on the market, that this is helping so many families.  I was there to be an expert.  That's what I was asked to do and not give my salary history.<br>Q:   And you've kind of already answered this, but just to be sure, what makes you think you are an expert separate from EZPZ to be able to say that? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A:  Although I love my job with EZPZ, I was an expert prior to working with EZPZ.  EZPZ did not make me an expert.  I was an expert prior and had been speaking across the United States and actually internationally on the subject of feeding and swallowing in pediatric disorders.  And so that was one of the reasons why Lindsey wanted me on board was because I had such of an expertise, not only within my field, but worldwide in regards to other allied medical professionals, pediatricians, ENTs, these recommend me to do their speaking engagements across the country prior to my working with EZPZ.<br><br>Q:  And you've worked in a number of different environments in the medical field, haven't you?<br><br>A:  Yes, ma'am.<br><br>Q:  Like?<br><br>A:  Nursing homes.  So adults, as well as pediatrics.  So nursing homes, acute rehab centers specifically with children, children hospitals, rehab centers.  My favorite work, which is the hardest work, but pediatric hospice as well.  So I even did trachs and vents for a pediatric unit.  I was a clinical director at most of these hospitals servicing feeding disorders on the unit. |
| (b)  That Mrs. Winkelmann was an independent contractor for EZPZ who was paid approximately $4,000/month before Mrs. Winkelmann signed her declaration (relative to the Declaration of Dawn Winkelmann) | **[Trial Tr., D. Winkelmann, 9/2/2021, 1469:1-25]:**<br><br>Q:  So what did you think when you saw the Happy Mat or what did you do after you saw that?<br><br>A:  I contacted them -- her.  I was, like, "You are going to change the world.  My name is Dawn.  Hi, how can I help?"<br><br>Q:  Okay.  So then what did you do?<br><br>A:  So then I asked Lindsey, one, I wanted to sponsor the Kickstarter because my husband and I do that a lot, but I also wanted to be involved.  I wanted to be able to get this to the kids that I was working with. At the time, I was running multiple feeding groups for the Down Syndrome Association of Orange County.  And so I had a couple hundred children ages six months to two and a half years of age that were really struggling feeding and self feeding is one of those issues.  So some of these babies who are six months, eight months, nine months of age were not doing any self-feeding whatsoever because they have low tone. Low tone happens in children with special needs specifically because they don't really have the core support to be able to keep them upright.  So the Happy Mat was able to help them be able to help facilitate that and be able to eat independently.  So I wanted my kiddos to be able to experience that.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1472:8 to 1475:19]:** |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | Q.   And then I'll have you look at Exhibit 932.  Wait.  I've got to ask you a little bit before we do that. So you said you called Lindsey Laurain and said, "How do I be a part of this?"  And so what happened then? |
| | A.   Lindsey and I started talking.  And I was explaining to her my experience. And, at the time, I was teaching also at Santa Ana college and said, you know, "I would love to have some of these Happy Mats to be able to not only help some of the children that I was working with but also to facilitate the next generation of speech language pathologists who will want to learn more about this because this will literally change the way that my profession sees feeding and sees that children can actually make those milestones."  So I was very excited from a personal standpoint for the clients that I serve, but also for the standpoint of teaching other medical professionals about the product. |
| | Q.   And so then what happened with you and EZPZ? |
| | A.   So the more that Lindsey and I talked, the more she wanted to really -- and she learned about my expertise and really what I was doing on, not only a state level, but on a national level with teaching, feeding. I did some speaking circuits for the Autism Society of America, the Down Syndrome Association and then all also for my professional organization the American Speech Language and Hearing Association. And so I wanted to take a Happy Mat on the road and be able to, you know, let families know that this was something that could actually help them, and then also let my colleagues know that there's a product out there now that can actually do the things that we've been wanting to help children facilitate. |
| | Q.   And are you still doing national speaking engagements? |
| | A.   Yes, ma'am. |
| | Q.   How often do you do them? |
| | A.   Pretty much every month. |
| | Q.   And so did you come and work with EZPZ? |
| | A.   Yes, I did. |
| | Q.   And in what capacity did you start working with them? |
| | A.   So I started working as a special needs coordinator, basically taking -- Lindsey knew everything with her twins about from a neurotypical standpoint, so what typical children do and how they could be able to successfully use a Happy Mat.  My expertise came from, hey, this not only works for neurotypical children, but these also work for children with special needs; so, you know, like I said before, cerebral palsy, pediatric stroke and wanting to be able to say that, you know, through this product is something that can really help facilitate children with special needs; and be able to tap into a skill set that they're going to be able to do for a lifetime and wanting to have the opportunity and to be able to do that and to showcase that. |

197

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
|  | Q.   And did you actually become an employee or an independent contractor with EZPZ?<br>A.   Yes, I did.<br>Q.   And when did that start?<br>A.   That started in 2014.  So soon after the Kickstarter, I really wanted to be a part of the organization and really help facilitate feeding for the kids.<br>Q.   And are you working with EZPZ today?<br>A.   Yes, I am.<br>Q.   And what do you do with them today?<br>A.   I still do a lot of special needs outreach.  But I also do a lot of education.  And so I educate parents as well as medical professionals.  And I do that by still doing what I have always done is teaching about developmental milestones and feeding skills and how to really make a joyful mealtime.  But now I'm also highlighting products that are going to be able to help them make those milestones because our products are really new and inventive especially the technology of the Happy Mat.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1475:22 to 1476:8]:**<br><br>Q.   Do you also have your own practice?<br>A.   Yes, ma'am, I do.<br>Q.   And what is your practice?<br>A.   It's called Ms. Dawn, SLP.  And I teach and also see clients hands-on for feeding and swallowing disorders, so helping parents who are struggling starting solids with their baby to be able to help make that process a little bit more relaxing, and really giving them the knowledge that they need in order to -- to really accept the mess and really understand when they're supposed to be chewing, when they're supposed to be grabbing, how they should be picking up foods, what the grasp is like from a developmental standpoint and so I teach.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1480:1 to 1481:12]:**<br><br>Q:   And you said in the first whereas clause, "I have a post graduate degree as a speech and language pathologist and feeding specialist."  I think we covered that.  "And assisting families with special needs children." And you said you had 20 years.  You were training special needs children at hospitals, rehabilitation facilities, --<br>A:   Yes.<br>Q:   -- at home for families with special needs children?<br>A:   Yes.<br>Q:   And then that's what we've already talked about so far. Right? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A: Yes, ma'am. Yes, ma'am. |
| | Q: And then you said you encountered numerous products devised to adhere to tabletops to prevent displacement and overturning during mealtime. |
| | A: Yes, ma'am. |
| | Q: What did you mean by that? |
| | A: So in a lot of the jobs that I had before, as a clinical director, we have to buy products for the whole entire facility. So I would buy products, feeding products, spoons, cups, plates, cushions, a whole bunch of different medical devices. And I would purchase those items for the entire pediatric unit. So a lot of the things at the time was just these suction cup bowls or plates that once you put them in the dishwasher they lost that suction function. So then, again, we were stuck not being able to utilize that. And then also different types of adhesives. So I would use Gorilla Glue, you know, any type of adhesive to suction and seal to a wheelchair or to a countertop. So that's what that meant. |
| | Q: Did any of them work very well? |
| | A: No, they didn't, but it's all we had. |
| | Q: Right. And then the next paragraph is, "I've never encountered any product in my over 20 years as an expert in special needs community that effectively seals to an underlying surface absent suction cups or an adhesive." |
| | A: That's correct. |
| | **[Trial Tr., D. Winkelmann, 9/2/2021, 1481:14 to 1483:1]:** |
| | Q: And then you say, "All statements made in the declaration are made of my own personal knowledge, and I'm not being paid for executing this declaration." |
| | A: Yes, ma'am. |
| | Q: And did you feel like -- do you feel like that's a true statement? I mean, you said you're not being paid, actually you were making a salary at EZPZ? |
| | A: Yes, but it was for this piece of paper. Me being an expert in signing that piece of paper I was not being paid. If you -- if you sign this piece of paper, you're going to get some money for that. I was not getting money for writing that piece of paper. I wanted to be able to bring some validity to the patent saying that I am an expert in this field, and, yes, I did not get paid to sign that piece of paper. |
| | Q: So if the utility patent were granted, that increases the value of EZPZ. And then if EZPZ gets sold with that greater value, doesn't that benefit you if you're getting a percent of the company? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A:   That's what ifs.  But, technically, yes, I guess it would. But then, again, as an expert, I wasn't thinking of what if, what if, what if.  It was my intention was to be able to help this product, make sure that it stays in the market so that the kids that I work with could actually have that opportunity, so that the therapists that were needing a product like this just like me that they have the opportunity to be able to do that.<br><br>Q:   And is your desire to help the feeding needs community, would you lie or misrepresent something on an affidavit to accomplish that?<br><br>A:   No, ma'am, I would not.<br><br>Q:   And then -- then you agree that you were being warned that "willful false statements are punishable by a fine or imprisonment and that such statements may jeopardize the validity of the submission."  And, despite that, you're declaring that all statements made in the declaration are made of your own knowledge and are true?<br><br>A:   Yes.<br><br>Q:   And do you believe today that you did that?<br><br>A:   Yes, ma'am.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1484:4 to 1485:5]:**<br><br>Q:   And what did you think that meant, from your point of view?<br><br>A:   That I've never seen anything like the Happy Mat before, any type of this technology; and that the self-sealing technology was going to be able to -- if this patent was granted, going to be able to be utilized to help families.<br><br>Q:   You felt like the Happy Mat was innovative?<br><br>A:   Absolutely.<br><br>Q:   And then you said, so it says, "By preventing displacement from an underlying surface except by peeling action at the outer edge absent need for any suction cups, adhesive, or other active suction means."  Did you know what that meant?<br><br>A:   Yes, ma'am.<br><br>Q:   And what does that mean?<br><br>A:   Everything that I was doing, Duck Tape, Crazy Glue, any way to be able to -- to provide a means to be able to help the patients that I served.<br><br>Q:   And then it says that, in your expert opinion, the present invention to which this affidavit is directed clearly realizes an unmet need by providing a novel feeding solution for special needs children.  Do you still believe that?<br><br>A:   Yes, ma'am. I think that, in retrospect, I would actually broaden that instead of just special needs I think I would have wrote six months of age to 99 and a half because of the fact that, you, know – by this way my |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | expertise part was to bring in that special needs component, but it really should say much broader six months to 99.<br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1487:22 to 1488:11]:**<br><br>Q:  And then there was another declarant who was a children's eating specialist, Melanie Potock?<br>A:  Yes, ma'am.<br>Q:  Do you know her?<br>A:  Yes, I do.<br>Q:  How do you know her?<br>A:  We are friendly competitors in the field.<br>Q:  And so she does the same thing you do?<br>A:  Yes, ma'am, she does.<br>Q:  Workwise?<br>A:  Yes.<br>Q:  And she provided a declaration as well?<br>A:  Yes, she did.<br>Q:  Does she work for EZPZ?<br>A:  No, she does not.<br><br><br>**[Trial Tr., D. Winkelmann, 9/2/2021, 1493:9-18]:**<br><br>Q:  And you talked about how you reached out to Ms. Laurain after you saw the Happy Mat on Kickstarter.  Right?<br>A:  Yes, ma'am.<br>Q:  And I wanted to show you Exhibit 987.<br>A:  Okay.<br>Q:  At this point, when you first reached out to Ms. Laurain, you were living in California.  Right?<br>A:  Yes, ma'am.<br>Q:  And you were planning to move to Colorado.  Right?<br>A:  Yes.<br>Q:  You sent her, I guess, a direct message through the Kickstarter platform?<br>A:  Yes. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| (c) That Tamara Falcone had (or had been promised) a 10% interest in any future sale of EZPZ prior to Ms. Falcone signing her declaration (relative to the Declarations of Tamara Falcone) | **[Trial Tr., T. Falcone, 9/2/2021, 1558:10-25]:**<br><br>Q.   So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?<br>A.   Yes.<br>Q.   Did you have a compensation package with EZPZ at the time you signed this declaration?<br>A:   I believe we did have, yeah, a phantom stock agreement in place, correct.<br>Q:   Did you get paid anything, a salary of any kind?<br>A:   Not until January of 2016.<br>Q:   Okay. So this declaration was signed March 9th, 2016. Would you have had a salary at this time?<br>A. Yes.<br>Q:   And did you think you needed to reveal you had a salary since you were identifying you were a chief operating officer?<br>A:   No. I would assume that that is obvious. I don't think a lot of people work for free<br><br>**[Trial Tr., T. Falcone, 9/2/2021, 1559:1-18]:**<br><br>Q.   Okay. Let's go back to the beginning. And the phantom equity agreement, what did you understand that to be?<br>A.   It essentially says that if I am still part of the organization in the case of a sale, I will be given a certain percentage of that sale.<br>Q.   And did you reflect that in your declaration?<br>A.    I did not.<br>Q.   Why not?<br>A.   I think divulging that I was the COO shows that I had a vested interest in this being accepted by the USPTO. And, yeah, and I also just -- a lot of small companies like this, not that it is -- it is assumed, but in many, many instances like this where you're a young company, somebody like the COO, the second in command, would have some sort of a compensation package.<br>Q.   And then so you didn't feel like you needed to spell that out?<br>A.   No, that never occurred to me. |
| (d) That Jeff Prager received a retainer of $1,500.00 per month from EZPZ and additional money on an hourly basis for | **[Trial Tr., J. Prager, 9/2/21, 1388:5-21, 1389:2-8, 13-20]:**<br><br>Q.   And then the next whereas product, "Whereas, I consult with EZPZ, LLC, and have a thorough knowledge of their commercial operations, including financial expenditures and revenues."  What did you mean by that? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| accounting and bookkeeping services, was paid $3,500.00 for converting EZPZ's bookkeeping system (relative to the Declaration of Jeff Prager) | A.   Well, number one, it's no surprise, and I don't know why it came up in deposition, but I was a consultant.  I got paid to work with her.  I got a monthly retainer.  And then when we added the accounting services, that was billed a different way. But, number one, I'm not totally independent because I do work with them.  So I wanted that to come out.  But I do have a thorough knowledge or feel like I had at the time, a full knowledge of their operations. I worked with Tammy to really understand the nuts and bolts of what made it tick, the marketing channels, the advertising channels, their gross profit.  I channeled – I helped them develop ways of following it.  So I do feel like I had an intimate understanding of their operations<br>Q.   Do you think it's misleading that you didn't say there, "Oh, by the way, I do get paid for being a consultant"?<br>A.   I think anybody with any kind of common sense would know if I'm consulting, I'm getting paid.<br>Q.   Right.<br>A.   That just stands to reason, I would think.  I didn't think I had to really spell it out to the detail you're talking.<br>Q.   Mr. Prager, the next paragraph is, you are being warned that willful false statements are punishable by imprisonment and willful false statements, and the like, jeopardize the validity of the submission. And you declare all statements made in the declaration as being of your own knowledge and are true. Do you still believe that's true?<br>A.   Absolutely. |
| (e) That Jeff Prager was EZPZ's Chief Financial Officer at the time Mr. Prager signed his declaration (relative to the Declaration of Jeff Prager) | **[Trial Tr., J. Prager, 9/2/21, 1369:15-25]**<br><br>Q.  And what is your occupation, Mr. Prager?<br>A.  Right now I am the cofounder of The CFO Project.<br>Q.  And what's The CFO Project?<br>A.  We teach professional -- financial professionals how to help their clients develop one clear path to a growing and more profitable business.<br>Q.  And what do you do in that project?<br>A.  Literally what we do is we have a course outlining how to -- for CPAs, bookkeepers, people with a financial background on how to provide the CFO service at an affordable price to the small to medium-sized business community.<br><br>**[Trial Tr., J. Prager, 9/2/21, 1379:5 to 1380:4, 1390:19-23]**<br><br>Q:  All right.  And speaking of at this time -- at the time you signed your declaration, were you CFO of EZPZ? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | A.  Yes, by my definition of CFO. |
| | Q.  Yes, by definition? |
| | A.  By definition which is a strategist helping them make sense of their numbers and developing a strategy to get bigger. |
| | Q.  All right.  And then the second paragraph of your declaration says you have over 40 years of experience valuing specific products on the international and domestic markets for investors and corporate decision-makers.  Can you tell us how you came to that conclusion? |
| | A.  Now it's about 45 years.  But in the course of my work, that's what I have to do is look at the products, the processes, the people, the numbers, trying to figure out what makes them valuable and how do we increase the value of those companies.  So, yeah. |
| | Q.  And did you do that for EZPZ in working for them? |
| | A.  Yes. |
| | Q.  Were you -- |
| | A.  Yes.  Under -- okay. |
| | Q.  Were you -- were you a CFO in the sense that you came to work every day at EZPZ? |
| | A.  No.  No.  I was on a retainer, and I would come in and -- on a routine basis and look at things and develop strategies.  I did not work as an in-house CFO. |
| | . . . |
| | Q:  Okay.  Were you still consulting with them when you signed this declaration in 2016? |
| | A.  Yeah, that was about -- Yes, I was -- I was definitely consulting.  I even say it in the affidavit.  Yes, I was consulting with them. |
| (f) That Mrs. Laurain promised Mr. Prager a bonus if she sold EZPZ, and Mrs. Laurain also discussed Mr. Prager possibly having an interest in the sale of EZPZ similar to Mrs. Winkelmann and Mrs. Falcone (relative to the | **[Trial Tr., J. Prager, 9/2/2021, 1388:22 to 1389:8]:** <br><br> Q:  All right. And then the next paragraph says, "All statements made in this declaration are made by my own personal knowledge, and I'm not being paid for executing this declaration." Right? <br> A:  I did not get anything extra for doing this. <br> Q:  Do you think it's misleading that you didn't say there, "Oh, by the way, I do get paid for being a consultant"? <br> A.  I think anybody with any kind of common sense would know if I'm consulting, I'm getting paid. <br> Q:  Right. |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| Declaration of Jeff Prager) | A:   That just stands to reason, I would think.  I didn't think I had to really spell it out to the detail you're talking. |
| (g) That EZPZ contracted with and compensated Jamie Grayson for conducting giveaways and promotions of EZPZ products on social media beginning in 2014, before Mr. Grayson signed his declaration (relative to the Declaration of Jamie Grayson) | **[Trial Tr., J. Grayson, By Deposition (11/27/18), 41:16-20, 41:23 to 42:06, 42:08-11, 42:13]:**<br><br>Q.  (BY MS. MENASCO)  Okay.  And when you went to the booth, you saw the product.  You ended up making a video of the product sealed to a table; is that right?<br>A.  Yes.<br>Q.  (BY MS. MENASCO)  And that video, you posted it on your social media; is that right?<br>A.  Yes.<br>Q.  That video went viral; is that right?<br>     MR. GARTHE:  Objection to form.<br>A.  Yes.<br>Q.  (BY MS. MENASCO)  Did EZPZ compensate you to post -- to make that post from the ABC Kids Show?Is that the name of it?<br>A.  Absolutely not.<br>Q.  (BY MS. MENASCO)  Okay.  So would that fall into the category of one of your editorial posts where you're not compensated?<br>A.  Correct.<br><br>**[Trial Tr., J. Grayson, By Deposition (11/27/18), 108:23-25, 109:2]:**<br><br>Q.   (BY MS. MENASCO)  Has Lindsey Laurain or EZPZ ever promised you anything of value upon the sale of EZPZ as a company?<br>A:   100 percent no.<br><br>**[Trial Tr., J. Grayson, By Deposition (11/27/18), 114:16-17, 114:19 to 115:02, 115:04-7]:**<br><br>Q.  Did Lindsey Laurain or anyone at EZPZ tell you why they wanted you to sign a declaration?<br>A.  To my understanding, because I am a recognized expert in this field and it is my opinion that they were the first company to have a suction mat like the Happy Mat, so they wanted me to just back that up.<br>Q.  (BY MS. MENASCO)  Okay.  And when you say they were the first one to have a suction mat like the  Happy Mat, are you saying they were the first to have a product that self-sealed? |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
|  | A.  In terms of self-sealing to the surface area, yes, because every other plate that I am aware of -- or plate or bowl or feeding device -- used a suction cup up until that point.<br><br>**[Trial Tr., L. Laurain, 8/31/21, 729:8 to 730:15]**<br><br>Q.  And actually we see, for example, Ms. Laurain, that one of the people is the second one there Baby Guy NYC contributor to FIT Pregnancy and Stroller-traffic.  And you describe him a lot. Obviously that one paid off, didn't it, Ms. Laurain?<br>A.  Well, luckily, Jamie found us in The Invention Connection and promoted a video without being paid.  So I guess I got -- we got lucky with Jamie Grayson.  So --<br>Q.  Well, let me ask you about Jamie Grayson and not being paid.  I mean, he's not just someone who posts on social media for the good of humanity, does he?  He's someone that he goes to the ABC Expo, and he's basically looking for clients because he's a marketer and he promotes things. And so he went and he was going to scratch your back, and he was going to take a video and post it.  And then a month or two later, you were paying him to do more promotion.  Right?<br>    MS. SECOR:  Objection, Your Honor, assumes facts not in evidence and involves speculation.<br>    THE COURT:  Okay.  Well, I'm going to allow her to ask it on cross I think if she knows the answer to that.<br>B.  No, I don't think --<br>    THE COURT:  She asked enough facts --<br>    THE WITNESS:  I'll answer that.<br>    THE COURT:  Go ahead.<br>B.  I don't think it was I'm going to scratch your back.  I'd like to pull up the Jamie Grayson quote again.  And everyone I've ever done business with, you make it sound like we're all criminals, and that's just not true. So Jamie Grayson posted because he believed in the product.  We were so lucky that he didn't charge us because Jamie literally only posts about the products he believes in and loves and stands by.  So, unfortunately, I wish Jamie was coming and you could ask him<br><br>**[Trial Tr., T. Falcone, 9/2/2021, 1541:7-22]:**<br><br>A:  . . . From there, it was -- within the Kickstarter campaign itself, we -- we had somebody who I know you guys have spoken about, the Baby Guy NYC.  He is kind of a celebrity within the baby gear space.  And he -- we |

| Information Not Disclosed in Declaration | No Material Omission With Intent to Deceive |
|---|---|
| | presented our product at the -- it's called the Invention Connection as part of one of the trade shows in the juvenile industry, and he could not believe the suction feature. And so he got really excited about it.  I remember in his video he said, "I've never shown anything from an Invention Connection.  I don't like to show product this early, but this is blowing my mind." <br> Q:   Go ahead. <br> A:   Okay.  And he kind of lifted the table.  So that was a wonderful thing where we did not have to pay, and he was excited and shared it with his other large community. And that's really when our Kickstarter campaign took off. |
| (h) Dr. Stathos was a former treating physician of Mrs. Laurain's children (relative to the Declaration of Dr. Stathos) | No evidence presented at trial. |
| (i)  Other information identified by the Court based upon the evidence presented at trial | Not applicable |

## Survey Evidence

138. A survey was conducted for the purposes of determining demand and substantiating high sales and relative low advertising expenditures. The survey results and raw data was provided in Appendix E. *See,* **Exhibit 245**, LNC395377-432 (.pdf 251-307).

**[Tr.T, B. Williams, 8/31/2021, 852:20 to 853:4]:**

Q: Okay.  And then you indicated that also you referenced a survey on here.  What was the purpose of the survey?

A: To my recollection, the purpose of the survey was to show that nexus requirement, why were people buying this mat?  Were they responding to ads in, you know, Baby

Magazine, or whatever, or was it because of word of mouth?  Why did they want to buy it?  Did they buy it because Ms. Laurain, you know, is a personality.  Did they buy it because of billboards?  Did they buy it for -- why did they buy it?  And the results I think really speak for themselves.

**[Tr.T, T. Falcone, 9/2/2021, 1554:13 to 1558:8]:**

Q:  All right.  And then did you also work with Jordan Bolton at Clark Hill with regard to the survey?
A:  Yes.
Q:  And so you interacted with him to get the survey done?
A:  Yes.  Like I said, we all kind of tried to have eyes on everything.  I certainly didn't understand the legal side of the submission process.  So I remember at one point I asked, like, you know, what sort of information should be in the request from a legal perspective, things like that.  So, yes, he -- they certainly -- or I should say Jordan certainly had his eyes on the survey as well as the communication that went out to the ask to have them take the survey.
Q:  Did you feel like you got accurate information from the survey?
A:  Yeah.
Q:  And did you also have all of the information from the survey; who you sent it to, what their actual answers were, and what part they had answered?
A:  Yes.  The -- we had raw data, you know, to back up how the cumulative percentages were broken out.  And that was submitted to the USPTO

139. As declared by Ms. Falcone, she "designed a survey for use by Eazy-PZ, LLC to determine consumer purchase history for the 'ezpz Happy Mat,' using a third-party software WuFoo®, designed for only surveying and distributable via email." "WuFoo® is a trusted brand name software application enabling creation of online forms having prompt fields customizable to capture specific end user responses to generate determinable response data." *See,* **Exhibit 245,** LNC395377 (.pdf 251).

**[Tr.T, B. Williams, 9/1/2021, 1025:11-25, 1026:19 to 1027:9]:**

Q:  Okay. And what was the purpose of the survey?
A:  The survey was to poll the customers of EZPZ to ask them why they purchased the Happy Mat.
Q:  And do you believe that -- do you remember why Tamara Falcone did a declaration regarding the survey?
A:  Yes, I think I do. She testified that she put the survey together and used third-party platforms to access the customers who had purchased the Happy Mat on line; and that the results were -- reflected what was in those third-party, you know, databases.

I think it was -- and correct me -- you know, it's been a while since I've looked at this. So Wufoo Forms, I think was the form by which the survey was done. And Mailchimp or one of those email programs was the program that handled the mass mailing because you can't just email, you know, 800 people, 1,000 people from your own email account. So --

. . .

Q:  All right. And did -- do you recall Mr. McCarthy advising you that the survey should be authenticated?
A:  I mean, yes, I do.
Q:  And did you do that?
A:  I think Tamara Falcone authenticated it, didn't she? So, yes.
Q:  So you believe that the declaration that she filed met what Mr. McCarthy was asking you to do?
A:  Yes; yes, I do.
Q:  Did you think it meant go out and hire an independent third party to run the survey?
A:  No, that was never discussed. And, to be frank, I don't think we needed to do that because of the way that the survey was administered. It was administered through third-party software. So there's no way to massage those results or do anything sort of nefarious or anything like that. So, no.

