# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **LUV N' CARE** | **CIVIL ACTION NO. 3:16-00777** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **LINDSEY LAURAIN, ET AL.** | **MAG. JUDGE PEREZ-MONTES** |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a patent infringement case in which Plaintiff Luv n' care, Ltd. and Nouri E. Hakim (collectively, "LNC") seeks a declaratory judgment that it does not violate any existing intellectual property right of Defendant Eazy-PZ, LLC (collectively "EZPZ"). The Court held an eight-day bench trial in this matter from August 25, 2021 to September 3, 2021.[1] The parties submitted pre-trial and post-trial proposed Findings of Fact and Conclusions of Law.[2]

Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes these findings and conclusions with respect to LNC's inequitable conduct allegations and unclean hands allegations. In summary, LNC failed to meet its burden of proving that the '903 Patent should be rendered unenforceable due to inequitable conduct under any of its theories. LNC did prove by clear and convincing evidence that EZPZ engaged in reprehensible conduct in relation to the matter in controversy. Therefore, the Court concludes that EZPZ has forfeited its right to have the Court hear its claims under the equitable doctrine of unclean hands.

The Court's Findings of Fact and Conclusions of Law are detailed below. These Findings and Conclusions are based on a detailed consideration of the parties' evidence (testimony and exhibits). To the extent necessary, all Findings of Fact that are labeled herein as Conclusions of

---

[1] Dkt. Nos. 817-820, 822-825.
[2] Dkt. Nos. 806, 811, 847, 848.

Law should also be considered Findings of Fact, and all Conclusions of Law that are labeled Findings of Fact should be considered Conclusions of Law.

As used herein, the following terms have the following meanings:

- "EZPZ" refers to Defendant Eazy-PZ, LLC.

- "D327 Patent" refers to U.S. Design Patent No. D745,327 (Trial Exhibit 936).

- "'903 Patent" refers to U.S. Patent No. 9,462,903 (Trial Exhibit 220).

- "'682 Application" refers to U.S. Patent Application No. 14/333,682, filed on July 17,  2014 (Trial Exhibit 245).

- "'955 PCT Application" refers to PCT Patent Application No. PC/US2015/011955  filed on January 20, 2015 (Trial Exhibit 814).

- "'403 Application" refers to U.S. Patent Application No. 15/700,403 filed on September 11, 2017 (Trial Exhibit 281).

- "'823 Application" refers to U.S. Patent Application No. 15/507,823 filed on March  1, 2017 (Trial Exhibit 905).

- "'976 Application" refers to U.S. Patent Application No. 16/207,976 filed on December 3, 2018 (Trial Exhibit 583).

- "'824  Application" refers to U.S. Patent Application No. 16/717,824 filed on December 17, 2019 (Trial Exhibit 582).

## TABLE OF CONTENTS

I.    INEQUITABLE CONDUCT ..................................................................................... 5

a)    Applicable Law ................................................................................ 5

b)    Findings of Fact: Background of Events Leading Up to the Filing and Prosecution of the '682 Application ................................................. 22

c)    Findings of Fact: Chronological Order of Prosecution of the '903 Patent. ......... 28

d)    Findings of Fact: Patent Applications Related to the '903 Patent ...................... 36

e)    Findings of Facts: The Webb Publication and the Webb Patent ("Webb Prior Art") ............................................................................................. 37

f)    Conclusions of Law: The Webb Publication and the Webb Patent ("Webb Prior Art") ............................................................................................. 41

g)    Findings of Fact: The Tommee Tippee Mat ....................................... 45

h)    Conclusions of Law: The Tommee Tippee Mat ................................... 48

i)    Findings of Fact: The Platinum Pets Mat .......................................... 51

j)    Conclusions of Law: The Platinum Pets Mat ...................................... 58

k)    Findings of Fact: The Remaining Prior Art Presented at the Bench Trail .......... 61

      i.    The Brinware Silicone Placemat ................................................. 61
      ii.   The Momo Baby Skid-Proof Silicone Placemat ............................ 62
      iii.  The Hot Iron Holster .............................................................. 64
      iv.   The CIBO Stick Anywhere Placemat ......................................... 66
      v.    The Bruno Patent .................................................................. 67
      vi.   The Lee Single Dog Bowl Mat .................................................. 67

l)    Conclusions of Law: The Remaining Prior Art Presented at the Bench Trail .... 69

m)    Findings of Fact: Declarations Attesting to a Lack of Marketing or Branding... 72

n)    Conclusions of Law: Declarations Attesting to a Lack of Marketing or Branding 85

o)    Findings of Fact: Failure to Disclose the Relationship Between Certain Declarants and EZPZ ..................................................................... 86

p)    Conclusions of Law: Failure to Disclose the Relationship Between Certain Declarants and EZPZ ..................................................................... 95

q)    Findings of Fact: Survey Evidence .................................................. 96

r)    Conclusions of Law: Survey Evidence .............................................. 96

II.    UNCLEAN HANDS ................................................................................... 97

        a)    Applicable Law ......................................................................... 97

        b)    Findings of Fact: EZPZ Failed to Disclose Pertinent Related Patent Applications
              to LNC and the Court ............................................................... 100

        c)    Findings of Fact: EZPZ's Failure to Disclose the '403 Application Deprived LNC
              and the Court of Pertinent Information Regarding Claim Construction ........... 102

        d)    Findings of Fact: EZPZ Repeatedly Blocked LNC's Efforts to Obtain Mrs.
              Laurain's Prior Art Search ........................................................ 107

        e)    REMOVED ................................................................................ 109

        f)    REMOVED ................................................................................ 110

        g)    Findings of Fact: Witnesses Gave Evasive Testimony By Claiming an Inability
              to Understand Simple Questions and a Lack of Recollection Even With
              Documents Placed Before Them ................................................... 110

        h)    Findings of Fact: Other False or Inconsistent Testimony, and Misrepresentations
              111

        i)    Conclusions of Law: Unclean Hands ............................................ 114

III.   CONCLUSION ....................................................................................... 115

# I.      INEQUITABLE CONDUCT

## a)  Applicable Law

1.      The public has "a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct…"[3]

2.      A patent by its very nature is affected with the public interest. "The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability."[4]

3.      It is well settled that patent applicants are required to prosecute patent applications "with candor, good faith, and honesty."[5]

4.      Advocacy cannot be chosen over candor. Patent agents and attorneys who "choose advocacy over candor" risk a finding of inequitable conduct, rendering the patent invalid and unenforceable.[6]

5.      There are two forms of inequitable conduct: (1) failure to disclose material information and (2) affirmative egregious misconduct. As regards the failure to disclose material information, "[t]he first step in an inequitable conduct inquiry is determining whether the patentee failed to disclose but-for material information to the PTO."[7].

6.      "To prevail on a claim of inequitable conduct, the accused infringer must prove that the patentee acted with the specific intent to deceive the [ USPTO]."[8] "A finding that the

---

[3] *Cap Export, LLC v. Zinus, Inc.*, 996 F.3d 1332, 1334 (Fed Cir. 2021).
[4] 37 C.F.R. § 1.56(a); MPEP § 2001.
[5] *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995).
[6] *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1331 (Fed. Cir. 2020) (affirming district court's finding of intent to deceive based in part on a "patently false statement" in a declaration where in the law firm and the inventors "chose advocacy over candor").
[7] *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017).
[8] *Therasense, Inc. v. Becton, Dickinson & Co.,* 649 F.3d 1276, 1290 (Fed. Cir. 2011).

misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." [9]

7.      "Because the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first proves a threshold level of intent to deceive by clear and convincing evidence."[10]

8.      "[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'"[11]  "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found."[12] "The evidence 'must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.'"[13]

9.      "Specific intent and materiality each have their own legal underpinnings. After *Therasense*, they are to be treated as separate requirements and not on a sliding scale."[14]

10.     "Because the consequences of an inequitable conduct finding are so grave, even if a court finds both elements are met, it must weigh the equities to determine whether the applicant's conduct before the PTO warrants rendering the entire patent unenforceable."[15]

11.     "The Federal Circuit has spoken clearly when stating the Court cannot strike down an entire patent where the patentee only committed minor missteps or acted with minimal culpability or in good faith."[16]

---

[9] *Id.*
[10] *Id.*at 1291 (internal quotations omitted).
[11] *Id.*at 1290.
[12] *Id.* at 1290-1291.
[13] *CliniComp Int'l, Inc. v. Athenahealth, Inc.*, No. A-18-CV-00425-LY, 2020 U.S. Dist. LEXIS 223570, at *4 (W.D. Tex. Nov. 10, 2020)(emphasis in original) (internal citation omitted).
[14] *Barry v. Medtronic, Inc.,* 245 F. Supp. 3d 793, 801 (E.D. Tex. 2017) (citing *Therasense*, 649 F.3d at 1290).
[15] *Id.*
[16] *Everlight Elecs. Co. v. Nichia Corp.*, 143 F. Supp. 3d 644, 661(E.D. Mich. 2015) (internal citations and quotations omitted).

12.     "[I]ntent to mislead may not be inferred, without more, from the failure to disclose to the patent examiner known, highly material information."[17]

13.     The court in *Therasense* "sought to restore objectivity and consistency to the law of inequitable conduct, by requiring that 'the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO.'"[18]

14.     "An inference is 'reasonable' if it is plausible and flows logically from the facts alleged."[19]

15.     "The Court must also be mindful that the inequitable conduct defense is not well-taken by the Court of Appeals. Because of its far-reaching consequences, it has been called the 'atomic bomb' of patent law."[20]

16.     "Court[s] understand[] the extreme consequences of finding inequitable conduct, and why the Federal Circuit so strongly disfavors it. Stripping inventors of their patent rights amounts to the 'nuclear option', and should only be exercised with clear and convincing evidence."[21]

17.     "Materiality is not limited to prior art but embraces any information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent."[22]

18.     "The duty to disclose all information known to be material to patentability is deemed

---

[17] *Judkins v. HT Window Fashion Corp.*, 529 F.3d 1334, 1343 (Fed. Cir. 2008).
[18] *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1290 (Fed. Cir. 2012).
[19] *Total Rebuild, Inc. v. PHC Fluid Power, LLC*, No. 15-1855-BAJ-CBW, 2019 U.S. Dist. LEXIS 45118, at *3-4 (W.D. La. Mar. 18, 2019)(internal quotations and citations omitted).
[20] *Austin Hardware & Supply, Inc. v. Allegis Corp.*, No. 19-CV-785- JPS, 2020 U.S. Dist. LEXIS 178588, at *39 (E.D. Wis. Sep. 29, 2020) (internal citations and quotations omitted).
[21] *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D. Tex. 2013).
[22] *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234 (Fed. Cir. 2003) (emphasis in original) (finding article which was not prior art to be material to enablement issue).

to be satisfied if all information was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) [Filing of Information Disclosure Statement] and 1.98. [Content of Information Disclosure Statement]."[23]

19.     According to the MPEP, when in doubt, "it is desirable and safest to submit information."[24] The USPTO warns applicants against "making and relying on their own determinations of materiality" because more disclosure "will result in a strengthened patent and will avoid later questions of materiality and intent to deceive."[25]

20.     Patentees "who are not 'up front' with the [US]PTO run the risk that, years later, a fact-finder might conclude they intended to deceive."[26]

21.     "Determining but-for materiality requires that the court place itself in the shoes of a patent examiner and determine whether, had the reference(s) been before the examiner at the time, the claims of the patent would have still issued."[27] "In determining the materiality of a reference, the court applies the preponderance of the evidence standard and gives claims their broadest reasonable construction."[28]

22.     As courts have noted, it "is difficult but necessary that the decisionmaker *forget what he or she has been taught at trial about the claimed invention and cast the mind back to the time the invention was made* (often as here many years), to occupy the mind of one skilled in the art who is presented only with the references, and who is normally guided by the then-accepted wisdom in the art."[29] "Therefore, it is absolutely imperative for a court to

---

[23] 37 C.F.R. § 1.56.
[24] MPEP § 2004(10).
[25] MPEP § 2001.04.
[26] *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1329-1330 (Fed. Cir. 2020) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed Cir. 1995)).
[27] *Regeneron v. Merus N.V.*, 864 F.3d 1343, 1351 (Fed. Cir. 2017) (citing *Therasense*, 649 F.3d at 1291-92).
[28] *Id.*
[29] *Twin Disc, Inc. v. United States*, 10 Cl. Ct. 713, 731, 231 U.S.P.Q. (BNA) 417, 425, 1986 U.S. Cl. Ct. LEXIS

transport itself back in time to when the claimed inventions were made  and determine obviousness from the perspective of one having  ordinary skill in the art to which the subject matter pertains, having only the prior art references  before him and unaided by the teachings of the patents in suit."[30]

23.    "As with an invalidity analysis, the first step in determining but-for materiality of  a  reference is determining the scope of the claims at issue. Thus, the court must first determine the  broadest reasonable construction of the claims that the PTO would have applied during prosecution. Next, based on the broadest reasonable construction, the court must determine whether a reasonable patent examiner would have allowed the claims had she known of the Withheld References."[31] "The broadest reasonable construction of a claim term is one that is consistent with 'the specification and the record evidence' and is 'consistent with the one that those skilled in the art would reach.'"[32] If a claim term has been broadly interpreted to read on  an accused device, then the same broad construction will read on the prior art.[33]

24.    In making the but-for materiality determination, the Court may also consider whether  obviousness and/or anticipation "was an issue of concern to the [US]PTO in its consideration of  the [] Patent Application."[34]

---

808, *34-35 (emphasis in original).

[30] *Id*.

[31] *Regeneron*, 864 F.3d at 1351 (citing *Am. Calcar v. Am. Honda Motor*, 768 F.3d 1185, 1189 (Fed. Cir. 2014)).

[32] *Regeneron*, 864 F.3d at 1351-52 (citing *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015), overruled on other grounds by *Aqua Products, Inc. v. Matal*, 872 F.3d 1290 (Fed Cir. 2017)).

[33] *01 Communique Laboratory, Inc. v. Citrix Systems, Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018); *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) (a patent holder must "beware of what [it] asks for" since a broad claim construction for infringement may ultimately result in a determination of patent invalidity).

[34] *Deep Fix, LLC v. Marine Well Containment Co. LLC*, No. H-18-0948, 2020 U.S. Dist. LEXIS 26896, at *24 (S.D. Tex. Feb. 18, 2020) (finding inequitable conduct when the patent attorney "was aware" that the USPTO "was conducting an obviousness  analysis" but "decided not  to  disclose" the "Y" references in the ISA).

25.    "To prevail on a claim of inequitable conduct in a patent case, the accused infringer must prove by clear and convincing evidence that the patentee: (1) 'knew of the reference' . . . ; (2) 'knew that it was material'; and (3) 'made a deliberate decision to withhold it.'"[35]

26.    "Proving that the [patentee] knew of a reference, should have known of its materiality, and decided not to submit it to the [US]PTO does not prove specific intent to deceive."[36] "The determination of whether an inference is reasonable cannot be decided in a vacuum;  it must be considered in light of the competing inferences to the contrary."[37]

27.    A party cannot prevail merely by proving that "key players had access to the [purported] prior art and likely contemplated its materiality, [where] there is insufficient evidence that they believed it was material . . . and then made a deliberate effort to withhold it from the  PTO."[38]

28.    "[W]hile inventors have a duty of candor when applying for a patent, it is possible  to innocently omit relevant prior art, either by accident or because of a good faith belief that the  art in question was not material."[39]

29.    "When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior  art."[40]

30.    "The Court is therefore required to place itself in the shoes of a patent examiner  and determine whether it would have allowed the claim 'if it had been aware of the undisclosed

[35] *GS CleanTech  Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020) (citing *Therasense*, 649 F.3d at1290).
[36] *GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020).
[37] *Fuma Int'l Llc v. R.J.  Reynolds Vapor Co.*, No. 1:19-CV-260, 2020 U.S. Dist. LEXIS 114066, at *4 (M.D.N.C. May 19,  2020) (citing *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 360 n.3 (4th Cir. 2001)).
[38] *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 609 (N.D. Tex. 2013).
[39] *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D.  Tex. 2013).
[40] *Regeneron Pharm., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 559 (S.D.N.Y. 2015).

reference.'"[41]

31.     Prior art 'encompasses not only the field of the inventor's endeavor but also any analogous arts.'"[42] A prior art reference is considered analogous art to the claimed invention if: (1) the reference is from the same field of endeavor as the claimed invention (even if it addresses a different problem); or (2) the reference is reasonably pertinent to the problem faced by the  inventor (even if it is not in the same field of endeavor as the claimed invention).[43]

32.     Prior art that is duplicative or cumulative is not material.[44] "'A reference is cumulative when it teaches  no more than what a reasonable examiner would consider to be taught by the prior art already before the PTO."[45]

33.     Where "certain arguments made by [the applicant] in the course of the prosecution could  not have been made had [a prior art reference] been disclosed to the PTO, the prior art reference  is not cumulative."[46]

34.     A withheld reference is not cumulative and may be "highly material when it discloses a  more complete combination of relevant features, even if those features are before  the patent  examiner in other references."[47]

35.     References are cumulative when they are "less material  than other references already

---

[41] *Id.*

[42] *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (quoting *In re GPAC Inc.*, 57 F.3d 1573, 1577-78 (Fed . Cir. 1995)).

[43] *See In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004); MPEP § 2141.01(a).

[44] *See, CertusView Techs., LLC v. S&N Locating Servs., LLC*, 198 F. Supp. 3d 568, 603 (E.D. Va. 2016) ("CertusView did  not have a duty to submit the specific ESRI prior art references during prosecution of the '204  Patent because such references are cumulative of other references that CertusView provided to the  PTO and are not material.") (citing 37 C.F.R. § 1.56(b).

[45] *Id.* (citing *Regeneron Pharms., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 560-61  (S.D.N.Y. 2015)).

[46] *Synthon IP, Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 777 (E.D. Va. 2007).

[47] *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1374 (Fed. Cir. 2000).

before the examiner."[48]

36.     The accused infringer must prove that the patent applicant knew of the undisclosed reference, "knew that it was material, and made a deliberate decision to withhold it."[49]

37.     "An applicant should know information is material when the examiner repeatedly raises  an issue to which the information relates."[50]

38.     "Once an attorney, or an applicant, has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her  duty to disclose."[51]

39.     An inventor "cannot obviate his own duty of candor by, in essence, 'passing the buck' to his patent counsel. Both patentees and their attorneys have an ongoing duty of candor and good faith dealing in the prosecution of patent applications…"[52]

40.     An applicant who chooses to withhold known prior art should maintain "contemporaneous evidence" to establish that the prior art was actually analyzed.[53]

41.     "The duty to disclose information, however, does not end when an applicant becomes allowed but extends until a patent is granted on that application."[54] "Potentially material information discovered late in the prosecution should be promptly submitted. That the issue fee  has been paid is no reason to excuse for failing to submit information."[55]

---

[48] *Baxter Intern., Inc. v. McGaw, Inc.,* 149 F.3d  1321, 1328 (Fed. Cir. 1998).
[49] *Energy Heating,* 889 F.3d at 1299 (citing *Therasense,* 649 F.3d at 1290).
[50] *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1366 (Fed. Cir. 2007).
[51] *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp*., 267 F.3d 1370, 1383 (Fed. Cir. 2001).
[52] *Sabasta v. Buckaroos, Inc.*, 683 F. Supp. 2d 937, 946 (S.D. Iowa 2010) (finding inequitable  conduct when inventor attempted to blame his attorneys for failing to disclose material prior art).
[53] *See McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 487 F.3d 897, 910 (Fed. Cir. 2007) (finding the  alleged explanation for failing to disclose prior art "incredible"  partially because "no contemporaneous evidence (*e.g*., notes, records, files, etc.) was adduced at trial to show that" the prior art was "actually analyzed").
[54] MPEP § 2001.04 (citing 37 C.F.R. 1.97(d)).
[55] MPEP § 2004(12). *See also* Dkt. No. 826-4 at 216:1-216:6.

42.     "An electronic publication, like any publication, may be relied upon for all that it would have reasonably suggested to one having ordinary skill in the art."[56]

43.     "A reference contains an 'enabling disclosure' if one of ordinary skill in the art could have combined the publication's description of the invention with his [or her] own knowledge to make the claimed invention."[57]

44.     A prior art reference provides an enabling disclosure and thus anticipates a claimed invention if the reference describes the claimed invention in sufficient detail to enable a person of ordinary skill in the art to carry out the claimed invention; "proof of efficacy is not required for a prior art reference to be enabling for purposes of anticipation."[58]

45.     "Even if a reference discloses an inoperative device, it is prior art for all that it teaches."[59] Therefore, "a non-enabling reference may qualify as prior art for the purpose of determining obviousness under 35 U.S.C. 103."[60]

46.     As long as there is evidence of record establishing inherency, failure of those skilled in the art to contemporaneously recognize an inherent property, function or ingredient of a prior art reference does not preclude a finding of anticipation.[61]

47.     "A reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference would 'at once envisage' the claimed arrangement or combination."[62]

48.     A reference is no less anticipatory if, after disclosing the invention, the reference

[56] MPEP § 2128 (c).
[57] *In re Donohue,* 766 F.2d 531 (Fed. Cir. 1985).  *See also* MPEP § 2121.01.
[58] *Impax Labs. Inc. v. Aventis Pharm.Inc.,* 468 F.3d 1366, 1383 (Fed. Cir. 2006).
[59] *Beckman Instruments v. LKB Produkter AB,* 892 F.2d 1547, 1551 (Fed. Cir. 1989).
[60] *Symbol Techs. Inc. v. Opticon Inc.,* 935 F.2d 1569, 1578 (Fed. Cir. 1991).
[61] *Atlas Powder Co. v. IRECO, Inc.,* 190 F.3d 1342, 1349 (Fed. Cir. 1999).
[62] *Kennametal Inc. v. Ingersoll Cutting Tool Co.,* 780 F.3d 1376 (Fed. Cir. 2015).

then disparages it. The question whether a reference "teaches away" from the invention is inapplicable to an anticipation analysis.[63]

49.     "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality."[64]    However, "[w]hen the patentee has engaged in affirmative acts  of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is   material."[65] "In this context, materiality is premised on the notion that 'a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that falsehood will affect issuance of the patent.'"[66]

50.     "When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of  an unmistakably false affidavit, the misconduct is material."[67]

51.     In an *ex parte* proceeding before the USPTO, the Examiner has no way to test the truth or falsity of a declaration and must accept the declaration as true – hence, the requirement for the  absolute duty of candor and good faith.[68]

52.     "Cases involving affidavits or declarations are held to a higher standard."[69] "[A] false affidavit or declaration is per se material."[70] "There is no room to argue that submission of

---

[63] *Celeritas Tech. Ltd. v. Rockwell Int'l Corp.,* 150 F.3d 1354, 1361 (Fed. Cir. 1998) (The prior art  was held to anticipate the claims even though it taught away from the claimed invention. "The fact that a modem with a single carrier data signal is shown to be less than optimal does not vitiate the fact that it is disclosed.")

[64] *Therasense,* 649 F.3d at 1291.

[65] *Id*. at 1292 (citations omitted).

[66] *Ohio Willow Wood Co. v. Alps S., LLC,* 735 F.3d 1333, 1345 (Fed. Cir. 2013) (citing *Therasense,* 649 F.3d at 1292).

[67] *Therasense,* 649 F.3d at1292.

[68] *See Ferring B.V. v. Barr Labs., Inc.,* 437 F.3d 1181, 1187 (Fed. Cir. 2006) ("Given the ex parte nature of proceedings before the PTO, it is especially important that the examiner has all the information needed to determine whether and to what extent he should rely on declarations presented by the applicant," and affirming a summary judgment ruling of unenforceability for  inequitable conduct based on the applicant's failure to disclose to the USPTO the financial  relationships of multiple declarants to the assignee)

[69] *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008).