**[Tr.T, T. Falcone, 9/2/2021, 1558:10-12, 1559:23 to 1560:4, 1560:8 to 1562:24]:**

Q:  So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?
A:  Yes.

. . .

Q:  And then the third one says you're the one who designed the survey to determine consumer purchase history for the EZPZ Happy Mat. Right?
A:  Correct.

. . .

Q:  And you said you use the third-party software designed for online surveying and distributable via email. Right?
A:  Correct.
Q:  And then you also identified the Wufoo that we've already talked about?
A:  Yes
Q:  And then you said you used the third-party email software Mailchimp to monitor delivery and participation of consumers reacting to the survey?
A:  Correct.
Q:  And then the next page you said, "Mailchimp is a trusted brand name and email marketing client enabling maintenance of bulk email address lists and tracking bulk email misses"?

A: Yes.

Q: What are "misses"?

A: I don't know. That sounds like a legal term.

Q: Okay. And then what did it do?

A: The -- so Mailchimp -- and it still is a widely used and established name in the email marketing space. And just sending out emails to bulk participants. So it was basically just saying that, you know, that we -- that we used credible sources to help gather our data.

Q: Okay. And then you said the survey was successfully delivered by email to 4105 customers who had purchased the Eazy Happy Mat on ezpzFun.com?

A: Yes. So, at this point, it's just being crystal clear about who exactly received the survey and what the -- what the survey participant base was made up of.

Q: And so then the next paragraph you gave the specifics of how many opened the survey and how many successfully completed the survey. Right?

A: Right. And you had the number right earlier. I did not. So I apologize. It is 825.

Q: It's perfectly fine.

A: Okay.

Q: Then the next paragraph -- so you think this tells you exactly what it is because you made sure it was right?

A: Yeah. I think we are divulging everything that went on with the methodology of the survey. And then I know that in the appendices we share what the survey actually looked like and then we also share the raw data.

Q: Okay. And so that's what the next paragraph is. Right? The data summary, the mail summary report, the survey screenshot, and the survey results imported as an Excel spreadsheet were all included in Appendix E?

A: Correct, and they were.

Q: Okay. And did you know Appendix E was also submitted to the U.S. Patent and Trademark Office?

A: Yes.

Q: Okay. And then you declared under the penalty of perjury that all those statements made in the declaration were true and correct?

A: I do.

Q: And you still believe that?

A: Absolutely. I stand behind it.

Q: Okay. And then in the very end, you said, "I testify to the authenticity of the survey results, included Overleaf and displayed as raw data imported into the Excel spreadsheet included herein; and that the associated percentages and metrics are all correct, accurate, and true to the best of your knowledge and ability"?

A: Yes.

Q: Okay. So is there any misrepresentation or falsity anywhere in this declaration?

A: No.

Q: Do you believe the survey results reflected what you believed had happened with the remarkable sales of EZPZ?

A: Yes. Yeah. Absolutely.

Q: And what do you believe those survey results showed?

A: I think they showed that the self-seal that, you know, suction function we called it back in the day, was truly special, disruptive, new. That it met an unmet need, and that it was a game changer for mealtime with infants and toddlers.

140. Each of the survey questions, with possible responses was submitted to the PTO. *See, Exhibit 245*, LNC395381 (.pdf 256).

141. The survey established a nexus between evidence of commercial success and the patented invention, which was part of the secondary considerations for the PTO to consider.

**[Tr.T, L. Laurain, 8/31/2021, 760:19 to 761:19]:**

Q: Have you ever looked at the language of that statute, that language of 716.03(b) commercial success derived from claimed invention?  Have you ever looked at that?
A: I -- I probably have.  You can refresh my memory and put it up though.
Q: Would you agree with me if it says, "Commercial Success Must Be Derived From The Claimed Invention"?  That's the title of that provision.
A: Yes.  And I would say our success is from the claimed invention.  So just from that statement, I would agree with, yes.
Q: "In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed in a marketplace where the consumer is free to chose on the basis of objective principles.  And that such success is not the result of heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee or other business events extraneous to the merits of the claimed invention."  And then it goes on. Do you recall reading that language before, Ms. Laurain?
A: I'm assuming that's why we would have done the survey is to create a nexus to show that people purchased the product for the product itself and not from advertising, and then in addition to submitting the advertising expenses.  So, yes, I'm sure I read that and I agree with what we stated.

**[Tr.T, B. Williams, 8/31/2021, 852:20 to 853:4]:**

Q: Okay.  And then you indicated that also you referenced a survey on here.  What was the purpose of the survey?
A: To my recollection, the purpose of the survey was to show that nexus requirement, why were people buying this mat?  Were they responding to ads in, you know, Baby Magazine, or whatever, or was it because of word of mouth?  Why did they want to buy it? Did they buy it because Ms. Laurain, you know, is a personality. Did they buy it because of billboards? Did they buy it for -- why did they buy it? And the results I think really speak for themselves.

142. LNC alleges multiple problems with the survey and concluding that it was improperly conduct according to accepted principles. This is not the question before the Court, however. The question before the Court is whether EZPZ manufactured and submitted false evidence.

**[Tr.T, J. Bolton, 9/2/2021, 1265:20 to 1267:7]:**

Q:  So, Mr. Bolton, when you were participating in helping do the survey, you said you wrote the cover that went out, the blast -- email blast.  What was your motivation in writing that cover?

A:  Well, I wrote a proposed version of it.  I'm not sure if that's the one that went out.  But certainly there was no intention on my part to try and deceive. My understanding of the objective of the survey was that in part it was supportive of the secondary considerations process, but also it served another objective of helping EZPZ gain some insight into its customers.  So there was certainly no -- no intention to drive a particular result.  It was just wanting -- wanting to learn.  It was a learning exercise.

Q:  And to the extent it helped with the patent, did you think that it was critical or that it had to be done a certain way?

A:  I didn't -- I didn't give that any thought at all.  I was -- I was looking at it from a -- just as, you know, I might look at certain letters going out that an associate drafts that I'm marking up.  I mean, it was looking at it from a wording perspective and making it tight. I mean, the only objective was to get people to respond so that EZPZ could learn. That was really -- I recall that being the objective, and the cover correspondence was EZPZ wants to hear from you about this because it wants to learn.  And it was really secondary -- you know, secondarily, at least in my mind, was the sort of patent piece of it.  But I didn't give any thought to that part of the process.  I left that to Ben and -- I'm sorry, to Mr. Williams and to Mr. McCarthy.  That was outside my wheelhouse.

Q:  In any of the communications that you saw or that you participated in, did you see anything that you thought was improper in the process of the survey?

A:  No.

Q:  And during the course of time that you worked with Mr. Williams and Ms. Laurain, did you see any evidence of fraud or deceit?

A:  No.

**[Tr.T, T. Falcone, 9/2/2021, 1556:1-20]:**

Q:  Do you recall this email exchange with Ms. Laurain?

A:  I do.

Q:  And she asked you, "Should we start with our peeps?" How many responses are we going for? Or -- yeah, she asked you. Right?

A:  Yep.

Q:  And what did you respond?

A:  I said, "No, the peeps would be considered bias since they received discounted product. Not a fair sample set." And then I go on to discuss how many people we would need to reach out to get 200 plus responses.

Q:  And so you said, "We'll have to send it to 4,000 people." Right?
A:  Yeah.
Q:  And that's what you did. Right?
A:  Yes.
Q:  So you sent it out to over 4,000 people expecting 200 responses?
A:  Correct.
Q:  And you got 825 responses?

143. Given that all of the survey and raw data was provided to the PTO there was nothing misleading that was submitted to the PTO. It also cannot follow that EZPZ submitted the survey results with any intent to deceive when not only the results, but the raw data was submitted.

**[Tr.T, B. Williams, 9/1/2021, 1029:12-23]:**

Q:  Right. And were all the parts of the survey submitted to the patent office?
A:  I believe everything, yeah. I think all of the -- if I remember correctly, I think all of the raw data was submitted to the patent office. Everything was submitted. I mean, its a gigantic filing, as we probably all know. It's pages and pages. And a lot of it is the Excel exported data out of the, I'm guessing, the Wufoo forms because, you know, I didn't actually do the survey. But that's what I believe it is, yes.
Q:  So the patent examiner had all the data, all the questions, all the answers?
A:  Correct, to my understanding, yes.

**[Tr.T, L. Laurain, 8/31/2021,703:24 to 704:7]:**

A:  Okay.  Sorry.  Yes, we submitted in regard to the survey everything that we knew or everything speaking of documentation.  So we submitted the way the questions were asked, the way they were placed.  The answer Tamara Falcone submitted that she was the COO, she was authenticating the survey results.  We submitted who completed the survey, how it was done and then all of the answers and all the raw data, sheets of paper of raw data they would -- they have in regard to the survey.

143-1.  The testimony establishes that there was no wrongful conduct with respect to the survey presented to the patent office, as shown in the following chart:

| Survey | Finding Yes or No |
|---|---|
| (a) The survey was designed to achieve a high percentage response to the "suction function" | **[Trial Tr., T. Falcone, 9/2/21, 1572:8 to 1573:6]**<br><br>Q.  Okay. And so, on the second question, I notice that the suction function, the style, the color, the material, the first three things there, are all product features. Right?<br>A.  Correct. |

| Survey | Finding Yes or No |
|---|---|
| as the answer to the second question which did not include other important reasons respondents could have purchased the mats such as "the story" of the family behind the products and/or branding and marketing efforts. | Q.   Right. Advertising is not a product feature. Right?<br>A.   No.<br>Q.   So why is it that you've got -- you've got three product features as a choice and then you've got advertising?<br>A.   I mean, that's -- that's how I crafted it. There wasn't anything that was intentionally manipulative or anything. It was how it was crafted at the time.<br>Q.   Well, you say, "That's how I crafted it."  But Mr. Bolton is the one that put the word in there that doesn't fit.<br>A.   Yeah.<br>Q.   The other three are product features.  Mr. Bolton's word is a word that's a very key word in the prosecution of the patent.  Right?<br>A.   Okay.  At the time, I did not think his changes -- and I still believe this, I didn't think they affected the integrity of the survey.  And they were a legal team that was guiding and advising us on a very important process where I was, you know, an amateur.<br>Q.   I understand that.  You're not a lawyer.  Right?<br>A.   I definitely am not. |
| (b) The survey defaulted to EZPZ's preferred responses | **[Trial Tr., T. Falcone, 9/2/21, 1573:7-25 to 1574:10]**<br><br>Q.   Mr. Bolton is the lawyer?<br>A.   He is.<br>Q.    Right. And he's the one telling you what changes to implement. Right?<br>A.   He was the lawyer that was helping to advise, but he was also a part of the process. Like I said, we were all kind of -- it was all hands on deck, let's put our best foot forward initiative.<br>Q.   And I think you've already said this, but just to make sure, you don't recall how you came up with the order of the responses?<br>A.   Yeah, I don't recall.<br>Q.   I mean, why is it that advertising ends up in virtually last place on both questions?<br>A.    It wasn't my intention -- I'll answer your original -- I'll answer your question. Can you state it again.<br>Q.   Why is it that advertising ends up at virtually the end of the –<br>A.   Which is where it was. There wasn't anything intentionally manipulative about the order.<br>Q.    Right. For people that takes surveys, the order of the responses does have some influence on their choices. Right?<br>A.   Depending on the survey taker, perhaps, but I can't say for sure. People take surveys all the time. They're pretty accustomed to just selecting which one they believe in. |

214

| Survey | Finding Yes or No |
|--------|-------------------|
|  | Q.    You never heard that there's any research that would indicate that the order of the responses can be material to the results?<br>A.    Not in recent history. |
| (c) The survey was prepared by Tamara Falcone and revised by Jordan Bolton, both of whom had an interest in the outcome of the survey | **[Trial Tr., T. Falcone, 9/2/21, 1558: 10-12, 1154:13 to 1555:2, 1559:23 to 1562:24]**<br><br>Q.    So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?<br>A.    Yes.<br><br>. . .<br><br>Q.     All right. And then did you also work with Jordan Bolton at Clark Hill with regard to the survey?<br>A.    Yes.<br>Q.    And so you interacted with him to get the survey done?<br>A.    Yes. Like I said, we all kind of tried to have eyes on everything. I certainly didn't understand the legal side of the submission process. So I remember at one point I asked, like, you know, what sort of information should be in the request from a legal perspective, things like that. So, yes, he -- they certainly -- or I should say Jordan certainly had his eyes on the survey as well as the communication that went  ut to the ask to have them take the survey.<br>Q.    Did you feel like you got accurate information from the survey?<br>A.    Yeah.<br><br>. . .<br><br>Q.    And then the third one says you're the one who designed the survey to determine consumer purchase history for the EZPZ Happy Mat. Right?<br>A.    Correct.<br>Q.    And you said you use the third-party software designed for online surveying and distributable via email. Right?<br>A.    Correct.<br>Q.    And then you also identified the Wufoo that we've already talked about?<br>A.    Yes.<br>Q.    And then you said you used the third-party email software Mailchimp to monitor delivery and participation of consumers reacting to the survey?<br>A.    Correct. |

| Survey | Finding Yes or No |
|--------|-------------------|
|  | Q.     And then the next page you said, "Mailchimp is a trusted brand name and email marketing client enabling maintenance of bulk email address lists and tracking bulk email misses"? |
|  | A.     Yes. |
|  | Q.     What are "misses"? |
|  | A.      I don't know. That sounds like a legal term. |
|  | Q.     Okay. And then what did it do? |
|  | A.     The -- so Mailchimp -- and it still is a widely used and established name in the email marketing space. And just sending out emails to bulk participants. So it was basically just saying that, you know, that we -- that we used credible sources to help gather our data. |
|  | Q.     Okay. And then you said the survey was successfully delivered by email to 4105 customers who had purchased the Eazy Happy Mat on ezpzFun.com? |
|  | A.     Yes. So, at this point, it's just being crystal clear about who exactly received the survey and what the -- what the survey participant base was made up of. |
|  | Q.     And so then the next paragraph you gave the specifics of how many opened the survey and how many successfully completed the survey. Right? |
|  | A.     Right. And you had the number right earlier. I did not. So I apologize. It is 825. |
|  | Q.     It's perfectly fine. |
|  | A.     Okay. |
|  | Q.     Then the next paragraph -- so you think this tells you exactly what it is because you made sure it was right? |
|  | A.     Yeah. I think we are divulging everything that went on with the methodology of the survey. And then I know that in the appendices we share what the survey actually looked like and then we also share the raw data. |
|  | Q.     Okay. And so that's what the next paragraph is. Right? The data summary, the mail summary report, the survey screenshot, and the survey results imported as an Excel  spreadsheet were all included in Appendix E? |
|  | A.     Correct, and they were. |
|  | Q.     Okay. And did you know Appendix E was also submitted to the U.S. Patent and Trademark Office? |
|  | A.     Yes. |
|  | Q.     Okay. And then you declared under the penalty of perjury that all those statements made in the declaration were true and correct? |
|  | A.     I do. |
|  | Q.     And you still believe that? |
|  | A.     Absolutely. I stand behind it. |

| Survey | Finding Yes or No |
|---|---|
| | Q. Okay. And then in the very end, you said, "I testify to the authenticity of the survey results, included Overleaf and displayed as raw data imported into the Excel spreadsheet included herein; and that the associated percentages and metrics are all correct, accurate, and true to the best of your knowledge and ability"? <br> A. Yes. <br> Q. Okay. So is there any misrepresentation or falsity anywhere in this declaration? <br> A. No. <br> Q. Do you believe the survey results reflected what you believed had happened with the remarkable sales of EZPZ? <br> A. Yes. Yeah. Absolutely. <br> Q. And what do you believe those survey results showed? <br> A. I think they showed that the self-seal that, you know, suction function we called it back in the day, was truly special, disruptive, new. That it met an unmet need, and that it was a game changer for mealtime with infants and toddlers. |
| (d) Tamara Falcone designed the survey such that it would default to EZPZ's preferred response | **[Trial Tr., T. Falcone, 9/2/21, 1573:7-25 to 1574:10]** <br><br> Q. Mr. Bolton is the lawyer? <br> A. He is. <br> Q. Right. And he's the one telling you what changes to implement. Right? <br> A. He was the lawyer that was helping to advise, but he was also a part of the process. Like I said, we were all kind of -- it was all hands on deck, let's put our best foot forward initiative. <br> Q. And I think you've already said this, but just to make sure, you don't recall how you came up with the order of the responses? <br> A. Yeah, I don't recall. <br> Q. I mean, why is it that advertising ends up in virtually last place on both questions? <br> A. It wasn't my intention -- I'll answer your original -- I'll answer your question. Can you state it again. <br> Q. Why is it that advertising ends up at virtually the end of the – <br> A. Which is where it was. There wasn't anything intentionally manipulative about the order. <br> Q. Right. For people that takes surveys, the order of the responses does have some influence on their choices. Right? <br> A. Depending on the survey taker, perhaps, but I can't say for sure. People take surveys all the time. They're pretty accustomed to just selecting which one they believe in. <br> Q. You never heard that there's any research that would indicate that the order of the responses can be material to the results? <br> A. Not in recent history. |

| Survey | Finding Yes or No |
| --- | --- |
|  | [Trial Tr., T. Falcone, 9/2/21, 1572:8 to 1573:6] |

[Trial Tr., T. Falcone, 9/2/21, 1572:8 to 1573:6]

Q.     Okay. And so, on the second question, I notice that the suction function, the style, the color, the material, the first three things there, are all product features. Right?
A.     Correct.
Q.     Right. Advertising is not a product feature. Right?
A.     No.
Q.     So why is it that you've got -- you've got three product features as a choice and then you've got advertising?
A.     I mean, that's -- that's how I crafted it. There wasn't anything that was intentionally manipulative or anything. It was how it was crafted at the time.
Q.     Well, you say, "That's how I crafted it."  But Mr. Bolton is the one that put the word in there that doesn't fit.
A.     Yeah.
Q.     The other three are product features.  Mr. Bolton's word is a word that's a very key word in the prosecution of the patent.  Right?
A.     Okay.  At the time, I did not think his changes -- and I still believe this, I didn't think they affected the integrity of the survey.  And they were a legal team that was guiding and advising us on a very important process where I was, you know, an amateur.
Q.     I understand that.  You're not a lawyer.  Right?
A.     I definitely am not.

**[Trial Tr., T. Falcone, 9/2/21 1573:15-18, 1583:5-20]**

Q.     And I think you've already said this, but just to make sure, you don't recall how you came up with the order of the responses?
A.     Yeah, I don't recall.

. . .

Q.     I mean, why is it that advertising ends up in virtually last place on both questions?
A.      It wasn't my intention
Q.     And then look at the second -- or the first question. So in the order of the survey online, the first question was word of mouth, wasn't it?
A.     Looks like it was social media -- oh, no, it was word of mouth. That's correct.
Q.      But you just listed the order here in the order of how the –
A.     Of the responses, yeah. The highest percentage to the lowest percentage.

218

| Survey | Finding Yes or No |
|---|---|
| | Q.   Okay. So even though it defaulted to word of mouth, people still chose social media 62 percent of the time?<br>A.   That's correct.<br>Q.   And then is there anything that you heard about the questions here that you think affected the integrity of the survey?<br>A.   No. |
| (e) The first proposed response to the second question of the survey ("What was the primary reason for purchasing the EZPZ Happy Mat") is the only one with an exclamation point, which leads customers to select that response | **[Trial Tr., T. Falcone, 9/2/21, 1582: 15 to 1583:4]**<br>MS. SECOR: All right. And then Exhibit 500, I think it's the second page.<br>Q.   So in these results you were asked, "Well, don't you know that the suction function, I've never seen anything like it." Has an exclamation on it?<br>A.   Uh, huh.<br>Q.   And did you want to say something about that when you were asked?<br>A.   No, I was -- I just wanted to say that I know there – you know, that there's -- we've gone into very, very specific details on the survey. And just that I -- I stand behind the integrity of the survey, and nothing that was placed in it was intentionally manipulating the end audience.<br>Q.   Did you think any of it was unethical?<br>A.   No. |
| (f)  The possible responses to the survey are unbalanced | **[Trial Tr., T. Falcone, 9/2/21, 1572: 4—1575:5]**<br><br>Q.   Okay. So just to step back a little bit, Mr. Bolton asked you to put in the word "advertising," but he never asked you to put in the word "promotion." Correct?<br>A.   Correct.<br>Q.   Okay. And so, on the second question, I notice that the suction function, the style, the color, the material, the first three things there, are all product features. Right?<br>A.   Correct.<br>Q.   Right. Advertising is not a product feature. Right?<br>A.   No.<br>Q.   So why is it that you've got -- you've got three product features as a choice and then you've got advertising?<br>A.   I mean, that's -- that's how I crafted it. There wasn't anything that was intentionally manipulative or anything. It was how it was crafted at the time.<br>Q.   Well, you say, "That's how I crafted it." But Mr. Bolton is the one that put the word in there that doesn't fit.<br>A.   Yeah.<br>Q.   The other three are product features. Mr. Bolton's word is a word that's a very key word in the prosecution of the patent. Right? |

219

| Survey | Finding Yes or No |
|---|---|
| | A.   Okay. At the time, I did not think his changes -- and I still believe this, I didn't think they affected the integrity of the survey. And they were a legal team that was guiding and advising us on a very important process where I was, you know,  an amateur.<br><br>Q.   I understand that. You're not a lawyer. Right?<br>A.    I definitely am not.<br>Q.   Mr. Bolton is the lawyer?<br>A.   He is.<br>Q.   Right. And he's the one telling you what changes to implement. Right?<br>A.   He was the lawyer that was helping to advise, but he was also a part of the process. Like I said, we were all kind of -- it was all hands on deck, let's put our best foot forward initiative.<br>Q.   And I think you've already said this, but just to make sure, you don't recall how you came up with the order of the responses?<br>A.   Yeah, I don't recall.<br>Q.    I mean, why is it that advertising ends up in virtually  last place on both questions?<br>A.   It wasn't my intention -- I'll answer your original --I'll answer your question. Can you state it again.<br>Q.   Why is it that advertising ends up at virtually the end of the –<br>A.   Which is where it was. There wasn't anything intentionally manipulative about the order.<br>Q.   Right. For people that takes surveys, the order of the responses does have some influence on their choices. Right?<br>A.    Depending on the survey taker, perhaps, but I can't say for sure. People take surveys all the time. They're pretty accustomed to just selecting which one they believe in.<br>Q.   You never heard that there's any research that would indicate that the order of the responses can be material to the results?<br>A.   Not in recent history.<br>Q.   Okay. And so the next question, "How would you rate the  Happy Mat in terms of providing a solution for tipped bowls and plates at mealtime?" And you made Mr. Bolton's change on that question, right, in that question as well?<br>A.   Oh, solved versus solution?<br>Q.   Yeah.<br>A.    Correct.<br>Q.   And this question assumes that the Happy Mat does provide a solution. Correct?<br>A.    I think it's -- it's saying how would you rate, so if somebody were to say one star, they would be suggesting that it doesn't provide a solution, but that's my interpretation.<br>Q.   Yeah, okay. |

| Survey | Finding Yes or No |
|---|---|
| | A.    That would not be a very compelling data point if we had a bunch of one stars.<br>Q.    Yeah, but the question itself assumes that a solution is being provided just the way that it's worded.<br>A.    Like I said, I think if someone put one star, they would be able to actively indicate that it was not providing a very  good solution for them in that regard. |
| (g) The design of the survey used marketing research techniques that would be reviewed or considered manipulative or inappropriate and outside of the standards of marketing research tenants and guidelines | **[Trial Tr., T. Falcone, 9/2/21, 1568: 4-9]**<br><br>Q.    Okay. So basically you implemented all of Mr. Bolton's changes. Correct?<br>A.    Correct.<br>Q.    Okay. And Mr. Bolton was the lawyer for EZPZ. Correct?<br>A.    I mean, not in-house counsel, but he was assisting with the patent process.  Correct.<br>Q.    He's not a survey designer. He's a lawyer. Right?<br>A.    Yes, he's a lawyer. |
| (h) The survey used manipulated data to present a position that is inconsistent with what should have been produced out of sound research practice | **[Trial Tr., T. Falcone, 9/2/21, 1560: 24 to 1562:24]**<br>Q:    Okay. And then you said the survey was successfully delivered by email to 4105 customers who had purchased the Eazy Happy Mat on ezpzFun.com?<br>A:    Yes. So, at this point, it's just being crystal clear about who exactly received the survey and what the -- what the survey participant base was made up of.<br>Q:    And so then the next paragraph you gave the specifics of how many opened the survey and how many successfully completed the survey. Right?<br>A:    Right. And you had the number right earlier. I did not. So I apologize. It is 825.<br>Q:    It's perfectly fine.<br>A:    Okay.<br>Q:    Then the next paragraph -- so you think this tells you exactly what it is because you made sure it was right?<br>A:    Yeah. I think we are divulging everything that went on with the methodology of the survey. And then I know that in the appendices we share what the survey actually looked like and then we also share the raw data. |

| Survey | Finding Yes or No |
|---|---|
| | Q:    Okay. And so that's what the next paragraph is. Right? The data summary, the mail summary report, the survey screenshot, and the survey results imported as an Excel spreadsheet were all included in Appendix E?<br><br>A:    Correct, and they were.<br><br>Q:    Okay. And did you know Appendix E was also submitted to the U.S. Patent and Trademark Office?<br><br>A:    Yes.<br><br>Q:    Okay. And then you declared under the penalty of perjury that all those statements made in the declaration were true and correct?<br><br>A:    I do.<br><br>Q:    And you still believe that?<br><br>A:    Absolutely. I stand behind it.<br><br>Q:    Okay. And then in the very end, you said, "I testify to the authenticity of the survey results, included Overleaf and displayed as raw data imported into the Excel spreadsheet included herein; and that the associated percentages and metrics are all correct, accurate, and true to the best of your knowledge and ability"?<br><br>A:    Yes.<br><br>Q:    Okay. So is there any misrepresentation or falsity anywhere in this declaration?<br><br>A:    No.<br><br>Q:    Do you believe the survey results reflected what you believed had happened with the remarkable sales of EZPZ?<br><br>A:    Yes. Yeah. Absolutely.<br><br>Q:    And what do you believe those survey results showed?<br><br>A:    I think they showed that the self-seal that, you know, suction function we called it back in the day, was truly special, disruptive, new. That it met an unmet need, and that it was a game changer for mealtime with infants and toddlers. |
| (i) The survey was biased in one or more respects | **[Trial Tr., T. Falcone, 9/2/21, 1556:1-21]**<br><br>Q.    Do you recall this email exchange with Ms. Laurain?<br><br>A.    I do.<br><br>Q.    And she asked you, "Should we start with our peeps?" How many responses are we going for? Or -- yeah, she asked you.  Right?<br><br>A.    Yep.<br><br>Q.    And what did you respond?<br><br>A.    I said, "No, the peeps would be considered bias since they received discounted product. Not a fair sample set." And then I go on to discuss how many people we would need to reach out to get 200 plus responses.<br><br>Q.    And so you said, "We'll have to send it to 4,000 people." Right? |