[70] *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012).

false  affidavits is not material."[71]

53.     A failure to disclose a declarant's bias or financial or other relationship to the applicant  m a y   constitute a breach of the duty of candor and good faith.[72]

54.     "The [Federal Circuit] held that a declarant's relationship with the applicant is material if (1) the declarant's views on the underlying issues are material and (2) the relationship  to the applicant is a significant one."[73]

55.     "Proving that the [declarant's] statements were false or misleading, without accompanying proof of an intent to mislead, falls short of the showing needed to support a finding  of inequitable conduct."[74]

56.     The Federal Circuit in *Ferring*, *supra,* "fully recognize[d] that inventors often consult their colleagues or other persons skilled in the art whom they have met during the course  of their professional life. Accordingly, when an inventor is asked to provide supportive  declarations to the PTO, it may be completely natural for the inventor to recommend,  and even  contact, his own colleagues or people who are, or who have been, affiliated with his employer and  to submit declarations from such people. Nothing in this opinion should be read as discouraging  such practice."[75]

57.     The egregious  misconduct exception  to but-for  materiality has flexibility  and is not  limited to the filing of a false affidavit.[76]

---

[71] *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1330 (Fed. Cir. 2020) (quoting *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983)).

[72] *Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571 (Fed. Cir. 1983) (cited with approval in *Therasense,* 649 F.3d at 1292) ("there is no room to argue that submission of false  affidavits [to the USPTO] is not material")

[73] *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 05-897  (WHW)(CLW), 2018 U.S. Dist. LEXIS 88011, at *19 (D.N.J. Apr. 20, 2018) (internal citations  and quotations omitted) (citing *Ferring B. V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1188 (Fed.  Cir. 2006)).

[74] *Juicy Whip v. Orange Bang*, 292 F.3d 728, 745 (Fed. Cir. 2002).

[75] *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1194-95 (Fed. Cir. 2006).

[76] *Therasense*, 649 F.3d at 1293 ("the egregious misconduct exception [to the requirement of proving but-for

58.     In *Ferring,* the Federal Circuit noted:

> [B]y presenting five separate declarations to the examiners, the applicants appeared to have a broad consensus of scientific support to overcome the Vavra reference. In actuality, four of the five declarations were submitted by scientists with significant associations with the assignee itself. While we will never know how the examiners may have weighed the declarations differently, it seems clear to us that this stellar showing of support would have, at the very least, been tarnished.[77]

59.     "[T]he duty of candor cannot be avoided by willful ignorance or compartmentalization of knowledge…in an effort to insulate the patent applicants and their attorneys from information unfavorable to patentability."[78]

60.     Even when an Examiner does "not raise a question concerning any such relationship, it is material to an Examiner's evaluation of the credibility and content of affidavits to know of any significant relationship between an affiant and an applicant; failure to disclose that relationship violate[s]" the duty of disclosure.[79]

61.     In the *ex parte* process of examining a patent application, the PTO lacks the means or resources to gather evidence which supports or refutes the applicant's assertion that the sales constitute commercial success.[80]

62.     "In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such success is not the result ***of heavy promotion or advertising***, shift in advertising,

---

materiality] gives the test sufficient flexibility to capture extraordinary circumstances").
[77] *Ferring,* 437 F.3d at 1194.
[78] *Synthon IP, Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 779 (E.D. Va. 2007).
[79] *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007) (internal citations omitted) (applicant violated his duty of disclosure for known affidavits "in support of patentability, including points of distinction over prior art patents, without informing the examiner of the affiant's relationship to" the applicant).
[80] *In re Huang,* 100 F.3d 135, 139-40 (Fed. Cir. 1996).

consumption by purchasers normally tied to applicant or assigned, or other business events extraneous to the merits of the claimed invention, etc."[81]

63.     "In *ex parte* proceedings before the Patent and Trademark Office, an applicant must show that the claimed features were responsible for the commercial success of an article if the evidence of nonobviousness is to be accorded substantial weight."[82]

64.     "Merely showing that there was commercial success of an article which embodied the invention is not sufficient."[83]

65.     "The patentee bears the initial burden of coming forward with evidence sufficient to constitute a prima facie case of the requisite nexus. There is a presumption of nexus when a patentee can demonstrate significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent." Further, "[a] patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is not due to factors other than the patented invention. It is sufficient to show that the commercial success was of the patented invention itself."[84] When "the marketed product embodies the claimed features, and is coextensive with them, then a nexus is presumed and the burden shifts to the party asserting obviousness to present evidence to rebut the presumed nexus."[85]

66.     "Once the patentee makes the requisite prima facie showing of nexus, the burden shifts to the alleged infringer to rebut the presumption of commercial success by proving that

---

[81] MPEP § 716.03(b) (emphasis added).

[82] MPEP § 716.03(b).

[83] MPEP § 716.03(b); *Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309 (Fed. Cir. 1985) (commercial success may have been attributable to extensive advertising and circumstances before the introduction of the patented product).

[84] *Jamison v. Olin Corp.- Winchester Div.,* No. 03-1036-KI, 2005 U.S. Dist. LEXIS 49109, at *119-120 (D. Or. Oct. 4, 2005).

[85] *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,* 229 F.3d 1120, 1130 (Fed. Cir. 2000).

the success was due to extraneous factors such as advertising or superior workmanship."[86]

67.     The second step in an inequitable conduct inquiry, is a finding by clear and convincing evidence that there was a specific intent to deceive the Patent and Trademark Office.[87]

68.     A finding of direct evidence of deceptive intent is rare.[88]

69.     A district court may infer intent from indirect and circumstantial evidence even without direct proof.[89] To infer an intent to deceive, the explanation must be "the single most reasonable inference able to be drawn from the evidence."[90] Intent to deceive may be inferred when an applicant fails to disclose material information to his or her patent agent or patent attorney during the prosecution of the patent.[91]

70.     "In the absence of a credible explanation by the patentee, intent to deceive may be generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information."[92]

71.     An "inference of deceptive intent may fairly be drawn in the absence of" a "credible explanation for the nondisclosure."[93]

---

[86] *Mitsubishi Chem. Corp. v. Barr Labs., Inc.,* 718 F. Supp. 2d 382, 436 (S.D.N.Y. 2010).

[87] *See Therasense,* 649 F.3d at 1287.

[88] *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009); *see also Abbott Labs. v. TorPharm, Inc.,* 300 F.3d 1367, 1380 (Fed. Cir. 2002) ("intent to deceive may be inferred from the surrounding circumstances rather than by direct evidence"); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1189–90 (Fed. Cir. 1993) (noting that "smoking gun" evidence of intent to deceive is rarely available and therefore this element "must **generally** be inferred from the facts and circumstances surrounding the applicant's overall conduct") (emphasis added).

[89] *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1340 (Fed. Cir. 2009)

[90] *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1366 (Fed. Cir. 2008)

[91] *See Ashland Prods., Inc. v. Truth Hardware Corp.,* No. 99-5786, 2003 WL21524827, at *10-11 (N.D. Ill. July 3, 2003) (finding intent to deceive, in part, due to the fact that the inventors "understood what the PTO meant by the terms 'prior art' and 'duty to disclose,'" yet the inventors were "in possession of highly material prior art, which was not disclosed to patent counsel or the PTO")

[92] *Agrizap, Inc. v. Woodstream Corp.,* 431 F. Supp. 2d 518, 533 (E.D. Penn. 2006).

[93] *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348 (Fed. Cir. 2005).

72.     A patentee aware of material information but who fails to disclose it to the USPTO "can expect to have great difficulty in establishing subjective good faith sufficient to overcome an inference of intent to mislead."[94]

73.     Deceptive intent may be inferred when "a patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability arguments to the PTO."[95]

74.     Deceptive intent should also be inferred where counsel "cultivate[s] ignorance, or disregard[s] numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art."[96]

75.     An applicant "cannot overcome a finding of deceitful intent merely by showing that it did certain things properly."[97]

76.     Advocacy cannot be chosen over candor. Patent agents and attorneys who "choose advocacy over candor" risk a finding of inequitable conduct, rendering the patent invalid and unenforceable.[98]

77.     Courts may consider lack of credibility in deciding whether there is an intent to deceive the USPTO.[99]

---

[94] *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239 (Fed. Cir. 2003).

[95] *Agfa Corp. v. Creo Products Inc*., 451 F.3d 1366, 1378 (Fed. Cir. 2006) (finding deceptive intent when the evidence regarding applicant's knowledge of the prior art reference as "overwhelming" and "because patentability arguments could not have been made had the withheld information been disclosed")

[96] *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp*., 267 F.3d 1370, 1382 (Fed. Cir. 2001) (quoting *FMC Corp. v. Hennessy Indus., Inc*., 836 F.2d 521, 1275 n.6 (Fed. Cir. 1987))

[97] *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1376 (Fed. Cir. 2000) (affirming district court's finding of inequitable conduct when the applicant "willfully misrepresented the [prior art] reference" by providing only a partial translation to the USPTO).

[98] *GS Cleantech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1331 (Fed. Cir. 2020) (affirming district court's finding of intent to deceive based in part on a "patently false' statement" in a declaration where in the law firm and the inventors "chose advocacy over candor").

[99] *See Belcher*, 11 F.4th at 1352 (affirming district court's finding of inequitable conduct when one of the individuals involved in the prosecution of the patent made "repeated efforts to evade questioning and inject attacks of the prior art into his answers" which "raised serious questions as to his credibility").

78.     The credibility of a witness can be called into question when he is unclear when questioned by opposing counsel but in sharp contrast fortuitously remembers when events took place and recalls the meaning of documents when questioned by the lawyer with whom he is aligned.[100]

79.     A failure to remember does not suffice as a credible explanation.[101]

80.     "Selective" memory establishes a lack of credibility.[102]

81.     The witnesses "across-the-board lack of recollection" is not credible, particularly given the significance of the documents at issue in this litigation.[103]

82.     Even if it does not actually question the veracity of a witness, a district court can certainly conclude that a witness has a "propensity to evade the truth."[104]

83.     A finding of an intent to deceive is also appropriate when an applicant "threatens" or attempts to coerce an individual to provide supportive testimony.[105]

84.     The Federal Circuit, in a post-*Therasense* decision, has held that evidence of inequitable conduct occurring during the prosecution of "related patents" can establish intent based on "a pattern of deceit."[106] In *Intellect,* to determine whether the inventor

---

[100] *See GS Cleantech Corp., supra.*

[101] *Paragon,* 984 F.2d at 1192 ("The inventor merely stated he could not remember telling the attorney. The attorney himself was silent on this point. Thus, viewing the evidence of record in the light most favorable to the non-movant, we find none which raises a genuine issue of fact respecting the deceptive intent inferred from the submission of deceptive, if not outright false, affidavits to the PTO.").

[102] *See Avid Identification Systems v. Crystal Import Corp.*, 603 F.3d 967, 975 (Fed. Cir. 2010) (finding inequitable conduct and a lack of credibility when the individual's "memory of facts was suspiciously selective, and he refused to acknowledge certain incontrovertible events").

[103] *Synthon IP Inc. v. Pfizer Inc.*, 472 F. Supp. 2d 760, 782 (E.D. Va. 2007) ("Viewed in the totality of the circumstances, this across-the-board lack of recollection on the part of the relevant Synthon employees is simply not credible, particularly given the significance and obvious materiality of the documents in issue.").

[104] *See GS Cleantech Corporation v. Adkins Energy LLC*, 951 F.3d 1310, 1319 n.9 (Fed. Cir. 2020).

[105] *See GS Cleantech Corporation v. Adkins Energy LLC*, 951 F.3d 1310, 1316 n.5 (Fed. Cir. 2020) (affirming district court's finding of an intent to deceive when the applicant and the prosecuting attorney "threatened" an entity "to coerce its support regarding the critical date for the Patents-in- Suit" by offering the entity "a royalty-free license in exchange for [its] willingness to admit that the pending patents were valid.").

[106] *See Intellect Wireless, Inc. v. HTC Corp.,* 732 F.3d 1339, 1345 (Fed. Cir. 2013).

intended to deceive the USPTO, the Court considered "the misrepresentations [made] during prosecution of the asserted patents," and the "false statements [made]…during prosecution of related patents in order to overcome prior art."[107] The Court noted the inventor made false statements "in several related patents," establishing a "pattern of deceit," and making "the inference [of intent] stronger."[108] Despite the fact that the inventor submitted the false statements "after the asserted patents were allowed," the Federal Circuit found them nonetheless relevant because they "reinforce[d] the pattern of deceit."[109]

85.    The MPEP specifically explains to applicants that "[i]t is desirable to avoid the submission of long lists of documents if it can be avoided" and "[i]f a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance."[110]

86.    Although mistakes and omissions may be considered an oversight and are "not per se unreasonable when considered in isolation…inadvertence can carry an applicant only so far," and "repeated attempts to avoid playing fair and square with the patent system" will render a patent invalid and unenforceable due to inequitable conduct.[111]

87.    Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office."[112]

---

[107] *Id.* at 1344.
[108] *Id.* at 1345.
[109] *Id.* (affirming district court's finding of intent to deceive).
[110] MPEP § 2004.
[111] *See Nilssen v. Osram Sylvania, Inc*., 504 F.3d 1223, at 1235 (Fed. Cir. 2007) (noting that "some of the errors were attributable to [the applicant] representing himself during the prosecution of his patents," but the "collection of such problems" precluded the Court from finding that the district court's holding of unenforceability was an abuse of discretion).
[112] MPEP § 2001.06(c).

88.     "At a minimum, the applicant should call the attention of the Office to the litigation, the existence and the nature of any allegations relating to validity and/or 'fraud,' or 'inequitable conduct,' relating to the original patent, and the nature of litigation materials relating to these issues."[113] The MPEP explains, that "[e]nough information should be submitted to clearly inform the Office of the nature of these issues so that the Office can intelligently evaluate the need for asking for further materials in the litigation."[114]

89.     Related litigation is "per se" material information covered by the duty of disclosure.[115]

90.     "It is clear from the language of § 2001.06(c) that the existence of [a] litigation itself is material information that an examiner needs to have."[116]

91.     The existence of the litigation "is important because it signals to the examiner that other material information relevant to patentability may become available through the litigation proceedings."[117]

### b) Findings of Fact: Background of Events Leading Up to the Filing and Prosecution of the '682 Application

1.     Mrs. Lindsey Laurain graduated with an undergraduate degree in marketing and communications and subsequently received a Master's in Business Administration while working at Pfizer.[118]

2.     After Mrs. Laurain and her husband, Brad, decided to create something kids can't toss or throw, Mrs. Laurain obtained a copy of "The Mom Inventor's Handbook,"[119] searched

---

[113] MPEP § 2001.06(c).
[114] MPEP § 2001.06(c).
[115] *Nisus Corp. v. Perma-Chink Systems, Inc.*, 421 F. Supp. 2d 1084 (E.D. Tenn. 2006); *DaimlerChrysler AG v. Feuling Advanced Tech., Inc.*, 276 F. Supp. 2d 1054, 1062–63 (S.D. Cal. 2003).
[116] *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, at 1234 (Fed. Cir. 2007).
[117] *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, at 1234 (Fed. Cir. 2007) (affirming district court's holding that patents were unenforceable for inequitable conduct in failing to disclose litigation)
[118] Dkt. No. 826-2 at 177:14-178:21; *See also* Dkt. No. 834 at 760:13-760:15.
[119] Trial Exhibit 719. *See also* Dkt. No. 826-2 at 203:2-203:14.

online,[120] and "ran out and purchased" various mats, bowls, and other existing art.[121] She then began combining what she had found and took a photograph to document her inventive thought process.[122]



3.      In March 2014, Mrs. Laurain asked Mr. Sisbarro to create a placemat and bowl combination that would suction or stick to a surface.[123] With no other instruction, Mr. Sisbarro produced a prototype that performed better than Mrs. Laurain had requested.[124]

4.      In April 2014, Mrs. Laurain contacted Ms. Danette Lilja, an attorney with whom her husband had previous experience.[125] Mrs. Laurain told Ms. Lilja, that she had "done a decent amount of research on [] the patent for the product."[126] Mrs. Laurain sent Ms. Lija documents she prepared for the trademark and patent, noting she "tried to do as much searching etc."[127]

5.      In April 2014, Ms. Lilja referred Mrs. Laurain to her colleague, Ms. Brenda Speer,

---

[120] Trial Exhibit 7 at Brenda Speer 000033-40.
[121] Trial Exhibit 41 at PDF 10.
[122] Trial Exhibit 1 at EZPZ299247-248; Dkt. No. 826-6 at 67:2-68:3.
[123] Dkt. No. 833 at 430:13-20.
[124] Dkt. No. 833 at 430:4-6, 430:13-431:13; Dkt. No. 844 (L-13 and L-12).
[125] Trial Exhibit 6.
[126] Trial Exhibit 6; Dkt. No. 826-7 at 30:7-30:9, 30:16-31:3.
[127] Trial Exhibit 863; Dkt. No. 826-7 at 32:5-32:17.

a patent lawyer[128] in Colorado and the head of BL Speer and Associates, from whom Mrs. Laurain sought patent advice.[129] On April 7, 2014, Mrs. Laurain told Ms. Lilja she would be meeting with Ms. Speer "in regard to the patent."[130]

6.      Around this time, Mrs. Laurain created a document entitled "Patent Search" (hereinafter referred to as "Patent Search I").[131] Patent Search I stated it included the "most similar" patents she found, which included the Webb Patent (United States Patent No. 8,251,340 B2).[132] Mrs. Laurain did a bunch of "googling" to put the document together.[133][20] Included in her search, was a search for "kids suction bowls."[134] Mrs. Laurain provided Mrs. Speer with a printout of Webb that was printed on March 25, 2014.[135] Mrs. Laurain also gave Ms. Speer a PowerPoint presentation containing a slide that featured photographs of a single dog bowl and mat featured on yankodesign.com (the "Lee Single Dog Bowl Mat") with the comment, "[t]hrough all my research, this is the only similar item 'online.'"[136]

7.      Mrs. Laurain then turned to an attorney from Michigan, Mr. Jordan Bolton, a close personal friend[137] of Mrs. Laurain and her husband.[138]

8.      On May 24, 2014, Mrs. Laurain e-mailed Mr. Bolton stating that after reviewing Patent Search I and conducting her own search, an unnamed female attorney did not "think a utility patent would be feasible and tough to write."[139] Mrs. Laurain told Mr. Bolton that

---

[128] Trial Exhibit 14
[129] Trial Exhibit 598; Trial Exhibit 8; *see also* Trial Exhibit 1019.
[130] Dkt. No. 826-7 at 39:23-40:19.
[131] Trial Exhibit 3.
[132] Trial Exhibit 3.
[133] Dkt. No. 826-7 at 34:8-34:11, 34:16-21, 34:23-35:11, 35:13-19; 78:16-21.
[134] Dkt. No. 826-2 at 201:13-201:25.
[135] Trial Exhibit 4; Dkt. No. 826-7 at 35:20-22, 36:11-16, 36:18-38:5, 38:7-20.
[136] Trial Exhibit 19.
[137] Dkt. No. 833 at 434:7-16; Dkt. No. 836 at 1246:11-18.
[138] Trial Exhibit 19.
[139] Trial Exhibit 19.

she had done "a lot of patent research"[140] on her invention.

9.      Mrs. Laurain retained Mr. Bolton and one of his colleagues, Mr. Timothy McCarthy, of Clark Hill, to provide her with utility patent advice in May and June 2014.[141]

10.     Mr. McCarthy was a Member and Senior Counsel of the Intellectual Property practice group of the law firm of Clark Hill.[142] Mr. McCarthy's areas of expertise include Intellectual Property Litigation and Patents, and he concentrates his practice in the area of patents, trademarks, copyrights and trade secrets.[143] Mr. McCarthy is registered to practice before the USPTO.[144] Mr. McCarthy was viewed as the "subject-matter expert" with respect to USPTO matters.[145]

11.     On May 26, 2014 Mrs. Laurain provided both Mr. Bolton and Mr. McCarthy with a document entitled "Patent Search" containing a list of links to the prior art she had located and which she believed were similar to her claimed invention. This Patent Search (hereinafter referred to as "Patent Search II") had the Lee Single Dog Bowl Mat added at the top of the list, a link to the Platinum Pets Mat under "other similar products (on amazon), the Webb Patent and the Webb Publication (US2008/0245947), which was also added.[146] In May 2014, Mr. Bolton advised Mrs. Laurain she would have a difficult time obtaining a utility patent because "all of the prior art" threw "up some red flags."[147]

12.     On June 1, 2014, Mrs. Laurain had an "extended" call with Mr. McCarthy.[148] In a

---

[140] Trial Exhibit 19.
[141] Trial Exhibit 19; Trial Exhibit 23.
[142] Dkt. No. 826-4 at 7:2-4; 8:10-15; Trial Exhibit 718.
[143] Trial Exhibit 718.
[144] Dkt. No. 826-4 at 12:3-6.
[145] Trial Exhibit 483; Trial Exhibit 24; Trial Exhibit 502 at EZPZ-CH-008650; Dkt. No. 826-4 at 218:11-17.
[146] Trial Exhibit 20; Dkt. No. 826-7 at 91:14-92:7, Trial Exhibit 17.
[147] Dkt. No. 826-7 at 116:4-14; 116:24-117:9; Trial Exhibit 24; Trial Exhibit 610.
[148] Trial Exhibit 23.

December 15, 2015 email, Mr. McCarthy recollected that he previously told Mrs. Laurain that her invention "was not patentable" because the Platinum Pets Mat was prior art.[149] On June 10, 2014, Mr. Bolton cautioned Mrs. Laurain about not obtaining the legal "support needed," and warned Mrs. Laurain that "the benefit of any patent will be diminished by an obviousness and prior art argument."[150]

13.     Prior to her June 1, 2014 conference call with Mr. McCarthy, Mrs. Laurain sent an e-mail to Mr. Bolton and M r . McCarthy specifically stating she had done some, but not much research on the "auto suction" and "suction function" she was hoping to patent,[151] that her invention focused on the "suction function" and "not necessarily the actual mat/bowl,"[152] and the "Example Patent" she sent to them highlighted the following: "Also and most importantly the design of the mat creates an auto suction so the mat can't be lifted off the table… The suction the mat creates could have other uses outside of this invention, therefore it is the 'technology' we are patented, the way the mat/bowl auto suctions to the surface."[153] In direct response to Mrs. Laurain's ideas on patenting the "suction function," Mr. Bolton told Mrs. Laurain that he did not advise spending significant sums on the patent application because "all of the prior art threw "up some red flags."[154]

14.     Mrs. Laurain stated in the 2017 Inspired Insider interview that "numerous lawyers" thought she would be unable to get the utility patent.[155]

15.     Mrs. Laurain retained Mr. Williams on June 30, 2014 to file her utility patent

---

[149] Trial Exhibit 86; Dkt. No. 826-4 at 120:10-121:19.
[150] Trial Exhibit 621.
[151] Trial Exhibit 603; Trial Exhibit 22.
[152] Trial Exhibit 24; Trial Exhibit 603; Dkt. No. 826-7 at 87:19-21, 87:23-88:7.
[153] Trial Exhibit 668 at EZPZ-CH-000128.
[154] Trial Exhibit 24; Dkt. No. 826-7 at 116:4-14, 116:24-117:9.
[155] Dkt. No. 844 (L-26).

application.[156] Compared to the price that Clark Hill would charge to prepare and file a patent application, Mr. Williams fees were significantly less. At the time of filing of the patent application that would become the '903 Patent, Mr. Williams had less than two years of practice as a patent agent.[157]

16.    Mr. Williams conducted a "client intake process" which "involve[d] getting disclosures" from Mrs. Laurain, because he tells his clients it is very important that they disclose any preexisting device that they think is similar to their alleged invention.[158] Despite Clark Hill warning Mrs. Laurain about the prior art,[159] Mr. Williams testified that the prior art "was not the focus of [their] conversation"[160] and that on June 30, 2014 Mrs. Laurain did not tell him about her conversations with the Clark Hill attorneys.[161]

17.    On June 30, 2014, Mrs. Laurain provided Mr. Williams an email wherein she referred to their "'plan'" and a similar document entitled "Patent Search," which contained a list of links to the prior art she had located and which she believed were similar to her claimed invention ("Patent Search III").[162] Patent Search III d o c u m e n t  included the Lee Single Dog Bowl Mat and the Platinum Pets mat at the top of the list.[163] Prior to trial, Mr. Williams stated under penalty of perjury in a declaration that he "failed to notice all of the attachments that were embedded between photos and did not download those attached files including her search."[164] When deposed in 2020, Mr. Williams again stated

---

[156] Trial Exhibit 611.
[157] Dkt. No. 836 at 1105:14-16; Dkt. No. 834 at 789:22-790:8, 790:21-23, 791:22-792:4.
[158] Dkt. No. 834 at 794:13-795:6; Dkt. No. 835 at 1124:16-19.
[159] Trial Exhibit 24; Trial Exhibit 610; Trial Exhibit 23.
[160] Dkt. No. 835 at 1115:25-1116:3.
[161] Dkt. No. 835 at 1122:5-14.
[162] Trial Exhibit 611 at BWILLIAMS002003.
[163] Trial Exhibit 611 at BWILLIAMS002003.
[164] Trial Exhibit 921 at ¶ 5.

that he did not review Mrs. Laurain's patent search.[165] Similarly, at trial Mr. Williams testified that he did not review her e-mail containing the links to the dog bowls either.[166] On cross-examination, Mr. Williams stated that he received the email and attachments and put them in the drawings folder with the intent to go back to the drawings folder but "I just never – never did until this started actually."[167]

18.    Mr. Willaims' contemporaneous notes of their meeting state: "She will send prior art refs. found, and two dog bowls extant in the art."[168] In the e-mail dated August 18, 2014, sent early in the prosecution, Mr. Williams  told Mrs. Laurain that while "the other mats (those dog bowls, etc.) [do not] exhibit the same 'suction function,'" he was concerned, as he thought he had "said before," that the Examiners would claim the "suction function" was "inherent to structure disclosed in additional references which, taken in combination, sustain their rejection."[169]

19.    Mr. Williams did not perform a prior art search of his own before filing the '682 Application.[170]

c)  **Findings of Fact: Chronological Order of Prosecution of the '903 Patent.**

1.    At the time Mr. Williams and Mrs. Laurain filed the '682 Application, they were both fully aware of the duty of candor and good faith owed to the USPTO during the prosecution of a patent application.[171] Mr. Williams acknowledged the duty of candor and good faith is broader than the duty to disclose material information.[172]

---

[165] Dkt. No. 826-9 at 417:18-418:5.
[166] Dkt. No. 834 at 797:7-16.
[167] Dkt. No. 835 at 1119:7-16.
[168] Trial Exhibit 678.
[169] Trial Exhibit 29.
[170] Dkt. No. 826-9 at 430:22-431:2.
[171] Dkt. No. 826-6 at 28:18-24; Dkt. No. 826-9 at 421:21-23, 421:25-422:9.
[172] Dkt. No. 826-9 at 421:21-23, 421:25-422:9.