| Survey | Finding Yes or No |
|---|---|
| | A.      Yeah.<br>Q.     And that's what you did. Right?<br>A.      Yes.<br>Q.     So you sent it out to over 4,000 people expecting 200 responses?<br>A.      Correct.<br>Q.     And you got 825 responses?<br>A.      842, but, yes. |
| (j) Interested individuals, including but not limited to Jordan Bolton and Christie Brock (an EZPZ employee), were encouraged to and/or responded to the survey, which was not disclosed to the USPTO | **[Trial Tr., T. Falcone, 9/2/21, 1582:1-14]**<br><br>BY MS. SECOR:<br>Q.   Will you, please, look at the '903 Patent prosecution Exhibit 245 at page 258. On the results of the survey, one of the people answered -- which number is it? "I worked for EZPZ." Right?<br>A.   Yes. With an F on the end.<br>Q.   Looks like the fun came off of it?<br>A.   Okay. Gotcha. Okay.<br>Q.   And then you didn't take that off of the results, did you?<br>A.   No, we didn't.<br>Q.   And then did you think it was improper or wrong for an EZPZ employee to answer the survey?<br>A.   No, not if they had experienced the product firsthand and fell within the bucket that we had disclosed to the USPTO. |
| (k) The survey was delivered to individuals who received the EZPZ Happy Mat as a gift and who worked for EZPZ, but Ms. Falcone's declaration represented to the USPTO that the survey was delivered to customers who purchased the mat on www.ezpzfun.com | **[Trial Tr., T. Falcone, 9/2/21, 1552:20 to 1553:11]**<br><br>Q.   Okay. And then you sent those that have purchased an EZPZ mat on your e-commerce site?<br>A.   Correct.<br>Q.   And your survey requests were sent via Mailchimp?<br>A.   That's right, yes.<br>Q.   And results gathered through a Wufoo survey?<br>A.   Wufoo survey. Correct.<br>Q.   Okay. So what's Wufoo and Mailchimp?<br>A.   Wufoo is an app that allows you to generate surveys and then tabulates the results for you. And it's a pretty – I would say it's a pretty basic survey tool. But, you know, for our purposes, it served its -- its role. And then Mailchimp was how we sent that information out. So there was probably a link to the survey within the communication that went out to the people that could fill out the survey. And, in this case, it's the people that purchased a Happy Mat on ezpzFun.com. |
| (l) The survey was not authenticated by an independent | **[Trial Tr., T. Falcone, 9/2/2021, 1558:10-25]:** |

| Survey | Finding Yes or No |
|---|---|
| and objective third party as Mr. McCarthy had advised it should be, but was instead sworn to by Tamara Falcone, an EZPZ employee who stood to gain a 10% of any future sale of the company | Q:  So you indicate right in the first whereas clause that you are the chief operating officer for EZPZ. Right?<br>A:  Yes.<br>Q:  Did you have a compensation package with EZPZ at the time you signed this declaration?<br>A:  I believe we did have, yeah, a phantom stock agreement in place, correct.<br>Q:  Did you get paid anything, a salary of any kind?<br>A:  Not until January of 2016.<br>Q:  Okay. So this declaration was signed March 9th, 2016. Would you have had a salary at this time?<br>A. Yes.<br>Q:  And did you think you needed to reveal you had a salary since you were identifying you were a chief operating officer?<br>A:  No. I would assume that that is obvious. I don't think a lot of people work for free<br><br>**[Trial Tr., T. Falcone, 9/2/2021, 1562:1-16]:**<br><br>Q:  Okay. And then you declared under the penalty of perjury that all those statements made in the declaration were true and correct?<br>A:  I do.<br>Q:  And you still believe that?<br>A:  Absolutely. I stand behind it.<br>Q:  Okay. And then in the very end, you said, "I testify to the authenticity of the survey results, included Overleaf and displayed as raw data imported into the Excel spreadsheet included herein; and that the associated percentages and metrics are all correct, accurate, and true to the best of your knowledge and ability"?<br>A:  Yes.<br>Q:  Okay. So is there any misrepresentation or falsity anywhere in this declaration?<br>A:  No.<br><br>**[Trial, Tr., J. Bolton, 9/2/21, 1270:13 to 1271:11](emphasis added)**<br><br>Q:  On March 7th, 2016, is this about the time your firm was working on the secondary considerations?<br>A:  I don't remember, but I have no reason to dispute that it was. I mean, my loose recollection was it was towards the end of 2015, maybe bled into early 2016. But --<br>Q:  Okay. I asked you a date. I'm sorry. So, generally, do you recall the process that -- between Mr. McCarthy and Mr. Williams working |

| Survey | Finding Yes or No |
|---|---|
|  | through secondary considerations, the declarations, do you recall being involved in the back and forth? |
|  | A:   At least tangentially, yes. |
|  | Q:   And you've worked with Mr. McCarthy for how many years? |
|  | A:   As of 2016, a decade probably or so. |
|  | Q:   Okay. **And then when Mr. McCarthy said, "I think the secondary considerations were handled very well,"** from your experience with him and dealing with him, did you think he said that lightly or just to please the client? |
|  | A:   That's not the Tim McCarthy I know. |
|  | Q:   And what do you mean by that? |
|  | A:   He's a technician. He's not -- you know, he wasn't very much a bedside guy, not a sunshine and a rainbows kind of -- kind of practitioner. He was just a very technical actor. So, no, I don't take him -- I think if he said that, he meant it. |
| (m) Any reason identified by the Court based upon the presentation of evidence at trial | **Not applicable** |

## Allegations of Unclean Hands

144.    As part of EZPZ's sales strategy, it utilizes various distributors worldwide. [Doc. No. 334-2].

145.    Hip Mommies is the Canadian distributor of EZPZ, and was the first distribution partner of EZPZ. As part of this relationship between Hip Mommies and EZPZ, Hip Mommies orders products from EZPZ, for which it is invoiced by EZPZ. EZPZ utilizes QuickBooks online for its invoicing needs. Once an invoice is created and ready to send to a distributor (such as Hip Mommies), an email is generated by QuickBooks to the recipient that includes a link for the distributor to view the invoice. [Doc. No.334-2].

146.    The invoice contains various fields, including as relevant here the "product/service" identifier for the invoice and a "description" field containing any additional information. The

version of any invoice on QuickBooks is the most current version of the invoice, reflecting any changes that have been made to it since the creation of the document.  [Doc. No. 334-2].

147. Although there are no historical versions of the document saved, QuickBooks Online records all financial transaction, and also tracks user login/logout activity, changes to setting, customers, vendors, and employees." "Taudit log shows: [t]he date of any changes to your books; [t]he name of the user who made the change; [t]he type of change or event; [t]he name of any customer or vendor related to the change; [a]ny original transaction date and amount."  [Doc. No. 334-2].

148. There are six invoices for which LNC claims failure to preserve and/or alteration of evidence: 148, 149, 150, 157, 168, and 247 ("Relevant HP Invoices"). The Relevant HM Invoices were generated on the following dates: Invoice No. 148 (3/17/2016); 149 (3/18/2016); 150 (3/18/2016); 157 (4/8/2016); 168 (4/21/2016); and 247 (9/19/2016). [Doc. No. 334-2].

149. At the time the Relevant HM Invoices were generated, the "product/service" field for these invoices used the nomenclature "Marketing & Brand Promotion." This product/service was added to QuickBooks by EZPZ on March 16, 2016. There were corresponding invoices for actual product at cost. For a short timeframe, EZPZ acquiesced to the request of Hip Mommies to produce its product invoices as two separate invoices for Hip Mommies accounting purposes.  [Doc. No. 334-2].

150. The "Marketing & Brand Promotion" product/service field was edited on January 24, 2017 by EZPZ for internal accounting purposes to "Canada Split." Upon the "product/service" field being updated, it automatically updated every invoice that had been coded with that product/service, both prospectively and retroactively. This was only a change of category

nomenclature not a substantive change of any type to EZPZ's accounting methods. The invoices
always reflected a sale of product.  [Doc. No. 334-2].

151. Subsequently, in January 2018, the "Canada Split" product/service was removed
entirely by EZPZ and only one product invoice was provided to Hip Mommies going forward.
[Doc. No. 334-2].

152. As shown in the audit logs for the Relevant HM Invoices, there was an "indirect edit"
to said invoices. This was a result of the change in the product/service characterization. Invoice
247 varies somewhat. The audit history for Invoice 247 shows that indirect edit, as does the other
Relevant HM Invoices, and also additionally shows a direct edit, which is a change in the
"description" field, removal and replacement of the brand and marketing language.  [Doc. No.
334-2].

153. All of the information about the changes is available via the logs that have been
produced in this litigation.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/28/2019), 33:23 to 34:21, 58:15 to 60:05]:**

Q:  Okay.  I want to switch gears now and ask you, Ms. Laurain, about some of the Hip
     Mommies invoices --
A:  Okay.
     (Deposition Exhibit Nos. 457 and 458 marked for identification)
Q:  (By Ms. Reisman)  -- that we have received.  And in particular I'm going to show you
     -- just gonna be 3 and 7.  I'm going to label as Exhibit 457 --
Q:  (By Ms. Reisman)  -- 457 and 458, and take your time and look at those please.
A:  Okay.
Q:  All right.  Now, these are invoices that are ezpz invoices, correct?
A:  Yes.
Q:  And my -- we have grouped them together, two invoices are Exhibit 457.  Those would
     be Invoice 455 and -- excuse me -- 145 and 148.  And then we have two invoices that
     are grouped together as Exhibit 458, which are Invoice 286 and 287 --
A:  Yep.
Q:  -- is that correct?  Now, these invoices are from back in 2016, right?
A:  Yes.

. . .

227

Q: (By Ms. Reisman)  Ms. Laurain, you were kind enough to print out for us today a landscaped copy of the audit history for Invoice Number 247, correct?

A: Yes.

(Deposition Exhibit No. 465 marked for identification)

Q: (By Ms. Reisman)  And so what I've put in front of you is an in-globo exhibit, which we've labeled 465, which is Invoice 247, which was recently produced to us as ezpz 299464, together with the audit history that you printed out today, correct?

A: Yep.  Yes.

Q: Okay.  And the invoice that is -- was produced refers to a Canada split, $11,400; do you see that?

A: Yep.

Q: And if we look at the audit history for this transaction we see that when this invoice was originally issued it actually said "brand and marketing promotions," correct?

A: That's what it says.

Q: And then if we look through the audit history we see where on September 18th, 2016, the invoice was changed so that brand and marketing -- excuse me -- brand and marketing promotions was deleted and instead international Canada split was placed on the invoice, right?

A: Yep, that's what it looks like.  It's switched.

Q: And do you have any explanation for us today as to why that change was made on September 18th, 2016?

A: No.  But if you find my e-mail it says -- I think it -- I mean, it said that in my e-mail to go back and switch them for internal accounting reasons.

Q: Okay.  But you don't -- you -- as you sit here today you don't know what those internal accounting reasons were?

A: I can't remember the why behind there.  I just say we need to switch those back for internal accounting reasons.

Q: And was it because brand and marketing promotions was false?

A: I don't recall.  Internal accounting reasons.

**[Tr.T, L. Laurain, 8/30/2021, 523:1-11]:**

Q: But you would agree, Ms. Laurain, we never got the brand and marketing promotions for some of those invoices until we went up to Canada to file a contempt motion to get them?

A: I don't agree with that.  So my understanding there were invoices produced that had, it was, like, brand/marketing and it was brand and marketing.  And we produced some of those. There was nomenclature that switched to can, can submit.  Quick Book does it automatically, goes back.  Literally it's a life [sic] link.  So if you click on it, there's no invoices.  If you got those from him, it's great.  But, I mean, we also produced everything.

**[Tr.T, L. Laurain, 8/26/21, by Deposition (6/10/2020), 213:13 to 215:11]:**

MR. DENEGRE:· So Holly, will you pull document 158?· And this will be marked as Exhibit 690.

Q:  (BY MR. DENEGRE)· Ms. Laurain, do you recognize this as an affidavit that you put into the record in this case in response to the LNC motion that we've been discussing?

A:  Yes.

Q:  I ask you to turn to paragraph 13.

A:  Yep.

Q:  I'm going to read it first and then ask you a question, or part of it.· "This product/service field for 'Marketing & Brand Promotions' was edited on January 24, 2017 for internal accounting purposes to 'Canada Split.'· This was only a change of category nomenclature not a substantive change of any type to EZPZ's accounting methods." Do you see that?

A:  Yep.

Q:  So my question to you is, what were the internal accounting purposes?

A:  And I've already –

A:  I mean, I've already answered this.· Lulu asked me these specific questions, and I don't recall. And honestly, a Canada split –

Q:  (BY MR. DENEGRE)· Well, you're –

A:  Well, I'm giving you my answer, George. So I answered this and I'll continue -- I'm going to -- do you want me to answer?· No?

Q:  Yes, I do.

A:  I -- at that time, I don't remember in terms of specifically why we said to do a Canadian split.· I will say that this nomenclature of Canada split or marketing brand and promotions has no difference on the way things pull over to EZPZ's accounting system.· It says a total line on our profit and loss Hip Mommie sales.· And so I don't remember the specifics of why this was done.  Even as Jennifer and I were trying to figure out all of this in my deposition, to go through and figure it all out was a massive task.· I think the ·difference -- well -- so I answered this before.· It was for accounting purposes.· Christie manages the majority of the accounting and the invoices were split to Canada split and it does not impact –

Q:  Ms. Laurain –

A:  Okay.· I was just going to say it doesn't impact anything on our books, the difference between these two.

### Allegations of Failure to Disclose Patent Prosecution Positions of the '403 Application in the Litigation

154. The Court does not need to address the substance of LNC's allegations that EZPZ took inconsistent claim construction positions in the underlying litigation and the '403 Application, although it notes that EZPZ vigorously denies same—EZPZ's statements in the '403 prosecution are consistent with EZPZ's arguments in claim construction and with the Court's Claim Construction Ruling. *See,* **Exhibit 281 ('403 Application).** Planar and camber are not mutually

exclusive terms. LNC's use of the word "camber" does not have the import that LNC wishes to ascribe to it.

154-1.  There are no statements by EZPZ (the inventor) that have been shown to be inconsistent. It is statements by *the inventor* that in some circumstances can be relevant to claim construction, not statements by the PTO. *See,* **Exhibit 281.** Applicant made no contrary statement in the '403 application to any position taken during claim construction of the '903 patent.

155. The allegation that there was a failure of EZPZ to disclose patent prosecution positions of the '403 Application in the litigation are meritless. Further, due to the protective order in this case, litigation counsel for EZPZ and counsel/patent agent prosecuting the patent were required to maintain a "Chinese wall."  Mr. Garthe is the only attorney who had exposure to the litigation and prosecution of the patent at high levels.

**[Tr.T, Z. Garthe, 9/2/2021, 1362:14 to 1363:3]:**

Q:  You were involved in the claims construction briefing in this case, weren't you, sir?
A:  I was.
Q:  And did you disclose to this court the USPTO's definition of planar portion from the '403 prosecution history which occurred during that period of time?
A:  I wouldn't have been involved in the '403 prosecution. I don't know what their definition of planar was from that.
Q:  Mr. Williams wasn't reporting to you what was happening in the '403 Application? Is that really your testimony, sir?
A:  Have you ever been general counsel to oversee a business with things that are going on and you've got patent applications going on? Yeah, I mean, he didn't come to me with every single line item of what's going on. We talked about the highlighted stuff.

<u>Credibility of Witnesses</u>

155-1. The Court finds Lindsey Laurain credible, including the following testimony:

**[Tr.T, L. Laurain 8/31/21, 681:2-10, 690:20-22, 698:21-699:9]**

Q:  And would you have -- would you have done anything to get that utility patent?
A:  No.
Q:  What do you mean by that?

A:  Well, you make it sound mischievous.  I think we obviously wanted to get the patent. It was important to us.  But we were doing our best to submit all of the stuff in a legal way.  So if you say you would have done anything, I wouldn't have done anything because that implies I would do bad stuff.

Q:  Okay.  Did you believe you had presented the patent office everything that was supposed to be presented to them?

A.  Yes, my assumption.  That was my assumption.

. . .

Q:  When – when you hired Mr. McCarthy and Mr. Bolton, did you think they understood your invention?

A:  I don't think I had retained them, so I don't think I hired them. Those were general conversations. And Ben Williams was the first person when I put that mat on the table and lifted it up, he just, like, explained all the words and understood the verbiage and how to, I guess, put the invention into words.

Q:  And is that why you hired him to be your patent lawyer?

A:  Yes.

Q:  Did you hire him so he would hide prior art?

A:  Absolutely not.

Q:  If you knew he had hid prior art, what would you do?

A:  I would terminate the relationship with him.

**[Tr.T, L. Laurain, 8/31/21, 651:14-25, 652:1-15, 653:1-3]**

Q:  Have you asked to do any speaking engagements regarding either patent issues or the EZPZ Happy Mat?

A:  I haven't asked, but I was contacted by -- so the USPTO, the United States Patent and Trademark Office, has regional offices.  There's an office located in Colorado.  So I was approached by the director of the regional office to be a keynote speaker at one of their events. So I got up and talked to patent examiners about patent issues all in the area as a keynote speaker, went through our invention and patent process and how we got the patent.  And then after that, I was invited by Director Iancu, who was the head of the entire USPTO.  He shows up on the certificate. I was at a round table with him in the Denver office of there's about maybe five other inventors.  I was then invited by Director Iancu to the White House.  The White House, they were doing a counterfeit roundtable. And so when President Donald Trump got into the office, they made a big initiative about, you know, trying to limit counterfeiting.  And so they did a roundtable. And I was honored to be included as a guest and was a small business owner included for the White House counterfeit roundtable. Other brands were there like Louis Vuitton and Amazon and just UPS, and I'm trying to think of the really big brands Nike.  I mean, it was huge.  It was a big honor.

Q:  If you would look at Exhibit 1085, is that your -- is that the sheet that shows the White House Intellectual Property Roundtable you were invited to?

Q:  You can continue.

A:  Yes, this was an event.  I went to the White House and we were -- I mean, there was probably 40 people.

**[Tr.T, Z. Garthe, 9/2/21, 1337:24-1339:14]**

Q:  Okay.   And are you familiar with the inequitable conducts defense to patent infringement?

A:  I am.  As a patent litigator, I'm very familiar.

Q:  And did you observe any actions or hear any statements by Mr. Williams that there was an intent to deceive the patent office?

> MR. DENEGRE:  Objection, Your Honor.  It's hearsay.
> THE COURT:  Well, I think he can answer that one because that would be a person who was allegedly involved in inequitable conduct.  So I think he can answer that.  So overruled.

A:  I would say emphatically no.  They were very --Mr. Williams and Ms. Laurain were very careful about making sure that that was not -- that that could not be imputed to them.

Q:  And how do you know that?

A:  From working with them on a daily basis, from arguing with Ben.  I mean, I really did not believe that disclosing the Yanko material was going to be helpful or impactful in any way.  But they were emphatic.  They really wanted it to be disclosed.  So that's the type of behavior.

Q:  Okay.  And is that consistent with their behavior throughout the time you knew them?

A:  Absolutely

> MS. MENASCO:  Objection, Your Honor.  Calls for character evidence.
> THE COURT:  Sustained.  You can ask -- you're asking about the character --
> MS. SECOR:  What he observed --
> THE COURT:  Of this person.  So --
> MS. SECOR:  I'll change that.
> THE COURT:  Okay.

(By Ms. Secor)

Q:  Mr. Garthe, did you observe any behavior or actions of either Mr. Williams or Ms. Laurain that caused you to question your opinion that they were trying to do everything properly?

> MS. MENASCO:  Same objection.
> THE COURT:  Okay.  I'm going to overrule that one. Go ahead.  You can answer.

A:  Working with Ms. Laurain and Mr. Williams, they tried to be aboveboard in every interaction I've had with them.

155-2. The Court does not find any statements made by Lindsey Laurain on a podcast to be persuasive impeachment testimony.

**[Tr.T, L. Laurain, 8/31/21, 436:22-23]**

Q:     Ms. Laurain, I'm telling the story you told Mr. Weisz [INspiredINsider interview].

A:     I'm in an interview trying to simplify things.

155-3. The Court does not find that EZPZ's changes of counsel through the litigation bears

on the credibility of EZPZ. The changes were unrelated to the merits of the litigation.

**[Tr.T, L. Laurain, 8/30/21, 514:9-25, 515:1-13, 515: 18-25, 516:1-22, 517:7-25, 5 18:1-19]**

Q: In November 2016, Ms. Laurain, you decided you were going o switch from having Jordan Bolton and Clark Hill involved; and you were going to instead go with Zac Garthe with the law firm of Chipman Glasser. They would be your litigation team in this Louisiana suit. Correct?

A: Can you repeat that again, sorry.

Q: In November 2016, you informed Mr. Bolton that you were going to go in a different direction. You were going to have Zac Garthe and the law firm of Chipman Glasser involved in the Louisiana litigation. Correct?

A: Yes, that's correct.

Q: And you also told Mr. Bolton that you were going to use Brian Tobin of Carlson Gaskey & Olds law firm. We refer to them as CGO for prosecution matters if needed?

A: No, that's not accurate. I never knew of Tobin until for litigation. And we ended up I hired Jack in-house of Chipman Glasser originally for two weeks. I was, like, Zac come work in-house where I can pay you full time. He was, like, you're going to need more than just me. You're going to need a law firm. That's when Zac quit his job at Glasser and came full time. I met Tobin and picked Glasser because of Zac. Zac came in-house. We needed a good IP litigator.

Q: Mr. Bolton was actually the one that referred you to them. Right? He made the introduction?

A: So when I told Bolton I didn't want to use them anymore, he said. "I want to make sure you're taken care of. There's a great litigator in" -- because I love Zac. Zac said when he came in-house we needed a firm behind us. That's when I reached out to Tobin and Gaskey. Zac came out, was blocked out of the case.

Q. Brian Tobin became the lead on this litigation. Correct?

A: Yes.

Q: And Carson Gaskey & Olds, Ted Olds was then brought in to get involved in the prosecution of the continuing application. Correct?

A: That -- yes, based on emails. I did not actually know that. But Zac was dealing with the continuations and Ted Olds was a part of that.

Q: Mr. Bolton remained as counsel of record in this litigation?

A: I didn't know they withdrew. They should have withdrawn but they just stayed on. They didn't do anything.

Q: How did Mr. Garthe obtain the confidential LNC patent litigation?

A: My understanding is that -- and this is just my recollection and understanding, so the lawsuit started by -- Bob Chiaviello sent Jordan Bolton LNC's feeding application, and

233

it didn't have -- Bob Chiaviello sent it but he left off his name off the patent application. He said, "We have our own patent.  Give us $50,000 for the licensing agreement, because we have a patent, you give us $50,000.  Here's our patent." And I said, "Oh, my God, I don't want to pay him $50,000." And then Bolton asked if he could show Ben the patent application to see if there was any merit.  And then we switched.  When I got rid of Clark Hill and Zac took over as lead counsel, I'm assuming, and, again, this is my assumption you can ask Bolton, I'm assuming, transferring of files, Bolton transferred the case to Zac and that would have included the now abandoned Luv N' Care application that Luv N' Care abandoned.

Q:  And you told him that Brian and David are the guys who are going to litigate Nuby.  They are on it and Zac is doing all the in-house stuff.  Right?  And then you gave the background and you said, Game F'ing on." Right?  And then you said, "I have the right team finally in place."  You made those statements, did you not, Ms. Laurain?

A:  That is what this email says.

MS. REISMAN:  I'd like to offer and introduce Exhibit 251 into evidence.

THE COURT:  Any objection to that?

MS. SECOR:  No, Your Honor.

THE COURT:  Okay.  Let 251 be admitted.

Q:  And Mr. Garthe left EZPZ in March 2019.  Correct?

A:  Yeah, he got a partner job at a firm.

Q:  And, prior to that, at the end of 2018, beginning of 2019, that's when Mrs. Secor and Mrs. Fischer and also a gentleman named Rick Martin came on board as your litigation counsel. Correct?

A:  I don't remember the date.  Yes, Tobin and them, I owed them so much money, I couldn't continue on.  Luckily I met Fischer and Fischer and Lisa, and they were willing to work with me.

Q:  And Mr. Tobin and Mr. Bolton both stayed in the case until they withdrew in August of 2019.  Correct?

A:  I don't know whenever -- I don't know when people withdrew. I just -- when I found Fischer and Fischer, they weren't involved anymore. I think when you sent the letters out to everybody, insurance carriers, all the lawyers, people started saying, "Why am I on this case?"

Q:  And so that's –

A: That's my recollection. I'm assuming the time frame is when you sent those letters to everybody.

Q:  And then Mr. Martin withdrew in March 2020 after the prosecution waiver. Right?

A:  No. That's not why and he has since passed away.

Q:  I'm sorry to hear that news. But Mr. Martin withdrew in March 2020. Correct?

A. I don't know when it was.

**[Tr.T, Z. Garthe, 9/2/21, 1306:8-25, 1308:25-1310:19, 1337:24-1339:14]**

A:  While was at Chipman Glasser is where I first met Lindsey Laurain and got introduced to EZPZ. They retained me as their outside litigation counsel for this case. And through my work with them on this case and getting to, you know, provide service to that client, learned about their company and was invited to join them as their in-house general

counsel. So I'm, again, EZPZ's general counsel; and, you know, did that for a few years until eventually, I think it was March or April 2019, when I went to my current firm which is called Cambridge Law. And so now I am practicing as a patent litigator at Cambridge Law.

Q: All right. And when you became general counsel for EZPZ, was Jordan Bolton still involved with prosecuting this case for EZPZ or really defending it for EZPZ?

A: Yes, ma'am. When I joined on to the case, Jordan and I were working together for -- you know, there's an overlap period of time when he and I worked together for the case.

Q:  And were you -- you were working at Chipman Glasser at that time?

A: Yes, that was all through Chipman Glasser.