2.     On July 17, 2014, Mr. Williams on behalf of Mrs. Laurain filed the '682 Application with the USPTO and did not disclose any prior art references or any Non-Patent Literature on an Information Disclosure Sheet ("IDS") .[173]The application was assigned to examiner Ms. Elizabeth Volz; however, because Examiner Volz was not a  primary examiner, certain actions required review, participation and sign-off by special patent  examiner ("SPE") Mr. Fenn C. Mathew.[174]

1.     In the Summary of the Invention, Mr. Williams asserted that the "surface contact self-sealing integrated tablewear and dining mat which is not anticipated, rendered obvious, suggested, or  even implied by the prior art, either alone or in combination thereof."[175]

2.     On April 13, 2015, Examiner Volz issued the First Office Action. She rejected all of the pending claims as being unpatentable as anticipated or for obviousness in light of two prior art  references, US Patent No. 8,684,218 ("Stravitz") and U.S. Publ. No. 2005/0056642 ("Lion").[176]

3.     Mr. Williams replied on Mrs. Laurain's behalf to the First Office Action on April 13, 2015. The response did not disclose any prior art references.[177]

4.     In responding to the first office action, Mr. Williams argued on behalf of Mrs. Laurain that Stravitz did not have a mat, and thus no planar portion with a suffuse undersurface as disclosed in the pending claims. Mr. Williams and Mrs. Laurain further argued that Stravitz, unlike Mrs. Laurain's alleged invention, creates a suction when pressed to a suitable surface:

> Applicant  clearly  sets  forth  that  her  suffuse  undersurface  (structure

---

[173] Trial Exhibit 245 at LN395194-228.
[174] Trial Exhibit 245.
[175] Trial Exhibit 245 at LNC395199.
[176] Trial Exhibit 245 at LNC395229-238.
[177] Trial Exhibit 245 at LNC395243-252.

entirely lacking in Stravitz) creates "a partial vacuum when attempts to *separate the undersurface* from the underlying surface are made *except at an outer edge*" [see claim 1]. Applicant's device does not create "suction" when pressed to a suitable horizontal surface "with which suction can develop", but on the contrary, creates a partial vacuum when attempts to remove the mat are made "except at an *outer edge* of the planar portion, whereby removal of the planar portion from the underlying surface is effective only by peeling the undersurface from the underlying surface starting first *at the outer edge*".[178]

5.      Mr. Williams, on behalf of Mrs. Laurain, argued that the disclosure of a "planar portion with a suffuse undersurface" was an "unanticipated structure":

> Applicant's invention, on the other hand, by having a planar portion with a suffuse undersurface, can effect stability over an uneven underlying surface by frictional contact because the entire undersurface contacts therewith, and resists removal because the partial vacuum is created only when attempts to lift the planar portion at a position *other than at an outer edge* are effected.[179]

6.      Mr. Williams, on behalf of Mrs. Laurain, asserted that, while her device may appear to be simple, "in actual fact it displays properties not seen in the prior art, properties entirely contrary [to] any enablement set forth by either Stravitz or Lion, or any proposed combination of the two."[180]

7.      On July 29, 2015, the USPTO issued a second, non-final Office Action in which all pending claims were again rejected as being obvious, this time in light of U.S. Pub. No. 2003/0152736 ("Bass"), U.S. Patent No. 5,053,262 ("Kerr"), and Lion.[181]

8.      Mr. Williams' contemporaneous notes of an August 16, 2015 phone interview with the Examiner interview state: "[s]end link to videos and email with relevant disclosure

---

[178] Trial Exhibit 245 at LNC395247 (emphasis in original).
[179] Trial Exhibit 245 at LNC395248 (emphasis in original).
[180] Trial Exhibit 245 at LNC395251.
[181] Trial Exhibit 245 at LNC395255-263.

definitive of this self sealing from spec informative of the claims."[182] There is no public record in the '682 Application of the email and link to videos referenced in Mr. Williams notes.[183]

9.      According to Mr. Williams' contemporaneous note of another phone interview, on August 26, 2015, the Supervising Examiner, Fenn Mathew, had concerns because "rubber sheets and silicone sheets exist that stick to walls."[184] Mr. Williams notes are not part of the public record of the prosecution of the '903 Patent in the USPTO and, thus, undisclosed to the public.[185] Nevertheless, the entry reflects what Mr. Williams understood from a communication with Supervisor Fenn Matthews.[186]

10.     On August 26, 2015, Mr. Williams on behalf of Mrs. Laurain filed a response to the Second Office Action. Again, Mr. Williams did not disclose any prior art references on an IDS or otherwise to the USPTO.[187]

11.     In the August 26, 2015 response, Mr. Williams, on behalf of Mrs. Laurain, argued against the Examiners' cited prior art references [Bass and Kerr] and amended the claims to require an "entirely suffuse undersurface" and an "undersurface entirely suffuse upon the portion."[188] Mr. Williams testified that this amendment was made to "distinguish [the '682 Application] from suction cups."[189]

12.     Mr. Williams, on behalf of Mrs. Laurain, argued that Bass "teaches" the use of adhesives as opposed to what the claimed invention required, which was "sealable contact

---

[182] Trial Exhibit 678 at BILLIWIAMS001944.
[183] See Trial Exhibit 245.
[184] Trial Exhibit 678 at BWILLIAMS001944; Dkt. No. 826-9 at 555:4-556:4.
[185] See Trial Exhibit 245.
[186] See Trial Exhibit 678 at BILLIWIAMS001944.
[187] Trial Exhibit 245 at LNC395269-277.
[188] Trial Exhibit 245 at LNC395269-73 (emphasis in original).
[189] Dkt. No. 835 at 1084:3-11.

with an underlying surface" on which the mat is disposed and creation of a partial vacuum *only* when attempts to separate the undersurface of the mat from the surface on which it is placed except at the outer edge of the mat.[190]

13.      Mr. Williams did not contest that Bass disclosed all of the non-functional limitations of the then-pending claims as asserted by Examiner Volz, except for the disclosure of the use of silicone and making "'sealable contact with an undersurface' wherein "said sealable contact creates a partial vacuum when attempts to separate the undersurface from the underlying surface are made except at an outer edge of the planar portion."[191]

14.      On December 9, 2015, Examiner Volz issued the Third Office Action, in which she rejected all pending claims for obviousness based solely upon the combination of Bass and Lion.[192] The rejection was made final.[193]

15.      Examiner Volz explained that Bass disclosed all of the elements of the claims, including a planar portion with an entirely suffuse undersurface, but admitted that Bass did not disclose that the planar portion was "rubberlike" or that it was made of nontoxic polymer (claim 5) or silicone (claim 9).[194]

16.      Examiner Volz cited the food enclosure shown in Lion as teaching the use of nontoxic silicone to create a vacuum seal.[195]

17.      Examiner Volz concluded "it would have been obvious … to modify Bass to include a vacuum seal and nontoxic silicone, as taught by Lion, … and sealing without losing

---

[190] Trial Exhibit 245 at LNC395274.
[191] Trial Exhibit 245 at LNC395269-75.
[192] Trial Exhibit 245 at LNC395301-308.
[193] Trial Exhibit 245 at LNC395302.
[194] Trial Exhibit 245 at LNC395303-306.
[195] Trial Exhibit 245 at LNC395304-305.

sealable contact with the underlying surface and a flexible, durable material."[196] Mrs. Laurain and Mr. Williams did not disclose to the USPTO the "resiliently deformable" silicone mat described in the Webb Patent.

18.     Examiner Volz again found that Bass also disclosed all of the non-functional limitations for the then-pending claims, except for the disclosure of specific material, in pending claims 2-9.[197]

19.     In response to the argument that "Bass does not disclose the claimed invention since an adhesive is included," the Examiner stated the use of adhesive "does not prevent the invention from reading on the claim. Since the invention when combined with Lion has the same material, it can be assumed the tableware will function the same way and the adhesive will only increase the attachment to the surface."[198]

20.     On December 14, 2015, Mr. Williams participated on a video conference interview with Supervisory Examiner Mathew and Examiner Volz. During that interview, the Examiners agreed that the Lion reference did not teach "the self-sealing property,"[199] but they still had not identified a silicone mat that stuck to walls to replace the Lion reference. According to Mr. Williams' contemporaneous notes, Supervisor Matthew inquired about the properties of silicone (*i.e.*, the science of the material) and was told by Mr. Williams that it was "the arrangement of the material, not the substance, that effects [*sic*] its properties."[200] Again, these comments are not part of the public record of the of the '682 Application.[201]

21.     The Applicant-Initiated Interview Summary of the December 14, 2015 video

---

[196] Trial Exhibit 245 at LNC395305.
[197] Trial Exhibit 245 at LNC395303-306.
[198] Trial Exhibit 245 at LNC395306.
[199] Trial Exhibit 245 at LNC395312.
[200] Trial Exhibit 691 at CC-BW-003213.
[201] *See* Trial Exhibit 245.

conference stated that the Examiners agreed to withdraw the previous final rejection based on Lion, but noted that there was no agreement as to the disqualification of the Bass reference. The interview summary concluded: "The previous final rejection has been withdrawn and the affidavit will be entered when filed."[202]

22.     In response to the Third Office Action, Mr. Williams planned to argue against Bass and provide evidence of secondary considerations of non-obviousness: commercial success and unexpected results.[203]

23.     On March 9, 2016, Mr. Williams filed Mrs. Laurain's response to the Third Office Action.[204]

24.     The March 9, 2016 response admitted that Bass "clearly teaches a planar portion."[205] Mr. Williams, on behalf of Mrs. Laurain argued, however, that the Examiner had improperly assumed or implied that the integrated mat and tableware device shown in Bass would have the "self-sealing" property claimed by Mrs. Laurain if made of silicone.[206]

25.     Mr. Williams, on behalf of Mrs. Laurain argued:

Examiner seems to be implying that simply rendering Bass's device in the same material of Lion (i.e. a "silicone mold") would be sufficient to render the same self-sealing property claimed by Applicant? Examiner fails to offer any teaching provided by either reference in support of this assumption, nor does she explain how such a combination of elements is meant to be effected.[207]

26.     Mr. Williams argued:

[M]erely making a device out of silicone alone does <u>not</u> necessarily create the surface contact self-sealing property Applicant claims…

---

[202] Trial Exhibit 245 at LNC395312.
[203] Trial Exhibit 692 at OMH-BW-00002163-64.
[204] Trial Exhibit 245 at LNC395437.
[205] Trial Exhibit 245 at LNC395441.
[206] Trial Exhibit 245 at LNC395439-440.
[207] Trial Exhibit 245 at LNC395439.

It's worth noting for the record, that there exist a whole panoply of silicone products in the state of the art that do not effect self-sealing in the manner explicitly set forth by Applicant. From mouse pads, placemats, and other household items, the list is extensive. For an example of prior art that is rendered of silicone but fails to perform the same self-sealing property claimed by Applicant, please see Appendix D included with this communication and the video demonstration at:

https://www.youtube.com/watch?v=o4kQlQJXM8A&feature=youtu.be[208]

27.    Mr. Williams argued the Examiner's assumption was improper because she had allegedly failed to "point[] out any teaching in the references themselves" that demonstrated a "suffuse undersurface effecting creation of a partial vacuum to resist separation except by peeling action  effected at an outer edge."[209]

28.    Mr. Williams, on behalf of Mrs. Laurain, described the "suffuse undersurface effecting creation of a partial vacuum to resist separation except by peeling action effected at an outer edge" as being the "novel property" Mrs. Laurain claimed to have "discovered … in setting forth the metes and bounds of her claims."[210]

29.    Mr. Williams, on behalf of Mrs. Laurain, further argued the alleged invention was nonobvious in light of secondary considerations.[211]

30.    On October 11, 2016, the United States Patent and Trademark Office issued the '903 Patent.[212]

31.    For the '682 Application/'903 Patent, the Parties substantially agree that a POSITA is a person who has either a bachelor's degree in mechanical  engineering or product design (or equivalent degree or experience) with at least two years of  practical experience in

---

[208] Trial Exhibit 245 at LNC395440 (emphasis in original).
[209] Trial Exhibit 245 at LNC395442-444.
[210] Trial Exhibit 245 at LNC395441.
[211] Trial Exhibit 245 at LNC395445-452.
[212] Trial Exhibit 220.

houseware products.[213]

32.     Mr. Michael Henley, an expert presented by EZPZ, is a POSITA. LNC did not present the testimony of any POSITA.[214]

### d)  Findings of Fact: Patent Applications Related to the '903 Patent

1.      On January 2, 2015, EZPZ filed its PCT Application No. PCT/US15/11955 ("'955 PCT").[215]

2.      EZPZ's filed its National Stage Entry on March 1, 2017, Application No. 15/507,823 ("'823 Application). This application post-dates issuance of the '903 Patent. This application was abandoned on January 23, 2019.[216]

3.      EZPZ filed a patent application on September 11, 2017, Application 15/700,403 ("'403 Application"). This application does not appear in the family of the '903 Patent on Public  PAIR with the PTO because the application did not claim priority to the '903 Patent. This application was abandoned on November 15, 2018.[217]

4.      EZPZ filed its first continuation application on January 3, 2018, Application 16/207,976 ("'976 Application). This application was abandoned on January 31, 2020.[218]

5.      EZPZ filed a second continuation application on December 17, 2019, Application 16/717,824 ("'824 Application"). This application was abandoned on April 20, 2020.[219]

6.      EZPZ filed the patent applications related to the '903 Patent, in the United States, primarily as a part of its litigation strategy.[220]

---

[213] Dkt. No. 836 at 1415:14-1416:5; Dkt. No. 835 at 925:9-14, 926:9-927:14.
[214] Dkt. No. 836 at 1413:16 to 1414:1, 1415:14-1416:5.
[215] Trial Exhibit 814.
[216] Trial Exhibit 905.
[217] Trial Exhibit 281.
[218] Trial Exhibit 583.
[219] Trial Exhibit 582.
[220] Dkt. No. 836 at 1309:3-11, 1315:3-1316:8; Dkt. No. 834 at 704:8-706:13.

7.    The Court ruled that it agrees with LNC that the non-final office actions in continuing patent applications of the '903 Patent [filed after its issuance] or '955 PCT is relevant. [221] Specifically, office actions in related patent applications are relevant for establishing the materiality of prior art references.[222]

### e)  Findings of Facts: The Webb Publication and the Webb Patent ("Webb Prior Art").

1.    On June 30, 2014, Mrs. Laurain provided Mr. Williams the results of her prior art search ("Patent Search III") containing a list of links to the prior art she had located and which she believed were similar to her claimed invention, including the Lee Single Dog Bowl Mat, a link to the Platinum Pets Mat, the Webb Patent, and the Webb Publication.[223] The body of the email also included links to the Lee Single Dog Bowl Mat and the Platinum Pets Mat.[224] In that same email, Mrs. Laurain outlined the "summary of [their] 'plan.'"[225]

2.    On January 20, 2015, Mr. Williams, on behalf of Mrs. Laurain, filed the '955 PCT Application with the same drawings, written specifications and claims set forth in the originally filed '682 Application claiming priority to the July 17, 2014 filing of the '682 Application that issued as the '903 Patent.[226] The USPTO was named as the receiving office.[227]

3.    On May 4, 2015, in connection with EZPZ's '955 PCT Application the International Searching Authority ("ISA") issued its International Search Report ("Report")

---

[221] Dkt. No. 715 at 31.

[222] *Regeneron Pharm., Inc. v. Merus B.V.*, 144 F. Supp. 3d 530, 560 (S.D.N.Y. 2015) ("Rejections over withheld prior art in other patent applications with similar claims is evidence of materiality.").

[223] Trial Exhibit 611 at BWILLIAMS002003.

[224] Trial Exhibit 611 at BWILLIAMS001967.

[225] *Id.*

[226] Trial Exhibit 814 at PDF 67-101; Dkt. No. 835 at 1141:12-22 (Williams agrees).

[227] *See id.*

and a separate Written Opinion of the ISA ("Written Opinion") identifying the Webb Publication as a "Y" reference along with two other prior art references: U.S. Patent 5,180,132 (Pearson et al.) and U.S. Patent No. 2,545,733 (Hatfield) meaning "the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more such documents, such combination being obvious to a person skilled in the art."[228] Mr. Williams and Mrs. Laurain were both aware of the ISA Report and the Written Opinion.[229]

4.      Later on June 9, 2016, Mr. Williams told Mrs. Laurain, Mr. Bolton, and Mrs. Falcone that he had a "fairly solid argument" to prevail over the prior art cited by the ISA in the Report, which included the Webb Patent and Webb Publication.[230] As testified by Mr. Marc Hubbard, a member of the Patent Bar and a former Professor at Southern Methodist University Law School,[231] the best practice is to disclose the ISA Report to the USPTO.[232] At trial Mr. Williams offered a possible interpretation of Rule 1.56 for not disclosing the prior art cited in the ISA Report and Written Opinion claiming "[t]he international phase of a PCT Application is not *necessarily* a foreign filing"[233] and based upon "reading of the law at that time, [he] did not think that the USPTO constituted a foreign filing."[234]

5.      EZPZ offered no contemporaneous notes to support his rationale to identify the law he relied upon for this position. Additionally, Mr. Williams explained his misreading of Rule 1.56's requirement because he claimed "[i]t's not a clear sentence without the

---

[228] Trial Exhibit 864; Trial Exhibit 527; Dkt. No. 826-7 at 237:15-23, 237:25-238:2, 238:3-23, 246:14-19.
[229] Dkt. No. 826-7 at 246:14-19, Dkt. No. 826-9 at 528:14-20, Dkt. No. 835 at 1140:24-1141:4.
[230] Trial Exhibit 194.
[231] Trial Exhibit 994; Dkt. No. 832 at 205:7-205:10.
[232] Dkt. No. 832 at 213:3-216:4.
[233] Dkt. No. 835 at 1050:16-1050:22 (emphasis added).
[234] Dkt. No. 835 at 1045:3-1045:5.

benefit of a senior practitioner to turn to to ask anyway."[235]

6.　　On May 8, 2015, Mr. Williams submitted informal comments arguing that neither the Webb Application nor Pearson "teach a *suffuse* undersurface capable of creating a partial vacuum *only* when attempts to separate the undersurface from an underlying surface are made."[236] Mr. Williams further argued that "each of the devices taught by Webb and Pearson require downward depression of a concave structure to actively create suction in contact with an underlying surface by elastic rebound subsequent deformation of particular structure."[237] According to Mr. Williams, "No such concavity, suction cup, or active depression to set suction, is required when operating Applicant's device as disclosed and claimed," because "Applicant's device passively creates a partial vacuum only when attempts to separate the suffuse undersurface from an underlying surface are made, except at an outer edge thereof."[238]

7.　　On September 14, 2015, Mrs. Laurain sent Mr. McCarthy, Mr. Bolton, and Mr. Williams EZPZ's "IP Summary" prepared by Mr. Williams[239] that was going to be provided to a prospective purchaser.[240] The IP Summary noted the ISA Report and Written Opinion was mailed to the International Bureau on May 4, 2015, to which informal comments were entered prior to the Chapter II filing and entry into the national stage.[241]

8.　　On March 1, 2017, the '955 PCT Application was filed in the USPTO as a Chapter II National Phase Application and became the '823 Application that was assigned

---

[235] Trial Exhibits 115, 116, and 194. Mr. Bolton claimed not to recall that conversation. Dkt. No. 826-3 at 162:9-25.
[236] Trial Exhibit 492 (emphasis in original).
[237] Trial Exhibit 492.
[238] Trial Exhibit 492.
[239] Trial Exhibit 56; Trial Exhibit 720.
[240] Dkt. No. 826-7 at 264:20-265:21.
[241] Trial Exhibit 720 at EZPZ0158019; Dkt. No. 826-7 at 263:22-265:2, 265:5-266:15, 266:17-267:19; Trial Exhibit 56.

to Examiner Volz, the same Examiner who was assigned to the '682 Application.[242] Because the '823 Application is based on the '955 PCT Application, the ISA Report and Written Opinion were already part of the prosecution of the '823 Application having been carried over from the '955 PCT Application.[243] The '823 Application was filed with the same drawings, written specification and claims as originally filed in the '682 Application.[244]

9.       On June 27, 2017, Mr. Williams filed a preliminary amendment of the '823 Application to clarify that the application is a "national stage entry of international application PCT/US1511955 filed on January 20, 2015, which claims the benefit of" the priority date of the '903 Patent.[245] On October 16, 2017, Mr. Williams filed a preliminary amendment canceling the original claims 1-9 and replacing them with method claims 10-13. The method claims 10-13 were analogous to the claims that issued as the '903 Patent.[246]

10.      On June 28, 2018, Examiner Volz rejected claims 10 and 11 as being anticipated by Webb et al. (U.S. Pub. No. 2008/0245947).[247] She rejected claims 12 and 13 for obviousness as being unpatentable over Webb et al. (U.S. Pub. No. 2008/025947 in view of Brown (U.S. Patent No. 2,683,974)).[248] Mr. Williams advised Mrs. Laurain of this rejection on June 29, 2018.[249] Examiner Volz's rejection of the claims in the '823 Application confirms the but-for materiality of the Webb Prior Art.