Q: And then, shortly after that, you became general counsel?

A: Yes. And so I think that was right around the end of January, beginning of February 2017 is when I put in my notice with Chipman Glasser and transitioned over to EZPZ. So that was -- that was several months later after -- after Chipman Glasser had been retained.

Q: Okay. And then were you in-house counsel then for EZPZ?

A: Yes. Starting -- starting around I think that would have been February 2017 that's when I became in-house counsel.

Q: And then did that become an issue when the protective order was entered in the case about what materials could be shared, attorney's eyes only, or confidential?

A: Yeah, that -- that did became an issue because part of the benefit of having me come as in-house counsel was to have me do a lot of the work for the litigation on the inside and avoid high billable costs. And so being -- the way the protective order came down, I was then excluded from the majority of the work of being able to prepare the work for the case. So we then ended up having to rely on outside counsel as well for continuing the litigation forward.

Q:  Is that when CGO was hired?

A:  That makes sense. I don't exactly recall the dates. I don't remember when the protective order came down. I don' remember when CGO got involved, but that accords with my understanding.

Q: And then so what do you mean you couldn't see the documents in the case anymore? A:  Well, I haven't reviewed the protective order in some time. But my recollection is that, as an internal decision-maker for the company, I was not privy to any material that was designated as attorneys' eyes only or highly confidential for the case.

Q: And was that the same for Lindsey Laurain too?

A. Yes. Yes.

Q: So from 2017 on, neither you nor she could see attorneys' eyes only material?

A: Yes, that's correct. And it was a challenge because there was information that our outside counsel had wanted to be able to help give context for us to be able to approve expenditures or, you know, certain strategies, but they couldn't. And so we were sort of trying to lead a litigation from looking outside of the black box.

**[Trial, Tr., J. Bolton, 9/2/21, 1270:5 to 1271:11]**

Q: Okay.  And then, at any time, did you or Mr. McCarthy want to distance yourself from EZPZ or this case?

A:  I can't speak for Mr. McCarthy, but I -- no.

    MS. SECOR:  Okay.  And then let's look at Exhibit

    MS. KIM:  I'm sorry.  One second.

    MS. SECOR:  That's all right.  You can leave it zoomed in.

Q:    On March 7th, 2016, is this about the time your firm was working on the secondary considerations?

A:  I don't remember, but I have no reason to dispute that it was.  I mean, my loose recollection was it was towards the end of 2015, maybe bled into early 2016.  But --

Q:  Okay.  I asked you a date.  I'm sorry.  So, generally, do you recall the process that -- between Mr. McCarthy and Mr. Williams working through secondary considerations, the declarations, do you recall being involved in the back and forth?

A:  At least tangentially, yes.

Q:  And you've worked with Mr. McCarthy for how many years?

A:  As of 2016, a decade probably or so.

Q:  Okay.  And then when Mr. McCarthy said,

"I think the secondary considerations were handled very well," from your experience with him and dealing with him, did you think he said that lightly or just to please the client?

A:  That's not the Tim McCarthy I know.

Q:  And what do you mean by that?

A:  He's a technician.  He's not -- you know, he wasn't very much a bedside guy, not a sunshine and a rainbows kind of -- kind of practitioner. He was just a very technical actor. So, no, I don't take him -- I think if he said that, he meant it.

**[Trial, Tr., T. McCarthy, 8/25/21, By Deposition (03/10/2020) 241:23 to 242:07]:**

Q:  Was it your hope that you were going to be assisting with the national phase of the PCT application?

A:  Again, the PCT application being the one filed by Ben Williams and not the one referenced in Exhibit 644?

Q:  Yes.

A:  I'm sure we would have been happy to work on the national phase applications had she asked us.

155-4. The Court finds Benjamin Williams credible, including the following testimony:

**[Tr.T, B. Williams, 9/1/21, 1201:11-1202:10, 1235:1-15]**

Q:  And if they're cumulative of something that was already before the patent examiner, by definition, they are not material.  Correct?

A:  Correct.

Q:  Under Rule 156.  And Ms. Reisman asked you, "Well, do secondary considerations trump failing to disclose prior art as inequitable conduct?"  And let me ask you this: So you're being accused of inequitable conduct.

A:  Yeah.

Q:  How do you feel about that?

A:  I mean, it feels horrible.  It's absolutely awful.  I don't appreciate it at all.  I mean, I don't know what else to say.

Q:  Do you think you did anything that could colorably be called inequitable conduct?

A:  I never have had at any time in my life any intent to deceive anybody. Did I -- you know, could I have done the prosecution better? Yes, I realize the importance of the record.  But I didn't do anything that is not -- there's no deceptive intent at all. And I think the record does show that. I don't think you can construe my errors and claim that they're deceptive intent. But, I mean, they're not. I think that's -- that should be obvious. I hope.

Q:  No pun intended?

A:  Yeah. No pun intended

Q:  All right.  And is there anything that acquiring the utility patent would have done for you in 2016 that would motivate you to lie and be accused of fraud?

A:  No.  My life you may have; my integrity never.  Absolutely not.

**[Tr.T, Z. Garthe, 9/2/21, 1337:24-1339:14]**

Q:  Okay.   And are you familiar with the inequitable conducts defense to patent infringement?

A:  I am.  As a patent litigator, I'm very familiar.

Q:  And did you observe any actions or hear any statements by Mr. Williams that there was an intent to deceive the patent office?

MR. DENEGRE:  Objection, Your Honor.  It's hearsay.

THE COURT:  Well, I think he can answer that one because that would be a person who was allegedly involved in inequitable conduct.  So I think he can answer that. So overruled.

A:  I would say emphatically no.  They were very --Mr. Williams and Ms. Laurain were very careful about making sure that that was not -- that that could not be imputed to them.

Q:  And how do you know that?

A:  From working with them on a daily basis, from arguing with Ben.  I mean, I really did not believe that disclosing the Yanko material was going to be helpful or impactful in any way. But they were emphatic.  They really wanted it to be disclosed. So that's the type of behavior.

Q:  Okay.  And is that consistent with their behavior throughout the time you knew them?

A:  Absolutely

MS. MENASCO:  Objection, Your Honor.  Calls for character evidence.

THE COURT:  Sustained.  You can ask -- you're asking about the character --

MS. SECOR:  What he observed --

THE COURT:  Of this person.  So --

MS. SECOR:  I'll change that.

THE COURT:  Okay.

(By Ms. Secor)

Q:  Mr. Garthe, did you observe any behavior or actions of either Mr. Williams or Ms. Laurain that caused you to question your opinion that they were trying to do everything properly?

MS. MENASCO:  Same objection.

THE COURT:  Okay.  I'm going to overrule that one. Go ahead.  You can answer.

A:  Working with Ms. Laurain and Mr. Williams, they tried to be aboveboard in every interaction I've had with them.

**[Tr.T, B. Williams, 9/1/21, 1152: 8-14, 1221: 25-1222:14]**

Q:  Were you aware that there was an email that was produced where she had asked for his advise and then the top of the email was redacted and we never have received what he responded?

A;  You know, I don't see how that's relevant. She's able to do whatever she wants.  Right? It's a free country.  If she wants to check people for advice, if she wants to talk to lawyers, attorneys, -- I recommend that all the time.  That is great.  I am not perfect, as you all know.  Right?  I made some mistakes here that, you know, they have been following me around for seven years. Nonetheless -- yeah, I'm glad she did.

155-5.  The Court finds that the statements made by EZPZ and its agents as represented by LNC do not rise to the level of unclean hands or inequitable conduct. The witnesses had plausible explanations for each statement. For example, see the following chart of accusations by LNC, compared to the trial testimony, which demonstrates EZPZ's good faith in prosecuting its patent before the patent office and in this case:

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| (a)  July  7,  2014 statement  to  the USPTO  that  the proposed  invention "has  many  novel features that result in a surface contact self-sealing  integrated tablewear and dining mat  which  is  not anticipated, rendered obvious,  suggested, or even implied by prior art, either alone or  in  combination thereof." | 1. On June 1, 2014, during a lengthy telephone conversation documented on Clark Hill's billings, Mr. McCarthy told Mrs. Laurain the Platinum Pets/Promotional Gift double dog bowl mat was prior art.<br><br>2. On June 10, 2014, Mr. Bolton told Mrs. Laurain, "the benefit of any patent will be diminished by an | **[Trial Tr., B. Williams, 8/31/21, 793: 16 to 794:12]**<br><br>Q:      . . . How did you become introduced to the invention?<br><br>A.      Oh, okay.  Well, Lindsey came to my apartment and she brought a prototype with her.  And she demonstrated the invention that day.<br><br>Q.      Do you remember which prototype it was?<br><br>A.      Yeah, I think it was that, it was that white mat, if I'm not mistaken.  It was substantially like that if that's -- yeah, I believe that is it.<br><br>MS. SECOR:  For the record, please let it reflect Mr. Williams referred to 1001-2.<br><br>Q.      And what do you think? |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | obvious and prior art argument." <br><br> 3. In August 2014, Mr. Williams told _Mrs. Laurain_: "None of the other mats (those dog bowls, etc.) exhibit the same 'suction function." My concern, though, as I think I said before, is whether they will try to claim that feature is inherent to structure disclosed in additional references which, taken in combination, sustain their rejection. <br><br> On April 13, 2015, Mr. Williams told Mrs. Laurain he anticipated a rejection under 103 for obviousness and the need for sales statistics to establish commercial success. | A.   Initially when I saw Lindsey walk in with the mat in her hand, I didn't think much, to be perfectly honest with you.  My initial opinion was, well, that's probably not going to be patentable.  Maybe we could do a design patent. And then she said, basically, you know, "Yeah, but watch this," and then she picked up my coffee table with it.  And I was intrigued at that point.  I was, like, wait a minute. Okay.  There might be language that we can devise that explained what just happened.  And, therefore, I think it met the threshold test for patent eligibility at that point. <br><br> **[Trial Tr., L. Laurain, 8/26/21, By Deposition (6/10/20), 184:1 to 185:08]** <br><br> Q.   (BY MR. DENEGRE)· Ms. Laurain, do you recognize -- well, first off, can you identify this e-mail string between you and Mr. Williams around ·August 18 of 2014? <br> A.   That's what it appears to be, yes. <br> Q.   I would like to ask you about the e-mail at the bottom of page 1.· He says, "I think it would ·be great to do Europe." Do you see that? <br> A.   Yep..· ·"I only wish we could be assured of winning!· It's an expensive road to go down.· None of ·the other mats (those dog bowls, et cetera) exhibit the same 'suction function.'· My concern though, as I think I said before, is whether they will try to claim that feature as inherent to structure disclosed in additional references which, taken in combination, ·sustain their rejection." <br> Q.   Do you see that language, Ms. Laurain? <br> A.   That's what the e-mail says followed by ·"I think we have some good language that enables this function in the description and in the claims.· I have won patents for a lot less in the past.· But I think it's a good choice you have to make for yourself. ·And, |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | remember, we have time." I mean, I think this is another good point that if in Nuby's, you know, narrative we were doing everything to get this patent when Ben is really saying, you know, You're going to have to make the· decision as we go, so -- and I don't need to make it right at that point.· And this was, I think, about ··filing the PCT, which is more expensive and so -- but what was your question?<br><br>**[Trial Tr., B. Williams, 9/1/21, 1119:17 to 1120:7]**<br><br>Q.    Well, let's look at, at least as of -- this is Exhibit 29. At least as of August 24th, you were aware of the dog bowl mats because you referred Ms. Laurain to them.  You said, "None of the other mats, those dog bowls, etcetera, exhibit the same function.  My concern, though, as I think I said before, is whether they will try to claim the feature as inherent to structure disclosed in additional references, which taken in combination, sustain their rejection."  Did you not write that, sir?<br>A.    I did write that.  And that's going to obviousness, correct?  You see the hypothetical combination obviousness. I'm not sure what those dog bowls are, those dogs bowls, etcetera.  It could have been a number of different dog bowls. It could have been.  I don't remember, I honestly don't.  But, nonetheless, the Platinum Pets was disclosed, if that's your inference.<br><br>**[Trial Tr., B. Williams, 9/1/21, 1123:8-20]**<br><br>Q.    If Mr. McCarthy had told Ms. Laurain that the dog bowl mat, the Platinum Pets Mat, was prior art that she needed to disclose; and if she had then come in to you and said, "Tim McCarthy, look him up.  He's very well known at Clark Hill, told me to disclose that," you would have disclosed it, would you not, Mr. Williams?<br>A.    And that's why we did disclose it.  Yes, it was disclosed.<br>Q.    But had she told you that from the beginning, you would have disclosed it in the beginning.  Right? |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A.  Yes, but I don't fault her for my not reading the email and not understanding the process properly. It's complicated, you know.  So -- We did disclose the mat.  Thank God we did.<br><br>**[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 491:04-12, 491:14-24, 492:20 to 493:12, 498:18-499:06]**<br><br>Q.  Yes, sir.  I wanted to direct your attention to the "Summary of the Invention."  You say -- you say that the invention is, quote, not anticipated, rendered obvious, suggested, or even implied by prior art, either alone or in combination thereof. And my question to you, sir, is, what prior art had you considered when you made that statement?<br>A.  Well, first of all, that paragraph is a boilerplate paragraph that is in every application that I wrote at that time.  That comes directly out of the firm I used to work at before. Secondly, the prior art that I'm referring to is the suction cups, adhesives, and the stuff that Lindsey had mentioned to me in the consumer products markets that didn't do what her invention did.  So in my mind, I'm thinking about placemats, tablecloths, plates, bowls, really anything that is a tableware or a mat.<br>Q.  (BY MS. MENASCO)  Isn't it true, sir, that you told Laurain that you were concerned the examiners would claim the suction feature was inherent to structure disclosed in the dog bowl references, plus additional references; which, taken in combination, sustain their rejection?<br>A.  Yeah, that's highly probable, sure.  But again, it doesn't matter, because we traverse the obviousness rejection on secondary considerations of nonobviousness, which is an entirely different legal inquiry.  It doesn't have to do with the hypothetical combination of known prior art.  In fact, it can be obvious, but because there are secondary considerations of nonobviousness, it is found not to be obvious for one of those reasons that are set forth in the Manual of Patent Examining Procedure, which we tried to show to the patent office during prosecution. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | Q.   (BY MS. MENASCO)  Going back to Exhibit 687 in front of you, where you say the examiners may claim -- they may try to claim that feature as inherent to structure disclosed in additional references, what additional references were you referring to there? |
| | | A.   Well, your -- your -- as is typical of LNC, you're quoting only here partially; because the rest of that sentence, if you read it, says, "which, taken in combination, sustain their rejection."  So I'm talking about the potential for the European equivalent to an obviousness rejection, based on a hypothetical combination of, you know, a similar situation, like Bass and Lion. |
| | | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 633:05-07, 633:09-10]** |
| | | Q.   Did -- did Lindsey Laurain ever tell you that Tim McCarthy had told her that the Platinum Pets Mat would prevent -- prevent a patent from issuing? |
| | | A.   No.  And I don't -- I don't think -- I don't think he's right about that, if he did say that. |
| | | **[Trial Tr., L. Laurain, By Deposition (6/10/20), 132:09-133:05]** |
| | | Q:   Well, both McCarthy and Bolton were very negative on your chances to obtain a utility patent, correct? |
| | | A:   That's a strong statement to make.  One, Bolton isn't a patent expert, so any one of Bolton's statements, I think, has to be used in that context, that he's giving his high level of friend opinion. And I don't remember my specific conversations with Tim McCarthy.  I would say if they were both that concerned, why would they have gotten involved helping us prosecute the patent in March of 2016? Yes, there were -- getting a utility patent isn't easy. And like I said, Jordan Bolton has statements similar in March of '16 that it's still going to be a tough road.  So I think any of that is taken out of context. If they had concerns, I'm assuming they would have said, We're not going to help you do the secondary |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | considerations and so on and so forth, and, quite frankly, wouldn't have probably got involved in a litigation, so I think your statement is taken out of context. |
| (b) On April 13, 2015, Mr. Williams, on behalf of Mrs. Laurain, asserted that, while her device may appear to be simple, "in actual fact it displays properties not seen in the prior art, properties contrary [to] any enablement set forth by either Stravitz or Lion, or any proposed combination of the two." | Ben Williams did not conduct a prior art search, and he did not review the prior art references Mrs. Laurain sent him at any time during the prosecution of the '903 Patent. | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 524: 11-15, 524:19 to 525:07, 525:10-15]**<br><br>Q.   You -- you argued to the patent office that the claimed invention, quote, displays properties not seen in the prior art.  What prior art were you referring to there, sir?<br>A.   Stravitz.<br>A.   Where was it?  I think I'm talking about Stravitz, but if you would show me where it says it. Is it the third paragraph, second paragraph?  I'm not -- I'm not sure where you're referring to, Ms. Menasco, but . . .<br>Q.   (BY MS. MENASCO) I'm looking for it right now.<br>A.   Okay.  But, you know, the discussion --the context of the response is Stravitz, correct?  So I presume it's in reference to Stravitz.  That is the prior art in issue.  I guess, also, Lion, right, if Stravitz and Lion were 4 through 9.<br>Q.   The words "the prior art," though, would include more than Lion and Stravitz, wouldn't it, sir?<br>A.   No, actually, it wouldn't.  I mean, typically when you're arguing in an office action, you refer to the references as the prior art.  I mean, that's what's on record.  I mean, you could read it that way if you want, but that's certainly not how most people prosecute patent applications.<br><br>**[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/2020), 415:9 to 416:13]**<br><br>Q:   (BY MS. MENASCO) And I believe you did have that conversation with Ms. Laurain, because after your meeting, she sent you an email that listed all of the prior patents that she had found and similar products that she had found, right?<br>A:   Yes, she did send me that email.  And I'm glad you brought that up.  That email was -- you're talking about a specific attachment that was on an email.  And the email had a lot of other stuff on it, including the drawings.  I took that email to be a disclosure |

243

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | email.  And, unfortunately, I did not even see that Word document tucked in between the giant JPGs. And when I dragged it into my folder, it's actually -- I think you -- you have it, because it was disclosed with all my hard drive.  It was in the old folder in my filing system. So yes, she did send me a list of patent numbers from a search that she, herself, had conducted.  At that time, unfortunately, I wasn't aware of that. And I will also say that it arrived at like -- when I got to it, it was about 10:30 at night.  And I just grabbed all the attachments and dragged them into my folder and went on with the -- the case I was working on at that time.  But yes, she did -- she did disclose that to me.

**[Trial Tr., L. Laurain, 8/26/2021, By Deposition (6/10/2020), 34:16-21, 34:23-25, 35:1-11, 35:23 to 36:1, 36:2-9]**

Q:     So this was produced to us by Ms. Speer as the patent search that you had sent to Ms. Lilja and Ms. Speer.· Do you recognize this patent search?

A:     I -- I recognize this patent search·document that's in front of me and that's what it ·says.

Q:     (BY MR. DENEGRE)· Okay.· And is this a document that you created?

A:     Um, I honestly don't recall specifically creating this document, because it was so long ago and it was done a week after I had the idea, but based on email exchanges and attachments, I have  no reason to dispute this being a document that I created.

. . .

Q:     Let me call your attention to one of the patents, which is the sixth one down, US 8251340.· Do you see that one?

A:     Yes.

. . .

Q:     Do you recognize that as the Webb patent?

A:     No, sir.