---

[242] Trial Exhibit 905 at 94.
[243] Trial Exhibit 905 at 134-143.
[244] Trial Exhibit 905 at 104-122.
[245] Trial Exhibit 905 at 78-79.
[246] Trial Exhibit 905 at 63-66.
[247] Trial Exhibit 905 at 31.
[248] Trial Exhibit 905 at 32-33.
[249] Trial Exhibit 299; Dkt. No. 826-9 at 755:7-10; 755:14-756:16.

11.     The '403 Application shared the same drawings and written specifications of the originally filed '682 Application.[250] On November 13, 2017,  the Examiner rejected each and every one of Mrs. Laurain's claims under 35 U.S.C. § 102(a) as being anticipated by the Webb Application because it "discloses a surface contact self-sealing integrated tableware and dining mat," comprising of a silicone planar portion, a suffuse undersurface made of sticky material, that creates a partial vacuum when attempts to lift except at outer edge is  made.[251] The Examiner further noted "the curve of the suction cup [of the Webb Patent] can act as a receptacle."[252] Finally, the Examiner noted that the Webb Application discloses a "cambered" planar portion "where the vacuum is created."[253]

12.     Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Tommee Tippee Mat, the Momo Baby Skid-proof Silicone Placemat, the Brinware Silicone Placemat, the Webb Patent, the Webb Publication, the Platinum Pets Mat and the Lee Single Dog Bowl at the time of filing the '682 Application.

### f)   Conclusions of Law: The Webb Publication and the Webb Patent ("Webb Prior Art")

1.     Had the Examiners had the benefit of the Webb Prior Art during the prosecution of the '903 Patent, it is more probable than not that they would have rejected all claims of the ' 903 Patent for obviousness and/or anticipation. Thus, the Webb Prior Art is but-for material to the patentability of the '903 Patent because at least claim 1  would not have issued had these references been disclosed to the USPTO during prosecution of  the '903 Patent. This is further confirmed by the prosecution of both the '823 Application and  the

---

[250] Trial Exhibit 281 at EZPZ301222-243.
[251] Trial Exhibit 281 at EZPZ301177-178.
[252] Trial Exhibit 281 at EZPZ301178.
[253] Trial Exhibit 281 at EZPZ301178.

'403 Application where the Webb Prior Art was disclosed and ruled upon by the respective Examiners to reject the pending claims as anticipated or rendered obvious.[254]

2.      Indeed, the Court confirmed the but-for materiality of the Webb Prior Art by finding that the '903 Patent  was obvious in light of the Webb Patent and the Webb Publication.[255] The Court obviousness ruling was made under the clear and convincing standard whereas the standard for but-for materiality is a preponderance of the evidence.[256] Thus, the Court concludes that the Webb Patent and the Webb Publication are but-for material prior art.[257]

3.      Additionally, given the ISA Report's characterization of the Webb Publication as a Y reference,[258] the Court concludes that Mr. Williams and Mrs. Laurain should have disclosed the Webb Prior Art to the USPTO.

4.      Thus, the issue before the Court is whether the single most reasonable inference is that there was a specific intent to deceive the USPTO by not disclosing the Webb Prior Art.

5.      As discussed above, Mrs. Laurain did a bunch of "googling" and created Patent Search I, II, III documents. The Patent Search documents included the "most similar" patents she found, which included the Webb Patent and Webb Application ("the Webb Prior Art"). Mrs. Laurain provided a version of the Patent Search documents to each of the attorneys she contacted about filing an application.

6.      Mrs. Laurain ultimately engaged Mr. Williams to prepare and file the '682

---

[254] Trial Exhibit 905 at 30-33; Trial Exhibit 281 at EZPZ301177-179.

[255] *See* Dkt. Nos. 522 and 523; *Therasense*, 649 F.3d at 1292 ("[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the PTO.").

[256] *Compare* Dkt. No. 522 at 4 (applying clear and convincing evidence as the burden of proof), *with Regeneron*, 864 F.3d at 1351 (citing *Therasense*, 649 F.3d at 1291–92) (applying a preponderance of the evidence standard for but-for materiality).

[257] *Therasense,* 649 F.3d at 1288 ("Unlike other deficiencies, inequitable conduct cannot be cured by reissue, or reexamination.") (internal citations omitted).

[258] Trial Exhibit 864.

Application. On June 30, 2014, Mrs. Laurain provided Mr. Williams with the Patent Search III document.

7.      As it relates to this issue, the Court concludes that Mr. Laurain's testimony regarding the non-disclosure of the Webb Prior Art is credible. Mrs. Laurain provided the Patent Search document to Mr. Williams, and it is reasonable to infer that she expected Mr. Williams to disclose the Webb Prior Art to the USPTO. Accordingly, the single most reasonable inference is *not* that Mrs. Laurain specifically intended to deceive the USPTO by  failing to disclose the Webb Prior Art.

8.      The Court now turns to the conduct of Mr. Williams. Mr. Williams testified that he did not see the reference to a google patent  reference that Ms. Laurain sent him, which included the Webb  Prior Art.[259] Instead, the Webb Prior Art first became known to Mr. Williams at the time the International Search Report  (ISR) and the Written Opinion of the International Search  Authority  issued for the PCT Application on May 4, 2015.[260] These documents identified the Webb Prior Art as a "Y" Reference. At the time, prosecution of the application '682 Application was ongoing.

9.      Although it is common practice to disclose the prior art identified in an ISR and Written Opinion  in an Information Disclosure Statement, Mr. Williams stated that he did not disclose the prior art cited in these documents, because he believed that the  results  were available  to the USPTO given that it was the ISA  Search office.  In particular, Mr. Williams testified that this was the first PCT that he had filed, and his mistaken belief was due to his inexperience.[261] The Court finds Mr. Williams testimony credible.

---

[259] Dkt. No. 826-9 at 415:9-416:13; Dkt. No. 826-7 at 34:16-21, 34:23-25, 35:1-11,  35:23-36:1, 36:2-9.
[260] Trial Exhibits 46, 47.
[261] Dkt. No. 835 at 1044:12-1054:25; Dkt. No. 826-9 at 528:6-20, 532:2-533:8, 533:19-534:9, 534:12-535:2.

10.     Additionally, Mr. Williams stated that he believed the Webb  Prior Art was cumulative and not material based on the prosecution history that had  already transpired regarding suction cups.

11.     The Court concludes that it was reasonable for Mr. Williams to believe that suction cups and adhesives do not anticipate "surface contact self-sealing" as disclosed in the context of the '903 Patent.[262] During the prosecution of the application that became the '903 Patent, Mr. Williams and the examiners discussed suction cups.[263] Mr. Williams testified that he believed that the Webb Prior Art teaches a suction cup, which he contends teaches away from the '903 Patent. He also testified that he believed that he had already discussed the inapplicability of suction cups to the '903 Patent with the examiners, and that suction cups had  already been disposed of as relevant or analogous prior art.

12.     Notably his belief that the Webb Prior Art is a suction cup is evidenced in contemporaneous statements that corroborate his testimony. For example, Mr. Williams provided Informal Comments to the International Search Authority on May 8, 2015, four days  after the ISA report identifying Webb Publication (US Pub. 2008/0245947-A1) as a "Y" reference.[264]  The Informal Comments identify Mr. Williams' belief that the Webb Publication teaches a suction cup and how the suction cup is different than the claims  of the application that became the '903 Patent.[265] Additional consistent statements are evidenced  by internal emails.[266] The Court further notes that Mr. Williams maintained his position in later prosecutions, specifically the '403 Application.[267]

---

[262] Dkt. No. 834 at 845:14-846:10; Dkt. No. 835 at 1226:22-1227:23; Dkt. No. 834 at 816:14-20.
[263] Dkt. No. 834 at 805:23-807:16.
[264] Trial Exhibit  865.
[265] Id.
[266] Trial Exhibit 194; Dkt. No.835 at 1141:23-1142:3.
[267] Trial Exhibit 281 at LNC301156-159 (PDF 104-105).

13.     As has been recognized, "while inventors have a duty of candor when applying for a patent, it is possible to innocently omit relevant prior art, either by accident or because of a good faith belief that the art in question was not material."[268]

14.     Accordingly, the single most reasonable inference is *not* that Mr. Williams specifically intended to deceive the USPTO by failing to disclose the Webb Prior Art.

### g)   Findings of Fact: The Tommee Tippee Mat

1.     The Tommee Tippee Mat[269] is the commercial embodiment of the Webb Patent.[270] The Tommee Tippee Mat is a two-part system including a flexible mat and a rigid bowl.[271]



2.     To create a mock-up of her alleged invention, Mrs. Laurain took the bowl that was sold with the Tommee Tippee Mat and taped it to a piece of paper, thereby creating her "all-in-one" bowl and placemat (bottom left).[272]

---

[268] *GE v. Mitsubishi Heavy Indus.*, 946 F. Supp. 2d 582, 588 (N.D. Tex. 2013).
[269] Trial Exhibit 446.
[270] Dkt. No. 832 at 283:23-284:1; Dkt. No. 832 at 337:16-338:14; Dkt. No. 834 at 550:4-5; Dkt. No. 835 at 956:17-19.
[271] Dkt. No. 836 at 1424:24-1425:5.
[272] Trial Exhibit 1 at EZPZ299247-248; Dkt. No. 826-2 at 203:2-203:14; Dkt. No. 826-6 at 67:2-68:3.



Mrs. Laurain also created her "all-in-one" bowl and placemat by placing the Oogaa bowl on top of the Tommee Tippee Mat, which she then placed on top of the Kidkusion Gummi Mat (top left). She documented her thought process by taking a photograph of the three products stacked one on top of the other and placed them alongside the Tommee Tippee bowl which she taped to a piece of construction paper.[273]

3.      The Tommee Tippee Mat has a planar portion with a suffuse undersurface that resists removal from the underlying surface when attempts are made to lift the mat from a location other than the outer edge.[274]

4.      During trial, Mr. Hubbard attempted to remove the Tommee Tippee Mat by pulling from the middle and it "wo[uld]n't lift at all" but he was able to peel it "from the side."[275] Mr. Hubbard's demonstration at trial establishes that the Tommee Tippee Mat self-seals to an underlying surface and is not a "suction cup".[276]

---

[273] Dkt. No. 826-6 at 67:3-68:3.
[274] Trial Exhibit 446.
[275] Dkt. No. 832 at 237:20-239:7.
[276] *See id.*

5.     A June 15, 2011 video review of the Tommee Tippee Mat notes that "there is no adhesive" and "it just plops right down" and "automatically sticks to anything, any surface."[277]  Mr. Williams admitted there was no suction cup on the bottom of the Tommee Tippee Mat in the June 15, 2011 video review.[278]

6.     Mrs. Laurain originally denied that the Tommee Tippee Mat self-seals to an underlying surface,[279] but after it was demonstrated to her, she admitted that the Tommee Tippee Mat "sticks" and could lift up the tray to a highchair absent any external pressure put on the mat.[280] She also unsuccessfully attempted to remove the Tommee Tippee Mat by grabbing the suction cup located at the center of the top of the mat and yanking forcibly upward. Mrs. Laurain conceded that she could not lift the mat off the table that way, but had to "peel[] it" to remove it.[281]

7.     Mrs. Laurain acknowledged that the Tommee Tippee Mat, and other silicone mats, will not self-seal if they are dirty.[282] Additionally, Mrs. Laurain confirmed that if you put a Tommee Tippee Mat on the carpet, the fibers of the carpet will stick to the silicone and get dirty.[283]

8.     Mrs. Laurain had a Tommee Tippee Mat in her possession in March 2014, and testified that the one she obtained came folded up in a box and did not lie flat or self-seal.[284] However, pictures Mrs. Laurain took of the Tommee Tippee Mat in her early presentation show the Tommee Tippee Mat lying flat on a table, with no visible folds or

---

[277] Trial Exhibit 969.
[278] Dkt. No. 835 at 1161:2-1161:6.
[279] Dkt. No. 826-6 at 73:11-74:8.
[280] Dkt. No. 826-6 at 141:12-142:8.
[281] Dkt. No. 826-6 at 72:5-73:10.
[282] Dkt. No. 833 at 415:5-415:8, 418:22-419:1; Dkt. No. 826-6 at 142:2-16.
[283] Dkt. No. 833 at 415:5-7.
[284] Dkt. No. 833 at 414:16-19; 423:9-16; Dkt No. 835 at 956:3-957:13.

bends.[285]

9.      The Court's examination of the Tommee Tippee Mat, and Mr. Williams testimony regarding the same,[286] confirms there is no suction cup on the undersurface of the mat.

10.      Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Tommee Tippee Mat at the time of filing the '682 Application.[287]

### h)  Conclusions of Law: The Tommee Tippee Mat

1.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, at least Claim 1 of the '903 Patent would be invalid for obviousness in light of the Tommee Tippee Mat combined with Bass, because the Tommee Tippee Mat[288] filled in the following elements the Examiner found to be missing from Bass:

- the use of silicone;

- preventative of lateral displacement; and

- the surface contact self-sealing characteristic.

2.      Had the Examiners had the benefit of the Tommee Tippee Mat during the prosecution of the '903 Patent, it is more probable than not that they would have rejected all claims of the '903 Patent for obviousness. Therefore, the Tommee Tippee Mat was but-for material to the patentability of the '903 Patent because at least Claim 1 would not have issued had these references been disclosed to the USPTO during prosecution of the '903 Patent.[289]

---

[285] Trial Exhibit 7 at Brenda Speer 000017 and Brenda Speer 000039.
[286] Dkt. No. 835 at 1161:2-6.
[287] Trial Exhibit 245.
[288] Trial Exhibit 446.
[289] *Therasense,* 649 F.3d at 1288 ("Unlike other deficiencies, inequitable conduct cannot be cured by reissue, or reexamination.") (internal citations omitted).

3.      For example, the supervising Examiner, Fenn Matthew, had concerns about "rubber sheets and silicone sheets…that stick[] to walls."[290] The Tommee Tippee Mat would have confirmed the Examiner's concern, but it was not disclosed during the prosecution of the '682 Application.

4.      Turning to the specific intent element of the inequitable conduct anaylsis, the Court concludes that the single most reasonable inference is *not* that Mrs. Laurain or Mr. Williams specifically intended to deceive the USPTO by not disclosing the Tommee Tippee Mat.

5.      There was not any evidence that Ms. Laurain believed that the Tommee Tippee Mat that she had in her possession exhibited "surface contact self-sealing."[291]

6.      This contemporaneous belief was evidenced in a presentation that discussed competitor's products and stated with respect to Tommee Tippee Matt, "Really???"[292]

---

[290] Trial Exhibit 678 at BWILLIAMS001944.
[291] Trial Exhibit 1017; Dkt. No. 834 at 676:21-25, 956:3 to 957:13, 670:6-17, 671:2-10, 712:18 -713:11, 714:18-715:20, 667:13-19, 679:14-21.
[292] Trial Exhibit 1 at 31 (annotated); Dkt. No. 834 at 670:6-17, 671:2-10.



7.      Mrs. Laurain also testified that her understanding at the time of the bench trial was that the Tommee Tippee Mat was cumulative of other silicone mats considered by the examiner.[293]

8.      Accordingly, the single most reasonable inference is *not* that Mrs. Laurain specifically intended to deceive the USPTO by  failing to disclose the Tommee Tippee Mat.

9.      Turning now to the conduct of Mr. Williams. Mr. Williams testified that he did not have a sample of the Tommee Tippee Matt during the prosecution of the '682 Application, and that Mrs. Laurain did not inform him that she had a sample Tommee Tippee Mat.[294] He further testified that he was not aware that the Tommee Tippee Mat exhibited "surface contact self-sealing."[295] LNC did not present evidence or testimony that contradicts Mr. Williams' testimony.

---

[293] Dkt. No. 834 at 177:18-178:1.
[294] Dkt. No 826-9 at 450:25-451:07, 451:12.
[295] Dkt. No 826-9 at 451:13-451:14, 451:16-451:19.

10.     Accordingly, the single most reasonable inference is *not* that Mr. Williams specifically intended to deceive the USPTO by failing to disclose the Tommee Tippee Mat.

### i)   Findings of Fact: The Platinum Pets Mat

1.     On May 26, 2014, Mrs. Laurain provided both Mr. Bolton and Mr. McCarthy with the Patent Search II document containing a list of links to the prior art she had located and which she believed were similar to her claimed invention. This document included a link to the Platinum Pets Mat under "other similar products (on amazon)."[296]

2.     On May 29, 2014, Mrs. Laurain emailed Mr. Bolton and Mr. McCarthy stating the following: "So.....you aren't going to believe this, guess what I just found! http://www.promotionalgiftwholesale.com/custom-silicone-pet-dog-mat-with-feed-bowlcombo_1105294291/inquiry#tabs-content I seriously was going to do a similar product for dogs! Now I can just get it whole sale :)"[297] This link contained an advertisement for the Platinum Pets Double Dog Bowl Mat.[298]

---

[296] Trial Exhibit 20; Dkt. No. 826-7 at 91:14-92:7.
[297] Trial Exhibit 24; Dkt. No. 826-7 at 109:8-21.
[298] Trial Exhibit 87.



3.      On June 30, 2014, Mrs. Laurain provided Mr. Williams with the Patent Search III document containing a list of links to the prior art she had located and which she believed were similar to her claimed invention, including a link to the Platinum Pets Mat.[299] The body of the email also included a link to the Platinum Pets Mat.[300] In that same email, Mrs. Laurain outlined the "summary of [their] 'plan.'"[301]

4.      On August 18, 2014, Mr. Williams told Mrs. Laurain that although "the other mats (those dog bowls, etc.)" did not "exhibit the same 'suction function'" he was "concern[ed]" that the USPTO will "try to claim that feature as inherent to structure disclosed in additional

---

[299] Trial Exhibit 611 at BWILLIAMS002003.
[300] Trial Exhibit 611.
[301] Trial Exhibit 611.

refences which taken in combination, sustain their rejection."[302]

5.      When Mrs. Laurain contacted Mr. Bolton and Mr. McCarthy in December 2015 to seek their assistance with the prosecution of the '903 Patent, Mr. McCarthy reviewed his previous emails between Mr. Bolton and Mrs. Laurain and was concerned that the Platinum Pets Mat had not been disclosed to the USPTO.[303] On December 15, 2015, Mr. McCarthy emailed Mr. Bolton stating the following:

> P.S. You sent an email five days earlier than Lindsey's email to me in which she says "guess what I just found!" In your earlier email, you say you seriously doubt that she could get a utility patent "i.e. good service device currently in-use for pets, and they invented the same thing for kids."
>
> So you seemed to know about the dog mat before Lindsey told me. Unless there is a different dog mat.[304]

6.      The Court finds that the only dog mat about which Mrs. Laurain and/or Mr. Bolton informed Mr. McCarthy was the Platinum Pets Mat. This appears to be one instance where Mr. Bolton failed to disclose information about prior art to Mr. McCarthy.[305]

7.      Mr. McCarthy told Mr. Bolton that if he reviewed Mrs. Laurain's application for the purpose of giving her legal advice, he would become a person associated with the application and would then have a duty to submit the Platinum Pets Mat to the USPTO.[306] He did not ask Mrs. Laurain for a copy of the application.[307]

8.      On December 15, 2015, Mr. McCarthy sent an email to Mr. Bolton in which he stated that he "told Ms. Laurain that her product was not patentable because the dog mat

---

[302] Trial Exhibit 29.
[303] Dkt. No. 826-4 at 130:14-131:2.
[304] Trial Exhibit 88; Dkt. No. 826-4 at 126:11-19, 127:13-128:4, 129:2-9.
[305] Trial Exhibits 118, 867, and 194.
[306] Trial Exhibit 86; Trial Exhibit 88; Dkt. No. 826-4 at 122:15-25.
[307] Dkt. No. 826-4 at 123:18-22.

is prior art" and went on to tell Mr. Bolton that "Ms. Laurain has a duty to submit this dog mat advertisement to the Patent Office, and if she does not do so, she is committing inequitable conduct which will make any patent she obtains on this application unenforceable. … Can you imagine being an adverse party in a patent infringement suit and seeing this email?"[308] On this same day, Mr. Bolton sent an email to Brian Tobin and Matt Koziarz (an attorney who graduated in Materials Science & Engineering)[309] of Carlson Gaskey and Olds stating that he and Mr. McCarthy "may need to refer out an engagement to support the prosecution of a US utility patent application."[310]

9.     Mr. Bolton asked Mrs. Laurain privately whether the Platinum Pets Mat suctioned.[311] Mrs. Laurain responded to Mr. Bolton, adding Mr. McCarthy to the discussion, and told them that the Platinum Pets Mat did not suction.[312]

10.     On March 1, 2016, Mrs. Laurain sent Mr. Williams at least two videos (EZPZ only produced two videos–the Disclosed Video and the Undisclosed Video) that  purported to demonstrate the "self-sealing function" of the EZPZ Happy Mat as compared to other prior art  products.[313] Mr. Williams responded to Mrs. Laurain's email providing him with the videos she had prepared:

> Hi Lindz – you know, I think I like the first one best. **The dog mat kind makes a suctioning noise in this one – so it looks like it tries to self-seal but fails**. I think we go with the first iteration – I like your discussion of the suction cups and the flat back better in that one **and the dog bowl comes away very easily without making a suctioning noise**.[314]

---

[308] Trial Exhibit 86.
[309] Trial Exhibit 649.
[310] Trial Exhibit 89.
[311] Trial Exhibit 692 at OMH-BW-00002160.
[312] Trial Exhibit 692 at OMH-BW-00002160.
[313] Trial  Exhibit  614; Trial  Exhibit 613 ("Undisclosed  Video"); Trial  Exhibit  612  ("Disclosed  Video").
[314] Trial Exhibit 614 (emphasis added).

11.     Mrs. Laurain did not send the Undisclosed Video that made a "suctioning noise" to Mr. Bolton or Mr. McCarthy, despite knowing that Mr. McCarthy was the "expert."[315]

12.     Mrs. Laurain did not send the Undisclosed Video that made a "suctioning noise" to Mr. Bolton or Mr. McCarthy despite having previously represented to them that the Platinum Pets Mat did not suction.[316]

13.     Apparently following Mr. McCarthy's suggestion, Mr. Williams and Mrs. Laurain identified the Platinum Pets Mat in Appendix D in a response to an Office Action.[317] . This was the first time the Platinum Pets Mat was disclosed to the USPTO, which occurred nearly 16 months after the filing of the '682 Application. Mr. Williams did not file a corresponding IDS listing the prior art identified in Appendix D.[318]

14.     In the Undisclosed Video, the Platinum Pets Mat makes suction sounds when Mrs. Laurain attempts to remove the mat from the counter.[319]

15.     Additionally, Mr. Williams and Mrs. Laurain misrepresented the characteristics of the Platinum Pets Mat by listing the Platinum Pets Mat as a prior art device made of silicone that does not "Effect Surface Contact Self-Sealing" under Appendix D.[320]

APPENDIX D

**APPENDIX D**
**Prior Art Devices Made of Silicone**
**Do NOT Effect Surface Contact Self-Sealing**

Despite being made of silicone, none of these prior art devices perform the same surface contact self-sealing action specifically claimed by Applicant.  Customer reviews of the Gerber mat are included below that likewise testify to this fact.

---

[315] Dkt. No. 826-6 at 115:3-18; Trial Exhibit 24; Trial Exhibit 483; Trial Exhibit 502.
[316] Trial Exhibit 692.
[317] Trial Exhibit 245 at LNC395355-356.
[318] Trial Exhibit 245.
[319] Trial Exhibit 613.
[320] Trial Exhibit 245 at LNC395355-356.