Q:     Do you know what I mean when I say "the Webb patent"? |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A:      I do because of this litigation, but I have no way of telling that that would be the Webb patent.· To me, like I said, it looks like a Google search. |
| (c)   On   April   13, 2015, Mr. Williams on   behalf   of   Mrs. Laurain,   stated   her device,   "does   not create 'suction' when pressed   to   a   suitable horizontal     surface 'with   which   suction can develop', but on the contrary creates a partial vacuum …" | The numerous statements by EZPZ to the consuming public that the Happy Mat "suctioned." A partial vacuum and suction are the same thing.  Indeed EZPZ admitted this in its 2015 Media Kit when it said the mat "[s]uctions to the surface because of the difference between the external and internal pressures.  The 2 surfaces create an air tight vacuum, …. In the Happy Mat video Mrs. Laurain states that the mat "suctions to the table, I mean really suctions." The Webb Patent describes formation of a partial vacuum. | **[Trial Tr., B. Williams, 8/31/21, 797:21 to 799:7]**<br><br>Q.      And Ms. Laurain wrote you and said, "The focus will be on the, quote, 'suction function.'"  End quote. What did you understand she meant by "the suction function"?<br>A.      Well, that's what I termed the surface contact, self-sealability of the mat.  So the ability of the mat to prevent the atmosphere from displacing underneath it so that when you try to lift it, you're basically lifting it against air pressure.  If it displaced underneath, it would just come away quite easily.  So it was the sealing of the mat to the underlying surface is what I took that to mean.<br>Q.      So when you say that air can get underneath the mat, you mean, like this?<br>A.      Yeah, just like that exactly.  Yes.<br>Q.      So I looked at the Platinum Pets lifting the right side of the right bowl as I look at it on the stand?<br>A.      Yeah, same with this too.  I mean, we're all sitting at the bottom of the atmosphere.  So there's, like, -- I don't know what the weight is so I can't remember.  But per square foot there's a column -- there's a column of atmosphere. Excuse me.  I'm sorry.  I didn't realize I wasn't speaking into the microphone.  But because the atmosphere is able to displace underneath this receptacle, it's easy to pick it up.  But Newly's principle buoyancy would apply too if it displaced more fluid than it does.  But if this sealed to the bottom and it wouldn't allow atmosphere to displace underneath it, in this case, I probably would be able to lift it up because the column is smaller, so the mass holding it down is less. But the effect is air pressure, but the cause is the self-sealing that prevents displacement of atmosphere under the mat.  In other words, there's no vacuum under the mat until you try to lift it.  And I think that is a crucial difference with what is taught in the art versus what is evinced in this form of self-sealing which is very |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | difficult to separate indeed.  I mean, I can't rip it up at all.<br><br>Q.    So you're talking about the EZPZ mat?<br>A.    Which you can -- yeah.<br><br>**[Trial Tr., L. Laurain, 8/31/21, 663:21 to 664:8]**<br><br>**Q.    Can I ask you a question about that?  Would the suction function -- so when you say "suction function," are you talking about suction like a suction cup?**<br>**A.    No.  It's my way to describe the invention.  I mean, the super suction that you were showing on the podium is – you know, from a -- a brand messaging standpoint, most people, most consumers would be confused if we said self-sealing, you know, only removable at the outer edge.  So super suction, suction function, I mean, that's in my mind self-sealing suction function.**<br>**Q.    Suction function sticks in the consumer's mind?**<br>**A.    Surface contact, self-sealing tableware and dining mat.  I say suction function, but I'm not meaning it's a suction cup.**<br><br>**[Trial Tr. L. Laurain, 8/26/21, By Deposition (6/10/20) 88:8-24]**<br><br>Q:    (BY MR. DENEGRE)  What did you mean by "suction function"?<br>A:    I think that's the easiest way to describe that literally at that time you couldn't get the plate off -- a plain bowl off the table.  I mean, I was lifting 200-pound tables with the mat.  Or I couldn't lift -- I couldn't break a seal.  I was able to lift hundreds of pounds table. So to even -- when you look at the Tommee Tippee mat that I had on the tray, they are so different to have now this white prototype all in one that people stop in their tracks.  I mean, they can't even believe it, that you can't get it off the table. It was literally and it literally is a phenomenon.  I mean, it was -- it's exciting and it goes back to an exciting time, that the suction function is something that you would not expect. |
| (d) The Platinum Pets Mat is an example of | To support this assertion, Mr. | **[Trial Tr., L. Laurain, 8/31/21, 673:23-674:18]** |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| a prior art device made of silicone that does not "Effect Surface Contact Self-Sealing" (Appendix D of March 9, 2016 submission) | Williams and Mrs. Laurain submitted a video to the USPTO in which the Platinum Pets mat "comes away very easily without making a suctioning noise," but failed to disclose a second video where the Platinum Pets "mat kind makes a suctioning noise … - so it looks like it tries to self-seal but fails." | Q.   Okay.  And then right here, here's the Platinum Pets bowl that was disclosed to the patent office, wasn't it?<br>A.   Yes, this is -- yes.<br>Q.   And it says, "Even though made of silicone, this device fails to make sealable contact with a underlying surface"?<br>A.   Yes, that's what it says.<br>Q.   Okay.  And so you saw the demonstration by Mr. Hubbard that it -- I mean, they were able to pick up the glass when they picked it up from the middle.  So how can you say it doesn't make sealable contact with the underlying surface?<br>A.   Well, that was the first time I've ever been able to see Platinum Pets.  I was with Mr. Hubbard.  In the video, Mr. Hubbard, he continues to lift Platinum Pets in his original video.  If you want to grab the Platinum Pets version I have over there, you can see it absolutely does not make self-sealing contact.  Again, the mat is only removable on the outer edge.  So there's Platinum Pets, the one we had.<br>Q.   So you mean because, like, as I was showing Mr. Hubbard that, because it goes up like this pretty easy, it's not --<br>A.   Yes, your point is you can only remove it on the outer edge by peeling the outer edge.<br><br>**[Trial Tr., M. Henley, 9/2/21, 1436: 15 to 1438:9]**<br><br>Q.   So, when Mr.Hubbard, LNC's expert, demonstrated Platinum Pets, he was able to lift this glass tabletop off the table with it?<br>A.   Uh, huh.<br>Q.   Can you do that?<br>A.   Probably.  I'll use that one because it looks a little bit --<br>Q.   No.  Can you do it with that one?<br>A.   I'll try.<br>Q.   What is it about this one that looks better to you for –<br>A.   It's just not as deformed.  So, in other words, it's not taking as much of a compression set.  There's a little bit of undulation there.  But --<br>Q.   Okay.  We'll use the better one then. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A.   All right.  Let's try it. |
| | | Q.   Do you know how this package -- this product comes packaged? |
| | | A.   In a box just folded on itself. Actually let's do it without these, first.  Thank you. Will this lift?  Hang on. |
| | | Q.   You can try it without the bowls if you want. |
| | | A.   Okay.  It really needs to be a thicker mat in order to work properly.  No.  All right.  So I'm basically just breaking the seal.  I can't replicate whatever -- whoever you said lifted the table. |
| | | Q.   If you have to smooth it down to get it to work, does that read away from the claims? |
| | | A.   Correct.  So that's manual manipulation, right.  It's not surface, contact self-sealing. |
| | | Q.   So if you have manual manipulation, it's not self-sealing? |
| | | A.   Correct. |
| | | Q.   So show us what you mean by that with the Happy Mat. |
| | | A.   I'll trade you.  Boy, this thing is heavy. |
| | | Q.   You don't need to lift the table.  I just want to show -- |
| | | A.   Isn't that what you said happened? |
| | | Q.   Yeah.  Well, they used the Platinum Pets. |
| | | A.   Okay. |
| | | Q.   So explain to us why the Happy Mat is different. |
| | | A.    It's structurally different.  It is -- it is truly surface contact, self-sealing.  In other words, I don't need to do any additional manual manipulation.  I can drop it from a lot of different angles.  It will sit down.  And as soon as I try to move it laterally, vertically, you know, obliquely, it's just not -- it sticks.  So I'm trying to create a partial vacuum underneath it and that's a very difficult thing to do. |
| | | **[Trial Tr., B. Williams, 8/31/2021, 860:17 to 861:10, 861:23 to 863:2]:** |
| | | Q:    Okay.  So why do you say that Platinum Pets is the closest prior art? |
| | | A:    Because it has molded receptacles that are part of an integral unit.  It is an integrated mat.  It's tableware mat integrated.   It has a  planar portion  that  is |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | rubberlike. It meets the claim description with the exception that it is removable at places other than the outer edge. It doesn't perform the same surface contact, self-sealing. Air displaces underneath the mat, and sometimes it makes a noise where you can hear the air displacing under the mat.<br><br>Q:  So you know that there's an issue about the two videos, one was of Platinum Pets? One was submitted to the patent office, one was not.<br><br>A:  I do. And I watched those videos. And, like, the suction sound is very very -- I mean, there's not that much difference between them. And the sound that it makes is actually evidence of the opposite alleged. It's the sound of atmosphere displacing under the mat. So the sound itself is evidence that it doesn't surface contact, self-seal.<br><br>. . .<br><br>A: Can I say also that the two videos are not that different. I don't know if you guys have watched them in here. But if you actually watched them and listened to it, I mean, I don't see - I don't see why -- anyway I just think that's ridiculous.<br><br>Q:  Okay. So you've said that the sound means that it shows that the air is getting underneath the mat?<br><br>A:  Yeah, the sound is atmosphere displacing under the mat. That's exactly what is happening.<br><br>Q:  So if air is displacing under the mat, it makes it less likely to stay --<br><br>A:  Well, when you try to lift the Happy Mat, do you hear a noise?<br><br>Q.:  When I try or when I do?<br><br>A:  No. When you try to lift it. Try to lift it in the middle. I don't hear any fart sounds, forgive my language, to use your vernacular. Now lift it up at the edge. Do you hear any displacement of atmosphere? No, because the atmosphere isn't -- you know, one, there is no seal for the atmosphere to displace under when you're picking it up at the edge. And the other time it is sealing and no atmosphere can displace under the edge. So there's no noise involved.<br><br>Q:  So if air can get underneath the mat, then it does not - - does not read on the Happy Mat? |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A:   Correct.  That is surface contact, self-sealing.  It's not just that air can't get under it, it's in contact.  It self-seals so there's no setting and the air does not get under the mat. Those, I think are three -- and there's other language in the claim, but those are three things that need to be met for sure<br><br>**[Trial Tr., B. Williams, 9/1/21, 1138: 13 to 11:39:16]**<br><br>Q.   And then you went on and you stated, "That there exists a whole panoply of silicone products in the state of the art that do not affect self-sealing in the matter explicitly set forth by applicant.  Correct?<br>A.   Panoply, and, yes, correct.<br>Q.   And so if you had information that was inconsistent or refuted that, that would be material information that should have been disclosed to the U.S. Patent Office.  Right?<br>A.   Could I ask a question?  How could the panoply of silicone substrates that do not affect self-sealing be contradicted as a true statement?  There is a whole panoply of silicone products that don't -- in fact, silicone is known to be nonstick in many examples.  I have a lot of products that are silicone that don't stick.<br>Q.   Well, and if Ms. Laurain had products that do exhibit the surface contact, self-sealing property, those should have been disclosed.  Right?<br>A.   Right.  If they were not cumulative, right, and if they were material then, yes.  But if they were cumulative or not material, no.<br>Q.   Well, they weren't cumulative because at that point, the U.S. Patent Office was looking for replacement for Lion.  They didn't have a reference; and you certainly hadn't disclosed two of them, had you, sir?<br>A.   They had over 100 references that they looked at and a lot of them had silicone in.  And Lion was not a great reference to begin with.  They found a lot better ones.  And Platinum Pets was disclosed as was the Gerber mat, which is made out of silicone and doesn't perform surface contact, self-sealing. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | **[Trial Tr., L. Laurain, 8/26/2021, By Deposition (6/10/2020), 169:6-25]:**<br><br>Q:   Did Mr. Williams ever give you an opinion that the Platinum Pets dog bowl did not need to be ·produced to the patent office?<br>A:   No.· I mean, I think the opposite was --  when it came back up in March 2016, he, I think, called the examiner to find out if we could actually send in the physical mats, so I would say, if anything, it was the opposite. He was figuring out how to get the best version of the mat to the examiner, whether an in-person interview, sending in the mats, video.· We also sent a link and we sent a picture of the mat, so·I think that was five different ways we discussed getting Platinum Pets to the examiner.<br>Q:   (BY MR. DENEGRE) Prior to that time in March of 2016, had he given you any opinion that it was not necessary to submit the Platinum Pets mats to the patent office?<br>A:   I don't recall, but I don't believe so. |
| (e) Appendix D of the March 9, 2016 submission includes "Prior Art Devices Made of Silicone Do NOT Effect Surface Contact Self-Sealing" | Mr. Williams and Mrs. Laurain did not authenticate Appendix D prior to submitting it to the USPTO, ignoring the advice of patent attorney Tim McCarthy that it should be authenticated | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 695:1-15, 697:01-14]**<br><br>Q.   (BY MS. MENASCO)  If you look at the next page, Mr. Williams, the one ending in 1291, he had some questions about the appendices.  He says, "In my opinion, Appendices B, C, and D should be authenticated."  Exhibit -- Appendix B was the list of stores, right, sir?<br><br>. . .<br><br>Q.   Appendix D is a list of devices -- was a list of devices that do not perform the same function; is that right?<br>A.   I don't remember, but I would say yes. I mean, I've got the file wrapper, right?<br>Q.   Yes, sir. So why didn't you have the list of devices that do not perform the same function authenticated. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A.   Again, because they're objectively (inaudible) and can be analyzed by Examiner Volz of her own devices. It's self-authenticating. <br><br> Q.   (BY MS. MENASCO)  You didn't follow his advice that Appendices C and D should be authenticated? <br><br> A.   I think he probably agreed that they didn't need to, by the time we filed it.  Otherwise, we would have authenticated them.  But again, I don't know how you authenticate them.  How would -- how would you recommend those be authenticated?  When was this email? It was March 7th, so this was a week or so before we filed, right?  So, in the end, he must have agreed that they were self-authenticating. <br><br> **[Trial, Tr., J. Bolton, 9/2/21, 1270:13 to 1271:11](emphasis added)** <br><br> Q:   On March 7th, 2016, is this about the time your firm was working on the secondary considerations? <br><br> A:   I don't remember, but I have no reason to dispute that it was.  I mean, my loose recollection was it was towards the end of 2015, maybe bled into early 2016. But -- <br><br> Q:   Okay.  I asked you a date.  I'm sorry.  So, generally, do you recall the process that -- between Mr. McCarthy and Mr. Williams working through secondary considerations, the declarations, do you recall being involved in the back and forth? <br><br> A:   At least tangentially, yes. <br><br> Q:   And you've worked with Mr. McCarthy for how many years? <br><br> A:   As of 2016, a decade probably or so. <br><br> Q:   Okay.  **And then when Mr. McCarthy said, "I think the secondary considerations were handled very well,"** from your experience with him and dealing with him, did you think he said that lightly or just to please the client? <br><br> A:   That's not the Tim McCarthy I know. <br><br> Q:   And what do you mean by that? <br><br> A:   He's a technician.  He's not -- you know, he wasn't very much a bedside guy, not a sunshine and a rainbows kind of -- kind of practitioner. He was just a very technical actor. So, no, I don't take him -- I think if he said that, he meant it. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | |
| (f) Appendix D of the March 9, 2016 submission includes "Prior Art Devices Made of Silicone Do NOT Effect Surface Contact Self-Sealing" and asserts that "[d]espite being made of silicone, none of these prior art devices perform the same surface contact self-sealing action specifically claimed by Applicant." | Mr. Williams and Mrs. Laurain knew of prior art devices that *did* self-seal, including but not limited to the Hot Iron Holster, the Oogaa Placemat, the Brinware Silicone Placemat, the Momo Baby Skid-proof Silicone Placemat, and the Tommee Tippee Mat – and failed to disclose those items to the USPTO | **[Trial Tr., B. Williams, 9/1/21, 1217: 6-16]**

Q.   So what I'm asking:  Once it was disclosed, did you feel like you sufficiently disclosed Platinum Pets?
A.   Yeah.  Because -- yes.  And not just in the action, in the conversations with the examiner.  I mean, there was a lot of discussion.  So, yes, absolutely that was considered.  That is known.  They looked at it, absolutely, as well as other stuff, a lot of other stuff.  And I think their short comments even show that and my notes to those comments about "We know of stuff that sticks to the wall."  I mean, they clearly were aware, and I know they were aware, of a lot of art in the field of endeavor.

**[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/2020), 555:04 to 556:04]:**

Q:   (BY MS. MENASCO)  All right.  I want to go back to your notes.  And we can -- we can see that there was a call on August 26 of 2015.  If you can flip back to tab 12 (sic) in your binder, that is the document that we marked as Exhibit 797.
A:   797?
Q:   Yes, sir.
A:   Okay.
Q:   And on the second page there's an entry for August 26, 2015.
A:   Oh, yes.
Q:   And can you -- and you wrote there, "Supervisor Fenn Matthew [sic] - concerns: says rubber sheets and silicone sheets exist that stick to walls. Concavity change to receptacle?  Suffuse undersurface - define."
A:   Yes.
Q:   "Suffuse means continuous and spread out."
A:   Yes.
Q:   Can you -- so was supervisor -- Supervisory Examiner Mathew (sic) telling you that he was aware of rubber sheets and silicone sheets that stick to walls? |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | A:    Yeah.  His argument -- his concerns were that there exist other sheets that -- that can stick to walls, yeah.<br><br>**[Trial Tr., B. Williams, 9/1/21, 1165:1-17]**<br><br>Q.    And the only reason that you finally disclosed that in March 2016 was because Tim McCarthy told you you had to. Right?<br>A.     I don't know if that's the only reason why. But, yeah, we did disclose it because I was aware of it at that time, absolutely.<br>Q.    And the disclosure was with your characterization of what it was. Correct?<br>A.    No, that's not true because we spoke about it on the phone. And they're smart people, Ms. Reisman.<br>Q.    Yeah. And there was no –<br>A.    They already knew that there was stuff that stuck to walls. You said it yourself. They're very aware of the field of art. They're aware of Platinum Pets. They're aware of probably all the other stuff that's out there more than me.<br>Q.    You never listed –<br>A.    They're probably aware of that one. |
| (g) The statement that experts in relevant fields of art supported nonobviousness due to the unexpected result in maintaining position upon an underlying surface without the use of suction cups or adhesives, when they knew the relevant field of art was the field of materials science. | Mr. McCarthy had told Mr. Bolton: "I want to hear from a material scientist that says he would not expect this structure to have this function."<br><br>Mr. Williams drafted a declaration to be signed by a material scientist, but could not find one to sign it.<br><br>Mrs. Laurain was looking for a material scientist to testify "to the properties of silicone and that the | **[Trial Tr., B. Williams, 9/1/2021, 1177:14 to 1178:7]:**<br><br>Q:    And can you tell me if the -- my understanding of the benefits to the public with a patent application are that someone that isn't of ordinary skill in the art would be able to pick up the application once it has -- pick up the patent once the patent has expired and make the EZPZ Happy Mat. Right?<br>A:    Just like you guys did, yes.<br>Q:    What language in the patent, sir, tells someone like me if we went into the future how to formulate the silicone to make it seal?<br>A:    Well, number 1, it's a person of ordinary skill, not a person not of ordinary skill.  And, number 2, ask you guys.  You did it.  You reduced it to practice.  You bought one and made one.  So clearly it was an undue experimentation. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | suction is indeed an unexpected result" of her alleged invention but was "honestly" unable to find anyone because of "the recent silicony suction/sticky stuff…" in the market. | Q: And, sir, wasn't it that Supervisor Mathew here was asking -- he was -- he was basically asking, just as he had been asking about the silicone sheets that stick to walls, now he's asking about material properties.<br><br>A: That's incorrect.<br><br>Q: He's asking about what a material scientist would know about the properties of silicone. Right?<br><br>A: No, there's two things I've got to respond to that. One, he wasn't asking about things that stick to walls. He said he knows of things that stick to walls. And, Number 2, we were discussing the arrangement of the mat, why, for example, a mouse pad in particular doesn't do this even though it's a very similar silicone substrate, and why the Happy Mat does and how the seal forms. But, anyway, yeah.<br><br>Q: Sir, isn't it true that you told Mr. Bolton and Ms. Laurain and Mr. Fountain and Ms. Falcone and Mr. McCarthy that the -- that LNC's likely argument after they filed suit in June 2016 was that the inherent property of silicone enabling the self-sealing action is not an expected result and that there is no novelty to the invention?<br><br>A: Did I say that was probably going to be your argument?<br><br>Q: Uh-huh.<br><br>A: And is that not the argument you made?<br><br>Q: Well, doesn't that mean, sir, that you -- that you knew -- that you knew there were inherent properties of silicone —<br><br>A: Inherency doesn't matter, though, when it comes to patentability and our presumption of validity because we have the secondary considerations that we didn't need inherency. Inherency is not relevant to the obviousness inquiry. But I appreciate the opportunity for sharing that.<br><br>**[Trial Tr., L. Laurain, 8/31/2021, 626:8 to 628:199]:**<br><br>Q: So then there's been a lot of talk about the material scientist.<br><br>A: Yes.<br><br>Q: So I think it was Mr. McCarthy that said we -- "To show the structure and to do this and show this, the silicone |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | doesn't do what's expected, I want a material scientist." Do you remember that email? |
| | | A:  Yes. |
| | | Q:  What did you think about that at the time? |
| | | A:  At the time, it was part of the secondary consideration. I was trying to find a material scientist, and I don't know the degrees, but having a Ph.D. and that could attest to that silicone, the inherent property of silicone or you wouldn't expect this with silicone. |
| | | Q:  What did you look for? |
| | | A:  I was never able to connect with one. I was trying to get through my network to literally find the person, and I never had a conversation with a material scientist. |
| | | Q:  What did you do about silicone and what you thought you were trying to prove at the time? |
| | | A.  So, at the time, and prior to this, I didn't realize silicone could be even, like, tacky and sticky. And so we had known of sticky silicone bakeware. That was when I saw the Hot Iron Holster. I was, like, silicone can be tacky, so we were not going to get a material scientist. I hope it's okay not to include that. |
| | | Q:  The reason you couldn't get the answer was it was different than you believed? |
| | | A:  Yes, yes, I didn't believe silicone could be sticky or tacky. I saw the Hot Iron Holster that was sticky and tacky. That's what I was saying, hey, there's other sticky stuff. I don't think a material scientist wouldn't say silicone can do that, yes. |
| | | Q:  Because it can? |
| | | A:  Yes. And I want to clarify, though, we still claimed unexpected results even though a material scientist wasn't there to give us an answer. Unexpected results -- for instance as a person passes us by in the trade show, they're walking and they see a placemat and a plate, you lift the table, it's an unexpected result. You wouldn't expect the table to lift. That's important. There's nothing about the properties of silicone in the patent. |
| | | Q:  And so there was not -- there was nothing -- that's okay. Did you think you had to have the material scientist to be able to overcome the secondary -- or -- I'll start from the beginning. Did you think you had to |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| | | have a material scientist to succeed on the secondary consideration?<br><br>A:    No, it was just the original strategy outlaying all different kind of areas.  And then that was when I said, "I hope it's okay because I didn't literally find one." And then I'm assuming, yeah, that's fine.<br><br>Q:    Did you believe you had unexpected results as to commercial success?<br><br>A:    Yes.<br><br>Q:    And why did you think you had commercial success? Why did you think those were unexpected results?<br><br>A:    Again, as a mom or dad back walking by, you would think placemat and plate and you wouldn't expect the table to lift. So it's literally an unexpected result. Yeah, everyone knows what a placemat and plate is. You see it, you say, "Oh, that's cool.  When you lift the table, that's an unexpected result.<br><br>**[Trial Tr., Z. Garthe, 9/2/21, 1311:2-21]**<br><br>Q.   And in the time that you were involved as in-house counsel for EZPZ, did you ever believe that you needed a material scientist for anything that related to the patent application?<br>        MS. MENASCO: Objection. Relevance, Your Honor. Mr. Garthe came on as outside counsel and then in-house both occurred after the '903 Patent issued. So I don't see the relevance of this.<br>        THE COURT: He can say if he did during that time. Only been a short period of time which I assume he would have known that. But --<br>        MS. MENASCO: The patent had already issued when he --<br>        THE COURT: Yeah. I'm going to allow her to ask him that just to see because there's a lot that happened after that. Overruled. Go ahead.<br>        THE WITNESS: Thank you, Your Honor.<br>A.   A material scientist for the functionality of the -- of EZPZ's utility patent is irrelevant, doesn't make any sense. It's not about -- it's not about the composition of the silicone. |
| (h) Mr. Williams and Mrs. Laurain | Mrs. Laurain repeatedly told others | **[Trial Tr., L. Laurain, 8/31/21, 663-21 to 664:8]** |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| represented to the USPTO:<br><br>Stravitz merely teaches "suction-providing means…"<br><br>This is directly contrary to Applicant's disclosure. Applicant clearly sets forth that her suffuse undersurface (structure entirely lacking in Stravitz) creates "a partial vacuum when attempts to separate the undersurface from the underlying surface are made except at an outer edge" [see claim 1]. Applicant's device does not create "suction" when pressed to a suitable horizontal surface "with which suction can develop", but on the contrary, creates a partial vacuum when attempts to remove the mat are made "except at an outer edge of the planar portion, whereby removal of the planar portion from the underlying surface is effective only by peeling the undersurface from the underlying surface starting first at the outer edge". | that she was trying to patent the "suction function" | Q.   Can I ask you a question about that?  Would the suction function -- so when you say "suction function," are you talking about suction like a suction cup?<br>A.   No.  It's my way to describe the invention.  I mean, the super suction that you were showing on the podium is – you know, from a -- a brand messaging standpoint, most people, most consumers would be confused if we said self-sealing, you know, only removable at the outer edge.  So super suction, suction function, I mean, that's in my mind self-sealing suction function.<br>Q.   Suction function sticks in the consumer's mind?<br>A.   Surface contact, self-sealing tableware and dining mat.  I say suction function, but I'm not meaning it's a suction cup.<br><br>[Trial Tr., L. Laurain, 8/31/21, 719:25 to 720:19]<br><br>Q:   In that video, you also said, "And it suctions, I mean really suctions."  Do you remember that?<br>A.   Sounds familiar.<br>Q.   Okay.  And do you remember Mr. Williams arguing to the patent office after your first rejection, played a little game of semantics, didn't he, with the overworked and inexperienced examiner?  And he said, "No, our product doesn't suction.  It creates a partial vacuum."  Do you remember that, Ms. Laurain?<br>A.   Again, I think I clarified that earlier.  This is suction cups.  I'm talking to laymen term.  Suction --<br>Q.   But Mr. Williams didn't use the term "suction cups."  He tried to tell the examiner that there was something different between the term "suctions" and "partial vacuum."  Right, Ms. Laurain?<br>A.   Suction cups.<br>Q.   Well, we'll let the Court look and see what he argued to the patent office.  And, in that video, you weren't just promoting the suction function, were you?  You had your boys in there and you had them all lying on your lap.  You were promoting your story, weren't you?<br>A.   If that's what you think it is.  I think I was promoting the product.  Again, the product sells itself. |

| Representation to the USPTO | LNC Established Facts | Actual Representations by EZPZ |
|---|---|---|
| This could not be more opposite the teaching of Stravitz. | | |
| (i) Falsely representing that Mrs. Laurain had orally assigned all her rights in intellectual property on April 10, 2014 when no such assignment had actually occurred. | Email evidence that Mrs. Laurain was still seeking the advice of Mr. Williams in June 2016 as to whether she should assign her IP rights in order to shield herself for personal liability in this lawsuit | This issue was already resolved by the Court. The oral assignment was made valid by a written assignment of record in the '903 patent file wrapper. |
| (j) Other false or misleading representations identified by the Court based upon the evidence presented at trial | | Not applicable |

155-6.  The Court finds that the conduct of EZPZ and its agents as represented by LNC do not rise to the level of wrongful or inequitable conduct. The witnesses had plausible explanations for each statement, and these explanations undermined the unsubstantiated accusation of acting dishonestly or for an improper purpose. For example, see the following chart of accusations by LNC, compared to the trial testimony, which demonstrates EZPZ did not act wrongfully and/or in each case, the desired outcome in litigation discovery or production was achieved. LNC failed to show it was prejudiced by any delay alleged.