16.    The Court finds that the Disclosed Video and Appendix D misrepresents the actual functionality of the Platinum Pets Mat, because the Platinum Pet Mat exhibits self-sealing depending on how it is placed on an underlying surface.[321] A review of the Disclosed Video shows that Mrs. Laurain placed it on the countertop with a fold in the middle of the mat, which prevented or significantly diminished the mat's ability to self-seal.[322]



17.    During the bench trial, Mr. Hubbard demonstrated the self-sealing characteristic of

---

[321] Trial Exhibit 613 (Undisclosed Video).
[322] Trial Exhibit 612.

the Platinum Pets Mat by laying it flat atop the protective glass covering of one of the wooden tables in the back of the courtroom.[323] Contrary to Mr. Williams' testimony that the Platinum Pets Mat "doesn't effectively prevent displacement underneath,"[324] Mr. Hubbard demonstrated the Platinum Pets Mat does in fact seal to a glass surface and prevents air from infiltrating underneath the mat. Specifically, Mr. Hubbard was able to lift the glass covering several inches above the underlying wood surface, as recreated in the following picture. [325]



The seal between the suffuse undersurface of the Platinum Pets Mat and the glass surface did not fail, and Mr. Hubbard was able to lower both the mat and the glass safely to the wooden surface.[326] Although EZPZ's expert, Mr. Henley, was not able to recreate Mr. Hubbard's results in the courtroom,[327] Mr. Henley did admit on cross-examination that the Platinum Pets Mat does self-seal to some extent.[328] Mrs. Laurain failed to provide Mr. Kennedy, EZPZ's patent law expert, with the Platinum Pets Mat or the Undisclosed Video

---

[323] Trial Exhibit 450.
[324] Dkt. No. 834 at 799:10-799:15.
[325] Dkt. No. 832 at 229:22-230:7.
[326] Dkt. No. 832 at 229:22-230:7.
[327] Dkt. No. 836 at 1436:15-1437:14.
[328] Dkt. No. 836 at 1456:13-1456:15.

where in the Platinum Pets Mat makes a "suction" sound when Mrs. Laurain attempts to remove the mat from the underlying surface.[329]

18.     The evidence at trial, including the Undisclosed Video and Mr. Hubbard's demonstration, establishes that the Platinum Pets Mat does in fact self-seal to an underlying surface.[330]

19.     Mr. Hubbard agreed that Platinum Pets can be lifted by means other than picking it up from the edge.[331]

### j)   Conclusions of Law: The Platinum Pets Mat

1.     Although Mr. Williams and Mrs. Laurain disclosed a small black and white image of the Platinum Pets Mat in Appendix D, they argued to the USPTO that the Platinum Pets Mat "fails to make sealable contact" with an underlying surface.[332] The Undisclosed Video indicates that Mrs. Laurain and Mr. Williams observed the Platinum Pets Mat self-sealing to the underlying surface to some extent before separating from the surface. This is clear from the audible "suction" sound.

2.     Thus, the issue before the Court is whether offering Appendix D and the Disclosed Video, and not the Undisclosed Video, is clear and convincing evidence of an affirmative act of egregious misconduct. It is not disputed that the Platinum Pets Mat does not self-seal as effectively as the commercial embodiment of the '903 Patent shown in the Disclosed Video.[333] This does not justify failing to properly disclose the Platinum Pets Mat's functionality, because it is clear to the Court that Appendix D and the Disclosed

---

[329] Dkt. No. 835 at 950:4-951:17.
[330] Trial Exhibit 613; *see also* Dkt. No. 832 at 229:22-230:6.
[331] Dkt. No.832 at 329:11-13.
[332] Trial Exhibit 245 at LNC395355.
[333] Dkt. No. 832 at 231:10-232:3.

Video misrepresent the functionality of the Platinum Pets Mat. However, LNC failed to prove by clear and convincing evidence that the manner in which the Platinum Pets Mat was disclosed was a deliberately planned and carefully executed scheme to defraud the PTO. Without question, the actions of Mrs. Laurain and Mr. Williams were grossly negligent, but gross negligence does not satisfy the requirements provided in *Therasense*.[334]

3.     The Court further concludes that the Platinum Pets Mat was not but-for material to the patentability of the '903 Patent, because it was disclosed to the USPTO.[335] In other words, the USPTO had the opportunity to consider the Platinum Pets Mat before allowing the claims.[336] For reasons not fully developed, Mrs. Laurain and Mr. Williams chose to disclose the Platinum Pet Mat in a reply to an Office action, instead of by an Information Disclosure Statement ("IDS"). Although the manner chosen by Mrs. Laurain and Mr. William is not standard practice, it is allowed. M.P.E.P. § 609.05(c) provides the following:

> **609.05(c) Documents Submitted as Part of Applicant's Reply to Office Action [R-08.2012]**
>
> Occasionally, documents are submitted and relied on by an applicant when replying to an Office action. These documents may be relied on by an applicant, for example, to show that an element recited in the claim is operative or that a term used in the claim has a recognized meaning in the art. Documents may be in any form but are typically in the form of an affidavit, declaration, patent, or printed publication.
>
> To the extent that a document is submitted as evidence directed to an issue of patentability raised in an Office action, and the evidence

---

[334] *Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

[335] Dkt. No. 834 at 855:16 -857:15; Dkt. No. 835 at 951:13-952:6.

[336] Dkt. No. 834 at 856:8-10 (Mr. Williams testified that he spoke with "Volz and Mathew Fenn about sending them all of these products, but they don't want physical samples anymore.").

is timely presented, applicant need not satisfy the requirements of 37 CFR 1.97 and 37 CFR 1.98 in order to have the examiner consider the information contained in the document relied on by applicant. In other words, compliance with the information disclosure rules is not a threshold requirement to have information considered when submitted by applicant to support an argument being made in a reply to an Office action. However, consideration by the examiner of the document submitted as evidence directed to an issue of patentability raised in the Office action is limited to the portion of the document relied upon as rebuttal evidence; the entirety of the document may not necessarily be considered by the examiner.

At the same time, the document supplied and relied on by applicant as evidence need not be processed as an item of information that was cited in an information disclosure statement. The record should reflect whether the evidence was considered, but listing on a form (e.g., PTO-892, or PTO/SB/08A and 08B) and appropriate marking of the form by the examiner is not required.

For example, if applicant submits and relies on three patents as evidence in reply to the first Office action and also lists those patents on a PTO/SB/08A and 08B along with two journal articles, but does not file a statement under 37 CFR 1.97(e) or the fee set forth in 37 CFR 1.17(p), it would be appropriate for the examiner to indicate that the teachings relied on by applicant in the three patents have been considered, but to line through the citation of all five documents on the PTO/SB/08A and 08B and to inform applicant that the information disclosure statement did not comply with 37 CFR 1.97(c).[337]

4.    Mr. Kennedy, EZPZ's patent procedure and practice expert, also testified that the manner that the Platinum Pets Mat was disclosed is not the "preferred mechanism."[338]

5.    Therefore, under the framework provided in *Therasense*, the Court concludes that Mrs. Laurain and Mr. Williams did not commit inequitable conduct as it relates to the Platinum Pet Mat. In other words, it is not more probable than not that the USPTO would have rejected at least Claim 1 of the '903 Patent, because the USPTO had an opportunity to

---

[337] M.P.E.P. Section 609.05(c).
[338] Dkt. No. 835 at 922:22-924:5.

consider the Platinum Pets Mat before allowing the claims of the '903 Patent. Accordingly, the Platinum Pets Mat is not but-for material to the patentability of the '903 Patent.

### k) Findings of Fact: The Remaining Prior Art Presented at the Bench Trail

#### i. The Brinware Silicone Placemat

1.      The Brinware Silicone Placemat teaches an entirely suffuse planar undersurface of a silicone product that will not slip or slide, that possesses self-sealing properties, exhibits a high coefficient of friction, and can only be removed by peeling away the undersurface from the  outer edge as presented in the '903 Patent.[339]



---

[339] Trial Exhibit 451.  *See also* Dkt. No. 832 at 233:19-235:2.

2.      Ms. Clark, a declarant who represented herself as an "expert in the baby industry,"[340] confirmed that the Brinware Silicone Placemat has a "self-sealing capability without the need of any suction cups or adhesives" and "prevent[s] displacement form an underlying surface except by peeling it at the outer edge."[341]

3.      During trial, Mr. Hubbard attempted to remove the Brinware Silicone Placemat by "sliding" it or pulling from the middle and "not only d[id] it resist," but he could not "even move it."[342] However, Mr. Hubbard was "able to peel it from the outer edge."[343] Mr. Hubbard further testified that there were no "adhesives" under the Brinware Silicone Placemat.[344] Mr. Hubbard's demonstration at trial establishes that the Brinware Silicone Placemat self-seals to an underlying surface without the need for suction cups or adhesives.[345]

4.      Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Brinware Silicone Placemat at the time of filing the '682 Application.

### ii.      The Momo Baby Skid-Proof Silicone Placemat

1.      The Momo Baby Skid-Proof Silicone Placemat teaches an entirely suffuse planar undersurface of a silicone product that will not slip or slide, that possesses self-sealing properties, exhibits a high coefficient of friction, and can only be removed by peeling away the undersurface from the outer edge as presented in the '903 Patent.[346]

---

[340] Trial Exhibit 245, at LNC395322.
[341] Dkt. No. 826-11 at 120:19-121:22.
[342] Dkt. No. 832 at 233:19-234:24.
[343] Dkt. No. 832 at 235:3-4.
[344] Dkt. No. 832 at 234:1-2.
[345] Dkt. No. 832 at 233:19-234:24.
[346] Trial Exhibit 445.



2.      During trial, Mr. Hubbard attempted to remove the Momo Baby Skid-Proof Silicone Placemat by pulling from the middle and it "wo[uld]n't come up if you pull in the middle" but he was able to peel it "from the edge, it just comes up."[347] Mr. Hubbard further testified that there were no "adhesives" under the Momo Baby Skid-Proof Silicone Placemat.[348] Mr. Hubbard's demonstration at trial establishes that the Momo Baby Skid-Proof Silicone Placemat self-seals to an underlying surface without the need for suction cups or adhesives.[349] When Mr. Hubbard's demonstration was described to Mr. Henley[350] on

---

[347] Dkt. No. 832 at 232:4-233:3.
[348] Dkt. No. 832 at 233:4-5.
[349] Dkt. No. 832 at 232:4-233:3.
[350] EZPZ's technical expert.

cross-examination, Mr. Henley agreed that would indicate "self-sealing."[351]

3.     EZPZ argued that the Momo Baby Skid-Proof Silicone Placemat is "sticky" or contained an adhesive on one side. The Court inspected the mat and commented that it "feels the same on both sides."[352] Moreover, nothing in the accompanying packaging states that the Momo-Baby Skid-Proof Silicone Placemat uses adhesive.[353]

4.     Mr. Williams admitted that the Momo Baby Skid-Proof Silicone Placemat is relevant for an "obviousness consideration."[354]

5.     During Mrs. Laurain's 2019 deposition, she admitted that to remove the Momo Baby Skid-Proof Silicone Placemat from an underlying surface you have to "peel" from the edge.[355]

6.     Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Momo Baby Skid-Proof Silicone Placemat at the time of filing the '682 Application.

### iii.     The Hot Iron Holster

1.     The Hot Iron Holster teaches an entirely suffuse planar undersurface of a silicone product that "cling[s] to any smooth, non-porous household surface," without the need for suction cups or adhesives as presented in the '903 Patent.[356] Mr. Williams agreed that the Hot Iron Holster was made of silicone and contained a planar portion.[357]

---

[351] Dkt. No. 836 at 1453:24-1454:10.
[352] Dkt. No. 832 at 293:8-294:1.
[353] Dkt. No. 835 at 1003:17-1004:24.  *See also* Trial Exhibit 445.
[354] Dkt. No. 834 at 823:1-7; 824:3-7.
[355] Dkt. No. 826-6 at 71:10-18.
[356] Trial Exhibit 119; Trial Exhibit 447; Trial Exhibit 740.
[357] Dkt. No. 835 at 1229:2-7.



2.      The Hot Iron Holster, while outside Mrs. Laurain's field of endeavor, is analogous prior art. It is reasonably pertinent to the problem faced by the inventor and uses "a [silicone] flap specially formulated to cling to any smooth, non-porous household surface" such that "[n]o screws or sticky adhesive is required."[358]

3.      The Hot Iron Holster exhibits the same functional characteristics that Mrs. Laurain and Mr. Williams argued to the USPTO made her alleged invention "novel" and "non-obvious."

4.      Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Hot Iron Holster at the time of filing the '682 Application.

---

[358] Trial Exhibit 119.

### iv.     The CIBO Stick Anywhere Placemat

1.      The CIBO Stick Anywhere Placemat is the commercial embodiment of U.S. Patent Application Publication No. US 2015/0135391 A1, filed November 19, 2013 that teaches a "planar" mounting portion made of "rubber material so as to increase the coefficient of friction  between the support surface [] and the bottom surface."[359]



2.      On January 21, 2015, Dawn Winkelmann emailed Mrs. Laurain the Grommet article and video of the CIBO "stick anywhere" Placemat.[360] Mrs. Laurain admitted she had seen the CIBO  Stick Anywhere Placemat at least as early as January 2015.[361] Mrs. Laurain further confirmed that  the CIBO placemat falls within the "tableware arts" because it is a placemat.[362] Although Mrs. Laurain denied ever thinking the CIBO Stick Anywhere Placemat was "so close" to her invention,[363] the contemporaneous evidence

---

[359] Trial Exhibit 952; Trial Exhibit 958.
[360] Trial Exhibit 932.
[361] Dkt. No. 833 at 403:2-4.
[362] Dkt. No. 833 at 403:5-7.
[363] Dkt. No. 833 at 406:8-11.

establishes that Mrs. Laurain recognized this product as "so close" to the Happy Mat.[364]

3.     Mrs. Laurain and Mr. Williams did not file an IDS disclosing the CIBO Stick Anywhere Placemat at the time of filing the '682 Application.

### v.     The Bruno Patent

1.     The Bruno discloses a food bowl integrated with a flexible mat that is intended for feeding pets. The invention of Bruno has three main portions, a cup or bowl [12] for holding food that sits within an upstanding skirt [11] that is "formed integrally with" a mat [10]. The mat is planar in shape and has a raised perimeter. The upstanding skirt is a receptacle that is above the surface of the mat and integrally formed therewith. This receptacle is designed to engage and hold the bowl portion of the invention. The embodiment depicted by figures 1-3 indicates the under surface of the mat in Figure 2 is also entirely suffuse, as that term was defined by the applicant during the during the prosecution of the '903 Patent. Although the bowl is detachable, the integrally formed upstanding skirt is a receptacle that could be used for holding food. Further, the Bruno Patent specifically discloses a "substantially flat sheet-like mat 10 fabricated of relatively flexible material such as sheet rubber, plastic or the like, and having a flat undersurface adapted to rest upon a supporting surface of the floor." In another embodiment depicted in Figure 4 there is also a continuous flat undersurface with an integrally formed upstanding skirt/receptacle.[365]

2.     Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Bruno Patent at the time of filing the '682 Application,

### vi.     The Lee Single Dog Bowl Mat

---

[364] Trial Exhibit 934.
[365] Dkt. No. 832 at 219:1-220:25.  *See also* Trial Exhibit 991.

1.      On March 21, 2014, while working for Humana, Mrs. Laurain sent herself a link to the  Lee Single Dog Bowl Mat, which was featured on the Yanko Design website.[366]

2.      In 2014, Mrs. Laurain created a PowerPoint presentation that included a slide wherein Mrs. Laurain included photographs of the Lee Single Dog Bowl Mat as well as a link to the Yanko design website and noted that at that time it was the only "similar" item she had found online.[367]

3.      In conjunction with Mrs. Laurain's retention of Ms. Speer, she provided Ms. Speer with a  PowerPoint presentation containing a slide that featured the photographs of the Lee Single Dog Bowl Mat, the Yanko design website link, and the comment, "[t]hrough all my research, this is  the only similar item 'online.'"[368]



4.      Mrs. Laurain and Mr. Williams did not file an IDS disclosing the Lee Single Dog

---

[366] Trial Exhibit 507.
[367] Trial Exhibit 7 at Brenda Speer 000040.
[368] Trial Exhibit 8 at Brenda Speer 000040; Dkt. No. 826-7 at 58:24-59:2, 60:15-61:3.

Bowl at the time of filing the '682 Application.

### l)   Conclusions of Law: The Remaining Prior Art Presented at the Bench Trial

1.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, the Court concludes that the Brinware Silicone Placemat filled in the following elements missing from Bass:[369]

- • the use of silicone;

- • preventative of lateral displacement; and

- • the surface contact self-sealing characteristic.

2.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, the Court concludes that the Momo Baby Skid-proof Silicone Placemat filled in the following elements missing from Bass:[370]

- • the use of silicone;

- • preventative of lateral displacement; and

- • the surface contact self-sealing characteristic.

3.     Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, the Court concludes that the Hot Iron Holster filled in the following elements missing from Bass:[371]

- • the use of silicone;

- • preventative of lateral displacement; and

---

[369] Trial Exhibit 451.
[370] Trial Exhibit 445.
[371] Trial Exhibit 447.

- the surface contact self-sealing characteristic.

4.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, the Court concludes that the CIBO Stick Anywhere Placemat filled in the following elements missing from Bass:[372]

- the use of silicone;

- preventative of lateral displacement; and

- the surface contact self-sealing characteristic.

5.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, the Court concludes that the Bruno Patent disclosed the following elements:[373]

- an integrated tableware and mat; and

- a mat made of relatively flexible material such as sheet rubber, plastic, or the like.

6.      Under the broadest reasonable interpretation and preponderance of the evidence standards employed by the USPTO when examining a patent application, , the Court concludes that the Lee Single Dog Bowl Mat disclosed the following elements:

- an integrated mat and bowl;

- the portion of the mat that surround the bowl appears to be flat and in contact with the floor; and

- an integrated tableware and mat made of silicone.

---

[372] Trial Exhibit 958.
[373] Dkt. No. 835 at 983:2-3.

7.      It is well established that references are cumulative when  they are less material than other references already before the examiner.

8.      The Court concludes that the following references are not "but-for" material prior art references, because they are cumulative of the Platinum Pets Mat that was disclosed to the USPTO:

- Brinware Prior Art Reference

- Momo Baby Prior Art Reference

- Hot Iron Holder Prior Art Reference

- CIBO Stick Anywhere Placemat

- Bruno Prior Art Reference

- Lee Single Dog Bowl Mat

9.      LNC impliedly concedes that a reasonable reading of these references are less material than the Platinum Pet Mat, by its testimony on the materiality of the Platinum Pets Mat.

10.     Given these facts, the Court concludes that Ms. Laurain and Mr. Williams were not under a duty to disclose these cumulative references.

11.      Furthermore, Mr. Williams' testimony was credible that he believed the Lee Single Dog Bowl Mat was not enabled and not a material reference that needed to be disclosed to the USPTO.[374]

12.     Likewise, any comment by Ms. Laurain that the Lee Single Dog Bowl Mat was "similar" does not establish by clear and convincing evidence the specific intent to deceive the USPTO as the single most reasonable inference.  It reasonable to infer that Ms. Laurain

---

[374] Dkt. No. 834 at 863:3-20, 865:5-867:2, 1162:9-1163:24, 1166:6-22; Dkt. No. 826-9 at 430:3-431:24.

believed that the Lee Single Dog Bowl Mat was similar, but also different.[375]

13.     Accordingly, LNC failed to show by clear and convincing evidence that the single most reasonable inference is that the Lee Single Dog Bowl Mat was withheld with the specific intent to deceive.

14.     That said, EZPZ's belief in the strength of its secondary considerations[376] did not excuse or relieve EZPZ of its duty of good faith and candor. Furthermore, this belief would not justify failing to disclose a material reference. Indeed, Mr. Williams admitted that he was not aware of any USPTO rule or procedure whereby the duty of good faith and candor is trumped simply because the applicant is seeking to overcome an obviousness rejection by relying on secondary considerations of nonobviousnes.[377] However, as discussed above, the Court concludes that these references were cumulative and less material than the Platinum Pets Mat already before the examiner.

> **m) Findings of Fact: Declarations Attesting to a Lack of Marketing or Branding**

1.     Mrs. Laurain and Mr. Williams submitted four declarations attesting to commercial success without marketing or branding:

> a.  the declaration of Mr. Joseph Chua, stating "sales of the same surface contact self-sealing integrated tableware and dining mat appear to be derived chiefly from the remarkable self-sealing property the instant mat exhibits upon demonstration, whereby sales are consistent without a need for extensive advertising or branding whatsoever;"[378]

---

[375] Dkt. No. 826-7 at 35:1-19, 58:24 to 59:16, 86:25-87:18, 319:3-22; Dkt. No. 835 at 939:16-25.
[376] Dkt. No. 835 at 1020:23-1023:2, 1215:13-25, 1210:3-13, 846:11-848:16, 1231:5-1232:5, 1233:22-1234:21, 1033:17-1034:18.
[377] Dkt. No. 835 at 1154:8-12.
[378] Trial Exhibit 245 at LNC395357.

b.  the declaration of Mr. Jeff Prager, stating "the present invention … demonstrates unequivocal commercial success derived of the product itself absent persuasion by branding or marketing strategies, strategies which, if subsequently employed, will only increase and strengthen market share;"[379]

c.  the declaration of M r s . Julie Clark, stating "commercial success derived from the product itself, and not due to any advertising or branding;"[380] and

d.  the declaration of M r . Jamie Grayson, stating the "invention…demonstrates unequivocal commercial appeal derived from the product itself, and not from any particular advertising reach or previous customer base, evincible by rapid acquisition of the market share in the baby[]product arts absent appreciable advertising efforts on behalf of the inventor."[381]

2.    Mrs. Laurain and Mr. Williams also argued to the USPTO in their March 9, 2016 submission: "Applicant demonstrates commercial success derived from the product itself, and not due to efforts directed at advertising or branding or any previous client base, from consistent high sales revenues relative very low expenditures on advertising proper."[382]

3.    Mr. Williams admitted that in order to establish commercial success, an applicant's alleged commercial success must be based on the alleged invention, and not "other

---

[379] Trial Exhibit 245 at LNC395321.
[380] Trial Exhibit 245 at LNC395323.
[381] Trial Exhibit 245 at LNC395318.
[382] Trial Exhibit 245 at LNC395445.

publicity"[383]  or "ancillary stuff that may lead people to purchase the product."[384]

4.    Mrs. Laurain is recognized as the "visionary leader" and "directs all of [EZPZ's] marketing and innovation efforts."[385] Mrs. Laurain and EZPZ consistently used the "story behind the brand" and labeled herself a "mom inventor" in order to market and advertise the product.[386] In fact, Mrs. Laurain was using her "story" for branding as early as April 2014 when she reached out to Ms. Speer for patent advice.[387]

5.    Prior to launching the Happy Mat on Kickstarter, Mrs. Laurain created a PowerPoint stating that she had a "plan" for "Lots of 'Free' Advertising/Marketing," which included Kickstarter, the ABC Kids Expo and Shark Tank.[388]

6.    Mrs. Laurain raised funds for the first manufacturing run of her claimed invention, commercially known as the EZPZ Happy Mat, through a Kickstarter campaign,[389] which according to the testimony of Nancy Albers, is a form of paid advertising because Kickstarter   retains a percentage of the funds raised through sales on its website.[390] Ms. Albers' testimony in this regard was unrefuted by EZPZ and Mrs. Laurain admitted Kickstarter took a fee to service the campaign.[391681]

7.    EZPZ promoted the Kickstarter launch on Facebook on August 18, 2014, August 25, 2014, August 28, 2014, August 30, 2014, and September 3, 2014.[392]

---

[383] Dkt. No. 834 at 850:5-11.
[384] Dkt. No. 835 at 1022:16-19.
[385] Trial Exhibit 339.
[386] See, e.g., Trial Exhibit 13 at HUMANA000079 ("the story behind the brand will help market to a unique audience, such as mogul mom, mom inventors, MOB" because "[w]ho doesn't want to support a mom who went for it and invented some great products?")
[387] Trial Exhibit 7 at Brenda Speer 000031.
[388] Trial Exhibit 624 at EZPZ0146654-655.
[389] E.g., Trial Exhibit 31; Trial Exhibit 59, at EZPZ0175068.
[390] Dkt. No. 831 at 141:13-142:1.
[391] Dkt. No. 834 at 594:12-21.
[392] Trial Exhibit 386 at 57, 59, 67, 69, and 71.