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| (a) Failing to timely produce highly relevant and | This was not an issue at trial. | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| responsive documents | | |
| (b) Hiding non-privileged highly relevant and responsive documents behind unfounded claims of privilege | Attorney-client privilege is not required to be waived for asserting a good faith defense that a party had good reasons for not disclosing cumulative prior art, or prior art of which she was not aware. Half the country follows the rule that does not require the waiver. Therefore, not producing documents under the attorney-client privilege was not improper from the outset. Further, when the Court ruled otherwise (on an issue the Federal Circuit has not yet ruled on), EZPZ produced the documents immediately. No smoking gun was found in the emails and documents. To the contrary, the emails show that Ben Williams has consistently taken the position that Webb is not material, and at least four patent examiners have agreed. | |
| (c) Falsely testifying that certain categories of highly relevant and responsive documents do not exist | This issue of EZPZ's alleged spoliation due to failing to preserve and altering evidence related to the Hip Mommies invoices was already brought before the Court by Motion practice [Doc. No. 324, 334, 335]. The Court resolved the issue by Order on January 8, 2020 [Doc. No. 466]. The Court found that LNC did not carry its burden. Id. at 7. It found that "for several reasons, LNC's showing falls well short of spoliation. Id at 6. The Court elaborated on its reasoning, finding that there did not appear to be any destruction of evidence; that there was no adequate explanation on how the field title alteration was adverse of prejudicial to LNC; and that it was not demonstrated that the change to the field title was done in bad faith. The decision of the Magistrate Judge was affirmed by this Court. [Doc. No. 485]. The Court found that the invoices were produced by EZPZ and by Hip Mommies, and the difference in the Memo line (not the category for EZPZ's accounting records) were well explained by documents and the software program's audit system, which was not discovered until litigation made it an issue several years later. | |
| (d) Failing to supplement document productions timely or at all | This was not an issue at trial. | |
| (e) Falsely representing that responsive documents to the extent they existed had been produced, when they had not been produced | Not sure what this refers to, and it was not an issue at trial. | |
| (f) Failing to disclose to LNC or the Court the USPTO's definition of | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 577:7-19]**<br><br>Q.    (BY MS. MENASCO) Are you aware that Eazy-PZ has taken the position in this lawsuit that "suffuse" does not mean a flat surface? | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| "planar," which was consistent with LNC's definition and inconsistent with EZPZ's definition, prior to the Court ruling on claim construction | A.  No.  That's not true.  They've -- they've taken the position, if I understand, because it's the same position that I took in arguing the '403 application, that a planar portion can, in fact, be curved.  And the planar portion may have a suffuse undersurface, but that doesn't mean that the curved planar portion in any way belies the suffusity of its undersurface.<br><br>Ben Williams testified at length that the patent examiner asked a hypothetical question and her statements show that she did not have the definition in mind as alleged by LNC.<br><br>**[Trial Tr., B. Williams, 9/1/21, 1082:15 to 1092:7, 1094:3 to 1096:12]**<br><br>Q.  And who was your examiner?<br>A.  On the 403, I think it was Mollie Impink was her name.<br>Q.  I-M-P-I-N-K?<br>A.  Correct.<br>Q.  Impink.  And in November 13, 2017, the first office action was rejected.  Do you recall that?<br>A.  I do, yes.<br>Q.  And that was specifically in view of Webb.  Right?<br>A.  Correct, yes.<br>Q.  And what happened?<br>A.  Well, I think this is important.  And if we could maybe get it up on the screen, I think it's worth showing the construction here of cambered because this is important.  And the other counsel has brought this up as well.<br><br>MS. SECOR:  Yeah, you had it right on me.<br>Q.  And are we talking about the amendment that we just spent, like, --<br>A.  No, we're talking about the '403 now.  So the preliminary amendment was in the '823 was the method claims that we were entering.  The '403 is a different application.  So this is actually the '823.  This is the method.  Right here you can see a method for -- we've gone back -- a method for effectuating surface contact, self-sealing.  These are the steps, right, causing creation, causing removal, wearing the surface.  They're not substantially parallel claims in this case.  But the amendment that was -- this is not even the preliminary amendment.  This is the amendment to the preliminary amendment to add in without the use of suction cups or adhesives in response to Examiner Volz' rejection in this case.  And this was an amendment added after the first | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | rejection to add in without the use of suction cups or adhesives to distinguish from the suction cup of Webb pursuant to the prosecution of the '903 Patent.  It is my belief that that amendment right there would have been sufficient to traverse Webb based on the prosecution history of the '903 Patent.However, we abandoned the application before Examiner Volz in this case was able to respond to this amendment. | |
| | Q.   Do you think that the words "without the use of suction cups or adhesives" needed to be in the '903 Application in order for it to overcome Webb or Stravitz? | |
| | A.   In a sense, they were because of the entirely suffuse undersurface amendment that was made.  That was the stipulation that we agreed to in the '903 Patent prosecution that distinguished it from suction cups.  So this was added in as a method claim amendment to the '823 continuing application as a means to distinguish it from the suction cup of Webb. | |
| | Q.   Okay.  Let's look at the Exhibit 281, which is the '403. | |
| | A.   Correct. | |
| | Q.   And on February 13 of 2018, you filed a response to her office action. | |
| | A.   Well, let's look at her.  If I may, I'd like to show you something, her original rejection because it goes into the cambered situation.  I think this is important for a number of reasons. | |
| | Q.   So if it's easier if you can find -- it's not? | |
| | A.   Okay.  Well, again, it's going to be near the bottom, right, because it's at the first -- | |
| | Q.   No, we're got going to do that again.  We are not going to -- | |
| | A.   Okay.  All right.  Well, I can tell you what it was then and you'll have to verify this for yourselves. In this first office action, which we cannot see on the screen, Examiner Impink asked a question.  She said, "How can the planar portion be cambered if it's planar?"  It was a question, question mark.  And she said, "For the purposes of this examination, the term 'cambered' is taken to mean not a molded in camber, but a form the mat takes in use to create a vacuum."  Those are her words pretty much.  So she's constructing wherein the planar portion is cambered, Claim 2 or 3, to mean it is a shape the mat takes in use to create a vacuum.  And that is why she rejected over Webb.  And if you read her rejection in this prosecution, that is basically what she says.  And when we amended this specification to remove cambered, Webb was | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | withdrawn. However, it is important to note that that was Claim 2 and not Claim 1. | |
| | Q.   Why? | |
| | A.   Webb was not a claim -- was not applied to Claim 1 either in the subsequent rejection.  So that's just an important thing to note too.  Okay.  Wait a minute.  Is this the first office action?  We might actually be here.  Okay.  Wait a minute, maybe if I could control the computer, I could find this in a second.  Yeah, we're in the wrong place.  So that's the second office action. | |
| | Q.   And go to the next page, please.  And you took off a surface contact, self-sealing integrated tableware and dining description -- | |
| | A.   Correct. | |
| | Q.   -- from the '903 Patent?  So this was just a mat of Claim 1 wherein at least a portion of at least one receptacle extends beyond the outer edge of the planar portion? | |
| | A.   This was a broadening of the claim, right, because we're getting rid of the preamble, and it's just the mat.  But if you go up to the other page, you'll see where the cambered is deleted.  And you'll see that we're saying -- | |
| | Q.   The previous page? | |
| | A.   There we go right here. | |
| | Q.   Okay. | |
| | A.   So see how Claim 2 originally said the surface contact, self-sealing integrated tableware and dining mat of Claim 1 wherein the planar portion is cambered, that was what she was constructing as the planar portion takes a cambered form in use to create a vacuum.  Those are her words.  So we deleted cambered.  And she also had other rejections regarding cambered that we can talk about.  I don't know if we have time.  We amended it to say splays to effect surface contact.  Because we were trying to get the idea that it could -- if you imagined a curved surface, that it could still work on a curved surface with this idea of suffuse being the settling over an irregular surface.  So, in a sense, it would work on a bowling bowl, say, a curvature.  So we wanted to say that it splayed down.  And so after this amendment was entered, Impink withdraws Webb from consideration and rejects over different prior art in that case. | |
| | Q.   Okay.  But I want to go back a little bit.  So do you believe that in this process where you were negotiating and amending claims, do you think that Examiner Impink said that suffuse means flat? | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | A. Well, she asked a rhetorical question. So I don't think she said that. She might have. I would have to go to her -- her comments off the top of my head. I don't think so. That's not necessarily relevant to what we were arguing.<br>Q. I know, but it's a separate question I have that's come up here.<br>A. Okay.<br>Q. Do you think that there's anything that Examiner Impink said that would define the entirely suffuse undersurface of the invention to mean flat?<br>A. I believe she said something along the lines of, "How can a planar portion be cambered when it's a plane?" Question mark. For the purposes of this examination, the term 'cambered' is taken to be not a molded camber, but a shape that the mat takes in use to create a vacuum." That's what she said. I remember. But, I mean, we could look at it, but I don't remember her exact words.<br>Q. Okay.<br>A. I don't believe she said that it had to be flat.<br>Q. Okay. And so let's just talk about that a minute. So she was saying that the camber refers to the shape that it takes over a bumpy surface like a curve?<br>A. No. She's saying that it is the shape it takes in use like Webb to make a volume to create a vacuum. And that's how she cites Webb. She says exactly that, that the mat becomes cambered and sets like a suction cup and has a camber to create the vacuum. So when we -- that's what she said.<br>Q. And what was your response?<br>A. The amendment where we deleted cambered and add splays to effectuate surface contact, self-sealing.<br>Q. And what's important about doing that?<br>A. Well, she removed Webb. She withdrew Webb from consideration in the next action. Here's my amendment. It says, "Applicant has amended Claim 2 to delete the word 'cambered.'" Right?<br>Q. Right.<br>A. And so we talk about what's going on. I think it would be useful to see her words.<br>Q. We'll get there.<br>A. Okay.<br>Q. So what is important about -- I know you understand it.<br>A. Okay.<br>Q. But it doesn't jump out at me.<br>A. Okay. I'm sorry. Okay.<br>Q. So why does deleting the word "cambered" get you around Webb? | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | A.  Because Webb makes a cambered shape to set his base sucker and has that volume number 38 to create a vacuum.  It's a suction cup.  When you pull it, it will make a popping sound.  And she's taken cambered and our planar portion to create a vacuum in exactly the same way, hence, Webb is germane to that recital in her opinion.  So we deleted cambered. We also had what's called antecedents issues with cambered.  So we deleted it for other reasons as well. | |
| | Q.  And we'll talk about that in just a minute. | |
| | A.  Understood, but I wanted to say that. | |
| | Q.  So when you put the word "cambered" in the claim before you amended it, what did you intend it to mean? | |
| | A.  I intended it to mean that, again, and this is – you know, we are attempting to broaden the claims, change, move the claims around within the scope of the specification. So we were trying to make it active -- excuse me, over, like, a curved surface so that it could splay down under its own weight.  So it's still effectuating surface contact, self-sealing, but that it basically -- there was some other art on the market called the Bumpkins.  It was a big, heavy plate with a kind of cambered suction cup element on the bottom, and we were trying to read over that kind of curvature.  Because of the curve itself, it still operates with a splaying, right?  It still does the same thing.  So that's what I was trying to say.  But, you know, cambered is not a particularly great word, I guess.  And she raised a fair point with the antecedence issue.  She raised a fair point. | |
| | Q.  Okay.  And so then how did the words that you changed it to, the splaying, still get what you intended with camber but work around Webb? | |
| | A.  Because of the way she was constructing the term "cambered."  She was saying that it's not a molded in camber. So the mat isn't curved like this.  It is a shape it takes in use. That's what she was constructing it as.  So we said, well, no, it splays down.  It is not cambered in use.  It is surface contact, self-sealing in use. | |
| | Q.  So you specifically distinguish the invention as you were trying to define it in the claims from Webb? | |
| | A.  As pertains to Claim 3, yes. | |
| | Q.  Okay.  And she was only using Webb as to Claim 3? | |
| | A.  No.  She was using Webb for Claims 1 through 5. | |
| | Q.  And so why did she withdraw Webb as to all the claims? | |
| | A.  Because she agreed with our arguments that Webb is a suction cup, and she rejected other new prior art.  That's my opinion. | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | Q.    Okay.  And then -- | |
| | A.    And if you scroll up, you can see where that happens.  I mean, I would commend to the Court's attention to review this prosecution history. | |
| | Q.    Okay.  What we're going to do is we're going to go to page 86.  Is this your writing, or is it the examiner's? | |
| | A.    This is my response to one of the actions. | |
| | Q.    And what -- what were you saying with respect to the examiner's rejection? | |
| | A.    I mean, you're in the middle of the page here.  So this -- the bottom here is my -- and I'm not sure which action we're looking at, to be honest with you.  But this is my response to regarding Claims 1, 5 and 11 about Webb right here under the 102, which says, "Webb discloses a surface contact, self-sealing action that creates a partial vacuum" -- I'm sorry.  This is my language.  "Creates a partial vacuum when attempts to separate the undersurface are made."  However, I'm distinguishing the mode by which Webb operates.  And, actually, in the paragraph above, you can see the cambered argument as well. | |
| | . . . | |
| | I want to find her exact words here.  So -- this is also backwards for some reason.  So that does not help either. | |
| | Q.    Maybe it's you that's backwards. | |
| | A.    No, I mean, ordinarily -- that may be true.  But ordinarily it is backwards in the order of the documents.  The document itself isn't backwards. So here it is, look, "Regarding Claims 2, 6 and 12.  If the planar portion is planar, how is it cambered?  By definition, cambered means arched slightly or curved up in the middle.  For the purposes of examination, the camber of the planar portion is not understood to be a molded camber, but a curved form the planar portion takes that creates a vacuum when the mat is in use."  So when she rejects under Webb down below, she is reciting that very language.  And she cites the camber of Webb in use, the setting of the base suction, the base sucker. So when we amend to remove camber from Claim 3, she rejects over new prior art because if she wanted to, she could have rendered it final over Webb.  And we would have -- and she would say, "I don't agree with your arguments.  It does not work." | |
| | Q.    So there's an example of where the patent examiner – in fact, is this Impink or Volz? | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | . . . | |
| | A.      Okay.  Here it is.  "Applicant's arguments with respect to the claims have been considered but are moot because the argument does not apply to any of the references being used in the current rejection."   So Webb is withdrawn from consideration in this application, in the '403 Application. | |
| | Q.       Because you removed the word "camber" and the way she thought of it? | |
| | A.      From Claim 3, yes.  And it was not applied to Claim 1 anymore.  That's important to note. | |
| | Q.      Okay.  But the word "cambered" and the way she thought about it has no application to the '903 Patent.  Right? | |
| | A.      Correct.  Exactly, yes. | |
| | Q.      So there's nothing that the examiner said that would change the '903 Patent? | |
| | A.      You're absolutely correct.  So I know what LuLu is about to do -- sorry, Ms. Reisman.  I know what Ms. Reisman is about -- My point here is that the '903 Application, the materiality of Webb to the '903 does not apply to surface contact, self-sealing.  And I think, and I think anybody who reads this prosecution would agree, that this prosecution actually testifies more to that than any materiality of Webb which is a representation I know has been made.  And I think it's a mischaracterization of what happened, I really do.  And I know you don't agree with me, but it's the truth. And I think the patent office would agree with me, and I think they have. | |
| (g) Failing to disclose to LNC or the Court the USPTO's determination that the specification did not support a "cambered" undersurface and the pending claims seeking to claim that the planar portion is cambered are indefinite under | **[Trial Tr., Z. Garthe, 9/2/21, 1335:19-1337:5]**<br><br>Q.      And then you were involved with the discussion about the designing the claim terms in the '823 -- no, the '403 Patent about the camber?<br><br>A.      Yes. Yes, I was.<br><br>Q.      And what was the idea there?<br><br>A.      So camber was -- that was funny. We were working on the Bumpkins Mat. So after -- after this come out we were at a trade show and we discovered the Bumpkins Mat.<br><br>Q.      Wait a minute. Bumpkins, can you spell that?<br><br>A.      I apologize. And I'm speaking too quickly. B-U-M-K-I-N-S, Bumkins.<br><br>Q.      Okay.<br><br>A.      And the Bumkins product had a -- had, like, a much smaller disc of a -- of what we would call the planar portion on the bottom | |

267

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| 35 U.S.C. § 112(b). | rather than, like, a full placemat position. And so we wanted claim language directed at the Bumkins Mat to cover that. That's where my recollection was there was a couple things -- a couple claim language that we put towards their structure. One related to having the receptacles that were larger than the underlying mat. And another one was then the cambered. I remember Ben and I flipped over the Bumkins and we were down -- we put it on the table and we were getting down level on it to see how it was structured. And, you know, there was a slight concavity there. And so we wanted to have as narrowly and accurate of construction onto that piece as we could. Q. Okay. And then were you involved in the patent prosecution of that? A. Only to the extent that I just described. Ben and I looking at it and figuring out -- excuse me, Mr. Williams and I figuring out what the specific features of that product were and how we were going to try to add that into the claims. Q. While you were working for EZPZ as in-house counsel and outside counsel, too, at the beginning, did you observe any behavior that you would call inequitable conduct? A. No. No. Strongly -- | |
| (h) Testifying falsely and/or evasively about highly relevant subject matters (i.e., Laurain searching for dog bowls/dog bowl mats, Speer providing patent advice, other utility patent filings, repetitive lack of memory of key events) | [Trial Tr., L. Laurain, 8/31/21, 620:21 to 622:23, 665:18- 666:-8] Q So when you -- when you were asked if you had a file, did you understand that Mr. Morse was asking you actually, if you had a, like, a file folder or a file in a computer? A. Well, yeah. And just to back up, I want to clarify because it has been disconcerting. It says, "Do you have any printout of any search results?" He didn't say prior art search. He didn't say patent search. I want to clarify and then we go on. Yes. I had no idea what he was talking about with the file. And I tried to get more clarification. And that's when the dialogue continues of, I think I keep going and being like, I did a lot of searches, if you keep going. Q. So on page 204 line 21, Mr. Morse asked, "Do you have a file or did you maintain a file of Internet searches that you did in connection with trying to solve the problem that your husband identified?" A. Yes. And then I just said, "Do you know what file" – or he said, "Do you know what file means?" And I said, "Yes, but I need to see it." I mean, this was, "Yes, I don't remember." And then he says, "I'm not referencing any file. I'm asking if you have a file." And I say, "Okay. Got it. I mean I have so many files, a ton of presentation of stuff. If you can be more specific in terms of -- Mr. Morse says, "I'm specific to the March time frame. File either electronic or digital or any other type of storage on a paper medium or electronic medium or digital medium that shows any of the Internet searches that you did in March of 2014. Yes, I don't -- I would have to see the | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | specifics. I don't recall the specifics. I did a bunch in the beginning in terms of what competitive products are out there." | |
| | Q.   So were you trying to hide that you had done patent searches? | |
| | A.   Absolutely not. I was just being more specific. I was searching competitors and all tons of stuff so more specifics. | |
| | Q.   When you were being asked about Internet searches, what were the Internet searches back when you were first contacting Ms. Speer? | |
| | A.   Well, just so that search, the Google patent search I probably did a week after the idea, maybe -- I'm assuming this, but probably at 1:00 in the morning.  I did it and saved it and really never looked back.  I sent it to Ms. Speers and everyone really.  And I didn't have that.  I didn't recall that up until this litigation that that even existed. | |
| | Q.   All right.  And then when you were asked for patent searches didn't come up, do you know why? | |
| | A.   Well, that's what I was saying, I had got a different email.  I didn't have that actual document.  I honestly don't even remember creating that document.  So apparently I literally physically didn't have it.  So that's when I came up with Ben and Bolton.  And apparently I was sending that to everybody. | |
| | Q.   Okay.  So back when you sent the patent search to Ms. Speer, that actually included the Webb patent, didn't it? | |
| | A.   I found out through this litigation it did. | |
| | . . . | |
| | Q.    And when you did a search, can you tell the Court what kinds of things you searched for at the very beginning when you had the idea? | |
| | A.    I mean, I think I told Hart this in my deposition, but suction bowls and plates and mats all-in-one placemats, plates, bowls, silicone, I think. | |
| | Q.    He had asked you if you specifically searched for dog bowls. Had you? | |
| | A.    I didn't recall specifically because all of my searches would be involved to kid suction products. Did dog mats come up. **Yes, obviously I wasn't trying to hide dog mats since we put it in publication and we published that there was a dog mat.** I don't recall specifically because I don't think I searched for dog mats. I searched for all-in-one silicone plates for kids was what I was originally searching for. I wasn't originally searching for pet products. | |
| | **[Trial Tr., L. Laurain, 8/25/21, By Deposition (5/4/18 Depo.), 200:16-20, 201:3-5, 201:9-12, 201:13-22,  202:23 to 203:14, 203:17-19, 204:4-12, 204:14-17, 204:19-24, 205:02-09, 206:11-13, 206:16-25, 207:02-05]** | |