8.     The Kickstarter website included a professional video prepared by EZPZ team members, Paul Joyner and Cara, that aired on August 28, 2014.[393] The Kickstarter video promoted Mrs. Laurain's "story" as a "working mother to" three boys.[394] Mrs. Laurain admitted that Kickstarter  promoted the Happy mat.[395]

9.     Mrs. Winkelman first learned about the Happy mat via the Kickstarter campaign.[396] On September 27, 2014, Mrs. Winkelmann, who was planning a move from California to Colorado, sent a direct message to Mrs. Laurain via Kickstarter saying she would like to "work/promote" together with Mrs. Laurain.[397] The following day, Mrs. Laurain responded to Mrs. Winkelmann that she would like to "work/promote" together.[398] Mrs. Winkelmann is paid full time and continued to  work with EZPZ at least through the bench trial.[399] EZPZ sponsored various conferences at which Mrs. Winkelmann spoke and then  promoted the story of EZPZ doing good on Instagram.[400]

10.    EZPZ began promoting the brand logo and the Happy Mats on Facebook in July 2014, before the Happy Mats had arrived in the United States.[401]

11.    Beginning in August 2014, Mrs. Laurain began marketing and promoting the EZPZ brand and her product on Instagram by using hashtags such as "#ezpzfun" and "#ezpz:"

---

[393] EZPZ Trial Exhibit 1124; Dkt. No. 834 at 591:8-592:6; 716:4-22.
[394] EZPZ Trial Exhibit 1124.
[395] Dkt. No. 834 at 716:8-11.
[396] Dkt. No. 836 at 1466:12-16.
[397] Trial Exhibit 987; *see also* Dkt. No. 836  at 1493:12-1494:4.
[398] Trial Exhibit 987; *see also* Dkt. No. 836 at 1494:5-1494:18.
[399] Dkt. No. 836 at 1475:9-10; 1476:9-10.
[400] Trial Exhibit 383 at 158.
[401] Trial Exhibit 386 at 1, 3, 5, and 7.



EZPZ has recognized the use of "#ezpzfun" as part of its marketing strategy.[402] Thus, before the launch of its product, EZPZ regularly utilized social media platforms to market and promote the alleged invention. Many of EZPZ's Instagram posts focus on the "story" behind the product, featuring Mrs. Laurain, her team, and her family, but do not include the Happy Mat or the alleged "suction function" of the Happy Mat.[403]

12.   EZPZ repeatedly used social media platforms to post promotional discounts.[404] Mrs. Laurain admitted that EZPZ posted on Instagram and Facebook an average of more than once per day prior to March 2016.[405] Mrs. Laurain used members of the private Facebook group as EZPZ's "brand ambassadors."[406]

13.   On October 27, 2014, EZPZ promoted the Happy Mat by showcasing mom entrepreneurship and the inventive process on a live chat with TheBabyGuy.[407]

---

[402] Trial Exhibit 51 at EZPZ0133658; Trial Exhibit 73 at EZPZ0293105.
[403] *See e.g.*, Trial Exhibit 41. *See also* Trial Exhibit 383 at 202, 292, 294, 308, 368, 372, 379, 404, 413, 416, 429, 435, 445, 463, 546, 551 and 584; Trial Exhibit 386, at 23, 75, 157, 337, 438, 627, 739, 746.
[404] *E.g.*, Trial Exhibit 383 at 75, 322, 324, 467, 486.
[405] Dkt. No. 41; Dkt. No. 833 at 394:15-395:22.
[406] Trial Exhibit 59 at EZPZ0175069; *see also* Dkt. No. 833 at 488:24-489:8.
[407] Trial Exhibit 386 at 157 and 159.

14.   On October 29, 2014, EZPZ paid Jamie Grayson, known as TheBabyGuy, to launch the Happy Mat on his social media websites through a promotional giveaway.[408] Mrs. Laurain knew that utilizing Mr. Grayson, as TheBabyGuy, was a marketing "tactic."[409]

15.   On January 25, 2015, Mrs. Laurain listed a list of 15,000 e-mail addresses as one of her company's intangible assets as well as a "utility patent" that had not yet issued.[410]

16.   EZPZ sponsored the Pump and Dump Show in Tempe Arizona on March 12, 2015.[411]

17.   In April 2015, EZPZ was featured in the Parenting Magazine's Registry Guide.[412]

18.   EZPZ's August 2015 Marketing Summary noted that EZPZ has "a **strong branding** campaign and continue with as much grass roots support and 'free' press as possible."[413]

19.   In EZPZ's August 2015 Marketing Summary, Mrs. Laurain recognized the following "tactics" as a form of marketing: Kickstarter; launching at ABC Kids Expo; BabyGuyNYC Giveaway; Meredith Viera Show; social media engagement; tradeshows; consumer shows; co-promotions; affiliate marketing campaign; and email campaign.[414]

20.   On September 5, 2015, Mrs. Laurain sent to the EZPZ team a "media outreach" plan that included local media email, speech/feeding affiliates, a long list of contacts and bloggers (including TheBabyGuy) that Mrs. Laurain wanted to use to promote the Happy Mat, and "sales sheet" or "promotional document" EZPZ could have sent to people.[415] The email also included "PR advertising events"[416] and notes that Mrs. Laurain thought Mrs.

---

[408] Trial Exhibit 32.
[409] Trial Exhibit 45 at EZPZ0095032.
[410] Trial Exhibit 522.
[411] Trial Exhibit 854; Trial Exhibit 41 at PDF 8.
[412] Trial Exhibit 383 at 223; Trial Exhibit 386 at 590.
[413] Trial Exhibit 51 at EZPZ0133657 (emphasis added); *see also* Dkt. No. 833 at 502:10-16.
[414] Trial Exhibit 51 at EZPZ0133657-659; *see also* Dkt. No. 833 at 502:17-20.
[415] Trial Exhibit 53; *see also* Dkt. No. 834 at 725:23-727:1; 728:11-22.
[416] Dkt. No. 836 at 1502:8-14; Trial Exhibit 53 at EZPZ0295496.

Winkelmann would be "perfect for this" and suggested she go to a few "studios" and make a "pitch."[417] Mrs. Laurain also wanted Mrs. Winkelmann to be involved in ShareASales, a third party affiliate platform.[418] In that same email, Mrs. Laurain drafted an email for Mrs. Winkelmann to send out to potential affiliates that included the "backstory" of the Happy Mat.[419]

21.   On September 14, 2015, Mrs. Laurain sent Mr. Williams, Mr. Bolton, and Mr. McCarthy EZPZ's IP Summary that was sent to potential acquirers that stated EZPZ had "strong branding."[420] The IP Summary was prepared by Mr. Williams who knew that EZPZ had "strong branding."[421]

22.   On October 9, 2015, Mrs. Laurain told Mr. Dunn of Munchkin that EZPZ was going to "have another promo that will reach 10 million +."[422]

23.   No later than November 2015, EZPZ began analyzing its social media impressions and reach via Twitter.[423] EZPZ posted its "top 9 posts" on Facebook on December 31, 2015.[424]

24.   The EZPZ November 2015 Business Plan included an extensive Marketing Plan, which referred to, *inter alia*, the following: a social calendar (*i.e.*, "Mom Crush Monday," "Tip Tuesday," "Weds Wisdom" "throwback Thursday," "Fun Friday"); attending trade shows (*i.e.*, ABC Kids Expo, Kind & Jugend); attending consumers shows (*i.e.*, Mommycon, Pump & Dump); co-promotion activities; affiliate programs (*i.e.*,

---

[417] Trial Exhibit 53; *see also* Dkt. No. 834 at 721:23-722:10.
[418] Trial Exhibit 53; Dkt. No. 834 at 723:10-16.
[419] Trial Exhibit 53; Dkt. No. 834 at 724:2-725:19.
[420] Trial Exhibit 720 at EZPZ0158016; Dkt. No. 826-7 at 263:22-265:2; 265:5-15; 266:17-267:19.
[421] Dkt. No. 826-9 at 585:22-586:2, 591:1-5, 591:20-22, 591:24-592:3, 592:7-592:14; Trial Exhibit 720.
[422] Trial Exhibit 867 at BWILLIAMS001633.
[423] Trial Exhibit 63.
[424] Trial Exhibit 386 at 707.

blogger affiliates); newsletters; and relaunching of website and blog.[425] All of these activities were recognized by Mrs. Laurain as "Marketing."[426] The November 2015 Business Plan included similar marketing plans to those set forth in the June 2015 Business Plan.[427]

25.   The EZPZ November 2015 Business Plan included several Promotional activities including, *inter alia*, the following: the use of "#ezpzfun;" blogger giveaways; cross-brand promotion; continuous social media engagement; and referral programs.[428] All of these activities were recognized by Mrs. Laurain as "Promotion."[429] The November 2015 Business Plan included similar promotional efforts to those set forth in the June 2015 Business Plan.[430]

26.   EZPZ aired on Shark Tank on January 8, 2016.[431] Mrs. Laurain recognized that "Shark Tank is a HUGE Show and over 10 million people watch new episodes. So, regardless of the outcome with the Sharks, the show will generate tremendous exposure for ezpz …"[432] In fact, Mrs. Laurain recognized as early as April 2015, in responding to Mr. Williams strategy for overcoming obviousness by establishing commercial success, that if her Shark Tank episode aired, "20 million consumers would see it."[433] Mrs. Laurain also recognized in an interview that Shark Tank was "phenomenal for brand recognition."[434]

27.   In light of the foregoing, the Court finds that EZPZ's appearance on Shark Tank was a significant promotional activity. Appearing on Shark Tank was part of Mrs. Laurain's

---

[425] Trial Exhibit 73 at EZPZ0293102-104.
[426] Trial Exhibit 73 at EZPZ0293102-104.
[427] *Compare* Trial Exhibit 73 at EZPZ0293102-104, *with* Trial Exhibit 50 at EZPZ0175081-83.
[428] Trial Exhibit 73 at EZPZ0293105.
[429] Trial Exhibit 73 at EZPZ0293105.
[430] *Compare* Trial Exhibit 73 at EZPZ0293105, *with* Trial Exhibit 50 at EZPZ0175083-84.
[431] Dkt. No. 834 at 603:25-604:1.
[432] Trial Exhibit 381.
[433] Trial Exhibit 920; Dkt. No. 833 at 411:11-21.
[434] Dkt. No. 844 (L-21).

"plan" from the very beginning.[435]

28.    At trial, Mrs. Laurain testified that Shark Tank did *not* cause any increase in sales.[436] The Court does not find Mrs. Laurain's testimony credible, as it is contradicted by the testimony of Jeff Prager, EZPZ's CFO,[437] and Tamara Falcone, EZPZ's COO,[438] a prior interview Mrs. Laurain gave,[439] as well as EZPZ's own internal documents showing a spike in sales due to the Shark Tank appearance.[440] The following EZPZ Sales Performance chart reflects that there was a sharp increase in sales once Mrs. Laurain began promoting her appearance on Shark Tank and continuing thereafter after she appeared on Shark Tank on January 8, 2016.[441]

---

[435] Trial Exhibit 624 at EZPZ0146654-655.
[436] Dkt. No. 833 at 475:16-25.
[437] Dkt. No. 836 at 1374:20-23; 1379:5-7; 1381:19-24.
[438] Dkt. No. 836 at 1542:3-6.
[439] Dkt. No. 844 (L-21).
[440] Trial Exhibit 923 at EZPZ0143540.
[441] Trial Exhibit 923 at EZPZ0143540; *see also* Dkt. No. 833 at 476:12-15.





29.   Although Mrs. Laurain tried to claim that there was "no marketing activity that's driving  [] sales and not even Shark Tank,"[442] the above chart showing EZPZ's sales performance identifies and places significance on Shark Tank, Amazon Prime day, and Kickstarter on the graph.[443] The Court finds, as EZPZ itself concluded when it placed the three promotional activities in boxes on the graph it created, that the three red circled promotional activities contributed to EZPZ's commercial success.

30.   In July 2015, Mrs. Laurain recognized that Amazon Prime day and Judy's Life posting of the Happy mat drove sales.[444]

31.   On December 21, 2015, EZPZ announced on Facebook that it would be appearing

---

[442] Dkt. No. 833 at 475:16-25.
[443] Trial Exhibit 923 at EZPZ0143540.
[444] Trial Exhibit 49; *see also* Dkt. No. 833 at 480:5-480:8.

on "Colorado's Own Channel 2: Daybreak."[445]

32.   Although Mrs. Laurain denied that QuickBooks wanted to have a commercial of EZPZ because of her story,[446] Mrs. Laurain's prior statements in an interview establish that QuickBooks approached EZPZ because it "love[d] [he]r story" and it wanted to "do a story about it."[447] At least four of the six QuickBooks commercials launched on February 16, 2016, before the March 9, 2016 submission to the USPTO.[448]

33.   In January 2016, Mrs. Laurain recognized that EZPZ's "Community/Brand" is what they were selling and that "Brand" was "VERY important."[449]

34.   Mr. Bolton also recognized that EZPZ was making "huge strides on the branding."[450]

35.   Prior to the March 9, 2016 submission to the USPTO, EZPZ paid Mr. Grayson to promote the Happy Mat.[451]

36.   During EZPZ's conversations with Frederick Lammens regarding Stokke acquiring EZPZ, Mrs. Falcone suggested, on July 25, 2016, they tell Mr. Lammens the following: "We are confident that we (or whomever acquires us) will maintain the majority of our market share due to our 'first to market' position and strong brand/community."[452]

37.   Additionally, the notes EZPZ prepared for its meeting with July 2016 Stokke state that EZPZ has "developed a successful digital marketing strategy" and EZPZ has a "very strong brand."[453]

---

[445] Trial Exhibit 386, at p. 687.
[446] Dkt. No. 833 at 480:17-480:21.
[447] Dkt. No. 844 (L-23).  *See also* Trial Exhibit 360.
[448] Trial Exhibit 118.
[449] Trial Exhibit 105 at EZPZ0082774.
[450] Trial Exhibit 108.
[451] Trial Exhibit 32.
[452] Trial Exhibit 654; Dkt. No. 826-5 at 173:7-18, 173:19-174:18, 174:21-175:1, 175:4-6, 175:9-14, 175:18-22, 175:25-176:2.
[453] Trial Exhibit 878 at EZPZ0143581-582; Dkt. No. 833 at 463:15-464:10.

38.   In EZPZ's own Sealed Motion for Temporary Restraining and Preliminary Injunction filed in Michigan on October 18, 2016, it recognized that Amazon postings are a form of advertising.[454]

39.   Mrs. Laurain's declaration filed in this Court in response to LNC's Motion for Summary Judgment on Trademark Infringement details significant marketing and advertising activities  for the EZPZ Happy Mat occurring between July 2014 and January 2016. [455]

40.   In November 2014, EZPZ recognized that "[t]hanks to Meredith Vieira and the BabyGuyNYC [Jamie Grayson] demand" for products "skyrocketed."[456] On October 22, 2014,  EZPZ thanked the Meredith Viera Show for the opportunity to appear on the show.[457]

41.   Jeff Prager, EZPZ's former CFO,[458] admitted that EZPZ engaged in significant marketing prior to March 2016, including social media, maintaining a website, blog posts, Amazon sales, trade shows, sales in boutiques, launching on Kickstarter, and appearing at the ABC Expo.[459]

42.   Julie Clark, the founder  of Baby  Einstein, likewise admitted that  EZPZ  engaged in significant marketing prior to March 2016, including sponsoring the Pump and Dump Show,  appearing on the Meredith Vieira Show, appearing on Shark Tank, and participating in promotions with TheBabyGuy.[460]

43.   Dr. Albers testified that TheBabyGuy's Facebook video of the Happy Mat is promotional.[461] She also testified that EZPZ participated in a number of other marketing

---

[454] Trial Exhibit 225 at 15 of pleading.
[455] Dkt. No. 392-4.
[456] Trial Exhibit 34 at EZPZ0139508; Dkt. No. 826-8 at 126:5-127:4.
[457] Trial Exhibit 383 at 43.
[458] Dkt. No. 836 at 1374:20-23; 1379:5-7.
[459] Dkt. No. 836 at 1395:13-1396:15.
[460] Dkt. No. 826-11 at 48:14-49:8, 96:13-98:1
[461] Dkt. No. 831 at 160:24-25.

and promotional activities, including posting on Instagram, Facebook and Twitter, participating in a live Blab interview, using electronic word of mouth, attending consumer events such as Mommycon and Club Mommy, and posting its products on a website and Amazon.[462] Dr. Albers' testimony is unrefuted by EZPZ. Accordingly, the Court finds that even if EZPZ did not pay for these activities, they are still promotional.[463]

44. Dr. Albers testified that Mrs. Laurain's creation of a "mom inventor" brand who left her job to care for her boys is an effort to develop a parasocial relationship with the intended audience. Dr. Albers described this as an effective branding and marketing method used to encourage consumers to purchase the EZPZ Happy Mat.[464] Dr. Albers' testimony is unrefuted by EZPZ.

45. Although Mrs. Laurain tried to focus solely on advertising as defined by Dr. Albers (*i.e.*, paid advertising),[465] Mrs. Laurain referred early on to her plan to take advantage of free advertising.[466] Thus, she viewed advertising as being broader in scope than traditional paid for advertising.[467] Dr. Albers explained that EZPZ actively participated in a wide range of nonpaid promotional, marketing, and branding activities.[468]

46. Mr. Kennedy, EZPZ's own patent procedure and practice expert, found Mr. Williams' arguments regarding the Happy Mat's alleged commercial success to be unsupported and merely "ballyhoo."[469]

---

[462] Dkt. No. 831 at 188:1-21, 190:25-192:10.
[463] *E.g.*, Dkt. No. 831 at 160:24-25.
[464] Dkt. No. 831 at 129:11-131:9; 133:1-133:22. *See also* Trial Exhibit 13, at HUMANA000079 and Trial Exhibit 7, at Brenda Speer 000031-32.
[465] *E.g.,* Dkt. No. 833 at 504:4-9.
[466] Trial Exhibit 624 at EZPZ0146654-655.
[467] *See id*.
[468] Dkt. No. 831 at 188:1-21, 190:25-192:10.
[469] Dkt. No. 835 at 986:4-19.

47.   Given all of the above, the Court finds that EZPZ was engaged in advertising, marketing, branding, and promotional activities between 2014 and March 9, 2016.

### n) Conclusions of Law: Declarations Attesting to a Lack of Marketing or Branding

1.   LNC contends that Mr. Williams' reliance on Mr. Prager's statement regarding advertising expenditures of less than 1% of gross sale is misleading.[470] The testimony and evidence presented indicates that Mr. Prager's statement regarding the same was inaccurate.[471] However, based on the evidence and testimony of Mr. Prager, the Court concludes that the single most reasonable inference is *not* that the statement was made with the specific intent to deceive the USPTO.

2.   LNC also contends that Mr. Grayson misrepresented himself as an "expert in the baby-product industry." Mr. Grayson stated in his declaration that he "is recognized as a leading expert and analyst in the baby-product industry."[472] He explained that he has "worked at Buy Baby Inc. and Real Birth, and alongside some of the top doulas and lactation consultants in New York City as a baby-product analysis, reviewer, and rater" and has "been featured in the Wall Street Journal, New York Times, LA Times, and on national television such as Martha Stewart's annual Baby Shower."[473] Based on the foregoing, the Court concludes that Mr. Grayson did not misrepresent himself as an "expert in the baby-product industry."

3.   The Court also concludes that the single most reasonable inference of the representation made by Mr. Williams and Mrs. Laurain that the invention's alleged "commercial success" was "derived from the product itself, and not due to efforts directed at advertising or branding

---

[470] Trial Exhibit 245 at LNC395320.
[471] Dkt. No. 836 at 1376:6-19, 1380:22-1385:6.
[472] *See* Exhibit 245 at LNC395318.
[473] *Id.*

Page 85 of 116

or any previous client base…"[474] is *not* that it was made with the specific intent to deceive.

4.     It is clear that Mrs. Laurain was fully aware of all of the advertising,  marketing, branding, and promotional activities described above.  Likewise, Mr. Williams  was aware EZPZ appeared on Shark Tank,[475] was aware of EZPZ's strong branding as evidenced  by the IP Summary that he drafted,[476] and was aware of EZPZ's active presence on various social media platforms as evidenced by Mrs. Laurain's signature block in her emails.[477] However, LNC has failed to show by clear and convincing evidence that the single most reasonable inference is that Mrs. Laurain and Mr. Williams acted with the specific intent to deceive the USPTO. It is reasonable to infer that they incorrectly believed that the factors related to commercial success was limited to "paid advertising" and not promotional activities. Without question, the actions of Mrs. Laurain and Mr. Williams were grossly negligent, but gross negligence does not satisfy the requirements provided in *Therasense*.[478]

### o) Findings of Fact: Failure to Disclose the Relationship Between Certain Declarants and EZPZ

1.     LNC contends that EZPZ failed to disclose the relationship between certain declarants and EZPZ. LNC also contends that EZPZ submitted false statements to the USPTO as it relates to certain declarants. Specifically, alleges that Mr. Williams and Mrs. Lauren committed inequitable conduct by submitting the declarations of Mrs. Winkelmann, Mr. Grayson, Mrs. Falcone, Mr. Chua, and Mrs. Clark to the USPTO.

2.     Mrs. Winkelmann's declaration dated February 16, 2016, identified her as having a

---

[474] Trial Exhibit 245 at LNC395445.
[475] Trial Exhibit 920.
[476] Trial Exhibit 720 at EZPZ0158016.
[477] *See, e.g.*, Trial Exhibit 680 at EZPZ-CH-001193.
[478] *Therasense*, 649 F.3d at 1290 ("A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement.").

"post-graduate degree as a speech and language pathologist and feeding specialist" and an "expert with extensive experience in reviewing technologies designed to assist parents raising children with special needs."[479]

3.      The evidence and testimony indicates that in early 2016 Mrs. Laurain "was trying desperately to come up with some ideas to keep" Mrs. Winkelmann on the EZPZ team.[480] Mrs. Laurain and Mrs. Winkelmann negotiated a percentage interest in a future sale of EZPZ if it were to get "big."[481] EZPZ argues that the written agreement was not actually signed until after Mrs. Winkelmann's declaration had been signed.[482] However, the evidence and testimony shows that the discussions about the percentage interest in a future sale started before Mrs. Winkelmann signed the declaration that was submitted to the USPTO.

4.      On February 13, 2016, shortly before Mrs. Winkelmann signed her declaration that was submitted to the USPTO,[483] the negotiations were memorialized in an email from Mrs. Laurain to Mrs. Winkelmann offering her $4,000 a month plus a 2% interest in the future sale of the company, which Mrs. Laurain valued at $500,000 (based on her valuation of the company at $25 million).[484]

5.      Mrs. Winkelmann's declaration did not disclose that she was an independent contractor for EZPZ making $4,000/month,[485] that she was part of the EZPZ "Team,"[486] or that Mrs. Laurain had promised her a 2% interest in any future sale of EZPZ days

---

[479] Trial Exhibit 245 at LNC395314-15.
[480] Dkt. No. 836 at 1505:8-1505:20.
[481] Dkt. No. 836 at 1476:14-1477:1.
[482] Dkt. No. 836 at 1477:2-22.
[483] Trial Exhibit 245, at LNC395315.
[484] Trial Exhibit 477; *see also* Dkt. No. 836 at 1504:25-1506:19.
[485] Trial Exhibit 477.
[486] Trial Exhibit 73 at EZPZ0293091.

before Mrs. Winkelmann signed her declaration.[487] Although these facts should have been disclosed to the USPTO, the Court concludes that the single most reasonable inference is *not* that the omissions was made with the specific intent to deceive the USPTO.