269

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | Q.   After the sentence I already read, it starts, "The next day."  "The next day I hopped online and, low and behold, nothing exists."  Did I read that accurately? | |
| | A.   Uh-huh. | |
| | Q.   Is that what you recall? | |
| | A.   I recall getting online and looking for -- | |
| | A.   I just recall looking online and realizing that there wasn't a solution for messy mealtime, and so I came home and said, I want to create a product that solves this problem. | |
| | Q.   (BY MR. MORSE)  Was that online research conducted at Humana or at your home? | |
| | A.    (No verbal response.) | |
| | Q.   You're shaking your head. | |
| | A.   Oh, sorry.  At Humana, yeah, I'm sure.  I don't even know if I had a laptop at that point. | |
| | Q.   Okay.  Did you -- first of all, what were you searching for? | |
| | A.   Gosh, anything you could imagine.  Kidsplates, kids bowls, kids mats, kids suction bowls.  I mean, anything that you can imagine to try to make mealtime less messy for children.  Products that make mealtime less messy. | |
| | Q.   And was the purpose of that search -- what was the purpose of your search? | |
| | A.   To see what existed, if there were any good products. | |
| | Q.   Okay.  Did you see as a result of that search any good products? | |
| | A.   Not what I thought was in my mind. | |
| | Q.   Okay. | |
| | A.   In terms of what I was thinking. | |
| | Q.   Well, what were you thinking when you were doing that search?  What were you specifically looking for that you could say nothing exists? | |
| | A.   Yeah.  So I think a solution to make mealtime less messy is what I was looking for.  And so I liked all-in-one.  I liked stuff that suctions.  Not immediately, but I became grown to like the benefits of silicone, the qualities silicone has to offer, something that's dishwasher safe, something that looks stylish, something that's safe, something that catches the mess. | |
| | Q.   So -- | |
| | A.   Something that kids can't throw. | |
| | Q.   Now, is this something that you gravitated towards over a period of time or was this conclusions that you came to -- | |
| | A.   It's what I liked as a mom.  I thought -- | |
| | Q.   Okay.  And at least, if I understood correctly, after that first search that you did, did you come to some -- these conclusions, I like the all-in-one?  Did you arrive at that conclusion after the first search you conducted? | |
| | A.    don't recall.  I came home, I taped a bowl to a piece of paper and realized the -- I mean, it was so long ago, too.  It was four years ago, so I don't recall all the things, but I taped a bowl to a piece of paper and said, Nothing exists.  I'm creating a product and I'm | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | creating a company.  If anyone can do it, I can do it, and then I ordered The Mom Inventors Handbook. | |
| | Q.  Did you happen to print out anything from that search you conducted the next day at Humana? | |
| | A.  I don't believe so. | |
| | Q.  Okay.  So you recall searching kids plates, bowls, mats, suction bowls.  Do you recall any other categories that you searched? | |
| | A.  No.  And I mean, that's -- that's – I shouldn't say guessing, because that's not what I'm going to be doing, but that's a broad range of things I would have thought I would have searched for. | |
| | Q.  Okay. | |
| | A.  I honestly -- it was so long ago.  Do  you recall if you searched for dog bowls? | |
| | A.  I don't recall. | |
| | Q.  Do you recall seeing anything that caught your eye and then you did a printout of? | |
| | A.  I don't recall. | |
| | Q.  Do you have any file or any documents verify that that search was taken in March of 2014? | |
| | A.  Yeah.  Do you have anything specific you can show me? | |
| | Q.  (BY MR. MORSE)  Yes.  Do you have a printout of any search results? | |
| | A.  Yeah.  I would have to see it.  It was so long ago. | |
| | Q.  (BY MR. MORSE)  Do you have a file or did you maintain a file of Internet searches that you did in conjunction with trying to solve the problem that your husband identified? | |
| | A.  Yeah.  I -- | |
| | Q.  (BY MR. MORSE)  Do you know what file  means? Yeah, but I need to see it.  I mean, this was -- | |
| | Q.  My question was-- | |
| | A.  Yeah.  I don't remember.  I don't remember. | |
| | Q.  I'm not referencing any file.  I'm asking you if you have a file. | |
| | A.  Oh, okay.  Got it. | |
| | A.  I mean, I have so many files of tons of presentations with stuff, so if you could be more specific in terms of -- | |
| | Q.  (BY MR. MORSE)  I'm specific to the March 24 time frame.  By "file," I mean either electronic or documentary or visual or video or digital or any other type of storage on a paper medium or electronic medium or digital medium that shows any of the Internet searches that you did in March of 2014. | |
| | A.   Yeah.  And I don't.  I would have to see the specifics.  I don't recall specifics.  I did a bunch of research at the beginning in terms of what other competitive products are out there.<br><br>**[Trial Tr., L. Laurain, 8/26//21, By Deposition (6/28/19 Depo.), 26:2 to 27:21]** | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | Q.   Okay. I am going to now show you what was previously labeled Laurain Exhibit 57. This is the document that Mr. Morse showed you previously at your deposition.<br>A.   Oh, yeah.  This is -- I -- I have not -- I had not seen this in the deposition.  I had never seen this so –<br>Q.   And if we look at this document, do you see where there is a reference --<br>A.   But I want to clarify something that this was presented and this is not what I had ever seen before. So, like, that is true, I had never seen this image, this specific image in my deposition.<br>Q.   Well, let -- let me ask you about that, Ms. Laurain, because there are -- there's an image that is larger that's below and then up at the top there are three images, correct?<br>A.   Yes.<br>Q.   Okay.  And the left-hand top image you had seen, correct?<br>A.   I don't know if that's the same one.  I just know this is different than what I had ever seen before.<br>Q.   Well, let's look back at the first document that I showed you today, the Humana 122, and that screen shot that you had on your iPhone.  And are you testifying today that the top photograph on that screen shot is not the exact same photograph that is on Laurain Exhibit 57?<br>A.   I'm gonna testify that I don't know the answer to that.  I can't tell.<br>Q.   Okay.<br>A.   They look different colors and I mean, you're taking it out of context.  When I looked at this I had not seen this specific one before so I was -- that's what I was saying --<br>Q.   And so is it --<br>A.   and I stand by that.<br>Q.   -- your testimony today that the bottom picture On  the screen shot on your iPhone is not the top left-hand photograph on Exhibit 57?<br>A.   I do not know the answer to that because the back of them are different colors.  Their color -- they look different in these pictures, the backs -- siding of it. One looks darker brown, one looks gray.  So I would not -- I -- I don't think you can make that statement that they're the exact same.<br><br>**[Trial Tr., L. Laurain, 8/26//21, By Deposition ( (6/10/20 Depo.), 59:3-16]**<br><br>Q.   And this Yanko Design dog bowl is·something you're quite familiar with, correct?<br>A.   Um, I don't know if -- once again, I don't agree with the predicate, and I would like to<br>take this opportunity to now for the third time clarify on the record that this is the image I had<br>seen and included in my presentation. In  previous depositions, there were | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---------|-------------------------------|-------------------|
| | exhibits put in front of me asking out of context questions about the Yanko dog bowl that had, once ·again, been turned around and used inappropriately in different motions.· So this is the image that you can·see that I had in my possession. <br><br>**[Trial Tr., L. Laurain 8/31/21, 745:2-15]** <br><br>Q.     In fact, we see there it refers to the God-B1Gowithdog. And do you remember testifying at your first deposition with Mr. Morse that you had not seen anything talking about a God-B1? <br> A.     Yes, and I still stand by that. I have no recollection of reading this. In my original PowerPoint that I sent to everyone, I included the Yanko image that I expressly cleared up with Hart and everyone, you and George, two different times  in the deposition. You guys were putting something in front of  me, "Do you recognize this?" It was the exact thing. And I said, "This isn't the exact picture I know." And then you tried to use that over and over again saying I'm lying when you literally tried to frame me. So I don't remember this, and I stand by what I said in that deposition. | |
| (i) Asking for an extension of time to answer LNC's Amended Complaint to buy time to seek a TRO and patent infringement claims in Michigan filed under seal and without providing notice to LNC of that proceeding | **[Trial Tr., J. Bolton, 9/2/21, 1302: 17 to1303:17]** <br><br>A.     I don't recall the specific question that you asked, but looking at this honestly I think Nuby is bullying EZPZ, yes, that's sort of consistent with kind of my view of what was happening as of -- as of that time. <br> Q.     And what do you mean by that? <br> A.     Bullying is not the word I would use.  It was more just tactically trying to make the process expensive, time consuming, etcetera. I mean, and I think that says actually a little bit prior to -- prior to the lawsuit itself.  But that was in the back and forth that I had with Mr. --Mr. Chiaviello.  That was sort of my sniff on it, if you will. <br> Q.     And when you asked for a motion for extension of time in this case and then proceeded to file the case in Michigan, did you think that was in any way improper? <br> A.     No.  I mean, the case in Michigan, although it dealt with -- with the same parties in this case, it also dealt with a broader swath of parties.  So the Nuby/LNC piece of it was a portion of it.  But, no, I didn't -- I didn't even know those two things were related, frankly. <br> Q.     Okay.  So did you believe when you filed the TRO in the Michigan case seeking an injunction, did you have an obligation to notify Nuby that you were doing that? <br> A.     Not so far as I'm aware.  In fact, I think given the nature of the proceedings, I had an obligation not to. <br> Q.     Okay.  And did you end up dismissing the Michigan lawsuit? <br> A.     We did, yes. | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---------|-------------------------------|-------------------|
|  | **[Trial Tr., L. Laurain, 8/31/21, 690:23-691:21, 695: 11-696:12]**<br><br>Q.   Okay. You were also asked about a Michigan lawsuit and that you had tried to do something there. I'm not sure I understand. But is there anything you'd like to correct from the questions or add to the questions that were asked of you yesterday.<br><br>A.   I think specifically in regard to the Michigan lawsuit, that was in October of 2016.  But prior to that, in September of 2016, we got our notice of allowance, which was really exciting. We went to Germany for the Kind + Jugend Trade Show.  And we walked to the trade show.  There was a blue mat on Nuby's booth replicating our Happy Mat.  Jordan Bolton was our German lawyer in the court system there.  And we were able to serve Nuby an injunction at the trade show.  Eddie didn't come out to meet me.  I got to meet Joe Hakim at that trade show.  We went in and served the injunctions.  They had to remove mats from their booth at the trade show, and they had to remove their placemats because we had a design patent in Germany.  We were extremely confident in our IP because we had just come off an injunction served against Nuby.  And then the Michigan suit, again, I was not involved because we had lawyers filing the suit. But I also believe there were some clerical errors.  But, again, I don't know all the details in regard to the Michigan lawsuit.<br><br>. . .<br><br>MS. SECOR:  We have substituted in for him.  So he was just a litigation attorney.  He wasn't a patent prosecutor who's information had to be waived when litigation was asserted under the unfair competition claims.  I mean, we're mixing and matching claims.  If the unclean hands claim is permitted, my understanding of it is that we acted improperly during the litigation.  And I'm just trying to show we didn't.  I'm not trying to get into the attorney reasons or attorney-client privilege.  I'm trying to get Ms. Laurain's understanding of why a lawsuit was filed on behalf of the EZPZ in Michigan and why it was dismissed.  You'll see that they make all these -- try to make all these inferences about why lawsuits or applications were dropped.  And I'm just trying to explain why. I can go on if you prefer.<br>THE COURT:  Well, okay, I'm going to sustain the objection.  Let's go ahead because I don't know that it's even -- I don't think that issue -- if I remember correctly, that's the one that I said couldn't be brought up.<br>MS. SECOR:  Right.  I'm happy to go on.<br>THE COURT:  Okay.  I don't think it will be brought up anyway as far as the unclean hands part.  It was the other -- other issues. |  |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
|  | MS. SECOR:  What is the -- okay.  So I'm -- I'm understanding that the Michigan lawsuit isn't part of the unclean hands then I'll move on.<br>THE COURT:  Okay. |  |
| (j) Falsely representing that Mrs. Laurain had orally assigned all her rights in intellectual property on April 10, 2014 when no such assignment had actually occurred and when there is documentary evidence that Mrs. Laurain was still seeking the advice of Mr. Williams in June 2016 as to whether she should assign her IP rights in order to shield herself for personal liability in this lawsuit | This issue of the timing of the Assignment and the fact that the oral assignment was duly executed later has been resolved by the Court. An oral assignment is not disputed, and the oral assignment was duly reduced to a written assignment by Mr. McCarthy on 10/10/2016. **Exhibit 584.** |  |
| (k) Filing continuation applications with the USPTO in order to obtain claims that would specifically cover the LNC Accused Products, but failing to produce the prosecution histories for those applications to LNC in discovery (because the adverse office actions in the USPTO supported LNC's non- | **[Trial Tr., Z. Garthe, 9/2/21, 1334:8-1335:13, 1348:14-25, 1349:1-7, 1350:1-14,** 1364:8-20, **1367:17-25, 1368:1-3]**<br><br>Q.   Okay. So you were trying to come up with a continuation that would cover workarounds that competitors were trying to work around the patent?<br>A.   Yeah. I mean, we had the continuation open. So it wasn't like -- it wasn't as if we were, like, "Oh, no, we need to get a way to open the continuation, take down these guys." It was like we have a continuation. The purpose of this is, like, a thoughtful, deliberate strategy of improving the value of your patent portfolio. And when you see -- Right? It's our burden to watch the market and see if people infringe. When you see that there are people infringing on your application to have specific claims directed at those issues.<br>Q.   To protect the claims you already had?<br>A.   Well, not to protect the claims we already had. No, because the claims we already had were already solid. We already had good claims. It's more to -- you're trying to create like more effective or |  |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| infringement defenses) | efficient opportunities to use your patents -- your patent portfolio. Right? The quiver of arrows. Right? So I don't want to always be hunting with a spear. I can, you know, see what I need to see; and I can take just a very directed, targeted shot at that particular issue when it comes up.<br>Q.  And is it kind of understood among the competition that if they read on the claims, they infringe and if they don't, they don't? Absolutely. And Bob Chiaviello can tell you that.<br>Q.  Why do you say that?<br>A.  Bob and I had several conversations during settlement conversations. And he understands -- he understands this whole aspect of patent, like, application and patent valuation strategy.<br><br>**[Trial Tr., Z. Garthe, 9/2/21, 1348:14 to 1349:7]**<br><br>Q.  And you provide some comments, but I'm interested in the last two sentences. "For example, do we file the accelerated patent to cover the Nuby products? What about Bumkins?" It's true, isn't it, sir, that the '403 Application, continuing application, was specifically designed to make sure that you had -- that EZPZ had claims that covered both the LNC accused products in this case and the Bumkins ones that you testified about with Ms. Secor?<br>A.  So I think there's maybe a crucial distinction there because I'm not exactly sure what your models are for the accused products in this case. The -- oh, yeah. Can we look at that claim language here. Beveled. So there were LNC products that we saw in a trade show in China that had a slightly different structure to it. And so the -- I'm not sure that they're accused in this case. But we added claims, as you do when you're building a patent portfolio, we added claims to the competitor products that we saw. So it would have included the Bumkins and then those other models.<br><br>**[Trial Tr., Z. Garthe, 9/2/21, 1350:1-14]**<br><br>Q.  Did you -- are you admitting that the claims in the '403 Application were specifically designed to cover the LNC accused products in this action?<br>A.  So I think that this is --<br>Q.  That's a yes or no.<br>A.  That's not. You don't understand patent law. You've tried to conflict –<br>Q.  I didn't go to Georgetown, and I didn't start working at Weil Gotshal. I guess that's my fault.<br>A.  No. No. You didn't study patent law. That's the issue. Because you've conflated all of the claims into one. Every claim has to be treated differently. You've also conflated all products into, like, one class of products. So, no, let's answer that question, but we can be specific about it. | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | **[Trial Tr., Z. Garthe, 9/2/21, 1364:8-20]** | |
| | Q.  Okay. And you were asked questions about filing prior art in the '403. You mention that LNC had a trade show in China, and you were addressing those products? | |
| | A.  Uh, huh. | |
| | Q.  So did you believe the accused products of LNC in this case were already covered by the '903 Patent? | |
| | A.  Absolutely. | |
| | Q.  Would the continuing application give you any more protection than you already had in the '903 Patent? | |
| | A:  Not in this case, no. | |
| | Q.  Okay. So you weren't using the continuing applications to cover any accused product in this case? | |
| | A.  They were already covered in this case, no. | |
| | **[Trial Tr., Z. Garthe, 9/2/21, 1367: to 1368:3]** | |
| | Q.  And you were asked a question about an exhibit, and you said, well, you're conflict -- you told Ms. Menasco that you're conflating all claims and conflating all products. | |
| | A.  Right. | |
| | Q.  And let's give a complete answer. And she said, "Well, we can move on." What would your complete answer have been? | |
| | A.  So we kind of already touched on that. We already had all of our claims in this case, you know, that's why we brought the litigation. And so all the products that are at issue in this case were already covered by the existing patent. But there were other claims to other products that we were, you know, being good stewards of our intellectual property. | |
| | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 736:11-737:04]** | |
| | Q.  (BY MS. MENASCO)  Let me direct your  attention to the document behind tab 122, which I'm going to mark as Exhibit 828. (Deposition Exhibit 828, remotely introduced and provided electronically to the court reporter. | |
| | A.  Sure.  That's Zac, right, yup. | |
| | Q.  It says, "We should make sure our continuation covers everything LNC says in this non-confidential disclosure; example, 3 degree curvature," right? | |
| | A.  And I believe that's referring to the '403 application.  And I will say that there's nothing unusual with that type of strategy in terms of a litigation or a concern over infringement and a  design-around. In my experience since this time, I have seen numerous other firms engaging in similar continuing strategy.  And, in fact, the patent office, you know, is used to it. | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | **[Trial Tr., Z. Garthe, 9/2/21, 1315:1-1318:2]**<br><br>Q.    So do you remember when this conversation took place?<br>A.    This conversation happened because we had opened up continuations on the patent application. And so we were – and as part of those continuations, additional information disclosure forms were to be filed, as you would with any normal patent application.<br>Q.    Did you -- were you involved in the decision to file the continuing applications?<br>A.    Yes, ma'am.<br>Q.    And how were you involved?<br>A.    So this was -- this was basically my legal strategy was to bring continuations into this application. So this is what we did when I was at the top firm working with all, you know, the most sophisticated legal counsel for the largest companies in the world. This is the type of activity that we would do. If you are representing a company and trying to secure and enhance the value of their patent portfolio and their assets as well as, you know, protect their market position, it is a strategic advantage to have an open patent application so that you can continue to file those continuations and those iterations. So that was the strategy that I kind of have brought over to EZPZ.<br>Q.    Are you the one -- so what did -- how did you think of it? Was that -- you're the one with the arrows and the quivers?<br>A.    Yeah, that's an analogy I throw around all the time, yeah. The idea is if you just have one patent, you've got all your eggs in that one basket, and so you're throwing that one spear is all you have. But, ideally, you would have several different arrows in your quiver instead. So instead of always having to fight with one spear, you have these different arrows you can use. So it's more targeted. It's more efficient. It's more -- it's more effective for certain negotiations or settlement conversations because you can -- you can turn around to that accused infringer, to that vendor and say, "Look, this is exactly what your product is," or what have you.<br>Q.    All right. And then what's important about that having those arrows and going after competitors that are copying your claims, as you say?<br>A.    Sure. So there's a couple different ways to look at it because there's the litigation context but there's also an equally, or maybe a larger aspect of this, is the business context of it. So for the value of the intellectual property portfolio of a company often depends on how many patents that you have in there and the ability to be able to use them. So aside from whether or not other infringers exist, having multiple patent applications open directed to a specific use is -- is a way to increase the value of your patent portfolio. And it's also important if you're going to take on a new owner or investment, et cetera. Typically new owners want to see | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---------|-------------------------------|-------------------|
|  | that there is an open continuation so that they can have their patent team also continue their practice. Right. his is, like, corporate best practice with managing intellectual property portfolio. So that's kind of the first piece of it that you do. But then if there are infringers, one of the add-on pieces to that strategy is to monitor the existing competitor marketplaceso that you can have patent continuations that apply when you find people who are stealing your invention. Right? Because the whole tradeoff with the patent system is, you know, under the Constitution. We give the disclosure. Right? We have an invention, and we put that out there to the world. And the tradeoff is we get a monopoly now for a certain period of time. Right? But that disclosure then gives the opportunity for, like, nefarious competitors or desperate competitors, or what have you, to then try to, like, weasel around the specific language of the claim but still copy the invention. And so the entire patent system is designed to say, okay, "Well, we're allowed now to watch what you're doing and say, no, no, you've stolen our invention still. And here is our patent continuation that covers what you've just, you know, tried to do. But it has to still fall under the invention, the original invention. Right? You can't -- you can't create new things.  But if it's within the scope of your original invention, you get to file those continuations. And the burden is on the inventor for that. Like, we have to go and shepherd and protect our invention in the marketplace. That's something that we take on to do. And that's the tradeoff for kind of the patent system.<br><br>**[Trial Tr., L. Laurain, 8/31/2021, 704:8 to 706:13]:**<br><br>Q:     And then do you know why the continuing applications were filed?<br>A:     So, my general understanding, and, again, this is my general understanding is patent continuations are filed to broaden your patent portfolio and to keep claiming to get patents.  And you broaden your portfolio to put more arrows in the quiver?  Is that the right term?  It was -- from a litigation perspective, we were encouraged to do it really from litigation counsel.  I was not involved.  I had Zac full time. Zac was working with Ben. And then you heard Ted Olds yesterday.  And I never met Ted Olds or talked to him personally.  It's my understanding they were filed to continue getting claims and then narrowing the scope, broadening the counterclaim, narrowing the scope of the claims, but --<br>Q:     You don't know what they were for?<br>A:     Well, I know there's, like, a method patent is one.  That was the '823.  The '403 had the priority issues.  But, generally speaking, patent continuations are to broaden your portfolio and have more arrows in the quiver.  So I was following that general advice to say |  |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | we can do these and then Zac led the process.  That's why I had Zac full time. | |
| | Q:   Is there reason -- | |
| | A:   Why are we doing this?  We've got a patent.  I mean, it just seems silly to me.  If you guys want to do it and that's the right thing to do for business.  So, it's all these lawyers advising me, "This is what you do and this is what everyone does."  And this was the way it continued until the last one we abandoned, the '824.  I continued getting advice we always have a continuation going.  And then we eventually abandoned the last one. | |
| | Q:   Why did you abandon the last one the last one specifically? | |
| | A:   Ben Williams -- Ben filed the first two and then he filed the beginning of the '976.  And then I got a brand new lawyer that wasn't -- Ben, it was just discovery and going after Ben. And Ben also had a baby and he started law school.  So he had a ton of stuff on his plate. I hired a brand new lawyer named Scott Swanson.  He filed -- I think he managed the '896 and then filed the '824. Then Hart Morse sent a letter with what things we didn't submit and inequitable conduct.  I was, like, I'm getting letters over here, and so I abandoned that application the same day Hart sent his letter because I was fed up.  I'm done.  I mean, and then we filed the reexam and they sent us three letters for that.  But that's why I was done. | |
| | Q:   Were you concerned about any of the rejections in the continuing applications? | |
| | A:   No. | |
| | Q:   And why not? | |
| | A:   Based on just the emails, if you read the emails about when we got a rejection and Ben's or Zac's response on how they were planning on overcoming them and what they were doing, I never saw any issues.  The one issue was priority date and that kind of nightmare about not having a priority date correct. But outside of that issue, I didn't see any issues. | |
| | **[Trial Tr., L. Laurain, 8/26//21, By Deposition (6/10/20 Depo.),  333:7-9, 333:11-25]** | |
| | Q.   Was one purpose of the continuations to ·try to include the Nuby mat with a 3 percent curvature ··at the bottom? | |
| | A.   Yeah.· Again, I'm not the best person to give the specific answers, because, quite frankly, I'm not on a lot of these e-mails even discussing the ·continuations.· It's my general understanding that continuations are filed to broaden the claims to cover -- I don't know if it's Nuby's mat -- or I guess a better example would be Nuby's redesigned mats and some redesigning going on, so that's my understanding generally. But I just wasn't involved in the detail ·of those conversations and really the full·understanding of continuations and why I had – I mean, I had | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | a full-time lawyer at this time, Zac, who was really managing the process, so he would be better ·to advise on the specifics. | |
| (l) Mrs. Laurain falsely testifying that EZPZ-Hip Mommies invoices (that supported LNC's claim that the Chua declaration was false) had not been altered, only to admit that she had in fact altered them once caught, and only in response to a Motion for Sanctions | This issue of EZPZ's alleged spoliation due to failing to preserve and altering evidence related to the Hip Mommies invoices was already brought before the Court by Motion practice [Doc. No. 324, 334, 335]. The Court resolved the issue by Order on January 8, 2020 [Doc. No. 466]. The Court found that LNC did not carry its burden. Id. at 7. It found that "for several reasons, LNC's showing falls well short of spoliation. Id at 6. The Court elaborated on its reasoning, finding that there did not appear to be any destruction of evidence; that there was no adequate explanation on how the field title alteration was adverse of prejudicial to LNC; and that it was not demonstrated that the change to the field title was done in bad faith. The decision of the Magistrate Judge was affirmed by this Court. [Doc. No. 485].

[Trial Tr., L. Laurain, 8/30/2021, 523:1-11]:

Q:   But you would agree, Ms. Laurain, we never got the brand and marketing promotions for some of those invoices until we went up to Canada to file a contempt motion to get them?
A:   I don't agree with that.  So my understanding there were invoices produced that had, it was, like, brand/marketing and it was brand and marketing.  And we produced some of those. There was nomenclature that switched to can, can submit.  Quick Book does it automatically, goes back.  Literally it's a life [sic] link.  So if you click on it, there's no invoices.  If you got those from him, it's great.  But, I mean, we also produced everything. | |
| (m) Tampering with other evidence by deleting date/time and other pertinent information from electronic messages | The Court found that LNC did not carry its burden. Id. at 7. It found that "for several reasons, LNC's showing falls well short of spoliation. Id at 6. The Court elaborated on its reasoning, finding that there did not appear to be any destruction of evidence; that there was no adequate explanation on how the field title alteration was adverse of prejudicial to LNC; and that it was not demonstrated that the change to the field title was done in bad faith. The decision of the Magistrate Judge was affirmed by this Court. [Doc. No. 485]. | |
| (n) Hiding the basis for the rejection of the '403 application – Air Pressure – The Atmospheric Mat | [Trial Tr., L. Laurain, 8/31/21, 706:4-19]

Q.   Were you concerned about any of the rejections in the continuing applications?
A.   No.
Q.   And why not?
A.   Based on just the emails, if you read the emails about when we got a rejection and Ben's or Zac's response on how they were planning on overcoming them and what they were doing, I never saw any issues.  The one issue was priority date and that kind of | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---------|-------------------------------|-------------------|
|  | nightmare about not having a priority date correct. But outside of that issue, I didn't see any issues. |  |
|  | Q.   And what was your understanding of that in the '403 patent? |  |
|  | A.    Again, our -- our patent could have been prior art.  And the priority date going back to the beginning date if we didn't correct that, it would have got rejected over prior art just generally.  I think that's my understanding. |  |
|  | **[Trial Tr., L. Laurain, 8/30/21, 498:13-23]** |  |
|  | Q:    . . . Let me ask you, Ms. Laurain, when the '403 patent was rejected based on the YouTube video with the atmospheric mat, you recognized continuing the lawsuit against LNC was a complete waste of time, didn't you? |  |
|  | A.    Absolutely not.  If I made any -- waste of time.  We were spending millions of dollars a year, almost going bankrupt; and it was a terrible experience, that's absolutely what I referenced. |  |
|  | Q.    If you thought you had a valid and enforceable utility patent? |  |
|  | A.     Which I do believe. |  |
|  | **[Trial Tr., B. Williams, 9/1/21, 1116:10-21]** |  |
|  | Q.    You have a science degree in college, do you not, sir? |  |
|  | A.    I do. I do, yes. |  |
|  | Q.    Well, you weren't here when Mr. Kennedy testified, but everyone else here in the courtroom heard him say that an atmospheric mat, such as the one that was referenced and basis for the rejection, the '403 Application, that's commonly taught in high school physics. Did you miss that class, sir? |  |
|  | A.    Well, I didn't actually ever see an atmospheric mat performed until I saw that video. But, yes, -- no, I would agree with you that the atmosphere mat does exist. But I think Examiner Volz and Impink knew about the atmospheric mat too because they have advanced degrees in engineering as well. |  |
|  | **[Trial Tr., B. Williams, 8/30/2021, By Deposition (6/17/20), 764:4-24, 769:10-17]** |  |
|  | Q.    And on August 6th (sic) of 2018, you're sending Ms. Laurain an office action response.  And if I could direct your attention to the page ending Bates No. 2063. |  |
|  | A.    Okay. |  |
|  | Q.    You see "102 rejection" towards the bottom of the page?  And you say, "This turned out to be a beauty.  The examiner is rejecting over a patent publication in view of a youtube video.  (The youtube video shows an atmospheric mat that demonstrates the |  |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | 'surface contact self sealing' and weighing of atmospheric pressure)," right? | |
| | A.     In quotes, yes, the -- yes. But you can't reject under 35.102 with more than one reference. The law requires that a single prior art reference read over each and every element set forth in the claims. So the term "in view of" is an obviousness rejection. So I think, you know, in all due respect to Ms. Impink, I think she made an error. So that's what the "beauty" means. It means that it's not really an anticipatory rejection in the way that it's framed in the action. | |
| | Q.     Sure, if you like. It's on -- but I think we can -- we can skip ahead, Mr. Williams. A decision was made to abandon the '403 application, correct? | |
| | A.     Yes. | |
| | Q.     And who was involved in that decision? | |
| | A.     You know, it would have been Zac and, you know, the corporate Eazy-PZ would have been the ones to make that decision. | |
| | **[Trial Tr., J. Kennedy, 9/1/21, 979:25-981:9]** | |
| | Q.     Mr. Kennedy, you rendered the opinion that the principle of a silicone placemat adhering to a glass or other surface was well known in the prior art, that Williams and Laurain could reasonably expect the examiners to have that common knowledge. Right, sir? | |
| | A.     So I believe what my report states is that the principles of atmospheric pressure, as shown in the Mehler deposition -- or Mehler video, which is for a silicone mat, is something that any high schooler taking physics, and certainly anybody ordinary skill in the art having an engineering degree or other science degree would know. So that principle is known. And since it's so well known, is no different than in the electrical arts, in which I primarily practice, I don't recite to the examiner references teaching the basic principals of electricity because it's something that's clearly to be expected to be within the knowledge of a person skilled in the art, and certainly from the knowledge of an examiner in a patent office the principal of atmospheric pressure. So i don't believe you have to recite that or disclose that to the examiner. | |
| | Q.     But you also rendered the opinion, sir, did you not, that when the examiner cited Bass and assumed that Lion would teach the self-sealing characteristic, that that was improper of her to do, that she needed to cite evidence? | |
| | A.     That's correct. She has to cite evidence establishing her basis for her rejection. So if she does not set forth a clear and unmistakable case of the basis of her opinion, even in the case of common and ordinary knowledge, the examiner has to cite the basis for where that common and ordinary knowledge exists. That does not impute a requirement or a duty upon the applicant to | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| | disclose references of common and ordinary knowledge. The duty is different. The duty of the examiner is to support the rejection. The duty of the applicant is to disclose but-for material references. They're not the same duty. | |
| (o) Falsely testifying that Mrs. Laurain did not start a boycott against Nuby/LNC | **[Trial Tr., L. Laurain, 8/30/21, 489: 18 to 490:8]**<br><br>Q.   She was someone you were communicating about with starting a boycott.  Right?<br>A.   Is that what this email says?<br>Q.   I'm not asking you in this email.  Do you remember emails exchanged with the Florida Pie lady about starting a boycott?<br>A.   I didn't start a boycott.  And this email says, "Someone made this for us and, yes, we have the best community ever, you included. You could share this with your code, ha, ha, if you were serious, feel free." Because I'm assuming she said I don't know the backstory to this.<br>Q.   Ms. Laurain, are you denying --<br>A.   No.<br>Q.    -- that there were emails that you exchanged with the 6 Florida pie lady about starting a boycott?<br>A.    I am not denying, if you want to pull up those emails. But no boycott was ever started. | |
| (p) Sending LNC a false and threatening letter that did more than just serve notice of the publication of patents but advised that LNC cease-and-desist sales activities prior to the issuance of the '903 Patent | **The Court has ruled that this issue was not pleaded.** | |
| (q) Making false social media posts prior to the issuance of the '903 Patent | **[Trial Tr., L. Laurain, 8/30/21, 495: 2-8 ]**<br><br>Q.   Mrs. Laurain, you represented to Dr. Jeremy Weisz and his listeners that you had nothing to do with the postings that your community made with respect to my client Luv N' Care. Correct?<br>A.   I can't remember exactly what I said, but I said in general there was a bunch of moms posting that I don't necessarily have control over. | |
| (r) Launching a campaign to boycott all of | **[Trial Tr., L. Laurain, 8/30/21, 489: 18 to 490:8]** | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---|---|---|
| LNC's Nuby branded products to improve marketshare while waiting for the issuance of the '903 Patent | Q.  She was someone you were communicating about with starting a boycott.  Right?<br>A.  Is that what this email says?<br>Q.  I'm not asking you in this email.  Do you remember emails exchanged with the Florida Pielady about starting a boycott?<br>A.  I didn't start a boycott.  And this email says, "Someone made this for us and, yes, we have the best community ever, you included.  You could share this with your code, ha, ha, if you were serious, feel free." Because I'm assuming she said I don't know the backstory to this.<br>Q.  Ms. Laurain, are you denying --<br>A.  No.<br>Q.  -- that there were emails that you exchanged with the 6 Florida pie lady about starting a boycott?<br>A.  I am not denying, if you want to pull up those emails. But no boycott was ever started.<br><br>**[Trial Tr., L. Laurain, 9/1/21, 688: 12-16, 690: 5-14]**<br><br>Q.  We talked a little while ago about the Maria mat from the UK and boycott Nuby hash tag.  When the people who published that said that Nuby was copying EZPZ, did you believe that to be true?<br>A.  Yes.<br><br>. . .<br><br>Q.  And the SureGrip Happy Meal Mat was first sold in September of 2016?<br>A.  Yes.  That was the hardest one for me to see because it looks so much like our Mini Mat, and it's in our colors and that was right before we went to Germany September 2016 smile mats came out, the Nuby Smile Mats.<br>Q.  Did you believe the -- that -- did you really believe that Nuby was copying you when you put that in Appendix C in March of 2016?<br>A.  Yes.<br><br>**[Trial Tr., J. Grayson, By Deposition (11/27/18), 100:12-21]**<br><br>Q.  (BY MS. MENASCO)  Why did you post the image that's reflected in Exhibit 189 on your social media?<br>A.  Because it is my opinion that the EZPZ mat came first and then Nuby copied them.  We have seen this with other manufacturers such as it is my opinion that they copied the Malarkey Kid Munch Mitt. It's my opinion they have copied the Banana Brush. I've also been vocal about that, which caused Nuby to block me from their social media. | |
| (s) Any other conduct identified | **Not applicable.** | |

| CONDUCT | EZPZ Objections and Responses | Finding Yes or No |
|---------|-------------------------------|-------------------|
| by the Court based upon the presentation of evidence at trial | | |

End supplemental facts.

## CONCLUSIONS OF LAW

### <u>Inequitable Conduct – Generally</u>

1.      "To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1290 (Fed. Cir. 2011). "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Id*.

2.      "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'" *Therasense, Inc.,* 649 F.3d at 1290. "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id*. at 1290-1291. "The evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances. *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, No. A-18-CV-00425-LY, 2020 U.S. Dist. LEXIS 223570, at *4 (W.D. Tex. Nov. 10, 2020)(emphasis in original).

3.      "Because the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a

threshold level of intent to deceive by clear and convincing evidence." *Id.* (internal quotations omitted).

4.      "Specific intent and materiality each have their own legal underpinnings. After *Therasense*, they are to be treated as separate requirements and not on a sliding scale." *Barry v. Medtronic, Inc.,* 245 F. Supp. 3d 793, 801 (E.D. Tex. 2017)(citing *Therasense, Inc., supra*).

5.      "Because the consequences of an inequitable conduct finding are so grave, even if a court finds both elements are met, it must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable." *Id.*

6.      "The Federal Circuit has spoken clearly when stating the Court cannot strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith." *Everlight Elecs. Co. v. Nichia Corp.*, 143 F. Supp. 3d 644, 661(E.D. Mich. 2015)(internal citations and quotations omitted).

7.      Even "[a] series of immaterial or unintentional improper actions during patent prosecution, without more, does not amount to inequitable conduct." *CFL Techs. LLC v. Osram Sylvania, Inc.*, No. 1:18-cv-01445-RGA, 2019 U.S. Dist. LEXIS 113402, at *21 (D. Del. July 8, 2019).

8.      "[I]ntent to mislead may not be inferred, without more, from the failure to disclose to the patent examiner known, highly material information." *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1343 (Fed. Cir. 2008).