6.    Mrs. Winklemann's declaration also states that she "encountered numerous products devices to adhere to tabletops..." She further states that over her  twenty (20) years of experience she has never seen a product that adheres to a tabletop without suction cups or adhesives. In view of this learned knowledge and experience, she declares that the "instant product" (*i.e.*, the EZPZ Happy Mat, the commercial embodiment of the '903 Patent) "realizes an unmet need."[488] Mrs. Winkelmann further testified that her knowledge regarding the unmet need came from her having to physically  attach duct tape to the bottom of a plate or bowl to keep her special needs children from throwing  food everywhere.[489]

7.    LNC contends that one of the problems with Mrs. Winkelmann's declaration is that it was drafted by someone other than herself.  Mrs. Winkelmann declaration stated, "WHEREAS I have never encountered any  product in my over twenty (20) years as an expert in the special-needs community that effectively self-seals to an underlying surface absent suction cups of adhesive[.]"[490] Although Mrs. Winkelmann testified that "it wasn't that [Mrs. Laurain] told me to state that" it "was me being an expert saying that,"[491] she admitted that she was not familiar with the terms "tableware arts,"[492] "surface contact, self-sealing" or "feeding arts."[493] This indicates that Mrs. Winkelmann's declaration was

---

[487] Trial Exhibit 477.
[488] *See* Exhibit 245 at LNC395314-315 (PDF 173-174).
[489] Dkt. No. 836 at 1479:21-25, 1480:1-1481:12, 1466:12-1467:25, 1484:1-20.
[490] Trial Exhibit 245 at LNC395314.
[491] Dkt. No. 836 at 1510:5-6.
[492] Dkt. No. 836 at 1483:11-16, 1509:18-23.
[493] Dkt. No. 836 at 1509:24-1510:1.

drafted by someone other than herself. However, this fact alone does not automatically indicate that there was specific intent to deceive the USPTO.

8.    LNC further argues that Mrs. Winkelmann's declaration stated that she had "never encountered any product in [her] over 20 years as an expert in special needs community that  effectively seals to an underlying surface absent suction cups or an adhesive" and that she previously testified during her deposition that she had never encountered "any silicone product" that adhered to a table.[494] LNC contends that this statement is false because on January 21, 2015, Mrs. Winkelmann forwarded to Mrs. Laurain via email a Grommet article discussing a CIBO "stick anywhere placemat."[495] Mrs. Winkelmann testified that she believed that the CIBO Stick Anywhere Placemat did not fall within  the category of tableware and testified it was not a placemat.[496] LNC contends that this testimony is not credible because Mrs. Winkelmann admitted that the mounting portion  of the CIBO Stick Anywhere Placemat is planar and made of silicone.[497]

9.    The Court examined the CIBO Stick Anywhere Placemat,[498] and finds that the planar silicone portion of the placemat does "stick" or self-seal to a table and acts to support the "trough" that hangs off the table. However, the Court concludes that the single most reasonable inference is *not* that Mrs. Winkelmann had the specific intent to deceive the USPTO. Specifically, the Court's examination of the CIBO Stick Anywhere Placemat finds that there are functional and structural differences between it and the EZPZ Happy Mat (*i.e.*, the mat that Mrs. Winklemann was referring to in her declaration). Accordingly, it is

---

[494] Trial Exhibit 245 at LNC395314-315; *see also* Dkt. No. 836 at 1510:9-12.
[495] Trial Exhibit 932; *see also* Dkt. No. 836 at 1510:13-1510:21.
[496] Dkt. No. 836 at 1511:3-10.
[497] Dkt. No. 836 at 1511:25-1512:9.
[498] Trial Exhibit 958.

reasonable to infer that Mrs. Winklemann's statement was made in the context of her experience of having to physically attach duct tape to the bottom of a plate or bowl to keep her special needs children from throwing food everywhere.[499]

10. LNC also contends that Mr. Grayson failed to disclose bias and financial interest in the declaration submitted to the USPTO. Specifically, LNC contends that Mr. Grayson failed to disclose that he sold EZPZ products and profited from those sales. The testimony and evidence indicates that Mr. Grayson did not sell product for EZPZ at any time prior to signing a declaration for the USPTO. Instead, he performed two giveaways of EZPZ products for a compensation of $2,500 each. There is no indication that there was on-going business relationship between EZPZ and Mr. Grayson.[500]

11. Moreover, Mr. Grayson's declaration sets the context upon which his statement is based. Namely, his initial impressions of EZPZ's product as demonstrated at a tradeshow in October 2014. These initial impressions occurred before Mr. Grayson ever gave away any EZPZ products, assisted in its marketing efforts, or otherwise. These actions occurred after his initial impressions of EZPZ products to which he was exposed in October 2014.[501] Accordingly, the Court concludes that the single most reasonable inference is *not* that the omission of any relationship between Mr. Grayson and EZPZ was made with the specific intent to deceive the USPTO.

12. Mr. Grayson also represented to the USPTO that the EZPZ Happy Mat had acquired a "rapid acquisition of market share," and had "commercial appeal derived from the product

---

[499] Dkt. No. 836 at 1479:21-25, 1480:1-1481:12, 1466:12 -1467:25, 1484:1-20.
[500] Dkt. No. 826-13 at 42:13-43:03.
[501] *See* Exhibit 245 at 180; Dkt. No. 826-13 at 126:22-127:02, 127:04-12, 127:14, 127:18-128:03.

itself, and not from any particular advertising reach."[502] However, during his testimony, Mr. Grayson admitted that he had "no knowledge of [EZPZ's] information whatsoever"[503] related to its advertising reach. The Court concludes that even though Mr. Grayson's statement was not based on actual information, the single most reasonable inference is *not* that the statement was made with the specific intent to deceive the USPTO.

13.   LNC also contends that Mrs. Falcone failed to disclose bias and financial interest in the declaration submitted to the USPTO. Mrs. Falcone's declarations disclosed that she was EZPZ's Chief Operating Officer,[504] but it did not disclose that Mrs. Laurain had agreed to give Mrs. Falcone a 10% interest in a future sale of EZPZ prior to Mrs. Falcone signing her declarations.[505]

14.   Mr. Bolton, EZPZ's Outside General Counsel at the time, was aware of the change of control agreement between Mrs. Falcone and EZPZ,[506] but refused to agree that he was aware of the agreement at the time of the March 2016 submission, even after having been shown an email dated November 27, 2015 discussing her 10% change of control agreement.[507] The Court finds Mr. Bolton's testimony that he did not recall Ms. Falcone's interest in EZPZ lacks credibility.

15.   Given that Mrs. Laurain was in discussions to sell EZPZ, and that the sales price would be higher if the '903 Patent were to issue,[508] the Court finds that Mrs. Falcone had a direct financial interest with respect to whether the '903 Patent issued. Although this

---

[502] Trial Exhibit 245 at LNC395318-319.
[503] Dkt. No. 826-13 at 33:22-34:4.
[504] Trial Exhibit 245 at LNC395359 and LNC395377.
[505] Trial Exhibit 476. *See id.*
[506] Dkt. No. 826-3 at 198:5-8.
[507] Dkt. No. 826-3 at 198:9-199:7; Trial Exhibit 715; Trial Exhibit 75.
[508] Trial Exhibit 960 at EZPZ0157312.

financial interest should have been disclosed, the Court concludes that the single most reasonable inference is *not* that the omission was made with the specific intent to deceive the USPTO. To be sure, Mrs. Falcone disclosed that she was EZPZ's Chief Operating Officer.[509] It is reasonable to infer that she expected that this disclosure would indicate that she had a financial interest with respect to whether the '903 Patent issued. It is reasonable to assume that someone reading the declaration would understand that a COO receives compensation, and may even get a promotion if the product does well.[510]

16.   LNC also contends that Mr. Prager failed to disclose bias in the declaration submitted to the USPTO. Mr. Prager's declaration identified him as "an expert analyzing strategies for investors and corporate decision makers" and "a cofounder and owner of several multimillion dollar companies, with a combined market valuation of over $100 million."[511] While his declaration did disclose that he "consult[s] with Eazy-PZ, LLC and [had] a thorough knowledge of their commercial operations including financial expenditures and revenues," his declaration did not disclose that he was EZPZ's CFO.[512]

17.   Although Mr. Prager should have disclosed that he was EZPZ's CFO, and was acting as more than just a consultant, the Court concludes that the single most reasonable inference is *not* that this omission was not made with the specific intent to deceive the USPTO. Indeed, Mr. Prager disclosed that he had a financial relationship with EZPZ in his declaration. Specifically, his declaration states that "... I consult with Eazy-PZ, LLC..."[513] It is reasonable to infer that he expected that this disclosure would indicate that he had a financial relationship

---

[509] Trial Exhibit 245 at LNC395359 and LNC395377.
[510] Dkt. No. 836 at 1558:10-25, 1562:1-16.
[511] Trial Exhibit 245 at LNC395320-321.
[512] Trial Exhibit 245 at LNC395320-321. *See also* Dkt. No. 836 at 1374:20-23, 1379:5-7.
[513] Exhibit 245 at LNC395321 (PDF 183).

with EZPZ.

18.   LNC also contends that Mr. Chua failed to disclose bias and financial interest in the declaration submitted to the USPTO. In the declaration, Mr. Chua states that "The present surface contact self-sealing integrated  tableware and dining mat demonstrates commercial success derived of its ability to self-seal to any  underlying surface without the need of suction cups, adhesives, or other active means of effecting  adhesion, to resist displacement from said underlying surface, wherein children are prevented from  overturning the mat or removing it from a tabletop during feeding time, and that removal from an  underlying surface is readily effected only by peeling action at the outer edge, such that reuse of  the present mat is enabled, whereby the present mat is attractive to consumers."[514]

19.   Mr. Chua also stated that he was a significant distributor for EZPZ, with the product constituting more than 70% of Hip Mommies' total sales, and that the sales are consistent without a need for extensive advertising or branding whatsoever.[515]

20.   Importantly, the dates LNC complains of related to Chua's  statements about bias occur after he signed his declaration. LNC argues that the fact  that Chua asked to treat part of his sales costs as marketing and brand promotion for customs  tax  purposes means  he lied in his declaration. However, the Court finds that the subsequent events do not change the  veracity of the declaration statement.[516]

21.   LNC also contends that Mr. Clark submitted misleading statement in the declaration submitted to the USPTO. Ms. Clark's  declaration  stated  that she was the founder of the

---

[514] *See* Exhibit 245 at LNC395358 (PDF 228); Dkt. No. 826-12 at 83:16-19, 83:21-84:15, 84:16; Dkt. No. 835 at 1032:21-1033:16.
[515] *See*  Exhibit  245 at LNC395357 (PDF 227); Dkt. No. 826-12 at 92:9-23, 93:7-94:02, 105:16-106:1; Dkt. No. 835 at 1024:18-1025:7; Dkt. No. 826-6 at 54:12-19; Dkt. No. 833 at 501:16-23, 688:6-11.
[516] Dkt. No. 826-12 at 162:20-163:15, 164:13-165:22, 194:13-195:4; Dkt. No. 833 at 520:23-521:15.

"Baby Einstein" brand, has authored over fifty (50) children books; is a nationally recognized personality, entrepreneur, and expert in the baby industry who has been featured on The Oprah Winfrey Show, The Today Show, Good Morning America, and many other broadcast news programs; and due to her expertise and experience has provided addresses at Fortune 500 companies such as Microsoft and business schools such as Harvard Business School, as a recognized expert within the billion dollar baby industry.[517] The Court finds that Ms. Clark has expertise in the baby industry and in reviewing new baby oriented products and technologies.[518]

22.   Like Mrs. Winkelmann's declaration, the evidence indicates that Mrs. Laurain and others at EZPZ drafted Mrs. Clark's declaration.[519] LNC contends that Mrs. Clark's declaration incorrectly states that she had "analyzed sales figures and marketing strategies of Eazy-PZ, LLC" and that the "advertising and branding…expenditure ha[d] compromised less than 1% of gross sales revenues over a like period."[520] LNC supports it argument by pointing to Mrs. Clark's testimony that she never reviewed any financial documents, sales reports, or sales figures of EZPZ,[521] but instead only had conversations with Mrs. Laurain about "how sales are going."[522] She also testified that she was not familiar with EZPZ's advertising efforts from 2014 through the date of her declaration.[523]

23.   Although Ms. Clark's declaration incorrectly stated that she analyzed sales figures, the Court concludes that the single most reasonable inference is *not* that this statement was made

---

[517] *See* Exhibit 245 LNC 395322 (PDF 185).
[518] Dkt. No. 826-11 at 22:10-22:23, 23:3-9, 23:22-24:01, 24:3-23, 25:3-24, 26:1-10, 26:12-20, 26:25-27:04, 27:6-14, 27:19-22, 27:24-28:06.
[519] Trial Exhibit 570, at BWILLIAMS001035.
[520] Trial Exhibit 245 at LNC395323.
[521] Dkt. No. 826-11 at 90:2-91:24.
[522] Dkt. No. 826-11 at 91:2-3.
[523] Dkt. No. 826-11 at 31:18-22.

with the specific intent to deceive the USPTO. It is reasonable to infer that she believed that reviewing the sales figures and advertising efforts would match the conversations she had with Mrs. Laurain. Ms. Clark testified that she both conversed with Ms. Laurain about EZPZ's sales and that she had "seen the success [EZPZ has] had internationally." Regarding the "1% of gross sales revenues," Ms. Clark testified that her statement was based on actual discussions with Ms. Laurain.[524]

### p) Conclusions of Law: Failure to Disclose the Relationship Between Certain Declarants and EZPZ

1.    The Court concludes that the testimony and evidence presented established the intent of the declarants and the patent agent in providing the patent office with the referenced declarations.   For the reasons stated above, the Court concludes that this testimony and evidence undermines LNC's claim of inequitable conduct.

2.    Accordingly, the Court concludes that LNC failed to show by clear and convincing evidence that the single most reasonable inference is that the declarations submitted by the following people were done with the specific intent to deceive the USPTO:

> i.  Mrs. Dawn Winklemann
>
> ii.  Mr. Jamie Grayson
>
> iii.  Mrs. Tamara Falcone
>
> iv.  Mr. Jeff Prager
>
> v.  Mr. Joey Chua
>
> vi.  Mrs. Julie Clark

3.    Therefore, under the framework provided in *Therasense*, the Court concludes that

---

[524] Dkt. No. 826-11 at 90:16-24, 91:1-7, 91:9-10, 91:12-19, 93:17-23, 93:25- 94:04, 94:6-11, 94:23-25, 95:2-6, 95:20-21, 95:23.

Mrs. Laurain and Mr. Williams did not commit inequitable conduct by submitting these declarations to the USPTO.

### q)  Findings of Fact: Survey Evidence

1.     A survey was conducted to determine consumer purchase history for the EZPZ Happy Mat.[525] The survey results and raw data were provided to the USPTO.[526]

2.     As declared by Ms. Falcone, she "designed a survey for use by Eazy-PZ, LLC to determine consumer purchase history for the 'ezpz Happy Mat,' using a third-party software WuFoo®, designed for only surveying and distributable via email." "WuFoo® is a trusted brand  name software application enabling creation of online forms having prompt fields customizable to  capture specific end user responses to generate determinable response data."[527]

3.     Each of the survey questions, with possible responses was submitted to the USPTO.[528]

### r)  Conclusions of Law: Survey Evidence

1.     LNC alleges multiple problems with the survey and concludes that it was improperly conducted according to accepted principles. The Court concludes that LNC failed to prove by clear and convincing evidence that the single most reasonable inference for any deviation from accepted principles was done with the specific intent to deceive the USPTO. There was no evidence that EZPZ manufactured and submitted false evidence.[529]

2.     Indeed, LNC's contention that the selection of default answers affected the integrity of

---

[525] Dkt. No. 834 at 852:20-853:4; Dkt. No. 836 at 1554:13-1558:8.
[526] Trial Exhibit 245 at LNC395377-432 (PDF 251-307).
[527] Trial Exhibit 245 at  LNC395377 (PDF 251); Dkt. No. 835 at 1025:11-25, 1026:19-1027:9; Dkt. No. 836 at 1558:10-12, 1559:23-1560:4, 1560:8-1562:24.
[528] Trial Exhibit 245 at LNC395381 (PDF 256).
[529] Dkt. No. 836 at 1265:20-1267:7; Dkt. No .836 at 1556:1-20.

the survey was contradicted by the actual survey results. The testimony and evidence showed

that the default answer for the first question was *not* the most selected answer.[530]

3.    Moreover, each of the survey questions with possible responses was submitted to the

USPTO. It does not follow that the single most reasonable inference is that EZPZ specifically

intended to deceive the USPTO when the survey results and the raw data was submitted to

the USPTO.[531]

4.    . Therefore, under the framework provided in *Therasense*, the Court concludes

that Mrs. Laurain and Mr. Williams did not commit inequitable conduct by submitting the

survey, survey results, and raw data to the USPTO.

## II.    UNCLEAN HANDS

### a)  Applicable Law

1.    "The equitable doctrine of unclean hands has long existed as a principal of patent

law."[532]

2.    "He who comes into equity must come with clean hands."[533] In *Keystone*, the

Supreme Court described the doctrine of unclean hands as follows:

> [Plaintiff] must come into court with clean hands. He must be
> frank and fair with the court, nothing about the case under
> consideration should be guarded, but everything that tends to a
> full and fair determination of the matters in controversy should be
> placed before the court...It is a principle in chancery, that he who
> asks relief must have acted in good faith. The equitable powers
> of this court can never be exerted on behalf of [one] who has acted
> fraudulently, or who by deceit or any unfair means has gained an
> advantage. To aid a party in such a case would make this court the

---

[530] Dkt. No. 836 at 1583:3-20.

[531] Dkt. No. 835 at 1029:12-23; Dkt. No. 834 at 703:24-704:7.

[532] *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13-cv-04057-BLF, 2016 U.S. Dist. LEXIS 73595, at *72 (N.D. Cal. June 6, 2016), *aff'd sub nom. Gilead Scis., Inc. v. Merck & Co.*, 888 F.3d 1231 (Fed. Cir. 2018).

[533] *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933).

a better of iniquity.[534]

3.      The misconduct must "affect the equitable relations between the parties in respect of  something brought before the court for adjudication."[535]

4.      The unclean hands doctrine is not bound by formula or restrained  by any limitation that tends to trammel the free and just exercise of discretion.[536]

5.      The doctrine of unclean hands permits a court to deny equitable relief to a party guilty of fraud, deceit, unconscionability, or bad faith relative to an issue present in the pending  lawsuit.[537]

6.      The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct  in relation to the matter in controversy forfeits their right to have the court hear their claim,  regardless of merit.[538]

7.      As Judge Learned Hand explained:

> The [unclean hands doctrine] is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has  nothing to do with the rights or liabilities of the parties; indeed the defendant who invokes it need not be damaged, and the court may even raise it sua sponte.[539]

8.      The party asserting the defense of unclean hands must prove it by clear and convincing  evidence.[540]

9.      The doctrine of unclean hands remains a viable defense in a patent infringement action

---

[534] *Id.* at 244-45.

[535] *Id.*

[536] *Id.* at 245-46.

[537] *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir.  1995).

[538] *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 333 (S.D. Tex. 2008).

[539] *Saudi Basic Indus. Corp. v. ExxonMobil Corp.*, 401 F. Supp. 2d 383, 392-93 (D.N.J. 2005) (quoting *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3rd Cir. 1959)).

[540] *See In re Omeprazole Patent Litig.*, 483 F.3d 1369, 1364 (Fed. Cir. 2007).

and does not require a finding of materiality:

> This court recognizes that the early unclean hands cases do not present any standard for materiality. Needless to say, this court's development of a materiality requirement for inequitable conduct does not (and cannot) supplant Supreme Court precedent. Though inequitable conduct developed from these cases, the unclean hands doctrine remains available to supply a remedy for egregious misconduct like that in the Supreme Court cases.[541]

10.    "[A] determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation,' *i.e.*, 'for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court.'"[542] The misconduct to be considered can take place both before and during the litigation as long as it has an "immediate and necessary relation" to the relief sought in the litigation.[543]

11.    "If an unconscionable act is committed during the prosecution of a patent before the PTO, then the unconscionable act has immediate and necessary relation to the equity sought before the PTO, namely the procurement of a patent."[544] "[B]ecause such an unconscionable act has an immediate and necessary relationship to any subsequent attempt to enforce the patent in a court of equity, the court has the discretion under the unclean

---

[541] *Therasense,* 649 F.3d at 1287.

[542] *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) (affirming district court's finding of unclean hands to vacate a $200 million infringement damage award because inter alia, the employee who prosecuted the patent had committed litigation misconduct by persistently lying in depositions and at trial regarding his actions in the relevant events).

[543] *See Intamin, Ltd. v. Magnetar Tech. Corp.*, 623 F. Supp. 2d 1055, 1074-77 (C.D. Cal. 2009) (finding unclean hands because prior to the commencement of the litigation, the patentee asserted to members of the public that it owned the asserted patent years before it had properly obtained assignments of the invention, demanded and collected royalties from members of the public on the patent before it had secured rights in the patent, had twice submitted a forged back-dated assignment to the USPTO to show it owned the patent, and failed to disclose the forged assignment during discovery), *aff'd without opn.,* 2010 WL 5136113 (Fed. Cir. Dec. 10, 2010).

[544] *Hoffman-LaRoche, Inc. v. Promega Corp.*, 319 F.Supp.2d 1011, 1017-18 (N.D. Cal. 2004).

hands doctrine to dismiss the litigation brought to enforce such a patent."[545]

12.    "[I]f the unconscionable act in question took place during litigation, the court has authority to use only the unclean hands doctrine to dismiss specific causes of action or the lawsuit in its entirety."[546]

13.    The unclean hands doctrine "'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant,' and requires that claimants 'have acted fairly and without fraud or deceit as to the controversy in issue.'"[547]

14.    The doctrine of unclean hands has been applied "to situations involving lying under oath, unethical business conduct, or litigation misconduct."[548]

### b)  Findings of Fact: EZPZ Failed to Disclose Pertinent Related Patent Applications to LNC and the Court

1.    Early in fact discovery, LNC propounded requests for production of documents on EZPZ seeking documents referring or relating to "the '903 patent and/or the patent application(s) from which it issued and any related continuation, continuation-in-part, and divisional applications filed with the PTO," "any continuation, continuation-in-part and/or divisional patent application(s) filed in the PTO claiming the benefit of the filing date of the '903 patent…" and "communications between Eazy-PZ and Mr. Williams and/or Williams Intellectual Property referring or relating to the '903 patent…and/or any continuation, continuation-in-part and/or divisional application(s) of the '903 patent…filed

---

[545] *Id.* at 1018.
[546] *Id.*
[547] *Gilead*, 888 F.3d at 1239 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach Co.*, 324 U.S. 806 (1945)).
[548] *Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13-cv-04057-BLF, 2016 U.S. Dist. LEXIS 73595, at *80 (N.D. Cal. June 6, 2016), *aff'd sub nom. Gilead Sciences, Inc. v. Merck & Co.*, 888 F.3d 1231 (Fed. Cir. 2018).

with the PTO."[549] EZPZ responded on June 5, 2017, and subject to general objections, nevertheless agreed to produce in response to RFP 13, "any related applications filed with the PTO, to the extent they exist and can be located with a reasonable search …;" in response to RFP 48, "relevant, responsive, non-privileged documents, to the extent they exist and can be located with a reasonable search;" and in response to RFP 50, "relevant, responsive, non-privileged documents specifically referencing the '903 patent…and/or any continuation, continuation-in-part and/or divisional application(s) of the '903 patent…, to the extent they exist and can be located with a reasonable search[.]"[550]

2. EZPZ did not state that any documents were being withheld as a result of any objections.[551] EZPZ also did not subsequently supplement its discovery responses to LNC's RFP 13, 48, and 50 or produce responsive documents regarding these related patent applications during fact discovery.[552] Nor did EZPZ present any evidence that it otherwise informed LNC of additional or corrective information identifying the filing and prosecution of the related patent applications during fact discovery or in writing per Rule 26(3)(1)(A) of the Federal Rules of Civil Procedure.