9.      The court in *Therasense* "sought to restore objectivity and consistency to the law of inequitable conduct, by requiring that 'the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.' *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012).

10.    "An inference is 'reasonable' if it is plausible and flows logically from the facts alleged." *Total Rebuild, Inc. v. PHC Fluid Power, LLC,* No. 15-1855-BAJ-CBW, 2019 U.S. Dist. LEXIS 45118, at *3-4 (W.D. La. Mar. 18, 2019)(internal quotations and citations omitted).

11.    "The Court must also be mindful that the inequitable conduct defense is not well-taken by the Court of Appeals. Because of its far-reaching consequences, it has been called the 'atomic bomb' of patent law." *Austin Hardware & Supply, Inc. v. Allegis Corp.*, No. 19-CV-785-JPS, 2020 U.S. Dist. LEXIS 178588, at *39 (E.D. Wis. Sep. 29, 2020)(internal citations and quotations omitted).

12.    "Court[s] understand[] the extreme consequences of finding inequitable conduct, and why the Federal Circuit so strongly disfavors it. Stripping inventors of their patent rights amounts to the 'nuclear option', and should only be exercised with clear and convincing evidence." *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D. Tex. 2013).

13.    In one case, although the Court noted that a "smoking gun" document to deceive the PTO is unlikely, it took into account that no "smoking gun" evidence was found "after production of over ten million pages of documents, over thirty deposition of GE and attorneys, in camera review of GE's privilege log, a jury trial on infringement and validity, and a bench trial, no single 'smoking gun' document emerged. As a result, the Court is obliged to rule in favor of GE, despite the evidence of materiality of the prior art and GE's possible awareness of it." *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 590 (N.D. Tex. 2013).

14.    Similarly, there is a lack of "smoking gun" evidence of intent in this case, notwithstanding EZPZ waiving privilege with its patent agent and attorneys involved in the relevant patent prosecution; LNC issuing approximately 30 non-party subpoenas, including subpoenaing Ms. Laurain's husband, father and father-in-law, her husband's old medical device

company, potential investors in EZPZ; LNC taking approximately 24 depositions in this matter, including parties and attorneys; 255 Requests for Production; 363 Requests for Admissions; 17 motions for summary judgment/Daubert motions; invalidity and unenforceability contentions that combined are approximately 950 pages (to put this in context, LNC's preliminary invalidity contentions were 2 pages long); among other litigation tactics.

## **But-For Materiality of Prior Art References**

### Inequitable Conduct – Determining Materiality of Prior Art

15.    The basis for any patent validity inquiry, which also informs inequitable conduct and other inquiries, begins with establishing an understanding of who is a person of ordinary skill in the art (a "POSITA,"). A POSITA is a "hypothetical person who is presumed to have known the relevant art at the time of the invention." MPEP § 2141. Such a POSITA, is one of "ordinary creativity" and necessarily has "the capability of the scientific and engineering principles applicable to the pertinent art." MPEP § 2143(internal cites omitted).

16.    A patent examiner is presumed to be at least familiar with the "level of skill in the art." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008) (quoting *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 649 F.3d 1276, 1359 (Fed. Cir. 2011)(overruled on other grounds).

17.    For the '682 Application/'903 Patent, the Parties substantially agree that a POSITA is a person who has either a bachelor's degree in mechanical engineering or product design (or equivalent degree or experience) with at least two years of practical experience in houseware products

18.    As courts have noted, it "is difficult but necessary that the decisionmaker *forget what he or she has been taught at trial about the claimed invention and cast the mind back to the*

*time the invention was made* (often as here many years), to occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then-accepted wisdom in the art." *Twin Disc, Inc. v. United States*, 10 Cl. Ct. 713, 731, 231 U.S.P.Q. (BNA) 417, 425, 1986 U.S. Cl. Ct. LEXIS 808, *34-35 (emphasis in original). "Therefore, it is absolutely imperative for a court to transport itself back in time to when the claimed inventions were made [approximately 20 years before] and determine obviousness from the perspective of one having ordinary skill in the art to which the subject matter pertains, having only the prior art references before him and unaided by the teachings of the patents in suit." *Id*.

<u>Inequitable Conduct – Non-Disclosure of Prior Art</u>

19.     "To prevail on a claim of inequitable conduct in a patent case, the accused infringer must prove by clear and convincing evidence that the patentee: (1) 'knew of the reference' . . . ; (2) 'knew that it was material'; and (3) 'made a deliberate decision to withhold it.' *GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020)(citing *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc)).

20.     "Proving that the [patentee] knew of a reference, ***should have known*** of its materiality, and decided not to submit it to the [US]PTO does not prove specific intent to deceive." *GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020)(emphasis added). "The determination of whether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary." *Fuma Int'l Llc v. R.J. Reynolds Vapor Co.*, No. 1:19-CV-260, 2020 U.S. Dist. LEXIS 114066, at *4 (M.D.N.C. May 19, 2020)(citing *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 360 n.3 (4th Cir. 2001)).

21.     A party cannot prevail merely by proving that "key players had access to the [purported] prior art and likely contemplated its materiality, [where] there is insufficient evidence

that they believed it was material . . . and then made a deliberate effort to withhold it from the PTO." *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 609 (N.D. Tex. 2013).

22.     "[W]hile inventors have a duty of candor when applying for a patent, it is possible to innocently omit relevant prior art, either by accident or because of a good faith belief that the art in question was not material." *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D. Tex. 2013).

23.     "When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Regeneron Pharm., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 559 (S.D.N.Y. 2015).

24.     "The Court is therefore required to place itself in the shoes of a patent examiner and determine whether it would have allowed the claim 'if it had been aware of the undisclosed reference.'" *Id.*

25.     "[M]ateriality is not analyzed in a vacuum.  It is not dependent on a single element viewed in isolation.  Rather, it is judged based upon the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner." *Baxter Intern., Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed. Cir. 1998). Further, to determine whether a reference is cumulative, an "element-by-element [approach is used] to compare the disclosed prior art reference and the undisclosed prior art reference with the claimed invention." *Taltech Ltd. v. Esquel Enterprises Ltd.*, 604 F.3d, 1324, 1336 (Fed. Circ. 2010)(citing to *Baxter Intern., Inc.*, 149 F.3d at 1329).

<u>LNC Cannot Show That There The Prior Art References That It Identifies Are Relevant Prior Art</u>

26.     LNC's shotgun approach to arguing that there are at least 14 references that anticipate or render the claims of the '903 obvious and are "but for material" is not persuasive.

291

LNC argues at least 14 references were "but for" material then *still* leaves open the possibility that it may offer additional references with its language of "[o]ther prior art references . . . based upon the evidence presented at trial." Courts have found that even the assertion of eight references is a shotgun approach. *See, Arthrocare Corp. v. Smith & Nephew, Inc.*, Civil Action No. 01-504-SLR, 2003 U.S. Dist. LEXIS 5975, at *10-11 (D. Del. Apr. 9, 2003)("Defendant has taken a 'shotgun' approach and argued that the following eight references anticipate one or more claims of the patents in suit").

27.     This is especially unpersuasive that so many alleged relevant references would have been missed by Examiner Volz in light of the fact that the examiner identified over 95 references in her own searches. LNC has not demonstrated that it attempted for most references to even address the "but for" materiality in light of the patent prosecution history.

28.     The Court does not find that the following references are "but-for" material prior art references:

      a.   Tommee Tippee Prior Art Reference

      b.   The Yanko Design website

      c.   All in One designed by Seungchan Lee, otherwise known as Yanko

      d.   Momo Baby Prior Art Reference

      e.   OOGA Prior Art Reference

      f.   Brinware Prior Art Reference

      g.   Hot Iron Holder Prior Art Reference

      h.   Uhalt Prior Art Reference

      i.   Bruno Prior Art Reference

      j.   VanIseghem Prior Art Reference

    k.  Hatfield Prior Art Reference

    l.  Pearson Prior Art Reference

    m.  Walls Prior Art Reference

    n.  Bridges Prior Art Reference

29.    The only reference that the Court can consider as a "but-for" material reference at this point in the litigation is the Webb Prior Art based on its earlier ruling.

<u>Prior Art – Before the PTO</u>

30.    LNC faces an especially heavy burden with respect to prior art that was before the PTO and was considered by the patent examiners. "Upon the acquisition of a patent, it is presumed to be valid, 35 U.S.C.S. § 282, and at trial the accused infringer must overcome that presumption by proving its invalidity by clear and convincing evidence." *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1171 (D.N.J. 1992). "While accused infringers often overcome this heavy burden by offering persuasive proofs, it is important to note that the presumption of validity reflects the deference owed patent examiners who are trained in interpreting prior art and evaluating comparable art for purposes of determining whether a patent should issue." *Telebrands Direct Response Corp.,* 802 F. Supp. at 1171. "This burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1467 (Fed. Cir. 1990).

31.    "Whether a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." *Molins PLC v. Textrn, Inc.* 48 F.3d 1172, 1185 (Fed. Cir. 1995).

32.    The Court finds that the following references were sufficiently disclosed to the PTO:

    a.   Platinum Pets Prior Art Reference

    b.   Gerber MealMat Prior Art Reference

32-1.    The PTO permits Platinum Pets and Gerber MealMat to be disclosed in the manner in which it was disclosed.  "To the extent that a document is submitted as evidence directed to an issue of patentability raised in an office action, and the evidence is timely presented, applicant need not satisfy the requirements of 37 CFR 1.97 and 37 CFR 1.98 in order to have the examiner consider the information contained in the document relied on by the applicant." MPEP 609.059(c). "In other words, compliance with the information disclosure rules is not a threshold requirement to have information considered when submitted by applicant to support an argument being made in a reply to an Office action." *Id.*

## Continuation Applications

33.    LNC implies that EZPZ's actions in seeking continuation applications was improper vis-à-vis its products based on its interpretation of EZPZ emails. Even if true, the Court notes, that "there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application." *Abcellera Biologics Inc. v. Berkeley Lights, Inc.*, No. 20-cv-08624-LHK (VKD), 2021 U.S. Dist. LEXIS 142906, at *11 (N.D. Cal. July 30, 2021),

## **Intent to Deceive Regarding Prior Art References**

## Credibility of Witnesses

34.    "When the testimony of the accused defrauder is relied on as evidence of intent, the witness's credibility should be evaluated." *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, No. A-18-CV-00425-LY, 2020 U.S. Dist. LEXIS 223570, at *4 (W.D. Tex. Nov. 10, 2020).

<div align="center">Cumulative Prior Art is Not Material</div>

35.    Prior art that is duplicative or cumulative is not material. *See, CertusView Techs., LLC v. S&N Locating Servs., LLC*, 198 F. Supp. 3d 568, 603 (E.D. Va. 2016) (" CertusView did not have a duty to submit the specific ESRI prior art references during prosecution of the '204 Patent because such references are cumulative of other references that CertusView provided to the PTO and are not material)(citing 37 C.F.R. § 1.56(b). "'A reference is cumulative when it teaches no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO." *Id*. (citing *Regeneron Pharms., Inc. v. Merus B.V.,* 144 F. Supp. 3d 530, 560-61 (S.D.N.Y. 2015)).

35-1.   37 CFR 1.56 states that "information is material to patentability when it is *not cumulative* to information already of record or being made of record in the application." 37 C.F.R. § 1.56(b) (emphasis added).

35-2.   It is well established that references are cumulative where they are "less material than other references already before the examiner." *Baxter Intern., Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1328 (Fed. Cir. 1998).

<div align="center">The Single Most Reasonable Inference is <em>Not</em> That Webb Prior Art Was Withheld With an Intent to Deceive</div>

36.    As discussed in the Findings of Fact section, Mr. Williams believed that the Webb Prior Art was believed to be cumulative and not material based on the prosecution history that had already transpired regarding the immateriality of suction cups. The Court analyzes the veracity of Mr. Williams' testimony regarding his belief at the time about the prior art; axiomatically, different

attorneys and different patent examiners each hold their own views, which may nor may not be consistent with Mr. Williams' or each other (indeed, we see different examiners treating Webb Prior Art differently in related applications).

37.     Mr. Williams' testimony is credible with respect to his reading of Webb teaching a suction cup and teaching away from the '903 Patent; that he had already discussed the inapplicability of suction cups to the '903 Patent with the examiners; and that suction cups had already been disposed of as relevant or analogous prior art. This was confirmed in the later examination of the '403 Application.

38.     As has been recognized, "while inventors have a duty of candor when applying for a patent, it is possible to innocently omit relevant prior art, either by accident or because of a good faith belief that the art in question was not material." *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D. Tex. 2013).

<u>Inexperience of Ben Williams</u>

39.     In addition, Mr. Williams' inexperience, especially given that it was his first PCT, supports an inference that his actions, or inaction in not disclosing the ISA Report, were based on inexperience or negligence, as opposed to inequitable conduct. *See, Quest Software, Inc. v. Centrify Corp.,* No. 2:10-CV-859 TS, 2011 U.S. Dist. LEXIS 129629 (D. Utah Nov. 9,2011)(noting that an attorney's inexperience tended to show that deceit was not the single most reasonable inference from his actions)*; Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 918 (Fed. Cir. 1992)(noting that the time it took patent attorney to respond to patent office was not an unreasonable time, among other things, given his relative inexperience as a patent lawyer and was not indicative that he acted with any intent to deceive the PTO"); *AstraZeneca Pharm. LP v. Mylan Pharm. Inc. (In re Rosuvastatin Calcium Patent Litig.),* 719 F. Supp. 2d 388,

403 (D. Del. 2010)(finding that the countervailing evidence produced by Plaintiffs and viewed as a whole, paints a more innocent explanation of [manager] as a new and inexperienced manager attempting to handle an understaffed and overworked Patent Department than intent to deceive).

### The 37 CFR §1.132 Declarations as an Alleged Basis for Inequitable Conduct

Inequitable Conduct/Affirmative Egregious Misconduct – Alleged False Statements

40.     "Although but-for materiality generally must be proved to satisfy the materiality prong of inequitable conduct, this court recognizes an exception in cases of affirmative egregious misconduct." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011). "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).

41.     LNC's focus on the alleged false statements of EZPZ in the Declarations are demonstrably false.

42.     Moreover, LNC's allegations of false statements about branding and marketing are misplaced.

43.     "The patentee bears the initial burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus. There is a presumption of nexus when a patentee can demonstrate significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent." Further, "[a] patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is not due to factors other than the patented invention. It is sufficient to show that the commercial success was of the patented invention itself." *Jamison v. Olin Corp.- Winchester Div.*, No. 03-1036-KI, 2005 U.S. Dist. LEXIS 49109, at *119-120 (D. Or. Oct. 4, 2005). As here, when "the marketed product

297

embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). EZPZ meets that presumption because the Happy Mat is practicing the '903 Patent and it enjoyed commercial success.

44.     EZPZ had further evidence by the survey supporting its commercial success and information about the amount it spent on advertising relevant to its gross revenue.

45.     LNC cannot meet its burden by clear and convincing evidence that the statements it alleges are false. The awards and recognition that EZPZ received do not constitute advertising. It is LNC's burden to show that EZPZ's commercial success was due to something over than the product, which was practicing the '903 Patent.

46.     "Once the patentee makes the requisite prima facie showing of nexus, the burden shifts to the alleged infringer to rebut the presumption of commercial success by proving that the success was due to extraneous factors such as advertising or superior workmanship." *Mitsubishi Chem. Corp. v. Barr Labs., Inc.,* 718 F. Supp. 2d 382, 436 (S.D.N.Y. 2010)

<u>Inequitable Conduct/Affirmative Egregious Misconduct –  Alleged Withholding of Bias</u>

47.     It does not follow that failure to disclose a declarant's relationship, however, is a "false affidavit. "The [Federal Circuit] held that a declarant's relationship with the applicant is material if (1) the declarant's views on the underlying issues are material and (2) the relationship to the applicant is a significant one." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 05-897 (WHW)(CLW), 2018 U.S. Dist. LEXIS 88011, at *19 (D.N.J. Apr. 20, 2018)(internal citations and quotations omitted)(citing *Ferring B. V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1188 (Fed. Cir. 2006)).

48. "Proving that the [declarant's] statements were false or misleading, without accompanying proof of an intent to mislead, falls short of the showing needed to support a finding of inequitable conduct." *Juicy Whip v. Orange Bang*, 292 F.3d 728, 745 (Fed. Cir. 2002).

49. A falsity or an omission in a declaration does not establish intent or render a patent unenforceable unless the falsity or omission was deliberately planned, unmistakably false, intentionally omitted, included manufactured evidence, or the like. *Therasense, supra.* The patent challenger still must establish an intent to deceive. *Id.*, at 1287.

50. "A holding of unenforceability based on the filing of a false oath requires that the oath was false, and made with knowledge of the falsity. *See Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 541, 16 U.S.P.Q.2D (BNA) 1622, 1624 (Fed. Cir. 1990) ("Establishing inequitable conduct for submitting false information . . . requires proof by clear and convincing evidence of two facts: that the information was material and that the patentee acted with intent to deceive."), cert. denied, 500 U.S. 918, 114 L. Ed. 2d 103, 111 S. Ct. 2017 (1991). Knowledge of falsity is predicate to intent to deceive." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1116 (Fed. Cir. 1996).

51. The Federal Circuit in *Ferring*, *supra,* "fully recognize[d] that inventors often consult their colleagues or other persons skilled in the art whom they have met during the course of their professional life. Accordingly, when an inventor is asked to provide supportive declarations to the PTO, it may be completely natural for the inventor to recommend, and even contact, his own colleagues or people who are, or who have been, affiliated with his employer and to submit declarations from such people. Nothing in this opinion should be read as discouraging such practice." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1194-95 (Fed. Cir. 2006).

52. The Court does not find that LNC carried its burden to show that there were material omissions in the declarations of:

a. Jeff Prager

b. Julie Clark

c. Dawn Winklemann; and

d. Tamara Falcone.

<u>Inequitable Conduct/Affirmative Egregious Misconduct – Intent to Deceive</u>

53.     LNC comes forward with no evidence of EZPZ's alleged intent to deceive, falling far short of the clear and convincing evidence that LNC needs to prove the claim.

<u>Unclean Hands – General Case Law</u>

54.     The equitable doctrine of unclean hands arises from the maxim, he who comes into equity must come with clean hands. *See, Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 241, 54 S. Ct. 146, 78 L. Ed. 293, 1934 Dec. Comm'r Pat. 639 (1933).

55.     The equitable doctrine of unclean hands bars a party from asserting claims where that party engaged in litigation misconduct. *See*, *Aptix Corp. v. Quickturn Design Sys.,* 269 F.3d 1369, 1374-75 (Fed. Cir. 2001). The unclean hands doctrine is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion. See, Keystone Driller Co, 290 U.S. at 245-46.

56.     The doctrine of unclean hands permits a court to deny equitable relief to a party guilty of fraud, deceit, unconscionability, or bad faith relative to an issue present in the pending lawsuit. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995).

57.     "[M]isconduct in the abstract, unrelated to the claim which it is asserted as a defense, does not constitute unclean hands." *De Long Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135,

1146, n. 10 (3d Cir. 1980), *overruled en banc on other grounds by Croker v. Boeing Co.* (Vertol Div.), 662 F.2d 975, 984 (3d Cir. 1981).

58.     Application of the doctrine is discretionary and does not apply when the party's behavior is not sufficiently serious. *Los Angeles News Serv. v. Tullo*, 973 F.2d 791, 799 (9th Cir. 1991). The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct in relation to the matter in controversy forfeits their right to have the court hear their claim, regardless of merit. *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 333 (S.D. Tex. 2008).

59.     The Court in *Gilead Scis., Inc. v. Merck & Co, Inc.,* No. 13-cv-04057-BLF, 2016 U.S. Dist. LEXIS 73595, at *104-05 (N.D. Cal. June 6, 2016) collected cases in which a finding of unclean hands was improper (citing *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 2014 U.S. Dist. LEXIS 109226, 2014 WL 3874193, at *10 (S.D.N.Y. Aug. 5, 2014) (finding defendant failed to present clear and convincing evidence that plaintiff's representations were inaccurate); *Top Grade Construction v. Fluoresco Lighting-Sign Maintenance*, 2012 U.S. Dist. LEXIS 47162, 2012 WL 1122599, at *10 (N.D. Cal. Apr. 3, 2012) (denying summary judgment that plaintiff had unclean hands because defendant 'presented no evidence to show that [p]laintiff intentionally misrepresented' information and there was a triable issue of fact as to whether plaintiff explanation for an inconsistent response is credible); *Lenz v. Universal Music Corp.*, 2010 U.S. Dist. LEXIS 16899, at *15-17 (N.D. Cal. Feb. 25, 2010) (no evidence any misstatements were made in bad faith); *Big Lots Stores, Inc. v. Jaredco, Inc.*, 182 F. Supp. 2d 644, 652 (S.D. Ohio 2002) (finding conduct was susceptible to more innocuous explanations because there was no evidence that a witness had lied or that counsel acted  wrongfully and deceitfully); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions (Pfizer, Inc. v. Int'l Rectifier Corp.)*, 538 F.2d 180, 195-196 (8th Cir. 1976). (any misstatements were an oversight because "the

facts so concealed were basically supportive of [the concealing party's] contentions"); *Helene Curtis Indus. v. Sales Affiliates*, 121 F. Supp. 490, 510, 512 (S.D.N.Y. 1954) (holding unclean hands was not applicable because there was no evidence that the patentee had deliberately misrepresented or omitted information).

60.     The party asserting the defense of unclean hands "bears the burden of proving by clear and convincing evidence that Astra acted with unclean hands." *Astra Aktiebolag v. Andrx Pharm., Inc. (In re Omeprazole Patent Litig.),* 483 F.3d 1364, 1374 (Fed. Cir. 2007).

Allegations of Failing to Preserve and Altering Evidence

61.     This issue of EZPZ's alleged spoliation due to failing to preserve and altering evidence related to the Hip Mommies invoices was already brought before the Court by Motion practice [Doc. No. 324, 334, 335]. The Court resolved the issue by Order on January 8, 2020 [Doc. No. 466]. The Court found that LNC did not carry its burden. *Id*. at 7. It found that "for several reasons, LNC's showing falls well short of spoliation. *Id* at 6. The Court elaborated on its reasoning, finding that there did not appear to be any destruction of evidence; that there was no adequate explanation on how the field title alteration was adverse of prejudicial to LNC; and that it was not demonstrated that the change to the field title was done in bad faith. The decision of the Magistrate Judge was affirmed by this Court. [Doc. No. 485].

62.     No evidence has been presented by LNC at trial that would lead to a different finding.

63.     "When acting pursuant to its inherent power to regulate the litigation process, the court's ability to sanction is limited by the party's degree of culpability, which, in the 5th Circuit, requires a finding of bad faith." *Titus v. Ameriwood Indus., No.* 6:15-1634, 2016 U.S. Dist. LEXIS 79202, at *2-3 (W.D. La. June 16, 2016)(internal citations omitted). Even conduct that is

"improper, negligent, and/or prejudicial" does not rise to a degree to culpability that equates to bad faith. *Id.* at *4.

<div align="center">Litigation Conduct</div>

64.     LNC arguments that alleged litigation conduct warrant a finding of unclean hands is not persuasive. Not only does the evidence not support the allegations made, but the Federal Circuit has warned against this being a basis for an unclean hands finding.

65.     "The Federal Circuit warned that a court must be conscious of the potential misuse of this necessarily flexible doctrine [of unclean hands] by parties who would prefer to divert attention away from dry, technical, and complex merits issues toward allegations of misconduct based on relatively commonplace disputes over credibility." *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Research Organisation*, No. 2:17-CV-503-HCM, 2020 U.S. Dist. LEXIS 36659, at *39-40 (E.D. Va. Feb. 7, 2020)(citing *Gilead Scis., Inc. v. Merck & Co.,* 888 F.3d 1231, 1240 (Fed. Cir. 2018)(emphasis added).

<div align="center">Alleged Failure to Disclosure Patent Examiner's Statements in the '403 Prosecution</div>

66.     The Federal Circuit has "held that statements made *by the inventor* during continued prosecution of a related patent application can, in some circumstances, be relevant to claim construction." *Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.* 473 F.3d 1173, 1184 (Fed. Cir. 2006)(emphasis added).

67.     Examiner Impink's question was not a restrictive argument or a position taken by Applicant. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the *inventor* understood the invention and whether the *inventor* limited the invention in the course of prosecution, making the claim scope narrower that it would otherwise be." *Philips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed. Cir. 2005)(emphasis added).

<div align="center">303</div>

68.     Prosecution disclaimer precludes "patentees from recapturing through claim interpretation specific meaning disclaimed during prosecution." *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). "It is a rule of patent construction consistently observed that a claim in a patent *as allowed* must be read and interpreted with reference to the claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940) (emphasis added). Applicant did not make any narrowing limitations in the '403 application to prompt issuance of the '403 application. The '403 prosecution cannot properly apply to the prosecution of the '903 patent post-issuance of the '903 patent.

**WHEREFORE**, EZPZ provides its supplemental report to its Proposed Findings of Fact and Conclusions of Law, with references to the trial evidence supporting each point of fact.

Respectfully submitted November 22, 2021.

*Attorneys for Defendant EAZY-PZ, LLC*

*/s/ Jennifer K. Fischer*
Jennifer K. Fischer (CO Reg. No. 36590)
(Admitted *Pro Hac Vice*)
E-Mail: Jennifer@fischeresq.com
Lisa C. Secor (CO Reg. No. 25394)
(Admitted *Pro Hac Vice*)
E-Mail: Lisa@fischeresq.com
Ronnie Fischer (CO Reg. No. 35260)
(Admitted *Pro Hac Vice*)
E-Mail: Ronnie@fischeresq.com
Fischer & Fischer, P.C.
1777 South Harrison Street, Suite 1500
Denver, Colorado 80210
Telephone: (303) 756-2500
Facsimile: (303) 756-2506

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2021, the foregoing paper was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system, including the following:

Melanie Derefinko
Carol W. Reisman
George Denegre, Jr.
Carey L. Menasco
LISKOW & LEWIS, APLC
701 Poydras Street, Suite 5000
New Orleans, LA 70139
     mderefinko@liskow.com
     cwreisman@liskow.com
     gdenegre@liskow.com
     clmenasco@liskow.com

Hartwell P. Morse, III
Luv N' Care, Ltd.
3030 Aurora Street, 2nd Floor
Monroe, LA 71201
     hartm@nuby.com

*/s/ Lisa C. Secor*
Lisa C. Secor