3. Despite having filed four separate patent applications related to the '903 Patent (the '823 Application, the '403 Application, the '976 Application, and the '824 Application), EZPZ never produced these applications to LNC until EZPZ waived the attorney-client and patent agent privilege well after the close of fact discovery and dispositive motion practice.[553] Each of these applications has the identical specification consisting of the

---

[549] Trial Exhibit 963 (requests for production Nos. 48 and 50).
[550] Trial Exhibit 963 (requests for production Nos. 48 and 50).
[551] Trial Exhibit 963 (requests for production Nos. 48 and 50). *See also* Dkt. No. 832 at 349:16-19; 350:6-9.
[552] Dkt. No. 832 at 361:24-362:6.
[553] Dkt. No. 832 at 352:10-353:3.

background of the invention, the  field of the invention, the summary of the invention, the drawings, and the detailed description of  the drawings as found in the '903 Patent.[554]

4.   Because the '403 Application was never published, and never made available to the public from the USPTO, LNC could not have learned of its existence unless disclosed by EZPZ.[555] Likewise, because the '976 Application and the '824 Application were not published until April 23, 2020, LNC could not have learned of their existence or the contents of the file wrapper unless EZPZ identified and produced them at an earlier time.

5.   EZPZ only produced the '403 Application, the '824 Application, and the '976 Application to LNC after LNC obtained an Order of this Court requiring their production.[556]

6.   EZPZ did not list the related applications on any privilege log provided to LNC.[557]

7.   At trial, EZPZ failed to establish any good faith justification for the failure to timely produce these related patent applications.

### c)   Findings of Fact: EZPZ's Failure to Disclose the '403 Application Deprived LNC  and the Court of Pertinent Information Regarding Claim Construction

1.   "A statement made during prosecution of related patents may be properly considered in  construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent."[558] "[T]he prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from  the same parent application."[559] The Federal Circuit has held that "where

---

[554] *Compare* Trial Exhibit 220 (the '903 Patent), *with* Trial Exhibits 281 at EZPZ301225-236; Trial Exhibit 905 at 183-193; Trial Exhibit 583 at 71-82; and Trial Exhibit 582 at 149-159.
[555] Dkt. No. 832 at 352:10-353:6.
[556] Dkt. Nos. 512, 513.
[557] Dkt. No. 832 at 352:10-20.
[558] *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015).
[559] *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004).

multiple patents 'derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.'"[560]

2.    The prosecution history of a patent is part of the "intrinsic evidence" and "consists of the complete record of proceedings before the PTO and includes the prior art cited during the examination of the patent."[561]  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."[562]

3.    One recognized maxim of claim construction is that "claims should be construed to preserve their validity."[563] "[C]laims can only be construed to preserve their validity where the proposed claim construction is 'practicable,' is based on sound claim construction principles, and does not revise or ignore the explicit language of the claims."[564] Moreover, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."[565]

4.    EZPZ failed to disclose the '403 Application to LNC or the Court during the claim construction phase of this litigation, which spanned eleven months between the period July 28, 2017 to June 29, 2018, and during the dispositive motion phase of this litigation.

5.    In accordance with this Court's Scheduling Order, the parties proposed their constructions of certain claim terms and elements of the '903 Patent:[566]

| Term | LNC Proposal | EZPZ Proposal |
|------|--------------|---------------|

---

[560] *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) (quoting *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005)).
[561] *Phillips v. AWH Corp.,* 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc).
[562] *Id.*
[563] *Id.* at 1327.
[564] *Generation II Orthotics Inc. v. Med. Tech. Inc.*, 263 F.3d 1356, 1365 (Fed. Cir. 2001).
[565] *Shire Dev., LLC v. Watson Pharms., Inc.*, 746 F.3d 1326, 1330 (Fed. Cir. 2014).
[566] Trial Exhibits 290 at 11, 15, 19.

| "planar portion"<br>(claims 1, 2, 5 and 9) | "'planar portion' has its plain and ordinary meaning of a flat surface.  A flat surface is one that is not curved." | "a part that includes an area that relates to a plane." |
| --- | --- | --- |
| "an entirely suffuse undersurface"<br>(claim 1) | "a continuous, flat surface, as spread out as with a liquid" | "a continuous undersurface without other separate adhering elements disposed |
| "an undersurface entirely suffuse upon the planar portion"<br>(claims 5 and 9) | "a continuous, flat surface, as spread out as with a liquid" | "an undersurface that is continuous on the planar portion without other |

6.    The '403 Application  sought to add claims to cover LNC's products by including the following language in pending claims 2, 6, 12, and 16: "wherein the *planar portion  is cambered.*"[567] The term "planar portion" also appears in the claims of the '903 Patent, and was a disputed term.

7.    On November 13, 2017, a month after the completion of claim construction briefing before the Magistrate Judge, the Examiner in the '403 Application issued a First Office Action, rejecting on the merits all of the then-pending claims of the '403 Application on multiple grounds.[568] In rejecting dependent claims 2, 6, and 12 under § 112, the Examiner stated the following:

> Regarding claims 2, 6, and 12, if the planar portion is planar, how is it cambered? By definition, Cambered [sic] means arched slightly or curved upward in the middle, and *planar means lying in a plane, or flat.* For the purposes of examination the camber of the planar portion is not understood to be a molded in camber but a curved form the planar portion takes that creates a vacuum when the mat is in use. With this in mind it seems that applicant has omitted functional language from the claims that are needed, to indicate how the planar portion is cambered.[569]

8.    Likewise, in rejecting dependent claim 16 under § 112 as indefinite, the Examiner raised

---

[567] Trial Exhibits 281 at EZPZ301237-242 (emphasis added).
[568] Trial Exhibits 281 at EZPZ301172-181.
[569] Trial Exhibit 281 at EZPZ301175 (emphasis added).

a series of fundamental unresolved questions:

> Regarding claim 16, regarding the limitation "wherein the planar portion is cambered wherein the planar portion splays upon the underlying surface when the mat is positioned upon said…." is the cambered portion related to the "when the mat is positioned" statement? Is the camber somehow caused by the positioning upon the underlying surface? Is the camber formed by the positioning or is it a structurally molded in camber? For purposes of examination the camber is understood to be part of the sealing of the mat.[570]

9.    In addressing the § 112 rejection for dependent claims 3, 7 and 13 involving the recited limitation "wherein the planar portion intermittently contacts the underlying surface," the Examiner noted that this limitation is unclear "since the undersurface of the planar portion **appears to be completely flat in the figures**" and the term "'intermittent' does not appear in the written description.[571]

10.   The Examiner's actions with respect to dependent claims 2, 6, 12, and 16 in the '403 Application support LNC's proposed construction of "planar portion" as flat and not curved argued during the claim construction process.[572] In contrast to LNC's reliance on extrinsic evidence of the proper construction of "planar portion" based on dictionary definitions, the Examiner's comments in the '403 Application represent intrinsic evidence of the proper construction viewed by the Examiner based on the identical written specification and drawings found in the '903 Patent.

11.   In addition, the Examiner objected to the specifications as failing to provide an antecedent basis for claiming "cambered."[573]

12.   Although briefing before the Magistrate Judge had been completed and the matter of

---

[570] Trial Exhibit 281 at EZPZ301176-177.
[571] Trial Exhibit 281 at EZPZ301175-176 (emphasis added).
[572] *Compare* Trial Exhibit 290 at p. 15, *with* Trial Exhibit 281 at EZPZ301175-177.
[573] Trial Exhibits 281 at EZPZ301173.

the proper construction of "planar portion" was still under advisement when the First Office Action issued on November 1, 2017 in the '403 Application (and remained under advisement for 162 days after EZPZ received the First Office Action), EZPZ deprived both LNC and the Court of the USPTO's interpretation of "planar" during claim construction in connection with the prosecution of the related '403 Application.[574]

13. On May 14, 2018 – still without the benefit of the Examiner's construction of "planar portion" rejections in the '403 Application – LNC appealed the Magistrate Judge's Claim Construction Memorandum Ruling objecting to the Magistrate Judge's refusal to consider the extrinsic evidence of the dictionary definition of "planar" as "flat and not curved" and presenting arguments based on both the intrinsic and extrinsic evidence of which LNC was aware at the time.[575] Had LNC been informed about the USPTO's rejection in the '403 Application that included the lack of specification support for "cambered" and the definition applied to "planar portion," it could have relied on this information in its briefing.[576] In opposing LNC's Appeal and despite having knowledge of what was transpiring in the prosecution of the '403 Application, EZPZ persisted in arguing against LNC's assertion that "planar" should be construed as "a flat surface, one that is not curved."[577] Additionally, EZPZ failed to bring the '403 Application to the Court's attention, much less disclose its existence to LNC in response to the outstanding and unsupplemented discovery responses.[578]

---

[574] Dkt. No. 832 at 359:6-13.
[575] Dkt. No. 115 at 12.
[576] Dkt. No. 832 at 359:20-360:18.
[577] Dkt. No. 122 at 11-13.
[578] Dkt. No. 832 at 359:6-13.

### d)  Findings of Fact: EZPZ Repeatedly Blocked LNC's Efforts to Obtain Mrs. Laurain's Prior Art Search

1.   Mrs. Laurain failed to disclose her prior art searches during the course of the litigation, despite LNC's Requests for Production requesting all documents reflecting prior  art searches.[579] These documents were only produced when Clark Hill, Brenda Speer, and Mr. Williams were subpoenaed. None of the Patent Searches performed by Mrs. Laurain were listed on EZPZ's privilege log.

2.   Further, when LNC requested at Mrs. Laurain's May 14, 2018 deposition whether she had a printout of any prior art searches or whether she had maintained a file of her searches, Mrs. Laurain requested definitions of simple words with ordinary and commonly understood meanings (*i.e.,* the word "file,").[580] For example, Mrs. Laurain testified she did not "know what a  file" was and repeatedly asked for LNC's counsel to "show" her what prior art searches he was  referring to.[581] Yet, the evidence at trial establishes that Mrs. Laurain prepared no less than  three versions of her Patent Search documents.[582] The various versions of Mrs. Laurain's Patent  Searches are crucial evidence and reflect that Mrs. Laurain had located Webb and other key prior  art during her initial prior art searches well before the July 17, 2014 filing of the '682 Application.[583] Only when LNC subpoenaed EZPZ's patent attorneys and patent agents did  LNC finally obtain  Mrs. Laurain's various prior art searches.[584] Mrs. Laurain's excuse for failing to produce her prior art searches is that she

---

[579] Trial Exhibit 963 at Request for Production Nos. 200 and 201.
[580] Dkt. No. 826-2 at 203:2-207:5.
[581] *See id.*
[582] Trial Exhibits 3 (Brenda Speer 000168); Trial Exhibit 17 (EZPZ-CH-14856), Trial Exhibit 20 (EZPZ-CH-000131), and 611 (BWILLIAMS001967 at 203).
[583] *See id.*
[584] *See id.*

lost access to her email account during a period of time.[585] She has no explanation, however, for not producing the Word document of the patent search documents. Moreover, as explained below, the Court does not find Mrs. Laurain's excuse to be adequate because it is undisputed that she sent her patent search to various counsel (including counsel of record) and her patent agent[586] and they could have retrieved and produced the patent search from the emails they received even if Mrs. Laurain no longer had the emails she sent.

3. Mrs. Laurain stated in a Shark Tank questionnaire dated January 25, 2015[587] that she had done a patentability search and had documentation of it.[588] However, when LNC's counsel specifically requested these prior art searches on May 29, 2019, EZPZ represented there was "no formal patent search" and all "responsive documents have been produced."[589] At that time, none of the prior art searches that were subsequently produced by Mr. Williams, Clark Hill, or Ms. Speer had been produced by EZPZ.

4. Mrs. Laurain sent her patent search to Mr. Bolton on two separate occasions and to Mr. McCarthy once in May 2014.[590] Importantly, Mr. Bolton and Mr. McCarthy, who were counsel of record for EZPZ from October 31, 2016 until August 22, 2019 were aware of and had the very patent search that LNC was searching for in their possession.[591] Yet, Clark Hill (counsel of record for EZPZ) failed to produce this document or list it on a privilege log until LNC subpoenaed Clark Hill following EZPZ's waiver of the attorney-client and

---

[585] Dkt. No. 833 at 470:7-16.
[586] *See id.*
[587] Although the Shark Tank IP Questionnaire was dated January 25, 2014, Mrs. Laurain admitted this was done in error and should be January 25, 2015. Dkt. No. 833 at 394:7-14.
[588] Trial Exhibit 516 at Shark Tank 00043 ("Yes, I searched a tremendous amount (have documentation) and a registered patent agent also searched – July 2014.").
[589] Trial Exhibit 949.
[590] Trial Exhibit 17; Trial Exhibit 19; Trial Exhibit 20; Trial Exhibit 22.
[591] *See id.*

patent agent privilege.[592]

5.   Mrs. Laurain was unable to explain why she did not produce any of her prior art searches to LNC during fact discovery other than to say she "lost" her email account.[593] Mrs. Laurain was undoubtedly aware that Mr. Williams, Mr. Bolton, and Mr. McCarthy were in possession of her patent searches.[594]

   **e)**  [REMOVED]

1.   [REMOVED]

2.   [REMOVED]

   i.   [REMOVED]

   ii.   [REMOVED]

   iii.   [REMOVED]

   iv.   [REMOVED]

   v.   [REMOVED]

   vi.   [REMOVED]

   vii.   [REMOVED]

   viii.   [REMOVED]

   ix.   [REMOVED]

   x.   [REMOVED]

   xi.   [REMOVED]

   xii.   [REMOVED]

---

[592] *See id.*
[593] Dkt. No. 833 at 470:11-16.
[594] Dkt. No. 833 at 470:11-22.

**f)** **[REMOVED]**

1. [REMOVED]

2. [REMOVED]

3. [REMOVED]

4. [REMOVED]

5. [REMOVED]

6. [REMOVED]

7. [REMOVED]

8. [REMOVED]

**g)** **Findings of Fact: Witnesses Gave Evasive Testimony By Claiming an Inability to Understand Simple Questions and a Lack of Recollection Even With Documents Placed Before Them**

1.    At her June 10, 2020 deposition individually and as EZPZ's Rule 30(b)(6) representative, Ms. Laurain remembered very little that was not in a document placed before her. She uttered the phrase "I don't recall" or a variation thereof many dozens of times.

2.    Mrs. Laurain also testified evasively at trial. Numerous times, Mrs. Laurain refused to answer the question LNC's counsel had asked, requiring both the Court and even her own counsel to instruct her to answer the question that had been asked.[595]

3.    Mr. Bolton, EZPZ's outside general counsel between 2015 and 2016, and an attorney who was involved in the prosecution of the '903 Patent, could not recall virtually anything that occurred during the prosecution of the '903 Patent. In the three hours played from his video deposition taken March 5, 2020, Mr. Bolton responded with "I don't recall,"

---

[595] *See* Dkt. No. 833 at 401:10-11 (by the Court), 408:3 (by the Court), 453:2 (by her own counsel),481:10-21 (by the Court), 482:13-20 (by the Court), 506:1-2 (by the Court); 750:5-10 (by her own counsel).

"I don't know," or some variation thereof, to nearly every question asked of him (nearly 300 times).

4.      When shown emails to refresh his recollection, Mr. Bolton claimed his memory was not refreshed.[596] The Court finds Mr. Bolton's testimony was purposefully evasive, generally dismissive of the contemporaneous documentary evidence, and lacked credibility.[597]

5.      The repeated evasive testimony from these witnesses establishes deceit.[598]

### h) Findings of Fact: Other False or Inconsistent Testimony, and Misrepresentations

1.      [AMENDED] Mrs. Laurain testified that she didn't start a boycott with the social media #boycottnuby campaign.[599] Mrs. Laurain testimony is contradicted by the documentary evidence. On April 25, 2016, Ms. Laurain asked the private EZPZ Facebook group if they should "start a boycott Nuby Group."[600] On April 26, 2016, Ms. Laurain told Robin Cochran that she was "Thinking [they] should start a Boycott Nuby campaign."[601] On April 27, 2016, Mrs. Laurain posted in the EZPZ Private Facebook Group: "I can't deal…Kinda getting serious about a Nuby Boycott?!!!"[602] On April 28, 2016, Mrs. Laurain emailed Mr. Grayson (The Baby Guy) that she was "honestly thinking about starting a Boycott Nuby Campaign."[603] On April 28, 2016, working with Jennifer Chua, Mrs. Laurain helped create the boycott Nuby

---

[596] *See, e.g.*, Dkt. No. 826-3 at 33:20-34:4; 162:9-25; 174:1-4; 177:23-179:3; 260:3-261:12.
[597] *See Gilead Scis., Inc. v. Merck & Co, Inc.*, No. 13-cv-04057-BLF, 2016 U.S. Dist. LEXIS 73595, at *123 (N.D. Cal. June 6, 2016) ("Candor and honesty define the contours of the legal system. When a company allows and supports its own attorney to violate these principles, it shares the consequences of those actions.").
[598] *See Brasseler, USA I, LP v. Stryker Sales Corp.*, 267 F.3d 1370, 1384-85 (Fed. Cir. 2001) (affirming finding of intent to deceive where district court found that witness "tiptoes around the truth" and provided "evasive testimony") (internal quotation marks omitted).
[599] Dkt. No. 833 at 489:23.
[600] Trial Exhibit 137
[601] Trial Exhibit 557
[602] Trial Exhibit 556
[603] Trial Exhibit 152

graphic.[604]

2.    In an effort to downplay the role that Shark Tank had on the product's "commercial success," which Mrs. Laurain and several declarants had told the USPTO was due to the product itself and not due to any advertising or branding, Mrs. Laurain testified that Shark Tank didn't cause a boost in sales.[605] Her testimony, however, is contradicted not only by her own documents showing a spike in sales,[606] but by the testimony of both Jeff Prager, EZPZ's CEO,[607] and Tamara Falcone, EZPZ's COO.[608] Mrs. Laurain also admitted at trial that she had previously told Mr. Williams she had applied to be on Shark Tank and that 20 million consumers would see it,[609] and that getting the utility patent would be "amazing" for "marketshare."[610]

3.    Although Ms. Laurain tried to avoid answering whether Shark Tank was phenomenal for brand recognition, during a prior Inspired Insider interview with Dr. Jeremy Weisz,[611] she admitted Shark Tank was "phenomenal for brand recognition."[612]

4.    The Court finds that in an attempt to downplay the significance of EZPZ's social media marketing strategy, Mrs. Laurain testified that she was not involved in the posting of social media and was not sure whether EZPZ analyzed social media posts to see how many were made and how many people they had reached.[613] Indeed, after Mrs. Laurain had testified, Mrs. Winkelmann identified a November 2015 email she had received from Mrs. Laurain

---

[604] Trial Exhibit 730; Trial Exhibit 555; Trial Exhibit 554. See also Trial Exhibit 163 (Mrs. Laurain asking Ms. Holland, an EZPZ employee, to add "heart ezpz" in "white cursive").
[605] Dkt. No. 833 at 475:24-25.
[606] Trial Exhibit 923 at 6.
[607] Dkt. No. 836 at 1381:17-21.
[608] Dkt. No. 836 at 1541:23-1542:3.
[609] Dkt. No. 833 at 411:11-21
[610] Dkt. No. 833 at 411:22- 412:2; Trial Exhibit 920.
[611] Trial Exhibit 360.
[612] Dkt. No. 833 at 478:19-479:2; Dkt. No. 844 (L-21).
[613] Dkt. No. 833 at 395:4-14.

in which Mrs. Laurain, herself, had stated, "I highlighted some statistics below. Wowza. Tons of impressions and reach via Twitter."[614] In that email, Mrs. Laurain noted with excitement not only that @AngelHepp had liked one of EZPZ's tweets, but also that Tweet impressions had increased from 15.4K in September 2015 to 84.5K in November 2015.[615] The evidence also contains another email dated January 8, 2016 wherein Mrs. Brock reported on social media statistics to the EZPZ team, which included Mrs. Laurain as a recipient.[616]

6.      In May 2018, Laurain testified she had no recollection of how she obtained the declarations or whether she was involved in drafting them.[617] In January 2019, she was able to give a declaration stating: "Williams IP provided ezpz with draft declarations and *other* members of ezpz communicated externally with the third parties about their declaration."[618] However, documents produced following EZPZ's waiver of the attorney-client and patent agent privileges reveal that Mrs. Laurain was significantly involved in the preparation of the declarations submitted to the USPTO in March 2016.[619] Mrs. Laurain worked on several of the declarations herself.[620] In light of her substantial involvement, the Court does not find credible Mrs. Laurain's claimed lack of recollection of her involvement in preparing the declarations as she testified in May 2018, nor does the Court find credible her declaration statement that "other members" of EZPZ, as opposed to Mrs. Laurain, communicated with the declarants.

---

[614] Trial Exhibit 63; *see also* Dkt. No. 836 at 1497:13-20.
[615] Dkt. No. 836 at 1497:21-1498:18; Trial Exhibit 63.
[616] Trial Exhibit 102.
[617] Dkt. No. 345-1 at 285:17-297:8.
[618] Trial Exhibit 312 (emphasis added).
[619] Trial Exhibit 120; Trial Exhibit 570; Trial Exhibit 121; Trial Exhibit 635; Trial Exhibit 695
[620] Trial Exhibit 120; Trial Exhibit 570; Trial Exhibit 121; Trial Exhibit 635; Trial Exhibit 695.

5.    [REMOVED]

    i.    [REMOVED]

    ii.    [REMOVED]

    iii.    [REMOVED]

7.    The repeated false or inconsistent testimony,  and misrepresentations from Mrs. Laurain establishes deceit.[621]

### i)    Conclusions of Law: Unclean Hands

1.    [AMENDED] The Court finds that there is an "immediate and necessary relation" between the unclean hands findings and the dismissed claims. EZPZ's design patent and trade dress infringement claims were pled at the outset,[622] the subject of LNC's written discovery,[623] addressed at depositions[624] and the subject of motion practice.[625] After five years of litigation, EZPZ's conduct with respect to its pursuit of the '903 Patent infringement claim cannot be cordoned off from its conduct with respect to its pursuit of its other claims. For example, the Court's finding that EZPZ knowingly deprived it of important information during claims construction cuts across all claims. The Court's loss of confidence in a party's candor cannot be overcome with respect to other theories of recovery.

2.    [AMENDED] Likewise, in denying LNC's first motion for summary judgment based on unclean hands, the Court found material issues of fact as to whether "Ms. Laurain's conduct is so offensive to the integrity of the court that EZPZ's claim should be denied," and stated that at

---

[621] *See Brasseler, USA I, LP v. Stryker Sales Corp.*, 267 F.3d 1370, 1384-85 (Fed. Cir. 2001) (affirming finding of intent to deceive where district court found that witness "tiptoes around the truth" and provided "evasive testimony") (internal quotation marks omitted).
[622] Dkt. No. 40 at 29, 37, 45, 50.
[623] Trial Exhibit 963 (Request for Production Nos. 144-156 (trade dress) and 17-26 (design patent)).
[624] EZPZ's 30(b)(6) deposition (Dkt. No. 350-2) (discussing EZPZ's trade dress claim).
[625] Dkt. No. 350 (trade dress), Dkt. No. 238 (design patent).

trial it "will have the opportunity to see and hear the witnesses testify and make the necessary evaluation of credibility at that time."[626] At the bench trial, the Court heard evasive, false and misleading testimony and misrepresentations from the mouth of Mrs. Laurain, conduct that is offensive to the integrity of the Court.

3.    [AMENDED] Accordingly, the conduct of EZPZ, Mrs. Laurain, and Mr. Bolton, as documented above, is sufficient to dismiss EZPZ's design patent and trade dress infringement claims, which are necessarily and immediately related to the utility patent infringement claims because they involve the same LNC products, and they seek the same ultimate relief.

4.    The Court finds that the doctrine of unclean hands bars EZPZ's requested relief. Accordingly, EZPZ is not entitled to the relief it seeks and the entirety of its claims are dismissed. In this way, not only will the wrongs be righted, but the public itself will not be subjected to a party who by deceit and reprehensible conduct attempted to gain an unfair advantage.

## III.    CONCLUSION

For the reasons stated above, LNC failed to prove that the '903 Patent is unenforceable due to inequitable conduct under any of its theories. LNC did prove by clear and convincing evidence that EZPZ's Counterclaims should be dismissed under the equitable doctrine of unclean hands. The Court will enter a separate judgment dismissing with prejudice the entirety of EZPZ's remaining Counterclaims. No damages will be awarded to either party.

---

[626] Dkt. No. 488 at 7.

**MONROE, LOUISIANA** this 9th day of June 2022.

_____
**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**